UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED,<br><br>PLAINTIFF,<br><br>-AGAINST-<br><br>MICHAEL MCKENZIE, AMERICAN IMAGE ART, JAMIE THOMAS, AND ROBERT INDIANA,<br><br>DEFENDANTS. | No.:  18 Civ. _____  (___) |

## COMPLAINT

Plaintiff Morgan Art Foundation Limited, by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, brings this action against Defendants Michael McKenzie, American Image Art, Jamie Thomas, and Robert Indiana and for its Complaint alleges as follows.

### NATURE OF THE ACTION

1.     Robert Indiana is a famous American artist.  His iconic *LOVE* image is one of the most recognized artworks in the world:  it graced a U.S. postage stamp in 1973 and the *LOVE* sculpture has been displayed in museums and public spaces around the globe.  But Indiana's good fortune has taken a dark turn.  He is bedridden and infirm.  He cannot create works of art.  He is vulnerable.  And Defendants have exploited him.  They have isolated Indiana from his friends and supporters, forged some of Indiana's most recognizable works, exhibited the fraudulent works in museums, and sold the fraudulent works to unsuspecting collectors for millions of dollars.

2.     In committing their crimes, Michael McKenzie, American Image Art, and Jamie Thomas have defamed the people who could expose the fraud and have violated the copyright and trademark of Morgan Art Foundation Limited—which has been Indiana's patron for more

than two decades and minted his place in art history.  This lawsuit seeks to end Defendants' unlawful conduct and to protect Indiana and his artistic legacy from Defendants' continued exploitation.

3.    Robert Indiana was born in 1928.  His career as an artist skyrocketed in the early 1960s when the famed Museum of Modern Art in New York City acquired two of his works—a painting titled *The American Dream I* and a sculpture titled *Moon*.  His work was subsequently acquired by several leading public and private collections across the United States and Europe.

4.    The year 1964 was a key moment that would mark an even higher level of fame for Robert Indiana:  he created a work depicting four colored letters, L-O-V-E, with the "LO" stacked on the "VE" and the "O" notably tilted outward to the right.   The image, called *LOVE*, went viral.  It originated as a work on paper and was then used by Indiana in paintings and sculpture.  It was published on posters and plastered on commercial products.  It was selected for a Christmas card published by The Museum of Modern Art.  It was translated by Indiana into new original artworks depicting the *LOVE* image in multiple other languages, including Hebrew, Spanish, and Chinese.  It became one of the most recognizable sculptures in the world and was placed in various public spaces, including the well-known "Love Park" in Philadelphia, Pennsylvania.  In 1973, the U.S. Postal Service printed 330 million U.S. postage stamps bearing the *LOVE* image.

5.     Indiana's initial success was short-lived.  He became so deeply associated with *LOVE* that the general public and the art world largely ignored his other works.  In Indiana's own words, "I'm sure all the people who have been born 20 years ago don't know anything about me at all, except 'LOVE.'"  The extensive commercialization and illegal reproductions of *LOVE*, without the artist's consent, also damaged Indiana's brand:  he was associated with everything

from novelty t-shirts to cheap gift store trinkets.  Indiana himself observed, "[r]ip-offs have done a great harm to my own reputation."

6.      By 1978, Indiana was suffering financially, and he retreated from the hub of the art world in New York City to Vinalhaven, Maine.  His home was reachable only by ferry and small-engine plane.  Two decades passed.  His fame subsided.  His artistic accomplishments were mostly forgotten.  His art was not the subject of any major exhibitions or retrospectives. His works were not in high demand.

7.      In the mid-1990s, Morgan Art Foundation Limited and its advisor, Simon Salama-Caro, sought to reverse the course of history for Indiana.  Salama-Caro saw great potential in Indiana's works and believed in Indiana as an artist.  He had a strategy to revive Indiana's career:  years of hard work and investment, strict enforcement of Indiana's rights, and a focus on quality.  Some prominent art dealers disagreed.  They told Salama-Caro that Indiana's market was dead—that Indiana had no future and Salama-Caro should not waste his time on a washed-up artist like Indiana.  But Salama-Caro had the vision and perseverance.  Over the course of several meetings with Indiana in Vinalhaven in the 1990s, Salama-Caro explained his recommendations and strategy.  He told Indiana that he would invest his time and resources trying to salvage Indiana's career.  He said that he would attempt to reduce the wide-scale infringement of Indiana's rights and that he would carefully educate the market and bring to the attention of art historians and museums the importance and quality of Indiana's works.

8.      Indiana agreed with and readily accepted Salama-Caro's recommendations. Morgan Art Foundation and Indiana subsequently memorialized their agreement in two written contracts.  In the first contract, dated April 9, 1999, and made effective as of June 28, 1998, Indiana conveyed to Morgan Art Foundation all "copyright, trademark, and other rights" in

certain images (*LOVE*, *AHAVA*, *AMOR*, *NUMBERS*, and *YALE*) and the art included in two catalogues (the Susan Sheehan print catalogue raisonne and the catalogue from an exhibition held at the Museum of Modern and Contemporary Art in Nice, France), and granted Morgan Art Foundation the exclusive right to reproduce, promote, and sell these images throughout the world.  In exchange, Morgan Art Foundation agreed to pay Indiana 50% of the net income it received from the reproduction, promotion, and sale of these images.  This contract was later amended to extend to all paintings and sculptures conceived by Indiana from 1960 to April 2004, the date of amendment.   In the second contract, dated December 22, 1999, and made effective as of July 27, 1995, Indiana conveyed to Morgan Art Foundation the exclusive right to "produce and fabricate," own, and sell sculptures of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS* (*ONE* through *ZERO*), *ART*, and *2000*.  In exchange, Morgan Art Foundation agreed to pay Indiana 20% of the receipts from the sale of these sculptures.  Under both agreements, Morgan Art Foundation had the right to sue for any infringement of the rights Indiana conveyed.

9.      Morgan Art Foundation then went to work.  On the advice of Salama-Caro, it appointed Artists Rights Society (ARS), a "pre-eminent copyright, licensing, and monitoring organization for visual artists in the United States" located in New York.  Together with ARS, Morgan Art Foundation began enforcing Indiana's rights against copyright infringers.   Morgan Art Foundation successfully removed cheap reproductions and products incorporating Indiana's images from the tchotchke market.  At the same time, ARS granted selective licenses in certain protected works, which enabled Morgan Art Foundation to obtain, for the first time, royalties to be paid to Indiana stemming from the authorized use of his images.  Morgan Art Foundation and Salama-Caro also revived the dialogue on Indiana's work with art historians, museums, and art dealers.   They enabled Indiana to concentrate on creating new works of only the highest caliber,

resulting in a period of great productivity for the artist.  Morgan Art Foundation was diligent and careful.  And in the end, Salama-Caro's strategy worked.  Indiana made a comeback.  He gained recognition once again.  His market revived and his works started selling for significant sums of money.

10.     Twenty years later, in 2013, Indiana finally received the museum attention his works deserved.  The highly regarded Whitney Museum in New York City held the first major retrospective exhibition of Indiana's works called "Robert Indiana: Beyond Love."  The exhibition was curated to demonstrate Indiana's impact beyond *LOVE*.  Indiana commented on this long journey from fame, to obsolescence, and back again:  "I was famous in the '60s.  I'm having this retrospective in 2013. Well, that's taken quite a while."

11.     Five years have passed since the Whitney Museum exhibition.  Indiana's works have continued to sell, and art historical accounts have treated his works with respect.  Leading institutions in the United States and Europe have started once again to acquire major examples of Indiana's artwork through the continuous work of Salama-Caro and his son, Marc Salama-Caro.  But Robert Indiana's health has deteriorated.  He can no longer create art or manage his financial affairs.  And this decline has enabled something sinister to occur.  On May 7, 2016, Indiana signed a power of attorney appointing Jamie L. Thomas, who is a fisherman from Maine with no art expertise that Indiana had employed to run errands and do work around the house.  He was not a friend or acquaintance of Morgan Art Foundation, Salama-Caro, or others who have helped revive and protect Indiana's financial well-being and reputation for the past two decades. Instead, Thomas has deliberately isolated Indiana from Morgan Art Foundation, the Salama-Caro family, and Indiana's other long-time friends and supporters.  He controls and intercepts Indiana's emails and telephone calls.  He refuses to permit visitors to Indiana's home.  He writes

aggressive and threatening emails from Indiana's email account—including an email sent to Marc Salama-Caro shortly after Marc visited Indiana at Indiana's request, telling Marc to "FUCK OFF" and to never return to Vinalhaven.

