UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/1/2019_____

MORGAN ART FOUNDATION LIMITED,

Plaintiff,

-against-

MICHAEL MCKENZIE, AMERICAN IMAGE ART,
JAMIE THOMAS, and JAMES W. BRANNAN as Personal
Representative of the Estate of Robert Indiana,

Defendants.

MICHAEL MCKENZIE and AMERICAN IMAGE ART,

Counter-Claimants,

-against-

MORGAN ART FOUNDATION LIMITED,

Counterclaim Defendant.

JAMES W. BRANNAN as Personal Representative of the
Estate of Robert Indiana,

Counter-Claimant,

-against-

MORGAN ART FOUNDATION LIMITED, FIGURE 5
ART LLC, SHEARBROOK (US), LLC, RI CATALOGUE
RAISONNÉ LLC, and SIMON SALAMA-CARO,

Counterclaim-Defendants.

MICHAEL MCKENZIE and AMERICAN IMAGE ART,

Cross-Claimants,

-against-

JAMIE THOMAS and JAMES W. BRANNAN as Personal
Representative of the Estate of Robert Indiana,

Crossclaim-Defendants.

18 Civ. 4438 (AT)

**ORDER**

ANALISA TORRES, District Judge:

## PROCEDURAL POSTURE

This case concerns the late artist Robert Indiana ("Indiana").[1]  A number of parties have brought claims with respect to the ownership of Indiana's intellectual property and other related claims.  As described below, four motions are pending before the Court.

On May 18, 2018, Plaintiff, Morgan Art Foundation Limited,[2] filed its initial complaint.  ECF No. 1.  On August 3, 2018, Plaintiff filed an amended complaint.  Am. Compl., ECF No. 47.  The complaint asserts claims against Defendants Michael McKenzie, American Image Art (Michael McKenzie and American Image Art together, "AIA"), Jamie Thomas, and the Estate.  On November 6, 2018, AIA filed a motion to stay Plaintiff's claims against it, the first motion addressed in this order.  ECF No. 101.

On September 7, 2018, the Estate filed its answer to Plaintiff's amended complaint.  ECF No. 62.  On September 20, 2018, the Estate filed an amended answer, which also asserted counterclaims against Plaintiff, Figure 5 Art LLC, Shearbrook (US), LLC, RI Catalogue Raisonné LLC, and Simon Salama-Caro (the "Counterclaim Defendants").  Estate Am. Ans. at 24–32, ECF No. 78.  On November 6, 2018, the Counterclaim Defendants moved to dismiss the counterclaims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the second motion addressed in this order.  ECF No. 105.

On September 7, 2018, AIA filed its answer to Plaintiff's amended complaint, which also asserted counterclaims against Plaintiff and crossclaims against Thomas and the Estate.  ECF No. 61 at 35–49.[3]  On October 2, 2018, after exchanging pre-motion letters with Plaintiff and the

---

[1] The Court shall refer to the artist Robert Indiana as "Indiana," and James W. Brannan, as Personal Representative of the Estate of Robert Indiana, as the "Estate."

[2] The Court shall refer to Morgan Art Foundation Limited as "Plaintiff," including in sections that address its status as a counterclaim-defendant.

[3] This was AIA's third answer—the first two had been filed before Plaintiff filed its amended complaint.  *See* ECF Nos. 29, 45.

Estate, *see* ECF No. 88, AIA filed its third amended answer, which also asserted counterclaims against Plaintiff and crossclaims against Thomas and the Estate. AIA Ans. at 40–57, ECF No. 91. On November 20, 2018, Plaintiff filed a partial motion to dismiss four of the eight counterclaims brought against it by AIA for failure to state a claim, the third motion addressed in this order. ECF No. 110. That same day, Thomas filed a motion to dismiss all of the crossclaims brought against it by AIA for failure to state a claim, the fourth motion addressed in this order. ECF No. 115.[4]

## DISCUSSION

I. <u>AIA's Motion to Stay and for Order Requiring Plaintiff to Post Bond</u>

First, the Court shall address AIA's request for a stay. ECF No. 101. AIA seeks an order staying Plaintiff's claims against AIA until after the Court resolves the disputes between Plaintiff and the Estate, or in the alternative, for an order requiring Plaintiff to post a bond. *See* AIA Stay Mem. at 1–2, ECF No. 104.

A. Background

The following facts are taken from Plaintiff's complaint. In an agreement dated April 9, 1999, which was made effective as of June 28, 1998 (the "April 9, 1999 Agreement"), Indiana transferred to Plaintiff his intellectual property rights in certain of his works—that is, in LOVE, AHAVA, AMOR, Numbers and YALE (the "Images"). Am. Compl. ¶ 43. In an agreement dated December 22, 1999, which was made effective as of July 27, 1995 (the "Sculpture Agreement"), Indiana conveyed to Plaintiff the exclusive right to produce and fabricate certain sculptures—that is, "the LOVE sculptures, the AHAVA sculptures, the AMOR sculptures, the Numbers sculptures . . . the ART sculptures and the 2000 Sculptures" (the "Sculptures"). *Id.*

---

[4] On October 9, 2018, the Court granted the Estate's motion to compel arbitration of AIA's crossclaims against the Estate, and stayed those crossclaims in this proceeding. ECF No. 94.

¶ 49.  Under both agreements, Plaintiff was required to pay to Indiana a certain percentage of income it received from licensing and selling the Images and Sculptures.  *Id.* ¶¶ 48, 52.  In 2004, Indiana amended the April 9, 1999 Agreement (the "2004 Amendment"), which expanded the scope of the April 9, 1999 Agreement to include "all paintings and sculptures conceived by Indiana from 1960 through the date of the amendment."  *Id.* ¶ 61.

   B.  Motion to Stay

      1.  Legal Standard

"[A] District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."  *Clinton v. Jones*, 520 U.S. 681, 706 (1997).  "The party moving for a stay must make out a clear case of hardship or inequity in being required to go forward."  *Am. Steamship Owners Mut. Protection & Indem. Ass'n, Inc. v. LaFarge N. Am., Inc.*, 474 F. Supp. 2d 474, 482 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).

In determining whether to grant a stay, courts in this district consider the five factors identified in *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996).  These are:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Id.*  "Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice."  *Id.*

      2.  Analysis

With respect to the first *Kappel* factor—the interests of Plaintiff—AIA argues that Plaintiff "does not have a legitimate interest in the immediate resolution of this action and would not be prejudiced [by a stay] because it showed no interest in prosecuting its claims against

[AIA] for nearly twenty years." AIA Stay Mem. at 18. However, the cases it cites for this proposition find that a stay is warranted where, after a party brings an action, it lets it languish. *See Kappel*, 914 F. Supp. at 1058. In contrast, a review of the docket in this matter shows that Plaintiff, and all other parties, have been vigorously litigating this action. *See Rex & Roberta Ling Living Tr. v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 411 (S.D.N.Y. 2018) (finding that a "clear interest in commencing discovery in order to pursue an expeditious resolution of [] claims" weighs against stay).

AIA also argues that Plaintiff would not be prejudiced because it seeks only monetary relief. AIA Stay Mem. at 18–19. In addition to monetary relief, however, Plaintiff seeks "injunctive relief to prevent Defendants from continuing to fabricate and sell forged and infringing art." Am. Compl. at 54. Therefore, Plaintiff has an interest in an expeditious resolution of this suit. Accordingly, the first factor weighs against granting a stay.

With respect to the second, third, and fifth *Kappel* factors, AIA argues that any resolution of the claims between Plaintiff and AIA is contingent upon a resolution of the claims between Plaintiff and the Estate. *See* AIA Stay Mem. at 22 ("[I]f [Plaintiff] has no enforceable rights to Indiana's intellectual property, then the Court will waste considerable time litigating [AIA's] defenses to those rights."); *see generally id.* at 19–24. The Estate alleges that Plaintiff breached its agreements with Indiana, Estate Am. Ans. ¶¶ 210–220, and AIA argues that if this is proven to be true, then Plaintiff would have no rights to Indiana's work and no claims to pursue against AIA. AIA Stay Mem. at 3. However, breach of a contract does not automatically result in rescission. *See Graham v. James*, 144 F.3d 229, 237–38 (2d Cir. 1998) ("Even assuming [the licensee] materially breached the licensing agreement and that [the licensor] was entitled to rescission, such rescission did not occur automatically without some affirmative steps on [the

licensor's] part."). Similarly, AIA argues that the Estate and Plaintiff dispute the scope (and existence) of the 2004 Amendment, AIA Stay Mem. at 3, but Plaintiff brings claims against AIA premised on the April 9, 1999 Agreement and the Sculpture Agreement in addition to the 2004 Agreement, Pl. Stay Opp. at 7, ECF No. 113. Even if the 2004 Amendment were found to have never been made, Plaintiff would still have claims against AIA. In addition, AIA complains of the burdens of its discovery obligations. AIA Stay Mem. at 21–22. However, a stay is not appropriate where it "would only postpone, not alleviate, defendant's discovery obligations." *Frilando*, 2016 WL 9503817 at *1. Accordingly, AIA has not demonstrated that its own interests, the interests of the Court, and the public interest would be benefitted by a stay and the second, third and fifth factors weigh against granting a stay.

With respect to the fourth factor—the interests of others—AIA argues that a stay would benefit the Estate. AIA Stay Mem. at 23. The Estate, however, opposed AIA's request for a stay in a previous filing. *See* ECF No. 87 at 2–3. AIA also argues that its own contractors would benefit from a stay because they could attend to other activities, AIA Stay Mem. at 23–24, but AIA does not explain why these individuals are the sort of "persons not parties to the civil litigation" that should be considered, *Kappel*, 914 F. Supp. at 1058. This factor is neutral. The Court concludes, therefore, that the *Kappel* factors weigh against granting a stay.

AIA also argues that a stay is appropriate because the Court granted the Estate's motion to stay AIA's cross-claims against the Estate in favor of arbitration, ECF No. 94, and that those cross-claims are "inextricably linked" to Plaintiff's claims against AIA, AIA Stay Mem. at 25. However, as the Estate noted in its papers in connection with that motion, "[Plaintiff] does not assert any claim or allegation regarding the HOPE artwork, which is the only intellectual property 'authorized' by the 2008 HOPE Agreement at issue in the arbitration." ECF No. 87 at

4.  Accordingly, the Court rejects AIA's characterization that the claims are "inextricably linked."

Accordingly, AIA's request for a stay is DENIED.

