UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MORGAN ART FOUNDATION LTD.,

                    Plaintiff,

        -against-

MICHAEL MCKENZIE,
AMERICAN IMAGE ART, JAMIE THOMAS,
and JAMES W. BRANNAN as Personal
Representative of the Estate of Robert Indiana,

                    Defendants.

---

MICHAEL MCKENZIE
and AMERICAN IMAGE ART,

                    Counter-Claimants,

        -against-

MORGAN ART FOUNDATION LTD.,

                    Counterclaim Defendant.

---

JAMES W. BRANNAN as Personal Representative of
the Estate of Robert Indiana,

                    Counter-Claimant,

        -against-

MORGAN ART FOUNDATION LTD.,
FIGURE 5 ART LLC, SHEARBROOK (US), LLC,
RI CATALOGUE RAISONNÉ LLC,
and SIMON SALAMA-CARO,

                    Counterclaim Defendants.

Case No.  1:18-cv-04438-AT-BCM

MICHAEL MCKENZIE
and AMERICAN IMAGE ART,

                                   Counter-Claimants,

          -against-

JAMIE THOMAS and JAMES W. BRANNAN as
Personal Representative of the Estate of Robert
Indiana,

                                   Counterclaim Defendants.

**DEFENDANT JAMIE L. THOMAS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**

**SERPE RYAN LLP**
Silvia L. Serpe
Paul W. Ryan
16 Madison Sq. West, 10th Floor
New York, New York 10010
Tel.: (212) 257-5010
Fax: (212) 981-2720
pryan@serperyan.com
sserpe@serperyan.com

*Attorneys for Jamie L. Thomas*

TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………………1

STATEMENT OF FACTS………………………………………………………1

   A.   JAMIE THOMAS' RELATIONSHIP WITH ROBERT INDIANA …………………....3

   B.   MULTIPLE PEOPLE HAD ACCESS TO AND USED INDIANA'S
       COMPUTER AND AOL EMAIL ACCOUNT………………………………………..4

   C.   MR. THOMAS PRESERVED ALL EMAILS ONCE HE HAD A DUTY TO DO SO…8

   D.   MR. THOMAS AND HIS WIFE PROVIDED REQUESTED INFORMATION………8

   E.   THE FINDINGS OF THE FTI REPORT…………………………………………...10

       1.     Robert Indiana's Desktop, and Jamie Thomas' Laptop…………………………...10

       2.     Analysis of Indiana's AOL Account, and of Thomas' Gmail Account …………....11

              i.     Emails "Appeared" to be Deleted from Indiana's AOL Email
                     Account But Were Preserved by Mr. Thomas……………………………11

              ii.    Emails That Appeared to be Deleted from Mr. Thomas' Gmail
                     Account Were Preserved……………………………………………13

              iii.   Analysis of Mr. Thomas' Access to Mr. Indiana's AOL Account
                     did not Demonstrate Document Spoliation…………………………….13

ARGUMENT: THIS COURT SHOULD DENY THE MOTION FOR SANCTIONS
AS AGAINST JAMIE THOMAS ……………………………………………………...14

   A.   STANDARD APPLICABLE TO THE SPOLIATION OF EVIDENCE…………………………...14

   B.   MORGAN ART DOES NOT – AND CANNOT – MEET ITS BURDEN OF
       SHOWING THAT THOMAS IS LIABLE FOR SPOLIATION …………………………….....15

       1.     *Morgan Art Cannot Show Mr. Thomas Deleted Emails After February 28, 2018*……………..15

       2.     *Morgan Art Fails to Meet its Burden of Demonstrating Mr. Thomas Spoliated
            Evidence with a Culpable State of Mind*…………………………………………….... 18

       3.     *Multiple People Had Access to Indiana's AOL Account*……………………………20

       4.     *Morgan Art Has Not Met Its Burden of Demonstrating Prejudice*……………………………21

CONCLUSION……………………………………………………………………22

# TABLE OF AUTHORITIES

**Cases**

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001). ..................................................................14

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135 (2d Cir. 2012)……………………………………………14

*Karsch v. Blink Health Ltd., et. al.,* 2019 WL 2708125 (S.D.N.Y. 2019)………………………….…..15, 20, 22

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. 2017)…………………………………14

*Ryan v. Rock Grp., NY. Corp.*, No. 1:18-CV-2600-GHW, 2019 WL 6841874 (S.D.N.Y. Dec. 16, 2019)……....14

Defendant Jamie L. Thomas, by his attorneys, Serpe Ryan LLP, respectfully submits this memorandum of law in opposition to the Motion for Sanctions Against Defendants Jamie Thomas and James W. Brannan as Personal Representative of the Estate of Robert Indiana (Dkt. 86), and joins in the arguments in the Memorandum of Law by Mr. Brannan to the extent they apply to Mr. Thomas.

## PRELIMINARY STATEMENT

Morgan Art Foundation Limited ("Morgan Art") filed a baseless motion boldly accusing Jamie Thomas of "maliciously" destroying "hundreds if not thousands" of emails. Moving Br. at 1. Based on speculation, it seeks the harshest sanction available: a default judgment against Mr. Thomas. This Court should swiftly deny this motion for many reasons. First, false assumptions underlie Morgan Art's motion. Morgan Art surmises, without basis in fact, that (1) emails once existed; (2) that those emails were relevant to this matter; (3) that those emails were deleted with malicious intent, and (4) that "only one person could have deleted the emails: … Jamie Thomas". *Id.* Morgan Art repeats this final pejorative and defamatory speculation throughout its motion. *See id.* at 4 ("Thomas had sole access to Indiana's AOL account"); *id.* at 2 and 13 (Thomas "restricted access solely to himself"); *id.* at 2,4, and 13 ("Thomas had exclusive access to Indiana's account before and after Indiana died.").

