USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:    7/1/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN ART FOUNDATION LTD., | |
| Plaintiff, | |
| -against- | |
| MICHAEL MCKENZIE, et al., | |
| Defendants. | |

18-CV-4438 (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

For the reasons that follow, defendants Jamie Thomas (Thomas) and James W. Brannan, as personal representative of the Estate of Robert Indiana (the Estate) must produce in discovery a complete and unredacted copy of their Confidential Settlement Agreement and Mutual Release, executed on December 24, 2019 (the Agreement), subject to the parties' stipulated Confidentiality Agreement and Protective Order (Protective Order).

## Background

This multi-party action concerns the late artist Robert Indiana, the legal rights to his intellectual property and artistic legacy, and related disputes. It is one of two interrelated cases pending in this district, both brought by plaintiff Morgan Art Foundation Ltd. (MAF),[1] which acquired the exclusive right to reproduce, fabricate, and market a variety of Robert Indiana artworks, including his well-known LOVE image and sculpture, by virtue of a series of agreements it entered into with the artist during his lifetime, including one dated April 9, 1999 (the April 1999 Agreement) and another dated December 22, 1999 (the Sculpture Agreement). *See* First Amended Complaint (FAC) (Dkt. No. 47) ¶ 8. In the April 1999 Agreement, Indiana conveyed to MAF "all copyright, trademark, and other rights" in the designated images, and in both agreements he

---

[1] *See Morgan Art Foundation Ltd. v. Brannan*, No. 18-CV-08231 (AT) (BCM) (*MAF II*).

granted MAF "the right to sue for any infringement of the rights Indiana conveyed." *Id*. Beginning in 1999, MAF and its "advisor" Simon Salama-Caro (who served as Indiana's "exclusive agent" in the art world, *id*. ¶¶ 54, 57, 60, 79) diligently enforced those rights, successfully removing "cheap reproductions" of Indiana's works from the "tchotchke market," "educat[ing] the market" about the importance and quality of his original works, and burnishing his reputation as an artist, as evidenced by a major retrospective at the Whitney Museum in 2013, entitled "Robert Indiana: Beyond LOVE." *Id*. ¶¶ 9-10, 59, 77-79.

American Image Art (AIA) and its principal Michael McKenzie (collectively, the AIA Defendants) also claim an exclusive right to create and market certain Robert Indiana artworks, including the HOPE image and sculpture used in Barack Obama's 2008 presidential campaign, by virtue of a contract signed by the artist on August 11, 2008 (the HOPE Contract). *See* Verified Third Amended Answer, Counter-Claims and Cross-Claims of Michael McKenzie and American Image Art (TAA) (Dkt. No. 91) ¶¶ 233-34, 237. The AIA Defendants further claim that their rights were expanded by a series of written and oral addenda to the HOPE Contract, which authorized AIA to produce and market additional artworks under Robert Indiana's name. TAA ¶¶ 240, 265.

In this action – filed one day before the artist's death, at age 89, on May 19, 2018 – MAF alleges that the AIA Defendants infringed its intellectual property rights and committed related torts by publishing new artworks based on works protected by the April 1999 Contract, including "unauthorized reproductions of the LOVE image." FAC ¶¶ 12-13. According to MAF, these reproductions were "falsely claimed to be authentic Robert Indiana works," and exhibited as such at "major art fairs," notwithstanding that Indiana himself "disavowed authorizing or creating such works." *Id*. ¶ 13. According to MAF, the HOPE works were also "forgeries" – in the sense that they were "fabrications by McKenzie" – as were many other "low quality works" that the AIA

2

Defendants "peddled" under Indiana's name for quick profit but which damaged Indiana's reputation. *Id.* ¶¶ 13-14, 17, 65-66, 69-71. In MAF's telling, McKenzie coerced an aging and vulnerable artist into approving his scheme to produce and market HOPE "through emotional abuse and intimidation," *id.* ¶ 13, 70, after which the AIA Defendants "flood[ed] the market with poorly made, often unauthorized Indiana works" in order to "make millions" at the expense of MAF's rights, the pocketbooks of the collectors who unknowingly overpaid for inauthentic Indiana works, and the integrity and legacy of the artist himself, whose reputation MAF and Salama-Caro had lovingly nurtured for more than two decades. *Id.* ¶¶ 11, 71-72, 108.

