UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/30/20
```

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED, | |
| Plaintiff, | 18-CV-4438 (AT) (BCM) |
| -against- | |
| MICHAEL MCKENZIE, et al., | |
| Defendants. | |

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED, et al. | |
| Plaintiffs, | 18-CV-8231 (AT) (BCM) |
| -against- | **OPINION AND ORDER** |
| JAMES W. BRANNAN, *As Personal Representative of the Estate of Robert Indiana*, | |
| Defendant. | |

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated January 29, 2020 (Dkt. No. 213 in Case No. 18-CV-4438; Dkt. No. 86 in Case No. 18-CV-8231), plaintiffs and counterclaim-defendants Morgan Art Foundation Limited (MAF), Simon Salama-Caro, Shearbrook (US), LLC (Shearbrook), Figure 5 Art LLC (Figure 5), and RI Catalogue Raisonné LLC (Catalogue; together, plaintiffs or the Morgan Art Parties) seek sanctions against defendants Jamie Thomas and James W. Brannan, as personal representative of the Estate of Robert Indiana (the Estate), up to and including the entry of a default judgment against both, as a remedy for what plaintiffs characterize as "maliciously destroy[ing]" (in the case of Thomas) or facilitating the destruction of (in the case of the Estate) "hundreds, if not thousands" of emails that would have been discoverable in this litigation. Pl. Mem. (Dkt. No. 215 in Case No. 18-CV-4438; Dkt. No. 88 in Case No. 18-CV-8231) at 1. Defendants assert that Thomas deleted emails from Robert Indiana's email account after he acquired a duty to preserve them, and later

lied about it, and that the Estate failed to take reasonable steps to preserve the emails, and then concealed the destruction from plaintiffs for months.

For the reasons that follow, the motion will be denied.

## I.   BACKGROUND

These interrelated actions concern the late artist Robert Indiana, the legal rights to his intellectual property and artistic legacy, and related disputes. Both actions were brought by MAF, an art dealer, which acquired the exclusive right to reproduce, fabricate, and market a variety of Robert Indiana artworks – including his well-known LOVE image and sculpture – by virtue of a series of agreements it entered into with the artist during his lifetime. In the *McKenzie* action (Case No. 18-CV-4438), filed one day before Indiana's death on May 18, 2018, MAF alleges that Michael McKenzie, an art publisher doing business as American Image Art (AIA), infringed its intellectual property rights and committed related torts by publishing new artworks based on works protected by MAF's agreements with Indiana, including "unauthorized reproductions of the *LOVE* image," which McKenzie "falsely claimed to be authentic Robert Indiana works." *See* First Amended Complaint (*McKenzie* FAC) (Dkt. No. 47 in Case No. 18-CV-4438) ¶¶ 12-13. MAF further alleges that Thomas, who was once Indiana's caretaker but later acquired his power of attorney (POA), aided McKenzie in a scheme to isolate and exploit Indiana while damaging MAF's relationship with the artist and its reputation in the art world. According to plaintiffs, Thomas (using the POA) and McKenzie falsely claimed that MAF "did not represent Indiana or his works," *id.* ¶¶ 102, 105, and improperly demanded that all "inquiries" go to Thomas alone, thereby damaging MAF's credibility and business. *Id.* ¶ 102.[1]

---

[1] For a more detailed description of the claims and counterclaims in the *McKenzie* action, *see Morgan Art Found. Ltd. v. McKenzie*, 2020 WL 3578251, at *1-3 (S.D.N.Y. July 1, 2020).

In the *Estate* action (Case No. 18-CV-8231), filed on September 10, 2018, MAF, Salama-Caro (described as an "advisor" to MAF and Indiana's "agent in the art market"), and three MAF-affiliated entities – Shearbrook, Figure 5, and Catalogue – allege that Brannan, as personal representative of the Estate, "inexplicably imposed roadblocks at every turn, refused to cooperate with Indiana's longstanding business partners, and caused his estate to fall into disarray," despite his responsibility to protect Indiana's legacy. First Amended Complaint (*Estate* FAC) (Dkt. No. 14 in Case No 18-CV-8231) ¶¶ 2, 14, 44-46. The MAF parties take particular umbrage at the fact that the Estate filed counterclaims against it in the *McKenzie* action, alleging that MAF breached its agreements with the late artist and committed related torts by, among other things, underpaying royalties due to Indiana and fabricating certain LOVE sculptures beyond those authorized by the relevant agreements. *See* Second Amended Answer and Counterclaims of Defendant James W. Brannan (Dkt. No. 226 in Case. No. 18-CV-4438) ¶¶ 253-318. In the *Estate* action, plaintiffs allege that the Estate (through Brannan) breached the same agreements by "falsely and publicly asserting that Morgan Art Foundation and Simon Salama-Caro's production of certain *LOVE* Sculptures fabricated from semi-precious stones and inscription of Robert Indiana's signature on these sculptures was not authorized by Robert Indiana[.]" *Estate* FAC ¶¶ 94, 102, 109, 115. The Estate counterclaimed for, inter alia, a declaration that it was entitled to terminate the agreements that plaintiffs made with Indiana and damages for breach of fiduciary duty.[2]

---

[2] For a more detailed description of the claims and counterclaims in the *Estate* action, *see Morgan Art Found. Ltd. v. Brannan*, 2020 WL 469982, at \*1-7 (S.D.N.Y. Jan. 28, 2020).

### A.   Events Leading to These Lawsuits

The sections below describe the parties involved in both actions, and recount the events underlying the litigation, only to the extent relevant to the pending sanctions motion.[3]

#### 1.   Robert Indiana's Relationship with Jamie Thomas

Jamie Thomas has lived on Vinalhaven, a small island off the coast of Maine, for nearly his entire life. Thomas Decl. (Dkt. No. 229) ¶ 2. He knew Robert Indiana, a fellow Vinalhaven resident, for "basically all [of his] life." *Id.* ¶ 3. Indiana lived and worked in a building called the Star of Hope Lodge. *Id.* ¶ 8. Starting in 1990, Thomas began – informally – working odd jobs for Indiana, including running errands for him and helping him with his art projects, and the two "became close friends." *Id.* ¶ 3. Thomas stopped working for Indiana in the late 1990s in order to work more in the lobster industry. *Id.* ¶ 4.

In 2013, Thomas asked Indiana if he could help "make a logo for [Thomas's] family lobster business." Thomas Decl. ¶ 5. As payment for the logo, the two "agreed to a barter exchange," in which Thomas agreed to bring Indiana "dinner every night for about two months." *Id.* After those two months, Indiana asked Thomas if he could continue working for him on a "permanent" and "full time" basis, assuring him that he would pay him enough so that he could quit lobstering. *Id.* "From that point forward," Thomas attests, he "was with [Indiana] or on-call for him 24 hours a day, every day, until the day he passed away." *Id.*

In May 2016, Indiana gave Thomas his POA, which enabled Thomas "to pay all of Bob's bills, collect all monies owed to him, hire and fire people, enter contracts, and do anything that needed to be done for his benefit." Thomas Decl. ¶ 6. Brannan, who was then Indiana's personal

---

[3] For purposes of consistency and ease of reference, the remainder of this Opinion and Order will refer only to docket numbers in the *McKenzie* action (Case No. 18-CV-4438).

attorney, drafted the papers. *Id.*; Brannan Decl. (Dkt. No. 232) ¶ 7. Thomas's wife, Yvonne

Thomas, "assist[ed] Jamie in that role." Yvonne Thomas Decl. (Dkt. No. 230) ¶ 3.

### 2.    Robert Indiana's Relationship with James Brannan

James Brannan practices law from an office in Rockland, Maine, which has a ferry

connecting it to Vinalhaven. Brannan Decl. ¶ 4. Brannan first met Indiana in 1979, after which the

artist engaged Brannan, at various times, "as his attorney to advise him on specific legal matters,"

including the incorporation of Star of Hope Inc., a charitable corporation "designated as the lone

beneficiary of Indiana's estate." Brannan Decl. ¶¶ 4-5, 8. On Indiana's death, Brannan was

appointed the personal representative of his Estate on May 25, 2018, pursuant to the terms of

Indiana's Last Will and Testament. *Id.* ¶ 3.

### 3.    Robert Indiana's Employees

Indiana hired a number of individuals to complete various tasks for him at his home in

Vinalhaven. Thomas Decl. ¶ 8. Some of them, as discussed in more detail below, had access to his

computer and his email account. Webster (Web) Robinson "worked off and on as a personal

assistant" for Indiana for 25 years, until February 2018. Robinson Decl. (Dkt. No. 214-4) ¶ 2;

Thomas Decl. ¶ 8.[4] Robinson worked for Indiana "often several times a week or more[.]" Robinson

Decl. ¶ 2. He "organiz[ed] and print[ed] out [Indiana's] emails, help[ed] him on the computer,

[and] print[ed] and organiz[ed] photographs of his artwork," among other tasks. Robinson Decl.

¶ 2; *see also* Hamilton Decl. (Dkt. No. 234) ¶ 10 (explaining that from 1999 at least through August

2016, Robinson "was the assistant who was primarily responsible for work relating to Indiana's

computer").

---

[4] Robinson's declaration, filed by the Morgan Art Parties in connection with their sanctions motion, is dated May 30, 2018, more than a year and a half before the sanctions motion was filed.

Wayne Flaherty and Sean Hillgrove both "performed odd jobs" for Indiana, and Hillgrove lived next door to Indiana in a house that Indiana owned. Thomas Decl. ¶ 8. From 2007 through 2015, Valerie Morton worked as Indiana's "personal assistant," Thomas Decl. ¶ 8, helping Indiana with his "household expenses and bookkeeping" while also assisting "at times" with Indiana's "correspondence and archiving." Hamilton Decl. ¶ 10. At various points between 1999 and 2016, Melissa Hamilton worked as an assistant for Indiana as well. She first met Indiana in 1996 and worked as his full-time personal assistant and archivist from 1999 until 2000. *Id.* ¶¶ 2-3. After 2000, she worked for Indiana in 2006 and then again from 2008 through 2016. *Id.* ¶ 3. She and Indiana had a "very close personal relationship," and she last visited Indiana on July 18, 2017. *Id.* Hamilton's responsibilities included "managing Bob's incoming and outgoing correspondence, maintaining his files and archives, and assisting him when he hosted visitors." *Id.* ¶ 4.

