UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORGAN ART FOUNDATION LIMITED,

PLAINTIFF,

-AGAINST-

MICHAEL MCKENZIE D/B/A AMERICAN IMAGE ART,

DEFENDANT.

Case No. 1:18-cv-04438-AT-BCM

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TERMINATING SANCTIONS AGAINST DEFENDANT MICHAEL MCKENZIE

Dated: December 10, 2021

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Luke Nikas
Maaren A. Shah
Ryan Rakower
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
ryanrakower@quinnemanuel.com

*Attorneys for Plaintiff Morgan Art Foundation Limited*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT.................................................................................................... 1

FACTUAL BACKGROUND...................................................................................................... 4

    A.   *Initial Document Production Disputes And Deficiencies*........................................ 4

    B.   *The May 25, 2021 Visit To McKenzie's Studio* ...................................................... 6

    C.   *The August 5, 2021 Court-Ordered Inspection Of McKenzie's Studio* ................. 7

    D.   *Post-Inspection: New Discoveries Of McKenzie's Misconduct*.............................. 8

ARGUMENT............................................................................................................................. 15

I.     LEGAL STANDARD ......................................................................................................... 15

II.    TERMINATING SANCTIONS AGAINST MCKENZIE ARE WARRANTED AND
NECESSARY .................................................................................................................... 16

    A.   *McKenzie's Conduct Was The Product Of Willfulness And Bad Faith*................. 16

    B.   *McKenzie's Conduct Has Prejudiced MAF* ........................................................ 19

    C.   *McKenzie's Conduct Is Part Of A Pattern Of Misbehavior* ................................ 21

    D.   *McKenzie's Conduct Was Never Corrected*........................................................ 22

    E.   *McKenzie's Misconduct Is Likely To Continue* ................................................... 23

    F.   *Lesser Sanctions Would Not Be Sufficient* .......................................................... 24

III.   ATTORNEY'S FEES AND COSTS ARE APPROPRIATE........................................................ 25

CONCLUSION ......................................................................................................................... 25

***Cases***                                                 ***Page***

*DAG Jewish Directories, Inc. v. Y&R Media, LLC*,
    2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) .......................................................... 24

*DeCastro v. Kavadia*,
    309 F.R.D. 167 (S.D.N.Y. 2015) ............................................................................... 25

*Design Strategy, Inc. v. Davis*,
    469 F.3d 284 (2d Cir. 2006) ..................................................................................... 21

*Ford v. Am. Broad. Co.*,
    101 F.R.D. 664 (S.D.N.Y. 1983) ............................................................................... 19

*In re Porsche Cars N. Am., Inc.*,
    2012 WL 4361430 (S.D. Ohio Sept. 25, 2012) ......................................................... 1

*John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*,
    845 F.2d 1172 (2d Cir. 1988) ................................................................................... 16

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
    2019 WL 4727537 (S.D.N.Y. Sept. 26, 2019) .......................................................... 16

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
    2005 WL 1958361 (S.D.N.Y. Aug. 16, 2005) .......................................................... 25

*Lawrence v. City of New York*,
    2018 WL 3611963 (S.D.N.Y. July 27, 2018) ........................................................... 23

*Local Union No. 40 v. Car-Win Constr., Inc.*,
    88 F. Supp. 3d 250 (S.D.N.Y. 2015) ................................................................. 19, 20

*Martinez v. City of New York*,
    2018 WL 604019 (E.D.N.Y. Jan. 24, 2018) ............................................................. 19

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 ................................................................................................... 24

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
    212 F.R.D. 178 (S.D.N.Y. 2003) ................................................................... 16, 22, 24

*Montblanc-Simplo GmbH v. Colibri Corp.*,
    692 F. Supp. 2d 245 (E.D.N.Y. 2010) ..................................................................... 16

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976) .................................................................................................. 25

*Nieves v. City of N.Y.*,
    208 F.R.D. 531 (S.D.N.Y. 2002) ............................................................................... 22

*Nittolo v. Brand*,
    96 F.R.D. 672 (S.D.N.Y. 1983) ................................................................................. 18

*Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc*,
    663 F.2d 371 ....................................................................................................... 22, 23

*Rammal v. Timberland Co.*,
    1995 WL 559394 (S.D.N.Y. Sept. 20, 1995) ........................................................... 23

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010)................................................................. 22, 25

*Sanchez v. Litzenberger*,
    2011 WL 672413 (S.D.N.Y. Feb. 24, 2011)............................................ 16

*Shcherbakovskiy v. Seitz*,
    2010 WL 3155169 (S.D.N.Y. July 30, 2010), *aff'd*, 450 F. App'x 87 (2d Cir.
    2011)........................................................................................... 24

*Skywark v. Isaacson*,
    1999 WL 1489038(S.D.N.Y. Oct. 14, 1999)...................................... 22, 23

*Tchatat v. O'Hara*,
    249 F. Supp. 3d 701 (S.D.N.Y. 2017)................................................ 16

*U. of Neb. v. BASF Corp.*,
    2007 WL 3342423 (D. Neb. Nov. 5, 2007)......................................... 1

*Weinstein v. Ehrenhaus*,
    119 F.R.D. 355 (S.D.N.Y. 1988)..................................................... 21

**Rules**

Fed. R. Civ. P. 11 ........................................................................... 5
Fed. R. Civ. P. 26(a) ...................................................................... 14
Fed. R. Civ. P. 26(b)(1) ................................................................. 15
Fed. R. Civ. P. 37 ....................................................................15, 16, 25
Fed. R. Civ. P. 37(b) ................................................................ 15, 25
Fed. R. Civ. P. 37(b)(2)(C)............................................................ 15
Fed. R. Civ. P. 37(b)(2)(a)(iii)....................................................... 15
Fed. R. Civ. P. 37(b)(2)(a)(vi)....................................................... 15

Morgan Art Foundation Limited ("MAF") filed this case to hold Michael McKenzie accountable for forging Robert Indiana artwork, defaming MAF, and intentionally interfering with MAF's exclusive contractual rights to make Indiana's most iconic works. MAF caught McKenzie red-handed: Indiana attested in writing that McKenzie was a forger, Indiana confirmed on video that McKenzie was emotionally abusive and uncontrollable, and McKenzie's own studio assistant recorded a video of McKenzie forging Indiana's artworks in which she described the artworks as forgeries. This was just the tip of the iceberg: unbeknownst to MAF, McKenzie continued to forge Indiana's artwork after litigation commenced and had thousands of documents and artworks in his possession that demonstrated the extent of his scheme. But there was *no* way McKenzie was going to disclose this evidence voluntarily. Instead, McKenzie lied under oath about the evidence in his possession, refused to voluntarily sit for his deposition or produce documents, misrepresented his discovery efforts to the Court and MAF's counsel, concealed those thousands of documents and artworks, and intentionally hid evidence after this Court ordered further discovery. Case-ending sanctions are necessary.