12.     Thomas's control of information and access to Indiana has allowed his co-conspirators, an art publisher named American Image Art and its founder Michael McKenzie, to exploit Indiana for profit.  Around this time, in 2016, American Image published an edition of derivative artworks, supposedly by Robert Indiana, based on works that are protected under Morgan Art Foundation and Indiana's April 1999 contract.  American Image and McKenzie marketed, exhibited, and sold these works as authentic works by Robert Indiana.  But they aren't. They are forgeries.  The physical works themselves betray this fact:  the quality, known features, and signatures are not consistent with Indiana's authentic works.  The forged works have been exhibited at Bates College Museum of Art in Maine and the Baker Museum in Naples, Florida. They have been offered for sale for six figures at several commercial art galleries.  They have been sold to collectors for equally substantial sums.  Morgan Art Foundation has estimated the total market value of the fraud, based on American Image and McKenzie's quoted prices, as in excess of thirty million dollars.  The forged and inauthentic works have harmed Indiana's market and have once again begun to undermine his reputation.

13.     The 2016 forged works followed a series of other fraudulent images peddled by McKenzie and American Image that were falsely claimed to be authentic Robert Indiana works—including unauthorized reproductions of the *LOVE* image that were exhibited at major art fairs.  Indiana himself has disavowed authorizing or creating such works.  He has even disavowed McKenzie's prolific reproductions of one of the most recognized works in recent years:  an image of *HOPE* styled in the same stacked format as the *LOVE* image that was

produced in 2008 in support of the Obama presidential campaign.  Indiana told the Salama-Caro family and other acquaintances that the *HOPE* works were McKenzie's creation, that McKenzie forced him into approving *HOPE* through emotional abuse and intimidation, that in this sense he "had no hand in" *HOPE*, and that he hadn't even seen several of the sizes and colors McKenzie was creating and exhibiting.  The quality and known features of these fraudulent *HOPE* works are inconsistent with Indiana's authentic works, but are consistent with American Image's other forgeries.

14.     The public narrative surrounding these forged works also reveals the shift from Indiana's voice to the voice of his exploiters.  Indiana, when of sound mind, sought to distance his legacy from the relentless focus on *LOVE*.  He appreciated the work and wanted it to be widely accepted and collected, but he wanted to be respected as an artist for all of his art, not just *LOVE*.  He therefore worked with Morgan Art Foundation and Salama-Caro for decades to move the public consciousness beyond *LOVE* and toward his other significant works.  This culminated in the landmark Whitney Museum retrospective, "Robert Indiana: Beyond Love."  Indiana also disliked the Pop Art label, saying, "I didn't like being identified in that way [as a Pop Artist]," and questioning "[h]ow can you take something like P-O-P seriously?"  He has repeatedly identified his artistic style in interviews as "Hard-Edge" and "not Pop," but noted that "people still get confused and think that I am Pop."  By contrast, McKenzie has fed the media a contrary narrative that Indiana never would have approved, recently telling one newspaper, "On the strength of 'LOVE,'" Indiana survives as "the crown prince of pop in the living genre."  This narrative suits McKenzie and Thomas's short-term profit motives—to sell these infringing works.  But it is harming Indiana's market, and it would never be peddled if Indiana were lucid and in control.

15.     McKenzie and Thomas will stop at nothing to protect the profits they're earning from selling the forged works.  Thomas has written defamatory letters about Morgan Art Foundation and Salama-Caro to third-parties—lying to auction houses that Morgan Art Foundation and the Salama-Caro family have no authority with respect to Indiana or his works, notwithstanding the two contracts and other letter agreements with Indiana stating otherwise.  He has attempted to intimidate Morgan Art Foundation and Salama-Caro from speaking truthfully about Indiana's works—threatening to shut down the website on which Salama-Caro will publish the catalogue raisonne of Indiana's works, because Thomas knows the catalogue will not contain the forged works created by American Image and McKenzie.

16.     This is not the first time that McKenzie has attempted to falsify Indiana's works. In 2008, McKenzie met with Salama-Caro over lunch and proposed that they create silkscreens of Indiana's work on canvas, call them paintings on canvas by Indiana even though they weren't, and sell them to unsuspecting collectors.  McKenzie told Salama-Caro they could make millions of dollars together through this fraud.  Salama-Caro refused.  When McKenzie attempted to bully him into accepting this proposal, Salama-Caro cut short the meeting and left reeling from this disturbing encounter.

17.     Notwithstanding Salama-Caro's resistance, McKenzie's plan has become reality. He and American Image Art have lined their pockets with millions of dollars by peddling fraudulent Indiana works.  They have violated Morgan Art Foundation's copyright and trademark in Indiana's works.  Thomas has conspired with American Image Art and McKenzie and, in furtherance of this scheme, has made defamatory statements about Morgan Art Foundation and the Salama-Caro family in an effort to prevent them from credibly exposing this scheme to the market.  And Thomas's actions as putative power of attorney for Indiana, which

breach his fiduciary obligations to Indiana, constitute breaches of Indiana and Morgan Art Foundation's contracts.

18.     Morgan Art Foundation brings this action to protect Robert Indiana and his legacy and to stop Defendants' scheme.

**PARTIES**

19.     Plaintiff Morgan Art Foundation Limited is a Bahamas limited liability company.

20.     Defendant Michael McKenzie is the principal of Defendant American Image Art. Upon information and belief, he resides at 361 Third Avenue, New York, New York 10016.

21.     Defendant American Image Art is a Delaware corporation that purports to produce "editions" by established artists.  It claims to operate a "production facility capable of printing editions large in numbers as well as massive in scale."  It has offices at 361 Third Avenue, New York, New York 10016 and 171 Goldens Bridge Road, Katonah, New York 10536.

22.     Defendant Jamie L. Thomas is a Maine resident.  Upon information and belief, he resides at 2 Pleasant Street, Vinalhaven, Maine 04863.

23.     Defendant Robert Indiana is an American artist.  He resides at Star of Hope, Vinalhaven, Maine.

**JURISDICTION AND VENUE**

24.     This action arises under the copyright laws of the United States, 17 U.S.C. §§ 101 et seq.  The Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

25.     The Court has personal jurisdiction over American Image Art because its principal place of business is in New York.

26.     The Court has personal jurisdiction over McKenzie because he resides in New York.

27.     The Court has personal jurisdiction over Thomas because he has transacted business in New York.  The Court also has personal jurisdiction over Thomas because he has committed tortious acts in New York.  The Court also has personal jurisdiction over Thomas because he has committed tortious acts outside New York that have caused injury in New York, he expected or reasonably should have expected his acts to have consequences in New York, and he derives substantial revenue from interstate and international commerce.

28.     The Court has personal jurisdiction over Indiana because he consented to the jurisdiction of this Court in the December 22, 1999 agreement.  The Court also has personal jurisdiction over Indiana because he has transacted business and contracted to supply goods or services in New York.

29.     Venue is proper in this District because the December 22, 1999 agreement states that all claims, disputes, and controversies related to or arising under or involving the terms and provisions of the agreement must be resolved in the federal courts located in New York County.

30.     Venue is also proper in this District under 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because a substantial part of the events giving rise to the claims occurred in this District and because, upon information and belief, Defendants may be found in this District and regularly do or solicit business in this District.

FACTUAL ALLEGATIONS

I.      Robert Indiana Created the *LOVE* Image.

31.     Robert Indiana is an American artist born in 1928 in New Castle, Indiana.

32.     In the early 1960s, Indiana's career exploded when the Museum of Modern Art acquired Indiana's painting, *The American Dream I*, and his sculpture, *Moon*.  His fame reached

new heights just a few years later when he created the image called *LOVE* that was featured on the annual Christmas Card published by the Museum of Modern Art in 1965.   The image contained four letters, L-O-V-E, and is depicted here:



33.     The image was an instant success and made Indiana world-famous.   It was made in aluminum and steel as a sculpture by the artist.   Later on, Indiana translated it into Hebrew (AHAVA), Spanish (AMOR), and Chinese (AI).   His first world-renowned *LOVE* sculpture was installed in New York in Central Park in 1971, and in 1976 a *LOVE* sculpture was donated to the City of Philadelphia and installed in a public space that was renamed "Love Park" in honor of the work.