### C.  Motion for Order Requiring Plaintiff to Post Bond

AIA moves in the alternative for an order requiring Plaintiff to post a $500,000 bond. AIA Stay Mem. at 25, 31.

#### 1.  Legal Standard

Pursuant to Rule 54.2 of the Local Rules of the United States District Court for the Southern District of New York, "[t]he Court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate."  "[S]ecurity for costs may include attorneys' fees to which a party is potentially entitled by statute."  *Selletti v. Carey*, 173 F.R.D. 96, 100 (S.D.N.Y. 1997) (collecting cases).  Plaintiff has asserted claims against AIA under the Copyright Act of 1976 and the Lanham Act, among others.  Am. Compl. at 46–48.  Both acts authorize costs for the prevailing party.  *See* 17 U.S.C. § 505 (Copyright Act); 15 U.S.C. § 1117(a) (Lanham Act).

The factors a court considers in deciding whether to order a party to post a bond are "[(1)] the financial condition and ability to pay of the party at issue; [(2)] whether that party is a non-resident or foreign corporation; [(3)] the merits of the underlying claims; [(4)] the extent and scope of discovery; [(5)] the legal costs expected to be incurred; and [(6)] compliance with past court orders."  *Selletti*, 173 F.R.D. at 100–01.

#### 2.  Analysis

With respect to the first factor—Plaintiff's financial condition—AIA claims that Plaintiff "is a Bahamian limited liability shell company with an unknown cabal of backers," and that

"[c]ourts have ordered foreign shell corporations to post a bond." AIA Stay Reply at 2, 12. However, the cases AIA cites for this proposition involve situations where the defendant had clearly established that the plaintiff was undercapitalized. *See, e.g.*, *Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11 Civ. 1529, 2014 WL 3579809, at *2 (S.D.N.Y. July 18, 2014) (requiring plaintiff to post a bond where it was "merely a shell[ and] a corporation formed for the special purpose of conducting [an] alleged letter of credit transaction" because plaintiff's attorney "testified that the plaintiff has no assets other than this litigation and was never capitalized"); *Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, No. 03 Civ. 10254, 2008 WL 161239, at *2 (S.D.N.Y. Jan. 15, 2008) (requiring plaintiffs to post bond where plaintiffs conceded that one plaintiff "has filed for bankruptcy protection" and the other "does not have the financial wherewithal to post security for the [defendant's] counterclaim"). AIA raises questions about Plaintiff's ownership and structure, AIA Stay Mem. at 5–7, but does not establish that Plaintiff is undercapitalized. Rather, Plaintiff's prosecution of this action suggests it has sufficient resources. *See Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, No. 08 Civ. 1533, 2010 WL 3452375, at *3 (S.D.N.Y. Sept. 1, 2010) (denying request for bond where plaintiffs "appear to have the financial means to engage a multistate legal team consisting of three law firms who have litigated this case vigorously" (internal quotation marks, citation, and alteration omitted)). AIA also argues that Plaintiff "has produced no documents or submitted affidavits supporting its financial condition." AIA Stay Reply at 13, ECF No. 121. However, Plaintiff's financial condition is AIA's burden to establish. *See N'Jai v. N.Y. State Higher Educ. Servs. Corp.*, 214 F.R.D. 251, 252 (E.D.N.Y. 2003) (denying request for stay where defendant "provides no information concerning the plaintiff's financial condition"). This factor weighs against AIA.

With respect to the second factor—whether Plaintiff is a non-resident—Plaintiff is a Bahamian limited liability company. Am. Compl. ¶ 19. This factor weighs toward requiring Plaintiff to post a bond. With respect to the third factor—the merits of the underlying claims— "the claims and defenses at issue here are not more or less colorable than other litigants' as would justify the imposition of security for costs," so this factor is neutral. *Mohamed v. Rajoub*, No. 05 Civ. 8335, 2008 WL 194746, at *4 (S.D.N.Y. Jan. 17, 2008).

With respect to the fourth factor—the extent and scope of discovery—AIA argues that a bond is appropriate because Plaintiff "has indicated it will use [foreign] blocking statutes to limit discovery." AIA Stay Mem. at 29; *see also id.* at 15 ("[Plaintiff] [a]ttempts to [u]se Swiss, English, and EU [b]locking [s]tatutes to [s]hield [i]tself [f]rom [d]iscovery."). However, far from "blocking" AIA's discovery requests, Plaintiff has merely indicated that it is subject to different privacy laws in different jurisdictions. *See* ECF No. 102-18 at 2 (Plaintiff lodging general objection to discovery requests "to the extent they request any documents that are protected by law, statute, or regulation, including applicable privacy and data protection laws of Switzerland, England, and/or the European Union, such as the EU General Data Protection Regulation, the Swiss Data Protection Act, the Swiss Federal Act on Data Protection, and the Swiss Criminal Code. [Plaintiff] will produce any such responsive documents only in accordance with, and upon and after complying with, all applicable laws, statutes, and regulations."). The Court shall not penalize Plaintiff for complying with the laws of the jurisdictions in which it operates. This factor is neutral.

With respect to the fifth factor—the legal costs expected to be incurred—it appears that the parties may incur significant legal costs in this action, *see* AIA Stay Mem. at 30, so this factor weighs against Plaintiff. With respect to the sixth factor—Plaintiff's compliance with past

Court orders—as AIA states, "[Plaintiff] has complied with court orders, so this factor weighs in [Plaintiff's] favor." AIA Stay Mem. at 30.

Accordingly, the *Selletti* factors are mixed, but having considered all relevant factors, the Court declines to exercise its discretion to order Plaintiff to post a bond, and AIA's motion is DENIED.

## II.    Motions to Dismiss

The Court shall next address the three pending motions to dismiss.

### A.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the

plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

B. Choice of Law

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 456 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Id.* (internal quotation marks and citation omitted). "In the absence of substantive difference, [] a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

All three motions concern at least some state law claims. Aside from New York, the only jurisdiction whose laws it would be plausible to apply in resolving the disputes is Maine, where Indiana lived from 1978 to the end of his life. Am. Compl. ¶¶ 6, 23.

With respect to the Counterclaim Defendants' motion to dismiss the Estate's counterclaims, the parties do not address the choice-of-law issue in their briefing, and cite only to New York caselaw. As described in further detail below, some of the relevant contracts contain choice-of-law clauses specifying that New York law shall apply. In light of Plaintiff's allegation that "Indiana has transacted business and contracted to supply goods or services in New York," Am. Compl. ¶ 28, the fact that Indiana sent correspondence to Salama-Caro in New York during the relevant period, *see* ECF Nos. 107-5, 107-7, and the choice-of-law clauses, New York is a "relevant choice" of law to resolve the state law claims asserted in the Estate's

pleading, *IBM Bus. Machs.*, 363 F.3d at 143.  Moreover, the Court has determined that there is an "absence of substantive difference" between New York's and Maine's laws for the purpose of these claims.  *Id.*

Similarly, with respect to Plaintiff's partial motion to dismiss AIA's counterclaims, the parties do not address the choice-of-law issue.  However, in addition to the reasons stated above that weigh in favor of applying New York law, Michael McKenzie is a resident of New York and AIA has offices in New York.  *See* Am. Compl. ¶¶ 20–21; AIA Ans. ¶¶ 20–21.

With respect to Thomas's motion to dismiss AIA's crossclaims, Thomas addresses the choice-of-law issue, but states that he has not "uncovered any conflict" between New York law and Maine law with respect to the crossclaims, and accordingly, "relies both on New York law, which provides a more robust body of case law upon which to draw, and also cites to Maine law, when available."  Thomas Mem. at 9, ECF No. 116.

Accordingly, in addressing all three motions, the Court shall analyze the parties' claims under New York law, occasionally citing to Maine law as well to show that it is in harmony with New York law.

C.  Counterclaim Defendants' Motion to Dismiss the Estate's Counterclaims

The first motion to dismiss that the Court shall address is the Counterclaim Defendants' motion to dismiss the Estate's counterclaims against them.  ECF No. 105.  In its answer, the Estate asserts eight counterclaims against the Counterclaim Defendants.  Estate Am. Ans. at 24–31.

1.  Background

The following facts are taken from the Estate's amended answer, which the Court accepts as true for the purposes of this motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d

Cir. 2012).  On November 18, 1996, Indiana sent a letter (the "November 18, 1996 Letter") to Salama-Caro (who is Plaintiff's "advisor," Am. Compl. ¶ 7), in which Indiana agreed that "no LOVE sculptures and no NUMBER sculptures will be made with any other party than [Salama-Caro] and/or [Plaintiff] for a period of five years from the date of this letter."  Estate Am. Ans. ¶ 181; November 18, 1996 Letter, *id.* Ex. 1, ECF No. 78-1.  On November 25, 1996, Indiana sent a letter (the "November 25, 1996 Letter," and together with the November 18, 1996 Letter, the "November 1996 Agreement") to Salama-Caro in which Indiana extended Plaintiff's rights in the November 18, 1996 Letter "to cover any sizes and mediums (including AHAVA and AMOR) and to two-dimensional images."  *Id.* ¶ 182; November 25, 1996 Letter, *id.* Ex. 2, ECF No. 78-2.

On May 4, 1998, Indiana and Plaintiff entered into an agreement (the "May 1998 Agreement") under which Indiana assigned Plaintiff "the copyright and any rights under Section 43(a) of the Lanham Trademark Act for the LOVE (including AHAVA and AMOR) and the NUMBERS in both two and three dimensional form."  *Id.* ¶ 183; May 1998 Agreement, *id.* Ex. 3, ECF No. 78-3.  Plaintiff and Indiana further agreed that Plaintiff would pay Indiana certain royalties derived from Plaintiff's licensing of the works to third parties, and that any project involving the use of the images would be discussed between Salama-Caro and Indiana.  *Id.* ¶ 183.