Morgan Art's baseless accusation is directly contradicted both by the FTI Report and the documents produced by Mr. Thomas in this litigation, which show conclusively that Mr. Indiana's computer and AOL account were accessible to anyone who turned on his computer. FTI even concluded that two individuals other than Mr. Thomas accessed Mr. Indiana's computer in the week after his death. And access to Mr. Indiana's AOL account itself is not a matter of speculation: multiple individuals used Mr. Indiana's computer and his email account, either to conduct Mr. Indiana's affairs or their own. Indeed, had Morgan Art searched the emails Mr. Thomas produced in

this litigation solely for its own name (e.g. "Morgan Art"), it would have known that someone (other than Mr. Indiana or Mr. Thomas) forwarded an email that Morgan Art had sent to Mr. Indiana to one of Mr. Indiana's then assistants. As soon as he learned of that fact, Mr. Thomas forwarded that email to his lawyer, as well as to James Brannan, Mr. Indiana's then- attorney and now personal representative.

Morgan Art makes several other false, misleading or exaggerated claims, and the Court should view these assertions with great skepticism. Notably:

- Morgan Art alleges that Mr. Thomas destroyed documents based on a finding by FTI that 227 emails sent from Mr. Indiana to Mr. Thomas were missing from Mr. Indiana's AOL account, but FTI actually found all of these emails in Mr. Thomas' account.

- Morgan Art asserts that Mr. Thomas deleted 114 emails from Indiana's AOL account, but misleadingly fails to inform the Court that FTI concluded that copies of these messages were preserved in Mr. Thomas' gmail account.

- Morgan Art alleges that Mr. Thomas destroyed 87 emails sent to him by Mr. Indiana but all, but two, were preserved in Mr. Thomas' gmail account. With respect to those two emails, one has been produced in this litigation, and the other is privileged and irrelevant.

- Morgan Art claims that 35 messages were deleted from Mr. Thomas' gmail account, but misleadingly fails to tell the Court that FTI concluded that the forwarded or replied to copies of these emails were preserved in Mr. Thomas' gmail account, and thus nothing substantive has been destroyed.

- Morgan Art asserts that "Indiana's emails may have been some of the most important evidence in this case. . .." Moving Br. at 2. This statement is baseless speculation. Morgan Art offers no concrete or plausible suggestions as to what the purportedly missing bombshell evidence might be. In fact, the examples it imagines of possible existing documents all would necessarily exist within Morgan Art's own files. Instead the absence of such documents is entirely consistent with what anyone who knew Mr. Indiana knew – he rarely communicated by email.

Significantly, FTI determined that there were no mass deletions, no wiping software, and did not foreclose the likely possibility that emails were deleted in the ordinary course, including by individuals other than Mr. Thomas.

In sum, Morgan Art cannot show Mr. Thomas deleted emails after a duty to preserve arose, and that if he did so, he did it with a culpable state of mind. Finally, Morgan Art has failed to offer anything more than unfounded speculation that any purportedly missing emails are even relevant – let alone prejudicial – to its case. Accordingly, this Court should deny Morgan Art's request for any sanction.

## STATEMENT OF FACTS

### A.  JAMIE THOMAS' RELATIONSHIP WITH ROBERT INDIANA

Mr. Thomas has lived his entire life on Vinalhaven, an island off the coast of Maine with a population of approximately 1200 people, except for when he served in the Army. In addition to working for Mr. Indiana, Mr. Thomas had many jobs on Vinalhaven, including for the local electric company, as a house painter and as a lobsterman. Declaration of Jamie L. Thomas, dated March 4, 2020 ("Thomas Dec."), ¶2.

Mr. Indiana lived and worked on Vinalhaven since Mr. Thomas was a child. Mr. Thomas thus knew Mr. Indiana essentially all of his life, and worked for him for many years. In about the beginning of 1990, he began performing various jobs for Mr. Indiana, including running errands, helping him to paint, and assisting him with various art projects. Although Mr. Thomas did not have set hours, he worked for him most days until the late 1990s. During that time, they became close friends. *Id.* ¶3.

In the late 1990s, Mr. Thomas stopped working for Mr. Indiana to take on more work in the lobster industry. However, the two remained close, living only a few blocks away from each other, seeing and/or speaking with each other frequently. Mr. Indiana often had dinner with Mr. Thomas' family and came to Mr. Thomas' house for holidays and parties. Over the years, Mr. Indiana gave the Thomas family many gifts of artwork. *Id.* ¶4.

In around 2013, Mr. Thomas asked Mr. Indiana if he could help Mr. Thomas make a logo for his family lobster business. Mr. Indiana agreed, and the two of them worked on the logo for months. When the logo was done, instead of accepting payment, the two agreed to a barter exchange that involved Mr. Thomas bringing Mr. Indiana dinner every night for about two months. Subsequently, Mr. Indiana asked Mr. Thomas whether he could work with him full time, and Mr. Indiana promised he would pay Mr. Thomas enough so that he no longer needed to work in the lobster business. From that point forward, Mr. Thomas was either with Mr. Indiana or on-call for him 24 hours a day, every day, until the day Mr. Indiana died. *Id.* ¶5.

In May 2016, Mr. Indiana made Mr. Thomas his power of attorney. The papers were drafted by Mr. Indiana's lawyer, James Brannan, now the Personal Representative for the Estate. In addition to Mr. Thomas and Mr. Brannan, Mr. Indiana signed the papers in front of multiple witnesses, including Mr. Indiana's medical professional, and another lawyer who notarized the papers. Among other things, this power of attorney gave Mr. Thomas the authority to pay all of Mr. Indiana's bills, collect all monies owed to him, hire and fire people, enter contracts, and do anything that needed to be done for Mr. Indiana's benefit. *Id.* ¶6. The power of attorney did not exclude Mr. Indiana from independent control over his own affairs. *Id.* ¶7.