According to MAF, the AIA Defendants were aided and abetted in their scheme to exploit Indiana by Thomas, whom they described as a "local fisherman" in Vinalhaven, Maine, where Indiana lived. FAC ¶ 17, 85. Beginning in 2014, Thomas allegedly used his position as Indiana's caretaker – and his access to Indiana's email account – to answer the artist's phone, screen his correspondence, rebuff visitors, and aggressively "isolate Indiana from his friends and supporters," including Salama-Caro, who might otherwise have helped the artist resist McKenzie's predations. *Id.* ¶¶ 85-90.

In 2016, after Thomas obtained Indiana's power of attorney, the AIA Defendants published a new group of "infringing works" consisting of old Robert Indiana images – covered by the April 1999 Agreement – to which AIA added "lyrics from Bob Dylan songs around the outside" (the Dylan Works). *Id.* ¶¶ 93-94. Although the Dylan Works were published under Indiana's name, MAF alleges that the artist himself did not authorize them; in fact, he "wanted nothing to do with" them and "directed McKenzie to destroy them," to no avail. *Id.* ¶ 98. In 2018, with Thomas firmly in control of Indiana's business affairs, he and McKenzie falsely stated that MAF and Salama-Caro

"did not represent Indiana or his works," *id*. ¶¶ 102, 105, and demanded that all "inquiries" go to Thomas alone, thereby damaging MAF's credibility and business. *Id*. ¶ 102.

MAF asserts claims against both AIA Defendants for copyright infringement, trademark infringement, tortious interference with contract, violation of the Visual Artist's Rights Act (VARA), and unfair competition, and against McKenzie for defamation. FAC ¶¶ 114, 120-21, 127-28, 140, 147-48, 151-54, 158. In addition, MAF seeks damages from Thomas – and from the Estate, as successor to Indiana, on whose behalf Thomas claimed to be acting – for copyright infringement and breach of the April 1999 Agreement and the Sculpture Agreement. FAC ¶¶ 115, 134. Plaintiff also accuses Thomas of tortious interference with those contracts, violation of VARA, unfair competition, and defamation. FAC ¶¶ 140-41, 147-48, 151-54, 157.

The AIA Defendants see the world somewhat differently. In their view, it is McKenzie who was "Indiana's friend and art publisher" for decades; who helped "reintroduce [his] artwork to an indifferent art world and an uninterested public" in the 1990s; and who paid the artist "nearly $10 million dollars pursuant to the HOPE Contract and addenda" while MAF, which the AIA Defendants characterize as a "malevolent partner," made "infrequent payments" to the artist and did little to increase his exposure or move his art. TAA at 1-4, ¶¶ 195-97. The AIA Defendants insist that all of the works they produced under Indiana's name were "authorized," either by the artist himself or by Thomas on his behalf. *Id*. ¶¶ 265-73. It was apparently Thomas, acting under Indiana's power of attorney, who entered into some of the "verbal" addenda to the HOPE Contract. *Id*. ¶ 265. Similarly, it was Thomas who "communicated Indiana's final approval of [AIA's] projects," including the Dylan Works, a project called WINE, and a monumental word sculpture spelling BRAT (short for bratwurst), which was commissioned by Johnsonville Sausage and

4

installed in September 2018, after the artist's death, outside the sausage company's plant in Wisconsin. *Id*. at 3, ¶¶ 265-73.

Notwithstanding AIA's contractual rights to make and market Indiana's new works, MAF and Salama-Caro falsely told art galleries, patrons, and journalists that these works "were not authentic," thereby hurting AIA's "standing and sales in the art world" and causing potential buyers to lose interest. TAA ¶¶ 278-86. According to the AIA Defendants, MAF also "planted a false story" in the New York Times that "the BRAT sculpture was not authorized by Indiana." *Id*. ¶ 286.[2]

Although the AIA Defendants rest their rights, in part, on authority provided by Thomas, they too appear to view him with some suspicion, noting that after he obtained Indiana's power of attorney  in 2016, his "duties expanded from physical caretaker to financial management," his salary increased from $1,500 to $5,000 per week, he gained control of Indiana's bank accounts, and – over the next two years – he paid himself $490,000, and paid a newly-formed art storage company owned by him another $190,000. TAA ¶¶ 249-53. In addition, Thomas received 118 artworks from Indiana as "gifts," and "made $615,000 in cash withdrawals from accounts controlled by Indiana." *Id*. ¶¶ 254, 260.