According to Hamilton, several other people also frequented Indiana's home to provide some form of assistance to the artist, including Stanley Stone, Ronald "Bo" Dodd, John McDonald, and Keith Ballard. Hamilton Decl. ¶ 11. Moreover, in 2017 and 2018, Thomas "hired health-care aides to help care for Bob at his house, including Jamie Philbrook Harris, Julia L. Haley, Candra Lee Perry, Lisa Simpson and Anne S. Debrow." Thomas Decl. ¶ 8.

### 4. Robert Indiana's Email Practices

Indiana owned a single desktop computer, located in a "work area on the second floor of his home." Thomas Decl. ¶ 9. "The computer was not password protected," and on the corner of the monitor, the current password for Indiana's AOL email account, robertoddfellow@aol.com (AOL Account), was written on a post-it note. *Id.* Moreover, the AOL Account usually "remained logged-in, so that when someone accessed [Indiana's] computer, the [AOL Account] was available for anyone to use." *Id.*; *see also* Hamilton Decl. ¶ 12 ("You did not need a login or password to access Indiana's computer, and the computer was frequently turned on with the AOL Account

already open. The AOL Account password was always at the computer terminal, on a post-it or under the mousepad.").

Because Indiana was "not computer-savvy," and because, particularly in the final years of his life, he had trouble reading small print, he relied on his employees, especially Robinson, Morton, and Hamilton, "to print out emails and share them with him." Thomas Decl. ¶ 10; *accord* Brannan Decl. ¶ 6; Hamilton Decl. ¶¶ 5, 8-9, 13.[5] If the emails were "of little importance," the assistants would discard the printed-out papers; on the other hand, important emails were "placed in binders or kept in piles." Hamilton Decl. ¶ 14; Thomas Decl. ¶ 10. The binders "were organized by person, by topic, and by date range." Hamilton Decl. ¶ 15. "Documents were piled up on the table and under the table in Indiana's office area on the second floor, with the intention of eventually placing them in binders," but "[o]ften, before the piles could be sorted, they were swept by hand into storage boxes and moved into other rooms, to get them out of the way because Indiana was expecting guests." Hamilton Decl. ¶ 15. According to Hamilton, it was "common practice" for her, and for Robinson, Morton, Hillgrove, and Flaherty, to "delete the emails in [Indiana's] AOL Account inbox after they were printed . . . by the end of each day." Hamilton Decl. ¶ 16.[6] Thomas, however, states that he did not generally go through Indiana's emails or print them out for Indiana's review. Thomas Decl. ¶ 11.

On the rare occasions Indiana wished to reply to an email (most often when it concerned upcoming visits to the Star of Hope), he asked Hamilton, Morton, or Robinson to do it on his behalf. Hamilton Decl. ¶¶ 18-19. The assistants "would print these responses for Indiana when he

---

[5] Hamilton "never saw [Indiana] sit at the computer to use his AOL Account," "never saw Indiana send an email, and [she] would be surprised if he knew how." Hamilton Decl. ¶ 7.

[6] Hamilton notes without further comment that "[b]y the summer of 2016, the number of incoming emails to Indiana on the AOL Account had decreased substantially." Hamilton Decl. ¶ 17.

requested." *Id.* ¶ 19. Hamilton does not recall whether they would also delete these messages from the AOL Account sent box. *Id.* ¶ 20.

Hamilton recalls seeing "Hillgrove, Flaherty, Dodd, and Stone each access Indiana's computer at different times," and is "aware of some instances where Hillgrove and Flaherty used the AOL Account." Hamilton Decl. ¶ 11. Each of these individuals had access to the AOL Account and the password. *Id.* ¶¶ 9, 12; Robinson Decl. ¶ 2. Hamilton does not remember seeing Thomas use Indiana's computer. Hamilton Decl. ¶ 11.

Thomas occasionally sent emails to Robinson, Morton, or Hamilton at Indiana's email address "because I knew they would see it." Thomas Decl. ¶ 10; *id.* Ex. A (emails dated between November 2014 and September 2016 from Jamie Thomas to robertoddfellow@aol.com but addressed specifically to Robinson, Morton, or Hamilton). Hamilton confirms that the AOL Account "was an expedient way for Indiana's assistants to communicate with each other," and "[i]n particular, it was common for Indiana's assistants to communicate with Robinson by emailing the AOL Account, since he was glued to Indiana's computer." Hamilton Decl. ¶ 23.

Because there were so many people viewing Indiana's emails, there was "a complete lack of privacy." Thomas Decl. ¶ 12. For example, in an email chain from February 2015 with a publicist regarding a secret project, the publicist asked that Thomas keep the project "under wraps" from Hamilton. Thomas emailed back: "[Hamilton] has access to [Indiana's] email. I can delete it out but, [t]he cat may be out of the bag." *Id.* ¶ 12 & Ex. B.

According to Thomas, Indiana told him that Robinson deleted many of Indiana's emails to avoid "clog[ging] up the system." Thomas Decl. ¶ 11.[7] After becoming power of attorney, Thomas

---

[7] Indiana apparently had a filter on his AOL Account for "emails with the subject 'Important Document' to be moved to a 'Recently Deleted' folder." Thomas Decl. ¶ 24; Garay Decl. (Dkt. No.

occasionally "forwarded some of [Indiana's] emails to [Thomas's] personal gmail account, to make sure that they were not deleted before they could be gone over with [Indiana]." *Id.* ¶ 14. Although he did not have any "specific system" for which emails he chose to forward, such emails included "visitor requests, notices about art exhibit openings, death notices for people [he] thought [Indiana] might want to know about, news stories and videos about local events, invitations to events, general greetings[,] holiday cards and birthday wishes, photos from friends and acquaintances, and business requests to use his art." *Id.*

It appears that little love was lost between Thomas and Robinson. Thomas explains that after he obtained Indiana's POA, he "became concerned that Web [Robinson] and others were using Bob's email account to conduct their own personal matters." Thomas Decl. ¶ 13. Thomas forwarded a few examples to his personal gmail.com address (the Gmail Account), *id.*, including a May 12, 2016 email from 2077903772@vtext.com, addressed to robertoddfellow@aol.com, reading: "Not n [sic] jail." On May 18, 2016, an email from 2077903772@mypixmessages.com, sent to the AOL Account, read: "Ok bro I'm just sick of the bs here cops were here bout truck was Larry he has a small RV all on road for 6000 everything works as well . . . " *Id.* Ex. C.

Robinson, for his part, attests that he "began noticing that emails were being deleted without being printed out and shown to" Indiana, and he further "noticed that [Thomas] was saving certain emails, including emails from art dealers and [Indiana's] friends, and forwarding them from [Indiana's] account to [Thomas's] email account." Robinson Decl. ¶ 8. He says that these "concerns" led him to change the password to Indiana's email account in November 2016, locking out Thomas. *Id.*; *accord* Thomas Decl. ¶ 15.

---

233) ¶ 12 & Ex. B. Thomas states that he was not aware of this filter until "recently." Thomas Decl. ¶ 24.

Thomas was able to gain back access several weeks later, at which point he re-reset the password.[8] Thomas Decl. ¶ 15 & Ex. D. Thomas gave the new password to Indiana a week or two later (on an unknown date), warning that sharing the password "would mean that the account would again be unsecure," *id.* ¶ 16, which appears to have been an accurate assessment. Although Robinson states that he "could no longer regularly access" the AOL Account after Thomas changed the password, Robinson Decl. ¶ 9, there is documentary evidence of him using the account on January 17, 2017, and receiving personal email on the account on January 10 and May 11, 2017. Thomas Decl. Exs. E & F. There is also documentary evidence of others using the account during this time period. On August 14, 2017, for example, someone with access to Indiana's email account forwarded an email from Simon Salama-Caro (as well as the original email thread) to Hillgrove. Thomas Decl. ¶ 18 & Ex. G.

On November 5, 2017, shortly after MAF sent Indiana a statement of account by email, Thomas's attorney, John Frumer, asked Thomas to search the AOL Account to see whether there were any other emails from MAF over the "past 3½ or 4 years." Thomas Decl. ¶ 19. Thomas responded that there was "[n]othing," adding that he had "forwarded most everything of any import to me since mid 2014, because of [W]eb [Robinson] deleting everything." *Id.* Ex. H.

Hamilton recalls seeing emails from Simon Salama-Caro and other members of his family – Marc, Emeline, and Gillian – over the years, though these emails generally concerned "lighter and upbeat topics" like "travel, photos of sculpture fabrication, and museum exhibitions." Hamilton Decl. ¶ 21. She does not recall any MAF emails containing formal proposals or contracts, and believes (based on what she saw) it was the "Salama-Caros' practice to bring proposals and contracts to Indiana when they met with him in person at his home." *Id.* ¶ 21. Hamilton does recall

---

[8] Thomas does not provide the exact date on which he re-reset the password.

Indiana asking her to respond to emails (1) "from Marc Salama-Caro regarding planned visits to the Star of Hope," and (2) "from Emeline Salama-Caro while she worked at Christie's, responding to her requests for information concerning works that were coming up for auction." *Id.* ¶ 22.

### 5.   Duty of Preservation

On February 28, 2018, Thomas, through his counsel, Frumer, sent a cease-and-desist letter to the Morgan Art Parties, alleging, among other things, that they had breached their contractual agreements with Indiana. Nikas Decl. (Dkt. No. 214) Ex. 1. After sending that letter, Thomas says his attorney advised him "multiple times . . . not to destroy any relevant documents," and that he "followed that advice and ha[s] not deleted any documents relating to [Indiana] or this litigation." Thomas Decl. ¶ 21.

On March 23, 2018, Frumer sent Brannan an email with the subject "RI 'Litigation Hold.'" Frumer wrote: "As I discussed with Jamie some time ago, and again more recently, given the strong possibility of litigation and/or arbitration regarding [Indiana's] rights flowing from the Cease & Desist letters (actually stemming from MAF/SS et al breaches), it is imperative that he continues to save, and not destroy, all of [Indiana's] documents, files, letters, etc." Brannan Decl. Ex. A. Frumer added that some of Indiana's documents could be at Brannan's office and that Brannan should "ensure the safekeeping of such documents . . . pursuant to the 'litigation hold.'" *Id.* Based on this email and other similar communications, Brannan attests he "underst[ood] that Thomas had been counseled regarding his document preservation obligations." *Id.* ¶ 12.

### B.   Events Following Commencement of Litigation

Plaintiffs filed the *McKenzie* action on May 18, 2018, naming McKenzie, AIA, Thomas, and Indiana himself as defendants. The next day, Indiana died. *See, e.g.*, Brannan Decl. ¶ 13. Brannan was appointed personal representative of the Estate on May 25, 2018, *id.* ¶ 3, and was thereafter substituted into the litigation in Indiana's place. (Dkt. No. 35.)