"Transparency in the discovery process is necessary to ensure that all relevant information is made available to the litigants[.]" *In re Porsche Cars N. Am., Inc*., 2012 WL 4361430, at *6 (S.D. Ohio Sept. 25, 2012). "The overriding theme of recent amendments to the discovery rules has been open and forthright sharing of information by all parties to a case with the aim of expediting case progress, minimizing burden and expense, and removing contentiousness as much as practicable." *U. of Neb. v. BASF Corp.*, 2007 WL 3342423, at *5 (D. Neb. Nov. 5, 2007). These bedrock principles mean nothing to McKenzie, who has made a mockery of the discovery process and has repeatedly thumbed his nose at this Court.

McKenzie's misconduct started at the beginning and hasn't relented since. At the outset,

McKenzie refused to sit for his deposition or produce responsive documents, which forced MAF to file a motion to compel. The Court granted the motion, observed that McKenzie's conduct was borderline sanctionable, and stated that McKenzie would not get another free bite at the apple.

McKenzie has since eaten the whole orchard. He testified, under oath, that he had no Indiana artworks in his possession. That was a lie. McKenzie had thousands in his possession. He represented to MAF and the Court multiple times that he had done a comprehensive search for documents and had disclosed all evidence in his possession. Those were also lies. He had thousands of highly relevant documents that he had never produced. MAF sought relief, and the Court granted MAF the opportunity to inspect McKenzie's studio and collect evidence that McKenzie had withheld. At the inspection, MAF found thousands of hardcopy documents that McKenzie had never produced, in which there were printed emails from addresses and databases at McKenzie's business that McKenzie had also never searched or produced.

A month passed after the inspection. It seemed that McKenzie's discovery abuses couldn't get worse. But then they did. McKenzie's former employee, Osvaldo Gonzalez, blew the whistle: he revealed that McKenzie continued to forge art and had also hidden over a thousand artworks from MAF's counsel *after* the Court ordered the inspection. McKenzie's own employees testified that McKenzie moved the artwork to avoid detection. McKenzie, however, continues to lie: he testified that he moved the artwork out of his studio to protect it from the weather—even though he continues to store and make artwork in the studio, he hid the artwork in his *basement* and *outside* while MAF's counsel was conducting the inspection, and he unceremoniously crammed the uncrated artwork into moving trucks to get it off his property.

We are far past the point when the Court warned McKenzie that he had taken his "one free bite" at the apple. He has gotten a second, third, and fourth chance. His representations have

proven demonstrably false. He has engaged in a pattern of willful misconduct: violating discovery obligations and Court orders, making false representations to MAF and the Court, and hiding evidence to cover up his lies. This misconduct will continue: MAF would *never* have learned about McKenzie's misconduct absent its diligence and the luck of receiving a whistleblower call. And McKenzie even testified at his latest deposition that he would "[a]bsolutely not . . . . completely not and no and never" turn over information related to his continued forgery of Indiana's artworks. McKenzie's studio assistants also testified about important documents that McKenzie *still* has not disclosed, including an inventory of *all* of the Indiana artwork that McKenzie made. McKenzie previously lied, under oath, that he didn't possess such an inventory.

Enough is enough. The Court should not countenance McKenzie's extreme disregard for the legal system. An adverse jury instruction is not good enough. More depositions will not remedy the problem. The Federal Rules of Civil Procedure mean nothing if McKenzie can get away with what he's done. How many parties get their depositions reopened *multiple* times because of discovery abuses with *no* consequences? What defendant gets to argue to a Court that they will not sit for a deposition or produce documents with *no* consequences? What party to a litigation intentionally conceals evidence and gets to move forward in the case unscathed? How about a defendant who lies under oath repeatedly about his discovery conduct and intentionally defies a Court order requiring discovery? And what does it mean for the integrity of the legal system if a defendant can engage in *all* of this misconduct and still proceed in the case? There is only one way to hold McKenzie accountable and make it clear that repeatedly concealing evidence will not be tolerated in the Southern District of New York: enter judgment against McKenzie, strike McKenzie's pleadings, and award MAF its attorney's fees and costs incurred in all discovery, briefing, and hearings connected to this sanctions application.

**A.** *Initial Document Production Disputes And Deficiencies*

MAF served its initial Requests for Production on September 10, 2018. ECF No. 131-1. On November 9, 2018, McKenzie made a meager production of documents, the majority of which were printed from the internet. ECF No. 131. On November 13, 2018, counsel for MAF met and conferred with McKenzie's counsel, who was unable to confirm whether all responsive documents had been collected, searched, and produced because counsel admittedly had allowed McKenzie to do his own unsupervised search for documents. *Id*. MAF followed up with McKenzie's counsel shortly after. This time, MAF received a letter dated January 7, 2019, in which McKenzie stated that "American Image Art and Mr. McKenzie will not produce any more documents or appear for a deposition absent a Court order." ECF No. 131-6. MAF moved to compel. ECF No. 131.

On January 29, 2019, the Court held a hearing on MAF's motion. ECF No. 137. The Court granted the motion and ordered McKenzie to conduct a "reasonably diligent search" for documents and produce the documents no later than February 28, 2019. ECF No. 137 at 2-3. At the hearing, the Court instructed McKenzie's counsel that a lawyer has an obligation to control and conduct a diligent search for the client's documents, ECF No. 142 at 47:11-48:9, and noted that this was McKenzie's "one free bite" at the apple and that he "won't get another one," *id*. 48:10-17.

Despite the Court's clear warning, McKenzie's misconduct continued. On March 22, 2019, MAF's counsel emailed McKenzie's counsel to request "the status of document collection and review from" McKenzie's current and former employees. ECF No. 180-1 at 2. This email was met with silence. *Id*. On April 10, 2019, MAF followed up, this time reminding McKenzie's counsel that the Court had ordered McKenzie to produce these documents "no later than February 28, 2019." *Id*. at 1. Five days later, counsel for McKenzie replied: "We have reached out to the

client and will have an update for you shortly."[1]  *Id.*  On July 3, 2019, counsel for MAF again reminded McKenzie's counsel that MAF was awaiting McKenzie's explanation concerning what sources and locations he had searched for documents, what search terms were used, and whether it was McKenzie or his counsel who had conducted the search, collection, and review of responsive documents. ECF No. 185-4 at 1-2. Five days later, McKenzie's attorney sent another one-sentence reply: "We have forwarded your inquiry to Mr. McKenzie." *Id.* at 1.  McKenzie was clearly in control, and he and his counsel had ignored the Court's admonition that lawyers must take control of discovery. Shortly thereafter, McKenzie's attorney withdrew from the case.