34.     In 1973, the U.S. Postal Service printed *LOVE* on an 8 cent postage stamp.   More than 330 million stamps were printed.   It appeared as follows:



## II.   Robert Indiana's Career Declined, He Suffered Financially, and He Retreated From New York City to Vinalhaven, Maine.

35.   Robert Indiana's initial success was short-lived.  People began ripping off the *LOVE* image without the artist's consent; they made cheap souvenirs and flooded the market with countless commercial products featuring the image.  The endless exposure of *LOVE*, in low-quality forms, stunted Indiana's rising career as an artist.  The art world associated Indiana's art exclusively with *LOVE*, wrongly branded him a "sell-out," and largely ignored his other works.  Indiana himself has negatively commented on the frivolous use of the *LOVE* image in popular culture, noting that he found the misuse of the image "discouraging" and that its ubiquitous low-quality reproduction led to the art world's disapproval and rejection of him as an artist.

36.   The market for Indiana's original works suffered.  Indiana had trouble selling his art for significant prices and, in 1978, he ran into financial trouble.  Indiana lost the lease on his residence in New York City, and he moved to Vinalhaven, Maine—a small island that is accessible only by ferry and small-engine plane.

37.   For the next two decades, Indiana disappeared from the popular consciousness.  His works were not highly regarded.  The demand for his works disappeared.  Many art dealers and scholars regarded him as a one-hit wonder who would never be heard from again.

## III.   Simon Salama-Caro Developed a Strategy to Revive Robert Indiana's Career, and Morgan Art Foundation and Indiana Executed Two Contracts Transferring Rights to Morgan Art Foundation.

38.   Simon Salama-Caro met Robert Indiana in 1988.  He had formed a different view of Indiana's work.  He saw a talented artist who created exceptional works of art—works of quality and importance.  He also saw an opportunity to educate the world about Indiana and revive his career.  Salama-Caro discussed his vision with prominent art dealers.  None agreed.  They told Salama-Caro that Indiana belonged in the dustbin of art history; that his market was

dead and could not be brought back to life.  They told Salama-Caro not to waste his time with Robert Indiana.

39.     Salama-Caro was not dissuaded.  He went directly to Vinalhaven, Maine, to express his views to Indiana.  Over the course of several meetings in the early 1990s, Salama-Caro explained his strategy to Indiana.  He said he would begin enforcing Indiana's intellectual property rights by removing cheap, infringing products from the market.  He would educate the market about Indiana's entire body of works, including their quality and importance.  And he would advise Indiana about how to rebuild and then maintain the market for his art.

40.     Indiana appreciated Salama-Caro's creativity and perseverance.  He authorized Salama-Caro to move forward and asked Salama-Caro to represent him.

41.     In 1991, Salama-Caro's art gallery in London held the first gallery exhibition of Indiana's seminal works since the 1960s.

42.     Because of Salama-Caro's hard work, in 1995, Indiana's dream to fabricate sculptures and complete editions of several works he had conceived of came true.  Morgan Art Foundation agreed to back this ambitious project financially.

43.     In 1999, Indiana and Morgan Art Foundation entered into two agreements to govern their relationship.  On April 9, 1999, Indiana and Morgan Art Foundation entered into a contract (together with any amendments, the "License/IP Agreement") under which Indiana conveyed to Morgan Art Foundation his rights in several works.  The Agreement was made effective as of June 28, 1998, and states:

> I [Robert Indiana] hereby transfer and assign [to Morgan Art Foundation] all of my trademarks, copyrights and all other rights that I now have or may hereafter acquire, including the right to sue for past infringement, in and to the *LOVE*, *AHAVA* (in Hebrew letters), *AMOR*, *Numbers* and *YALE* Images and in and to any and all paintings, sculptures, constructions and other art work,

(hereinafter called the 'Images'), copies of which Images appear in the 1998 Catalogue of my art work prepared for my 1958-1998 Retrospective Exhibition at Museum of Modern and Contemporary Art in Nice, France and/or in the Catalogue Raisonne, 1951-1991, of my prints published by the Susan Sheehan Gallery, New York, except for the image of the *LOVE* postage stamp as illustrated on page 50.

44.     The License/IP Agreement further stated that Indiana's transfer of rights included the "exclusive right throughout the world in perpetuity to reproduce, promote and sell the Images in such forms and sizes, singularly or in any combination, in such manner, at such time, for such price and subject to such terms and conditions as Morgan Art Foundation in its sole discretion shall determine."

45.     Indiana agreed that he would forward all projects regarding the Images to Salama-Caro for "review, discussion, and recommendation," after which "Morgan [Art Foundation] shall negotiate and, enter into an agreement with respect to each such project on such terms and conditions as Morgan [Art Foundation] shall determine."

46.     Indiana warranted that he owned each of the Images, that the rights transferred to Morgan Art Foundation had not been transferred to any third parties, and that Morgan Art Foundation has the authority to prosecute a lawsuit if a dispute arose involving the works. Indiana expressly agreed that he would "render any and all assistance that shall be necessary to protect and defend the rights transferred and assigned to Morgan [Art Foundation] here under."

47.     Indiana agreed that the License/IP Agreement "shall be binding upon and shall inure to the benefit of the undersigned, and their respective successors, assigns, heirs, next of kin and representatives."

48.     In exchange for these transfers, Morgan Art Foundation agreed to pay Indiana 50% of the net income Morgan Art Foundation received from selling the Images.  Morgan Art

Foundation initially agreed to provide Indiana a quarter-annual accounting, but the parties agreed in November 2001 that Morgan Art Foundation would do so annually.

49.     On December 22, 1999, Indiana entered into another contract (the "Sculpture Agreement") with Morgan Art Foundation.  The Sculpture Agreement conveyed to Morgan Art Foundation the right to produce and fabricate sculptures of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS* (*ONE* through *ZERO*), *ART*, and *2000*.  It also granted Morgan Art Foundation the exclusive right to market and sell the sculptures.  Specifically, the Agreement was made effective as of July 27, 1995, and states:

> I [Robert Indiana] hereby authorize, permit and grant to [Morgan Art Foundation] the exclusive right, in perpetuity, to produce and fabricate the LOVE sculptures, the AHAVA sculptures, the AMOR sculptures, the Numbers sculptures (One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Zero), the ART sculptures and the 2000 sculptures (the "Sculptures") in the colors, dimensions and edition sizes set forth [in the attached schedule] . . . .

50.     Indiana further agreed that "Morgan [Art Foundation] shall have the exclusive right throughout the world, in perpetuity, to promote and sell the Sculptures in such manner, at such time, for such price and subject to such terms and conditions as Morgan in its sole discretion shall determine."

51.     Indiana agreed that he would not authorize any party other than Morgan Art Foundation to fabricate the Sculptures, that the rights transferred to Morgan Art Foundation had not been transferred to any third parties, and that Morgan Art Foundation has the authority to prosecute a lawsuit if a dispute arose involving the Sculptures.  Indiana expressly agreed that he would "render any and all assistance that shall be necessary to protect and defend the rights granted to Morgan [Art Foundation] hereunder."

52.     Indiana agreed that "Morgan's exclusive authority to fabricate the Sculptures shall continue in perpetuity without interruption or abatement when I am no longer living" and that

"[t]his Agreement shall be binding upon and shall inure to the benefit of the undersigned and their respective successors, assigns, heirs, next of kin and representatives."  In exchange, Morgan Art Foundation initially agreed to pay Indiana a sum equal to 20% of the receipts from the sale of the Sculptures, with the accounting to be provided on an annual basis.  The parties then agreed in January 2000 that Morgan Art Foundation would pay Indiana 20% of the "net income received by Morgan Art Foundation from the sale of the sculptures after deduction of Permissible Deductible Expenses as listed in the April 9, 1999 Agreement."

53.     Indiana and Morgan also executed separate Bills of Sale dated December 22, 1999, in connection with the License/IP Agreement and Sculpture Agreement.  Through these Bills of Sale, Indiana conveyed and sold to Morgan Art Foundation certain works and the sculptures that had been or would be fabricated of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS (ONE* through *ZERO)*, *ART,* and *2000*.  Indiana agreed to "warrant and defend the sale" of these works, as well as the rights conveyed to Morgan Art Foundation in the License/IP Agreement and Sculpture Agreement, "against all and every person and persons whomever."

54.     In September 2000, Indiana acknowledged, in writing, that "Simon Salama-Caro is my exclusive agent and has my full authority to deal on all matters regarding the AHAVA sculpture."