On April 9, 1999, Indiana and Plaintiff entered into an agreement (defined *supra* as the "April 9, 1999 Agreement"), made effective as of June 28, 1998, under which Plaintiff agreed to pay Indiana fifty percent of net income derived from Plaintiff's sale of "any and all paintings, sculptures, [and] constructions" of the LOVE, AHAVA, AMORE, YALE and NUMBER artworks (defined *supra* as the "Images").  *Id.* ¶ 185 (alteration in original); April 9, 1999 Agreement, ECF No. 107-1.  The parties also agreed that Plaintiff would "furnish an accounting

to [Indiana], on a quarterannual basis, which accounting shall itemize the income received, the expenses incurred, and the payments made to [Indiana] in connection with the sale or sales" of the Images. *Id.* ¶ 186 (alteration in original). The April 9, 1999 Agreement states that it "is subject to and shall be construed in accordance with the laws of the State of New York." April 9, 1999 Agreement at 2.

On December 22, 1999, Indiana and Plaintiff entered into an agreement (defined *supra* as the "Sculpture Agreement") pursuant to which Indiana gave Plaintiff the exclusive right "to produce and fabricate the LOVE sculptures, the AHAVA sculptures, the AMOR sculptures, the Numbers sculptures . . . the ART sculptures and the 2000 sculptures . . . in specified colors, dimensions, and edition sizes" (defined *supra* as the "Sculptures"). *Id.* ¶ 187; Sculpture Agreement, ECF No. 107-2. Plaintiff agreed to pay Indiana twenty percent of its receipts from the sale of the Sculptures. Estate Am. Ans. ¶ 187. The agreement also provides that Plaintiff "shall furnish an accounting to [Indiana], on an annual basis." *Id.* ¶ 188. The Sculpture Agreement states that it "is subject to and shall be construed in accordance with the laws of the State of New York." Sculpture Agreement at 4.

The Estate alleges that Plaintiff failed to provide accountings to Indiana as required by the April 9, 1999 Agreement and the Sculpture Agreement. *Id.* ¶ 189. Specifically, Plaintiff (a) failed to provide any accountings for 1995; (b) failed to provide accountings between January 1999 and December 2008; and (c) sent undated and unsigned documents in August 2009 that purport to show lump sums (not itemized records) for the years 1999 and 2008. *Id.* ¶¶ 191–192. Plaintiff also failed to pay Indiana royalties it owed him, and also produced works that exceeded the scope of its rights in its various agreements with Indiana. *Id.* ¶¶ 193–194.

The Estate also alleges that Plaintiff and Salama-Caro have "created new LOVE sculptures that were never approved (and, upon information and belief, never would have been approved" by Indiana. *Id.* ¶ 197. "Specifically, and without limitation, [Plaintiff] and Simon Salama-Caro have authorized the production of certain LOVE Sculptures fabricated from semi-precious stones" (the "Semi-Precious Stone Sculptures"), each of which "has an inscription that purports to be Mr. Indiana's signature, but is in fact neither his signature nor an authorized facsimile thereof." *Id.* ¶ 198. Furthermore, Plaintiff and Salama-Caro "have entered into agreements with galleries and museums to exhibit these unauthorized works," "[t]he Albright-Knox Art Gallery in Buffalo, New York, is currently showing an exhibition of Indiana's works . . . that includes a number of [the Semi-Precious Stone Sculptures]," and the accompanying wall signs falsely state that Indiana authorized their creation. *Id.* ¶ 199.

In addition, four of the Counterclaim Defendants (Plaintiff, Salama-Caro, Figure 5 Art LLC, and Shearbrook (US), LLC) "registered and are currently utilizing the domain name 'robertindiana.com' [(the "Website")] for a website that purports to represent the rights, interests, trademarks, and intellectual[] property of Robert Indiana," which they have no right to do. *Id.* ¶¶ 201–203.

On December 2, 2006, Indiana and Salama-Caro signed an agreement (the "Catalogue Raisonné Agreement") in the form of a letter from Indiana to Salama-Caro which, in its entirety, states: "This is to confirm that we have agreed that you are responsible for the preparation of the Catalogue Raisonne of my complete oeuvre." *Id.* ¶ 204; Catalogue Raisonné Agreement, ECF No. 78-4.[5] The Estate alleges that the Catalogue Raisonné Agreement "did not grant Simon

---

[5] "A catalogue raisonné is a comprehensive, annotated listing of all the known works of an artist . . . . [It] may provide some or all of the following: "[t]itle and title variations[; d]imension/[s]ize[; d]ate of the work[; ]medium[;] . . . [r]eproduction of each work.]" *What is a Catalogue Raisonné?*, New York Public Library, https://www.nypl.org/node/29583 (last visited July 1, 2019).

Salama-Caro any copyright or trademark in any of Indiana's artworks, nor did it grant Simon

Salama-Caro the right to reproduce or publish all of Indiana's works," but was rather intended

"to prepare a [c]atalogue [r]aisonné to be published by a third party with the supervision and

consent of Robert Indiana." Estate Am. Ans. ¶ 205. In addition, Salama-Caro and RI Catalogue

Raisonné LLC operate a website with the domain name "ricatalogueraisonne.org," which

advertises the forthcoming catalogue raisonné, and states that "[o]wners of paintings and

sculptures are encouraged to contact . . . info@robertindiana.com." *Id.* ¶¶ 206, 261 (alteration

and ellipsis in original). The Website includes a page that states that a catalogue raisonné is

"Coming Soon." *Id.* ¶ 207. Neither Indiana nor the Estate have consented to the publication of

the catalogue raisonné. *Id.* ¶ 208.

2. Analysis

a. First Counterclaim

In its First Counterclaim, the Estate alleges that Plaintiff "breached [the] April [9,] 1999

Agreement by failing to provide accountings and royalties as required." *Id.* ¶ 213. Although the

Counterclaim Defendants argue for the dismissal of this claim in its entirety, *see* Counterclaim

Def. Mem. at 10, ECF No. 108, the Estate discusses only Plaintiff's alleged failure to provide

accountings in its opposition, and does not discuss a failure to pay royalties under the April 9,

1999 Agreement, see Estate Opp. at 3–4, ECF No. 117. Accordingly, the Estate has conceded

the counterclaim inasmuch as it concerns an alleged failure to pay royalties. *See LightSquared*

*Inc. v. Deere & Co.*, No. 13 Civ. 8157, 2015 WL 585655, at *18 (S.D.N.Y. Feb. 5, 2015), *aff'd*

*sub nom Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015). In

any event, the Estate's only allegations concerning a failure to pay royalties with respect to the

April 9, 1999 Agreement are that "[o]n information and belief, [Plaintiff has] reproduced,

fabricated, licensed, sold, or otherwise received income on Indiana artworks for which [Plaintiff has not] paid Indiana royalties owed to him" and that Plaintiff "ha[s] fabricated reproductions of Indiana's artworks in colors, dimensions and/or sizes that are not authorized by" the April 9, 1999 Agreement. Estate Am. Ans. ¶¶ 193–194. These vague allegations are insufficient to state a claim for breach of contract. *See Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 597–98 (S.D.N.Y. 2017) (dismissing breach of contract claim where plaintiff "does no more than list terms in the [contract] and conclusorily allege that [defendant] violated them").

With respect to a failure to provide accountings as required by the April 9, 1999 Agreement, the Estate alleges that Plaintiff failed to provide accountings in 1995, and between 1999 and 2008. Estate Am. Ans. ¶¶ 191–192. These breaches fall outside New York's six-year statute of limitations for breach of contract claims and are thus time-barred. N.Y. C.P.L.R. § 213(2); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (dismissal on the basis of statute of limitations appropriate "if the defense appears on the face of the complaint").[6] The Estate does not argue otherwise. Estate Opp. at 9. The Estate, however, argues that "the breaches have been ongoing and continue through the current time," i.e., that there are also breaches within the statute of limitations period. *Id.* The only allegation in support of this argument, however, is that Plaintiff "failed to provide Robert Indiana with accountings . . . as expressly required by the April [9,] 1999 Agreement." Estate Am. Ans. ¶ 190. This "does no more than list terms in the [contract] and conclusorily allege that [defendant] violated them," and such "naked assertions" are insufficient to survive a motion to dismiss. *Hadami*, 272 F. Supp. 3d at 597–598.

Accordingly, the Estate's First Counterclaim is DISMISSED.

---

[6] Maine's statute of limitations for breach of contract claims is also six years. *See* 14 M.R.S.A. § 752 ("All civil actions shall be commenced within 6 years after the cause of action accrues.").

b. Second Counterclaim

In its Second Counterclaim, the Estate alleges that Plaintiff breached the Sculpture Agreement by "failing to provide accountings and royalties." Estate Am. Ans. ¶ 218; *see also id.* ¶¶ 189–194. This claim suffers from the same defects as the First Counterclaim, and is DISMISSED on that basis. In the Second Counterclaim, the Estate also alleges that Plaintiff breached the Sculpture Agreement by "fabricating, displaying, licensing, and/or selling reproductions of Indiana's artworks in colors, dimensions and/or sizes not authorized by the Sculpture Agreement, including without limitation, the [Semi-Precious Stone Sculptures]." *Id.* ¶ 219. To the extent the Second Counterclaim is predicated upon artworks Plaintiff created apart from the Semi-Precious Stone Sculptures, it is too vague to state a claim and fails to provide the Counterclaim Defendants with "fair notice" of "the grounds upon which [the claim] rests," *Twombly*, 550 U.S. at 555, and it is DISMISSED.

With respect to the Semi-Precious Stone Sculptures, however, the Estate properly states a claim. It alleges that Plaintiff and Salama-Caro created sculptures in the LOVE design made out of semi-precious stone, some of which are on display at an art gallery in Buffalo, New York. Estate Am. Ans. ¶¶ 198–199. The Counterclaim Defendants argue that by the terms of the April 9, 1999 Agreement, Indiana gave Plaintiff "the exclusive right throughout the world in perpetuity to reproduce, promote and sell the [LOVE image] in such forms and sizes, singularly or in any combination, in such manner, at such time, for such price and subject to such terms and conditions as [Plaintiff] in its sole discretion shall determine." April 9, 1999 Agreement at 1. The Counterclaim Defendants, therefore, argue that the Semi-Precious Stone Sculptures were authorized. However, the April 9, 1999 Agreement also states that Salama-Caro must engage Indiana in a "review, discussion, and recommendation" of any proposed projects. April 9, 1999

18

Agreement at 1. The Estate alleges that Indiana "had strong opinions about the design elements and specifications for his 'LOVE' sculpture, and took great pains to preserve the artistic integrity of the work in any form in which it was created," and that the Semi-Precious Stone Sculptures "were never approved (and, upon information and belief, never would have been approved) by Mr. Indiana." Estate Am. Ans. ¶¶ 196–197. Therefore, that portion of the Second Counterclaim that asserts a claim for breach of the Sculpture Agreement with respect to the Semi-Precious Stone Sculptures shall survive dismissal.