## B. MULTIPLE PEOPLE HAD ACCESS TO AND USED INDIANA'S COMPUTER AND AOL EMAIL ACCOUNT

Over the decades that Mr. Thomas knew and worked for Mr. Indiana, Mr. Indiana paid various people who would come to his home, the Star of Hope Lodge, and do various jobs for him. These people included Webster Robinson, who worked off and on as a personal assistant; Sean Hillgrove, who performed odd jobs and lived in a house next door that Mr. Indiana owned; Wayne Flaherty, who also performed odd jobs; Valerie Morton, who was Mr. Indiana's personal assistant; and Melissa Hamilton, who was also an assistant but mostly in the summers. In addition, in 2017 and 2018, while Mr. Thomas was Mr. Indiana's power of attorney and with the knowledge and approval

of Mr. Indiana's medical professional as well as Mr. Brannan, Mr. Thomas hired health-care aides to help care for Mr. Indiana at his house, including Jamie Philbrook Harris, Julia L. Haley, Candra Lee Perry, Lisa Simpson and Anne S. Debow. *Id.* ¶8.

        Except for a short period of time in late 2016, anyone in Mr. Indiana's home could access his computer and email account. Mr. Indiana had a desktop computer in his living and work area on the second floor of his home. The computer was not password protected. There was a post-it note on the corner of the monitor with whatever the current password was for his AOL email account, the email address of which was roberttoddfellow@aol.com. But usually the AOL email account remained logged-in, so that when someone accessed Mr. Indiana's computer, his AOL account was available for anyone to use. *Id.* ¶9.

        This was by Mr. Indiana's design: he wanted his assistants, such as Mr. Robinson, Ms. Hamilton and Ms. Morton, to be able to access his email account. Mr. Indiana, who was not computer-savvy, had increasing difficulty reading, particularly small print, in the last years of his life. Mr. Indiana relied on others, especially Mr. Robinson, Ms. Morton and Ms. Hamilton, whose primary job was dealing with his email correspondence, to print out emails and share them with him. After printing and sharing the emails with Mr. Indiana, they would put some of them into three-ring binders for him. On occasion, Mr. Thomas would send emails to Ms. Morton, Ms. Hamilton and Mr. Robinson at Mr. Indiana's email address because Mr. Thomas knew they would see it. *Id.* ¶10 and Ex. A. Mr. Indiana told Mr. Thomas that Mr. Robinson deleted large numbers of emails with some frequency so as to not "clog up the system." *Id.* ¶11. Going through Mr. Indiana's email account and printing and storing some of them was not part of what Mr. Thomas generally did for Mr. Indiana. *Id.*

        The fact that many people could access Mr. Indiana's emails meant that there was a complete lack of privacy. Mr. Thomas warned people of that lack of privacy. *Id.* ¶12 and Exs. B, F.

After Mr. Thomas became Mr. Indiana's power of attorney, Mr. Thomas became concerned that Mr. Robinson and others were using Mr. Indiana's email account to conduct their own personal matters. Mr. Thomas forwarded a few examples of this to his personal gmail account so that he could keep a record. *Id.* ¶13 and Ex. C. Mr. Thomas was unable to stop others from deleting emails, because Mr. Indiana insisted that Mr. Robinson and others continue to have access to his emails. *Id.* ¶13.

After Mr. Thomas became Mr. Indiana's power of attorney, Mr. Thomas would sometimes forward some of Mr. Indiana's emails to his personal gmail account, to make sure that they were not deleted before Mr. Indiana could review them. Mr. Thomas did not have a specific system or practice for which emails he forwarded to himself. The emails that he forwarded included visitor requests, notices about art exhibit openings, death notices for people Mr. Thomas thought Mr. Indiana might want to know about, news stories and videos about local events, invitations to events, general greetings holiday cards and birthday wishes, photos from friends and acquaintances, and business requests to use Mr. Indiana's art. *Id.* ¶14.

In November 2016, Mr. Robinson changed the password to Mr. Indiana's AOL account causing Mr. Thomas to be locked out of it. Mr. Thomas' attorney had to contact AOL so that Mr. Thomas, as Mr. Indiana's power of attorney, could access Mr. Indiana's email. It took several weeks before Mr. Thomas was able to gain access. *Id.* ¶15 and Ex. D. When Mr. Thomas finally did gain access, he reset the password. *Id.* ¶15.

Within a week or two after Mr. Thomas gained access to the AOL account, Mr. Indiana asked Mr. Thomas for the new password. Mr. Thomas warned Mr. Indiana that sharing the password would mean that the account would continue to be unsecure, but because he was directed by Mr. Indiana to provide it to him, Mr. Thomas complied. *Id.* ¶16.

After Mr. Thomas changed the AOL password, Mr. Robinson continued to access and use the account. *Id.* ¶17. In fact, Mr. Thomas continued to send emails to Mr. Robinson (who was known as "Web") at Mr. Indiana's AOL account email address. *Id.* ¶17 and Ex. E. And other individuals continued to communicate with Mr. Robinson at Mr. Indiana's AOL email address. *Id.* ¶17 and Ex. F.

On July 20, 2017, with the knowledge and approval of Mr. Indiana and Mr. Brannan, Mr. Thomas' attorney, John Frumer, sent an email to Simon and Marc Salama-Caro, telling them that they were deficient in their payments and owed Mr. Indiana unpaid royalties "in excess of $6 million". *Id.* ¶18 and Ex G. On July 26, 2017, Simon Salama-Caro sent a response letter back to Mr. Frumer, in which Mr. Salama-Caro copied Mr. Indiana, among others. *Id.* On August 14, 2017, Mr. Thomas discovered that someone who had access to Mr. Indiana's AOL account had forwarded Mr. Salama-Caro's response and the original email thread to Mr. Hillgrove. *Id.* Mr. Thomas emailed this information to his lawyer and to Mr. Brannan. *Id.* Even after this happened, Mr. Thomas did not block access to Mr. Indiana's email, because he knew it would anger Mr. Indiana, who had told him that he wanted Mr. Robinson to have access to his emails. Mr. Robinson and possibly Mr. Hillgrove and others continued to have access to Mr. Indiana's email account after this incident. *Id.* ¶18.