The AIA Defendants asserted various counterclaims against MAF, some of which were dismissed by the Hon. Analisa Torres, United States District Judge, in an Order dated July 1, 2019 (Dismissal Order) (Dkt. No. 175). In their remaining counterclaims, the AIA Defendants seek a declaratory judgment that they "had full authority from Indiana to produce, market, and sell all of

---

[2] *See* Colin Moynihan and Graham Bowley, *Was This Homage to Bratwurst Really Designed by Robert Indiana?*, N.Y. Times, Sept. 21, 2018, at C-6 (electronic version available at https://www.nytimes.com/2018/09/21/arts/design/robert-indiana-bratwurst-sculpture.html).

the artworks at issue," and that those artworks "are not forgeries." TAA ¶¶ 322-38. Additionally,

the AIA Defendants seek damages for defamation and slander of title. *Id.* ¶¶ 339-45, 379-88.[3]

The Estate asserted counterclaims against MAF, for breach of the April 1999 Agreement

and the Sculpture Agreement and related torts, and against Salama-Caro and certain entities he

allegedly controls, for unfair competition, trademark infringement, and tortious interference with

contract. *See* Second Amended Answer and Counterclaims of Defendant James W. Brannan

(SAAC) (Dkt. No. 226) ¶¶ 253-318. The Estate alleges, among other things, that MAF failed to

properly account for its sales of artworks covered by the April 1999 Agreement and the Sculpture

Agreement; that it underpaid the royalties due to Indiana by failing to "count all relevant sales

revenues" and by deducting "improper, inflated, and artificial expenses"; that it failed to make any

royalty payments after December 2016; and that it sold certain editions of the LOVE sculpture "in

colors, dimensions, and/or sizes" beyond those authorized by the Sculpture Agreement. SAAC ¶¶

256, 261-62. Additionally, the Estate charges, MAF cheated Indiana out of royalties due to him by

routinely selling his works to one of the Salama-Caro-controlled entities "at below-market prices,"

thereby reducing the proceeds due to the artist while enriching the straw buyer, which later resold

the same works at market prices without making further royalty payments. *Id.* ¶¶ 183, 217, 268-

71.

---

[3] The AIA Defendants also asserted a variety of cross-claims against the Estate and Thomas, including claims for contractual and common-law indemnification of the their defense costs and potential settlement or judgment in this action, as well as a conditional claim for breach of the HOPE Contract (on the theory that if the artworks that the AIA Defendants published infringed MAF's rights, then the Estate and Thomas breached the HOPE Contract by not disclosing MAF's rights to them). *See* TAA ¶¶ 389-459. On October 9, 2018, relying on a broad arbitration clause in the HOPE Contract, Judge Torres stayed all of the AIA Parties' cross-claims against the Estate in favor of arbitration. (Dkt. No. 94.). On July 1, 2019, she dismissed their cross-claims against Thomas pursuant to Fed. R. Civ. P. 12(b)(6). Dismissal Order at 40-46.

Thomas did not assert any affirmative claims in this Court. Instead, on June 28, 2019, he filed an action in the Knox County, Maine Superior Court (the Maine Lawsuit), asserting generally that the Estate owed him a duty to provide a defense and indemnification in this action. Complaint, *Thomas v. Brannan*, No. CV-19-19 (Knox Co., Maine, Sup. Ct. June 28, 2019). The Estate counterclaimed "for the return of property and money" that Thomas "appropriated from Indiana," alleging among other things that Thomas "took advantage of Indiana's advancing age, isolation, frailties, and fame to develop a relationship of trust and control over the artist," which he used to help himself to $1.1 million and more than one hundred works of art without Indiana's permission, while allowing the artist to "live in squalor and filth despite his ample wealth." Answer, Counterclaim, and Third-Party Complaint, *Thomas v. Brannan*, No. CV-19-19 (Knox Co., Maine, Sup. Ct. Aug. 13, 2019), ¶¶ 1-4. The Estate also sought "reimbursement of atttorneys' fees and other expenses that Indiana paid on Thomas's behalf." *Id.* ¶ 4.