### 1.    May-August 2018

Brannan knew that Indiana's home, and another property leased on his behalf, were "filled with artwork that was likely worth many millions of dollars," and "contained extensive paper files, archives and loose papers," and that the Star of Hope Lodge "was an old building in need of substantial repairs," which lacked property insurance, had no sprinklers, and suffered from leaks and other issues. Brannan Decl. ¶ 14. He was also aware that "many different people had historically had access to the Star of Hope over time." *Id.* ¶ 15. Thus, he prioritized dealing with the physical property.[9]

On May 24, 2018, "at Mr. Frumer's direction," Yvonne Thomas created a list of information and passwords for Brannan, who was planning to visit Vinalhaven two days later. Yvonne Thomas Decl. ¶ 4. The list included Indiana's various bank accounts, utilities for his home, phone numbers, and the account name and password for the AOL Account. *Id.* ¶¶ 4, 5 & Ex. 1. She sent her "start on the list" to Frumer on May 24, 2018, explaining that she would "work on it more" the following night. The next morning (May 25, 2018), at 6:13 a.m., Yvonne sent Frumer a "revised version" of the list. Yvonne Thomas Decl. Ex. 2. Frumer responded that it "look[ed] great," but to "remove the AOL password" and put that (along with any other passwords and pins) on a "separate list." *Id.* On May 26, 2020, she sent a revised list to Frumer. *Id.* Ex. 4. Later that day, Yvonne "personally handed an envelope with the revised list to Mr. Brannan." *Id.* ¶ 9; Brannan Decl. ¶ 21 & Ex. B. She says she "believe[s]," though she "cannot swear," that she "also included in the envelope a handwritten piece of paper with the AOL account password." Yvonne Thomas Decl. ¶ 9. Brannan says he does "not recall seeing any information about Indiana's email account[.]" Brannan Decl. ¶ 22.

---

[9] Beginning on or about May 25, 2018 and through March 18, 2019, the Estate was represented by Hogan Lovells, with Dennis Tracey as the partner in charge. Tracey Decl. (Dkt. No. 235) ¶ 5.

On that trip – Brannan's first visit to the Star of Hope since May 2016, "when Indiana executed his Last Will and Testament," Brannan Decl. ¶ 18 – he was accompanied by Bruce Gamage, an appraiser; Peter Whitney, who worked for a fine art transportation and storage service; and Kevin Lipson, an attorney from Hogan Lovells. *Id.* Upon entering the home, Brannan observed "a state of disrepair and disorder." *Id*. ¶ 19. There was a "hole in the roof" that had "caused extensive water damage, mold, and mildew in portions of the house." *Id.* Some of Indiana's papers, artwork, and his personal library had been water damaged. *Id.* Brannan also noticed "piles of papers that needed to be protected and sorted." *Id.* Due to the extensive "disrepair and disorder," Brannan attests that his "top priority" was "maintaining the physical security of Indiana's home and property," *id.* ¶¶ 19-20, and he "did not have any concern at that time about the preservation of emails in Indiana's email account, nor did [he] have any urgent need to review those emails." *Id.* ¶ 22; *see also* Tracey Decl. ¶ 6 ("At the outset of its representation of the Estate, one of Hogan Lovells's main objectives was to locate, assess, and preserve all documents and other information that belonged to Indiana and that might be relevant to the litigation.").

On May 30, 2018, Thomas gave his computer to his wife to bring to their lawyer, whose office was also in Rockland, Maine, in order to have a company called AlixPartners image it "in connection with this litigation." Thomas Decl. ¶ 22. Yvonne delivered her husband's computer to Frumer that same day. Yvonne Thomas Decl. ¶ 10. Thomas attests that he does not remember "deleting [his] browser history prior to giving" his wife his computer, Thomas Decl. ¶ 22, and his wife denies deleting the browser history as well. Yvonne Thomas Decl. ¶ 10.

On June 1, 2018, Tracey met with Frumer to discuss "the preservation and transfer of documents, both electronic and hard copy." Tracey Decl. ¶ 9. Frumer began sending Tracey "copies of hard copy documents maintained by Thomas" shortly thereafter. *Id.* On June 8, Tracey

followed up with Frumer over email, asking when he could expect to receive copies of "all documents created, received or maintained by Jamie Thomas while acting under the power of attorney[.]" Tracey Decl. Ex. A. On June 14, in the same email exchange, Frumer provided several updates. He explained that Thomas had "some documents at his home that he moved from Star of Hope some time ago in the course of his archival tasks in order to dry them out and to preserve them." *Id.* Ex. B. "[E]lectronic data," Frumer wrote, "is still a work in progress." *Id.*

Concurrently, in early June 2018, Brannan "arranged to have the locks changed at the Star of Hope and at the Schoolhouse," which was completed shortly thereafter. Brannan Decl. ¶ 16. He also continued to ensure "24 hour security through the Pinkerton Agency at the Star of Hope and the 'Schoolhouse,' a separate premises that also contained Indiana's artwork and other property." Tracey Decl. ¶ 7(a).

Also beginning in June 2018 (and for the next several months), Brannan directed Gamage and Whitney to "sort[] through and preserv[e] Indiana's effects," "mov[e] artwork . . . to a secure storage facility," and bring to Brannan's attention "any files, binders or other sources of information that they located pertaining to the parties in [this] litigation." Brannan Decl. ¶ 23. As part of this task, they secured and then delivered Indiana's desktop computer to Brannan. *Id.* ¶ 24.

On July 2, 2018, Brannan hired Adelina Garay "as a paralegal to assist [Brannan] in the administration of Indiana's Estate." Brannan Decl. ¶ 25; Garay Decl. ¶ 3. In that role, Garay worked with Gamage, Whitney, and their teams "to ensure that all documents located among Indiana's property were assessed, both to evaluate their importance to the Estate, and to determine whether they contained information relevant to the litigation." *Id.*; *see also* Garay Decl. ¶¶ 5-6. Ultimately, she reviewed thousands of pages of paper records. Brannan Decl. ¶ 25; Garay Decl. ¶ 7. These papers were "not well organized"; some papers were in binders, while others were in bags and

boxes, or just "piled throughout the house." Garay Decl. ¶ 7. Additionally, "[s]ome paper records were water damaged and mildewed." *Id.* Garay reviewed "paper printouts of hundreds of emails sent to the email address robertoddfellow@aol.com," spanning 2003 through 2016. *Id.* ¶ 8. However, there were "few printouts of replies or responses from that email address." *Id.* Garay attests she was not aware of Indiana's email practices at the time. *Id.*

On July 9, 2018, Frumer emailed Yvonne requesting the "list of passwords and access codes for the various accounts, etc," Yvonne Thomas Decl. Ex. 5, which she provided the following day. *Id.* Ex. 6. The list included the password to Indiana's email account. *Id.*

On or about July 24, 2018, Hogan Lovells engaged Epiq eDiscovery Solutions (Epiq) to image Indiana's computer, and to "maintain the electronic and hard copy documents on an eDiscovery platform." Tracey Decl. ¶ 8. Epiq imaged the computer that same day. *Id.* Also on or about July 24, Hogan Lovells engaged Key Discovery "to physically collect and copy the hard copy documents." *Id.*

On July 25, Tracey again emailed Frumer asking whether he had turned over to Brannan "all documents and information, electronic and hard copy, in your (or your client's) possession created, received or maintained while" Thomas was Indiana's power of attorney. Tracey Decl. Ex. C. Frumer responded later that day, stating that there were additional hard copy documents but as for electronically stored information (ESI), "there are significant financial limitations being encountered which encroaches on the ability to deal with" the ESI. *Id.* Counsel then spoke over the phone, at which point Frumer explained that Thomas used his personal laptop for "both personal business and to conduct tasks as Indiana's Power of Attorney," that the laptop would need to be reviewed, and that Thomas "was entitled to indemnity from the Estate for all expenses and

legal fees he incurred in conducting that review." *Id.* ¶ 13. Frumer also "assured" Tracey that "all records were, in the meantime, being preserved." *Id.*

During the week of August 20, 2018, Garay, Brannan, and Tracey met to discuss the printed emails, which caused Garay to believe that the paper record could be incomplete. Garay Decl. ¶¶ 8-9. The group "decided that [Garay] should try to access the email account." *Id.* ¶ 9; *see also* Tracey Decl. ¶ 16. But Garay could not locate the password. On or about August 28, 2018, after Tracey asked Frumer for the password but before Frumer provided it, *see* Garay Decl. ¶ 10; Tracey Decl. ¶ 17 & Ex. E, Thomas signed on to Indiana's email account. Thomas Decl. ¶ 23.  He says that he did this to confirm that the password still worked. *Id.* Thomas then "confirmed the password with my lawyer." *Id.* Thomas states that during this timeframe he "did not delete any emails, or do anything else within the email account." *Id.*

The following day, Frumer gave Tracey the email password, Tracey Decl. ¶ 18, and Tracey relayed it to Brannan and Garay. Garay Decl. ¶ 10. On August 30, 2018, Garay signed into the account and realized that Indiana's email inbox only "contained approximately 400 emails, almost all of which were spam." *Id.* ¶ 10. "The deleted folders were empty," and she "did not see the hundreds of emails that [she] had reviewed in paper." *Id.* Garay also noticed the automated filter moving emails with the subject "IMPORTANT DOCUMENT" into the "Recently Deleted" folder. *Id.* ¶ 12; *id.* Ex. B. She then changed the password and ensured there were "no automated rules in place that would lead to the deletion of any [further] emails," and provided all of this information to Brannan and Tracey. Garay Decl. ¶ 13; Tracey Decl. ¶ 24. Upon hearing this information from Garay, Hogan Lovells reviewed AOL's email retention and civil subpoena policies to determine whether they could recover any deleted emails, but they learned that deleted emails are automatically deleted from the AOL system 24 hours after user deletion. Tracey Decl. ¶ 25.