On August 27, 2019, counsel for MAF forwarded the July 3, 2019 email to McKenzie's new counsel at Goetz Fitzpatrick LLP.[2]  On September 27, 2019, McKenzie's counsel wrote to MAF stating flatly that McKenzie and AIA had "exhausted all reasonable diligence to obtain such ESI from such persons with no further information or records to provide beyond what was already provided." ECF No. 262-2 at 1. In the same letter, McKenzie's new counsel inexplicably stated that McKenzie had "complied with every aspect of discovery" and accused MAF of "hiding behind legal mumbo jumbo rather than telling the truth." *Id.* at 2. But the letter still failed to address MAF's inquiries.  *Id.*  On October 1, 2019, MAF therefore again wrote McKenzie's counsel regarding McKenzie's deficient document production.  ECF No. 262-3.  After a failed global mediation, on April 9, 2020, MAF re-sent McKenzie's counsel the October 1 letter. ECF No. 262-

---

[1] While McKenzie and his counsel at Dunnington Bartholow & Miller LLP ignored McKenzie's discovery obligations, they *did* find the time to lodge frivolous Rule 11 threats against MAF's counsel, threaten to sue MAF's counsel *personally* for $10 million, and demand to speak with Quinn Emanuel's general counsel to disparage MAF's counsel and advance these frivolous threats.  Similarly, McKenzie emailed the head of Venable's New York office to falsely accuse the Estate's principal lawyer of committing fraud while he was employed at a prior law firm. McKenzie has no respect for the justice system, the rules, or basic tenets of professionalism.

[2] Goetz Fitzpatrick has also since withdrawn from its representation of McKenzie.

3.  MAF and McKenzie conferred on April 13, 2020, and McKenzie refused to respond to MAF's letter, which necessitated another pre-motion letter to the Court.  ECF No. 262.

At the conference that followed, the Court ordered McKenzie to provide detailed information about his collection efforts.  ECF No. 264 at 2.  On May 26, 2020, McKenzie described steps his attorneys and his employees purportedly took to collect documents—including representations that a litigation hold was sent shortly after this case was filed, that "[a] search was conducted of the AIA hard copy files for records responsive to the Morgan demands," and that "AIA and McKenzie have met their obligations concerning document discovery and there is no right for Morgan or any other party to demand further inquiry."  ECF No. 393-3.

Those representations, along with others, seemingly ended the issue: McKenzie's counsel represented, as an officer of the Court, that a full search of McKenzie's files had been conducted and that all responsive documents had been produced.  But this proved to be completely false.

## B.  *The May 25, 2021 Visit To McKenzie's Studio*

In Spring 2021, the parties began engaging in settlement discussions.  Declaration of Luke Nikas ("Nikas Decl.") ¶ 2.  As part of those discussions, MAF learned that McKenzie possessed a significant number of Indiana works.  *Id.*.  MAF requested access to McKenzie's property in Katonah, New York, to view the artworks in McKenzie's possession.  *Id*; *see also id*. Ex. 1, McKenzie Dep. 104:4-15.  The visit was conducted on May 25, 2021, with McKenzie's consent and McKenzie's lawyers present.  *Id*. ¶ 3.  Upon arrival, MAF's counsel was directed to McKenzie's studio, which he was told contained all the artworks in McKenzie's possession.  *Id.*

The results were disturbing.  Despite McKenzie's repeated representations to MAF, this

Court,[3] and the Maine probate court that is overseeing Indiana's estate[4] that he had nothing further in his possession, MAF discovered that McKenzie possessed roughly 1,000 artworks purportedly by Indiana, including many forgeries. MAF also saw thousands of documents in the studio that McKenzie had failed to produce. McKenzie had even used Post-It notes to tab numerous pages in the catalogue raisonné of Robert Indiana's works (which contains images that MAF owns under its contracts with Indiana), pulled those images from the tabbed pages into notebooks and other printed documents, screen printed forgeries of these images, and forged Robert Indiana's signature on the works. *See, e.g.*, Nikas Decl. Exs. 6, 28-29, 37. MAF also saw numerous documents relating to these works, inventory lists, and invoices for the sale of the works. *See id*. Exs. 6, 8-41.

## C.     *The August 5, 2021 Court-Ordered Inspection Of McKenzie's Studio*

McKenzie had improperly concealed *thousands* of pages of responsive documents and *thousands* of artworks. MAF sought relief from the Court on June 25, 2021. ECF No. 393. On June 29, 2021, the Court ordered McKenzie to make his Katonah studio available for inspection by MAF's counsel. *See* ECF No. 395 at 1-2; ECF No. 396 at 19-21, 27.

On July 21, 2021, the Court entered a stipulation and order governing the inspection. ECF No. 408. The order stated that MAF's counsel could "copy, photograph, and/or video-record the Site and any documents found at the Site," defining the word "document" to include "artwork." *Id*.

---

3 *See, e.g.*, ECF No. 393-1 (representing that, "[f]ollowing a reasonable search," McKenzie "ha[d] identified documents responsive to" numerous RFPs and would "produce those documents by November 9, 2018, as the parties agreed"); ECF No. 142 at 9:9-12 (representing that McKenzie had "produced everything that [had been] found as a result of a reasonably diligent search"); ECF No. 262-2 at 2 (representing that McKenzie has "complied with every aspect of discovery").

4 *See, e.g.*, ECF No. 393-2 at 63:19-25 (McKenzie testifying that he did not have any *LOVE* works in his possession); *id.* at 78:18-79:10 (McKenzie testifying that, to the best of his knowledge, there were no remaining Indiana works in his possession and that he had given "everything" to the Estate); *id.* at 75:3-15, 77:9-17 (McKenzie testifying that he did not keep copies of the accountings he sent to Indiana or a record of Indiana works sold).

at 2. Before the proposed order was submitted, MAF's counsel had explained to McKenzie's counsel that "document" must be defined to include "artwork." Nikas Decl. ¶ 4 & Ex. 5. MAF's counsel explained that while he didn't "intend to inventory all the artwork because that was basically done before" (or so he believed), he did not want to "be completely precluded from photographing any artwork at [the] inspection." *Id.* ¶ 4.

MAF's counsel conducted the second inspection of McKenzie's studio on August 5, 2021. *Id.* MAF's counsel was not provided access to other parts of the property because he was told all potentially responsive evidence was in the studio. *Id.* ¶ 3. The inspection revealed documents and artworks that were relevant to MAF's claims, responsive to MAF's discovery requests, and had never been produced. This included printouts from "art archive," a digital program used to catalog Indiana artworks produced and sold by McKenzie. *See id.* Ex. 1, McKenzie Dep. 102:5-104:15; *id.* Exs. 8-10, 16. After three years of discovery, nothing from the archive had been produced, and the existence of the archive was never even disclosed. In fact, McKenzie had testified under oath that he had no records of these works. ECF No. 393-2 at 75:3-15, 77:9-17.

MAF produced the photographs of responsive documents and artworks it had taken during the inspections. *See* Nikas Decl. ¶ 5. The production totaled 5,913 pages. *Id.*

### D. *Post-Inspection: New Discoveries Of McKenzie's Misconduct*

Shortly after the August 5, 2021 inspection, MAF's counsel received an unsolicited communication from Osvaldo Gonzalez, an individual who worked at McKenzie's studio and had been present for both of MAF's inspections. Nikas Decl. ¶ 6; ECF. No 417. Gonzalez informed MAF that McKenzie had removed several truckloads of artworks from his property *after* the Court ordered McKenzie to permit MAF's inspection. Nikas Decl. ¶ 6. He stated that McKenzie continues to forge Indiana artworks and conceal evidence about those forgeries. *Id.* Finally, he informed MAF that McKenzie had been working with a man named Gregory Allen to sell forged

Indiana works. *Id.* McKenzie's counsel received a similar call from Gonzalez and raised McKenzie's behavior to this Court. ECF. No. 416. Gonzalez confirmed these allegations in a sworn declaration and with photographs of McKenzie's property. Nikas Decl. Exs. 46-50.