55.     On July 12, 2001, Indiana agreed, in writing, to "irrevocably grant unto Morgan Art Foundation Limited, the exclusive right and authority throughout the term of the [Sculpture Agreement] to execute on behalf of [Indiana], Certificates of Authenticity of and for the artwork described in said Agreement."

### IV.   Morgan Art Foundation and Simon Salama-Caro Revive Robert Indiana's Career, Restoring His Place in Art History and His Financial Security.

56.     After Morgan Art Foundation and Indiana executed the 1999 agreements, Salama-Caro and Indiana agreed that he should undertake even broader responsibility for preserving Indiana's legacy and market.

57.     In September 2000, Indiana confirmed to Salama-Caro in writing that, "as my exclusive agent, [you have] my full authority to represent me in the search for a gallery in New York and to deal on all matters regarding an exhibition at such gallery."

58.     In August 2003, Indiana confirmed that "Simon Salama-Caro is currently working on the Catalogue Raisonne of my work to be published by the Whitney Museum of American Art.  In this capacity he will authenticate my works whenever necessary."  He reiterated this agreement in December 2006, when he wrote to Salama-Caro that, "[t]his is to confirm that we have agreed that you are responsible for the preparation of the Catalogue Raisonne of my complete oeuvre."

59.     During this time, and in the eight years that preceded the memorialization of the 1999 agreements, Salama-Caro invested countless hours and significant resources reviving Indiana's career.  He championed Indiana's work.  He revived the dialogue with art historians and educated the market about the quality of Indiana's works.  He introduced Indiana's work to important galleries and contacted art dealers who had previously shown Indiana's work in the 1960s and 1970s but had since lost interest.  Together with ARS and Morgan Art Foundation, he helped enforce the rights Indiana conveyed to Morgan Art Foundation by removing unauthorized reproductions of Indiana's works from the market.   His hard work paid off.  By 1998, Salama-Caro had obtained and helped organize the first museum retrospective of Indiana's works in Nice, France, at the Museum of Modern and Contemporary Art.

60.     Simon Salama-Caro's relentless enthusiasm convinced galleries, museums, and cities around the world to exhibit Indiana's work.  In 2002, Salama-Caro, as Indiana's exclusive agent, engaged two prominent New York art galleries to represent Indiana.  Two concurrent gallery exhibitions took place, together with the installation on Park Avenue in New York City of Indiana's *NUMBERS* sculptures, which featured monumental fabrications in aluminum of the numbers *ONE*, *TWO*, *THREE*, *FOUR*, *FIVE*, *SIX*, *SEVEN*, *EIGHT*, *NINE*, and *ZERO*.  These two exhibitions and the sculpture installation resulted in the publication of three meaningful catalogues that celebrated Indiana's return to the New York art scene after a three decade absence.  The success of the *NUMBERS* installation led to even more publicity and exhibitions for Indiana's work in galleries and museums.  Throughout this time, Morgan Art Foundation's support, both financially and as a lender of major artworks, was crucial to creating the high-quality exhibitions of Indiana's works that led to this critical success.

61.     In 2003 and April 2004, with Salama-Caro's assistance, Indiana's works were exhibited in two major shows at a prominent New York art gallery, which became a significant supporter and dealer of Indiana's art.  In April 2004, Indiana traveled to New York for the opening of the second exhibition.  At that time, Indiana and Salama-Caro were discussing Indiana's vision to produce the paintings shown in the exhibition—the "Peace Paintings" series created by Indiana in reaction to the events of September 11, 2001—in print or poster format for wider distribution to the general public.  He also wanted to ensure Morgan Art Foundation had standing to protect the rights in other images not covered by the parties' earlier agreements.  In contemplation of this proposed project, and in order to safeguard the vision and work that Morgan Art Foundation and Salama-Caro had successfully been pursuing with respect to Indiana's art on his behalf, Morgan Art Foundation and Indiana entered into an amendment of

18

the License/IP Agreement.  This amendment, signed in April 2004 by Indiana, extended the terms of the License/IP Agreement to all paintings and sculptures conceived by Indiana from 1960 through the date of the amendment (together with the Images in the April 1999 contract, the "Images"), thereby granting Morgan Art Foundation the same rights in each of these works and providing for payment to Indiana on the same terms as set forth in the License/IP Agreement.

62.     From 2002 to 2008, Salama-Caro and Morgan Art Foundation continued to work closely with leading galleries within the United States, Europe, and Asia to promote and display Indiana's works, as set forth in the various agreements between Indiana and Morgan Art Foundation.  They reestablished control over Indiana's image and brand and implemented high quality standards for Indiana's works by continuing to eradicate unauthorized commercial reproductions of Indiana's images and by carefully monitoring any approaches by potential licensees or others seeking to exploit Indiana's works.  As the market began to recognize and appreciate the quality of Indiana's works and the way that Indiana's career was being managed, the demand for Indiana's work skyrocketed and price levels in galleries and at auction increased more than ten-fold.

63.     As a result of Salama-Caro and Morgan Art Foundation's careful efforts, Indiana made a spectacular comeback and the art market for Indiana's work increased dramatically from 2004 through 2008.

**V.      American Image Art and Michael McKenzie Begin Creating Low Quality Works, and Defendants Conspire to Isolate Robert Indiana From His Friends and Supporters and Sell Forged Art.**

64.     Around 2008, everything was going smoothly for Indiana.  His market was rejuvenated; the art world was again recognizing the quality of his works.  That all would begin to change when American Image and McKenzie arrived on the scene.

65.     On the occasion of Indiana's 80th birthday on September 13, 2008, Indiana invited Salama-Caro to visit his sculpture studio.  Indiana told Salama-Caro that he wanted to show him something.  When he arrived at the studio, Salama-Caro noticed that the studio was filled with about 10-15 silkscreen prints on canvas in different sizes and colors depicting the four letters, H-O-P-E, that were arranged in the same way as *LOVE*, with the "HO" stacked on top of the "PE."  This was the first time that Simon Salama-Caro had seen or heard of these works. When Salama-Caro asked Indiana about these works, Indiana explained that they were Michael McKenzie's work.

66.     Indiana told Salama-Caro that McKenzie was creating art and trying to convince Indiana that these were his new paintings (even though Indiana was not creating them and they were not paintings), and that McKenzie didn't know how to market these works.

67.     Indiana asked Salama-Caro if he would meet with McKenzie.  Salama-Caro had met twice with McKenzie before, in 1994 and 1999, and both times McKenzie had told Salama-Caro he wanted to mass reproduce *LOVE* artworks and sell them worldwide.  On both occasions, Salama-Caro was troubled by McKenzie's reckless proposal, and he had no interest in meeting with McKenzie again.  Out of respect for Indiana, however, Salama-Caro agreed to meet with McKenzie in New York.

68.     Salama-Caro met with McKenzie the next month, October 2008, over lunch in New York City.  At the meeting, McKenzie asked Salama-Caro to include the silkscreen prints of the *HOPE* images in the Catalogue Raisonne of Indiana's oeuvre—but as *paintings*.  He told Salama-Caro, "with the gallery network that you have created for Bob's work and your power as the author of the Catalogue Raisonne, we could make tens of millions together.  I couldn't care less about Indiana, as a matter of fact I despise him."

69.     McKenzie's unorthodox words and proposal were highly disturbing to Salama-Caro.  The *HOPE* works were not paintings on canvas; they were prints.  It was not clear to Salama-Caro that they were even Indiana's works, rather than fabrications by McKenzie forced on Indiana.  McKenzie's proposal to misrepresent these facts to collectors and improperly increase their value by including them in the Catalogue Raisonne of paintings was unacceptable to Salama-Caro.  Salama-Caro rejected McKenzie's proposal outright.  When McKenzie tried to bully Salama-Caro into accepting the works as paintings to be listed in the Catalogue Raisonne, Salama-Caro cut the lunch short.  He requested the bill, paid, and left the restaurant.

70.     Salama-Caro's suspicions about the inauthenticity of the *HOPE* prints were borne out over the next several years—notwithstanding the prominence that the image gained from its highly publicized association with the 2008 Obama presidential campaign.  Two years after Salama-Caro first discussed the *HOPE* "paintings" with Indiana and McKenzie, another of Salama-Caro's contacts also approached Indiana with concerns about the *HOPE* works.  Indiana confirmed that he "had no hand in *HOPE*"—in other words, McKenzie was creating the works, not Indiana, and then forcing them on Indiana through emotional abuse and intimidation.