The Sculpture Agreement also gave Plaintiff the right to produce "the LOVE sculptures," but they were limited to the "colors, dimensions and edition sizes" set forth in an annexed schedule. *See* Sculpture Agreement. The Counterclaim Defendants also attach to their opposition papers a series of agreements (collectively, the "Marble Sculpture Agreements") that were not discussed in the Estate's Counterclaims, in which Indiana authorized Salama-Caro to produce marble sculptures. Marble Sculpture Agreements, ECF Nos. 107-5, 107-6, and 107-7. However, the Marble Sculpture Agreements allow a finite number of sculptures across five types of marble in certain sizes. *See* Marble Sculpture Agreements. Even if the Marble Sculpture Agreements authorized the production of some of the Semi-Precious Stone Sculptures, therefore, it is plausible that the Counterclaim Defendants exceeded the agreements' scope.

The Court also rejects the Counterclaim Defendants' argument that the Estate's allegations are too vague to state a claim. Counterclaim Def. Mem. at 13. As discussed, the Estate has alleged that Plaintiff created and sold a number of sculptures, in the "LOVE" design, made out of semi-precious stone, affixed with Indiana's signature, without Indiana's approval, some of which are on display at an art gallery in Buffalo, New York. Estate Am. Ans. ¶¶ 196–199. This is sufficiently detailed to plausibly state a claim for breach of contract, because it

meets *Twombly*'s requirement that it provide the Counterclaim Defendants with fair notice of the grounds upon which the claim rests. 550 U.S. at 555. Moreover, the Court rejects the Counterclaim Defendants' argument that the alleged breach is outside New York's six-year statute of limitations on the basis that the Estate does not "allege a specific instance of contractual breach . . . that falls within the (at-most) six-year limitations period." Counterclaim Def. Mem. at 14. As the Counterclaim Defendants concede in their reply, "[a] motion to dismiss based on the affirmative defense of statute of limitations may be granted only 'if the defense appears on the face of the complaint.'" Counterclaim Def. Reply at 3, ECF No. 119 (alteration in original) (quoting *McKenna*, 386 F.3d at 436). The Estate does not allege the dates that the Semi-Precious Stone Sculptures were created and sold, and therefore, a statute of limitations defense does not appear on the face of the complaint.

### c. Third Counterclaim

In its Third Counterclaim, the Estate alleges that Plaintiff was unjustly enriched "[b]y fabricating, displaying, licensing and/or selling unauthorized reproductions of Robert Indiana's artworks." Estate Am. Ans. ¶ 222. However, "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks and citation omitted). "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.* at 587 (internal quotation marks and citation omitted); *cf. Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561, 580 (E.D.N.Y. 2014) ("Where there is a bona fide dispute regarding the existence of a contract, however, both an unjust enrichment and

a breach of contract claim may be pled."); *see also Knope v. Green Tree Servicing, LLC*, 161 A.3d 696, 704 (Me. 2017) ("[T]he existence of a contractual relationship between the parties precludes recovery on a theory of unjust enrichment." (internal quotation marks and citations omitted)).

As discussed, the Estate alleges the existence of a number of contracts between Plaintiff and Indiana, and does not allege that any are invalid or that Indiana failed to perform. Moreover, its allegation in support of its unjust enrichment claim mirrors that of its claim that Plaintiff breached the Sculpture Agreement. *Compare* Estate Am. Ans. ¶ 222 *with id.* ¶ 219. The Estate merely alleges that Plaintiff operated outside the scope of its agreements. The Third Counterclaim is, therefore, DISMISSED.

### d. Fourth Counterclaim

In its Fourth Counterclaim, the Estate alleges that Plaintiff violated the Visual Artists Rights Act ("VARA"). Estate Am. Answer ¶¶ 226–233. VARA provides that "the author of a work of visual art[] shall have the right[] to claim authorship of that work, and to prevent the use of his or her name as the author of any work of visual art which he or she did not create." 17 U.S.C. § 106A(a)(1). The Estate alleges that Plaintiff violated VARA by "appl[ying] Mr. Indiana's signature to a number of works of visual art, including the [Semi-Precious Stone Sculptures] derived from the original LOVE sculpture." Estate Am. Ans. ¶ 228.

Plaintiff argues that pursuant to an agreement between Indiana and Plaintiff (the "Signature Agreement"), Indiana transferred to Plaintiff "the exclusive right to inscribe or set forth [his] signature and the copyright date on all reproductions of [LOVE] reproduced by [Plaintiff] as authorized by the [April 9, 1999] Agreement." Counterclaim Def. Mem. at 11–12 (quoting Signature Agreement, ECF No. 107-8). Plaintiff argues that the Signature Agreement

operates as a waiver of Indiana's rights under VARA. *See* 17 U.S.C. § 106A. The Estate did not

discuss the Signature Agreement in its counterclaims, and the parties disagree over whether it is

properly considered at the motion to dismiss stage. Estate Opp. at 11–12; Counterclaim Def.

Reply at 7. Even if the Court were to consider the Signature Agreement, however, it would not

dismiss the Fourth Counterclaim, because the Signature Agreement only concerns reproductions

of images authorized by the April 9, 1999 Agreement, and the Estate alleges that the Semi-

Precious Stone Sculptures were not authorized by that agreement. Estate Opp. at 12; Estate Am.

Ans. ¶¶ 196–200. To the extent that the Estate alleges violations of VARA outside of the Semi-

Precious Stone Sculptures, however, the claim is DISMISSED as too vague to state a claim

because it fails to provide the Counterclaim Defendants with "fair notice" of "the grounds upon

which [the claim] rests." *Twombly*, 550 U.S. at 555.

Accordingly, the Court shall not dismiss the Fourth Counterclaim to the extent that it

alleges a violation of VARA with respect to the Semi-Precious Stone Sculptures.

e.   Fifth, Sixth, and Seventh Counterclaims

In its Fifth Counterclaim, the Estate alleges that Plaintiff, Salama-Caro, Figure 5 Art

LLC, and Shearbrook (US), LLC violated the Lanham Act by operating the Website. Estate Am.

Ans. ¶¶ 234–241. In its Sixth Counterclaim, the Estate alleges that these same parties committed

common law trademark infringement by operating the Website. *Id.* ¶¶ 242–250. In its Seventh

Counterclaim, the Estate alleges that these same Counterclaim Defendants were unjustly

enriched by operating the Website. *Id.* ¶¶ 251–256.

The Counterclaim Defendants argue that the Fifth and Sixth Counterclaims must be

dismissed because "nowhere do[es the Estate] allege that Indiana was unaware of or objected to

the Counterclaim-Defendants' operation and maintenance of th[e W]ebsite," and that "the

website had been registered and publicly operated by [the] Counterclaim-Defendants for many years while Indiana was alive, since at least 2011." Counterclaim Def. Mem. at 15. They argue, therefore, that these counterclaims are "prohibited by the doctrines of laches, estoppel, and other equitable doctrines." *Id.* at 16. However, "[l]aches is an affirmative defense and is generally not available on a motion to dismiss." *George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 655 (S.D.N.Y. 2014). The Counterclaim Defendants contend that the Court should nevertheless consider it because "the defense of laches is clear on the face of the complaint, and [] it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar." Counterclaim Def. Reply at 9 (quoting *George Nelson Found.*, 12 F. Supp. 3d at 655). However, even though the Counterclaim Defendants claim that Indiana was aware of the Website and that it had been operated "open[ly] and notorious[ly]" "while Indiana was alive, since at least 2011," Counterclaim Def. Mem. at 15, no such allegations appear on the face of the Estate's answer. Accordingly, the Court shall not dismiss the Fifth and Sixth Counterclaims.

With respect to the Seventh Counterclaim, however, the Counterclaim Defendants make an additional argument—that the Estate has failed to state a claim because it "neglects to identify any specific income or enrichment derived by Counterclaim-Defendants from the [W]ebsite." Counterclaim Def. Mem. at 16. Indeed, the Estate only alleges vaguely that "[b]y registering and operating the [Website], the [] Counterclaim-Defendants have received a benefit in the form of using the 'Robert Indiana' mark in a manner to which they were not authorized," that they "have an appreciation of that benefit and continue to receive the benefit of using the 'Robert Indiana' mark," and that they "have been unjustly enriched from their continued, unauthorized operation of the [Website]." Estate Am. Ans. ¶¶ 252–254. This is insufficient to state a claim for unjust enrichment. *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y.

2004) ("A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff." (internal quotation marks and citation omitted)); *see also Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks, citations, and alterations omitted)).  Accordingly, the Seventh Counterclaim is DISMISSED.

### f. Eighth Counterclaim

In its Eighth Counterclaim, the Estate alleges that Salama-Caro and RI Catalogue Raisonné LLC are engaged in unfair competition in violation of Section 43(a) of the Lanham Act by working toward the creation and publication of the catalogue raisonné, and by soliciting works for it via the "info@robertindiana.com" email address, without the permission of Indiana or the Estate.  Estate Am. Ans. ¶¶ 257–264; *see also* Estate Opp. at 14.  The Estate requests that the Court enjoin the Counterclaim Defendants "from the unauthorized publication of Robert Indiana works for which the Estate owns the intellectual property rights, and enjoin the [] Counterclaim Defendants from the unauthorized use of the 'Robert Indiana' mark in connection with the [c]atalogue [r]aisonné."  Estate Am. Ans. at 33.

The Lanham Act states that:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . name . . . which[] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a)(1)(A).

The Counterclaim Defendants argue that this claim must be dismissed because the creation and publication of the catalogue raisonné was expressly authorized by the Catalogue Raisonné Agreement. Counterclaim Def. Mem. at 17–18. As discussed, that agreement stated that Indiana and Salama-Caro "agreed that [Salama-Caro is] responsible for the preparation of the [c]atalogue [r]aisonne of my complete oeuvre." *See* Catalogue Raisonné Agreement.

A contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (internal quotation marks and citation omitted); *see also Acadia Ins. Co. v. Buck Constr. Co.*, 756 A.2d 515, 517 (Me. 2000) ("Language is considered to be ambiguous if it is reasonably susceptible to different interpretations."). "The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities. Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning . . . it should be submitted to the trier of fact." *Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).

The Estate argues that under the Catalogue Raisonné Agreement, "Indiana did not grant the right to publish the catalogue raisonné or otherwise engage in commercial activity related to the catalogue raisonné, and much less to engage in such commercial activity using Indiana's name." Estate Opp. at 15. Rather, "the purpose of the [Catalogue Raisonné Agreement] was to allow Simon Salama-Caro to prepare a [c]atalogue [r]aisonné to be published by a third party with the supervision and consent of Robert Indiana." Estate Am. Ans. ¶ 205. It argues that use

of Indiana's name via the info@robertindiana.com email address "is likely to confuse or deceive the public into believing that Mr. Indiana or the Estate have sponsored or approved of the commercial activities of the [] Counterclaim-Defendants," and that "[o]wners of paintings and sculptures are more likely to aid in these commercial activities if they perceive Mr. Indiana has sponsored or approved them." *Id.* ¶ 262. The Counterclaim Defendants disagree, arguing that the Catalogue Raisonné Agreement's "broad grant of authority necessarily includes permission and an implied license to publish images of all of Indiana's works," and that the agreement "nowhere indicates that this clear and broad grant of authority was somehow intended to exclude the authority to publish that prepared [c]atalogue [r]aisonné, or to exempt from its pages images of" all of Indiana's works. Counterclaim Def. Mem. at 17–18.

The Court finds that Catalogue Raisonné Agreement is ambiguous. The agreement is one sentence long. The use of the word "prepare" makes the Estate's interpretation reasonable, because one definition of "prepare" is "to work out the details of[, or to] plan in advance," Merriam Webster, http://www.merriam-webster.com/dictionary/prepare (last visited July 1, 2019), but not necessarily to shepherd the project to its conclusion. On the other hand, the Counterclaim Defendants' interpretation, in which Indiana gave Salama-Caro the authority to oversee the entire catalogue raisonné process is also reasonable. *See* Counterclaim Def. Reply at 12–13. Accordingly, at this stage, the Catalogue Raisonné Agreement is not dispositive of the Eighth Counterclaim.[7]

The Court also rejects the Counterclaim Defendants' remaining arguments with respect to the Eighth Counterclaim. The Counterclaim Defendants contend that the publication of the

---

[7] The Court also rejects the Counterclaim Defendants' separate argument that the Catalogue Raisonné Agreement, at a minimum, unambiguously gave Simon Salama-Caro the authority to use the "info@robertindiana.com" email address to solicit works to be included in the catalogue raisonné. *See* Counterclaim Def. Reply at 10–11. Because of the brevity of the agreement, the Court finds it to be ambiguous on this point as well.

catalogue raisonné would constitute fair use.  Counterclaim Def. Mem. at 19.  However, fair use is an affirmative defense that would be inappropriate to resolve at this stage.  *See Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).  In addition, the Counterclaim Defendants argue that the Eighth Counterclaim is not ripe because the catalogue raisonné has not yet been published. Counterclaim Def. Mem. at 19; *see also* Counterclaim Def. Reply at 14 ("Among other details relevant to the parties' copyright infringement dispute, it remains to be settled exactly which images will appear in the [c]atalogue [r]aisonné, who owns the rights to those images, what size each will appear in, and what and how much text will accompany each image").  The Court disagrees.  The claim is ripe because it is "clear that the two parties are on a collision course that has already framed the essential disputes in plain terms and that will enable the Court to determine their respective rights."  *McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 257 (S.D.N.Y. 2005).  Finally, the Counterclaim Defendants contend that granting an injunction against the publication of the catalogue raisonné "would constitute an impermissible prior restraint" in violation of the First Amendment.  Counterclaim Def. Mem. at 19 (citing *Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC*, No. 03 Civ. 9471, 2004 WL 1574645 (S.D.N.Y. July 13, 2004)).  Although the Estate requests injunctive relief in its pleading, it does not move for an injunction at this time, and the Court finds that this argument does not require dismissal of the Eighth Counterclaim at this stage.

For the reasons stated above, Plaintiff's motion to dismiss the Estate's counterclaims against it is GRANTED in part and DENIED in part.

### D.  Plaintiff's Partial Motion to Dismiss AIA's Counterclaims and Thomas's Motion to Dismiss AIA's Crossclaims

Next, the Court shall address Plaintiff's partial motion to dismiss AIA's counterclaims, ECF No. 110, and Thomas's motion to dismiss AIA's crossclaims, ECF No. 115.

27

1.  Background

The following facts are taken from AIA's third amended answer. *See* AIA Ans. Because there is some overlap in allegations relevant to the motions, the facts set forth here apply to both motions.

In 1976, Indiana moved to Vinalhaven, an island off the coast of Maine. *Id.* ¶ 201.

In 2006, Indiana and McKenzie discussed a follow-up project to LOVE that would ultimately become Indiana's HOPE sculpture. *Id.* ¶ 232. Although the project was originally a reference to Indiana's home in Maine—the Star of Hope Lodge—it took on a new meaning because of then-candidate Barack Obama's use of the word "hope" in his presidential campaign. *Id.* ¶¶ 232–233. On August 11, 2018, Indiana and AIA entered into a contract to produce HOPE sculptures and prints. *Id.* ¶ 234; AIA Ans. Ex. B, ECF No. 91-2. The contract states that Indiana "will cooperate with [AIA] in maintaining, for both [Indiana's] and [AIA's] benefit, the exclusivity of the artwork and all intellectual property rights associated with it [to] the best of his ability." AIA Ans. ¶ 237. Indiana and AIA entered into four addenda to the agreement from 2010 to 2012 (agreement and addenda together, the "HOPE Contract"). *Id.* ¶ 240; AIA Ans. Exs. C–F, ECF Nos. 91-3 through 91-6). Pursuant to one addendum, the HOPE Contract automatically renewed upon an annual payment of $1 million by AIA to Indiana. AIA Ans. ¶ 241.

The HOPE sculpture was ultimately installed at the entrance to the 2008 Democratic National Convention and was used by the national Obama campaign. *Id.* ¶¶ 233, 238. Sales of Indiana's art pursuant to the HOPE Contract never earned $1 million or more in royalties, but AIA has continued to pay the $1 million each year. *Id.* ¶¶ 265–266. AIA alleges that "[t]hough HOPE was a great success, sales of sculptures, canvases, and prints declined during the Obama

administration as excitement from the campaign declined and the Great Recession battered the art market." *Id.* ¶ 264.

Thomas worked as a studio assistant to Indiana for several years in the 1990s. *Id.* ¶ 246. In 2013, Thomas began working for Indiana as his assistant and caretaker. *Id.* ¶ 247. On May 7, 2016, Thomas became Indiana's attorney-in-fact pursuant to a power-of-attorney. *Id.* ¶ 248. Thomas's duties expanded to include financial management. *Id.* ¶ 249. Pursuant to Thomas's power-of-attorney, Thomas had control of Indiana's bank accounts. *Id.* ¶ 250. As attorney-in-fact, Thomas authorized payments to himself and to a limited liability company that he controls. *Id.* ¶¶ 251–253. He also made cash withdrawals from accounts controlled by Indiana. *Id.* ¶ 260. From 2016 to 2018, AIA paid Indiana HOPE Contract royalties of over $2 million, which Thomas deposited into one of Indiana's bank accounts. *Id.* ¶ 255. When Thomas became attorney-in-fact in May 2016, AIA often communicated with Indiana through him, and Thomas authorized various projects pursuant to the HOPE Contract. *Id.* ¶¶ 265, 272–273.

AIA also makes allegations concerning statements by Plaintiff about AIA. For example, during art fairs "in Basil and Miami," Plaintiff told representatives of the Galerie Thomas that certain artworks made in accordance with the HOPE Contract were not part of Indiana's oeuvre and that Indiana had never heard of the HOPE sculpture. *Id.* ¶ 291. Plaintiff also told art dealers that the HOPE sculpture was of poor quality. *Id.* ¶ 292. Plaintiff falsely told galleries that Indiana had disavowed AIA and no longer worked with it, falsely told the Contini Art Gallery and other galleries that AIA was forging HOPE artworks, falsely informed an owner of a damaged HOPE sculpture that only Plaintiff (i.e., not AIA) could authenticate and repair it (and made a similar statement to Sotheby's), and falsely stated that it was the head of Indiana's "Star of Hope Foundation" and could authenticate artworks made pursuant to the HOPE Contract. *Id.*

¶¶ 293–296, 374. Moreover, Plaintiff "interfered with the HOPE Contract by attempting to affix [its own] copyright notice to a HOPE [s]culpture loaned to the Farnsworth Museum in Rockland, ME." *Id.* ¶ 290; *see also id.* ¶ 352.

These statements by Plaintiff "prevented [AIA] from participating in valuable exhibitions. *Id.* ¶ 362. Similarly, "[p]rospective business relationships would have been entered into but for Plaintiff's interference." *Id.* ¶ 367. Because of Plaintiff's statements, AIA "is virtually unable to sell the Indiana artworks for anything approaching their true value, given the legal uncertainty that now wrongfully clouds title to the Indiana artworks." *Id.* ¶ 387.