On November 3, 2017, Morgan Art sent Mr. Indiana an email attaching a statement of account. *Id.* ¶19 and Ex. H. That day, Mr. Thomas forwarded the email to himself, and the next day he forwarded it to his attorney. On November 5, 2017, at the direction of his attorney, Mr. Thomas searched Mr. Indiana's AOL account for emails concerning Morgan Art. As Mr. Thomas reported back to Mr. Frumer, there were none, due to the fact of Mr. Robinson "deleting everything." *Id.*[1]

---

[1] By including communications between Mr. Thomas (or his wife, Yvonne) and their attorney, neither Mr. Thomas nor Ms. Thomas waives their rights protected by the attorney-client or work-product privilege (or any other applicable privilege), except that they agree to a limited subject-matter waiver were it necessary for the Court's disposition of this motion.

### C.  MR. THOMAS PRESERVED ALL EMAILS ONCE HE HAD A DUTY TO DO SO

On February 28, 2018, as power of attorney, Mr. Thomas – with Mr. Indiana's approval as well as that of Mr. Brannan - sent, through his attorney, a letter to Morgan Art Foundation, S.A., Simon Salama-Caro, Marc Salama-Caro, Emiline Salama-Caro, and Shearbrook (US) LLC. Among other things, this letter stated that these receiving parties had breached their agreements with, and duties to, Mr. Indiana, and that they should cease and desist all actions as purported representatives of Mr. Indiana and his related entities. *Id.* ¶20.

After that letter, Mr. Thomas was advised multiple times by his attorney not to destroy any relevant documents. Mr. Thomas followed that advice and has not deleted any documents relating to Mr. Indiana or this litigation. *Id.* ¶21.

On May 30, 2018, Mr. Thomas gave his computer and the charging cord to his wife Yvonne to bring to their lawyer for imaging in connection with this litigation. Mr. Thomas does not remember deleting his Chrome history prior to giving his computer to his wife. *Id.* ¶22.

### D.  MR. THOMAS AND HIS WIFE PROVIDED REQUESTED INFORMATION

On May 24, 2018, a week after Mr. Indiana's death, on Mr. Thomas' behalf, his wife prepared a list of items requested by Mr. Brannan, who was appointed the personal representative of the estate. Mr. Brannan was planning to visit Vinalhaven on May 26, and Ms. Thomas planned to give the list to him then. Declaration of Yvonne Thomas, dated March 4, 2020 ("Y. Thomas Dec."), ¶4. The list included Mr. Indiana's various bank accounts, utilities for his home, various important phone numbers, and the account name and password for Mr. Indiana's AOL account. *See id.* ¶5 and Exhibit 1.[2]

---

[2]  After Mr. Thomas became power of attorney for Mr. Indiana, with the knowledge of Mr. Indiana and his attorney, Mr. Brannan, Mr. Thomas' wife took on increasing administrative responsibility in assisting Mr. Thomas in his role as power of attorney. She also assisted Mr. Thomas in connection

On the evening of May 25, 2018, Mr. and Ms. Thomas' attorney instructed Ms. Thomas to remove from the list the AOL password and other pins for security reasons. *Id.*, ¶6 and Exhibit 2. The following morning, Mr. Frumer instructed her to add some additional items, which Ms. Thomas complied with and then sent a revised list. *Id.*, ¶¶7-8 and Ex. 3 and 4. Later that day, Ms. Thomas personally handed an envelope with the revised list to Mr. Brannan. *Id.*, ¶9. Ms. Thomas believes that she also included in the envelope a handwritten piece of paper with the AOL account password, but she is not certain of this. *Id.*

A few days later, on May 30, 2018, Ms. Thomas met Mr. Thomas' attorney on the mainland in Rockland, Maine, and handed him Mr. Thomas' laptop to be imaged. Ms. Thomas did not delete the Chrome history on the computer before handing it over. *Id.* ¶10.

On July 10, 2018, following a second request from Mr. Thomas' attorney, Ms. Thomas again provided Mr. Indiana's AOL account and password to Mr. Thomas' attorney. *Id.* ¶13 and Exs. 5, 6. Ms. Thomas has never accessed Mr. Indiana's email account herself. *Id.* ¶14.

On August 28, 2018, the attorney for the Estate asked Mr. Thomas – through his attorney – for Mr. Indiana's AOL account password. Knowing that his wife had already provided the password, Mr. Thomas became concerned that the password she had given the Estate was incorrect, so he accessed Mr. Indiana's account in order to confirm that the password still worked, and then provided it to his attorney. At some point around August 29, he also took a picture of his computer screen, which shows the number of emails then in the AOL account (452 emails). Thomas Dec., ¶23 and Ex. I. During this time period, Mr. Thomas did not delete any emails, or do anything else within the email account. *Id.*

---

with his work with the Star of Hope, Inc. (the "Foundation"), the foundation that Mr. Indiana started. In late 2017, she was hired (although never paid) by the Foundation to act as its part-time bookkeeper. Y. Thomas Dec., ¶3.

### E. THE FINDINGS OF THE FTI REPORT

Morgan Art has mischaracterized many of FTI's findings in the report that it issued on November 8, 2019. S*ee* Nikas Decl., Ex. 11 (Dkt 87-11) ("Report"). Key portions of the Report include the following:

1. <u>Robert Indiana's Desktop, and Jamie Thomas' Laptop</u>

The Report confirms that Mr. Indiana's desktop computer did not require a password for access. *See* Report at 8 ("No password was needed"). As a result, "anyone with physical access to the Indiana Computer could boot the Indiana Computer and access the files on it." *Id.* FTI also observed that the webmail accounts of at least three individuals who worked for Mr. Indiana – Mr. Robinson, Ms. Simpson, and Ms. Harris – were accessed from Mr. Indiana's computer, evidencing that these individuals had used Indiana's computer. *Id.*; *see also id.* at 23-24.[3] Notably, FTI "did not identify any indications of wiping software or mass deletions occurring on" Mr. Indiana's computer. Report at 8.