In a joint letter dated January 13, 2020 (Dkt. No. 208), the parties reported that Thomas and the Estate had settled their dispute and dismissed the Maine Lawsuit.

### The Motion to Compel

On May 26, 2020, the AIA Defendants filed a letter-motion in this Court to compel Thomas to produce all "settlement agreements and/or defense/indemnity agreements" entered into with the Estate. (Dkt. No. 271.) In a separate letter-motion filed the same day, the AIA Defendants sought to compel the Estate to produce the same documents (among others). (Dkt. No. 274.) After briefing (Dkt. Nos. 279, 284, 288, 299), and a telephonic discovery conference on June 12, 2020, I ruled that the AIA Defendants "are entitled to know whether, and under what conditions, the Estate (or any other person or entity) has agreed to pay or advance Thomas's defense fees in these actions and/or indemnify him against a potential judgment or settlement," and directed the parties to

negotiate in good faith with regard to "the precise parameters" of the discovery necessary to answer these questions. (Dkt. No. 307, at 2.)

By letter dated June 19, 2020 (AIA Ltr.) (Dkt. No. 312), the AIA Defendants' counsel reported that no agreement had been reached. Thomas and the Estate offered either to stipulate to certain facts concerning their settlement or to produce a redacted version of the Agreement "that would disclose the provisions relating to any agreement to indemnify Mr. Thomas for legal fees or liability in this case, or to pay legal fees already incurred in this action (redacting the specific dollar amount of any payment made)," which would be designated "confidential" under the parties' Protective Order. AIA Ltr. at 1. The Estate argued that because it and AIA "are currently adversaries in an arbitration proceeding, the disclosure to AIA of the Estate's settlement terms with another party would unfairly disadvantage the Estate in any settlement negotiations between the Estate and AIA relating to the arbitration." *Id*. at 2. The AIA Defendants agreed to treat the Agreement as "confidential" but saw no reason for redactions, noting that Thomas was a "pivotal witness," uniquely positioned to corroborate or contradict AIA's claim that Indiana authorized the works it published and sold under his name, and arguing that the Estate's concern about compromising its negotiating position against AIA was "a strategy preference" rather than a legally cognizable reason to withhold otherwise discoverable information. *Id*. at 2-3.

On June 24, 2020, I directed Thomas and the Estate to submit a complete copy of the Agreement for *in camera* review (Dkt. No. 316), which they did later that afternoon. The document reveals, among other things, that the Estate has entered into a monetary settlement of Thomas's claims for reimbursement of his legal fees incurred in this action and the Maine Action. Ag. ¶ 9. The Estate has also agreed, among other things, to defend and indemnify Thomas in this action though counsel that it selects. *Id.* ¶ 12. For his part, Thomas has agreed to "reasonably cooperate

with respect to his defense of [this action] and related issues and proceedings, including by providing documents and testimony." *Id*. ¶ 12. He has also agreed to certain additional restrictions concerning the conduct of this litigation, the administration of the Estate, and the marketing or sale of Robert Indiana artworks. The Agreement does not "prevent any party from providing truthful testimony under oath" in this action or elsewhere. *Id*. ¶ 16.

## <u>Analysis</u>

We begin with the familiar standard of Fed. R. Civ. P. 26(b): "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Although Fed. R. Evid. 408(a) bars the admission of settlement communications and agreements into evidence for certain purposes, such as "to prove or disprove the validity or amount of a disputed claim," *id.*, nothing in Rule 408 renders such materials privileged against discovery. *See*, *e.g.*, *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 71507, at *3 (S.D.N.Y. Feb. 20, 1996) (Rule 408 "accomplishes [its] purpose" of encouraging settlement "not by making the settlement information unavailable, but by limiting abusive use of positions taken during the process"); *see also Republic of Turkey v. Christie's, Inc.*, 326 F.R.D. 394, 399 (S.D.N.Y. Aug. 20, 2018) ("Rule 408 does not apply to discovery"); *Barclay v. Gressit*, 2013 WL 3819937, at *4 (D. Me. July 24, 2013) (the Rules of Evidence "may limit the admissibility of the settlement agreement at trial, [but] this does not determine its discoverability").