Also on August 30, 2018, Tracey emailed Frumer, explaining that "there were no documents in the inbox" and that it appeared "virtually all of the contents have been deleted." Tracey Decl. ¶ 19 & Ex. E. He asked Frumer if he could tell him "when that occurred, who did it, and whether the documents have been secured in another location." *Id.* Ex. E. In response, Frumer wrote that Thomas "has not deleted anything." *Id.* He explained that Thomas did change the password (while he had the POA) because he "became aware that others with access to [Indiana's] computer were deleting things from the computer." *Id.* Frumer added that "historically," Indiana had "emails printed for him, for his review, and saved in binders," and that Thomas did not know what happened to the electronic versions of those emails. *Id.*

### 2.    September 2018-March 2019

On September 10, 2018, plaintiffs served the Estate and Thomas with discovery requests, Nikas Decl. Exs. 6, 7, including requests pertaining to the AOL Account. Tracey Decl. ¶ 28. The requests instructed: "If You are aware that a document or thing once existed but has been destroyed, You shall state when the document or tangible thing was destroyed, why it was destroyed, and the circumstances under which it was destroyed." Nikas Decl. Ex. 6 at 6; *id.* Ex. 7 at 6. Neither the Estate nor Thomas objected to this instruction nor disclosed that anything had been "destroyed." Nikas Decl. Exs. 8, 9. Also on September 10, 2018, the Estate served Thomas with discovery requests, Tracey Decl. ¶ 28, and on December 19, 2018, "the Estate noticed Thomas's deposition for the purpose of, among other things, determining what information he had concerning the AOL Account." Tracey Decl. ¶ 28.

At the direction of the Estate's then-counsel, Hogan Lovells, Epiq forensically examined Indiana's computer in an attempt to recover any deleted emails. On October 15 and 19, 2018, Epiq sent its results to Hogan Lovells "in the form of Internet History reports, System Information

reports and a full file listing," but the firm was unable to recover any deleted emails nor determine dates on which any emails had been deleted. Tracey Decl. ¶ 27.

On January 9, 2019, Hogan Lovells and counsel for MAF "participated in a telephone conference regarding the status of discovery." Tracey Decl. ¶ 29. Tracey recalls that he "informed Quinn Emanuel [MAF's counsel] that the Estate had accessed the AOL Account, that there were not any relevant emails in that Account when the Estate accessed it, and that we knew that Thomas had accessed the Account shortly before the password was provided to the Estate." *Id.* MAF's lead counsel, Luke Nikas, recalls the conversation differently. Nikas says that after remarking that there were very few emails to or from robertoddfellow@aol.com in the Estate's production, Tracey told Nikas that "Indiana's emails had been deleted," that they had been "deleted by Thomas," and that "the Estate would likely join in an application against Thomas in connection with the deletion." Nikas Decl. ¶ 15.

In a follow-up communication to Nikas on January 16, 2019, Tracey recounted the steps the Estate took in document preservation, and wrote that he did "not have any direct information as to . . . who deleted the emails, or the date of any deletions." Nikas Decl. Ex. 2. Tracey also wrote that he had "been informed that upon becoming power of attorney, Mr. Thomas changed the password and restricted account access solely to himself." *Id.* That same day, Hogan Lovells served a subpoena on Oath Inc. (Oath), which later responded that it "does not maintain AOL email on its servers that is not directly accessible to an active user of an email address. If a current active user cannot access any given email message, then it doesn't exist on Oath's AOL email servers. Oath does not archive or keep records of deleted AOL email." Tracey Decl. Exs. F & G.

Tracey followed up with Nikas yet again on January 25, 2019, repeating the steps Hogan Lovells, on behalf of the Estate, took to attempt to recover Indiana's emails, and reiterating that

the Estate "has no knowledge of the 'destruction' of any evidence." Nikas Decl. Ex. 5. The letter also confirmed that the Estate was preserving "all evidence in the Estate's custody or control relevant to this litigation." *Id.*

Plaintiffs brought the issue of potential spoliation to the Court's attention on February 22, 2019, leading to a series of responses. (*See* Dkt. Nos. 144, 145, 146, 147, 148, 149.) However, during a discovery conference on the issue on March 6, 2019 (Dkt. No. 165), it became clear to the Court that a "fuller record" was needed to resolve the dispute. Thus, following the conference, the Court issued an Order dated March 6, 2019 (March 6 Order) (Dkt. No. 153), creating a procedure for the parties to hire an expert to perform a forensic examination of the electronic devices and computers of Indiana and Thomas. The parties would split the cost of the expert's work, though "[t]his allocation is without prejudice to a reallocation of costs, if appropriate, after the conclusion of the expert's work and any further motion practice." March 6 Order ¶ 6.

### 3.    The FTI Report

On April 1, 2019, the parties retained FTI Consulting "to conduct a forensic examination of electronic devices and email accounts belonging to Robert Indiana and Jamie Thomas[.]" Nikas Decl. Ex. 11 (FTI Report) at 1. FTI was given access to Indiana's desktop computer, the log-in credentials to Indiana's AOL Account, Thomas's laptop computer, a forensic image of the laptop previously created by AlixPartners, and the log-in credentials to Thomas's Gmail Account. FTI Report at 1.

#### a)    Jamie Thomas's Computer

On May 15, 2019, FTI imaged the hard drive of Thomas's laptop computer. It also received a copy of the image made by AlixPartners, made on June 1, 2018. FTI Report at 5, 14. FTI found

that on March 20, 2018, a "System Refresh/Reset"[10] was performed on the laptop, though it "did not uninstall or remove applications of interest to [FTI's] examination, such as mail applications or wiping software." FTI Report at 5. FTI added that "the user selected not to remove personal files or to overwrite free space." *Id.* at 5, 14.

FTI also found that on May 30, 2018, two days prior to the imaging completed by AlixPartners, the computer's operating system was "updated from a previous Windows 10 version to Windows 10 Home version 1803." FTI Report at 5, 14. On or about May 31, 2018, the Chrome history was cleared, though FTI was able to recover internet history from July 19, 2016 through May 14, 2019, and it could not say "with certainty what data, if any, was lost as a result of this action." *Id.* at 5, 14. On October 14 and 16, 2018, a "disk cleanup utility packaged with Dell computers was executed" by a user "and removed Google Chrome history and system files[.]" *Id.* at 5, 14. As a result, "there is a gap in active, user-initiated internet history (e.g. internet history from the user which has not been deleted) before May 31, 2018 and again between June 1, 2018 and October 16, 2018." *Id.* at 6, 14. In other words, webmail history (gmail activity) cannot be retrieved for these date ranges.

According to FTI, someone accessed Indiana's AOL Account through Thomas's laptop as late as May 24, 2018. FTI Report at 6, 15. The AOL Account was also accessed through Thomas's laptop on November 18, 2017, March 28, 2018, and March 30, 2018. *Id.* at 15. On those dates, "[t]o provide context," "FTI reviewed all system activity that transpired starting ten minutes before the login to the AOL account and continuing thirty minutes after the login to the AOL account" on all four dates. *Id.* at 15. On November 18, 2017, FTI observed access to Thomas's personal email

---

[10] "System Refresh/Reset is [a] feature built into Microsoft operating systems and is typically utilized to optimize the system by removing applications and returning the computer to factory settings." FTI Report at 14.

(the Gmail Account) and an email titled "Fwd: Your recent order and appointment confirmation." *Id.* at 15. On March 28, 2018, FTI observed, among other things, access to two emails in Thomas's Gmail Account titled "(no subject)." There were also two searches performed in his Gmail Account for the terms "robert Indiana" and "robert indiana_star." *Id.* On March 30, 2018, FTI observed, among other things, access to Thomas's Gmail Account and three emails titled "museum of multiple        art        logo,"        "Fwd:        RI        MM,"        and        "RI        Fwd: 2018May_Wine_Enthusiast_RIndiana_Cover_Q&A.pdf." *Id.* Finally, on May 24, 2018, FTI observed access to Thomas's Gmail Account and, specifically, emails titled "RI" and "(no subject)." *Id.*

    b)  Jamie Thomas's Gmail Account

    There were 232 messages in Thomas's mailbox sent from Thomas to Indiana, but only 5 of those messages still existed in Indiana's mailbox at the time of the FTI Report. FTI Report at 6, 20. "The remaining 227 messages were deleted from Indiana's mailbox between the time they were sent and May 2019, when FTI downloaded Indiana's mailbox." *Id.* at 6. Thirty-five of the 232 emails forwarded or responded to an earlier (original) message, where the earlier original messages "appear to have been deleted from Thomas' mailbox." *Id.* at 6, 21. "[T]hese original messages were forwarded or replied to between September 7, 2014 and December 30, 2015 . . . and thus the deletions from Thomas' mailbox took place between September 7, 2014 and May 2019[.]" *Id.* at 7. FTI could not determine when, within this four and a half year period, the deletions took place. Further, although the original messages were deleted, "the forwarded or replied to copy of these messages still exists in Thomas' mailbox." *Id.* Twenty-seven of those 35 messages were forwarded, meaning they likely retained any attachments from the original message. *Id.* at 7, 21. Eight of those 35 messages were replied to, meaning they likely did not retain attachments, if any, from the

original message. *Id.* at 7, 21. However, FTI examined those eight messages and "was unable to identify any overt signs of an attachment that was no longer present." *Id.* at 7, 21.

There were 122 emails sent to Thomas (and in his inbox) that also included Indiana as a recipient. FTI Report at 7, 22. Only eight of those messages could be found in Indiana's AOL Account inbox. *Id.* at 7, 22. The other 114 messages were sent between July 31, 2014 and November 24, 2017, "and thus the messages were deleted between July 31, 2014 and May 2019." *Id.* at 7, 22. FTI could not determine when, within this almost five-year period, the deletions took place.

A search for jamieleethomas13@gmail.com on Thomas's laptop (rather than his webmail account) did not result in the recovery of any intact emails, folder metadata details, or emails saved as documents. FTI Report at 7. FTI was able to recover two individual snippets, one of which was "net new, meaning it was not in the population FTI downloaded from either webmail account in May 2019." *Id.* A review of Appendix B suggests that the "net new" email was sent from Jamie Thomas to Yvonne Thomas and John Frumer on August 20, 2018, with the subject: "Re: Robert Indiana." *Id.* App. B.

c)    Indiana's Computer

FTI noted that "[n]o password was needed to access" Indiana's computer, and "thus, anyone with physical access" to Indiana's computer could turn it on and "access the files on it." FTI Report at 8, 23. The computer "had its operating system updated to Windows 10 Home on December 10, 2017." *Id.* at 23. The last time someone logged in to the computer was May 29, 2018. *Id.* at 8, 23. "FTI did not identify any indications of wiping software or mass deletions occurring on the system." *Id.* at 8, 23.

FTI did observe webmail usage from various Yahoo accounts, including miester1300@yahoo.com (associated with Webster Robinson), which was last accessed on August 3, 2017 (and prior to that on April 1 and April 24, 2017); simpsonl16@yahoo.com (associated with Lisa Simpson), last accessed on May 22, 2018 (and prior to that on May 21, 2018); and islandergerly@yahoo.com (associated with Jamie Harris), last accessed on May 29, 2018. FTI Report at 8, 23-24.