The Court ordered a conference to occur on September 13, 2021. ECF No. 420. It also ordered that McKenzie "make himself available for a continued deposition." *Id.* At the conference, the Court ordered additional discovery regarding allegations that McKenzie had moved and concealed the artworks before the court-ordered inspection. ECF No. 422. MAF has since taken depositions of McKenzie, two of his employees (Annette Vessecchia and Timothy Ginexi), and Gregory Allen. The depositions further revealed the extent of McKenzie's misconduct.

***McKenzie Actively Concealed Artworks Before MAF's May 2021 Visit:*** At the May 25, 2021 visit, MAF and its counsel were directed to McKenzie's studio to inspect the Indiana artworks that McKenzie had fabricated. Nikas Decl. ¶ 3. They were told this was the only place on the property where Indiana artworks were located. *Id.* But it wasn't. Subsequent depositions of McKenzie's staff have revealed that McKenzie hid hundreds of artworks in the basement of his residence. *Id.* Ex. 2, Vessecchia Dep. 120:12-17, 123:19-24; *see also id.* Ex. 4, Ginexi Dep. 27:5-21, 89:11-25. Vessecchia sketched a map of McKenzie's property during her deposition, which demonstrated that the studio and residence are separated by seven other buildings. *See id.* Ex. 2, Vessecchia Dep. 16:8-15; *id.* Ex. 43.

Approximately ***half*** of McKenzie's entire inventory of Indiana artworks was hidden in the basement of his residence during MAF's first visit. *See id.* Ex. 4, Ginexi Dep. 89:15-25; *id.* Ex. 2, Vessecchia Dep. 156:5-13. McKenzie had also moved other artworks from the studio to temporary wooden racks that were hidden behind a separate building on McKenzie's property. *See id.* Ex. 2, Vessecchia Dep. 133:11-134:16; *id.* Ex. 44; *id.* Ex. 48. And McKenzie had hidden an Indiana

sculpture on his property under a tarp. *Id.* Ex. 1, McKenzie Dep. 56:9-12; *id.* Ex. 2, Vessecchia Dep. 137:9-17; *id.* Ex. 46, Gonzalez Decl. ¶ 14; *id.* Ex. 49. MAF's counsel could not have known (and did not know) about these other relevant artworks. *Id.* ¶ 6. McKenzie concealed and lied about these facts. *Id.*; *see also id.* Ex. 2, Vessecchia Dep. 148:15-23. In fact, he never disclosed this even in his follow-up court-ordered deposition. *See generally id.* Ex. 1, McKenzie Dep.

***McKenzie Concealed And Moved Artworks Before The August 2021 Court-Ordered Inspection:*** McKenzie took further steps to avoid detection before MAF's second, court-ordered inspection. Starting in early July—just ***days*** after the Court ordered on June 29, 2021, that McKenzie make his property available for inspection by MAF—McKenzie rented trucks and moved over a thousand Indiana artworks off his property. *See* ECF No. 395 at 1-2; ECF No. 396 at 19-21, 27; Nikas Decl. Ex. 1, McKenzie Dep. 40:20-23, 45:13-16, 49:16-17; *id.* Ex. 2, Vessecchia Dep. 158:18-24; *id.* Ex. 4, Ginexi Dep. 109:9-110:15. McKenzie's current employee, Ginexi, admitted that McKenzie was "visibly angry" about the Court-ordered visit and "felt like he was being invaded." *Id.* Ex. 4, Ginexi Dep. 116:8-22. Gonzalez confirmed that these artworks "were taken out to avoid the inspection before the second look" by MAF's counsel. *Id.* Ex. 47. Gonzalez had expressly warned McKenzie that his behavior would constitute hiding evidence from the court. *Id.* Ex. 46, Gonzalez Decl. ¶ 15. McKenzie would either ignore these warnings or respond with curses. *Id.* Gonzalez provided photographs corroborating the transportation of Indiana artworks from McKenzie's property stacked haphazardly in the back of a truck, *id.* Exs. 45, 47, and McKenzie's concealment of works in other locations on the property, Ex. 50.

McKenzie has now admitted that he moved approximately 2,500 artworks to the storage facility before MAF's August 5 inspection. *See* Nikas Decl. Ex. 1, McKenzie Dep. 45:13-16. These works were moved over the course of "maybe two weeks" with McKenzie and his staff working

"every day, sometimes even on weekends" to load the artworks onto trucks and drive them to the facility. *Id*. at 48:24-49:5. McKenzie also admitted that he encountered difficulty renting so many trucks so quickly, and he was required to rent trucks from "whoever had them." *Id*. at 49:17-50:10. McKenzie moved the artworks from his studio, his basement, and a wooden rack he had hid behind a building on the property. But not once throughout this deposition did McKenzie mention that he had kept half of his inventory of Indiana artworks in his basement. He testified only about the artworks that he had moved out of his studio. *See, e.g.*, *id*. Ex. 1, McKenzie Dep. 63:20-66:3, 67:18-22. MAF learned about hidden artworks in the basement through later depositions of McKenzie's staff. *See id*. Ex. 4, Ginexi Dep. 89:15-25; *id*. Ex. 2, Vessecchia Dep. 156:5-13.

Vessecchia, estimated that 80% "if not more" of McKenzie's Indiana inventory was moved offsite to the storage facility before the Court-ordered inspection. *Id*. Ex. 2, Vessecchia Dep. 160:14-16. This inventory included works that infringe on MAF's rights. *See, e.g.*, *id*. Ex. 1, McKenzie Dep. 52:5-7 ("Q. My question is just did you move any *LOVE* works to the storage facility? A. Possible."); *id*. Ex. 4, Ginexi Dep. 146:6-147:6 (Ginexi believed there "may have been" *LOVE* artworks and "potential[ly]" *EAT* artworks transported to the storage facility). Many of the artworks moved to the storage facility were taken from the basement of McKenzie's residence—rather than the studio—meaning that they were concealed from MAF during MAF's first visit in May and again concealed when MAF visited in August. *Id*. ¶¶ 3, 6; *id*. Ex. 2, Vessecchia Dep. 158:6-8; *id*. Ex. 4, Ginexi Dep. 104:16-19; *id*. Ex. 44. MAF never would have known about these hidden artworks if it had not received the whistleblower tip. The same holds true for the artworks moved first to outdoor racks and then to the storage facility. *See id* Ex. 2, Vessecchia Dep. 133:11-134:16; *id*. Ex. 44; *id*. Ex. 48.