71.     Following the commercial success of the *HOPE* prints, American Image and McKenzie continued to flood the market with poorly made, often unauthorized Indiana works between 2009 and 2013.  The high production of low quality works damaged Indiana's market, which started to decline.  A number of important art dealers informed Salama-Caro that these low-quality works were damaging Indiana's market and his standing in the art world.

72.     In 2009, Salama-Caro visited Michael McKenzie's studio in upstate New York and saw some of the low-quality works produced by McKenzie and attributed to Indiana.

McKenzie reiterated in his abusive language how he despised the artist but saw an opportunity to make millions.

73.     In November 2012, Salama-Caro and his son Marc Salama-Caro (who worked with Simon Salama-Caro) visited Indiana in Vinalhaven.  Indiana showed them a new catalogue of an exhibition taking place in Venice at the Contini gallery, which was showing works produced by McKenzie.  Indiana specifically pointed out an illustration contained in that catalogue of the *LOVE* image rendered in red and gold and screen printed on a 26 x 26 x 2-inch aluminum panel.  Indiana asked Salama-Caro and Marc Salama-Caro to investigate that work, expressing concern that he had never seen that work before and had not created or authorized it.

74.     Based on Indiana's request, on April 22, 2013, Simon and Marc Salama-Caro again met with McKenzie at Simon Salama-Caro's office.  They asked McKenzie for information about the *LOVE* images that had been screen printed onto aluminum panels—the ones Indiana had disavowed and asked them to investigate.  McKenzie gave a suspicious explanation to Simon Salama-Caro.  When Simon Salama-Caro questioned the explanation, McKenzie abruptly ended the meeting and left.

75.     The evidence of McKenzie's fraud and his mistreatment of Indiana continued to mount as years went by.  On May 7, 2013, Indiana again expressed concern about McKenzie to Marc Salama-Caro.  Indiana told Marc Salama-Caro that he was scheduled to meet with McKenzie the next day, but that he was very distressed about the prospect of meeting with McKenzie.  Robert Gore, Chairman of Morgan Art Foundation, was notified and immediately raised his concerns directly to Indiana in writing the next day, saying, "Marc Salama-Caro called me earlier today to say how upset and worried he is to see you so distressed at the prospect of Michael McKenzie's visit to you today. I want you to know that you have my support and I am

asking you not to sign any work or agreement brought to you by Michael McKenzie which is in violation of our agreements with you."

76.    In the wake of McKenzie's misconduct, Simon and Marc Salama-Caro fought hard to preserve Indiana's legacy.  During the fall of 2012 and in 2013, Simon and Marc Salama-Caro worked tirelessly and successfully with the Whitney Museum in New York City to produce a major retrospective exhibition of Indiana's works.  The retrospective was called, "Robert Indiana: Beyond Love."  The exhibition and accompanying scholarly publication created a new major platform for re-appraisal of Indiana's work at an institutional level.

77.    Indiana had been waiting for this moment his entire career.  In an interview with the New York Times related to the retrospective's opening, he explained, "I was famous in the '60s.  I'm having this retrospective in 2013. Well, that's taken quite a while." The Whitney Museum retrospective received stellar reviews from significant media publications, including The New York Times, The Wall Street Journal, and The Washington Post, and it graced the cover of a leading art magazine.

78.    Morgan Art Foundation's and the Salama-Caro family's dedication to Indiana's work and legacy made this exhibition possible.  As one of the Whitney Museum's most significant benefactors wrote to Indiana after the exhibition, "I also want to tell you about Simon. He did an unbelievable presentation of your work to two directors and never gave up on the idea that the Whitney should do a major retrospective.  It was through his perseverance and belief in you that the show finally happened.  I was happy to do what I could but he was the guiding force."  The curator of the Whitney Museum retrospective wrote in her acknowledgements that "[n]o Indiana project can be realized at the highest degree of quality without the cooperation of Simon Salama-Caro, Indiana's longtime agent."

23

79.     The Whitney Museum exhibition should have been yet another catalyst for Indiana's market.  But American Image and McKenzie continued to debase the market.  They published even more low-quality works, many of which infringed Morgan Art Foundation's rights under the 1999 agreements. American Image and McKenzie also published a catalogue that purported to illustrate works covered by the 1999 agreements between Indiana and Morgan Art Foundation that contained no copyright or other credit information and infringed on Morgan Art Foundation's rights.  The catalogue included text falsely attributed to Indiana that was in fact written by McKenzie and, generally, was inconsistent with Indiana's voice.

80.     On February 27, 2014, Marc Salama-Caro traveled to Vinalhaven to discuss his concerns about McKenzie directly with Indiana.  At this meeting, Indiana again complained about McKenzie—saying he was a loose cannon, out of control, and that Indiana was afraid of him.  Indiana said that McKenzie "does things without even asking him [Indiana]" and that "Michael doesn't even ask for permission"—including by making unauthorized works and falsely representing them to be Indiana originals.  Marc Salama-Caro told Indiana that he had seen a work named *CHAI*, which is the Hebrew word for life, at the Art Miami fair in December 2013.  Although Indiana may at some point have seen graphic renditions of certain *CHAI* works, he made clear to Marc Salama-Caro that he did not authorize, and in some cases had never seen, the *CHAI* works that McKenzie was creating and exhibiting without his approval.  In a recorded exchange, Marc Salama-Caro asked Indiana directly, "And you say you've never seen one." Indiana replied, "No, no."  Marc asked Indiana, "And you never authorized that, no?"  Indiana confirmed: "No.  I don't like it."  Indiana then implored, "How do we restrain Michael? Help me. How does one restrain Michael? He's beyond me. . . .  He's mischievous."

81.     Marc Salama-Caro then asked about the *HOPE* sculpture, inquiring, "Have you seen all of the colors he's [Michael] done of the *HOPE* sculpture," to which Indiana replied, "I don't know.  Tell me what they are?"  When Marc informed Indiana that he had seen a blue and violet sculpture being exhibited for sale, Indiana confirmed, "Well let me say, I haven't seen it." Although Indiana might have approved certain *HOPE* works in certain colors, he expressly stated that he did not create the widespread forgeries McKenzie was producing and exhibiting.

82.     As a result of this conversation, Marc Salama-Caro again visited Indiana on May 20, 2014.  At the meeting, Indiana provided Marc with a letter dated May 20, 2014, and signed by Indiana that depicted a rendering of *LOVE* screen printed on an aluminum panel, in which Indiana stated, "[t]his [*LOVE*] artwork as illustrated above and in any other color combination has never been authorised by me."  Marc left a copy of the letter with Indiana.

83.     Not only were these *LOVE* works fraudulent, but they infringed on the rights granted to Morgan Art Foundation in the 1999 agreements.  These unauthorized *LOVE* works that Indiana disavowed in his letter had been and were being exhibited and sold in the United States, United Kingdom, and Italy by galleries used by American Image and McKenzie.

84.     In the immediate aftermath of the May 20, 2014 meeting, Jamie Thomas, a local fisherman who Indiana had been increasingly relying on to run errands and perform work around the property, began aggressively attempting to isolate Indiana from his friends and supporters. Two days after the meeting, Marc Salama-Caro received two threatening emails from Indiana's email account.  It is clear Indiana did not write these emails, both because Indiana was no longer using his email account at that time—Thomas was—and because of the friendly and supportive meeting Marc Salama-Caro and Indiana just had together.  Indeed, these words, just like the forged works created by McKenzie and his conspirators, were highly uncharacteristic of Indiana;

in the twenty-year relationship between Indiana and the Salama-Caro family, Indiana had never before spoken to the family using such crude, expletive language.  The first email, falsely sent under Indiana's name, said, "FUCK YOU DO NOT COME BACK YOU ARE NOT WELCOME.  YOU FUCKING PRICK."  Five minutes later, Thomas wrote again, falsely under Indiana's name, "DO you speak English.  I told you to leave.  Fuck someone else.  You are a crook."  It was apparent from these emails that Thomas realized he needed to keep visitors away from Indiana—else his scheme with American Image and McKenzie to forge Indiana's works and control Indiana's business affairs would be exposed.  Upon information and belief, before Thomas sent these emails, he had seen a copy of the letter Marc Salama-Caro left with Indiana, in which Indiana disavowed an unauthorized *LOVE* work.