In a May 18, 2018 Reuters article (the "Reuters Article"), Plaintiff stated that AIA was involved in a "rogue and brazenly unlawful forgery scheme" through its counsel, Luke Nikas. *Id.* ¶ 283 (citing Jonathan Stempel, *Legacy of 'Love' Artist Robert Indiana is Subject of New Lawsuit*, Reuters, May 18, 2018, ECF No. 129-2). In a May 23, 2018 Portland Press Herald article (the "Portland Press Herald Article"), Plaintiff stated in reference to works published by AIA that "the first and most important thing [in] protecting [Indiana's] legacy [is] to stop proliferation of inauthentic works." *Id.* ¶ 284 (citing Bob Keyes, *Lawsuit Paints Sad Image of Exploitation in Robert Indiana's Final Years on Maine Island*, Portland Press Herald, May 23, 2018, ECF No. 129-1). In addition, Plaintiff "has fed false statements to the New York Times concerning [AIA]." *Id.* ¶ 285. Specifically, in an article published on August 1, 2018 (the "8/1/18 NYT Article"), Plaintiff "caused the publication of false claims that use of the Ghostwriter [automatic signature] machine was not authorized by Indiana." *Id.* (citing Graham Bowley & Murray Carpenter, *How Robert Indiana's Caretaker Came to Control His Artistic Legacy*, N.Y. Times, Aug. 1, 2018, ECF No. 112-1). In an article published on September 21, 2018 (the "9/21/18 NYT Article"), Plaintiff "planted [a] false story that [a] BRAT sculpture was

30

not authorized by Indiana." *Id.* ¶ 286 (citing Colin Moynihan & Graham Bowley, *Was This Homage to Bratwurst Really Designed by Robert Indiana?*, N.Y. Times, Sept. 21, 2018, ECF No. 112-2).

### 2. Plaintiff's Partial Motion to Dismiss AIA's Counterclaims

In its third amended answer, AIA asserts eight counterclaims against Plaintiff. AIA Ans. at 40–48. On December 11, 2018, Plaintiff moved to dismiss the Fifth, Sixth, Seventh, and Eighth Counterclaims. ECF No. 110.

#### a. Fifth Counterclaim

AIA's Fifth Counterclaim against Plaintiff is for tortious interference with contract— specifically, the HOPE Contract. AIA Ans. at 44. "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's actual knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996); *see also June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 50 (Me. 1996) ("A party can recover damages for a tortious interference with a contract if a person by fraud or intimidation procures the breach of a contract that would have continued but for such wrongful interference." (internal quotation marks and citation omitted)).

Plaintiff argues that the Fifth Counterclaim should be dismissed for failure to allege an actual breach of the HOPE Contract by Indiana. Pl. Mem. at 7–8, ECF No. 111; Pl. Reply at 2–4, ECF No. 128. The Court agrees. The sole allegation concerning a breach that AIA makes in its pleading is that "Plaintiff's interference with the contract was intentionally designed to disrupt

the [HOPE Contract]." AIA Ans. ¶ 356. This is too "vague and conclusory" to allege a breach. *Black Car & Livery Ins., Inc. v. H&W Brokerage, Inc.*, 28 A.D.3d 595, 595 (2d Dep't 2006).

In its opposition brief, AIA makes a number of allegations for the first time that are not present in its pleading, and which the Court shall not consider. *See Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526–527 (S.D.N.Y. 2015). For example, AIA states that "[t]he confusion created by [Plaintiff] led Indiana to authorize [Plaintiff] to try to affix a copyright notice to a HOPE sculpture at the Farnsworth Museum." AIA Opp. (Morgan) at 6, ECF No. 125. However, AIA's answer merely stated that Plaintiff "interfered with the HOPE Contract by attempting to affix [its own] copyright notice to a HOPE [s]culpture loaned to the Farnsworth Museum in Rockland, ME," and made no mention of Indiana authorizing Plaintiff's alleged action. AIA Ans. ¶ 290; *see also id.* ¶ 352. Similarly, AIA states in its opposition brief that "[a]s a result of [Plaintiff's] actions, the sales of HOPE declined and never met the $1,000,000 royalty threshold," AIA Opp. (Morgan) at 6, but its answer alleges no such thing, instead claiming that sales of HOPE art "declined during the Obama administration as excitement from the campaign declined and the Great Recession battered the art market," AIA Ans. ¶ 264. AIA also states in its opposition brief that "Indiana [] breached the HOPE Contract by not promoting the HOPE Artworks because [Plaintiff] duped Indiana into believing he did not authorize certain HOPE designs," but does not cite to its answer, which contains no such allegation. AIA Opp. (Morgan) at 11.

Accordingly, AIA has not alleged a breach of the HOPE Contract by Indiana, and the Fifth Counterclaim is DISMISSED.

b. Sixth Counterclaim

AIA's Sixth Counterclaim is for tortious interference with actual and prospective contractual relations. AIA Ans. at 45. In order to state a claim for tortious interference with business relations under New York law, a party must allege "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible, (4) an actual breach of the contract, and (5) damages to the plaintiff." *Fung-Schwartz v. Cerner Corp.*, No. 17 Civ. 233, 2018 WL 4386087, at *9 (S.D.N.Y. Sept. 13, 2018) (internal quotation marks and citation omitted); *see also Currie v. Indus. Sec, Inc.*, 915 A.2d 400, 408 (Me. 2007) ("Tortious interference with a prospective economic advantage requires a plaintiff to prove: (1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." (internal quotation marks and citation omitted)). Plaintiff argues that the Sixth Counterclaim should be dismissed on the ground that AIA has failed to adequately allege "an actual or prospective business opportunity that [Plaintiff] interfered with and that AIA lost as a result." Pl. Mem. at 10.[8] The Court agrees.

As discussed, AIA merely alleges that Plaintiff's statements "prevented [AIA] from participating in valuable exhibitions," and that "[p]rospective business relationships would have been entered into but for Plaintiff's interference." AIA Ans. ¶¶ 362, 367. The Court finds that AIA has "failed to allege facts sufficient for the Court to infer that [AIA] would have consummated contractual relationships if not for [Plaintiff's] conduct," and that its allegations

---

[8] AIA does not substantively respond to Plaintiff's argument. *See* AIA Opp. (Morgan) at 13–14.

"are too vague to support a finding that [AIA] would have executed specific contracts but for interference by [Plaintiff]." *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 79 (S.D.N.Y. 1995).

Accordingly, the Sixth Counterclaim is DISMISSED.

c. Seventh Counterclaim

AIA's Seventh Counterclaim is for unfair competition. AIA Ans. at 46. Under New York law, "unfair competition is [] held to encompass a broad[] range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 662 (2d Cir. 1979); *see also Knowles Co. v. Ne. Harbor Insurers*, No. CV-97-12, 2003 WL 23162892, at *7 (Me. Sup. Ct. Dec. 15, 2003) ("[T]he underlying element in all claims for unfair competition is that no person shall be permitted to palm off his own goods or products as the goods or products of another." (internal quotation marks, citation, and alteration omitted)). "An unfair competition claim must also involve some degree of bad faith." *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002).

AIA pleads an unfair competition claim on two theories. The first is based on AIA's allegation that Plaintiff "attempt[ed] to fix [its own] copyright notice to a HOPE [s]culpture loaned to the Farnsworth Museum in Rockland, ME." *See* AIA Opp. (Morgan) at 14–15 (citing AIA Ans. ¶ 290). However, AIA does not allege a misappropriation of its property—only that Plaintiff "attempt[ed]" to affix a copyright notice. This is insufficient to state a claim for unfair competition. *See Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 895 (S.D.N.Y. 2001) (dismissing unfair competition claim because "plaintiff has not specifically alleged that [the defendant] actually incorporated any exclusive property of [the plaintiff] into its server").

34

AIA's second theory of unfair competition is based on its allegations that Plaintiff made a number of false statements to art dealers, art galleries, and an owner of a HOPE sculpture about the quality of artworks made pursuant to the HOPE Contract, the legal rights to the artworks, and Indiana's alleged disavowal of them. AIA Ans. ¶¶ 291–296, 371–375. Plaintiff argues for their dismissal on the ground that "[t]o state a claim for unfair competition based on disparagement, a plaintiff must allege some injurious falsehood intentionally uttered that caused the plaintiff to suffer actual damage," and that "when the special damage alleged is the loss of customers, the individuals who ceased to be customers or refused to purchase must be specifically named." *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11 Civ. 3327, 2013 WL 417406, at \*17–18 (S.D.N.Y. Feb. 4, 2013) (internal quotation marks and citations omitted). Plaintiff argues that the only damages AIA alleges are insufficient to meet this standard—i.e., that "Plaintiff's statements are likely to deceive a substantial segment of the intended audience," "Plaintiff's deception was likely to influence purchasing decisions because collectors in the art world will likely be deterred from purchasing artworks from [AIA]," and that "[a]s a direct and proximate result of the acts of Plaintiff, [AIA] has suffered damages in an amount to be determined at trial." AIA Ans. ¶¶ 376–378. AIA responds that some of Plaintiff's alleged statements are not "disparagement," and therefore, the rule articulated in *Korova Milk Bar* does not apply. AIA Opp. (Morgan) at 15. The Court agrees with Plaintiff, however, that all of these alleged statements fall squarely within the definition of disparagement used in this context. *See Korova Milk Bar*, 2013 WL 417406, at \*17 ("Disparagement is a matter which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property or upon their quality." (internal quotation marks, citation, and

ellipsis omitted)).  Accordingly, AIA has not sufficiently alleged the damages it suffered through

Plaintiff's statements, and the Seventh Counterclaim is DISMISSED.

### d.  Eighth Counterclaim

AIA's Eighth Counterclaim is for slander of title.  AIA Ans. at 47.  AIA argues that

Plaintiff's statements in four news articles (the Reuters Article, the Portland Press Herald Article,

the 8/1/18 NYT Article, and the 9/21/18 NYT Article, *see* AIA Ans. ¶¶ 283–286), as well as its

statement to the Contini Art Gallery and other galleries that AIA was forging HOPE artworks,

*see id.* ¶ 294, amounted to slander of title.  AIA Opp. (Morgan) at 15–17.[9]

"To state a claim for slander of title under New York law, a plaintiff must allege: (1) a

communication falsely casting doubt on the validity of the complainant's title, (2) reasonably

calculated to cause harm, and (3) resulting in special damages."  *Narrative Ark Entertainm[en]t*

*LLC v. Archie Comic Publ'ns, Inc.*, No. 16 Civ. 6109, 2017 WL 3917040, at *9 (S.D.N.Y. Sept.

5, 2017) (internal quotation marks citation, and alterations omitted).  "New York law also

requires that [a p]laintiff demonstrate that the statements are made with 'malice' or 'at least a

reckless disregard for their truth or falsity."  *Nials v. Bank of Am.*, No. 13 Civ. 5720, 2014 WL

2465289, at *4 (S.D.N.Y. May 30, 2014); *see also Harvey v. Furrow*, 107 A.3d 604, 614 (Me.