Similarly, FTI analyzed Thomas' laptop computer and noted that no "applications of interest to our examination … such as mail applications or wiping software" had been uninstalled or removed. Report at 5. FTI also determined that "the user [Thomas] selected not to remove personal files or to overwrite free space." *Id.* FTI also found that on one image of Mr. Thomas' laptop there was "[l]imited active internet history exists on the Thomas Laptop," concluding that "the Chrome history was cleared on or about May 31, 2018." *Id.* FTI made clear, however, that it "cannot say

---

[3] Specifically, FTI could not "definitively" identify by date and time all instances of access of webmail by individuals, but it did identify access by people other than Mr. Thomas even after Mr. Indiana's death. *See* Report at 24 (noting access of Lisa Simpson's account on May 21 and 22, 2018, and Jamie Harris' account on May 29, 2018).

with certainty what data, if any, was lost as a result of this action." *Id.* Also, FTI did not conclude

that Mr. Thomas intentionally cleared the Chrome history. In fact, two days before Mr. Thomas'

laptop was first imaged, its operating system was updated to a newer version of Windows. *Id.*[4]

Moreover, FTI found that the image that it had captured of Mr. Thomas' laptop yielded

different data as to Mr. Thomas' internet history. *Id.* at 14 (paragraph beginning "In contrast").

Nonetheless, FTI was able to recover internet history spanning well before Mr. Thomas' duty to

preserve began. *Id.* (FTI's forensic tools recovered internet history spanning from July 19, 2016 to

May 14, 2019.).

2.   Analysis of Indiana's AOL Account, and of Thomas' Gmail Account

i.   Emails "Appeared" to be Deleted from Indiana's AOL Email Account But Were
     Preserved by Mr. Thomas

*First*, FTI found that 227 emails sent by Mr. Thomas to Mr. Indiana had been deleted from

Mr. Indiana's AOL account, but were retained in and recovered from Mr. Thomas' email. *See* Report

at 6 ("FTI analyzed the 232 messages sent from Thomas to Indiana that were found in the Thomas

mailbox to identify if the messages were original messages or if they were forwards or responses.");

*see also id.* ("Of the 232 messages in Thomas' mailbox that were sent from Thomas to Indiana, only

five of the 232 messages still exist in Mr. Indiana's box."). FTI also found that these 232 emails had

been sent between August 26, 2013 and December 14, 2017. *See* Report at 6, 20-21. FTI explained

that it "cannot say when these messages were deleted" from Mr. Indiana's email (*id.* at 20), but

surmised that they would have been deleted "between the time they were sent and May 2019, when

FTI downloaded Indiana's mailbox." *Id.* at 6. Thus, FTI does not exclude the possibility that all of

---

[4] The Report is silent on whether the clearing of the Chrome history was "initiated by the user" or
the result of "an automated process". *See* Report at 5 (noting that a disk cleanup utility package that
exists as part of Dell computers was executed by the user and removed Google Chrome history and
system files in October 2018).

these 227 emails were deleted during the 54-month period ranging between August 26, 2013 and February 28, 2018, **before** any duty to preserve evidence arose in this case. Also, notably, the Report does not conclude that all 227 emails were deleted at the same time, as opposed to, for example, contemporaneously with when the email was received by Mr. Indiana. In any event, all of these emails were found in Mr. Thomas' gmail account so FTI's analysis of whether they existed via a forwarded or replied to email is a non-issue.

*Second*, FTI found that 114 emails that were sent to Mr. Thomas and also included Mr. Indiana as a recipient were deleted from Indiana's AOL mailbox, but not from Mr. Thomas' mailbox. *See* Report at 7; *id.* at 22. Once again, FTI could not conclude when exactly these emails were deleted from Mr. Indiana's email account, but given that they were sent between July 31, 2014 and November 24, 2017, FTI surmised that the deletions took place "between when they were sent and May 2019." Id. at 22. Therefore, FTI did not rule out the possibility that all of these 114 emails were deleted from Mr. Indiana's account in the 42-month period ranging between July 31, 2014 and February 28, 2018, **before** any duty to preserved evidence arose in this action. Additionally, FTI specifically found that "[d]espite having been deleted from Indiana's mailbox, copies of these messages **still exist** in Thomas' mailbox." Report at 22. Therefore, the deletion of these 114 emails from Indiana's AOL account is a non-issue.

*Third*, FTI identified 87 emails from Mr. Indiana to Mr. Thomas, 85 of which still existed in Mr. Thomas' mailbox. FTI found that only two emails that were sent by Mr. Indiana to Mr. Thomas had been deleted from Mr. Thomas' mailbox. Report at 8. However, these two emails have been located. *See* Declaration of Paul W. Ryan, dated March 4, 2020, ¶2. One of the emails was produced. *See id.*, Exhibit A (email confirming the payment and shipment of an order, "Shipment Arriving: Thursday, 10th May -- See Details Here"). The other email, dated November 24, 2017 was not produced because it is privileged (and has nothing to do with this litigation). *See id.*, ¶4. Additionally,

FTI does not exclude the possibility that this email – created before the duty to preserve even arose – was not deleted between November 24, 2017 and February 28, 2018, before any obligation to preserve arose. *See* Report at 26.

     *Fourth*, FTI analyzed the messages that were sent to Mr. Indiana that included Mr. Thomas as a recipient and concluded that "Mr. Thomas had not deleted any of these messages from his mailbox." Report at 9, 26.

    ii.   <u>Emails That Appeared to be Deleted from Mr. Thomas' Gmail Account Were Preserved</u>

     FTI identified "35 original messages in Thomas' mailbox that were forwarded or responded to and which were sent to Indiana [that] *appear* to have been deleted from Thomas' mailbox." (emphasis added). Report at 6. FTI stated that "these original messages were forwarded or replied to between September 7, 2014 and December 30, 2015" and thus concluded that any deletion would have had to occur "between September 7, 2014 and May 2019 when FTI downloaded the Thomas mailbox." Report at 7. The Report does not exclude the possibility that all of these 35 original messages were deleted from Thomas' mailbox during the 41-month period ranging between September 7, 2014 and February 28, 2018, **<u>before</u>** any duty to preserve evidence arose in this case. Additionally, to the extent these deletions took place, they were immaterial because, as FTI found that, "[d]espite the original message being deleted, the forwarded or replied to copy of these messages **<u>still exists</u>** in Thomas' mailbox." *Id.* at 7; *see also id.* at 21 (same). Therefore, the deletion of these 35 emails is a non-issue.

    iii.   <u>Analysis of Mr. Thomas' Access to Mr. Indiana's AOL Account did not Demonstrate Document Spoliation</u>

     FTI "definitively" concluded that Mr. Thomas accessed Mr. Indiana's AOL account four times from his laptop, including once "as late as May 24, 2018". Report at 15. Without explaining its basis, FTI also concluded that these four times "may not represent every time the account was accessed", but it is unclear whether "the account" FTI refers to here is Mr. Thomas' account or Mr.