Because settlement agreements are not privileged, "no heightened showing of relevance need be made" to justify their disclosure. *ABF Capital Mgmt. v. Askin Capital*, 2000 WL 191698, at *1 (S.D.N.Y. Feb. 10, 2000) (collecting cases); *accord Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 394 F. Supp. 3d 461, 464 (S.D.N.Y. 2019) (citing a "slew of cases" applying the ordinary discovery standards of Rule 26 to privately-negotiated settlement agreements); *Bank*

*Brussels Lambert*, 1996 WL 71507, at *3 (Rule 408 "does not require any special restriction on Rule 26 because the discovery rules do not affect admissibility."). This appears to be the rule in Maine, where the Estate and Thomas reached their Agreement, as well as in New York. *See Barclay*, 2013 WL 3819937, at *2 (declining to "require a heightened showing" and compelling disclosure of a settlement agreement).

Nor may the parties to a settlement agreement shield it from discovery "merely because it contains a confidentiality provision, or was filed under seal." *ABF Capital Mgmt.*, 2000 WL 191698, at *2. *See also Rocky Aspen Mgmt.*, 394 F. Supp. 3d at 464 ("[C]onfidentiality provisions inserted by parties into private settlement agreements do not immunize those agreements from discovery."); *Conopco, Inc. v. Wein*, 2007 WL 1040676, at *5 (S.D.N.Y. Apr. 4, 2007) ("[T]he simple fact that the parties to the settlement agreement agreed to its confidentiality does not shield it from discovery.") (internal quotation and citation omitted); *Tribune Co. v. Purcigliotti*, 1996 WL 337277, at *3 (S.D.N.Y. June 19, 1996) ("[T]he mere fact that the settling parties agreed to maintain the confidentiality of their agreement cannot serve to shield it from discovery.").

In this case, the AIA Defendants are correct that the Agreement between Thomas and the Estate is relevant to the potential bias or prejudice of Thomas, who will likely be a "pivotal witness" as to the key fact issues underlying their dispute with MAF. *See* AIA Ltr. at 2-3. Courts "routinely" permit discovery of settlement agreements for this purpose. *ABF Capital Mgmt.*, 2000 WL 191698, at *2. *See, e.g.*, *S.E.C. v. Gupta*, 2012 WL 1592525, at *1 (S.D.N.Y. May 1, 2012) ("The best evidence of bias in a cooperator's testimony comes from the actual agreement he struck with the SEC"); *Santrayll v. Burrell*, 1998 WL 24375, at *2 (S.D.N.Y. Jan. 22, 1998) (compelling production of settlement agreement because it "may lead to the discovery of evidence that would establish [a witness's] bias, interest, or prejudice"); *Purcigliotti*, 1996 WL 337277, at *2

(compelling production of plaintiffs' settlement with one of many defendants, after an *in camera* review, because the settling defendant "may be an important fact witness" and the settlement agreement is "relevant to his motivation for testifying"). Indeed, while settlement agreements are inadmissible at trial to prove liability or damages, they may be admitted for other purposes, "such as proving a witness's bias or prejudice." Fed. R. Evid. 408(b). "Thus, settlement materials *are* admissible – and so, discoverable – if they bear on those collateral matters." *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 60290, at *4 (S.D.N.Y. Jan. 12, 2004) (emphasis in the original).