d)     Indiana's AOL Account

A single message was sent from Indiana's AOL Account after his death. The message was sent on February 28, 2019, to a civil subpoena mailbox. FTI Report at 8, 25. The email included an attachment containing an authorization and consent for Oath, Inc. to release records. *Id.* at 25.

There were 91 sent messages in Indiana's mailbox, "87 of which were sent to jamieleethomas13@gmail.com." FTI Report at 8. Of those 87 messages, 85 still exist in Thomas's mailbox, meaning that two of them were deleted from Thomas's mailbox. *Id.* at 8, 25. FTI retrieved the metadata for the two deleted emails, one sent on November 24, 2017, and the other sent on May 10, 2018.[11] Of the 87 sent messages in Indiana's mailbox, 86 of them forwarded or responded to an earlier (original) message. *Id.* at 9, 26. Yet, "58 of the original messages appear to have been deleted from Indiana's mailbox." *Id.* at 9, 26. Because "these messages were forwarded or replied to between February 6, 2017 and April 9, 2018," the messages had to have been deleted between

---

[11] After the FTI Report was submitted, Thomas's attorney, Paul Ryan, was able to locate the two emails referred to in the FTI Report. *See* FTI Report at 25-26; Ryan Decl. (Dkt. No. 228) ¶ 2. One email, dated May 10, 2018, was produced by Thomas in this litigation. The document was an email, with the subject line "Payment received#62398, Dated: THURSDAY,10 MAY," confirming the payment and shipment of an order. Ryan Decl. Ex. A. The other was an email dated November 24, 2017 – forwarded by Thomas to his lawyer that same day – which Mr. Ryan states was privileged and "bears no relevance to the claims and defenses in this litigation." Ryan Decl. ¶ 4. Thus, it was not produced in this litigation.

February 6, 2017 and May 2019. *Id.* at 9, 26. However, "the forwarded or replied to copy of these messages still exists in" Indiana's mailbox. *Id.* at 9, 26. 56 of the 58 messages were forwarded messages, meaning they likely contained any attachments from the original messages. *Id.* at 9, 26. FTI examined the remaining two deleted original messages, which were replies, "and was unable to identify any overt signs of an attachment that was no longer present." *Id.* at 9, 26.

All of the seven messages sent to Indiana that also included Thomas as a recipient still resided in Thomas's mailbox. FTI Report at 9, 26.

Separately, FTI was able to recover "six intact emails containing Robert Indiana's email address, robertoddfellow@aol.com, on the Indiana Computer." FTI Report at 26. Four of these emails were "net new emails, meaning they were not located in the email FTI downloaded in May 2019." *Id.* at 26. The other two emails were found in Thomas's Gmail Account but not in Indiana's inbox. *Id.* at 26. Thus, all six of these emails were deleted from Indiana's AOL Account, and because they were sent between November 2013 and November 2015, they had to have been deleted sometime between then and May 2019. *Id.* at 26. FTI could not determine when, within this five and a half year period, the deletions took place.

In its search for both robertoddfellow@aol.com and jamieleethomas13@gmail.com on Indiana's computer, FTI also recovered 246 folder metadata details (239 of which were "net new"), 21 individual snippets (18 of which were "net new"), 4 emails saved to documents (all of which were "net new"), and four intact emails containing Thomas's email address (1 of which was "net new"). FTI Report at 9-10, 26-27. A review of Appendix B suggests that these emails were sent no later than 2016, with the vast majority having been sent in 2013 or 2014. *Id.* App. B.[12]

---

[12] On September 3, 2019, following the dissemination of the FTI Report to the parties, Nikas says that his associate, Ryan Rakower, spoke with counsel for the Estate and Thomas as well as individuals at FTI. Although "Rakower raised the possibility of FTI comparing Robert Indiana's

#### 4.      October 22, 2019 Response to Interrogatories

On October 22, 2019, Thomas responded to plaintiffs' interrogatories. Nikas Decl. Ex. 12. Interrogatory No. 16 asked: "If you contend that since May 19, 2018, you did not delete emails or any other electronically-stored information that belonged to Robert Indiana, that was sent or received by Robert Indiana, or that pertained to Robert Indiana, identify all documents (by Bates number), facts, and witnesses that you claim support this contention." *Id.* at 21. In response, Thomas stated that his "position," based on "his personal knowledge and the forensic study conducted by FTI," was that "he has not knowingly deleted emails or any other electronically-stored information that belonged to Robert Indiana, that was sent or received by Robert Indiana, or that pertained to Robert Indiana, without first sending a copy to himself, copies of which have been produced in this litigation." *Id.* at 22.

#### C.      January 15, 2020 Order

After receiving a letter-motion from MAF seeking "a hearing" on its request for spoliation sanctions, the Court issued a scheduling order dated January 15, 2020 (the Jan. 15 Order) (Dkt. No. 210). The Court expressly advised that plaintiffs "may reserve their sanctions motion until the completion of fact discovery (including depositions)," and warned that "if they choose to file their motion now, the Court does not intend to delay briefing or decision on that motion to accommodate

---

email account to documents produced by Michael McKenzie to discover whether emails contained in McKenzie's production had been deleted from Indiana's account," Mr. Nikas says, "[c]ounsel for the Estate and Thomas rejected Rakower's proposal" because "FTI would never be able to identify the 'full universe' of documents that were deleted from Indiana's inbox, as there may be deleted emails that were not contained in either Thomas's inbox or McKenzie's produced documents." Nikas Decl. ¶ 16.

discovery, nor to permit the MAF Parties to renew or supplement their motion at a later date." Jan. 15 Order at 2.[13] Plaintiffs chose not to wait, and filed their sanctions motion on January 29, 2020.

### D. The Sanctions Motion

According to plaintiffs, the evidence, including FTI's findings, shows that Thomas "maliciously destroyed Indiana's emails despite his clear obligation to preserve" them. Pl. Mem. at 11. First, plaintiffs argue, that it cannot be "pure coincidence" that "at least 35 unique emails were deleted from *both* Indiana's email account *and* Thomas's email account." Pl. Mem. at 11 (emphases in the original unless otherwise noted). Second, they stress that "Indiana's AOL account was accessed numerous times from Thomas's personal laptop," and "[o]n several of these occasions, Thomas's and Indiana's email accounts were accessed within the same 30-minute period." *Id*. Third, according to plaintiffs, "Thomas has *admitted* that he deleted Indiana's emails," in that he responded to plaintiff's interrogatory by denying that he deleted such emails "without first sending a copy to himself, copies of which have been produced in this litigation." *Id.* at 12. Finally, plaintiffs note that "Thomas had exclusive access to Indiana's account before and after Indiana died," and assert that he was the only person with the "motive, means, and opportunity to delete Indiana's emails." *Id*. at 13.

With respect to Brannan, plaintiffs argue that he "flout[ed]" his obligation to secure Indiana's ESI early and effectively, and then concealed his knowledge that the artist's emails had been deleted. Pl. Mem. at 3. In plaintiffs' telling, Brannan failed to follow up with Thomas's counsel for weeks to confirm that Thomas was preserving Indiana's emails; waited months before

---

[13] As of the date of this Opinion and Order, it appears several depositions have yet to occur and are scheduled to take place sometime between October 12 and October 31, 2020. Among the witnesses who have yet to sit for deposition is Jamie Thomas. *See* Estate Ltr. dated Sept. 23, 2020 (Dkt. No. 352) at 4.

obtaining the credentials to the AOL Account; and then concealed the deletion of Indiana's emails for additional months "despite having ample opportunities to come clean and a serious obligation to do so." *Id.* at 3-6, 16-17.

In his opposition brief (Thomas Mem.) (Dkt. No. 227), filed on March 4, 2020, Thomas argues that multiple people, including Indiana's personal assistants and home health-care aides, had direct access to Indiana's computer, which was not password-protected, and to the AOL Account, the password to which was written on a post-it note on the computer monitor. Thomas Mem. at 5. Moreover, Thomas points out, because Indiana was not computer-savvy, he used a system in which his assistants customarily printed out and saved important emails (on paper), and then deleted the electronic versions. *Id.* at 5. Robinson, in particular, deleted "large numbers of emails" so as not to "clog up the system." *Id.* Thomas asserts that since February 28, 2018, when his attorney sent a cease-and-desist letter to the Morgan Art Parties, he "has not deleted any documents relating to Mr. Indiana or this litigation," *id.* at 8, and states that nothing in the FTI Report establishes that any deletions occurred after that date. *Id.* at 10-14.

Addressing the FTI Report head on, Thomas argues that the facts that plaintiffs point to as "damning" are in fact red herrings. For example, although FTI found "that 227 emails sent by Mr. Thomas to Mr. Indiana had been deleted from Mr. Indiana's AOL account," these emails "were retained in and recovered from Mr. Thomas' email." Thomas Mem. at 11. Likewise, although "114 emails that were sent to Mr. Thomas and also included Mr. Indiana as a recipient were deleted from Indiana's AOL mailbox," the same emails were found in Thomas's Gmail Account mailbox. *Id.* at 12. As for the 87 emails sent from Indiana to Thomas, only two were missing from Thomas's mailbox, and Thomas's counsel later located those two, one of which was produced in this litigation and one of which was both privileged and irrelevant to this litigation. *Id.* at 12. Finally, although

FTI identified "35 original messages in Thomas' mailbox that were forwarded or responded to and which were sent to Indiana [that] appear to have been deleted from Thomas' mailbox," "the forwarded or replied to copy of these messages still exists in Thomas' mailbox." *Id.* at 13. Thomas also notes almost all of the emails as to which one or another copy is missing are dated prior to February 28, 2018. Since there is no evidence as to when – precisely – they were deleted, *id.* at 11-13, there is also no evidence that the deletion occurred after Thomas's obligation to preserve them arose. *Id.* at 11-13.

In its own opposition brief (Estate Mem.) (Dkt. No. 231), filed on March 4, 2020, the Estate echoes Thomas's points and adds that it took "reasonable steps" to preserve the late artist's ESI. Estate Mem. at 15. In response to plaintiffs' argument that it "should have acted more quickly to gain access to Indiana's" AOL Account, the Estate contends it had a "far greater and more urgent evidence preservation task" at hand, that is, the preservation of Indiana's paper records (which were "at risk of physical damage and destruction") at the Star of Hope. *Id.* at 15-16. In addition to the various tasks Brannan undertook to preserve the paper records (detailed in its brief), the Estate argues that it took "more than reasonable" steps to preserve the ESI by communicating with Thomas's counsel, requesting the password to the AOL Account, and reviewing the emails in late August 2018, approximately three months after the artist's death. *Id.* at 16-17. The Estate vehemently denies it engaged in a "cover up," arguing that since it "never had any evidence that any spoliation occurred," it was under "no legal or ethical obligation to disclose anything to [plaintiffs]" simply because the AOL Account, when accessed, contained few emails. *Id.* at 18-19.