McKenzie also admitted that he covered a monumental sculpture on his property with a tarp before MAF's inspection. Nikas Decl. Ex. 1, McKenzie Dep. 56:9-12. As Gonzalez later reported to McKenzie's counsel, McKenzie "went to a lot of trouble to hide the Hope DNC and the 18 inch Hope Stainless Steel that he secreted in my house" before MAF's inspection. *Id.* Ex. 47.

At his deposition, McKenzie offered ridiculous excuses for moving the artworks. He said that he suddenly realized the artworks should be stored in a facility that was better protected and temperature controlled. *See id.* Ex. 1, McKenzie Dep. 34:9-36:5. Yet McKenzie had created and stored these artworks for *years* in the studio and his unfinished basement, without interruption or incident. It defies credulity that he suddenly came to the view that the artworks were unsafe mere days after the Court's order, and with such urgency that he worked night and day, every day, for two weeks to move them off the property immediately thereafter—without informing his counsel or MAF of this supposedly prudent move. Further undermining his excuses, the evidence shows that McKenzie loaded stacks of canvases and prints, uncovered and unprotected, into the backs of rental vehicles, *see id*. Ex. 45; *id.* Ex. 4, Ginexi Dep. 108:2-14, which would have imperiled their condition far more than remaining in place on the property. Despite McKenzie's claimed fear for the safety of the works, he moved thousands of pieces under cover of night *without* "employ[ing] professional art movers." *Id.* Ex. 1, McKenzie Dep. 47:11-16. And even before that, he had moved the works *outside* on wooden racks to avoid detection. *Id.* Ex. 2, Vessecchia Dep. 133:11-136:7.

***McKenzie Concealed The Existence Of His Art Archive:*** McKenzie also concealed the existence of his "art archive," a digital inventory of all Indiana artworks that McKenzie has produced or sold that is located on an online database to which McKenzie and his staff have access. *See* Nikas Decl. Ex. 1, McKenzie Dep. 102:5-104:15; *id.* Ex. 2, Vessecchia Dep. 139:5-140:21 (the art archive inventory "should be a pretty close representation of what's been manufactured,

produced … in addition to a photograph that goes along with it."). In other words, despite numerous discovery requests, motions to compel, and Court orders, and despite the Court-ordered inspection of documents in McKenzie's studio that was intended to remedy these abuses, McKenzie concealed a central record in the case about the artwork directly at issue in MAF's claims. And McKenzie has *still* failed to produce the document.[5] McKenzie knew all along that he possessed this inventory. McKenzie admitted that he started using art archive in 2015. *See id*. Ex. 1, McKenzie Dep. 121:5-9. McKenzie also admitted that his staff had access to and used the program. *Id.* at 105:5-8, 106:17-20. Vessecchia explained that she updated the archive "pretty much any time a production was … moved." *Id.* Ex. 2, Vessecchia Dep. 141:6:13.

**_McKenzie Concealed The Existence Of His Dealer, Gregory Allen:_** MAF has also learned that McKenzie planned to further conceal his art inventory by using "a sequence of transfers that would hide their true ownership." Nikas Decl. Ex. 46, Gonzalez Decl. ¶ 16. McKenzie planned to sell the work to Gregory Allen so that Allen could transfer the artwork to various trusts, with McKenzie's son named as the sole beneficiary. *Id*. McKenzie designed this plan to hide the artworks from MAF and the Court. *Id.*

After Gonzalez revealed Allen's identity, McKenzie—during his reopened deposition— admitted that he has been selling Indiana works to Allen for decades, ever since McKenzie "started

---

[5] McKenzie's failure to produce his art archive contradicts his representations to MAF and this Court that "following a reasonable search," McKenzie "ha[d] identified documents responsive to" MAF's Request for Production of "[a]ll documents and communications relating to or concerning [McKenzie's] business dealings or projects with Robert Indiana or relating to any Robert Indiana Works" and would "produce those documents by November 9, 2018, as the parties agreed," ECF No. 393-1 at 5-6; that McKenzie had "produced everything that [had been] found as a result of a reasonably diligent search," ECF No. 137 at 9:9-12; and that McKenzie had "complied with every aspect of discovery," ECF No. 262-2 at 1. It also contradicts his testimony in the Robert Indiana probate proceeding that he maintained no such records. ECF No. 393-2 at 75:3-15, 77:9-17.

with Robert Indiana" in 1995, *id*. Ex. 1, McKenzie Dep. 73:16-24. This included at least one artwork bearing the *LOVE* image to which MAF owns exclusive rights. *Id*. Ex. 3, Allen Dep. 82:11-13. Allen admitted that he and McKenzie emailed and texted often, including to exchange sales invoices or purchase orders for transactions involving Indiana artworks. *See id*. at 16:4-10, 55:5-19. McKenzie also revealed that, in the midst of settlement discussions with MAF, he "spoke to Gregory Allen about buying all the work" in McKenzie's possession. *See id*. Ex. 1, McKenzie Dep. 75:2-76:14. In fact, the men spoke of this possibility "often." *Id*. at 79:5-9. Yet Allen's name did not appear in McKenzie's Rule 26(a) disclosures or his responses to MAF's interrogatories, and not a single email, text message, or invoice between McKenzie and Allen has been produced.

McKenzie also defiantly stated that he was speaking to other individuals about selling his entire inventory of Indiana artworks during this litigation, but point-blank refused to disclose who they are or testify further on this subject. *Id*. at 83:4-85:15 ("[T]he more you talk, the more I think I will sell it—I think I'll just sell it tonight…. Q. Who would you sell it to tonight? A. All the people I just mentioned before. Q. You only mentioned Greg Allen…. Can you give me the names of anyone else you are thinking of selling the work to? A. Nope. Q. Do you know the names? A. I might. Q. Is that a yes or a no? A. None of your business."). Allen, who is represented by McKenzie's counsel, likewise refused without any legitimate basis to answer questions about McKenzie's customers at his deposition. *Id*. Ex. 3, Allen Dep. 20:22-21:6, 23:3-24:3, 82:14-83:10.

***Post-Whistleblower Discovery Reveals Ongoing Forgery:*** The depositions also confirmed that McKenzie has continued to forge Indiana artworks to this day, including backdating posthumously created Indiana prints. This was yet another fact that would not have been discovered but for the whistleblower call. *See* Nikas Decl. Ex. 46, Gonzalez Decl. ¶ 11. Gonzalez accurately pointed to Vessecchia as having "stencil[ed] Indiana's signature on unauthorized works" at

McKenzie's direction. *Id.* Vessecchia has admitted that, at McKenzie's direction, she helped him stencil Indiana's signature on prints and observed McKenzie's staff using a machine referred to as the "Ghostwriter" to sign Indiana's name on artworks. *See id.* Ex. 2, Vessecchia Dep. 104:7-18, 187:14-20, 189:23-191:17. Vessecchia further confirmed that—also at McKenzie's direction—she used Indiana's stencil to stamp Indiana's signature on artworks after his death. *Id.* at 189:15-25. She had also seen McKenzie and others do the same. *Id.* at 190:1-12. These stencils used a date from *before* Indiana's death. *Id.* at 190:13-191:17. McKenzie uses these stencils to falsely indicate that Indiana created and signed the works during his lifetime. *See id.* 45, Gonzalez Decl. ¶ 10.