85.    Four days later, on May 25, 2014, Thomas sent another email from Indiana's account.  It had the subject heading "New Way of Doing Things" and was signed, "Staff, Robert Indiana Estate."  Thomas wrote, "Message, going out to all concerned.  Mr. Robert Indiana is not feeling up to snuff these days.  [S]o from now on, if persons want to see Bob in person for ANY reason, one must have prior permission.  In other words if you call or email that you are on your way to see Mr. Indiana, [i]t will be a wasted trip if you have not been told personally that it is fine to come.  To[o] many people have just come without prior permission.  Thank you for respecting his privacy."  It was no coincidence that Thomas sent the email just days after Morgan Art Foundation was on the verge of definitively uncovering Defendants' scheme.

86.    Access to Indiana changed even more dramatically following the death in mid-2015 of Valerie Morton, who was Indiana's long-time assistant and co-executor of Indiana's will, and Thomas continued increasingly to isolate Indiana over the following years.  Indiana's friends and supporters repeatedly wrote to Indiana seeking to schedule a visit.  Thomas's stock

response was to refuse these visits.  Indeed, while Marc Salama-Caro had continued to visit Indiana several times between the fall of 2014 and the summer of 2015, Thomas began refusing to permit him to visit throughout 2016.  On June 17, 2016, Thomas wrote to Marc Salama-Caro saying, "We seem to be having a problem with communication.  BOB IS NOT UP FOR ANY VISITS.  I will let you know when he wants visitors.  Please respect this."  Thomas signed this email, for the first time, as purported Power of Attorney for Robert Indiana.

87.    On December 16, 2015, Marc Salama-Caro again tried to visit Indiana, and Thomas refused Marc access to Indiana.  Similarly, a renowned American art historian, who was a longtime Indiana friend and scholar, tried to visit Indiana in July 2016 and was refused by Thomas.  Thomas wrote that "Bob is not up for many visits right now."  The art historian forwarded Thomas's message to Marc Salama-Caro, commenting, "Big surprise.  I wonder whether he even showed Bob my message."

88.    On October 30, 2016, Simon Salama-Caro wrote to Indiana to inform him of a forthcoming visit by the Deputy Director of the Albright-Knox Art Gallery, a modern and contemporary art museum in Buffalo, New York.  The museum was preparing a major exhibition of Indiana's works to open in Summer 2018, and the Deputy Director wanted to meet Indiana and interview him in connection with the exhibition.  Simon Salama-Caro knew that Indiana was fond of the museum and would welcome the visit.  But Salama-Caro again received Thomas's stock response, "Bob is not up for any visits.  If he changes his mind you will be informed."

89.    Thomas also prevented Indiana from answering his phone.  Marc Salama-Caro, who had spoken to Indiana many times before on the phone, attempted to reach Indiana by phone on several occasions.  Indiana never answered—only Thomas.  Marc understood that the phone calls had been transferred from Indiana's phone number to Thomas's phone.  Thomas refused to

let Marc Salama-Caro speak with Indiana.  For example, Marc Salama-Caro called Indiana in December 2016, and Thomas answered the phone.  Marc mentioned that Indiana had asked him to visit the last time they spoke.  Thomas responded, "I just do what I am told."  Marc then asked if he could visit Indiana, and Thomas hung up the phone.  Marc called back, but Thomas refused to answer.

       **VI.**    **American Image Infringes Morgan Art Foundation's Rights, and Thomas Attempts to Shut Down Disagreement by Defaming Morgan Art Foundation and Salama-Caro.**

      90.    As Thomas successfully isolated and manipulated Indiana, American Image and McKenzie continued to pump out forged works.  The market continued to fall as a result, and collectors continued expressing concern about McKenzie.

      91.    In November 2014, a collector emailed the Catalogue Raisonne office that Simon Salama-Caro had established (RI Catalogue Raisonne LLC) looking for help regarding a purported Robert Indiana work he had recently purchased at the Park Avenue Armory Antique Show.  Upon information and belief, McKenzie created the work.  The collector had developed concerns about the work's authenticity and emailed the seller and Rosenbaum Fine Art, a gallery McKenzie uses to push his works into the market.  That email said, "I purchased the Robert Indiana Summer Hope Rainbow, oil on canvas 36x36 . . . for $110,000.  I have repeatedly requested a certificate of authenticity and an archive number from Howard Brassner for the past 6 weeks; to no avail.  He is blaming your gallery, Rosenbaum Fine Art, for not providing the documentation.  Recently, I had several experts examine the painting.  They believe it is a copy of the original and basically a fake for the following reasons:  1) The signature is not typical of Indiana 2) there is no archive number stamped on the piece and 3) the mounting is not typical of Indiana."

92.     In 2016, American Image published a new group of works that further confused the market.  The works—called the "Dylan" works—depicted images from original Indiana works, the rights to which Indiana conveyed to Morgan Art Foundation in the License/IP Agreement, with one exception:  American Image screened lyrics from Bob Dylan songs around the outside of the works.  American Image also infringed Morgan Art Foundation's trademark in *LOVE*.

93.     The following side-by-side comparisons show the original works (the rights to which are owned by Morgan Art Foundation), the source of the rights granted to Morgan Art Foundation and/or the images' location in the catalogues referenced in the April 1999 contract between Morgan Art Foundation and Indiana,[1] and examples of the infringing works created by American Image and McKenzie:

---

[1]  For ease of reference, the "1998 Catalogue of my art work prepared for my 1958-1009 Retrospective Exhibition at Museum of Modern and Contemporary Art in Nice, France" will be referred to as the "Nice Catalogue," and the "Catalogue Raisonne, 1951-1991, of my prints published by the Susan Sheehan Gallery, New York" will be referred to as the "Sheehan Catalogue."

**ORIGINAL**                                        **INFRINGEMENT**




1. *LOVE*, 1966, oil on canvas, 72 x 72
inches. Indianapolis Museum of Art, Indiana

*Rights transferred in April 1999 contract*

ORIGINAL

INFRINGEMENT




2. *The American Dream I*, 1961, oil on canvas, 72 x 60 1/8 inches. Museum of Modern Art, New York

*Located in Nice Catalogue at p. 153; print image located in Sheehan Catalogue at p. 43*

ORIGINAL                                    INFRINGEMENT



3. *The Black Diamond American Dream #2*,
1962, oil on canvas, 85 x 85 inches.
(Diamond). Museu Colecção Berardo,
Lisbon, Portugal.

*Located in Nice Catalogue at p. 177; print
image located in Sheehan Catalogue at p. 71*

**ORIGINAL**                                   **INFRINGEMENT**



4. *The Red Diamond American Dream #3*,
1962, oil on canvas, Overall: 102 x 102
inches. Van Abbemuseum, Eindhoven, The
Netherlands.

*Located in Nice Catalogue at p. 179*

**ORIGINAL**                              **INFRINGEMENT**

 

5. *The Beware-Danger American Dream #4*,
1963, oil on canvas, Overall: 102.25 x
102.25 inches. Hirshhorn Museum and
Sculpture Garden, Smithsonian Institution,
Washington, D.C.

*Located in Nice Catalogue at p. 191*

ORIGINAL

INFRINGEMENT





6. *The Sixth American Dream (USA 666)*, 1964–66, oil on canvas, fine panels, each 36 x 36 inches. Private collection.

*Located in Nice Catalogue at p. 201; print image located in Sheehan Catalogue at p. 45*

ORIGINAL

INFRINGEMENT

 



7. *The New Glory Penny*, 1963, oil on canvas, each panel: 24 x 24 inches. Private collection.

*Rights transferred in April 2004 amendment; print image located in Sheehan Catalogue at p. 22*

35

**ORIGINAL**                                    **INFRINGEMENT**

          

8. *The Black Yield Brother III*, 1963–64, oil
on canvas, 85 x 85 inches, (Diamond).
Private collection.

*Rights transferred in April 2004 amendment*

ORIGINAL                                           INFRINGEMENTS





9. *US 66 (States) and US 66 (Cities)*, 2002,
oil on canvas, each panel: 101.5 x 101.5
inches. Private collection.

*Rights transferred in April 2004 amendment*



37

**ORIGINAL**                                    **INFRINGEMENT**

          

10. *The Ninth American Dream*, 2001, oil on
canvas, nine panels, overall: 153 x 153
inches. Private collection.

*Rights transferred in April 2004 amendment*

**ORIGINAL**                    **INFRINGEMENT**



11. *USA FUN*, 1964–65, oil on canvas, 51 x
51 inches. Private collection.

*Rights transferred in April 2004 amendment*

**ORIGINAL**                          **INFRINGEMENT**

  

12. *Peace Escapes Once Again*, 2003, oil on canvas, 50.5 x 50 inches (Diamond). Private collection.