2014) ("[T]o prove slander of title a claimant must prove (1) there was a publication of a

slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement

was made with malice or made with reckless disregard of its falsity; and (4) the statement caused

actual or special damages." (internal quotation marks and citation omitted)).

---

[9] In AIA's opposition brief, it improperly asserts a slander of title claim for the first time premised on a May 24, 2018 New York Times article that is not mentioned in its answer.  AIA Opp. (Morgan) at 8.  The Court shall not consider any claim based on this new allegation.  *See Guo*, 95 F. Supp. 3d at 526–27.

Plaintiff argues that the claim premised on the 9/21/18 NYT Article should be dismissed because AIA's allegation is contradicted by the actual text of the article. Pl. Mem. at 13–14; *see also MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) ("Allegations in the complaint that are contradicted by . . . documentary evidence are not entitled to a presumption of truthfulness." (internal quotation marks and citation omitted)). The Court agrees. AIA alleges that Plaintiff "planted [a] false story [the 9/21/18 NYT Article] that the BRAT sculpture was not authorized by Indiana." AIA Ans. ¶ 286; *see also id.* ¶ 383 ("[Plaintiff] falsely commented in the [9/21/18 NYT Article] that the BRAT sculpture was not authorized by Indiana."). However, Plaintiff is not mentioned at any point throughout the 9/21/18 NYT Article, and the article's statement that "[s]keptics said they were dubious that Mr. Indiana, who died in May at 89, actually signed off on the work commissioned last year by Johnsonville Sausage in Indiana," is not sufficient to support Plaintiff's allegation. 9/21/18 NYT Article at 1.

With respect to the remaining articles, Plaintiff argues that the slander of title claims should be dismissed because Plaintiff's statements are protected by the litigation privilege. Pl. Mem. at 12; Pl. Reply at 11–12. The Court agrees. "Under New York law, in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (internal quotation marks, citation, and alteration omitted). "The test of 'pertinency' is extremely broad," and the privilege "embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Id.* (internal quotation marks and citation omitted). The privilege applies to slander of title claims. *See San-Dar Assocs. v. Fried*, 151 A.D. 3d 545,

546 (1st Dep't 2017). "All that is needed to claim the privilege is that the alleged defamatory material may possibly bear on the issues now or at some future time." *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F. Supp. 555, 561 (S.D.N.Y. 1976) (internal quotation marks and citation omitted). The privilege applies where an attorney speaks to the press and "merely restat[es] the allegations of a complaint that [is] both privileged and available to the public." *Id.*; *see also Feist v. Paxfire, Inc.*, No. 11 Civ. 5436, 2017 WL 177652, at *5 (S.D.N.Y. Jan. 17, 2017) ("If the statements are no more than recitations of matter in pleadings that are themselves privileged, the statements or delivery of the pleadings to the press may be covered by the litigation privilege." (internal quotation marks, citation, and alteration omitted)); *see also Vogt v. Churchill*, 687 A.2d 961, 961–62 (Me. 1997) (affirming trial court's finding that defendants "were entitled to an absolute privilege for statements made in the course of a judicial proceeding, and a conditional privilege which was not abused for statements made outside the judicial proceeding").

The privilege applies to the Reuters Article. *Compare* AIA Ans. ¶ 283 ("[Plaintiff] told Reuters . . . that [AIA] was involved in a 'rogue and brazenly unlawful forgery scheme.'") *and* Reuters Article at 3 ("The complaint seeks a variety of damages for trademark infringement, breach of contract and other claims for what Nikas called a 'rogue and brazenly unlawful' forgery scheme.") *with* Am. Compl. ¶ 102 ("Defendants' scheme to isolate Indiana, obscure the true authenticity and ownership of his works, and reap the profits from selling unauthorized and forged works has escalated [] and continues to this day."). The privilege also applies to the Portland Press Herald Article. *Compare* AIA Ans. ¶ 284 ("[Plaintiff] told the Portland Press Herald that 'the first and most important thing [in] protecting [Indiana's] legacy [is] to stop proliferation of inauthentic works in reference to artworks published by [AIA]." (third alteration

in original)) *and* Portland Press Herald Article at 2 (quoting Plaintiff's counsel Luke Nikas) *with*

Am. Compl. ¶ 12 ("The forged and inauthentic works have harmed Indiana's market and have

once again begun to undermine his reputation.").  Finally, the privilege applies to the 8/1/18

NYT Article.  *Compare* AIA Ans. ¶ 285 ("[Plaintiff] caused the publication of false claims that

use of the Ghostwriter [automatic signature] machine was not authorized by Indiana.") *and*

8/1/18 NYT Article at 7 ("Mr. McKenzie said Mr. Indiana had personally signed all the works

they produced together, citing that as evidence they were all authorized.  But Luke Nikas, the

lawyer for [Plaintiff], said the company had found a video that 'proves the opposite.'") *with* Am.

Compl. ¶ 76 ("A video taken, on information and belief, in or around 2013 shows the

'ghostwriter' machine being used at McKenzie's instruction to mechanically replicate Indiana's

signature onto a print," which Plaintiff alleges amounted to "forging Indiana's signature.").[10]

AIA also alleges that Plaintiff "told Contini Art Gallery and other art galleries that [AIA]

was forging HOPE [a]rtworks that Indiana authorized."  AIA Ans. ¶ 294; *see also id.* ¶ 381.

Plaintiff argues that "[t]his allegation is entirely devoid of any specificity concerning what was

said, when, to whom, and by whom."  Pl. Mem. at 14.  Although the question is close, the Court

disagrees with Plaintiff, at least with respect to the statement to the Contini Art Gallery.  The

allegation gives sufficient notice that an agent of Plaintiff falsely told an agent of the gallery that

AIA was engaged in forgery, which is sufficient to state a claim.  The Court agrees, however,

that allegations about statements to "other art galleries" are too vague to support a plausible

claim.

---

[10] The Court rejects AIA's argument that the statements are not privileged because they are "so outrageously out of context as to permit one to conclude, from the mere fact that the statement was uttered, that it was motivated by no other desire than to defame."  AIA Opp. (Morgan) at 16–17 (quoting *Martirano v. Frost*, 25 N.Y.2d 505, 507–08 (1969) (statements by client in open court that his attorney "has just solicited [the client's adversary's] case in court" which were made "apparently for the purpose of questioning the propriety of the [attorney's] appearance and his adjournment request" were not privileged)).  The statements do not rise to this level.

The Court also rejects Plaintiff's argument that the claim should be dismissed because AIA "fails to adequately plea the required element of actual or express malice," Pl. Mem. at 14, in light of AIA's allegation that Plaintiff and its agents "knew [AIA] published original artworks authorized by Indiana pursuant to the HOPE Contract," AIA Ans. ¶ 288, but told the Contini Art Gallery otherwise. Plaintiff may prove at a later stage that it was engaged in a "good-faith dispute over title of the works at issue [which] cannot support a finding of malice," Pl. Mem. at 14, but the Court shall not make such a finding as a matter of law.

Accordingly, the Fifth, Sixth, and Seventh Counterclaims are DISMISSED in their entirety, and the Eighth Counterclaim is DISMISSED except to the extent that it alleges slander of title based on a statement by Plaintiff to the Contini Art Gallery.

### 3. Thomas's Motion to Dismiss AIA's Crossclaims

In its third amended answer, AIA asserts four crossclaims against Thomas—the Fourth, Fifth, Sixth, and Seventh Crossclaims. AIA Ans. at 52–5.[11] Thomas moves to dismiss all four crossclaims. ECF No. 115. For the reasons stated below, Thomas's motion is GRANTED.

As a preliminary matter, AIA's primary argument in opposition to Thomas's motion to dismiss is that the alleged power-of-attorney between Thomas and Indiana has not been produced, that AIA "has no knowledge of [the] terms" of the power-of-attorney, and that this "prevents the Court from ascertaining the scope of [Thomas's] duties"—which means that "Thomas'[s] motion is improper and should be dismissed because the scope of Thomas'[s] powers is a factual issue." AIA Opp. (Thomas) at 1–2, ECF No. 126. AIA does not allege anywhere in its answer that Thomas acted outside the scope of the power-of-attorney, and this argument was improperly raised for the first time in AIA's motion. *See Guo*, 95 F. Supp. 3d at

---

[11] All seven of AIA's crossclaims, including those asserted against Thomas, are asserted against the Estate. AIA Ans. at 48–55. As discussed, these crossclaims have been stayed pending arbitration. *See* ECF No. 94.

526–27. In any case, the matter is irrelevant. As explained below, regardless of whether or not Thomas was acting within the scope of the power-of-attorney, AIA has failed to state any of its crossclaims against Thomas.

a. Fourth Crossclaim

AIA's first crossclaim against Thomas (Fourth Crossclaim) is for breach of contract. AIA Ans. at 52. AIA claims that "[t]he HOPE Contract was based on Indiana's representations and warranties that Indiana had the right to enter into the contract and grant [AIA] a license to create, market, and sell the artworks at issue." *Id.* ¶ 422. However, Indiana's various contracts with Plaintiff, discussed *supra*, "placed limits on the artworks Indiana could produce," and accordingly, Indiana may have breached the HOPE Contract by failing to disclose that he did not possess some or all of the rights to the artworks produced pursuant to it. AIA Ans. ¶¶ 425, 427.

In order to state a claim for breach of contract, a party must allege, *inter alia*, the existence of a contract between the parties. *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2019); *see also Aquila, LLC v. City of Bangor*, No. CV-08-64-B-W, 640 F. Supp. 2d 92, 98 (D. Me. 2009). As discussed, AIA's breach of contract claim is predicated on an alleged breach of the HOPE Contract. However, Thomas was not a party to the HOPE Contract, which was between AIA and Indiana (and which was executed before Thomas allegedly became attorney-in-fact). AIA Ans. ¶¶ 234, 248, 420. Nor does it matter that Thomas was acting as Indiana's agent when he authorized artwork to be produced by AIA pursuant to the HOPE Contract. "[A]n agent for a disclosed principal will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Savoy Record Co. v. Cardinal Export Corp.*, 203 N.E.2d 206, 207 (N.Y. 1964) (internal quotation marks and citation omitted); *see also*

*Cty. Forest Prods., Inc. v. Green Mountain Agency, Inc.*, 758 A.2d 59, 69 (Me. 2000). AIA has

not alleged that Thomas intended to be bound, and Indiana was obviously disclosed as his

principal. In any event, the HOPE Contract contained a "no assignment" clause. ECF No. 91-2;

*see also* ECF No. 91-17 at 4 (legible draft).