Indiana's, and in the following footnote FTI points out that Mr. Thomas' wife accessed her account from Mr. Thomas' computer (FTI was unable to say when). *Id.* at 15 n.7. FTI also chose to analyze Mr. Thomas' computer during a ten-minute window before and thirty-minute window after Mr. Thomas accessed Mr. Indiana's AOL account these four times. FTI unremarkably observed that during this time frame, there was activity – undoubtedly by Mr. Thomas – on his laptop, such as accessing his gmail account, searching his gmail for emails related to Mr. Indiana and accessing older emails some of which were related to Mr. Indiana (all during the time he was power of attorney), and other personal activity, such as accessing HBOGo. *Id.* at 15-16. Notably, "FTI was not able to determine what actions, *if any*, took place in the AOL account" during the times in which FTI definitively concluded he accessed it. *Id.* at 16 (emphasis added). Finally, FTI did not identify any downloads from Mr. Indiana's AOL account on Mr. Thomas' laptop. *Id.*

## **ARGUMENT**

### **THIS COURT SHOULD DENY THE MOTION**
### **FOR SANCTIONS AS AGAINST JAMIE THOMAS**

A. STANDARD APPLICABLE TO THE SPOLIATION OF EVIDENCE

The Second Circuit has made clear that a party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001); *see also, e.g., Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017).

These elements are "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted); *Ryan v. Rock Grp., NY. Corp.*, No. 1:18-CV-2600-GHW, 2019 WL 6841874, at *6 (S.D.N.Y. Dec. 16, 2019) (same).

Only upon a finding of prejudice to a party deprived of information may the Court order measures "necessary to cure the prejudice", and only upon a finding that the party was the victim of an intentional deprivation of information, may the Court take the more drastic measures of instructing the jury that it can presume the information was unfavorable to the party, dismiss the action or enter a default judgment. Fed. R. Civ. P. Rule 37(e); *see also Karsch v. Blink Health Ltd., et. al.,* 2019 WL 2708125 at *47-48 (S.D.N.Y. 2019).

B.  MORGAN ART DOES NOT – AND CANNOT – MEET ITS BURDEN UNDER RULE 37(A)

This Court should deny Morgan Art's motion for at least four reasons. First, there is no evidence of any mass deletion, or of any deletion of relevant emails. Second, Morgan Art fails to demonstrate that Mr. Thomas deleted emails with a "culpable state of mind" at any time, let alone after February 28, 2018, which is when Morgan Art alleges that a duty to preserve first arose in this case. Third, to the extent any emails were deleted at any time, such deletions cannot be attributed to Mr. Thomas. As FTI found, multiple former employees of Mr. Indiana had access to Mr. Indiana's computer and his AOL account. Fourth, even if Morgan Art could establish that Mr. Thomas deleted emails after February 28, 2018, it cannot establish that any emails were destroyed that would support Morgan Art's claims.

1.  *Morgan Art Cannot Show Mr. Thomas Deleted Emails After February 28, 2018*

Morgan Art asserts that "[t]here is clear and convincing evidence that a mass deletion took place." Moving Br. at 11. This is directly contradicted by FTI, which concluded that it did not identify any mass deletions on Mr. Indiana's computer, and that there was no wiping software on Mr. Thomas' computer. *See supra* Statement of Facts ("Facts"), Section E.1. The Report also demonstrates many occasions in which emails not preserved in Mr. Indiana's account were actually preserved in Mr. Thomas' account. *See supra* Facts, Sections E.2.i, ii (describing 227 emails sent by Mr. Thomas to Mr. Indiana which were retained in Mr. Thomas' email; 114 emails sent to Mr.

Thomas and also Mr. Indiana were preserved in Mr. Thomas' email account; 85 emails from Mr. Indiana's account to Mr. Thomas were preserved in Mr. Thomas' email account). Furthermore FTI concluded that Mr. Thomas had deleted no messages from his account in which individuals emailed Mr. Indiana and copied Mr. Thomas. *See supra* Facts, Section E.2.i.

Additionally, Morgan Art misleads the Court by suggesting that Mr. Thomas nefariously deleted 35 emails. Moving Br. at 11. This is Morgan Art's first argument purportedly in support of its assertion that Mr. Thomas intentionally deleted emails. In fact, as FTI found, these "deletions" are much ado about nothing given that "[d]espite the original message being deleted, the forwarded or replied to copy of these messages *still exists* in Thomas' mailbox." Report, at 21 (emphasis added). Morgan Art assumes that the fact that the original emails were not in either of Mr. Indiana's email or Mr. Thomas' account means that *Mr. Thomas* must have intentionally deleted the original emails from both accounts. There is no evidence for this. Indeed, were Mr. Thomas on some crusade to delete emails, then it stands to reason that he would have deleted the reply emails as well, which FTI did not conclude. Nor did FTI find any systemic or mass deletion. Instead, it is more than likely that the 35 emails were deleted contemporaneously with when they were received by or on behalf of Mr. Indiana, and Morgan Art fails to meet its burden that it was Mr. Thomas who deleted those emails from Mr. Indiana's AOL account.

In fact, as Mr. Thomas documented in 2017, other people were deleting Mr. Indiana's emails well prior to any obligation to preserve them. For example, back in November 2017, Mr. Thomas emailed his lawyer and noted that Mr. Robinson had a practice of deleting Mr. Indiana's emails. At his lawyer's instruction, and in the course of his work as Mr. Indiana's power of attorney, Mr. Thomas searched Mr. Indiana's AOL account for all emails with a Morgan Art email address. There were none, "because of Web [Robinson] deleting everything". *See supra* Facts, Section B.