Thomas is undoubtedly an important witness as to Robert Indiana's state of mind in his last years. He may be the only living witness with first-hand knowledge as to whether Indiana created – or at least knowingly approved – the Dylan works, WINE, the BRAT sculpture, and other artworks that AIA marketed under the artist's name after allegedly receiving authorization through Thomas. He is also in a unique position to shed light on related fact questions, such as whether Indiana privately complained about McKenzie, as MAF alleges, *see* FAC ¶ 81, or privately complained about MAF, as the AIA Defendants report. *See* TAA at 3-4. The Estate – which is adverse to MAF in this action (and in *MAF II*) and adverse to AIA in an arbitration proceeding – is also vitally interested in these questions. Both MAF and the AIA Defendants, therefore, are entitled to discover, before Thomas takes the stand, whether he has a financial incentive or other motivation to testify favorably to the Estate (and, by extension, unfavorably to either or both of them). *See Purcigliotti*, 1996 WL 337277, at *2 (compelling disclosure of complete settlement agreement between plaintiffs and Britton, who was "a direct participant in the events giving rise to plaintiffs' claims against all of the remaining defendants," and where the settlement agreement was "relevant to his motivation for testifying"); *Kaplan Cos. v. Peoplesoft USA, Inc.*, 2006 WL

11

8447846, at *2-3 (M.D.N.C. Mar. 15, 2006) (compelling disclosure of complete settlement agreement between plaintiff and former co-defendants Revere and Convoy where "people from Revere and/or Convoy will be important witnesses at the trial" and the settlement terms "could sway the settling parties' testimony").

Given the specific facts of this case, the Court declines to limit disclosure to the indemnification provisions of the Agreement or to redact the specific dollar amounts paid or promised. In *Purcigliotti*, Judge Katz of this Court rejected a similar request, reasoning that "[t]he amount of money that plaintiffs have agreed to accept from Britton in exchange for dismissing the case against him, as well as other terms of the settlement, may bear on the issue of his bias and prejudice." 1996 WL 337277, at *3. *See also Kaplan Companies*, 2006 WL 8447846, at *3 ("Merely disclosing the fact of a settlement does not reveal just how favorable the settlement was and any special terms that could sway the settling parties' testimony. For an important participant witness in a complicated case, the mere disclosure of the fact of settlement is not sufficient.") Like the witness in *Kaplan Companies*, Thomas is "an important participant witness in a complicated case." *Id.* The remaining parties are therefore entitled to full details of the settlement agreement now governing his participation in this action.

## Confidentiality and Timing

The production of the Agreement in discovery, however, does not necessarily render it admissible at trial (or otherwise) in this action. Nor does this Order wholly vitiate the settling parties' bargained-for confidentiality assurances, *see* Ag. ¶ 15, or discount the inherent sensitivity of any agreement compromising disputed claims. To safeguard the confidentiality of the settlement details, therefore, Thomas and the Estate may designate the Agreement "confidential" pursuant to ¶ 2(e) of the Protective Order (Dkt. No. 141). *See Republic of Turkey*, 326 F.R.D. at 400 ("The

confidentiality concerns expressed by the Republic can be addressed by the Republic designating the relevant testimony by Ms. Boz as confidential pursuant to the terms of the Stipulated Protective Order entered in this case."); *Barclay*, 2013 WL 3819937, at *4 (directing the parties to "devise an appropriate confidentiality order" prior to production of settlement agreement in discovery).

We note that the AIA Defendants, who were represented when they moved to compel production of the Agreement, have since parted ways with their attorneys. On June 19, 2020, the Court granted a motion by those attorneys to withdraw from their representation, and directed the AIA Defendants' new counsel to file a notice of appearance no later than July 20, 2020. (Dkt. No. 311.) Although defendant McKenzie has the right to represent himself, he advised the Court in connection with the withdrawal motion that he would move expeditiously to retain new counsel for both AIA Defendants. Moreover, McKenzie did not personally execute the Protective Order, and may require guidance to ensure compliance with its terms. The Court therefore directs Thomas and the Estate to produce the Agreement in discovery, subject to the Protective Order, within one business day after the AIA Defendants' new counsel has appeared.[4]

Chambers will serve a copy of this Order on the AIA Defendants.

Dated: New York, New York
       July 1, 2020                              **SO ORDERED.**

                                                 _____
                                                 **BARBARA MOSES**
                                                 **United States Magistrate Judge**

---

[4] If new counsel has not appeared for the AIA Defendants by July 20, 2020, any other party may request appropriate relief by letter-application.