In their reply memorandum (Reply Mem.) (Dkt. No. 244), filed on March 18, 2020, plaintiffs argue that the deletion of Indiana's emails prejudiced them because there are no hard copies of the deleted emails from 2017 through May 2018. Reply Mem. at 1. Plaintiffs also point

to FTI's finding that "at least 135 emails" existed in some form (mostly not "intact," and evidenced only by "[f]older metadata details" or "[i]ndividual snippet[s]") on Indiana's computer or Thomas's laptop, but were not in Indiana's or Thomas's mailbox. *Id.* at 2-3. Plaintiffs acknowledge the limitations in FTI's investigation (for example, "if an email that Thomas did not send or receive was deleted from Indiana's account, FTI could not identify this deletion"), but seek to turn it to their advantage, arguing that "substantially more emails may have been deleted than FTI was able to identify through its analysis." *Id.* at 3. Plaintiffs also argue that "FTI found definitively that at least 35 unique emails were deleted from both Indiana's AOL account and Thomas's Gmail account, which proves that Thomas specifically coordinated deletions between the accounts." *Id.* at 3.

On June 9, 2020, the Court heard oral argument on the sanctions motion. *See* Transcript dated June 9, 2020 (June 9 Tr.) (Dkt. No. 309). Plaintiffs, represented by Nikas, stressed the deletions noted in the FTI Report and the fact that – as Nikas put it – Thomas intentionally ran "two system operations that deleted browser history" from his own laptop. June 9 Tr. at 35:23-36:1. The Court then questioned the significance of deletions that left another version of the same email intact:

> THE COURT: But don't those emails still exist or doesn't the text of those emails still exist? That's how I read the report at the top of page 7, end of the carry-over paragraph: "Despite the original message being deleted, the forwarded or replied to copy of these messages still exist in Thomas' mailbox."
>
> MR. NIKAS: What we don't have, your Honor, is the metadata for the original email. We don't have – and therefore we don't have verification of authenticity. If you reply to an email, you can change the email below it because it's open text. This was in an inclusive email with Thomas and Indiana. And so we don't know the metadata. We don't have verification of authenticity. We don't know for sure if there were attachments. FTI said it looked – just read the emails to see if there were any obvious indicators of attachments in the same way

| | |
|---|---|
| | that you or I would look at the email. They couldn't find any, but obviously, we don't know whether there were attachments to those original emails. So we have only emails up the chain without any availability to decipher authenticity of the original emails or attachments. |
| THE COURT: | All right. I take your point that when you reply to an email or forward an email, you can do a number of things to the original email. You can edit the text. You can strip it of attachments, etc. But you have to – it's your burden on this motion. So what you are suggesting might have happened here is that Thomas years ago, prior to this litigation being brought or this litigation even being threatened, that he doctored the original email so that the only copy left on his system, the reply or the forward, was not authentic and then later, after this litigation was threatened or brought, he deleted the original, right, both of those things have to be true? |

*Id.* at 39:18-40:24.

Likewise, the Court noted that emails "between the Indiana account or the Thomas account, on the one hand, and the Morgan parties, are not permanently gone" because Morgan Art had those. June 9 Tr. at 80:4-6. Nikas agreed with the Court as to those emails, but also agreed with the Court's interpretation of his argument that "there may be another set of communications between the Indiana account and/or the Thomas [account] and the AIA parties," which may be "permanently gone or at least have not been produced by American Image and have been deleted from the Indiana end of things," and that there also may be missing communications with third parties. *Id.* at 80:4-81:23.

Plaintiffs also argued that Thomas lied several times, under oath, about deleting Indiana's emails, *see* June 9 Tr. at 49:16-21; 50:20-24; 82:11-13, and pointed out that, although Robinson and Hamilton used Indiana's computer, they only used it through early 2017 and 2016, respectively. *Id.* at 44:16-22; 77:16-21. After that – and, in particular, after the duty to preserve arose – there were two healthcare workers with access, but they (unlike Thomas) had "[z]ero motivation to delete Indiana's emails," and there is "[z]ero evidence that they did." *Id.* at 44:16-22.

30

As for the Estate, plaintiffs argued – as they had in their briefs – that it "took no steps to preserve documents, no steps to preserve them with AOL, and didn't disclose this for four and a half months." June 9 Tr. at 48:4-6. Finally, in speaking to the issue of prejudice, plaintiffs noted that there were some emails from Indiana (or at least from the AOL account) referenced in their complaint and attached to their motion papers, including "one from 2001 that goes to a central issue in this case," and others "where Jamie Thomas was using Indiana's email account to write my clients." June 9 Tr. at 78:19-21. Moreover, Nikas argued, since those emails were relevant to the claims and counterclaims in this litigation, any missing emails could also be relevant. "[W]e see emails about the [robertindiana.com] website. We see emails from Thomas using Indiana's account to block out our clients from the rights they had to exercise under the two 1999 agreements. We see Thomas texting about emails he had written regarding his creation of works that we believe violated our rights." *Id.* at 79:7-13.

Counsel for Jamie Thomas, Paul Ryan, stressed that many other individuals accessed Indiana's computer and the AOL Account, any of whom could have deleted emails – as a matter of course – and that Webster Robinson in particular was using Indiana's email account as late as January 17, 2017. June 9 Tr. at 55:3-56:5, 56:22-57:6. Moreover, Ryan noted, Indiana and MAF were business partners for twenty or more years, and "Morgan Art did not have a single email from Mr. Indiana himself to them," *id.* at 58:8-12, thus corroborating the evidence that Indiana simply did not send business emails himself (and rarely any emails). Finally, although "there's no question that there were deletions from Mr. Thomas' own laptop, . . . there's no evidence that these deletions were made after an obligation to preserve them [arose]" *Id.* at 59:13-16.

Counsel for the Estate, Jessie Beeber, catalogued the "reasonable step[s]" the Estate took "to be assured that hard copy and electronic documents were being preserved and were not being

destroyed." June 9 Tr. at 69:1-3. The Morgan Art Parties, she contended, had failed to offer a single

"plausible, concrete suggestion about what an email from Robert Indiana who didn't send emails

would have said that would have been helpful to them in this case." *Id.* at 73:15-20.

## II.   ANALYSIS

### A.   Legal Standards

Because this action was referred to me for general pretrial management pursuant to 28

U.S.C. § 636(b) and Fed. R. Civ. P. 72(a), I have broad authority to impose discovery sanctions.

Orders imposing such sanctions "are ordinarily considered non-dispositive, and therefore fall

within the grant of Rule 72(a), 'unless the sanction employed disposes of a claim.'" *Joint Stock Co.*

*Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *16 (S.D.N.Y. July 18,

2017) (quoting *Seena Int'l Inc. v. One Step Up, Ltd.*, 2016 WL 2865350, at *10 (S.D.N.Y. May

11, 2016)), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017). A

magistrate judge's authority to order (rather than recommend) a discovery sanction does not

depend on the relief requested, but rather depends on the "sanction the magistrate judge actually

imposes." *Id.* (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal*

*Practice and Procedure* § 3068.2, at 383 (Thomson Reuters 2014)).

Rule 37(e), which was significantly amended in 2015, now governs sanctions for failure to

preserve ESI. "If electronically stored information that should have been preserved in the

anticipation or conduct of litigation is lost because a party failed to take reasonable steps to

preserve it, and it cannot be restored or replaced through additional discovery," the court:

    (1)    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

    (2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

        (A)    presume that the lost information was unfavorable to the party;

(B)   instruct the jury that it may or must presume the information was unfavorable to the party; or

(C)   dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As amended, therefore, Rule 37(e) requires "a three-part inquiry":

The first is to decide if the rule applies at all – that is, if a party failed to take "reasonable steps" to preserve electronically stored information "that should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been "prejudice to another party from loss of the information," in which case the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Lastly, the third step to consider – regardless of prejudice to any other party – is whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation," in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Coan v. Dunne*, 602 B.R. 429, 437 (D. Conn. Apr. 16, 2019).

The sanctions permitted under subsection (e)(1), available upon a finding that the spoliation caused "prejudice to another party," must be limited to "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Thus, if the only prejudice to the movant "lies in the extra time and expense that have been necessary to obtain relevant discovery from third parties," *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018), monetary sanctions may be a sufficient cure. Other sanctions permissible under subsection (e)(1) include more "serious measures," such as "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

However, to obtain the "particularly harsh" sanctions listed in subsection (e)(2) – including adverse inference instructions and terminating sanctions – the court must first find that the party to be sanctioned acted with an "intent to deprive." *Lokai Holdings*, 2018 WL 1512055, at *8. If such a finding is made, no separate showing of prejudice is required, because "the finding of intent [to deprive] . . . support[s] . . . an inference that the opposing party was prejudiced by the loss of information." *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).[14]

"In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Lokai Holdings*, 2018 WL 1512055, at *9; *see also CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016).

The "party seeking spoliation sanctions" – here, plaintiffs – "has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence." *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014).

## B.    Application of Standards

The parties do not dispute that many emails in Indiana's AOL Account were deleted – by someone, at some point. The declarations and the FTI Report agree on this point. But the fact of those deletions, standing alone, does not show that spoliation occurred or entitle plaintiffs to sanctions. Before considering sanctions under either subsection of Rule 37(e), the Court must determine: (1) whether ESI was destroyed, by Thomas, after a duty of preservation arose, and (2)

---

[14] "The requirement of intent, which is unique to Rule 37(e), distinguishes the destruction of electronically-stored information from alternative forms of evidence; for all other types of evidence, a movant can obtain a severe sanction, including an adverse inference instruction, upon a showing that a party engaged in only 'negligent spoliation.'" *Greene v. Bryan*, 2019 WL 181528, at *3 (E.D.N.Y. Jan. 14, 2019) (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 12 (E.D.N.Y. 2018)).

whether that ESI was permanently lost, in that it "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Plaintiffs fail to meet these threshold prongs of the test.