McKenzie himself has now admitted that he "100%" continues to fabricate Indiana works. *See id.* Ex. 1, McKenzie Dep. 91:9-11-15. When asked whether he had disclosed this to MAF he responded: "Absolutely not. That means completely not and no and never. Maybe when something comes that makes sense, I can show it, but right now, it doesn't make sense." *Id.* at 93:4-15. To ensure his misconduct went undetected, McKenzie moved silkscreens out of his studio before the Court-ordered inspection. *See id.* Ex. 46, Gonzalez Decl. ¶ 14.

<u>ARGUMENT</u>

## I.    LEGAL STANDARD

Rule 26(b)(1) authorizes parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Rule 37 states that if a party "fails to obey an order to provide or permit discovery" the court may, among other remedies, "strik[e] pleadings in whole or in part" and "render[] a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(a)(iii), (vi). The court "must" also "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(b)(2)(C).

"The only predicates to the imposition of sanctions under Rule 37(b) are a court order

directing compliance with discovery requests and non-compliance with that order." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2019 WL 4727537, at *18 (S.D.N.Y. Sept. 26, 2019). "The decision of what type of sanction is appropriate in a given case is left to the sound discretion of the district court." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 706 (S.D.N.Y. 2017). "Ultimately, the imposition of litigation-ending sanctions under Rule 37 is a matter of judicial discretion." *Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245, 252 (E.D.N.Y. 2010).

## II. TERMINATING SANCTIONS AGAINST MCKENZIE ARE WARRANTED AND NECESSARY

When evaluating sanctions requests under Rule 37, a court must consider "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *Sanchez v. Litzenberger*, 2011 WL 672413, at *4 (S.D.N.Y. Feb. 24, 2011). Courts will also consider whether lesser sanctions would be sufficient to achieve compliance and promote future compliance. *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 227 (S.D.N.Y. 2003). Here, every single factor weighs heavily in favor of case-terminating sanctions.

### A. McKenzie's Conduct Was The Product Of Willfulness And Bad Faith

McKenzie's discovery abuses were intentional. Case-terminating sanctions are "appropriate in the face of willful misconduct, to achieve the purpose of Rule 37 as a credible deterrent rather than a paper tiger." *Montblanc*, 692 F. Supp. 2d at 251 (quotation marks and citations omitted); *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988) ("Dismissal under Rule 37 is warranted, however, where a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault.").

McKenzie repeatedly and intentionally refused to comply with Court-ordered discovery, and he intentionally concealed highly relevant evidence. *See infra* II.C. From the outset, he refused to produce responsive documents or sit for his deposition until ordered by this Court. He concealed thousands of responsive and damning documents that were discovered in his studio, including invoices, sales records, artworks, notes, and printouts of the art archive that he has maintained for years. He said he had no inventory list of Indiana works, yet he actively maintains an archive inventory list. He concealed his relationship with Gregory Allen, his long-time dealer of Indiana works, and has failed to produce a single document or communication relating to or with him. The documents located in McKenzie's studio reveal email addresses used by McKenzie and his staff that were never disclosed or searched. Nikas Decl. Ex. 41. All the while, McKenzie lied under oath and through his counsel that he had conducted exhaustive searches and had produced everything he had. It is crystal clear that McKenzie intentionally concealed evidence and that the current evidentiary record is woefully incomplete because of his misconduct.

As if that weren't enough, we now have incontrovertible proof that McKenzie actively hid and physically removed more than 80% of his art inventory from his property to avoid detection by MAF and in deliberate defiance of a Court order. *See* ECF No. 395 at 1-2; ECF No. 396 at 19-21, 27; ECF No. 408; Nikas Decl. Ex. 1, McKenzie Dep. 45:18-16; *id.* Ex. 2, Vessecchia Dep. 158:18-24, 160:14-16; *id.* Ex. 4, Ginexi Dep. 109:9-110:15. McKenzie's current and former assistants have confirmed this, with Gonzalez stating that he warned McKenzie "he should not be hiding evidence from the Court or the other parties in the case." *Id*. Ex. 46, Gonzalez Decl. ¶ 15; *see also id.* Ex. 47 (Gonzalez telling McKenzie's counsel that artworks were "taken out to avoid the inspection" by MAF's counsel). Ginexi, who still works for McKenzie and shares the same counsel, admitted that McKenzie was "visibly angry" about the Court-ordered inspection and

moved thousands of artworks days after the Court ordered it. *See id.* Ex. 4, Ginexi Dep. 109:9-110:15, 116:8-22. This was willful, bad-faith, and contemptuous conduct.

McKenzie did not come clean about any of his discovery abuses. MAF uncovered his conduct fortuitously at the studio visit and then through the report of a whistleblower. McKenzie cannot and does not deny what happened. *See id.* Ex. 1, McKenzie Dep. 45:8-16, 48:23-49:5, 49:16-50:10. Instead, McKenzie offers the following excuse: he wanted the works to be in a storage facility that was better protected and temperature controlled. *See id.* 34:9-36:16. This is absolutely ridiculous. McKenzie had just moved and stored the artwork *outside* to avoid detection by MAF's counsel (hardly a safe place to store art), moved the artwork immediately after the Court ordered the inspection, concealed this activity from MAF and his own counsel, and even today refuses to disclose evidence of his continued forgeries. *See id.* Ex. 2, Vessecchia Dep. 133:11-136:7; *id.* Ex. 1, McKenzie Dep. 91:9-11-15. Moreover, when McKenzie moved the art, he and his staff loaded stacks of the works, uncovered and unprotected, into rental vehicles for at least seven different trips without employing a professional art mover. *See id.* Ex. 45; *id.* Ex. 4, Ginexi Dep. 108:2-14; *id.* Ex. 1, McKenzie Dep. 47:11-16. Meanwhile, there was *no* event that occurred, after *years* of keeping these works in his studio and basement, that credibly prompted the move; the only relevant event was the Court's inspection order that would have revealed the scope of McKenzie's fraudulent scheme if he had complied. McKenzie's own employee *admitted* that the Court's order was the motivating factor for moving the works. *See id.* Ex. 46 ¶¶ 13-15; *id.* Ex. 47; *see also* Ex. 4, Ginexi Dep. 116:8-22 (testifying that McKenzie "complained" and was "visibly angry" about the Court-ordered inspection). McKenzie's false excuses further confirm his bad faith and only amplify the need for terminating sanctions. *See Nittolo v. Brand*, 96 F.R.D. 672, 676 (S.D.N.Y. 1983) (finding that party's possession of evidence "coupled with the false and

incredible explanations offered in support thereof, permit the inference that plaintiff was seeking to conceal or destroy material evidence"); *Ford v. Am. Broad. Co.*, 101 F.R.D. 664, 667 (S.D.N.Y. 1983) (entering case-terminating sanctions in light of plaintiff's "deliberate and selective attempt to deceive by concealing evidence" that he knows "would be powerfully damaging").