*Rights transferred in April 2004 amendment*

**ORIGINAL**                          **INFRINGEMENT**

  

13. *The Electric EAT sign* installed at the 1964 World's Fair. Collection of the artist. On loan to the Farnsworth Museum.

*Located in Nice Catalogue at p. 89*

94.    Several of these works were exhibited at Bates College Museum of Art in Maine (Summer 2016) and The Baker Museum in Naples, Florida (Fall 2016 - Winter 2017).  When ARS put The Baker Museum director on notice that Morgan Art Foundation, not Indiana, owned the copyrights and trademark (where applicable) to these works, the Museum told ARS that it had been informed by Indiana's "long time publisher" that Indiana owned the copyright, not Morgan Art Foundation.  Upon information and belief, American Image is the longtime publisher the Museum referenced, and McKenzie made this false statement to the Museum.

95.    Art historians and critics expressed grave concern about the authenticity and effect on Indiana's legacy of the infringing fraudulent works.  One renowned American art historian and longtime Indiana scholar visited The Bates Museum exhibition of purported Indiana works and wrote to Marc Salama-Caro on June 17, 2016, " I stopped at the Bates College Museum of Art to see the 'Indiana' show they have just opened. It's all Michael McKenzie, including the 'school of' Alphabet paintings we saw in the lower studio last summer. Mostly ghastly and embarrassing stuff, a few good ideas but all ghosts of the real thing….a shame."

96.    Collectors also expressed concern about the authenticity of these works.  In August 2017, one collector emailed the Catalogue Raisonne office set up by Simon Salama-Caro, with Indiana's agreement, stating, "It has come to our attention that these works may not have been approved by the Robert Indiana Foundation to be produced, and are not authenticated. Please let us know any information that would pertain to the Baker Museum Works.  I believe the works were produced by American Image Art."

97.    On June 6, 2017, Simon and Marc Salama-Caro traveled to Portland, Maine, to meet with the Director of The Portland Museum.  The next day, June 7, Simon met with the

Chief Curator of The Farnsworth, while Marc Salama-Caro took the ferry to Vinalhaven, hoping to be able to visit Indiana.  When Marc landed at Vinalhaven, he saw one of Indiana's assistants. As they walked together to Indiana's home, the assistant told Marc Salama-Caro disturbing tales of Thomas's and McKenzie's behavior toward Indiana.  The assistant confided to Marc that Thomas and McKenzie were "in cahoots" with each other and that Thomas had changed the password to Indiana's email account and forwarded Indiana's email correspondence to McKenzie.  The assistant also relayed two instances in the prior months when McKenzie had arrived at Indiana's home in a truck loaded with prints of purported Indiana works.  In both instances, Indiana had refused to sign the prints.

98.     Upon arrival at Indiana's home, the assistant asked Indiana if he wished to see Marc Salama-Caro, and when Indiana confirmed that he did, he welcomed Marc inside.  It was apparent that Thomas was not present at the home.  Indiana spoke highly of Simon and told Marc he had wanted Simon to visit him—contrary to the stonewalling emails Thomas had sent to the Salama-Caro family.

99.     Marc left the visit and informed Simon Salama-Caro of Indiana's request. Concerned about Indiana's health and wishing to see him, Simon Salama-Caro wrote Indiana's longtime personal lawyer about Indiana's request for a visit.  The letter was forwarded to Thomas, whose lawyer informed Salama-Caro that Indiana was not interested in having visitors, just as Thomas had falsely stated before.

100.     Defendants' scheme to isolate Indiana, obscure the true authenticity and ownership of his works, and reap the profits from selling unauthorized and forged works has only escalated since and continues to this day.  In March 2018, Thomas began a letter-writing campaign designed to further damage Morgan Art Foundation's and the Salama-Caro family's

credibility and business, and thereby to undermine their ability to expose Defendants' scheme. He wrote letters to three major auction houses—Christie's, Phillips, and Sotheby's—falsely stating that Morgan Art Foundation and the Salama-Caro family did not represent Indiana or his works, had no authority to authenticate Indiana's works, and had no authority to create a Catalogue Raisonne.  He also stated that all inquiries regarding Indiana's works must be referred to Thomas.

101.    Thomas's statements were false.  Indiana specifically agreed that Salama-Caro had authority to authenticate Indiana's works.  Indiana had also agreed that Salama-Caro had authority to create a Catalogue Raisonne of Indiana's works.  Further, under Morgan Art Foundation and Indiana's written contracts, Morgan Art Foundation was granted exclusive rights with respect to several Indiana artworks.  Thomas's letter was intended to wrest even more control over Indiana's business affairs in order to continue profiting from Defendants' scheme.

102.    Also in March 2018, Thomas wrote a letter to CyberCity, the host for the RobertIndiana.com website that one of Salama-Caro's companies maintains.  Thomas falsely stated that Robert Indiana owned the website.  He demanded that all material related to the website, including the domain name itself, be turned over to Indiana.  In fact, however, Salama-Caro had been maintaining the website for educational purposes—to benefit Indiana's legacy— for several years with Indiana's approval.  For example, as early as May 2001, Salama-Caro confirmed in an email to Indiana that he was setting up the site, stating, "Web site[.]  Tomorrow I am having lunch with the owner of Artnet to discuss the details of setting up a web site.  I will then go to Bark to go over the frames."

103.    As recently as April 2018, McKenzie has been making false statements about Morgan Art Foundation and Simon Salama-Caro.  For example, McKenzie received a phone call

from a conservator about a *HOPE* work.  The conservator said he spoke about *HOPE* with the Catalogue Raisonne office, which informed him that it did not have information about the conservation standards for *HOPE*.  McKenzie responded by disparaging Morgan Art Foundation and Simon Salama-Caro, falsely saying that they do not represent Indiana or his works and have no authority with respect to Indiana.

104.   McKenzie is also continuing to create and exhibit fraudulent and unauthorized "Indiana" works that infringe on Morgan Art Foundation's rights.  In March and April 2018, the Mitchell Gallery at St. John's College in Annapolis, Maryland, held an exhibition entitled "Robert Indiana: Love and Hope" that was curated by McKenzie and American Image.  This exhibition featured infringing and unauthorized works, including *LOVE* images similar to the screen printed aluminum *LOVE* works that Indiana has disavowed and works from the infringing "Dylan" series.  McKenzie conducted a "Curator's Conversation" at the gallery on April 22, 2018, during which he discussed these works as though they were authorized Indiana originals.

105.   Defendants have isolated and exploited Indiana in his most vulnerable state in the twilight of his life.  They have lined their pockets at the expense of innocent collectors by creating and selling unauthorized works and have largely succeeded in passing off these forged works as Indiana originals.  They have confused and damaged Indiana's market and attempted to disparage and undermine the business of Morgan Art Foundation and the Salama-Caro family to prevent the scheme from being exposed.  Morgan Art Foundation asserts the following claims to put an end to Defendants' wrongdoing and to protect Robert Indiana's legacy and the valuable intellectual property rights in his works.

### COUNT I
### COPYRIGHT INFRINGEMENT
### Against All Defendants

106.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

107.    The Image titled "The Ninth American Dream" (2001) is an original, creative work first published in the United States and is copyrightable under the laws of the United States.

108.    Morgan Art Foundation is the owner of a valid copyright in the Image.

109.    Morgan Art Foundation has complied in all respects with 17 U.S.C. §§ 101 et seq. and has secured the rights in and privileges to the copyright in the Image.

110.    Defendants McKenzie and American Image have infringed Morgan Art Foundation's copyright by deliberately and willfully producing, distributing, and publicly displaying original elements of the Image without authorization or other permission from Morgan Art Foundation.

111.    Defendants Thomas and Indiana, through the power of attorney, have a financial interest in and the ability to supervise the infringing activity of Defendants McKenzie and American Image.

112.    As a direct and proximate result of Defendants' infringements, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

### COUNT II
### TRADEMARK INFRINGEMENT (LANHAM ACT)
### Against Michael McKenzie and American Image Art

113.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

114.    Morgan Art Foundation established and received a trademark in *LOVE* under 15 U.S.C. §§ 1051 et seq.

115.    Morgan Art Foundation's trademark in *LOVE* is inherently distinctive, has acquired secondary meaning in the minds of the public as inextricably linked to Morgan Art Foundation, or both.

116.    After Morgan Art Foundation established and received a trademark in *LOVE*, Defendants McKenzie and American Image reproduced, counterfeited, copied, colorably imitated, or all of the foregoing, Morgan Art Foundation's trademark in *LOVE* in connection with the advertising, sale, offering for sale, and distribution of goods for financial gain.