Accordingly, the Fourth Crossclaim is DISMISSED as against Thomas.

b. Fifth Crossclaim

AIA's second crossclaim against Thomas (Fifth Crossclaim) is for contractual

indemnification for any damages it may be ordered to pay to Plaintiff. AIA Ans. at 53. Because

the Court has found that no contractual relationship existed between AIA and Thomas, this claim

must be dismissed. In any event, the HOPE Contract does not even provide for indemnity by

Indiana. *See* HOPE Contract; *see also* ECF No. 91-17 (legible draft). In its opposition, AIA

argues that the indemnity is "implied-in-fact" due to the "special nature of [AIA's] contract with

Indiana" because "their relationship was much more than a mere art publisher-artist

relationship," AIA Opp. (Thomas) at 11–13, but AIA says nothing in its brief (let alone its

answer) about a special relationship between it and Thomas.[12]

Accordingly, the Fifth Crossclaim is DISMISSED as against Thomas.

c. Sixth Crossclaim

AIA's third crossclaim against Thomas (Sixth Crossclaim) is for common law

indemnification for any damages it may be ordered to pay to Plaintiff. AIA Ans. at 54. "The

principle of common[]law, or implied, indemnification permits one who has been compelled to

pay for the wrong of another to recover from the wrongdoer the damages it paid to the injured

---

[12] AIA's speculation that the unproduced power-of-attorney between Indiana and Thomas may have contained
"stipulations . . . showing an intent to indemnify [AIA] under the HOPE Contract and addenda or showing a special
relationship between Thomas and [AIA]," AIA Opp. (Thomas) at 12, merits no analysis.

party.  Common[]law identification is warranted where a defendant's role in causing the plaintiff's injury is solely passive, and thus its liability is purely vicarious."  *Bd. of Managers of 125 N. 10th Condo. v. 125North10, LLC*, 150 A.D.3d 1063, 1064 (2d Dep't 2017) (internal quotation marks and citations omitted); *see also Emery v. Hussey Seating Co.*, 697 A.2d 1284, 1288 (Me. 1997).

Plaintiff asserts several federal law claims against AIA: copyright infringement, trademark infringement, and a violation of VARA.  Am. Compl. at 46–47, 51.  Common law indemnification is not available for these claims.  *See Zino Davidoff SA v. Selective Distribution Int'l Inc.*, No. 07 Civ. 10326, 2013 WL 1245974, at *5 (S.D.N.Y. Mar. 8, 2013), *report and recommendation adopted*, 2013 WL 1234816 (S.D.N.Y. Mar. 27, 2013) (common law indemnification not available under Lanham Act); *Elektra Entm't Grp. Inc. v. Santangelo*, No. 06 Civ. 11520, 2008 WL 461536, at *2 (S.D.N.Y. Feb. 15, 2008) (common law indemnification not available under Copyright Act).  This is because "unless Congress has explicitly or implicitly provided for such a remedy in the statute or the court recognizes such a remedy as a matter of federal common law, the defendant may not seek it."  *Zino Davidoff SA*, 2013 WL 1245974, at *4.  With respect to the VARA claim, the Court has found no cases recognizing common law indemnification as a matter of federal common law, nor is it provided for in the statute.  17 U.S.C. § 106A.  AIA fails, therefore, to state a claim for common law indemnification with respect to Plaintiff's federal claims.

The remaining state law claims brought by Plaintiff against AIA are for intentional torts committed by AIA—i.e., tortious interference with contract, unfair competition, and defamation.  Am. Compl. at 50, 52–53.  Accordingly—because AIA's role is not "solely passive," *Bd. of Managers*, 150 A.D.3d at 1064—common law indemnification is not available for these claims.

*See Barbagallo v. Marcum LLP*, No. 11 Civ. 1358, 2012 WL 1664238, at *7 (E.D.N.Y. May 11, 2012) ("New York law [] does not permit common law indemnification against intentional torts," including tortious interference with contract and unfair competition); *see also Milner v. N.Y. State Higher Educ. Servs. Corp.*, 24 A.D.3d 977, 978 (3d Dep't 2005) (defamation is intentional tort).[13]  Without citing any caselaw, AIA argues that this rule should not apply because "[t]he intentional tort claims were born out of the HOPE Contract and addenda and McKenzie's larger relationship with Indiana and Thomas." AIA Opp. (Thomas) at 16.  This argument about the larger picture, however, does not overcome the settled rule in New York that common law indemnification is not available for intentional torts. *Barbagallo¸* 2012 WL 1664238, at *7.

Accordingly, AIA cannot seek common law indemnification from Thomas on any of Plaintiff's claims, and the Sixth Crossclaim is DISMISSED as against Thomas.

### d.  Seventh Crossclaim

AIA's final crossclaim against Thomas (Seventh Crossclaim) is for unjust enrichment. AIA Ans. at 55.  AIA alleges that Thomas unjustly enriched himself by allegedly misappropriating money that AIA paid to Indiana pursuant to the HOPE Contract.  *Id.* at 55–56.

"Under New York law, an unjust enrichment claim requires a plaintiff to prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (internal quotation marks and citation

---

[13] Plaintiff also asserts a claim for common law trademark infringement.  Am. Compl. at 48.  Common law trademark infringement is a strict liability offense.  *See Cartier Int'l B.V. v. Ben-Menachem*, No. 06 Civ. 3917, 2008 WL 64005, at *12 (S.D.N.Y. Jan. 3, 2008) ("[A] seller bears strict liability for violations of the Lanham Act."); *see also C-Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013) ("In New York, common law trademark infringement and unfair competition claims largely mirror the Lanham Act claims." (internal quotation marks and citation omitted)).  However, given AIA's role in creating artworks under the HOPE Contract that allegedly infringed Plaintiff's copyrights, AIA's role was clearly not "solely passive."  *Bd. of Managers*, 150 A.D.3d at 1064.

omitted).  "The essence of such a claim is that one party has received money or a benefit at the expense of another."  *Nagelberg v. Meli*, 299 F. Supp. 3d 409, 417–18 (S.D.N.Y. 2017) (internal quotation marks and citation omitted); *see also Forrest Assocs. v. Passamaquoddy Tribe*, 760 A.2d 1041, 1045–46 (Me. 2000) ("To sustain a claim for unjust enrichment, a claimant must establish that it conferred a benefit on the other party[,] that the other party had appreciation or knowledge of the benefit[,] and that the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." (internal quotation marks, citation, and ellipses omitted)).

In *Nagelberg*, a defendant broker-dealer was alleged to have enticed the plaintiff investors to invest in a fraudulent scheme perpetrated by its client, a co-defendant.  *Id.* at 412–413.  After the investors invested in the scheme, the client paid the broker-dealer a fee tied to the gross proceeds it received from the plaintiffs.  *Id.* at 412.  The court dismissed the plaintiffs' unjust enrichment claims against the broker-dealer, reasoning that "[w]hile what turned out to be a loss for [plaintiffs] was a gain for [the broker-dealer]," the broker-dealer's enrichment was "not at plaintiffs' expense."  *Id.* at 418.  This is because if the broker-dealer had not received its fees, its client, "and not plaintiffs, would have retained that money," and "[p]laintiffs' financial position would be exactly the same today whether [the broker-dealer] was paid the fees or not." *Id.*  The same reasoning applies here—even if Thomas was paid a salary by Indiana or withdrew funds from Indiana's bank accounts, his enrichment was not at AIA's expense, and AIA's "financial position would be exactly the same today."  *Id.*

Accordingly, the Seventh Crossclaim is DISMISSED as against Thomas.

e.   Dismissal With Prejudice

Thomas argues that dismissal of the crossclaims against him should be with prejudice—i.e., AIA should not be permitted leave to amend.  Thomas Mem. at 7–8, 25.  AIA does not respond to this argument.

"Dismissal may be with prejudice when there is an absence of any indication that a plaintiff could—or would—provide additional allegations to support a plausible claim." *Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 33 (2d Cir. 2018) (internal quotation marks, citations, and alterations omitted).  In any event, "[w]hen a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257 (2d Cir. 2018) (internal quotation marks, citation, and alterations omitted).

For the reasons stated above, there is no indication that additional allegations could support AIA's crossclaims against Thomas.  Moreover, AIA filed its third amended complaint after receiving a pre-motion letter from Thomas outlining the deficiencies in its second amended complaint, but the third amended complaint did not cure the deficiencies.  *See* Thomas Mem. at 5–6.  Accordingly, the dismissal of AIA's crossclaims against Thomas is with prejudice.

## CONCLUSION

In conclusion, first, AIA's motion for an order staying Plaintiff's claims against AIA, ECF No. 101, is DENIED.

Second, the Counterclaim Defendants' motion to dismiss the Estate's counterclaims against it, ECF No. 105, is GRANTED in part and DENIED in part as follows:

- The Estate's First Counterclaim is DISMISSED;

- The Estate's Second Counterclaim is DISMISSED, except to the extent that it alleges a breach of the Sculpture Agreement with respect to the Semi-Precious Stone Sculptures;

- The Estate's Third Counterclaim is DISMISSED;

- The Estate's Fourth Counterclaim is DISMISSED, except to the extent that it alleges violations of VARA with respect to the Semi-Precious Stone Sculptures;

- The Estate's Fifth and Sixth Counterclaims state claims and are not dismissed;

- The Estate's Seventh Counterclaim is DISMISSED; and

- The Estate's Eighth Counterclaim states a claim and is not dismissed.

Third, Plaintiff's partial motion to dismiss AIA's counterclaims against it, ECF No. 110, is GRANTED in part and DENIED in part as follows:

- AIA's Fifth, Sixth, and Seventh Counterclaims are DISMISSED; and

- AIA's Eighth Counterclaim is DISMISSED, except to the extent that it alleges slander of title based on a statement by Plaintiff to the Contini Art Gallery.

Finally, Thomas's motion to dismiss AIA's crossclaims against it with prejudice, ECF No. 115, is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 101, 105, 110, and 115.

SO ORDERED.

Dated:  July 1, 2019
        New York, New York

_____
ANALISA TORRES
United States District Judge