Morgan Art's repeated accusations that any such deletions were part of a "malicious" and

"coordinated" effort on the part of Mr. Thomas are unfounded. Indeed several individuals had access to Mr. Indiana's computer and to his AOL account. *See* Report at 8, 23 (describing some computer access by others); *see also* Thomas Dec. at ¶¶ 9, 15 (anyone who accessed Mr. Indiana's computer had access to his AOL account, except for a period of several weeks in November 2016 when Mr. Robinson changed the password); Dkt. 87-4 (Robinson Dec), at ¶2 (Mr. Robinson "had access to [Mr. Indiana's] computer password and email password, and had a key to his home on Vinalhaven."); Declaration of Melissa Hamilton, dated February 28, 2020 ("Hamilton Dec."), ¶4 (Ms. Hamilton "had access to Indiana's computer and his email account."). Any one of these individuals could have accessed Indiana's AOL account then, and Morgan Art has no basis to suggest otherwise.

Morgan Art's second argument is that Mr. Thomas accessed Indiana's AOL account "numerous times" from his personal laptop. To be exact, FTI found that Mr. Thomas, who was Mr. Indiana's power of attorney, remotely accessed Mr. Indiana's email account at least four times in the 6-month period from November 18, 2017 and May 24, 2018.[5] There is nothing improper about this: this is the time period when Mr. Thomas was acting as Mr. Indiana's power of attorney (except for the week after Mr. Indiana's death). Morgan Art does not bother to spell out the purported import of FTI's finding other than to assert that Mr. Thomas therefore "opened Indiana-related emails." Moving Br. at 12. Of course, the fact that Mr. Thomas opened Mr. Indiana's email on at least four occasions does not bolster Morgan's Art's unsupported allegations that Mr. Thomas deleted emails,

---

[5] FTI "definitively" concluded that Mr. Thomas accessed Mr. Indiana's AOL account four times from his laptop, including once "as late as May 24, 2018". Report at 15. Without explaining its basis, FTI also concluded that these four times "may not represent every time the account was accessed", but it is unclear what "the account" refers to and in the accompanying footnote FTI points out that Mr. Thomas' wife accessed her account from Mr. Thomas' computer but FTI was unable to say when. *Id.* at 15 n.7.

and, not surprisingly, the Report does not make that conclusion. *See* Report at 16 ("FTI was not able to determine what actions, if any, took place in the AOL account."). Nor does Mr. Thomas disagree with Morgan Art's conclusion that it was indeed Mr. Thomas who accessed Mr. Indiana's AOL account from his own laptop for each of the four "definitive" accesses noted by FTI. *See* Moving Br. at 12. Thus, Morgan Art's second argument amounts to a resounding – so what?

Finally, Morgan Art proclaims that Mr. Thomas admitted that he deleted Indiana's emails. Moving Br. at 12. In support, Morgan Art points to Mr. Thomas' response to an interrogatory in which he stated that "he has not knowingly deleted emails or any other electronically-stored information that belonged to Robert Indiana, that was sent or received by Robert Indiana, or that pertained to Robert Indiana, *without first sending a copy to himself, copies of which have been produced in this litigation.*" *Id.* at 12 (emphasis in original). On its face, the response is not a confession, and Morgan Art's interpretation is self-serving to say the least. The response merely states that to the extent that, at any point in time, Mr. Thomas may have deleted Mr. Indiana'a emails, such deletions were preceded by his having forwarded them to his own email address. As stated above, there is no "there" there: Morgan Art's claims to the contrary, Mr. Thomas did not intentionally delete any relevant emails. *See* Report at 21 (noting that the forwarded and replied to copy of certain messages were preserved in Mr. Thomas' gmail account).[6]

  2. *Morgan Art Fails to Meet its Burden of Demonstrating Mr. Thomas Spoliated Evidence with a Culpable State of Mind*

Morgan Art has not met its burden of demonstrating that Mr. Thomas spoliated evidence, let alone that he did so with a culpable state of mind. To the contrary, the evidence demonstrates that Mr. Thomas fully complied with his attorney's admonition that he preserve and not destroy

---

[6] Morgan Art avers that Mr. Thomas *did produce* "emails received by Indiana that attached photographs of artworks that infringed MAF's rights." Moving Br. at 19. If Mr. Thomas was mass deleting relevant emails, did he just forget to delete that one?

documents concerning this litigation, both in electronic form and hard copy. *See supra* Facts, Section C. Moreover, Mr. Thomas' timely response to the Estate's requests for documents and information to provide an orderly transition of his role as power of attorney to Mr. Brannan as the Estate's personal representative speaks volumes. The evidence clearly demonstrates that Mr. Thomas (with his wife's assistance) complied with the instructions that he preserve documents and information, and that when Mr. Thomas or his wife were asked for the AOL account password, they promptly provided it – three times. *See supra* Facts, Section D.

The only aspect of Morgan Art's submission that speaks to Mr. Thomas' state of mind is arguably a finding in the Report that the Chrome history on Mr. Thomas' laptop was cleared on or about May 31, the day before it was imaged by AlixPartners. *See* Moving Br. at 7. This argument is a red herring. Clearing Chrome history does not equate to spoliation, and Morgan Art thus overreaches when it characterizes this as "damning evidence that Thomas destroyed Indiana's emails". *Id.* at 7, *see* heading at Section IV. In fact, the Report did not conclude that any data or emails were even lost as a result of the clearing of the Chrome history, and FTI recovered internet history spanning from July 19, 2016 to May 14, 2019. Report at 14. Moreover, the Report does not say – nor does Morgan Art claim – that Mr. Thomas was even the one to clear his Chrome history, and if he did clear it, that he did it with any bad intent. Morgan Art tries insinuates something nefarious by stating that the history was cleared "just *one day*" before the laptop was imaged (Moving Br. at 7 (emphasis in original)), but FTI also found that the operating system on the laptop was updated two days before the image (on May 30, 2018), and it could only conclude that the history was cleared "on or about May 31, 2018" without giving an exact date. Thus, the Chrome history could have been cleared by an automatic system update within the time frame identified by FTI. At best, the Report is confusing as to the import of the Chrome history. Indeed, its findings differed depending on which image it analyzed. *See supra* Section E.1. Mr. Thomas has no recollection of