"The first element of the traditional spoliation test," which is also applicable to ESI under Rule 37(e), "requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *8 (S.D.N.Y. Dec. 19, 2017) (citation and quotation marks omitted). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *accord Resnik v. Coulson*, 2019 WL 1434051, at *7 (E.D.N.Y. Mar. 30, 2019) (quoting *Rabenstein v. Sealift, Inc.*, 18 F. Supp. 3d 343, 360 (E.D.N.Y. 2014)). "Although the obligation to preserve evidence commonly arises when the suit has already been filed, it can arise earlier 'when a party should have known that the evidence may be relevant to future litigation.'" *Field Day, LLC v. Cnty. of Suffolk*, 2010 WL 1286622, at * 4 (E.D.N.Y. Mar. 25, 2010) (quoting *Kronish v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Treppel v. Biovail*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)). Because the rule "does not apply when information is lost before a duty to preserve arises," courts may need to decide when the duty of preservation arose. Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment.

The moving party must also show that the lost ESI cannot be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Ordinarily, if emails were sent to or from other parties, those emails are not "permanently lost or unrecoverable" because they can be replaced in discovery

by obtaining them from those other parties. *See Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *17 n.21 (S.D.N.Y. June 20, 2019); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere.").[15]

### 1.    The Duty of Preservation Attached on February 28, 2020

In their moving papers, plaintiffs contend that Thomas's duty of preservation arose no later than February 28, 2018, the date that his counsel sent a cease-and-desist letter to the Morgan Art Parties. Pl. Mem. at 14. Thomas and the Estate agree. Thomas Mem. at 8; Estate Mem at 13. In a footnote in plaintiffs' reply brief, however, they suggest – for the first time – that Thomas's duty of preservation was triggered months earlier, in December 2017. *See* Pl. Mem. at 6 n.7 ("The preservation date clearly extends back to 2017, although it is unnecessary to reach back further given FTI's conclusion that Thomas deleted messages in 2018.").[16] In support of this theory, plaintiffs cite minutes of a December 2017 meeting of the Star of Hope Foundation board, Nikas Reply Decl. Ex. 2 (Minutes), which in plaintiffs' view reflect a "conspiracy by Brannan and Thomas to litigate and steal the rights to LOVE." Pl. Mem. at 6 n.7.

The minutes do mention potential litigation, *see* Minutes at 3 ("if there is litigation about" Indiana's will and Estate, the Star of Hope Foundation "will be doing the 'suing'"); however, without additional context, the Court cannot conclude that litigation was "reasonably foreseeable,"

---

[15] This principle does not apply, of course, where the parties' claims or defenses call into question whether and when a particular email was sent from or arrived in a particular email account or was opened or forwarded from that account, or where those claims and defenses otherwise raise issues that can only be answered by the metadata associated with a particular account or computer. *See*, *e.g.* Opinion and Order, *Charlestown Cap. Advisors LLC v. Acero Junction, Inc.*, No. 18-CV-4437 (JGK) (BCM), ECF No. 155 (S.D.N.Y. Sept. 30, 2020). This is not such a case.

[16] Plaintiffs also made this argument during the June 9 Hearing. *See* June 9 Tr. at 41:3-11.

*see West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), nor that the Estate, as opposed to the Foundation, would be a party to it, and therefore cannot conclude that Thomas's duty of preservation, either personally or in his capacity as Indiana's power of attorney, had arisen. *See Karsch*, 2019 WL 2708125, at *18 (collecting cases finding that the duty to preserve arose when litigation was actually threatened). Thus, the Court agrees with plaintiffs' original contention – and with the Estate and Thomas – that Thomas's duty to preserve was triggered on February 28, 2018, when his counsel served the Morgan Art Parties with a cease-and-desist letter.[17]

### 2. Plaintiffs Fail to Show that Indiana's Emails were Deleted After the Duty of Preservation Attached or Were Permanently Lost

The FTI Report, upon which plaintiffs principally rely to support their spoliation argument, contains very little evidence of deletions that occurred after the duty of preservation was triggered. To the extent it can be conclusively determined that any emails were deleted after the duty arose, those emails were not "permanently lost." As discussed in more detail below, this defeats plaintiffs' Rule 37(e) motion.[18]

#### a) Jamie Thomas's Emails

In its analysis of Jamie Thomas's Gmail Account, FTI found 232 messages sent from that Gmail Account to Indiana's AOL Account. FTI Report at 6, 20. The earliest message was sent on

---

[17] Even if the duty attached in December 2017, that would not alter the remainder of the Court's analysis or its decision to deny sanctions.

[18] There are two notable limitations in the FTI Report. First, FTI could analyze only emails that appeared in some form on either Indiana's computer or Thomas's laptop. *See, e.g.*, Pl. Mem. at 8. Thus, emails that were completely destroyed on both computers – if any – would not appear in FTI's analysis. The same is true of emails – if any – that were never shared between the Thomas Account and the AOL Account and that were completely destroyed on the one computer where they once existed. *See, e.g.*, June 9 Tr. at 43:21-23 ("So if Thomas deleted the Indiana email and then he deleted the same email from his own account, it is likely that it's gone forever without a trace."). Second, FTI was unable to determine the exact date on which emails were deleted. FTI could conclude only that emails were deleted sometime between when they were written and when FTI imaged the two computers on May 15, 2019. *See, e.g.*, FTI Report at 6.

August 26, 2013, and the last was sent on December 14, 2017. *Id.* at 6. Of the 232 messages, FTI explained, only five still existed in Indiana's mailbox as of May 2019. *Id.* at 6, 20. Thus, 227 incoming messages from Thomas were deleted from the AOL Account sometime between the dates on which they were sent and May 2019. The deleted messages may have included messages sent as late as December 14, 2017 (although the Court cannot so conclude based on the Report alone). If so, those messages were deleted at some point between December 14, 2017 and May 2019. Within those bounds, the FTI Report cannot identify the date of deletion with any further precision. Given the potential date range, and given the substantial evidence concerning Indiana's email practices, it is plausible that many or even all of those emails were deleted innocently by Indiana's assistants months (or, as to the earlier emails, years) before any duty of preservation was triggered. Moreover, the FTI Report does not prove, or even suggest, any of these emails were deleted on or after February 28, 2018.

Even if the Court were to conclude that the duty of preservation attached in December 2017, the FTI Report would not assist plaintiffs in meeting the requirements of Rule 37(e), because the 227 messages deleted from the AOL Account still exist in Thomas's Gmail Account mailbox. Thus, they were not permanently lost, and in fact they have already been produced.[19]

FTI further found that 35 of the 232 messages sent from the Gmail Account to the AOL Account were emails that forwarded or responded to an earlier (original) message, and that, although a copy of the original message was retained (as part of the forwarding or responding email), the original message itself was deleted from the Gmail Account. FTI Report at 6, 21. The

---

[19] *Cf. Karsch* 2019 WL 2708125, at *17 n.21 (noting that some emails housed on a spoliated server were not "permanently lost or unrecoverable," because they were "sent to or from defendants" or "sent to or from any of the non-destroyed, non-corrupted accounts maintained by Karsch and his affiliates," but other emails from that server were "permanently lost or unrecoverable").

35 forwarding/replying emails were sent between September 7, 2014 and December 30, 2015; thus, the first of the original messages was deleted at some point between September 7, 2014 and May 2019; the last was deleted at some point between December 30, 2015 and May 2019. *Id.* at 6-7, 21. Within those bounds, the FTI Report cannot identify the date of deletion with any further precision. Twenty-seven of the 35 deleted original messages were forwarded to Indiana, meaning that the forwarding email likely included attachments, if any, from the original message. *Id.* at 21.[20] However, the remaining eight original messages were sent to Indiana via reply, which means they likely did not include attachments, if any, from the original message. *Id.* FTI examined the eight replying emails individually, however, and was "unable to identify any overt signs of an attachment that was no longer present." *Id.*

These 35 deleted original messages may also have been deleted innocently, months or years before any duty of preservation was triggered. There is no evidence that any of them was deleted on or after February 28, 2018 – which was more than two years after the last of them was forwarded or replied to. Additionally, all 35 of them still exist in another form, as part of the email forwarding or replying to them. Thus, as to these 35 original messages, plaintiffs' proof suffers from the same two deficiencies identified above: they cannot establish either that the deletions occurred after the duty of preservation arose or that the original messages were permanently lost.[21]

---

[20] It is not clear to the Court whether FTI looked at these forwarding emails individually so as to determine whether they did in fact include any attachments referenced in the original message.

[21] It is theoretically possible – as plaintiffs suggest – that Thomas altered the original messages in the course of forwarding or replying to them (in which case the original message would in fact be permanently lost). *See* June 9 Tr. at 39:24-12, 82:11-12. However, plaintiffs present nothing but speculation on this point, *see id.* at 40:16-24, and the scenario seems particularly implausible given that the last forwarding/replying email was sent on December 30, 2015, years before to the earliest date on which plaintiffs now contend that Thomas anticipated potential litigation.

FTI also analyzed messages that were found in Thomas's Gmail Account mailbox and that also included Indiana as a recipient. Of 122 such instances, only eight of the emails still resided in Indiana's mailbox, meaning that 114 messages sent to both the AOL Account and the Gmail Account were deleted from the AOL Account. FTI Report at 22. Of these 114, the earliest was sent on July 31, 2014, and the last was sent on November 24, 2017; thus, the first such message was deleted at some point between July 31, 2014 and May 2019; the last was deleted at some point between November 24, 2017 and May 2019. *Id.* at 7, 22. Within those bounds, the FTI Report cannot identify the date of deletion with any further precision. As support for plaintiffs' sanctions motion, these 114 deleted emails suffer from the same two problems identified above: they may have been deleted in the regular course well before any duty of preservation was triggered, and they still exist, in Thomas's mailbox, and thus are not "permanently gone." *Id.* at 7, 22.