After all this—lies, concealment, violations of Court orders—McKenzie *remains* defiant and in complete disrespect for the Court and the discovery process. *See* Nikas Decl. Ex. 1, McKenzie Dep. 84:11-14 ("And the more you talk, the more I think I will sell it – I think I'll just sell it tonight."); *id.* at 84:25-85:9 ("Q. Can you give me the names of anyone else you are thinking of selling the work to? A. Nope. Q. Do you know the names? A. I might. Q. Is that a yes or a no? A. None of your business. Q. That's not the question. A. Well, that's the answer."); *id.* at 93:4-15 (when asked whether he had or would turn over records of Indiana artworks McKenzie fabricated during this litigation, McKenzie responded, "[a]bsolutely not," and "[t]hat means completely not and no and never"). On this record, willfulness and bad faith are beyond dispute.

## B.    *McKenzie's Conduct Has Prejudiced MAF*

"The absence of prejudice is given little weight, even though its presence tilts the scales heavily in favor of sanctions, because both the Second Circuit and the Supreme Court 'have consistently rejected the "no harm, no foul" standard for evaluating discovery sanctions.'" *Martinez v. City of New York*, 2018 WL 604019, at *22 (E.D.N.Y. Jan. 24, 2018) (quoting *Local Union No. 40 v. Car-Win Constr., Inc.*, 88 F. Supp. 3d 250, 263 (S.D.N.Y. 2015)). Thus, while MAF need not show prejudice to obtain terminating sanctions, McKenzie's failure to produce documents *has* resulted in prejudice to MAF and weighs heavily in favor of terminating sanctions.

MAF took every reasonable step to obtain discovery from McKenzie. It served extensive document requests and interrogatories, filed motions to compel, sought representations from McKenzie's counsel, and obtained Court orders requiring disclosure. At every turn, however,

McKenzie flouted his obligations. In so doing, he has been successful at limiting inquiries into his conduct and prejudicing MAF. For example, MAF recently discovered that McKenzie had concealed *thousands* of unproduced, highly relevant documents and artworks. This included inventories of work McKenzie created and shipped for exhibition or sale, accounting documents, notebooks with sales information, documents reflecting his forgeries, and Indiana artworks containing images to which MAF has exclusive rights and which relate directly to MAF's claims. *See* Nikas Decl. Exs. 6, 8-41. MAF did not have the benefit of this information during discovery.

That was just the beginning. Recent depositions revealed that McKenzie had successfully concealed even more relevant information that would have otherwise guided MAF's behavior during discovery. For example, MAF learned that McKenzie used a program called "art archive" to digitally catalog his collection of artwork, including Indiana artwork. *See Id.* Ex. 1, McKenzie Dep. 102:5-104:15. McKenzie's employee explained that art archive "should be a pretty close representation of what's been manufactured, produced … in addition to a photograph that goes along with it," including Indiana works that have been produced and sold. *Id.* Ex. 2, Vessecchia Dep. 139:5-23. It is hard to think of a more important document regarding the scope of McKenzie's fraud, and it is located on a computer to which McKenzie and his assistants had easy access and regularly use. MAF never would have learned about the archive if its counsel hadn't picked up a handful of pages from an old printout of the archive that were laying around McKenzie's studio, and then obtained a second deposition of McKenzie to inquire what it was. *Id.* Exs. 6, 8-16; *see also id.* Ex. 1, McKenzie Dep. 101:17-105:4. And McKenzie *still* hasn't produced a copy of the records. MAF therefore has had *no* opportunity to examine the records or track down the evidence and artworks that are reflected in the document or revealed by it.

MAF would have also sought extensive discovery related to Gregory Allen, to whom

McKenzie has been selling Indiana work—including at least one *LOVE* artwork, *id.* Ex. 3., Allen Dep. 82:11-13—since McKenzie "started with Robert Indiana" in 1995, *id.* Ex. 1, McKenzie Dep. 73:16-24. Neither McKenzie nor Allen have produced *any* emails or text communications with one another, despite Allen admitting that the two frequently exchange emails and text messages regarding the sale or purchase of Indiana artworks. *See id.* Ex. 3, Allen Dep. 16:4-10, 55:5-17. MAF would have had the opportunity to investigate Allen's sales, subpoena third-parties who have information about these sales, and pursue discovery related to these transactions and forgeries.

It is impossible to remedy the scope of McKenzie's obstruction of justice and fully pursue discovery in the case without reopening discovery. McKenzie failed to electronic collect documents from business email accounts that contain highly relevant information. He collected virtually no hardcopy documents. Given his concealment of evidence, it is impossible to know if other hardcopy documents and evidence exist elsewhere. Or what has been destroyed. Accordingly, MAF is *still* in the process of discovering which artworks McKenzie concealed in the off-site storage facility and, therefore, has taken *no* discovery from anyone related to those works. All this after more than *three years* of discovery. This substantial prejudice to MAF weighs strongly in favor of granting case terminating sanctions. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006) (finding that prejudice would be "severe" because party would need to "prepare for" the previously undisclosed evidence); *Weinstein v. Ehrenhaus*, 119 F.R.D. 355, 359 (S.D.N.Y. 1988) (entering case terminating sanctions where "notwithstanding plaintiff's very belated production . . . [p]laintiff's continued obstreperous conduct has prejudiced defendant's ability to develop his case and resulted in additional expense to the litigants and the court system").

## C. *McKenzie's Conduct Is Part Of A Pattern Of Misbehavior*

The Second Circuit has explained that case-terminating sanctions may be appropriate when the misconduct is not "isolated but rather formed a pattern of 'prolonged and vexatious obstruction

of discovery with respect to … highly relevant records.'" *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010); *see also Metro. Opera*, 212 F.R.D. at 227 (history of non-compliance "weighs heavily in favor of the most severe sanctions"). That is the situation here.

For more than three years, McKenzie has intentionally and repeatedly failed to produce thousands of highly relevant documents, misrepresented his efforts to conduct document discovery, and concealed evidence. *See supra* pp. 4-15. This significant, multi-year rap sheet is far from an isolated occurrence. It started at the very outset of the case and has apparently continued unabated throughout. McKenzie's actions reflect a pattern of behavior that warrants terminating sanctions. *See Nieves v. City of N.Y.*, 208 F.R.D. 531, 536 (S.D.N.Y. 2002) (failure to fully and adequately respond to discovery for two years merited dismissal); *Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 390 (2d Cir. 1981) (case terminating sanctions appropriate when discovery misconduct was viewed against history of repeated misconduct).