117.    Morgan Art Foundation has not authorized Defendants McKenzie and American Image to use its trademark.

118.    Defendants McKenzie and American Image's use of Morgan Art Foundation's trademark in *LOVE* is likely to cause ordinary purchasers, buying under the usual conditions and exercising ordinary care, to purchase the reproductions, counterfeits, copies, and colorable imitations in the belief that they are authentic.

119.    As a direct and proximate result of Defendants McKenzie and American Image's use of Morgan Art Foundation's trademark, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

### COUNT III
### TRADEMARK INFRINGEMENT (COMMON LAW)
### Against Michael McKenzie and American Image Art

120.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

121.    Morgan Art Foundation established and received a trademark in *LOVE* under the common law.

46

122.    Morgan Art Foundation's trademark in *LOVE* is inherently distinctive, has acquired secondary meaning in the minds of the public as inextricably linked to Morgan Art Foundation, or both.

123.    After Morgan Art Foundation established and received a trademark in *LOVE*, Defendants McKenzie and American Image reproduced, counterfeited, copied, colorably imitated, or all of the foregoing, Morgan Art Foundation's trademark in *LOVE* in connection with the advertising, sale, offering for sale, and distribution of goods for financial gain.

124.    Morgan Art Foundation has not authorized Defendants McKenzie and American Image to use its trademark.

125.    Defendants McKenzie and American Image's use of Morgan Art Foundation's trademark in *LOVE* is likely to cause ordinary purchasers, buying under the usual conditions and exercising ordinary care, to purchase the reproductions, counterfeits, copies, and colorable imitations in the belief that they are authentic.

126.    As a direct and proximate result of Defendants McKenzie and American Image's use of Morgan Art Foundation's trademark, Morgan Art Foundation has suffered damages in an amount to be determined a trial.

### COUNT IV
### BREACH OF CONTRACT
### Against Jamie Thomas, as Power of Attorney, and Robert Indiana

127.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

128.    The License/IP Agreement and the Sculpture Agreement are valid and binding contracts between Morgan Art Foundation and Robert Indiana.

129.    Morgan Art Foundation has complied with the License/IP Agreement and the Sculpture Agreement.

130.    Indiana, or Thomas under his purported power of attorney, has breached the License/IP Agreement and the Sculpture Agreement by authorizing the production, promotion, and sale of works of art that, under the License/IP Agreement and the Sculpture Agreement, can only be produced, promoted, and sold by Morgan Art Foundation.

131.    As a direct and proximate result of this conduct, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**Against Michael McKenzie, American Image Art, and Jamie Thomas**

132.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

133.    The License/IP Agreement and the Sculpture Agreement are valid and binding contracts between Morgan Art Foundation and Robert Indiana.

134.    Morgan Art Foundation has complied with the License/IP Agreement and the Sculpture Agreement.

135.    Upon information and belief, Defendants McKenzie, American Image, and Thomas know of the License/IP Agreement and the Sculpture Agreement.

136.    Defendants McKenzie, American Image, and Thomas intentionally caused Indiana to breach the License/IP Agreement and the Sculpture Agreement by authorizing the production, promotion, and sale of works of art that, under the License/IP Agreement and the Sculpture Agreement, can only be produced, promoted, and sold by Morgan Art Foundation.

137.    Thomas also sent, or caused to be sent, letters to three major auction houses stating that Morgan Art Foundation does not represent Indiana's works, contrary to the express terms of Morgan Art Foundation's written contracts with Indiana.   Thomas caused these

defamatory letters to be sent to undermine Morgan Art Foundation's reputation and business and interfere with its contracts with Indiana.

138.     As a direct and proximate result of Defendants McKenzie, American Image, and Thomas's conduct, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

**COUNT VI**
**VISUAL ARTIST'S RIGHTS ACT**
**Against Michael McKenzie, American Image Art, and Jamie Thomas**

139.     Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

140.     The Visual Artist's Rights Act of 1990, 17 U.S.C. §§ 101, 106A, et seq. ("VARA"), protects the reputation and integrity of visual artists and the works of art that they create, and provides moral rights of attribution and integrity independent of the license or sale of the original work of art.

141.     Robert Indiana is a world-renowned and widely-recognized visual artist and his works, including the Images and Sculptures, are works of visual art with recognized stature within the meaning of VARA.

142.     Pursuant to the License/IP Agreement and the Sculpture Agreement, Morgan Art Foundation has the authority to prosecute a lawsuit concerning any dispute involving the Images and Sculptures and to protect and defend the rights and interests therein.   Under these agreements, Indiana has the obligation to assist Morgan Art Foundation in the prosecution of this lawsuit.

143.     Defendants McKenzie, American Image, and Thomas have engaged in activities that violate Robert Indiana's rights under VARA, including by producing, distributing, and

publicly displaying works of art attributed to Robert Indiana that were not created or authorized by Robert Indiana or by Morgan Art Foundation.

144.    Defendants' activities have injured the reputation and integrity of Robert Indiana and his artistic works, including the reputation and integrity of the Images and Sculptures.

145.    As a direct and proximate result of Defendants McKenzie, American Image, and Thomas's activities, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

**COUNT VII**
**UNFAIR COMPETITION**
**Against Michael McKenzie, American Image Art, and Jamie Thomas**

146.    Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

147.    Defendants McKenzie, American Image, and Thomas have committed unfair and deceptive practices by producing, distributing, and publicly displaying unauthorized and counterfeit works of art.

148.    Defendants McKenzie, American Image, and Thomas have performed these acts in the conduct of business, trade, or commerce and in the furnishing of a service.

149.    The acts of Defendants McKenzie, American Image, and Thomas are oriented toward consumers and have caused injury to consumers in New York.

150.    The acts of Defendants McKenzie, American Image, and Thomas are materially misleading.

151.    As a direct and proximate result of the acts of Defendants McKenzie, American Image, and Thomas, Morgan Art Foundation has suffered damages in an amount to be determined at trial.

COUNT VIII
DEFAMATION
**Against Jamie Thomas and Michael McKenzie**

152.     Morgan Art Foundation repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth here.

153.     Defendant Thomas published or caused to be published orally and in writing defamatory statements of fact concerning Morgan Art Foundation.

154.     Defendant McKenzie published or caused to be published orally defamatory statements of fact concerning Morgan Art Foundation.

155.     The false and defamatory statements of fact that Thomas and McKenzie published or caused to be published state outright and also carry the unmistakable message that Morgan Art Foundation lacks authority to authenticate Indiana's works, to represent any of Indiana's works, to create a catalogue raisonne, or to operate a Robert Indiana website.   The defamatory statements pertained to and injured Morgan Art Foundation in its trade, business, and profession and constitute defamation per se.

156.     These statements are false, and Thomas and McKenzie published them or caused them to be published with knowledge that they were false or with reckless disregard for the truth or falsity of the statements.

157.     Those who read or otherwise receive the false and defamatory statements of fact Thomas and McKenzie published or caused to be published understand their defamatory meaning and understand that the statements concern Morgan Art Foundation.

158.     As a direct and proximate result of the false and defamatory statements concerning Morgan Art Foundation that Thomas and McKenzie published or caused to be published, Morgan Art Foundation has suffered damages in amount to be determined at trial.

159.     Thomas and McKenzie published or caused to be published, and have continued to promote, the false and defamatory statements concerning Morgan Art Foundation with the specific intent to harm Morgan Art Foundation and boost their own reputations.  Thomas and McKenzie's acts show willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care that raises the presumption of conscious indifference to consequences.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

a.   awarding Plaintiff general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

b.   awarding Plaintiff nominal damages;

c.   awarding Plaintiff punitive damages;

d.   awarding Plaintiff pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.   awarding Plaintiff the costs of suit as incurred in this action and attorney's fees;

f.   awarding Plaintiff injunctive relief to prevent Defendants from continuing to fabricate and sell forged art; and

g.   all other relief as may be appropriate.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.


Dated:  May 18, 2018
        New York, New York

        Respectfully submitted,

        QUINN EMANUEL URQUHART & SULLIVAN, LLP


        By: */s/ Luke Nikas*_____
            Luke Nikas
            Maaren A. Shah
            51 Madison Avenue, 22nd Floor
            New York, NY 10010
            Telephone:  (212) 849-7000
            Email:  lukenikas@quinnemanuel.com


            *Attorneys for Plaintiff*