clearing the history. *Id.* Mr. Thomas gave his computer to his wife on May 30, the day the operating system was updated, and she delivered it to their attorney that day (*id.*), and she did not clear the Chrome history. Y. Dec., ¶10. In sum, even putting aside that Morgan Art cannot demonstrate any prejudice stemming from the clearing of the Chrome history, Morgan Art simply cannot meet its burden of demonstrating that it was more likely than not that (1) Mr. Thomas cleared his Chrome history, and (2) that if so, he did it with any "intent to deprive" its use in this litigation. *See Karsch,* 2019 WL 2708125 at *37-38.

       *3.  Multiple People Had Access to Indiana's AOL Account*

       In its moving brief, Morgan Art proclaims that, to the extent Mr. Indiana's emails were deleted, only Mr. Thomas could have deleted them. *See* Moving Br. at 1. Its argument is based on the false premise that "Thomas had exclusive access to Indiana's account *before and after* Indiana died". *Id.* at 13 (emphasis added). In its next breath, Morgan Art essentially admits that this is an overstatement given that Mr. Indiana's former assistant, Webster Robinson, "had access to Indiana's email account". *Id.*; *see also* Hamilton Dec., ¶9 (describing how she, Mr. Robinson, and Ms. Morton all had access to AOL account). But Morgan Art alleges that Mr. Robinson no longer had access after Mr. Thomas became power of attorney in May 2016. *Id.* The evidence shows otherwise. *See supra* Facts, Section B. Morgan Art relies on a letter, dated January 16, 2019, from former counsel to the Estate. In the letter, counsel states that he was "informed that upon becoming power of attorney, Mr. Thomas changed the password [to Indiana's AOL account] and restricted account access solely to himself." *See* Moving Br. at 5 (citing Dkt. 87-2). But, the Estate does not speak for Mr. Thomas, and in any event, we now know that that statement was inaccurate. Also, the former counsel for the Estate's statement that "virtually all of the content [of the inbox] have been deleted" is not probative given that it does not (and could not) speak as to when those deletions occurred. *Id.*

       Also, the Declaration of Mr. Robinson, upon which Morgan Art relies, contradicts Morgan

Art's allegation. In that Declaration, Mr. Robinson states only that following the password change in late 2016, he "could no longer *regularly* access [Mr. Indiana's] email account." Robinson Aff. ¶9 (emphasis added). Any reasonable reading of this statement demonstrates that Mr. Robinson did have at least some access to the account following the password change. Moreover, as explained by Mr. Thomas, and as the documentary evidence irrefutably shows, Mr. Robinson continued to access Mr. Indiana's AOL email even after Mr. Thomas changed the password. *See supra* Facts, Section B.

But the Court need not concern itself with the "he-said, he-said" of dueling affidavits. During the time period in which Morgan Art claims Mr. Thomas had "sole access" to the account, there are emails that demonstrate that individuals other than Mr. Thomas (including Mr. Robinson) used Mr. Indiana's account, both to conduct Mr. Indiana's affairs and their own. *See* Thomas Dec., Exs. B, C, E, F, G. Furthermore, as FTI found, even after Mr. Indiana's death, individuals continued to have access to Mr. Indiana's computer. Report at 8. Finally, Morgan Art's mischaracterization that Mr. Thomas had exclusive access to Mr. Indiana's AOL account is a red herring in light of the fact, as discussed above, that there is no evidence of any spoliation of relevant evidence.

### 4.  *Morgan Art Has Not Met Its Burden of Demonstrating Prejudice*

Even were Morgan Art able to establish that Mr. Thomas deleted emails *and* that he did so after a duty to preserve them, and that such deletions were with the requisite malicious intent, it has offered nothing more than the vague assertion that the supposedly destroyed emails would offer insight into "Indiana's living knowledge and wishes". Moving Br. at 1. This is rank speculation. *See id.* ("The best evidence … *may well have been* his emails.")(emphasis added); *id.* at 2 ("Indiana's emails *may have been* some of the most important evidence in this case…."). This speculation is farfetched given that Morgan Art has not produced a single email sent to it by Mr. Indiana. *See* Dkt. 209 at 4 (joint letter submission describing search by the Estate's counsel). Indeed, were there documents in which Mr. Indiana confirmed the alleged relationship between Morgan Art and Mr. Indiana, then

Morgan Art would likely have been on the receiving end of such communications, and it would have them in its possession. Thus, Morgan Art's claim that "Indiana's received emails may demonstrate his knowledge and approval of Plaintiffs' operation of the website www.RobertIndiana.com" (Moving Br. at 20), is contradicted by the absence in *plaintiffs' production* of any reply email by Mr. Indiana to its communication with him about the website. This is equally true with respect to documents that *might have existed* evidencing Mr. Indiana's purported acceptance of Morgan Art's accounting statements, or his alleged approval of Morgan Art's creation of stone *LOVE* sculptures. *See* Moving Br. at 21. Thus, although Morgan Art need not establish the spoliation of a "smoking gun" email, it must do more than speculate about how it could have been prejudiced by the allegedly destroyed evidence. Morgan Art's submission falls woefully short of providing the "plausible, concrete suggestions as to what [the destroyed] evidence might have been." *See Karsch,* 2019 WL 2708125 at *7 (citations omitted).

## CONCLUSION

For the foregoing reasons, this Court should deny Morgan Art's motion for sanctions as against Jamie Thomas in its entirety, including its request for a hearing.

Date: March 4, 2020

Respectfully submitted,

/s/  Silvia L. Serpe
 Silvia L. Serpe
Paul W. Ryan
16 Madison Sq. West, 10th Floor
New York, New York 10010
Tel.: (212) 257-5010
Fax: (212) 981-2720

*Attorneys for Jamie L. Thomas*