Finally, when searching Thomas's computer (not just his webmail account) for the relevant email addresses (jamieleethomas13@gmail.com and robertoddfellow@aol.com), FTI did not locate any intact emails, folder metadata details, or emails saved as documents, FTI Report at 22, but it did recover two individual "snippets" of emails based on its search for Thomas's email address. *Id.* at 7, 22. Of those two, only one was "net new, meaning it was not in the population FTI downloaded from either webmail account in May 2019." *Id.* at 7. An appendix to the report reveals that both were sent in August 2018, after the duty of preservation attached. *Id.* at App. B (final two rows). The email that was not "net new" existed in Thomas's email account and thus was never deleted. The email that was "net new" (labeled as "Not Found in Jamie Thomas' Gmail Account") was sent on August 20, 2018 with the subject line "Re: Robert Indiana." *Id.* That email was sent from Jamie Thomas to Yvonne Thomas and Thomas's counsel, John Frumer, *id.*, and thus can likely be recovered from one or both of the recipients. The motion papers, however, do not

reveal whether any efforts have been made to do so. Additionally, given its recipients and timing, the communication may have been privileged. Thus, although the "net new" snippet shows that a potentially relevant email was deleted after the duty of preservation arose, even as to this email, plaintiffs have failed to satisfy their burden of showing that it cannot be reproduced if discoverable.[22]

b)   Robert Indiana's Emails

In its analysis of Indiana's AOL Account, FTI found 87 messages sent from that account to Thomas's Gmail Account, only 85 of which remained in Thomas's mailbox. FTI Report at 25. The other two had been deleted from Thomas's mailbox. *Id.* These two emails were sent on November 24, 2017 and May 10, 2018, meaning one of them was deleted from Thomas's mailbox after the duty of preservation arose. *Id.* at 26. However, Thomas's counsel, attorney Ryan, attests that neither of these two emails was lost. Ryan Decl. ¶¶ 3-4. The May 10, 2018 email was produced by Thomas in this litigation,[23] whereas the November 24, 2017 email was withheld as privileged. *Id.* ¶ 3-4. Because these two emails were not "permanently lost," the deletions do not warrant spoliation sanctions under Rule 37(e).

FTI further found that 86 of the 87 messages sent from Indiana to Thomas were part of longer email threads, and that 58 of the original messages – later incorporated into the threads – "appear to have been deleted from Indiana's mailbox." FTI Report at 9. These 58 messages were

---

[22] Plaintiffs cannot argue that they did not have the benefit of full discovery when making their sanctions motion, because the Court expressly gave them the option of reserving the motion until discovery was completed, Jan. 15 Order at 2, which they declined.

[23] The produced version of the email, *see* Ryan Decl. Ex. A, was forwarded from robertoddfellow@aol.com to jamieleethomas13@gmail.com on May 10, 2018 at 6:08 p.m., and from jamieleethomas13@gmail.com to jdfrumer@christieyoung.com one minute later. *Id.* The original email came from "Billing Confirmation" at 8:45 a.m. on May 10, 2018, was addressed to robertoddfellow@aol.com, and appears to be an automated email announcing the arrival of a "shipment" on May 10, 2018. No additional substantive text appears in the forwarding emails.

41

forwarded or replied to between February 6, 2017 and April 9, 2018; thus, the first such message was deleted at some point between February 6, 2017 and May 2019; the last was deleted at some point between April 9, 2018 and May 2019. *Id.* at 9, 22. These date ranges show that at least one message was deleted after the duty of preservation arose. However, "[d]espite the original message being deleted, the forwarded or replied to copy of these messages still exists in Indiana['s] mailbox." *Id.* at 9. Fifty-six of the 58 deleted original messages were forwarded, meaning that they likely retained attachments, if any, from the original message. *Id.* The two messages that were not forwarded were replied to; although replies typically do not include attachments from the original message, FTI "was unable to identify any overt signs of an attachment that was no longer present" as to either of the two. *Id.* Therefore, although at least one of the emails was deleted after the duty of preservation arose, all 58 deleted original messages exist in some other form and thus, were not "permanently lost."

When searching Indiana's computer (not just his webmail account) for robertoddfellow@aol.com and jamieleethomas13@gmail.com, FTI found ten intact emails, twenty-one individual snippets, four emails "saved to documents," and 246 folder metadata details. FTI Report at 9-10. With respect to the ten intact emails, five were "net new" but none of them was "permanently lost," as they were fully intact on Indiana's computer. This is also true with respect to the four emails (all "net new") saved to documents on Indiana's computer. As to the 246 folder metadata details (which, as FTI cautions, "were recovered from unallocated space and could have originated from other users checking their email on this computer"), 239 of them were "net new." *Id.* FTI also recovered 21 "individual snippets" on the Indiana computer (which, as FTI again cautions, "were recovered from unallocated space and could have originated from other users"), 18 of which were "net new." *Id.* However, the metadata details for all of these items shows

that the underlying emails were sent years before any duty of preservation was triggered. *Id.* App. B. Thus, even though the underlying emails may be "permanently gone," plaintiffs have failed to show that they were deleted non-innocently, that is, by Thomas, after his duty of preservation arose.

c)     Thomas's Deleted Internet History

According to FTI, the Chrome (browser) history on Thomas's computer was cleared on or about May 31, 2018. FTI Report at 5. FTI cautions, however, that it "cannot say with certainty what data, if any, was lost as a result of this action." *Id.* at 5. FTI further concludes that a user-initiated disk cleanup utility "was executed and removed Google Chrome history and system files on October 14, 2018 and October 16, 2018." *Id.* As a result of these actions, there was a "gap in active, user-initiated internet history before May 31, 2018 and between June 1, 2018 and October 16, 2018." *Id.* at 6. FTI does not suggest that deleting Chrome history resulted in the deletion of emails, and the Court will not infer that without the express endorsement of the parties' forensic consultant. Nor do plaintiffs make any proffer as to what they could have learned had the browser history not been cleared or the cleanup utility not run. Thus, these findings do not support the threshold questions for spoliation sanctions.[24]

d)     Use of Indiana's AOL Account on Thomas's Computer

FTI observed several instances of Indiana's AOL Account being accessed from Thomas's computer. FTI Report at 15-16.[25] This occurred on three occasions after the duty of preservation

---

[24] A party's conduct in clearing his browser history could support – to a certain degree – the element of intent required for Fed. R. Civ. P. 36(e)(2) sanctions. However, the, Court does not reach the question of intent absent evidence of the threshold factors.

[25] FTI notes only the instances in which it could "definitively associate both account access and an access time," but it cannot conclude that the noted instances represented every time the AOL Account was accessed. FTI Report at 15.

attached: on March 28, 2018, March 30, 2018, and May 24, 2018. *Id.* On each date, within thirty minutes, FTI observed and noted "events" indicating that Thomas's Gmail Account was also accessed.[26] During these times, Thomas opened emails and searched for emails that were potentially relevant to this litigation, including opening an email with the subject line "Fwd: RI MM" on March 30, 2018. *Id.* at 15. However, the mere fact of access does not show or even suggest that the emails searched for (or opened) were deleted – then or later – and thus does not establish that emails were deleted after the duty of preservation attached.

e)      Thomas's "Confession"

If Thomas in fact confessed to spoliation in violation of Rule 37(e), that would of course overcome deficiencies in the technical evidence. According to plaintiffs, Thomas confessed to purposefully deleting Indiana's emails. Specifically, plaintiffs point to Thomas's October 22, 2019 response to plaintiffs' interrogatory, which read:

> If you contend that since May 19, 2018, you did not delete emails or any other electronically-stored information that belonged to Robert Indiana, that was sent or received by Robert Indiana, or that pertained to Robert Indiana, identify all documents (by Bates number), facts, and witnesses that you claim support this contention.

Nikas Decl. Ex. 12 at 21. In response, after reciting various objections, Thomas wrote:

> It is Thomas' position, based on his personal knowledge and the forensic study conducted by FTI, that he has not knowingly deleted emails or any other electronically-stored information that belonged to Robert Indiana, that was sent or received by Robert Indiana, or that pertained to Robert Indiana, without first sending a copy to himself, copies of which have been produced in this litigation.

*Id*. at 22. However, Thomas's "confession" suffers from the same deficiencies (in terms of supporting plaintiffs' motion) as the FTI findings discussed above: emails that Thomas sent to

---

[26] The Court presumes that the user accessing Indiana's AOL Account from Thomas's computer was Jamie Thomas, as there has been no evidence presented suggesting any other individual even uses Thomas's computer, nor has Thomas argued that to be the case.

himself before deleting from the AOL Account (or elsewhere) are not "permanently lost" if they existed in Thomas's Gmail Account (or elsewhere on his computer) when that computer was turned over for imaging in May 2019.

## III.   CONCLUSION

The Court having found that plaintiffs failed to carry their burden as to two threshold elements needed before spoliation sanctions can be assessed,[27] it need not address the hotly-disputed question of whether plaintiffs adequately demonstrated that it was Thomas (as opposed to any of Indiana's other employees, assistants, or caregivers) who was responsible for any deletion of Indiana's emails after Thomas's duty to preserve such evidence arose.[28] Nor is there any reason for the Court to reach the questions of prejudice or – for subsection (e)(2) purposes – intent to deprive.

Plaintiffs' motion is DENIED.

Although the Court left open the possibility of reallocating the costs associated with the FTI Report, *see* March 6 Order ¶ 6, and the Estate requests that plaintiffs now be required to pay the full costs of that report, *see* Estate Mem. at 23, the Court in its discretion declines to shift those

---

[27] Plaintiffs do not assert that the Estate itself deleted any emails. Rather, the claim is that the Estate was asleep at the switch and failed, during the crucial period immediately after Indiana's death, to take reasonable steps to prevent Thomas from spoliating relevant ESI. Since the Estate's liability, if any, is derivative of Thomas's, the denial of the motion as to Thomas requires that it be denied as to the Estate as well.

[28] It is evident that numerous individuals had access to Indiana's computer and AOL Account for many years relevant to this litigation. At least some of them routinely deleted Indiana's emails, at the artist's request, in the ordinary course. *See*, *e.g*., Hamilton Decl. ¶ 16. Plaintiffs are correct, however, that the number of individuals with such access had diminished by the time the duty of preservation attached, particularly after Robinson was fired in February 2018. *See* Robinson Decl. ¶¶ 13-15. After February 28, 2018, there is evidence that two of Indiana's healthcare aides – Lisa Simpson and Jamie Harris – accessed Indiana's *computer*, *see* FTI Report at 24, likely to check their own email accounts, but no evidence, from FTI or elsewhere, showing that they accessed, or deleted, Indiana's emails.

costs. The FTI Report benefitted all parties. Moreover, Rule 37(e) (unlike, for example, Rule 37(a)) does not include any presumption as to fee- or cost-shifting in the event the motion is denied. To the extent the Estate suggests that the sanctions motion was brought in bad faith or for dilatory purposes, *see* Estate Mem. at 23, the Court does not so find.

The Clerk of Court is respectfully directed to close Dkt No. 213 in Case No. 18-CV-4438 and Dkt. No. 86 in Case No. 18-CV-8231.

Dated: New York, New York
September 30, 2020                    **SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**

46