### D. *McKenzie's Conduct Was Never Corrected*

Case terminating sanctions are also warranted because "rather than having fully corrected his misdeeds, [McKenzie] has filled the record with desperate excuses and additional lies to try to cover-up earlier wrongdoings." *Skywark v. Isaacson*, 1999 WL 1489038, at \*16 (S.D.N.Y. Oct. 14, 1999). McKenzie's false representations to this Court began years ago. For example, during the January 29, 2019 hearing before this Court, McKenzie represented that he had "produced everything that [had been] found as a result of a reasonably diligent search." ECF No. 142 at 9:9-13; *see also* ECF No. 262-2 at 2 (representing that McKenzie has "complied with every aspect of discovery").[6] These statements were false: McKenzie had countless documents relating to works

---

[6] McKenzie made similarly false statements under oath in the Maine Probate Court proceedings. *See, e.g.*, ECF No. 393-2 at 63:19-25; *id.* at 78:18-79:10; *id.* at 75:3-15, 77:9-17.

that directly infringe on MAF's rights, inventory lists of such works, and invoices for the sale of such works, among other documents. *See* Nikas Decl. Exs. 6, 8-41. These documents were not in a remote location that could have reasonably been forgotten. Instead, until McKenzie began moving evidence to avoid detection, all of the undisclosed material was located on his property.

Nor has McKenzie corrected or ameliorated his misconduct. Instead, he continues to conceal, mislead, obfuscate, and refuse. *See supra* II.A. These "cover-up attempts also militate toward [case-terminating sanctions]." *Skywark*, 1999 WL 1489038, at *16; *see also Rammal v. Timberland Co.*, 1995 WL 559394, at *4 (S.D.N.Y. Sept. 20, 1995) (dismissal appropriate where plaintiff misled the court as to the reason it did not collect and produce records that were readily available); *Penthouse*, 663 F.2d at 392 (case-terminating sanctions were "essential to the sound administration of justice" where plaintiff refused to produce records in violation of court order and deliberately misled the court to prevent defendant from otherwise obtaining the relevant records).

### E. *McKenzie's Misconduct Is Likely To Continue*

Case terminating sanctions are further warranted because McKenzie's "pattern of misbehavior is likely to continue." *Lawrence v. City of New York*, 2018 WL 3611963, at *7 (S.D.N.Y. July 27, 2018). McKenzie has repeatedly engaged in discovery misconduct despite the measures taken to address his conduct. There is no reason to believe he will stop now. And his own testimony confirms that. For example, McKenzie recently admitted that he continues to fabricate Indiana works. *See* Nikas Decl. Ex. 1, McKenzie Dep. 91:7-92:2. McKenzie's staff also admitted that McKenzie forces them to fabricate and backdate the works. *See id.* Ex. 46, Gonzalez Decl. ¶¶ 10-11; *id.* Ex. 2, Vessecchia Dep. 101:20-104:18, 189:15-25, 190:1-191:17. Yet when MAF asked McKenzie whether he would produce records concerning these activities, he responded, "[a]bsolutely not. That means completely not and no and never." *Id.* at 93:4-15. And when McKenzie was recently asked to whom he has been selling these works, he responded,

"[n]one of your business." *Id*. at 85:7. At his deposition, McKenzie even threatened to sell his entire Indiana inventory "tonight" out of annoyance with MAF's counsel's deposition inquiries into this subject. *Id*. at 84:11-14. MAF cannot fully and fairly litigate its claims when McKenzie has concealed significant evidence and promises to continue doing so. *See DAG Jewish Directories, Inc. v. Y&R Media, LLC*, 2010 WL 3219292, at *5 (S.D.N.Y. Aug. 12, 2010) (dismissing action where intentional fraud on court and subsequent lies to cover it up showed that "further misconduct [was] likely"); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 462 (S.D.N.Y. 2002) (dismissing action where "lies and misconduct will almost certainly continue in the future ... nullifying any chance for a fair adjudication of the merits").

### F. *Lesser Sanctions Would Not Be Sufficient*

Lesser sanctions would be insufficient to deter McKenzie's misconduct. The Court has repeatedly ordered McKenzie's compliance and warned him about failing to conduct proper discovery, to no avail. *See, e.g.*, ECF No. 137 at 2-3; ECF No. 142 at 47:11-48:15; ECF No. 264 at 2. McKenzie has willfully flouted the Court's orders, while misrepresenting compliance to MAF and the Court. *See, e.g.*, ECF No. 393-1; ECF No. 137 at 9:9-12; ECF No. 262-2 at 1. Lesser sanctions would not change this result. *See Metro. Opera*, 212 F.R.D. at 230 ("[B]ecause . . . the conduct . . . continued in the face of repeated, documented examples of non-compliance and repeated inquiries by [plaintiff] and the Court, a lesser sanction would not be adequate to penalize [defendant] here or to deter others from similar misconduct in the future."); *Shcherbakovskiy v. Seitz*, 2010 WL 3155169, at *13 (S.D.N.Y. July 30, 2010) (same), *aff'd*, 450 F. App'x 87 (2d Cir. 2011). This is not speculation—the Court can rest assured that lesser sanctions would not fix the problem because they have repeatedly been tried and failed. Indeed, in response to MAF's last motion for sanctions, the Court instead ordered an inspection to remedy this abuse; it did not remedy the discovery deficiencies, but uncovered even more.

"[I]n any event, district courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record." *S. New England Tel. Co.*, 624 F.3d at 148. Rule 37 is meant not only to "deter those who might be tempted to such conduct in the absence of such a deterrent," but also to "penalize those whose conduct may be deemed to warrant such a sanction." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). McKenzie's conduct is egregious. The most severe penalty is warranted.

If the Court declines to impose terminating sanctions, it should draw adverse inferences against McKenzie and adopt adverse jury instructions at any trial of this matter for all the reasons stated in this memorandum. *See DeCastro v. Kavadia*, 309 F.R.D. 167, 183–84 (S.D.N.Y. 2015).

## III.     ATTORNEY'S FEES AND COSTS ARE APPROPRIATE

MAF should be awarded attorney's fees and costs incurred in seeking sanctions against McKenzie, including all fees and costs associated with the August 5, 2021 inspection, briefing, re-opened depositions, sanctions-related discovery, and the hearing. "Rule 37 mandates that, where a party has failed to comply with a discovery order, the court must order the disobedient party, its attorney, or both to pay its opponent's reasonable expenses, including attorney's fees, caused by its failure, 'unless the failure was substantially justified or other circumstances make an award of expenses unjust.'" *DeCastro*, 309 F.R.D. at 184; *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 2005 WL 1958361, at *16 (S.D.N.Y. Aug. 16, 2005).

### CONCLUSION

The Court should strike McKenzie's Answer and Counterclaims, enter default judgment against McKenzie in MAF's favor, require that McKenzie reimburse MAF for attorney's fees and costs, hold McKenzie in contempt, and impose all other appropriate sanctions under Rule 37(b).

Dated: December 10, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Luke Nikas*
    Luke Nikas
    Maaren A. Shah
    Ryan Rakower
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    (212) 849-7000
    lukenikas@quinnemanuel.com
    maarenshah@quinnemanuel.com
    ryanrakower@quinnemanuel.com

    *Attorneys for Plaintiff Morgan Art*
    *Foundation Limited*