Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
MORGAN ART FOUNDATION LIMITED,

       Plaintiff,

         -against-

MICHAEL MCKENZIE, AMERICAN IMAGE ART,
JAMIE THOMAS AND JAMES W. BRANNAN AS
PERSONAL REPRESENTATIVE OF THE ESTATE
OF ROBERT INDIANA,

       Defendants.

- - - - - - - - - - - - - - - - - - - - x
MORGAN ART FOUNDATION LIMITED, SIMON
SALAMA-CARO, SHEARBROOK (US), LLC, FIGURE 5
ART LLC,
AND RICATALOGUE RAISONE, LLC

         -against-

JAMES W. BRANNAN AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF ROBERT INDIANA,

       Defendant.

- - - - - - - - - - - - - - - - - - - - x

       Zoom video conference deposition of
MICHAEL McKENZIE, taken pursuant to
notice, was held remotely, commencing
September 10, 2021, 12:00 p.m., before
Leslie Fagin, a Stenographic Court
Reporter and Notary Public in the State
of New York.

          - - -

     MAGNA LEGAL SERVICES
  320 West 37th Street, 12th Floor
    New York, New York 10018
      (866) 624-6221



Page 2

1
2  APPEARANCES:
3
4  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Attorneys for Plaintiff
5       51 Madison Avenue
        New York, New York 10010
6  BY:   MAAREN SHAH, ESQUIRE
         RYAN RAKOWER, ESQUIRE
7
8  MARKHAM READ & ZERNER
   Attorneys for Michael McKenzie and American
9  Image Art
        One Commercial Wharf West
        Boston, Massachusetts 02110
10 BY:    BRIDGET ZERNER, ESQUIRE
11
12
13
14 ALSO PRESENT:
   JUSTINE BARBARY, VIDEOGRAPHER
15 BRODERICK SCOTT, EXHIBIT TECHNICIAN
16
17
18
19
20
21
22
23
24
25

Page 3

1
2       THE VIDEOGRAPHER:  We are now on
3  the record.  This begins Videotape No. 1
4  in the deposition of Michael McKenzie in
5  the matter of Morgan Art Foundation
6  verse McKenzie et.
7       Today is Friday September 10, 2021,
8  and the time is 12:04 p.m.  This
9  deposition is being taken virtually at
10 the request of Quinn Emanuel Urquhart &
11 Sullivan, LLP.  The videographer is
12 Justine Barbery of Magna Legal Services,
13 and the court reporter is Leslie Fagin
14 of Magna Legal Services.
15      Will counsel and all parties
16 present state their appearances and whom
17 they represent.
18      MS. SHAH:  Maaran Shah from Quinn
19 Emanuel Urquhart & Sullivan representing
20 the plaintiff, Morgan Art Foundation
21 Limited, and I'm joined also by my
22 colleague Ryan Rakower.
23      MS. ZERNER:  Bridget Zerner of
24 Markham Read Zerner LLC for Michael
25 McKenzie doing business as American

Page 4

1
2       Image Art.
3  M I C H A E L  M c K E N Z I E, called as a
4  witness, having been duly sworn by a Notary
5  Public, was examined and testified as
6  follows:
7  EXAMINATION BY
8  MS. SHAH:
9       Q.  Good afternoon, Mr. McKenzie.
10      A.  How are you?
11      Q.  I'm good.  Thanks.  How are you?
12      A.  Good.
13      Q.  My name is Maaran Shah.  I
14 represent Morgan Art Foundation in this
15 litigation.  I am going to be asking you some
16 questions this afternoon.
17      And if I refer to Morgan Art
18 Foundation as Morgan or as MAF, you will
19 understand what I'm referring to as Morgan
20 Art Foundation, correct?
21      A.  Yes.  No problem.
22      Q.  Thank you.
23      Now, I know you've done a
24 deposition in this case before but just as a
25 reminder of some rules of the road, this is

Page 5

1
2  being taken down by a court reporter and so
3  it's important that we each try to wait for
4  the other to finish speaking before we speak
5  so she can get an accurate transcript of the
6  conversation.
7       A.  Fine.
8       Q.  I will need you to give verbal
9  answers so yes, no, any verbal answer; not a
10 shake of the head or nod of the head.
11      Do you understand?
12      A.  Yes.
13      Q.  And if I ask a question that you
14 don't understand, please ask me to clarify.
15      A.  Fine.
16      Q.  Okay.  If you don't ask me to
17 clarify a question, if you go ahead and
18 answer it, I am going to assume that you
19 understood my question as asked.
20      Is that fair?
21      A.  Makes sense.
22      Q.  Now, because we are doing this
23 remotely, I want to ask you a couple of
24 questions about the room you are sitting in.
25      A.  Okay.



Page 6

1
2      Q.   Where are you presently located?
3      A.   I'm not sure what you are asking.
4      Q.   What city are you in -- what city?
5      A.   I'm in Katonah, New York.
6      Q.   Okay.  Are you in your home in
7  Katonah, New York?
8      A.   I'm in my studio.
9      Q.   Okay.  Is there anyone else in the
10 room with you?
11     A.   No.
12     Q.   What -- I assume you are doing this
13 deposition on Zoom on an electronic device.
14 What is that device that you are looking at?
15     A.   It's a computer.
16     Q.   Other than the computer that you
17 are doing this Zoom deposition on, do you
18 have any other electronic devices in the
19 room?
20     A.   Yes.
21     Q.   What are they?
22     A.   An Apple phone and a Pro MAC.
23     Q.   Are those turned on or off?
24     A.   The Pro MAC is turned off.  The
25 iPhone is turned on.

Page 7

1
2      Q.   Okay.  Other than the Pro MAC and
3  the -- well, I suppose -- other than the Pro
4  MAC or the iPhone, do you have any other
5  electronic devices in the room?
6      A.   You are not talking about, like, a
7  toaster and a coffee maker, right?
8      Q.   No.  Something you can communicate
9  on?
10     A.   No, no, no.  Those are the own two
11 things.
12     Q.   Okay.  I'm going to ask that during
13 the pendency of the deposition you keep the
14 laptop off unless you indicate you have a
15 need to use it during the deposition?
16     A.   No.  It's off.  It's just -- it's
17 just shut.  There's nothing there.
18     Q.   Thank you.
19          And I'm going to also ask you to
20 confirm that during the pendency of the
21 deposition you won't use any electronic
22 devices to communicate with anyone about the
23 deposition.
24     A.   I have no intention of doing that
25 except if there is a break, and...

Page 8

1
2      Q.   Sure.  And if there is a break, you
3  know, you are entitled to communicate with
4  your attorney but I would ask that you don't
5  communicate with anyone else about the
6  deposition during the breaks.
7      A.   I will only communicate with my
8  attorney.  That's the plan.
9      Q.   Okay.  Do you understand the
10 purpose of today's deposition?
11     A.   I think so.
12     Q.   Can you tell me what you understand
13 that to be?
14     A.   Whatever it is, you are trying to
15 determine something.  I don't know what you
16 are trying to determine to tell you the
17 truth.
18     Q.   Are you aware on August 5 attorneys
19 from Morgan Art Foundation conducted an
20 inspection of your studio?
21     A.   I wasn't here, but I was told, yes,
22 that eight people were here for multiple
23 hours and went through whatever I have.
24     Q.   Are you aware that that inspection
25 was done pursuant to a court order allowing

Page 9

1
2  Morgan Art Foundation to conduct that
3  inspection?
4      A.   Yes, which I agreed to and probably
5  didn't have to.
6      Q.   I would like to pull up tab 3,
7  please.  I am just show you the court order
8  we are referring to.  It will come up on the
9  screen share and also I can leave a copy in
10 the chat function if you want to open it for
11 yourself.
12          (Exhibit 1, Court Order, marked for
13 identification.)
14     Q.   I am going to continue to ask you
15 questions while Broderick tries to pull that
16 up.
17     A.   Okay.
18     Q.   So we were just discussing the
19 court order permitting the inspection.  Did
20 you see a copy of that court order that
21 permitted the inspection?
22     A.   I don't remember.  I think if
23 Mr. Markham told me they were going to do it,
24 I would have just said go ahead.
25     Q.   Okay.  Do you recall whether you



Page 10

1
2   learned of the inspection and the court order
3   permitting the inspection around the time
4   that the court entered that order?
5       A.  No idea.
6       Q.  Do you recall about when you were
7   informed about the court order of inspection?
8       A.  No idea.
9       Q.  Did you understand the purpose of
10  the court order regarding the inspection of
11  your studio?
12      A.  I assumed that having given --
13  since I had told Mr. Nikas that I had over
14  4,000 works of art, I assumed that the
15  purpose of the inspection was to count the
16  works of art insofar as if I had said to him
17  I have $4 million in cash that he would want
18  to count it to make sure that it really was
19  $4 million in cash and not significantly
20  less.
21          So the fact when I told him I had
22  4,000 works of art I was hoping or thinking
23  that I probably had more but I didn't want
24  him to come in and say, oh, I've got 3,820
25  and you cheated me by 180 pieces.

Page 11

1
2           So the purpose, as I thought, would
3   be to count and make a detailed count of
4   everything I had, the size, its dimension,
5   its color, its number, its year, where it's
6   signed, how it got signed, and everything
7   else.  That's what I would have done if it
8   were me trying to inspect works of art.
9       MS. ZERNER:  Mr. McKenzie, just
10      to -- Michelle was asking you about the
11      second visit.  If you could --
12      A.  Oh, are you asking about the first
13  visit or the second visit?
14      Q.  Thank you for that clarification.
15          I was asking about the second visit
16  but let's -- let's make that clear.
17          So your testimony just now, was
18  that about the first visit that Mr. Nikas
19  made?
20      A.  That was about the first visit.
21      Q.  Okay.  And after the first visit
22  that Mr. Nikas made, you are aware that he
23  made a second visit, is that right?
24      A.  Yeah.  I was told that they were
25  going to come again, yes.

Page 12

1
2       Q.  Okay.  And -- and who were you told
3   that by?
4       A.  By Mr. Markham.
5       Q.  Okay.  And did you understand that
6   Mr. Nikas' second visit was pursuant to a
7   court order permitting that visit?
8       A.  I didn't really get into that.
9   Mr. Markham told me that he was going to come
10  to inspect documents.
11      Q.  Okay.  And what did you understand
12  that to mean?  What did you understand the
13  purpose of that second visit to be?
14      A.  Well, if he told me that he was
15  coming to inspect documents, I would assume
16  it meant he was coming to inspect documents.
17      Q.  And did you understand that to be
18  documents that would be relevant to this
19  litigation?
20      A.  I didn't understand any specific
21  thing other than he was coming to look at
22  documents.  I mean, I didn't think he was
23  going to look at documents that related to my
24  tennis.  I didn't think that's what was going
25  on.

Page 13

1
2       Q.  So I take it you were told or
3   understood that the documents were related,
4   that he was going to inspect the documents to
5   be related more or less to the matters at
6   issue in this litigation?
7       A.  Yes.  I can't imagine that it would
8   be anything else.
9       THE EXHIBIT TECH:  Ms. Shah, I'm
10      sorry.  I apologize for the technical
11      difficulties.  I have everything
12      straightened out and we are ready to go.
13      MS. SHAH:  Okay.  Great.  We can
14      hold off on that for just yet and I'll
15      ask you to pull it up in a little bit.
16      THE EXHIBIT TECH:  Yes, ma'am.
17      MS. SHAH:  Thank you.
18      Q.  Are you aware that as a party to
19  this litigation you were required to produce
20  or provide relevant documents and information
21  to Morgan Art Foundation as part of this
22  case?
23      A.  After we provided an awful lot of
24  information.
25      Q.  Can you tell me --

MAGNA
LEGAL SERVICES

1
2      A.   Three other attorneys and workers
3  and subworkers and subcontractors, and I
4  don't recall Morgan doing that.
5      Q.   Did you personally look for the
6  documents and information that you provided
7  in this case?
8      A.   To some degree.  The initial
9  attorneys from Raymond Dowd came up for quite
10  a long time and they went through all the
11  documents.  We didn't prevent them from
12  looking at anything.  They took whatever they
13  wanted to take.
14      And then they asked to take, if I
15  recollect, they took my computer to do -- to
16  scan it for anything they thought was
17  relevant.  And they asked, as well, all of my
18  staff as well as some people that worked for
19  me previously the same.  And I think some of
20  the people that I've contracted with did the
21  same.  So, yeah, there was quite a few people
22  that provided all sorts of information.
23      THE VIDEOGRAPHER:  Off the record
24      at 12:18 p.m.
25      (Off the record.)

1
2      THE VIDEOGRAPHER:  On the record at
3  12:28 p.m.
4      Q.   Mr. McKenzie, before we went on a
5  break, you were saying that attorneys from
6  Raymond Dowd came up for quite a long time to
7  collect relevant information and documents,
8  is that right?
9      A.   Yes.
10      Q.   And when you say came up, do you
11  mean came up to your Katonah residence?
12      A.   Yes.
13      Q.   Okay.  Are you aware whether they
14  went into your studio to collect relevant
15  documents and information?
16      A.   Yes.  They were in my studio for
17  many hours.
18      Q.   Okay.  Did you have any personal
19  involvement in collecting documents and
20  information for this case?
21      A.   I don't remember how much I was
22  involved.  I mean there were other people
23  that were doing it all.  The attorneys, Dowd
24  brought up -- he brought up two people for
25  the whole day and I think they came up twice.

1
2  I don't remember their names offhand to tell
3  you the truth.
4      Q.   And those two visits by Mr. Dowd's
5  colleagues, is that the only time that anyone
6  collected documents and information from you
7  for this case?
8      A.   No.  Because later we were asked to
9  send more documents and we did that.  My --
10  as I said, all of my staff was asked to go
11  through their phone and computers and collect
12  that, which they did.  And then they asked
13  some of my people that had worked for me that
14  were subcontractors to do the same, and they
15  did the same.  I know my painters sent -- I
16  believe I sent over a thumb drive.
17      So several people complied with all
18  of the requests.  And I personally contacted
19  them to ask them to do that.
20      So did I go there to supervise them
21  doing it?  No, I did not.  But I did ask them
22  to send anything they felt had any relevance
23  of any kind.
24      Q.   And other than the two visits by
25  Mr. Dowd's colleagues up to your Katonah

1
2  studio, did anyone else ever go into your
3  studio to collect hardcopy documents or
4  photographs or images or anything else that's
5  contained in the studio?
6      A.   I don't remember, but I know people
7  on the staff looked at some point.
8      Q.   Do you mean people on your staff?
9      A.   Yes.
10      Q.   Who are those people?
11      A.   I know Annette looked.  I can't
12  remember because several people worked here
13  who don't work here anymore, and I don't
14  remember which ones did what.
15      Q.   Can you tell me any of their names?
16      A.   I can't remember the woman's name
17  who I would say probably would have looked
18  the most because I would have put the, for
19  lack of a better term, the lowest person on
20  the totem pole to do that search.  Kate, I
21  can't remember her name to tell you the
22  truth.  She had glasses and she worked here
23  for about a year.  I just don't remember her
24  name.  She is still in publishing, but I
25  can't remember her name.



1
2       Q.   And when was that that she went to
3   search --
4       A.   Right at the beginning of this
5   case, you know, within the first couple of
6   months of the case.
7       Q.   Okay.  And when was it that Annette
8   went to search in the studio?
9       A.   I think on different occasions, to
10  tell you the truth.  I'm not -- not sure when
11  she did it last.
12      Q.   Can you remember if it was this
13  year?  Last year?  The year before?
14      A.   You know, I didn't get that wrapped
15  up in it.  I have other things I do besides
16  look through boxes.
17          So, you know, I know that Dowd was
18  really the one who sent people here to go
19  over everything.  And, you know, everybody
20  here I believe helped, what was they needed
21  to look at.  You know, they asked to open
22  drawers or look at this or look at a file or
23  open -- I know they also looked at computers
24  while they were here.
25          I didn't really get wrapped up in

1
2   it.  I know that they were here for quite a
3   long time.  I think they came at, like, 9:00
4   in the morning and left, you know, fairly
5   late, 5:00, 6:00.
6       Q.   And this is during one of the one
7   or two visits by Mr. Dowd's colleagues that
8   you referenced before, correct?
9       A.   Yes.  Yes.
10      Q.   Other than the one or two visits by
11  Mr. Dowd's colleagues and the times that
12  Annette may have searched or Kate, whose name
13  you can't remember, may have searched the
14  studio, did you or anyone else at any point
15  in time ever go search the studio for
16  relevant documents or information?
17      A.   I'm not sure.  I think -- I think
18  there were other times that people looked for
19  things if they were requested, so we looked
20  for them.
21      Q.   Okay.  Can you give me anyone
22  else's name who helped you with that?
23      A.   Well, probably everyone who worked
24  in the studio.  I know Tim went -- Tim Ginexi
25  went through all of his phones and emails and

1
2   anything else he could think of and his
3   computer and the computer here.  I'm assuming
4   that Annette probably did the same thing.
5          I just gave me computer to the
6   attorneys and left it there for them to do
7   whatever they want.  I think I gave them my
8   phone as well to search for anything they
9   wanted to search for.
10      Q.   Did you ever go into your studio
11  personally and gather up documents from your
12  studio that you thought would be relevant to
13  this case?
14      A.   Like I said, that wasn't really my
15  job.  That's more of a secretarial thing;
16  that's not what I do.
17      Q.   So I take that's a no?
18      A.   That's a no.
19      Q.   Okay.  What is Annette's last name?
20      A.   Vessescia, V-E-S-S-E-C-C-I-A.
21      Q.   AND where does she live?
22      A.   She lives in Bedford, the adjacent
23  town to here.
24      Q.   Okay.  Do you have her contact
25  information?  Could you tell me it on this

1
2   deposition or have your attorneys provide it
3   to me after the deposition?
4       A.   Yeah.  They'll provide it to you.
5       Q.   And by contact information, I mean
6   phone number, address and email?
7          MS. ZERNER:  Yes --
8       A.   I don't have -- yeah.  I don't her
9   address.  I don't know what you need that
10  for, but I will give you her -- her email and
11  phone, which I do have.
12      Q.   Okay.  Does she still work for you?
13      A.   Yes.
14      Q.   How long has she worked for you?
15      A.   Eleven years.
16      Q.   What does she do for you?
17      A.   She does a lot of IT work.  She
18  does design work, phone calls, sets up
19  meetings, all sorts of things.
20      Q.   Does she help at all with the
21  fabrication, production, conception,
22  distribution, sale of Indiana works?
23      A.   To some degree she works on the
24  creation of it.  So, you know, if we were to
25  do a piece, she would be involved in making



Page 22

1
2  the matrix for it because she is, you know,
3  one of our top IT people so she'll help
4  create the plates.  I don't know if that
5  makes any sense.
6       Q.  Does she help do the printing or
7  the stencilling or anything like that?
8       A.  She will create the stencil; that's
9  what she does.  She will create what are
10 called the plates.  Printing isn't really her
11 thing.
12      Q.  Can you describe to me how she goes
13 about creating the plates?
14      A.  Well, as an example, if we were
15 going to do HOPE and we were going to do it
16 in two colors, she would go on the computer
17 and figure out how to get the word HOPE out
18 of the picture, so it was just by itself as a
19 black and white, and then she would make a
20 background that coupled with it so that they
21 would go on top of each other and it could be
22 printed.  You know, the machine then takes
23 whatever it is she created to print it.
24      Q.  Does she help create the Indiana
25 insignia that is sometimes stamped on the

Page 23

1
2  back of the verso of the works?
3       A.  Yeah.  Indiana -- I was of the
4  impression that Indiana signed his paintings
5  with a pencil, and he corrected me to say
6  that no, that's not what he wanted to do.  He
7  wanted to use a stencil and showed me that,
8  indeed, he had been using stencils on the
9  back of his paintings since 1958.
10      So, you know, the artist has --
11 always has the right to decide how something
12 gets signed.  I wasn't especially happy about
13 it, but he gave us the matrix for the
14 stencil.
15      We made the stencil, we gave him
16 prints of the stencil, he approved it, and
17 that was how we then signed the paintings as
18 his direction.
19      Q.  Okay.  And is Annette involved in
20 creating the matrix for the stencil or
21 applying the stencil on the verso of the
22 works?
23      A.  Yes.  She creates the matrix but
24 she creates the matrix for the stencil and
25 she's -- she is the one we kind of trust to

Page 24

1
2  do it, because she actually went up and met
3  with Indiana early on.  And then he showed us
4  how to do the stencil, what he wanted on the
5  stencil, what it had to look like, what color
6  it had to be, all these things.
7       Q.  Okay.  And as part of stencil, is
8  it also stamped with the year of creation?
9       A.  Yes.  And Bob, every year, would
10 change that number so we've stuck with that
11 idea.
12      Q.  And when I say the year of
13 creation, I mean the year of creation of the
14 work that is stamped with his insignia, is
15 that correct?
16      A.  The way -- no, it isn't.  The way
17 it works is, as an example with your LOVE
18 stuff, they have the year that it was first
19 created is stamped on to your -- on to your
20 sculpture.
21      So with the paintings, it's the
22 year that it was first created.  So if we do
23 an edition of, say, 11, sometimes we don't do
24 all 11.  We may have not wanted to have that
25 much laying around so maybe we did two.

Page 25

1
2       So if we did two and the year was
3  1912 -- 2012, when you finished that edition,
4  you have to use the 2012, not 2017 or '18 or
5  whenever you did it.  Does that make sense?
6       Q.  It does.  Thank you.
7       And how about silk screen prints?
8  What was the practice for the date on the
9  stencil or insignia that is stamped on the
10 verso of the prints?
11      A.  Well, silk screen prints don't get
12 stenciled.  They get hand signed.
13      So the way Indiana broke down his
14 art was that he wanted to pencil sign paper
15 and stencil sign canvas.  Took me a while to
16 really wrap my head around that because -- I
17 have worked with a hundred artists.  I never
18 encountered something like that before.
19      At the beginning of this project,
20 we had him hand signing the paintings.  And
21 then he one day just said, You know what?  As
22 soon as I hand sign it, you devalue the
23 paint.
24      Like I had never heard of anything
25 like this, and he pretty much demanded that



Page 26

1
2    we go into stencils.
3        Q.  Okay.  And for the stencils on the
4    back of the paintings, the date that is
5    stamped on that, is that the year of creation
6    or what is the custom for that?
7        A.  I think I just explained to you
8    that whenever you first start the edition,
9    that's the year that it began.  But if you do
10   it -- if you don't finish the edition,
11   which -- which with paintings oftentimes we
12   don't, you have to, when you finish the
13   edition, the year will be the year that the
14   edition was begun, not the year that you did
15   it three years later or two years later or
16   the next year.
17       Q.   So you are then talking about
18   editioned paintings?
19       A.  Yes.
20       Q.  Okay.  And those are printed or
21   silk screened on canvas?
22       A.  Yes, silk screened.
23       Q.  Okay.  And you mentioned a Kate
24   earlier who worked for you for about a year,
25   and you didn't remember her last name.

Page 27

1
2        Do you recall if it was Kate
3    Cerciello (phonetic) or Kate Casey?
4        A.  Ah, that's it.  Kate Cerciello.
5        Q.  You mentioned Tim Ginexi.  Who is
6    he?
7        A.  He is our printer.  He is our
8    master printer.
9        Q.  Where does he live?
10       A.  Wappingers Falls.
11       Q.  In New York?
12       A.  Yeah.  It's probably 20 minutes
13   from here or so.
14       Q.  Okay.  And I'd ask also for his
15   contact information if you have it and can
16   provide it to your lawyers to provide to me
17   after the deposition.
18       A.  Of course.  No problem.
19       Q.  Thank you.
20       MS. SHAH:  If we could now pull up
21   tab 3, which is Exhibit 1, please.
22       And Mr. McKenzie, I think you also
23   have a copy of that in the chat so feel
24   free to pull that up.  But I can direct
25   you on the screen if you can see it to

Page 28

1
2        where I want you to look.
3        Q.  Can you see this document in front
4    of you?
5        A.  Yes.
6        Q.  For the record, this is an order
7    from the court dated 6/29/21.  It's Doc 395
8    we've marked as Exhibit 1.
9        Mr. McKenzie, have you seen this
10   document before?
11       A.  Probably.
12       Q.  Okay.  And down on paragraph 3 on
13   the first page it says, "Inspection of
14   McKenzie's studio."
15       Do you see that?
16       A.  Yes.
17       Q.   And you are aware that the second
18   visit by Mr. Nikas and his colleagues that we
19   were speaking about earlier to your studio,
20   that that was done pursuant to this court's
21   order, is that correct?
22       A.  No.  I don't know if that's true.
23   I think that was the second thing.  This
24   doesn't seem to cover that at all.
25       Q.  Can you explain to me what you mean

Page 29

1
2    by that?
3        A.  Exactly what I said is exactly what
4    I mean.  That this seems to talk about a
5    meeting, not a meeting and a second meeting.
6    I don't see anything here that says there
7    will also be a second inspection.  Do you see
8    that?  Because I don't.
9        Q.  Okay.  Do you understand that the
10   first inspection that Mr. Nikas did was just
11   pursuant to an agreement between him and you
12   and some other parties, but it was not a
13   court-ordered inspection?
14       A.  Yeah.  I think I -- I agreed to do
15   it without a court order.  I just said come
16   on -- come on down.
17       Q.  Yes.
18       A.  Right?
19       Q.  Yes.  And then the second visit or
20   inspection that Mr. Nikas did, do you
21   understand that that was done because the
22   court ordered that Mr. Nikas could do it?
23       A.  Is that what this is?
24       Q.  Yes.
25       A.  Oh, so I thought this was for the



Page 30

1
2  first one; so I don't know.  I'm not that --
3  you know, if Mr. Markham tells me that he
4  wants somebody to come over, I'm not studying
5  the documents to find a way out.  You know,
6  whatever he says I'm going to do.
7        So I'm not going through documents
8  with a fine tooth comb to find out if there
9  is something in there that contradicts what
10  Mr. Markham says.  I kind of go by what he
11  asks me to do.
12     Q.  I understand.  So let me ask it a
13  different way.
14        Did you understand from Mr. Markham
15  that Mr. Nikas was going to come inspect the
16  studio because the court had ordered that
17  he'd be able to do that?
18     A.  I guess so.  If he asked me to have
19  Mr. Nikas over even at the beginning, I
20  didn't ask is there is a court order.  I just
21  said yes.
22     Q.  Do you recall if Mr. Markham or
23  anyone else ever informed you that there was,
24  in fact, a court order?
25     A.  I don't recall.  It wouldn't have

Page 31

1
2  mattered to me one way or the other.
3     Q.  Okay.  Did you do anything to
4  prepare for this -- sorry.  Let me back up a
5  minute.
6        I want to talk to you about the
7  inspection next and ask some questions.  And
8  just to lay the groundwork, I would like you
9  to understand that I'm going to be talking
10  only about the second inspection -- the
11  second inspection, okay?
12     A.  Okay.
13     Q.  That second visit happened on
14  August 5, okay?
15     A.  Okay.
16     Q.  So did you do anything to prepare
17  for that second inspection?
18     A.  I think they bought bagels and
19  cream cheese and coffee.  That's all I can
20  remember.
21        I wasn't here.  You know, I
22  specifically didn't want to be here for any
23  of the reasons, that I didn't feel like
24  getting into a confrontation with anybody.
25  So I didn't think it was prudent for me to be

Page 32

1
2  here.  I let other people do it.  Everything
3  I know about it I'm hearing secondhand.
4     Q.  Okay.  And everything you know
5  about it, are you hearing secondhand from
6  your attorneys or someone else?
7     A.  Both.  From the people that were
8  here, you know, mainly from Annette and then
9  whatever -- I don't know.  I think
10  Mr. Markham was here too if I remember.
11  Again, I wasn't here so it's hard for me to
12  really tell you what transpired.  I wasn't
13  here.
14     Q.  Okay.
15        MS. SHAH:  We can pull that exhibit
16  down, Broderick.
17     Q.  Mr. McKenzie, are you aware that
18  Mr. Markham wrote a letter to the court on
19  August 30, I believe, informing the court
20  that had you moved some artwork off the
21  property before this second inspection?
22     A.  Yes.
23     Q.  Do you understand that that letter
24  from Mr. Markham is among one of the reasons
25  that we are here at this deposition today?

Page 33

1
2     A.  Whatever; I don't know.
3     Q.  Can you tell me, is it correct that
4  you moved artwork off of the property before
5  Mr. Nikas' second inspection?
6     A.  I had no idea there was going to be
7  a second inspection.  Nobody told me that
8  there would be.
9        I mean, you had eight people here
10  for ten hours.  I could have gone through
11  everything here with Annette in five hours
12  with two people.
13        You had eight people here for ten
14  hours.  I assume you went through everything,
15  had a full list of everything that was here,
16  pictures of everything that was here, the
17  size, their gate, the number, and then
18  compared that to whatever I gave you so that
19  you wouldn't then turn around and say there
20  are 300 more pieces than you said or 22
21  pieces less than you said or whatever.
22        That's what I thought was
23  happening.  Nobody ever got to the point of
24  telling me I had -- the only thing I was told
25  was that they thought I had far too much



Page 34

1
2  inventory, which I found really strange given
3  that you're making money from the inventory.
4     Q.   So let me take this one step at a
5  time.
6        Is it your testimony -- first, I
7  guess, let's do a yes-or-no question, if you
8  can answer it with a yes or no.
9        Is it correct that you moved
10 artwork off of the property before Mr. Nikas'
11 second visit?
12    A.   As I said, I -- no one told me
13 there would be a second visit.  So I moved
14 things off the premises because after,
15 theoretically, you guys were going to buy
16 everything, I realized that it was impossible
17 or very difficult to see everything here
18 because it was stacked up on top of each
19 other just for lack of space.
20       So I started moving things so
21 that -- and it's much better in the space
22 that it's in to view.  Viewing things here,
23 much more difficult.  Viewing things there,
24 very, very simple.
25       So I was trying to set it up to

Page 35

1
2  finish a sale and also, frankly, I've had a
3  number of trees fall down on this property,
4  even recently.  And it occurred to me that I
5  had trees within 20 feet of this building,
6  that if they fell down, this building would
7  be crushed like a grape.  And, in fact, I
8  just took two of them down a couple of weeks
9  ago.
10       So moving it to the -- when I saw
11 the facility, I realized I was keeping
12 valuable art in a space that maybe, maybe not
13 was up to the task; whereas, the space that I
14 viewed was brand new, made out of steel, no
15 trees, anything around it that could damage
16 the building and art.  It was temperature
17 controlled I felt better than my own
18 temperature controls.  It was humidity
19 controlled I felt better than my own humidity
20 control.  And also, the value of my property
21 compared to the value of the storage space,
22 the property is much more valuable.
23       So on every level, I was making a
24 mistake to keep it here.  I hadn't really
25 thought about it because it was sitting

Page 36

1
2  around for so long.  But when the estate or
3  whomever is trying to buy the work, it
4  stimulates what am I doing.
5        And when I did that, I realized I
6  was keeping all this stuff in the wrong
7  place.  It was costing me more money to keep
8  it here than put it somewhere else.  It
9  wasn't being protected as well, and it also
10 opened up all of my space here.  Instead of
11 having to crawl around thousands of works of
12 art where I can't even move in my own studio,
13 it opens up the studio to really be able to
14 work here a lot better and my home too.  So
15 it was nothing but plus from my standpoint,
16 moving.
17    Q.   So is it your testimony that when
18 you moved the artwork off the property you
19 did not yet know about a second inspection?
20    A.   I had no idea there would ever be a
21 second inspection.  It seemed to me that
22 80 hours of inspecting was probably five
23 times as much as would have been needed to
24 inspect it.
25    Q.   And when you were informed of the

Page 37

1
2  second inspection by your attorneys, did you
3  tell them at that point that you had moved
4  artwork off the property?
5     A.   I was told they were only coming to
6  look at documents.
7     Q.   Okay.  And so is that a no, you did
8  not tell them that you had moved artwork off
9  the property?
10    A.   It had no relevance because if
11 you're coming to look at documents, I didn't
12 move any documents.  They were all here.
13    Q.   So am I correct, that you did not
14 tell them that you had moved artwork off the
15 property?
16    A.   Well, you're correct in knowing
17 that it had no relevance to the question they
18 asked and the question you're asking.
19    Q.   Okay.  Regardless of whether it had
20 relevance or not, I'm just trying to get a
21 clear transcript.
22       Did you or did you not --
23    A.   You have a clear transcript.  There
24 was no reason to tell them that.
25    Q.   Okay.  Do you recall when you moved



Page 38

```
1
2    the artwork off the property?
3         A.  I would say shortly after the first
4    visit because, you know, I started really
5    realizing that I can't even walk in this
6    place.  You know, and that when I talked to
7    Annette, she said, you know, they went
8    upstairs, downstairs, here, there, and
9    whatever.  I don't know what they were
10   looking for.
11        And then you start looking around
12   and you realize it's -- you know, I have very
13   valuable space.  Bedford is a -- is a prime
14   time part of Westchester, and I'm tying if up
15   with storage.  It's not a really very
16   intelligent thing to do.
17        So I started looking around to see
18   if I went within an hour, an hour and a half
19   of here, rather than try to do it here where
20   everything is super expensive, am I better
21   off, you know, being somewhere elsewhere
22   with -- my concern was going outside of here,
23   which is very expensive, that I would go
24   somewhere else but it would be a horrible
25   facility.  That was my scare.
```

Page 39

```
1
2         But when I went into what I'm going
3    to call the hinterlands, which is, you know,
4    an hour or so away from here, I realized that
5    there were brand new storage facilities that
6    were built much better than the storage
7    facilities here.  I didn't know realize that.
8    I didn't know if that would be the case.
9         But when I looked and inspected
10   storage spaces elsewhere, it was abundantly
11   clear to me that me using my storage space
12   here that one, it was nowhere near as good;
13   two, it was nowhere near as well protected;
14   three, it didn't, while I have a kind of
15   loosely put together temperature and humidity
16   control, it's nothing like the professional
17   controls in these storage spaces; and four,
18   you know, the -- I have a vulnerable space.
19        You know, there's animals around
20   here.  It's an old farm.  You know, there's
21   raccoons.  There's coyotes.  God forbid you
22   leave the door open for a minute and
23   something like that gets in or when they
24   break a window and get in.
25        So when I looked at the liabilities
```

Page 40

```
1
2    I was putting on the art, for what?  To save
3    a couple of thousand dollars?  When, in fact,
4    the space I have is probably worth quadruple
5    that.  So there was just no good reason to
6    keep it here.
7         What -- you know, I had really not
8    thought about moving it until all of a sudden
9    it got pushed, like maybe -- maybe this will
10   get sold in one shot.  And I said, well, now
11   what?  What if -- what if a tree comes down
12   and destroys the building and I've agreed to
13   sell this stuff and now it's all destroyed?
14   Am I -- what -- what happens to me?  And now
15   I'm liable for -- it was just too much
16   liability and we've -- I never really faced
17   that before.  But it was in my face once it
18   came time to think of maybe I have to sell
19   this stuff in one shot.
20        Q.  Do you recall about how long after
21   the first visit it was that you moved the
22   works off the property?
23        A.  It was very short time because,
24   like, as soon as I started looking at
25   everything, I realized I was making a huge
```

Page 41

```
1
2    mistake to leave stuff here.  And, frankly,
3    space in my house that I was giving up was
4    worth a lot of money, and I was thinking that
5    I would make a separate and, I am entitled to
6    under Bedford code, to make a separate in-law
7    apartment for my children.
8         So every single thing that I could
9    think of that would be positive or negative
10   came up negative leaving it there, positive
11   moving it.  So the only question I had was,
12   was there a facility that was affordable?
13   And the answer was that they were very
14   affordable.
15        And then the second question was,
16   was that facility up to the task of having
17   temperature and humidity controls?  And what
18   I found out was that these -- these brand-new
19   facilities in these far-off places were much,
20   much better than my facility.  Much, much
21   better.
22        Q.  What's the name of the facility
23   that you moved the works to?
24        A.  Honestly, I don't know the name.
25   It's in Middletown, New York, and it's a
```



1
2 brand-new facility.  And it's -- it's got
3 unbelievable amount of security and cameras
4 all over the place, and people working there.
5 And, you know, the temperature and humidity
6 controls are backed by generators.  It just
7 was a truly fine facility.  Much, much better
8 than what I had provided.  It made my
9 facility, I realized how -- how weak my
10 facility was.
11    Q.  Do you have records of -- that
12 would say the name of the facility?
13    A.  Yes.
14    Q.  Do you have records that would say
15 the date that you moved it to the facility?
16    A.  I'm not sure about that because we
17 moved it in stages.  You know, at the
18 beginning, I moved in and they allowed me to
19 come in until sometime when I got the rest --
20 some of the rest of the things in.  So I'm
21 not sure that they have the first date; I'm
22 sure they have some date.
23    Q.  Is it your testimony that you moved
24 the work into the facility at different
25 dates, at different times?

1
2    A.  Yeah.  You couldn't move it all --
3 unless you had a freight train, you couldn't
4 move it all in one shot.  You know, it's --
5 you are talking about 16 -- you know, my
6 studio here is 7,000 square feet.  You can't
7 get -- and the ceiling height upstairs is 23
8 feet.
9       You can't get that amount of
10 storage space.  It's not possible, because
11 storage spaces are 8-by-20, or something like
12 that.  So you can only get -- and where are
13 you going to get a truck to take 1600 square
14 feet?  I mean, I don't know where you get
15 that.
16       You can only get a truck that is so
17 big, and it can only take so much.  So it had
18 to be done in stages.  And if I'm driving, it
19 takes me a few hours to load.  You know,
20 you've got to be careful.  You're moving art.
21 It's not like you are moving bowling balls.
22       So loading up takes time.  And
23 then, to get there is an hour and 10 minutes
24 and then unloading takes time.  So you can
25 really only do one truckload a day.  You

1
2 can't possibly think about moving it in a
3 day.  It's not humanly possible.
4    Q.  How many works did you move from
5 the -- from your studio in Katonah to the
6 storage facility?
7    A.  I didn't count them.  I don't know.
8    Q.  Do you have an inventory that shows
9 how many works you would have stored in the
10 storage facility?
11    A.  It's -- the problem with our
12 inventory is that different people worked on
13 it at different times, and there are pieces
14 missing that were either -- you know, sold or
15 Rosenbaum has them or whatever else.  So when
16 we look at our inventory, we are not sure
17 that what we have in inventory the list is
18 what we actually have.  So trying to count it
19 all over again as to compared to what we have
20 as notes is a time-consuming thing, which we
21 really haven't done to the max like we
22 should.
23       I thought that that -- one of the
24 things I thought in your team coming was,
25 good, let them go count 4,000 pieces and tell

1
2 us what they are, how they got there, what
3 the colors are, what the numbers are and all
4 that, and then we can compare it against our
5 notes, because it's a -- you know, it's a
6 16-, 18-hour job to do, and we just never did
7 it.
8    Q.  Do you think it's about 4,000 works
9 of art that you moved from your studio to the
10 storage facility?
11    A.  No.  Because we still have probably
12 maybe a third of it here.
13    Q.  So you think it's about 2500 works
14 of art that you moved to the storage
15 facility?
16    A.  Again, that's my guess.  But again,
17 I didn't try to count it because sometimes
18 pieces that take up a lot of space -- you
19 know, you could have pieces like, for
20 instance, prints that are stacked up where
21 400 prints are only taking up an area that is
22 4 inches high; whereas, something else that
23 is a giant painting is just one piece that
24 takes up 8 feet by 8 feet by 4 inches deep.
25 So there is no real formula.

Page 46

1
2        I mean, each thing is -- it's a
3   work of art.  It has its own space and time.
4   You know?  So I didn't -- I'm not sure.  But
5   if I had to guess, a third of it is here and
6   two-thirds is there.  I'm not positive.
7        Q.  Okay.  And if you could give me
8   your best guess of the numbers, would it be
9   about 2500 in the storage facility and about
10  a 1,000 or 1500 remaining at your Katonah
11  studio?
12       A.  Yeah.  If you take a third and
13  two-thirds, that's what it is, and that's a
14  guess.  And I'm -- I would say that's
15  accurate within 10 or 15 percent; at least
16  that's what I think.
17       Q.  Okay.  Did you do -- did you or the
18  storage facility do anything to record what
19  specific pieces of art you moved to the
20  storage facility?  Do you have a storage
21  inventory?
22       A.  No.
23       Q.  Do you have any records showing
24  what specific pieces you moved to the storage
25  facility?

Page 47

1
2        A.  No.  We just tried to do a
3   truckload -- it was a very time-consuming
4   job.  And -- and it's also nerve wracking
5   because, you know, every work of art you
6   move, you know, you're trying to figure out
7   how to stack it on the truck.  You're hoping
8   it doesn't break.  I mean, you've got a
9   thousand things -- you're wrapping it as best
10  you can.
11       You know, I'm not a professional
12  art mover.  We didn't employ professional art
13  movers.  We did it ourselves.  And, you know,
14  it wasn't -- wasn't so easy and it wasn't so
15  much fun.  It was very time consuming and
16  very nerve wracking.
17       Q.  Who helped you pack up and move the
18  works to the storage facility?
19       A.  Everyone who was here on the staff;
20  Annette, Tim, Oz Gonzalez.  I think I
21  employed a couple of other people that do
22  construction work for me to help.  I'm trying
23  to think if anybody else helped.  I think
24  that's it.
25       Q.  That's Annette Vessacia, is that

Page 48

1
2   correct?
3        A.  Yes.
4        Q.  And Tim Ginexi?
5        A.  Yes.
6        Q.  And Oz Gonzalez?
7        A.  Yes.
8        Q.  And how many other people do you
9   think you -- helped you do that, that you
10  employed who do construction projects?
11       A.  It was mainly those three.  You
12  know, the other people didn't go to the
13  storage facility.  They may have helped me
14  take some of the work out of the -- out of
15  the space but that was about it.
16       Q.  Do you remember about how many
17  other people that would have been?
18       A.  I think two.
19       Q.  Do you recall their names?
20       A.  I don't.  They were kind of day
21  laborers.  I don't really know them.  They
22  were people that knew Osvaldo Gonzalez.
23       Q.  How many trips did it take you to
24  drive the works to the storage facility?
25       A.  I didn't count them, to be honest

Page 49

1
2   with you, but it was quite a while of time.
3   You know, maybe two weeks and going, if not
4   every day, sometimes even on weekends.  It
5   took a lot of trips.
6        You know, if you have a -- like,
7   the trucks, the biggest truck you can get is,
8   like, 20 feet or something, but you can't
9   always get it.  So if you get a truck
10  that's 12 feet and it's 7 feet wide, it's not
11  a lot of stuff that we can take.  And you can
12  only get whatever trucks are available.  I
13  don't own a 40-foot truck, so I'm at the, you
14  know, the disposal of Avis and the other
15  truck companies.  So...
16       Q.  So you rented the trucks?
17       A.  Yeah.  And apparently the trucks
18  are in high demand right now.  At least
19  that's what they tell me because I would call
20  up and, you know, apparently there is a huge
21  amount of people moving.  You know, you have
22  an influx of people moving from the five
23  boroughs up to this area, and then you have
24  an outflux of people in this area who are
25  getting double what they thought they would



Page 50

```
1
2   get for their home and moving to Tennessee
3   and North Carolina, so there is a lot of
4   trucks going out here.
5      Q.  Do you have records of the truck
6   rentals?  Receipts, anything like that?
7      A.  I'm not sure.  I'd have to -- I
8   don't really save those things.
9      Q.  Where did you rent the trucks from?
10     A.  Whoever had them.  I rented it from
11  anyplace that could give it to me.  There
12  were probably three different places that I
13  rented from all within, you know, this area.
14     Q.  Did you do it online or over the
15  phone?
16     A.  Over the phone.
17     Q.  What records do you have that would
18  show the name of the storage facility?
19     A.  I'm sure I have that -- that
20  record, is my bookkeeper has that I'm sure.
21     Q.  Okay.  We're going to ask for the
22  production of that, please, and any other
23  records you have from the storage facility or
24  showing an inventory of the works that were
25  moved.
```

Page 51

```
1
2      A.  I don't have any -- like I said for
3   the fortieth time, I don't have an inventory
4   of what was moved.
5      Q.  Okay --
6      A.  You can ask me 500 other ways but
7   the answer will remain the same.
8      Q.  I am also going to ask for the
9   production of any receipts you have from the
10  truck rental that would show the dates that
11  you rented the trucks.
12     A.  I also own my own truck, by the
13  way.
14     Q.  Did you use that truck to move --
15     A.  Yes, I did.
16     Q.  Okay.  Can you describe for me, to
17  the best of your recollection, what were the
18  works or the images -- the images on the
19  works that you moved to the storage facility?
20     A.  We moved anything that fit in the
21  truck; so any of the works that we had, we
22  moved.
23     Q.  Did that include LOVE works?
24     A.  I'm not sure.  Maybe.  Think of
25  what LOVE works we had.  But we don't own the
```

Page 52

```
1
2   trademark or copyright to LOVE so that's a
3   story that's got to stop.
4      Q.  Well, that's not my question.
5         My question is just did you move
6   any LOVE works to the storage facility?
7      A.  Possible.  You know, I didn't -- I
8   didn't try to -- you know, whatever was
9   taking up space that I needed is what I
10  moved.  So I tried to move anything that
11  would give me a chance to work in my own
12  studio and/or live in my own house.
13         So I moved anything that I -- that
14  I thought I could fit in a truck and anything
15  I thought I could fit in a locker or whatever
16  they call those things, a storage space.
17     Q.  Do you recall if you moved any Book
18  of Love works to the storage space?
19     A.  I only have maybe two or three of
20  them; they're probably still here.
21     Q.  What about Dylan works, do you
22  recall if you moved any of the works with
23  Bob Dylan lyrics on them to the storage
24  space?
25     A.  I'm pretty sure that we did.  I
```

Page 53

```
1
2   mean, the Bob Dylan books were very -- taking
3   up a huge amount of space and they were heavy
4   and in the way, and I'm sure that was one of
5   the things that I moved first.
6      Q.  About what about any works with the
7   word EAT on them, E-A-T?
8      A.  I don't know that we had any.  But
9   if we did, we probably moved them.
10     Q.  Okay.  What about any works with
11  the words USA FUN on them?
12     A.  Again, I'm not sure that we had --
13  you know, we may have had a couple, and if we
14  did, we probably moved them.
15     Q.  What about works with the word ART,
16  A-R-T, on it?
17     A.  I'm sure we moved at least some of
18  them.  I don't know that we have that many.
19     Q.  What about HOPE works?
20     A.  Yeah.  We moved a lot of them.
21  There were a lot of them and we moved a lot
22  of them.
23     Q.  What about works with the word
24  Tikva, T-I-K-V-A?
25     A.  I'm not sure that we have any of
```



1
2  those, but they may all be with Rosenbaum.
3     Q.   Okay.  What about works with the
4  word Ahava?
5     A.   We never did -- Ahava, I did
6  publish many years ago.  I don't think we
7  have any though.
8     Q.   Okay.  What about alphabet works?
9     A.   Yes.  We -- we moved several of
10  those.
11    Q.   Are there any other Indiana works
12  that you can recall that you moved to the
13  storage locker?
14    A.   I think there was a piece called
15  "Retrospective" that we moved that was really
16  in the way, too.  And I don't know.  You
17  know, I didn't -- again, I am doing it by
18  memory and it was a long haul.  I can't
19  remember if there is anything else besides
20  what you mentioned that we would have moved.
21  I don't know if we have anything else besides
22  what you mentioned.  I'm trying to think of
23  anything.  Nothing is jumping to my mind.
24    Q.   Did you move prints and paintings?
25    A.   Yes.

1
2     Q.   Did you move any sculptures?
3     A.   No.  I don't think we have any.
4  Those are kind of made as they are ordered.
5     Q.   Do you have a stainless steel HOPE
6  sculpture on your property?
7     A.   We believe that Osvaldo Gonzalez is
8  trying to steal that.
9     Q.   Did you cover over the HOPE
10  sculpture with a tarp that's on your
11  property?
12    A.   Yes.  It's -- it's in need of
13  repair.  It has to be -- unfortunately, it
14  has to be resurfaced or whatever they do.
15  It's rusting.
16    Q.   When did you cover it over with a
17  tarp?
18    A.   A couple months ago.
19    Q.   Do you recall if it was covered
20  over with a tarp during Mr. Nikas' second
21  visit?
22    A.   It's still covered over with a
23  tarp.  You know, it's -- the rain is killing
24  it and it's rusting like mad and I don't want
25  to see it fall apart.  And until I can locate

1
2  somebody who gives me a good idea of how to
3  store it, I am going to keep it covered.
4     Q.   So it's been covered over with a
5  tarp for the past few months until today, is
6  that right?
7     A.   Still covered over as we speak.
8     Q.   Other than the paintings and prints
9  that we've discussed that you moved to the
10  storage facility, did you move anything else
11  to the storage facility?
12    A.   Yes.  I moved Alex Katz.  I had a
13  number of large Alex Katz paintings, a number
14  of Robert Cottingham paintings, a number of
15  my own paintings, a number of Donald Sultan
16  paintings, a number of prints from Ronnie
17  Cutrone, a number of prints from Crash,
18  paintings from Ron English, paintings from
19  Dan Witz, paintings from Iko, paintings from
20  Tristan Eaton, prints from Tristan Eaton.  I
21  moved anything that was in the way that was
22  tying up my space.
23    Q.   Okay.  Other than the paintings and
24  prints that you just described, did you move
25  anything else to the storage facility?

1
2     A.   Not that I can think of.
3     Q.   Did you move any documents to the
4  storage facility?
5     A.   No.
6     Q.   Did you move any photographs to the
7  storage facility?
8     A.   No.
9     Q.   Is the storage facility rental
10  under your name?
11    A.   Yes.
12    Q.   Michael McKenzie?
13    A.   That's my name.
14    Q.   Did you rent the storage
15  facility -- well, can you tell me when you --
16  when you rented the space in the storage
17  facility?
18    A.   I don't -- it was shortly after,
19  whenever the first meeting was.  It took me a
20  while to figure out where I wanted to go with
21  it because I -- I went to three or four
22  storage facilities around to see what would
23  click.  And when I visited this one, I
24  realized that -- that it would work.  So I
25  don't remember how long it took, but it would

Page 58

```
1
2   have been not too much longer after the --
3   when was the first meeting?
4      Q.  You mean Mr. Nikas' first visit up
5   to your studio?
6      A.  Yes.
7      Q.  Okay.  I don't -- I don't know the
8   date off the top of my head.
9      A.  I don't either.  But, so shortly
10  after that, I realized that my facility was
11  not a great idea for what I was trying to do.
12  It didn't make any sense.  That even trying
13  to look at the work to sell it made no sense
14  whatsoever because -- it was just everything
15  was on top of itself.
16      So to look at ten paintings of HOPE
17  you had to move 15 paintings of Alex Katz.
18  It didn't make sense.
19      Q.  Can you tell me the names of
20  everyone who you are aware of that knows that
21  you moved those works to the storage
22  facility?
23      A.  Well, I told you the names of all
24  the -- all the people that worked to move it
25  are all the people that know about it.
```

Page 59

```
1
2      Q.  Okay.
3      A.  And I'm not -- not standing on my
4   roof saying does anybody want to know where
5   my storage facility is.  You know -- I'm not
6   trying to broadcast where I'm keeping
7   valuable art.  It wouldn't be very smart.  So
8   I'm not particularly interested in letting
9   everybody know where I'm keeping things.  Why
10  would I?
11      Q.  Okay.  So putting aside the people
12  on this call -- your lawyers, the court,
13  et cetera, you know, the people involved in
14  this deposition and lawsuit, other than
15  Annette, Tim, Oz Gonzalez, and the couple of
16  construction workers that might have helped
17  you pack up stuff -- is there anyone else who
18  knows that you moved the works to the storage
19  locker?
20      A.  No.  And I don't think the
21  construction workers have any idea.  They
22  just -- were just moving a few things out of
23  a barn.  I don't think they had any idea
24  where it was going, why it was going or
25  even -- if they even knew it was art.  You
```

Page 60

```
1
2   know, they're not that sophisticated.
3      Q.  Okay.  And you never apprised
4   Morgan or its attorneys that you had moved
5   art off the property before the second
6   inspection, is that correct?
7      A.  This is, what, the ninth time I'm
8   telling you I didn't think it was anybody's
9   business.
10      Q.  Okay.
11      A.  And that's -- that's where it's at.
12  You know, it has nothing to do with anything.
13  I'm not telling you what I had for lunch
14  either because it's not your business.
15      Q.  Were Annette and Tim present during
16  the second inspection by Mr. Nikas?
17      A.  You know, I wasn't here so my -- I
18  know Annette was here because she told me
19  that she was surprised that nobody -- we were
20  waiting for somebody to say, This is a list
21  of everything we found and you told us you
22  had 4,000 pieces.  We found 4600 or we found
23  3600.
24      And that's what we thought was
25  going to happen and Annette too.  She was
```

Page 61

```
1
2   waiting to see a list that -- that somebody
3   would try to get her to confirm and then get
4   me to confirm that you told us you had this
5   but this is what we found.
6      But we -- we never -- nobody ever
7   gave us that.  No one ever came back with a
8   list and said, Look, you told us you had
9   4,000 works of art.
10      You know, some of these pieces sold
11  for a couple of $100,000, so we are talking
12  about a substantial amount of money.  But
13  nobody counted the art.  Nobody counted it.
14  Nobody came back and said, This is how many
15  pieces you have or this is how many --
16  because we were waiting for that.
17      It would have been good for us to
18  have because we didn't even know how many
19  pieces we had.  So if eight people want to
20  stay here for ten hours and count pieces,
21  great, count them; but that never happened.
22  Nobody came back to us and said, You have
23  1200 pieces, 12,000 pieces, you have
24  892 pieces of this.  Nothing.
25      There was no list ever came back to
```

MAGNA
LEGAL SERVICES

1
2  us to -- to check on, which is very, very
3  strange that eight people were here for ten
4  hours and they compiled no list.
5      Q.  Are you aware of whether Annette --
6  (audio distortion) -- are you aware of
7  whether Annette Vesseccia told Morgan Art
8  Foundation or its attorneys that a number of
9  works had been moved off the property before
10  the second inspection?
11     A.  Again, that wouldn't have anything
12  to do with what they were doing.  Apparently,
13  they were looking at documents, so I don't
14  see any reason why she -- they didn't ask,
15  she didn't tell.  There was to reason to even
16  have that discussion.
17         They had 80 hours of manpower to
18  look at it.  We assumed they -- they had a
19  list and they just -- we also assumed they
20  weren't showing us or didn't want to show us
21  the list, and we didn't know why.
22         And why would you go there with
23  eight people for ten hours to check out a
24  list of everything is -- that's in the space
25  and not go piece by piece and check the list,

1
2  make sure that the number -- if I say there's
3  4,000 pieces -- if I told you there was
4  $4 million and it was in a suitcase and it
5  was in thousand dollar bills, you would count
6  it.  That's just what you would do.
7         So here is a thing that has
8  $50 million worth of art, or whatever it is.
9  Aren't you going to count it?  Aren't you
10  going to, like, document it?  And say, Look,
11  you said you had 4,000 pieces.  We only count
12  2200.
13         Or, you know what, you said you had
14  4,000 pieces.  We counted 7,000.
15         Where was that?  How come -- how
16  come we didn't get a list of what they spent
17  eight people ten hours to go over the list
18  but nobody came back with a list?  What is
19  that about?
20     Q.  Before Mr. Nikas' second visit to
21  your studio, did you also move blank silk
22  screens from the studio into your house?
23     A.  Blank silk screens?
24     Q.  Uh-huh.
25     A.  No.  I didn't move any blank silk

1
2  screens into my house.
3         (Simultaneous crosstalk.)
4     A.  -- blank silk screens are blank.
5  You know, we blast these screens out and move
6  them around all the time.  It's -- you know,
7  you finish it, you blast it.  Or sometimes
8  you finish it, you don't want to blast it
9  because you may use it again.
10         So -- but I don't move any silk
11  screens into my house ever because they're --
12  they stay in the studio.  Sometimes we put
13  them outside if we don't have the space.
14     Q.  Before Mr. Nikas' second visit, did
15  you move anything else out of the studio?
16     A.  I can't think of anything.
17     Q.  Before Mr. Nikas' second visit, did
18  you move anything out of the studio into your
19  house?
20     A.  No, not that I can think of.  I
21  mean, unless there was a book here I needed.
22  You know, sometimes there is something here;
23  because when you go through everything, there
24  is so much stuff here.  You know, I may have
25  found a Picasso that I forgot I had.  You

1
2  know, if I did that, I would put it up on the
3  wall.  Or if it was something special to me.
4         It's like when you start going
5  through everything, you start seeing things
6  that you forgot you even had.  That I don't
7  remember if I found anything that I forgot I
8  even had but that does happen from time to
9  time; that I find something that, you know, I
10  have sentimental attachment to for one reason
11  or another from an artist I knew very well
12  who is now passed on and I want to get it up
13  and remember him.
14         I'm an art collector and an art
15  publisher.  I have thousands of works of art
16  besides the Robert Indiana of all kinds of
17  artists that I worked with over the last
18  40 years.  You know, there's -- you know,
19  those times that I spent with Picasso.  Those
20  are important moments in my life.  Times that
21  I spent with Andy Warhol, important moments
22  in my life.
23         And I have a lot of Andy Warhol and
24  it pops up from time to time, that I have
25  something that I forgot I even had.  I'm



Page 66

1
2  looking at one right now that I forgot I even
3  had.
4      Q.   Since the beginning of this
5  litigation, have you moved off the property
6  or thrown away or disposed of any documents
7  or photographs that are relevant to the
8  litigation?
9      A.   No.  No.  I don't feel like that's
10  their place, so I wouldn't do it.
11     Q.   Since the beginning of the
12  litigation, have you moved any other works
13  off the property other than the ones we've
14  just talked about?
15     A.   Not that I can think of.
16     Q.   What about works that you sold to
17  Rosenbaum or other sales outlets, for
18  example?
19     A.   Well, I've sold things if that's
20  what you are asking.  But nothing has been
21  sold to Rosenbaum since the beginning of the
22  litigation because he was, behind my back,
23  corroborating with the estate to screw me so
24  I would never trust him again.  He is a
25  swindler.

Page 67

1
2          We've also found out that he sold,
3  as we told the estate, he sold things for
4  double and triple what he claimed he sold
5  them for, kept two sets of books, and
6  probably owes us, I don't know, $12 million
7  of which the estate is entitled to a third.
8  I don't know why they didn't -- they instead
9  wanted to work with Rosenbaum rather than
10  collect $4 million from him, which I don't
11  really get either.
12     Q.   Other than the storage facility in
13  Middletown, New York, where a lot of these
14  artworks now reside, do you have any other
15  storage facilities where you keep artworks or
16  documents?
17     A.   No.
18     Q.   Do you have any other locations
19  than your Katonah studio or this storage
20  facility where you keep Indiana artwork or
21  documents related to Robert Indiana?
22     A.   No.
23     Q.   How long has Oz Gonzalez worked for
24  you?
25     A.   We had that debate.  I'm not sure;

Page 68

1
2  it's either two or three years.
3      Q.   What did he -- what did he do for
4  you when he worked for you?
5      A.   Well, he -- I knew him previously,
6  and he was an attorney, and he came on to
7  consult the legal matters at hand.  I was
8  looking for another attorney, and I thought I
9  would possibly hire him, and he told me that
10  he retired.  We found out that wasn't exactly
11  true later.
12     Q.   You are aware that he has been
13  disbarred as an attorney, correct?
14     A.   Yes.  I was unaware of the terms of
15  his disbarment until relatively recently, and
16  I was fairly shocked of those terms.  And I
17  frankly conferred with the people at the bar
18  association to make sure that what I thought
19  I was reading was true, and they confirmed
20  everything, which is very upsetting to me.
21     Q.   Can you describe for me the types
22  of things that Oz Gonzalez did for you when
23  he worked for you?
24     A.   Well, mainly he was on the phone
25  with the various attorneys that I worked

Page 69

1
2  with, specifically Mr. Markham, Zerner.  And
3  he also, previous to that, worked often and
4  daily with Mr. Simone.  And he also went up
5  to Maine and negotiated a mediation
6  settlement as essentially the principal
7  attorney, which, you know, we now understand
8  it's illegal so it's little -- we felt like
9  we were lied to from day one with Mr.
10  Gonzalez.
11     Q.   Well, Mr. Gonzalez is not your
12  attorney in this litigation, is that correct?
13     A.   No.  But his -- his disbarment,
14  which happened -- he was disbarred twice as
15  it turns out.  And the terms of disbarment
16  prevented him from speaking to anyone on any
17  matter regarding anything legal, and that's
18  clearly not what he complied with in the
19  course of the last two or three years here.
20  He was speaking with our attorneys in very
21  complicated legal matters on a daily basis
22  and then conferring with me on a daily basis
23  about legal things, and that is what he was
24  paid to do, which is not what he was allowed
25  to do.

**MAGNA**
LEGAL SERVICES

Page 70

```
 1
 2      Q.  Did you have an engagement letter
 3  or retention letter or employment contract
 4  with Mr. Gonzalez?
 5      A.  No.  It was a handshake deal.
 6      Q.  Do you have an engagement letter or
 7  retention letter with Ms. Zerner's firm?
 8      A.  Yes.
 9      Q.  Did you have an engagement letter
10  or retention letter with Mr. Simone's firm?
11      A.  Yes.
12      Q.  What about with Mr. Dowd's firm?
13      A.  Yes.  But none of them have a
14  decree from the bar association saying not to
15  confer to anyone about anything of a legal
16  matter.  None -- none of the three people you
17  mentioned are prevented from conferring with
18  someone about any legal matters, which I'm
19  told, by the way, is illegal and has jail
20  time associated with it.
21      Q.  Did ask you Mr. Gonzalez to help
22  you collect documents as part of this case?
23  Was he one of the people that helped collect
24  documents and information to produce in this
25  case?
```

Page 71

```
 1
 2      A.  I'm not sure.  He reviewed a lot of
 3  the documents and then made a lot of comments
 4  about what the documents meant and also made
 5  comments of what he felt I should do in
 6  relationship to just about every document
 7  that came in.  So I don't know if that's what
 8  you are asking or not; I can't tell.
 9      Q.  More specifically I'm asking, you
10  know, as part of the process where you or
11  your assistants or Mr. Dowd's firm went
12  through your computers and went through your
13  studio for hardcopy documents looking for
14  documents to produce in this litigation, did
15  Mr. Gonzalez also do those types of
16  activities?  Go through your computer or
17  emails or hardcopy documents in your studio
18  or home to look for documents to give over to
19  Morgan Foundation in this litigation?
20      A.  Yes.
21      Q.  He did?
22      A.  Yeah.
23      Q.  Okay.  Did he help you in the
24  fabrication or creation or sale or
25  distribution of any Indiana art works?
```

Page 72

```
 1
 2      A.  He doesn't know anything about art
 3  or how to sell it.  He claimed that he did;
 4  that was part of what he sold himself as
 5  doing but it was abundantly clear, we gave
 6  him a few books and projects; he claimed he
 7  knew a whole bunch of people, in specifically
 8  in Bronxville and those areas, that he could
 9  sell art to.  And we did that for a few weeks
10  and it became very clear that all we were
11  going to do is spend a huge amount of our
12  time giving him materials but nothing would
13  transpire from it.  He wouldn't sell any --
14  didn't sell any art in the three years he was
15  here.
16          Does that answer your question or
17  no?  Hello?  Did it freeze?
18      Q.  No.  I didn't freeze.  I'm -- I'm
19  reading your answer to see if it answered my
20  question.  I think it did.  Thank you.
21          Does he live on your property?
22      A.  Yes.
23      Q.  Does he still work for you?
24      A.  No.
25      Q.  Who is Greg Allen?
```

Page 73

```
 1
 2      A.  He is an art consultant that
 3  formerly directed a few different studios and
 4  was a -- one of the people who ran Peter
 5  Max's studio.  He has a number of fairly high
 6  profile collectors that he works with.  I
 7  know him for probably 12 years.
 8      Q.  Do you work with him to sell
 9  Indiana art works?
10      A.  Yes.
11      Q.  Can you describe to me how you work
12  with him to sell Indiana art works?
13      A.  He calls me up and says, I have
14  somebody who wants to buy a Robert Indiana
15  artwork, do you have it?
16      Q.  And how long -- how long has that
17  arrangement been going on for?
18      A.  Since I started with Robert
19  Indiana, he was one of the first -- I believe
20  he bought some Books of Love going all the
21  back to 1995, '96.  But more recently, when
22  we started the HOPE stuff, he was one of the
23  people who sold a number of the Barack Obama
24  HOPEs, so he was in on it from the beginning.
25      Q.  Where does he live?
```

Page 74

1
2      A.  Various places actually.  He has a
3  place up here near me in the country.  He has
4  a studio house and office in West New York.
5  And I believe he has an apartment on
6  Riverside Drive.  And I can't tell; either he
7  stays with clients or -- I know he had a
8  place in Malibu for several years.  And I
9  think he has a place in Las Vegas because --
10  or he has a lot of clients there.  I don't
11  really probe into what he owns and doesn't
12  own, but he is in Las Vegas a lot with
13  clients.  I think he's got a place there as
14  well.
15      Q.  Do you have his contact information
16  available if I could ask you to give it to
17  your attorneys to give to me after the
18  deposition?
19      A.  Absolutely.  He would love to talk
20  to you.
21      Q.  Great.
22      Did you ever speak to Greg Allen
23  about transferring art works to him that he
24  would then transfer to trusts that were set
25  up to benefit your children?

Page 75

1
2      A.  I spoke to Gregory Allen about
3  buying all the work.  He had two or three
4  different clients that were interested, you
5  know, after Mr. Nikas or whomever purported
6  to buy all the works, which I'm not sure
7  ended up as really an honest -- since they
8  never made a list.
9      He actually came forward and said
10  he'd like to -- he had clients that would bid
11  against that.  That depending on what I was
12  offered he might have clients -- three
13  different clients that would be interested in
14  purchasing all the work and/or purchasing
15  half the work or purchasing with the estate
16  or any way that it could be set up.
17      Q.  When did you have that conversation
18  with him?
19      A.  Right after the first time it was
20  offered to me to sell all the work.  I
21  thought, well, if I'm going to sell all the
22  work, like if I'm going to sell a car, you
23  know, if the first person wants to buy the
24  car and I decide I'm going to sell it and
25  that person doesn't come through and I've

Page 76

1
2  already made a mental commitment to selling
3  it, I'm going to sell it to somebody else.
4      So he -- he is somebody that's been
5  buying -- I mean, I know he's -- he's gotten
6  in front of clients that have bought Rothkos.
7  Those are big ticket items.  And he has also
8  gotten in front of clients that bought major
9  Warhols, and those are big ticket items.
10      So I know he's got different
11  clients that -- that are very high -- you
12  know, high profile or if not high profile,
13  high-worth people and they were -- he was
14  quite anxious to buy everything.
15      Q.  Did that conversation happen this
16  year?
17      A.  Yes.
18      Q.  Did it happen after Mr. Nikas'
19  first visit up to your studio?
20      A.  I think it probably happened
21  before.  I mean, you know, there were points
22  at which I said to him that, you know, I'm
23  kind of sick of dealing with all this crap.
24      And he said, you know what, if you
25  want to sell everything, you know, we will

Page 77

1
2  give the estate its whatever, very
3  transparent.  The estate wants to -- if they
4  are entitled to get 30 percent, or whatever
5  the number is, you know, we'll -- we'll make
6  the check out in two parts; one part for the
7  estate, one part for you if you want to sell.
8  And you know, I kept that in the back of my
9  mind.  I still do, by the way.
10      Q.  And the works that he was offering
11  to purchase, those are Indiana works,
12  correct?
13      A.  He is interested in actually buying
14  everything.  He is interested in the Katz,
15  the Cottingham, and Indiana.  That's -- which
16  is, you know, I don't know if he is
17  interested in the Stella, the Lichtenstein or
18  the Rivers or the other things I have.  But
19  those three, and possibly Sultan, but
20  certainly those three.  He was interested in
21  buying all the Indiana, all the -- all the
22  Katz and all the Cottingham.  And possibly
23  all the Picassos as well.
24      Q.  Did you speak to Mr. Allen about
25  transferring those works to trusts that were



Page 78

1
2   set up in your son's name?
3       A.  I don't have a trust set up in my
4   son's name.
5       Q.  Did you ever speak to Mr. Allen
6   about setting up trusts in your son's name?
7       A.  Mr. Allen doesn't set up trusts;
8   it's not what he does.  He is an art dealer.
9       Q.  Okay.  But that's not my question.
10      My question is did you ever speak
11  to him about transferring these works to
12  trusts that are set up in your son's name?
13      A.  No.  It's not what he does; he is
14  an art dealer.
15      MS. ZERNER:  If I could -- I'm
16      sorry to interrupt, Maaren.  I'm just
17      being sure.  Construction just seems to
18      have started outside my window, and I
19      didn't know if you could hear it.  If I
20      need to move.
21      MS. SHAH:  I can't here it.  It's
22      not bothering the audio quality on my
23      end.
24      MS. ZERNER:  Okay.
25      THE WITNESS:  Yeah.  I don't hear

Page 79

1
2   it either.
3       MS. ZERNER:  Sorry.  Okay.  Great.
4       MS. SHAH:  Thank you.
5       Q.  How many conversations did you have
6   with Greg Allen about potentially purchasing
7   all these Indiana works?
8       A.  I don't know.  We talk about it
9   often.  He is still very interested.  And
10  he's got three different clients, so he says
11  that each one of which is a high-net-worth
12  individual, one of whom apparently inherited
13  inherited quite a large amount of money and
14  is looking for investments.
15      So, and I know other people as well
16  that have purchased from me in the past or
17  that I know from other businesses, I -- you
18  know, I consult with several high profile,
19  very high-net-worth developers who also would
20  have -- and also, I have another friend
21  that's a -- he's a Wall Street guy who sets
22  up deals.  So I have people that would be
23  interested in purchasing entire lock, stock
24  and barrel; not just Gregory Allen, but
25  others as well.

Page 80

1
2       Q.  Did you ever apprise the estate
3   that you were thinking of selling the Indiana
4   works to Mr. Allen?
5       A.  It's none of their business.  It's
6   my work.  And under all the terms of the
7   contract, I'm the one who gets to sell it.
8       So going through that kind of
9   nonsense, after -- frankly, the whole estate
10  is in terrible trouble with the State of
11  Maine.  They are accused of so many things.
12  You know, to go put a lot of trust in James
13  Brannan right now, I don't know if that's a
14  clever idea because he's got a 50/50 chance
15  of being in bankruptcy and a 25 percent
16  chance of being in jail.
17      Q.  So is that a no, that you never
18  apprised the estate that you were thinking of
19  selling the works to Greg Allen?
20      A.  Oh, no.  The answer was it's none
21  of their business.  That's the answer.
22      Q.  My question, though, is did you
23  ever tell them you were thinking about
24  selling the works to Greg Allen, yes or no?
25      A.  And the answer remains.  It's none

Page 81

1
2   of their business.  I frankly don't want to
3   have anything to do with them until they can
4   straighten out whether or not they are
5   crooks.  I don't really want to deal with
6   crooks.  I --
7       Q.  So you did not tell them?
8       A.  The answer is I don't deal with
9   crooks.  They're crooks right now.  Until
10  they can be proven otherwise right now
11  they're thieves.
12      Q.  Is there a reason you don't want to
13  answer the question I'm asking?
14      A.  No.  The answer is the -- what I've
15  given you.  Is that it's none of their
16  business and none of yours either.
17      Q.  And so you did not -- you have not
18  told them that you were thinking about
19  selling the works to Greg Allen.
20      Am I correct in that assumption?
21      A.  Well, they -- they should be able
22  to figure out that once they make an offer to
23  buy everything, that they've opened up
24  Pandora's Box to sell everything.  Because
25  nothing in the contract that prevents me from



Page 82

1
2    selling it in one piece.
3         So once they've offered to buy it
4    in one piece, which they -- how long ago now?
5    I've had conversations with Mr. Zaretsky,
6    what is it, six, seven months ago?  So I
7    don't know.
8         You know, they've opened up the
9    idea that maybe you should just sell
10   everything and, you know, now I agree with
11   them.  Maybe I should just sell everything.
12       Q.  Okay.  I'm going to assume from
13   that answer that you have not apprised them
14   that you were thinking of selling the works
15   to Greg Allen, and you correct me if that is
16   wrong, okay?
17       A.  It's none of their business, like I
18   said.  I'm not going to -- I don't have to
19   apprise anybody of anything.
20         (Simultaneous crosstalk.)
21       A.   -- they don't have any rights -- if
22   they asked me I would tell them probably
23   because I don't care.  But in terms of my
24   rights, I have every right to sell
25   everything.  And frankly, if I didn't, then

Page 83

1
2    you couldn't come to approach me to buy
3    everything.  So what else -- what is there?
4        Q.  And you did not apprise Morgan Art
5    Foundation or Mr. Nikas that you were
6    thinking of selling the Indiana works to Greg
7    Allen, is that right?
8        A.  Nikas opened up the floor to sell
9    everything, and he hasn't come through.  And
10   it doesn't appear, from what we can tell,
11   that it's been an honest offer at all.
12        We feel that it's been a dishonest
13   offer that has not been followed up in a way
14   that has anything resembling honesty.  And
15   that I honestly want to sell everything
16   because it will free up my house and my
17   space.  So that's your answer right there.
18       Q.  All right.  I'm going to assume
19   from that answer that you have not apprised
20   Mr. Nikas or Morgan Art Foundation that you
21   were thinking of selling those works to Greg
22   Allen --
23         (Simultaneous crosstalk.)
24       Q.  So, just for the record, my
25   question was I'm going to assume from that

Page 84

1
2    answer that you have not apprised Mr. Nikas
3    or Morgan Art Foundation that you were
4    thinking of selling the works to Greg
5    Allen --
6         (Simultaneous crosstalk.)
7          -- and you can please correct me
8    now if that assumption is wrong.
9        A.  No.  That's 100 percent right.
10       Q.  Okay.
11       A.  And the more you talk, the more I
12   think I will sell it -- I think I'll just
13   sell it tonight.  I'm kind of sick of the
14   lies.
15       Q.  Who would you sell it to tonight?
16       A.  All the people I just mentioned
17   before.
18       Q.  You only mentioned Greg Allen.  Who
19   else are you thinking about selling it to?
20       A.  I -- I told you that there are
21   several other people that I work with that
22   are developers, and Greg Allen himself has
23   got three different people that want to buy
24   it.
25       Q.  Can you give me the names of anyone

Page 85

1
2    else you are thinking of selling the work to?
3        A.  Nope.
4        Q.  Do you know the names?
5        A.  I might.
6        Q.  Is that a yes or a no?
7        A.  None of your business.
8        Q.  That's not the question.
9        A.  Well, that's the answer.  You are
10   asking me personal information about my
11   business that you have no right to ask.
12        That's the answer.  I'm not going
13   to start opening up people to you given that
14   everything you've done thus far has been, at
15   best, suspect and, at worse, illegal.
16         MS. ZERNER:  Mr. McKenzie, when --
17   since a question isn't pending, I would
18   like to take a break and speak with
19   Mr. McKenzie.
20         MS. SHAH:  That's fine.
21         THE VIDEOGRAPHER:  Off the record
22   at 1:46 p.m.
23         (Recess.)
24         THE VIDEOGRAPHER:  On the record at
25   2:01 p.m.

MAGNA
LEGAL SERVICES

Page 86

```
 1
 2       Q.   Hi, Mr. McKenzie.  Can you hear me?
 3       A.   Yes, perfectly.
 4       Q.   Great.  Thank you.
 5            Coming back to Greg Allen, how do
 6  you typically communicate with Mr. Allen?  Is
 7  that over email?  Over the phone?  A
 8  combination of the two?
 9       A.   And in person as well.
10       Q.   Okay.  So email, phone and in
11  person, is that right?
12       A.   Mainly phone and in person.
13            MS. ZERNER:  Mr. McKenzie, you do
14       sound a little far away to me.  I
15       think -- I don't know where your phone
16       is, if it's different from where it was
17       before.
18       Q.   Have you ever emailed with Greg
19  Allen about Indiana works?
20       A.   Probably.
21       Q.   Do you keep or have any invoices of
22  Greg Allen sales of Indiana works that were
23  produced by you?
24       A.   Possibly.  I would have to look.  I
25  mean, it's -- again, it's mainly, I know him
```

Page 87

```
 1
 2  for quite many years.  A lot of it is
 3  handshake deals.
 4       Q.   How many Indiana works do you think
 5  he has sold for you?
 6       A.   Since the very beginning?
 7       Q.   Yeah.
 8       A.   I think from the very beginning he
 9  bought six or seven HOPE paintings, maybe one
10  or two sculptures, and possibly 10 or 12 HOPE
11  prints.  And he also bought three or four
12  Cottingham paintings, I believe a Sultan
13  painting, and I'm not really sure what else.
14       Q.   Did he buy any of the Bob Dylan
15  works?
16       A.   Not to my knowledge.  He was very
17  interested in it, but I don't think any --
18  anything transpired.
19       Q.   Did he buy any LOVE works?
20       A.   I believe he bought a Book of Love
21  several years ago.
22
23       Q.   What about any ART, A-R-T, or EAT,
24  E-A-T works?
25       A.   I don't think so.  I don't recall
```

Page 88

```
 1
 2  him having a real interest in that either, to
 3  tell you the truth.
 4       Q.   Do you keep any records of your
 5  sales to or through him?
 6       A.   Yes.
 7       Q.   Do you know whether or not you've
 8  provided those records to us in this case?
 9       A.   No.  I'm still owed 3 and a half
10  million dollars from back royalties, so got a
11  long way to go.
12       Q.   Was that a no, you don't know; or
13  no, you have not provided them?
14       A.   I'm not -- what was the question
15  again?
16       Q.   The -- let me ask it a better way.
17  Have you provided those records to us as
18  part of this case?
19       A.   No.
20       Q.   Are there any other records of your
21  sales of Indiana works that you have not
22  provided to us as part of this case?
23       A.   I don't think so; not that I can
24  think of.
25       Q.   Have you ever been advised by
```

Page 89

```
 1
 2  anyone that selling or transferring works to
 3  Greg Allen would constitute a fraudulent
 4  transfer?
 5       A.   No.
 6       Q.   Have you ever discussed with anyone
 7  the idea of a fraudulent transfer when it
 8  comes to Indiana works or this case?
 9            MS. ZERNER:  Object -- I'd just
10       like to make -- wait one second,
11       Mr. McKenzie.
12            I just want to object to the extent
13       he has consulted with attorneys and this
14       calls for attorney/client privileged
15       communications.
16       Q.   Okay.  Let's -- let's start with a
17  yes or a no answer to that question, and then
18  we can take it from there to make sure you
19  don't reveal privileged information.
20       A.   I don't even know what you are
21  talking about to tell you the truth.
22  How could -- how would be selling a work to
23  anyone be fraudulent?  Tell me.
24       Q.   Well, I can think of a number of
25  ways.  But my question is --
```

MAGNA
LEGAL SERVICES

Page 90

1
2      A.  I can think of none so --
3      Q.  Okay.
4      A.  -- to me, it's a nonsensical
5  question, and the answer is no.
6      Q.  All right.  So the answer is no to
7  the question have you ever had a discussions
8  with anyone about fraudulent transfer when it
9  comes to Indiana works?
10     A.  No.
11     Q.  Have you ever made a plan with
12 anyone to conceal assets in order to protect
13 it from judgment in this case?
14     A.  I'm not sure what you are asking.
15 What now?
16     Q.  Have you ever had any discussions
17 with anyone about concealing assets in order
18 to protect them from judgment resulting from
19 this case?
20     A.  No.  I had discussions with an
21 attorney about setting up estate for my
22 children --
23     MS. ZERNER:  Mr. McKenzie, I just
24     want to make sure unless you choose to,
25     that you -- you know, if you want to

Page 91

1
2      protect your attorney/client
3      communications to not to divulge the
4      subject matters that you discuss with
5      your attorneys.
6         THE WITNESS:  Okay.
7      Q.  I'm not going to ask anymore about
8  that.
9         Are you continuing to print or
10 fabricate Indiana works?
11     A.  Yes.
12     Q.  Have you been continuing to print
13 or fabricate Indiana works throughout this
14 litigation?
15     A.  100 percent.
16     Q.  What works?  What are the images?
17     A.  HOPE.
18     Q.  Paintings?
19     A.  Yeah.
20     Q.  Prints?
21     A.  No.
22     Q.  Sculptures?
23     A.  Yes.
24     Q.  Have you been selling Indiana works
25 during the pendency of this litigation?

Page 92

1
2      A.  Yeah.
3      Q.  Have you produced the records of
4  those sales in this litigation?
5      A.  Not yet.
6      Q.  Have you produced the records of
7  the fabrications that you have done during
8  the pendency of this litigation?
9      A.  I wouldn't -- who would I produce
10 them for?
11     Q.  Have you given them to your
12 attorneys to give to us?
13     A.  No.  I don't know who "us" is
14 because I don't really know who is who in the
15 game anymore.  You've got yourself purporting
16 to be the Star of Hope.  You've got the Star
17 of Hope, I don't know who they are anymore.
18 You've got the estate that's basically under
19 investigation in Maine.
20         So I really don't know who's who on
21 your side or what rights they have under any
22 circumstances.  I -- I don't know anymore.
23 There's a lot of -- everyone is against
24 everyone.  Morgan is against the estate.  The
25 estate is against Morgan.  So I don't know

Page 93

1
2  who's -- who's who.  I really don't and
3  neither does anybody else.
4      Q.  Okay.  But am I correct that you
5  have not turned over to your attorneys to
6  produce in this litigation records of the
7  Indiana works that you've been producing
8  during this litigation?
9      A.  Absolutely not.
10     Q.  Absolutely not, you have not turned
11 them over?
12     A.  Absolutely not.  That means
13 completely not and no and never.  Maybe when
14 something comes that makes sense, I can show
15 it, but right now, it doesn't make sense.
16     Q.  For the Indiana works that you have
17 been producing during the pendency of this
18 litigation, have you been stamping them on
19 the back with the Indiana stencil?
20     A.  Exactly as the Supreme Court asked
21 me to do.
22     Q.  What Supreme Court?
23     A.  New York Supreme Court.
24     Q.  What are you referring to when you
25 say, "the Supreme Court asked me to do"?



Page 94

1
2      A.  We sat down with the estate and the
3  Judge Schecter.  And Judge Schecter said she
4  didn't like to break up a winning team, that
5  I had made over $10 million for Indiana, and
6  I should continue to make and fabricate art.
7      So I'm doing what the judge asked
8  me to do.
9      Q.  When did this conversation occur?
10     A.  I can tell you exactly if I can
11  spend a minute looking for it.  It wasn't a
12  conversation.  It was -- it was a court
13  appearance that got ruled on by the judge.
14      For some reason I'm not finding it,
15  but we can send it to you.  It's a -- it's a
16  Supreme Court ruling signed by
17  Judge Schecter --
18     Q.  Okay.
19     A.  -- which I'm sure you have in your
20  files somewhere.
21     Q.  And when you stamp the back of the
22  works that you've been -- the Indiana works
23  you've been fabricating with the Indiana
24  stencil, is the date that is stamped on the
25  back a date that precedes 2018 or that

Page 95

1
2  post-dates 2018?
3      A.  It would be the date of when we
4  began that particular edition.  So if an
5  edition was of seven and we only printed one,
6  which happened a lot, so we have the right to
7  do six more or five more, whatever the number
8  is.
9      And if that was started in 2012,
10  then we have to use the stencil from 2012.
11  If it was started in 2015, we have to do it
12  in 2015.  If it was done in 2017, we have to
13  do it in 2017.  Because that's the rules and
14  regulations that are set up by the College
15  Art Association for how you continue the
16  artwork of an artist who deceases.
17      You have to make it exactly as he
18  identified it, in the same time and as when
19  he did it.  So the same would be true with
20  the sculptures.  The same would be true for
21  paintings.
22      Prints are trickier because --
23  first of all, I don't know -- there was only
24  one print edition that we started that we
25  didn't finish and, frankly, I'm not that

Page 96

1
2  interested in finishing it.  It's too much
3  work and doesn't return enough money.
4      I don't know if that answers your
5  question or not.  And I found the Supreme
6  Court order.  I have it in my hand.
7      It's from Honorable Jennifer G.
8  Schecter, S-C-H-E-C-T-E-R, and she is
9  determining that we should continue to
10  fabricate art pending whatever happens in the
11  arbitration.  So that's, we are following the
12  letter of the law from the Honorable Jennifer
13  G. Schecter, Supreme Court of the State of
14  New York, New York County.
15     Q.  Okay.  Thank you.
16     A.  And it's signed 9/22/2019.
17     Q.  Thank you.
18     A.  But we don't -- until another judge
19  reverses that, we are going to obey what the
20  judge asked us to do.
21     Q.  I assume you have that paper
22  sitting in front of you, is that right?
23     A.  I do.  Yeah, I sure do.
24     Q.  Do you have any other papers
25  sitting in front of you?

Page 97

1
2      A.  Yes.
3      Q.  Can you tell me what they are?
4      A.  I have a lot of papers sitting in
5  front of me.  Not that many relate to you.  A
6  whole bunch of real estate paperwork here for
7  one thing.  But I just happened to find this
8  mixed in with whatever else, things from
9  Barbara Moses.
10     Q.  Is there -- are there any other
11  papers sitting in front of you that you've
12  referred to during this deposition, looked
13  at?
14      A.  No.  You just happened to bring
15  this one up, so I had a feeling you would
16  because --
17     Q.  Okay.
18     A.  -- you have some kind of ridiculous
19  story that I'm forging things, but I'm only
20  following the order of the judge.  So you
21  might want to call the judge and tell her she
22  doesn't have any right to do what she says or
23  stop saying that I'm forging things.
24      MS. ZERNER:  Mr. McKenzie, if you
25  could wait for a question and then



Page 98

1
2      answer the question, that would be
3      helpful for all of us in getting through
4      today.
5          THE WITNESS:  Okay.
6          MS. ZERNER:  Thank you.
7          THE WITNESS:  Okay.
8      Q.  Can you tell me what orders from
9  Judge Moses you have sitting in front of you?
10     A.  Orders scheduling the conference.
11 Namely about these conferences, just the
12 timing of it.
13     Q.  Can you give me the dates on each
14 of those orders?
15     A.  Oh, Christ.  This is 8/31/2021.
16 Another one here.  And this is -- this is a
17 letter to Judge Moses from you, whatever that
18 is.  I don't see the date; August 30th.
19         And that's what I've got.
20     Q.  Okay.  Going back to Mr. Nikas'
21 second visit up to your studio.
22         Are you aware that Mr. Nikas and
23 his associates while he -- while they were
24 there took photographs of various documents
25 and art works that are related to this

Page 99

1
2  litigation?
3      A.  Yes.
4      Q.  And are you aware that none of
5  those documents or photographs of the art
6  works had been produced before in this
7  litigation?
8      A.  It seemed to me that, you know, if
9  I have a whole book which was given to you
10 and all kinds of other things, that it's very
11 redundant.  So once you have a picture of one
12 thing, why do you want to have it five times?
13         So you might have a decision that
14 you want to have the same thing 30 times.  We
15 may have the decision that it's redundant.
16 So I didn't really see anything there that
17 you didn't have.
18         You know, clearly, you had the
19 whole book Robert Indiana A to Z in this.  I
20 don't know how many hundreds of things in
21 there.
22         And then we supplemented that with
23 I don't know how many thousands and thousands
24 of things more.  At a certain point, you
25 know, when I got things from you, you had the

Page 100

1
2  same thing, same magazine article reproduced
3  16 times.  I don't know why I need that.  To
4  me it seems obnoxious really I think is the
5  word that comes to mind.  I didn't want to be
6  obnoxious and give you the same thing 16
7  times.
8      Q.  So was it you that made the
9  decision not to produce things that you
10 believed were redundant?
11     A.  No.  That was -- again, that was
12 Mr. Dowd.  He was the one who initiated all
13 this stuff.  And I didn't even have anything
14 to do with it other than I opened up all
15 my -- my records to them to do whatever they
16 wanted, all my studio, all my staff and all
17 my computers and phones.  I mean I can't do
18 anymore than that.
19         I don't know what they did or
20 didn't do or submit or not submit or what
21 they thought was important or not important.
22 I didn't plug into any of that.  They just
23 stayed here for days and hours and took
24 whatever it was they felt was relevant to
25 this case.

Page 101

1
2      Q.  Okay.  I'm going to show you some
3  of the photographs of -- of the documents and
4  materials that we photographed in your studio
5  next.
6          MS. SHAH:  And I would like to
7  start with Exhibit 4.  Broderick, I'm
8  going to ask you pull up on the screen a
9  series of exhibits one after another.
10         Mr. McKenzie, if you can look at
11 them as we pull them up and mark them,
12 and then I am going to ask you questions
13 about all of them together.  Just let me
14 know if it's confusing.
15         Broderick, my apologies.  It's
16 tab 1, Exhibit 4.
17         (Exhibit 2, Docket 393-4 Art
18 archive printout of Book of Love covers,
19 marked for identification.)
20     Q.  All right.  This is a document that
21 was attached as Docket 393-4 on the docket in
22 this case.  It's dated at the bottom 3/23/17.
23 We are going to mark it as Exhibit 2.
24         And I will show you a few more of
25 these, Mr. McKenzie.



Page 102

1
2        But just to start, can you see the
3  document in front of us?
4      A.  Yes.
5      Q.  Can you tell me what this is?
6      A.  This is one of the things that is
7  from the -- what we call the art archive,
8  which, unfortunately, is defective.  So we
9  are not always sure how accurate it is.
10       These are Book of Love things.
11  These were the -- the covers of the Book of
12  Love.  I think that's what it is; namely, the
13  covers to the Book of Love, which was a
14  1993/1994 project.
15      Q.  What is the art archive that you
16  just referenced?
17      A.  Somebody -- I think it may have
18  been Katie, the person that we referenced
19  before, had knowledge of an art archive,
20  which is a very complicated program that I
21  think she knew how to run -- I'm not sure
22  that we know how to run -- which you can add
23  things into and subtract.  I don't know if we
24  know how to subtract.  I don't know if we
25  have added properly.

Page 103

1
2        So we have this whole record in
3  this art archive, which none of us is really
4  quite sure is accurate, unfortunately.  And
5  that's why we were hoping that if you came
6  here for all those hours and went through
7  every last piece and documented it, that we
8  would be able to compare that to out art
9  archive and correct it.  But, unfortunately,
10  it doesn't -- doesn't seem like anyone did
11  an -- any attempt to really see what was
12  here.
13      Q.  Does the art archive list all of
14  the Indiana works that you have produced over
15  the years?
16      A.  Like I said, we are not sure of its
17  accuracy because the person who started it,
18  I'm not sure who it is, but whoever it was no
19  longer works here.  And various people went
20  through it over the course of the last many
21  years and none of us, at least now, really
22  are certain that we know how to navigate the
23  art archive.  And we are not sure if people
24  along the way knew how to navigate the art
25  archive either.  So we can't really tell you

Page 104

1
2  that what's in there, in the art archive, is
3  really accurate to what we have.
4      Q.  Okay.  Apart from whether it's
5  accurate or not, was the intent to catalogue
6  the Indiana works that you produced over
7  time?
8      A.  Yeah.  That was -- the idea was to
9  actually know not only what we had but where
10  it was in the studio.  Was it upstairs,
11  downstairs, back.  I don't know that we got
12  that far.  I don't know.  Like, I don't
13  really plug into this much.  I only get the
14  report from others of what's happened and
15  not.
16      Q.  And does this art archive that we
17  are looking at also list, for example, you
18  know, if the work was sent to an exhibition
19  or if the work was sold to a particular
20  person or sent to Rosenbaum for example?
21      A.  Well, it seems to say that here; so
22  I guess yes, it does.  And the intent was to
23  be able to track everything.  You know, we
24  didn't quite get it together.  Because, like,
25  the people that have been doing it for the

Page 105

1
2  last several years, I don't think anyone has
3  a firm grip on the art archive.  I know I
4  don't.
5      Q.  Who has been managing it for the
6  last several years?
7      A.  It's gone from person to person to
8  person as people came in and out of here.
9      Q.  Can you give me any of their names?
10      A.  Well, I know Katie was on top of
11  it.  I'm not sure if she is the one who
12  initiated it.  I'm not sure.  Annette seems
13  to be the one who knows the most about it
14  now.  And in between, there was a woman who
15  worked here and I can't even remember her
16  name.  That was really way back, probably
17  2011 or '12.  Blond hair.  She was here for
18  about six months specifically to do this, but
19  I'm not in touch with her.  I don't know what
20  she does or where she is.  I don't know if
21  there is anybody else, but we kind of lost a
22  handle on it when Katie left.
23      Q.  When did Katie leave?
24      A.  I'm trying to remember.  I'm going
25  to say 2015, 2014.

MAGNA ◆
LEGAL SERVICES

1
2      Q.  Do you know if Annette has
3  continued to update the art archive with the
4  HOPE works you've been fabricating recently
5  for example?
6      A.  I'm not sure.  You know, I don't
7  really -- I don't know if she knows art
8  archive as well as she needs to.  I know when
9  we ask her to get something from art archive,
10  it doesn't always work out.
11      You know, we are just not -- it's a
12  good program, but whoever started it knew how
13  it worked.  I don't think we've had another
14  person who really had the full idea of what
15  this program does.  It's apparently very,
16  very complicated.
17      Q.  But Annette has the art archive
18  records available to her to check, is that
19  right?
20      A.  I think so.
21      Q.  And you have the art archive
22  records available to you to check, right?
23      A.  I wouldn't know where to begin to
24  check the art archive.  I wouldn't know how
25  to open it, where it is, how to get there or

1
2  anything else.
3      Q.  Is it an electronic program?
4      A.  I'm not sure.  I think we rent it
5  by the month.  I'm not even sure.  I don't
6  know if it's a -- if it's old disks or if
7  it's a rental by the month.  I don't really
8  know how it works.  I know every time --
9      Q.  But it -- sorry.  Go ahead.
10      A.  Every time I try to plug into it, I
11  realize it's way beyond my ability to do
12  anything with it.
13      Q.  It's on the computer, is that
14  right?  Do I understand that correctly?
15      A.  I think so.  I don't know if it's
16  in the cloud or on the computer.  I really
17  don't know much about it.
18      Q.  But it's electronic, it's not
19  hardcopy written documents, correct?
20      A.  Yes.  But I think we print it out
21  from time to time too; otherwise, how did you
22  get this?
23      Q.  Yeah.  Are we looking at a
24  printout?
25      A.  Yeah.  It looks like a printout to

1
2  me.
3      Q.  And do you have some of the
4  printouts around your studio?
5      A.  Like I said, I don't know.  Maybe.
6  I guess so.  This -- this looks like a
7  printout and it comes from the studio, so the
8  answer must be that somewhere someone has
9  printed it out over the years somewhere.
10      Q.  In No. 7, the entries under No. 7
11  LOVE red metal, the second row there is a
12  notation that says, "G. Allen bought:
13  3/23/14," and then it says, "consigned to
14  Gregory Allen 8/23/13."
15      Do you see that?
16      A.  Yes.
17      Q.  Is that the same Greg Allen we've
18  been discussing?
19      A.  Certainly.
20      Q.  Okay.  And everywhere it says Greg
21  Allen or G. Allen on this page, is that the
22  same Greg Allen we've been discussing?
23      A.  Yes.  And Rosenbaum is the same
24  Rosenbaum we've been discussing.  And these
25  go back to 2013, 2014.  I know he bought --

1
2  the original LOVE pieces that -- HOPE pieces
3  that we did for Obama, he was one of the one
4  or two most important purchases of those
5  pieces right from the beginning.
6      Q.  Which "he"?
7      A.  Gregory Allen.
8      Q.  Oh, Greg Allen.  Okay.
9      A.  Well, Rosenbaum came actually after
10  Gregory Allen.  Gregory Allen was there right
11  from day one.  He had come to the studio and
12  he was excited.
13      A lot of people didn't think that
14  Obama had any chance of being president.  So
15  when we kind of worked with him to make
16  things happen, there was a group of people
17  who didn't want to work with us because they
18  thought this guy isn't going to -- it's a
19  waste of time.  And then there were other
20  people who felt that he was an important
21  player and they wanted to be involved.  He
22  was -- he was a big supporter of Obama.
23  Rosenbaum less so.
24      Q.  Okay.
25      MS. SHAH:  If you could take that

Page 110

1
2    down, Broderick, and pull up tab 001,
3    Exhibit 5.  It's probably going to be
4    marked as 339-5 at the end.
5        (Exhibit 3, Docket 393-5 Art
6    archive printout listing Book of Love
7    books, marked for identification.)
8        MS. SHAH:  This is a document that
9    is on the docket in this litigation as
10   393-5.  It's dated at the bottom
11   3/23/17.  We are going to mark it as
12   Exhibit 3, please.
13   Q.  Do you see this, Mr. McKenzie?
14   A.  I think so.  It's more of the LOVE
15   metal pieces, right --
16   Q.  Yeah.  It appears to be part of the
17   same printout of the art archive listing Book
18   of Love Indiana books --
19   A.  Yeah.  I see it.  I got it.
20   Q.  Do you agree with me that that's
21   what this is?
22   A.  Yes.
23   Q.  The date at the bottom, do you see
24   that, 3/23/17?
25   A.  Yes.

Page 111

1
2    Q.  Does that indicate to you that this
3    was a printout from 3/23/17 of the art
4    archives?
5
6    A.  I can't tell you.  I don't know
7    enough about art archive to say yes or no to
8    that, but it's as good a guess as I would
9    give.  I don't know that it dates everything.
10   I can't tell you.  I don't use art archive so
11   I don't know how it works.
12   Q.  Okay.  And are you aware that -- so
13   this is another document that we photographed
14   during the inspection of your studio.  Are
15   you aware of that?
16   A.  No.  I wasn't here for that.  But
17   I'm seeing it now; I believe you.  What do
18   you want me to say?
19   Q.  And this is a document if it were
20   in your studio that you had available to you,
21   is that right?
22   A.  I don't know.  I don't know if this
23   document was printed out last week, 2013 or
24   2017.  I don't know if Mr. Dowd took pictures
25   of it or copied it or if it was -- I have no

Page 112

1
2    idea.  I can't answer.  It's a long time ago.
3    Q.  Okay.  If you'll look with me at
4    the top of the page, under the first block of
5    entries, it says, "Note, image to
6    Woodward."
7        Do you see that?
8    A.  No.  I don't see that.  Where is
9    it?
10   Q.  Do you see --
11   A.  Oh, there -- yeah, yeah, yeah,
12   yeah.  Got it.
13   Q.  Does Woodward refer to Woodward
14   Gallery?
15   A.  Yes.  It might refer to Christine
16   Woodward who is a partner in Woodward
17   Gallery.
18   Q.  Okay.  And did you sell Indiana
19   works through Woodward Gallery?
20   A.  Yes.  Pretty much, again, from the
21   beginning.  I think that they bought Obama
22   prints in 2008, and they continued to -- to
23   buy a little bit of Indiana.  But they bought
24   Alex Katz.  I think they bought some
25   Cottingham.  Different artists that I work

Page 113

1
2    with.
3    Q.  Okay.  And if you look at I guess
4    what I will call entry 13, it says "13 LOVE
5    (red metal)."
6    A.  Yes.
7    Q.  And then there is a chart
8    underneath it?
9    A.  Yes.
10   Q.  The second line in the chart there
11   is a note on the right that says, "Bates
12   Museum 2016 exhibit.  Used for Utica,
13   Allentown.  Returned."
14   A.  Okay.
15   Q.  Can you tell me what that refers
16   to?
17   A.  Both of those were museum exhibits
18   that we put together for Indiana.
19   Q.  Okay.  So --
20       (Simultaneous crosstalk.)
21   A.  -- Allentown.  There was some
22   reason why he wanted to show in Allentown.  I
23   can't remember what it was.
24       It was -- he wanted to show in
25   Utica because he was in the Air Force in

Page 114

1
2  Utica.  He was a quirky guy.  He would say
3  yes to things that were, I don't know,
4  questionable in my opinion and no to things
5  that were amazing for reasons that made
6  little to no sense.
7      You couldn't really predict what he
8  would say yes to.  He would -- he said no to
9  having an exhibit at the Metropolitan Museum
10 because he averred that no one goes there.
11     What am I going to tell him?  What
12 do you tell someone that says no one goes to
13 the Metropolitan Museum?
14     We sent him pictures of thousands
15 of people sitting on the steps in the middle
16 of June, and he still said nobody goes there.
17     At the same time he said let's have
18 a show in Utica because he was in the Air
19 Force there.  So what do you do?
20     MS. SHAH:  Broderick, you can take
21 that down and pull up tab 1, Exhibit 6,
22 393-6.
23     (Exhibit 4, Docket 393-6 art
24 archive printout for HOPE works, marked
25 for identification.)

Page 115

1
2      MS. SHAH:  This a document that's
3  filed on the court docket as 393-6 dated
4  3/23/17.  We will mark this as
5  Exhibit 4, please.
6  Q.  Mr. McKenzie, can you see this
7  document?
8  A.  Yes.
9  Q.  Is this also a printout from the
10 art archive inventory that you keep?
11 A.  I think so.  It looks like the same
12 thing.
13 Q.  This one lists Hope works, is that
14 right?
15 A.  Right.
16 Q.  Can you tell if these are
17 sculptures or paintings or prints?
18 A.  Well, they are printed on pieces of
19 metal.  What happened was when I tried
20 printing on metal in 1993, '94, both Bob and
21 I agreed that the fabrication in metal looked
22 horrible.  And I went back to it in 2000 or
23 so, and we still agreed that the fabrication
24 of the metal was horrible.
25     And then, in 2013 or so, I found,

Page 116

1
2  you know, because the evolution of metal
3  fabrication went into computers, so the
4  ability to make what looks like a portfolio
5  cover or a wall sculpture, all of a sudden
6  became pretty nice looking.  And the earlier
7  models that we made frankly looked -- they
8  just didn't look good.  You know, neither Bob
9  nor I liked it.
10     But when I found new fabricators
11 with the computers, both Bob and I were
12 excited to see what that looked like.  And we
13 produced -- we finished the LOVE project.
14 And then, once we did the LOVE project, he
15 said we should do some HOPE pieces.  I said,
16 You're right.  Let's do it.
17     So they are fabricated metal.  And
18 it results from a computer bending the metal
19 so that the metal is so perfectly bent and so
20 perfectly then painted that it almost looks
21 like a metal canvas.  All the corners are
22 really tight.
23     Previous to that we couldn't get
24 corners that were tight.  They looked really
25 messy.  And we couldn't get -- we had to

Page 117

1
2  either get the top and bottom or the two
3  sides, so you had two giant holes in it.  And
4  it just didn't -- it wasn't matching what in
5  our mind we thought we were going to be able
6  to make.
7      So when this new form of
8  fabrication came out, which is all computer
9  generated, we -- we liked it and we made
10 these pieces.
11 Q.  Thank you.
12     MS. SHAH:  If you can pull this
13 down, Broderick, and put up tab 1,
14 393-12.
15     (Exhibit 5, Docket 393-12 Art
16 archive printout for Aluminum Art,
17 marked for identification.)
18     MS. SHAH:  This is a document that
19 has been filed on the court docket under
20 No. 393-12, dated also 3/23/17 at the
21 bottom.  If we could mark this as
22 Exhibit 5.
23 Q.  Do you see this, Mr. McKenzie?
24 A.  Yes.
25 Q.  Is this another printout from the

MAGNA
LEGAL SERVICES

Page 118

1
2  art archive inventory that we've been
3  discussing?
4      A.  It appears to be, yes.
5      Q.  Up at the top it says, "aluminum
6  art" and then it lists a number of what look
7  like additions to me.
8          Can you explain what this notation
9  means?
10     A.  It's the same thing as the other
11  pages, which they're -- they're fabricated
12  metal that happens to be aluminum.  They are
13  fabricated and painted aluminum and then
14  screened with the word HOPE.
15     Q.  Up at the top right corner on the right
16  it says, updated 3/23/17.
17         Do you see that?
18     A.  Yes.
19     Q.  Do you have any reason to doubt
20  that this was the list that was updated as of
21  3/23/17?
22     A.  I'm not sure.  It be could be, as
23  soon as you open art -- whatever it is, art
24  archive, it just automatically confirms that
25  you opened it so it says updated.  I don't

Page 119

1
2  know.  Like I said, I don't know how art
3  archive works, and I have a feeling you don't
4  either; so neither one of us can really
5  comment on it.
6          I tried to figure out how it
7  worked.  I just -- it's not my thing.  It's
8  too complicated for me.
9          So I don't know if as soon as you
10  hit it, it might update.  If I send you an
11  email, it's going to update the date.  You
12  know, it is what it is.  It could well be the
13  same thing.  I don't know.
14     Q.  All right.  And all of these
15  printout pages from art archive we've been
16  looking at in Exhibits 2, 3, 4 and 5, are you
17  aware that these were not produced to us in
18  this litigation?
19     A.  I'm not aware.  I know there were
20  thousands and thousands and thousands of
21  pages of things produced in the litigation
22  and boxes and boxes of printouts and stuff.
23  I didn't regulate anybody from going into
24  anything I had.  I didn't really care if they
25  did or didn't.

Page 120

1
2          Like I said, I turned over my
3  computer.  I had the impression they were
4  looking more for things out of the computer
5  and emails, to tell you the truth.  And why
6  they didn't go to art archive, I can't tell
7  you.  I have no idea.
8          I wasn't the one making those
9  judgment calls.  That was really Ray Dowd and
10  his staff.  I mean, they were never prevented
11  from accessing anything I owned or had or,
12  you know, boxes or whatever.  I took them
13  every -- every single last, you know, inch of
14  everything I opened they had access to.
15         So if they didn't provide some
16  things, how would I know?  I wasn't even the
17  one sending it.  They were.
18     Q.  Did you ever tell Mr. Dowd or any
19  of his associates or any of your other
20  attorneys about the existence of art archive?
21     A.  I think so.  I mean, I think that
22  they -- you know, they spent quite a lot of
23  time here.  Again, I'm not an art archive
24  person.  But I'm pretty sure that they would
25  have said, Look, this is how we -- because

Page 121

1
2  I'm sure they would have asked, Well, how do
3  you determine what you have?  And somebody
4  would have given the answer, art archive.
5          I'm pretty sure.  Because we were
6  doing art archive since, I don't know when,
7  2000-- -- I don't know when we got it, 2015?
8  So by the time Mr. Dowd got in, clearly we
9  had art archive.
10         So why he -- you know, again, I'm
11  not a lawyer.  I don't know how discovery
12  works.  You know, it's just when somebody
13  says, Can I come over and look at everything
14  in your studio, the answer is yes.
15         Can we keep your computer for a
16  day?  Yes.
17         Can we keep your phone?  Well,
18  that's a little trickier.  If you are going
19  to keep my phone, I'm going to have to come
20  in the city and hang out in your office
21  because I don't want to -- I'm not going to
22  mail you my phone and hope I get it back.
23  It's not going to happen.
24         So when they took my phone, and
25  actually when they took my computer too, I



1
2  let them have it for, I don't know, six hours
3  and I waited in his office until they were
4  done and then took it home.
5       With this stuff, anything that was
6  here, they had full range of anything they
7  wanted to take, photograph, copy.  We have
8  Xerox machines.  Nobody was prevented from
9  doing whatever they wanted.
10      Q.  Do you know one way or another
11 whether or not information from art archive
12 was produced to us in this litigation?
13      A.  I have no idea.  You know, I
14 didn't -- there were too many things for me
15 to go over.  I didn't -- I can't remember if
16 there was 16,000 pieces that were sent over
17 or 26,000, some monstrous number that they
18 subtracted from -- and then however many
19 things came from everybody else.  I didn't
20 check anything anybody else.
21      So if my painter sent over 1500
22 things, if my -- if my printer sent over
23 2,000 things, I didn't look at it.  I didn't
24 ask him how many it was.  I didn't see if it
25 went to Mr. Dowd or went to somebody else or

1
2  the estate or you.  That's just something I
3  wouldn't really have anything to do with to
4  tell you the truth.
5       Q.  If you wanted to access the records
6  in art archive, you could ask Annette to
7  access them for you, is that right?
8       A.  I'm not sure.  Sometimes she can
9  open it and sometimes she can't.  You know, a
10 few times we went to open it, we couldn't do
11 anything.
12      So I don't know -- like I said for,
13 I don't know how many times I have said this.
14      I don't really know much about art
15 archive or how it works.  So I don't
16 necessarily -- or really I don't ask anybody,
17 Would you open art archive?  That's just not
18 something I would say.
19      Q.  Have there been instances that you
20 are aware of where she has been able to
21 access art archive?
22      A.  Yes.  And I don't know why yes and
23 why no.  I have no idea.
24      Q.  Okay.
25      MS. SHAH:  Broderick, you can pull

1
2  that down, please.  If you could put up
3  tab 1-15, which would be marked 393-15
4  (Exhibit 6, Docket 393-15 Photograph of
5  proofs of fabricated ART images, marked
6  for identification.)
7       MS. SHAH:  This is a document
8  that's been filed on the court docket as
9  393-15.  I'm going to mark this as
10 Exhibit 6 I think is where we are at.
11      Q.  Do you see this document,
12 Mr. McKenzie?
13      A.  Yes.
14      Q.  This is another photograph of a
15 document that we took while we were
16 inspecting your studio.  Do you have any
17 reason to disagree with that?
18      A.  No.  I have no idea what it is
19 actually.
20      Q.  Well, that was going to be my next
21 question.
22      Can you tell me what it is?
23      A.  It looks like nine pieces -- you
24 know, when we were doing two pieces that we
25 did that -- that Bob really changed around

1
2  EAT and ART.  He had real strong feelings
3  about it.  And then we got into different
4  color ways, and he had all these ideas for
5  it.
6       So we tried a lot of different
7  things, some of which he picked out and kept
8  for himself and some of which we -- we kept.
9       So these are variations of -- we
10 did a print of ART.  And I can't remember if
11 it was in one of the museums.
12      And while we were trying to get the
13 colors right, he kept on coming up with
14 different ideas for colors.  So we -- we
15 tried different stuff.  And this looks like
16 some of the trial proofs and tests and color
17 ways that we played around with before we --
18 before actually he decided what the best
19 color was.  Some times we did stuff like this
20 and, at the end of it, the whole project
21 died.
22      Q.  So these are proofs of Indiana
23 works that you fabricated with the image ART,
24 A-R-T, on it, am I right?
25      A.  It's printed, printed on paper.

Page 126

1
2    These are paper prints.
3        Q.  I see.  But they are Indiana works,
4    correct?
5        A.  Yes.  And they are signed by him,
6    too.  Apparently some are fully signed and
7    some are initialed.
8            That's another thing that you never
9    knew what was going to happen when you went
10   into his studio.  Sometimes he would sign it;
11   sometimes he would initial it; sometimes we
12   would threw it away.  We just never knew
13   where it was going to go until we went there.
14       Q.  Can you tell me when these were
15   produced or fabricated?
16       A.  I'm looking for a date.  Whatever
17   the date on his signature is, that's probably
18   going to tell you when it is.  But it's a
19   little too small and messy to read for me
20   right here.
21       Q.  There is handwriting on this
22   exhibit.  Is that your handwriting?
23       A.  It doesn't look like my
24   handwriting.
25       Q.  Do you know whose handwriting it

Page 127

1
2    is?
3        A.  I can't tell you.  I have no idea.
4    I'm assuming somebody who worked in the
5    studio was -- had this printout and was
6    trying to determine -- that's what would
7    happen.  Sometimes they would go to art
8    archive and say we are missing six pieces.
9    Where the hell are they?
10           And they would call around and find
11   out that Rosenbaum had a couple or somebody
12   else had one.  One was sent to a museum and
13   they never returned it.  I mean, there's a
14   million variations on that theme.
15       Q.  There is a notation above the
16   center image that says, "shipped to Lara
17   Rosenbaum 9/9/15."
18           Do you see that?
19       A.  Yes.  I would say that that
20   probably means it was shipped to Lara
21   Rosenbaum on 9/9/15.  That would be my guess.
22       Q.  Is Lara Rosenbaum affiliated with
23   Rosenbaum gallery?
24       A.  Yes.
25       Q.  And would that have been shipped to

Page 128

1
2    her to sell?
3        A.  I would assume so, yeah.  That's
4    what she does; she is an art salesperson.
5        Q.  Are you aware that these prints
6    contain images that Morgan alleges that it
7    has the rights to?
8        A.  Morgan doesn't have these rights at
9    all.  They can allege all they want, but it
10   doesn't -- if it doesn't show up in the U.S.
11   copyright office, it doesn't particularly
12   mean anything.
13           And also, I believe that Indiana
14   would have the rights anyway, as author, to
15   do whatever he wants.  So I don't buy into
16   your story very well.  And nobody else does
17   either, by the way.
18       Q.  Are you aware of whether or not
19   this was produced in the litigation?
20       A.  Produced in the litigation.  What
21   are you talking about?  This was done in
22   2015 -- it was already shipped in 2015.  Is
23   that what you are asking?
24       Q.  Sorry.  No.  Let me clarify.
25           Are you aware of whether or not

Page 129

1
2    this document was provided to us in the
3    litigation?
4        A.  No.  Like I said, I did not go over
5    what Mr. Dowd picked out, sent and shipped,
6    whether -- I assume he did most of it
7    electronically.  I don't honestly know.
8            He was the attorney of record.  He
9    came in here with staff for many, many hours,
10   and they had the ability to take whatever
11   they were going to take.  I don't know what
12   they did take.  I don't know what they didn't
13   take.  I didn't regulate it.
14           In fact, one of the days they were
15   here, I wasn't even here.  I forget.  I think
16   I was in California.  So I have no clue what
17   they did or didn't do.
18       Q.  If I told you that this had not
19   been provided to us in the litigation, this
20   document had not been provided to us in the
21   litigation, would you have any basis to
22   disagree with that?
23       A.  Like I said, I have no idea what
24   Mr. Dowd took.  I have no clue.  He had the
25   ability to take 100 percent of what was here.

MAGNA
LEGAL SERVICES

1
2     I don't know if he took 3 percent,
3     30 percent, 90 percent, 42 percent; I
4     wouldn't have any idea.
5           And how he may have felt that this
6     was -- I don't know if he felt this was an
7     irrelevant document.  I don't know what it's
8     relevant to anyway, to tell you the truth.
9           You know, you have that whole book
10    that shows all these pieces that we did.
11    It's not like I'm trying to hide that I did
12    art.  I'm proud of it.
13          So not only am I proud of it, I
14    gave it to museums to show.  I was on TV with
15    it.  It's not like exactly a hidden thing.
16    So I don't get the point.
17        Q.   And would that be the same answer
18    if I asked you about, you know, any of the
19    documents that I'll show you photographs of?
20    If I -- you know, if I tell you they haven't
21    been produced in the litigation, do you have
22    any basis to disagree with that?
23          MS. ZERNER:  Objection.
24          You can answer if you can,
25    Mr. McKenzie.

1
2           But you are talking about a
3     whole -- we don't know what documents
4     you are talking about.
5        A.   Yeah.  So, you are asking about the
6     future.  I don't know about that.
7           But I mean I've told you now how it
8     was done.  Mr. Dowd sent over two people, a
9     man and a woman; they were junior associates.
10    They were here, I believe, for two days.  One
11    of the days I was here, I believe part of the
12    day, and the other day I wasn't here.
13          So I wouldn't know.  I didn't
14    regulate.  I didn't study.  I didn't walk
15    behind them.  I wasn't over their shoulder.
16    I wasn't asking what they were doing.
17          They had free access to everything
18    in the studio and the complete cooperation of
19    all the people in the studio to help them get
20    anything they said they needed, whether it
21    was a document or a slide or a picture or a
22    coffee.  So I didn't -- I don't know what
23    they took, and I never saw what they sent.
24          So I would have no way of knowing
25    if they sent this or didn't send it; if they

1
2     took a picture of it and decided not to send
3     it; if they Xeroxed it and didn't take it.  I
4     have no clue.
5        Q.   Okay.  And that visit -- or those
6     one or two visits by Dowd's associates, is
7     that the only time or are those the only
8     times that lawyers came up to go through
9     whatever materials and documents were in your
10    studio?
11       A.   I think so.  I don't remember
12    Mr. Simone ever -- he -- he never came here.
13    I don't think so.  I can't remember him
14    coming here.  I don't think he ever did.  And
15    he only had one other associate that we ever
16    met, and I know she definitely didn't come
17    here.
18          So I don't think either of those
19    people came here.  And I think by the time
20    Mr. Markham came on board, those issues were
21    kind of assumed to be a moot point.  I don't
22    think there was any reason for him to come up
23    here looking for more documents when, in
24    fact, Mr. Dowd had full reign of doing that.
25    You just would assume that he got whatever it

1
2     was he was supposed to get.
3           I mean, he is a fairly competent
4     attorney.  I don't have any reason to doubt
5     that he wouldn't abide by whatever discovery
6     rules there are.
7           MS. SHAH:  Okay, Broderick.  If you
8     could pull that down, please.  If you
9     could put up the next one.  It's tab 1,
10    Exhibit 17 -- sorry 16, I think.  Tab 1,
11    Exhibit 16 is marked 393-16.
12          This is a document that's been
13    filed on the court docket under 393-16.
14    We are going to mark it for the record
15    as Exhibit 7.
16          (Exhibit 7, Docket 393-16
17    Variations on metal of LOVE and HOPE,
18    marked for identification.)
19       Q.   Do you see this document,
20    Mr. McKenzie?
21       A.   Yeah.  I'm guessing that these are
22    some of the variations that were done on
23    metal of LOVE and HOPE that you had before on
24    those pages and pages.  LOVE and HOPE on
25    metal.  This is just the surface of it

MAGNA
LEGAL SERVICES

Page 134

1
2    without the rest of it, I think.
3       Q.  Okay.  So these are Indiana works
4    of the images LOVE and HOPE that you
5    fabricated, correct?
6       A.  Yes.  I think so.  I don't see the
7    size of it so it's a guess; but that's what
8    it looks like.
9       Q.  Is this part of the art archive?
10      A.  I don't know.  You know, because
11   before it had -- the others all had a little
12   date bottom right.  And I was thinking that
13   date popped up as soon as you went into art
14   archive, which I don't know.  I'm just
15   guessing.
16          And this one has no date, so I'm
17   not sure that this is part of art archive or
18   if it was just pictures taken and put into
19   the computer and printed out.  Either way, I
20   don't know.
21      Q.  Okay.  If I told you that this is a
22   document we found in your studio, would you
23   have any reason to disagree with that?
24      A.  No.  You know, again, I have 4,000
25   works of art.  Who knows how many tens of

Page 135

1
2    thousands of other things here, as well as
3    another maybe 5 or 6,000 works that are not
4    Robert Indiana.
5          So I don't even know what is here.
6    Sometimes I find things that -- you know,
7    works of art that are very valuable.  And I
8    find them and think I didn't even know I had
9    this.  So that's what it is.
10      Q.  If I told you that this document
11   hadn't been produced to us as part of this
12   litigation, would you have any reason to
13   disagree with that?
14      A.  You know, you are really going to
15   have to start asking Ray Dowd because he is
16   the one who did all this.  I didn't.
17          You know, you are asking me to
18   speak for what he did when I don't know what
19   he did.  And, you know, I don't know if he
20   knows what he did.  I don't know.
21          But I can tell you for sure I did
22   not supervise his discovery.  He supervised
23   and his team supervised their own discovery.
24          All we did was help them find
25   whatever it was they asked they were looking

Page 136

1
2    for.  We didn't hide anything.  We didn't
3    keep them away from a room.  We didn't close
4    a drawer.  They had 1,000 percent access to
5    anything we had, including all of our
6    computers and all of our phones.
7       Q.  Okay.
8          MS. SHAH:  Broderick, you can pull
9       that down.  Thanks.
10          And if you could put up tab 1,
11      Exhibit 19.  That should be 393-19.
12          This is a document that's been
13      filed on the court docket under 393-19.
14      We are going to mark it as Exhibit 8 for
15      the record, please.
16          (Exhibit 8, Docket 393-19 Star of
17      Hope pictures, marked for
18      identification.)
19      Q.  Do you see this picture,
20   Mr. McKenzie?
21      A.  Yes.
22      Q.  What are these?
23      A.  These are Star of Hope pictures.
24   Something Indiana really liked, which we were
25   frankly not that interested in doing but we

Page 137

1
2    did it because he was all hopped up on it.
3       Q.  These are Indiana works that you
4    fabricated, is that right?
5       A.  Yes.  We printed these.  They look
6    like works on paper.  Again, I think; it's
7    hard to tell.
8       Q.  Okay.  And if I told you we found
9    this in your studio, would you have any basis
10   to disagree with that?
11      A.  No.  But if I told you that Ray
12   Dowd gave this to you, I wouldn't have any --
13   I wouldn't any idea if you got it and you are
14   hiding it.  I don't know.
15          You are asking me if I'm hiding it.
16   I don't know what you are talking about.  I'm
17   asking you if you are hiding it, so I don't
18   know.
19          You know, I don't know if you got
20   all these things and you are just hiding it
21   and reproducing it a second time.  I don't
22   know.  I really don't know.
23          I don't know what Mr. Dowd did and
24   I don't know what you did, so I don't know if
25   either one of you is hiding from the other

MAGNA ►
LEGAL SERVICES

Page 138

1
2  one.  I don't have any clue.
3      Q.   Okay.  I appreciate that.  If you
4  could listen just specifically to my
5  question, I think it will help speed things
6  along.
7          And the question was, if I told you
8  that we found this in your studio, would you
9  have any reason to disagree with that?
10     A.   Like I say, I don't know what is
11 here.  It could be here.  Sounds right.  It
12 sounds like something we would have, and it
13 sounds like something Ray Dowd would have.
14 And it sounds like something you already
15 have, so I don't know what to tell you.
16     Q.   You have free access to go in and
17 out of your studio whenever you want, is that
18 right?
19     A.   Of course.  It's my studio.  But I
20 don't go looking through papers all day long.
21 I've got other things that I do.
22     Q.   And if I told you that this had not
23 been provided to us as part of this
24 litigation, you wouldn't have any reason to
25 disagree with me on that, would you?

Page 139

1
2      A.   I wouldn't have any basis for
3  knowing one way or the other.  You know,
4  you've asked me the same question a couple
5  hundred times now.
6          And it just -- I don't know what
7  Mr. Dowd did.  I don't know what he didn't
8  do.  I don't know what he gave you.  I don't
9  know what you are hiding.  And I don't know
10 if I ever saw this with Mr. Dowd.  I have no
11 idea.
12         You know, he did all of that on his
13 own, so I wouldn't have any idea what of what
14 he took.  I wouldn't have any idea of what he
15 gave you; so, therefore.  I can't really
16 aveer [sic] that he gave this to you or not,
17 and I can't aveer [sic] that he took it from
18 me because I don't know.
19         I just -- you know, I'm telling you
20 everything I know and you keep asking me the
21 same thing and it's not going to change.  It
22 just is what it is.
23         I don't know what -- what was sent
24 to you.  I didn't review it, I didn't look at
25 what he took.  I didn't look at what he

Page 140

1
2  copied.  I didn't look what he got off of my
3  phone, my computer.  I just let him take
4  whatever he needed, whatever he wanted, and I
5  have no idea whether or not he gave you this
6  or he didn't.  No clue.
7      Q.   Okay?
8          MS. SHAH:  You can pull that down,
9  Broderick.  Thanks.
10         If you could put up tab 1,
11 Exhibit 14.  It's going to be marked
12 393-14.
13         MS. ZERNER:  Is this Exhibit 9?
14         MS. SHAH:  Yes.  Thank you.
15     Q.   It's a document that has been filed
16 on the court docket under 393-14.  We are
17 going to mark it as Exhibit 9 for the record.
18         (Exhibit 9, Docket 393-14 Baker
19 Museum Exhibit Inventory Checklist, marked
20 for identification.)
21     Q.   Do you see this document,
22 Mr. McKenzie?
23     A.   Yes.
24     Q.   Can you tell me what this is?
25     A.   I believe it looks like a checklist

Page 141

1
2  of what went to the Baker Museum in Naples.
3  And it's basically the same information that
4  is in the book Robert Indiana Agency, which I
5  know that your firm has.
6      Q.   So this is a list of Indiana works
7  that were sent to the Baker Museum for
8  exhibition, is that right?
9      A.   Yes.  And the catalogue indicates
10 what that is and your firm has got it for
11 sure with the pictures as well.
12         MS. SHAH:  If you can pull that
13 down, Broderick, and put up tab 1,
14 Exhibit 18, which is 393- -- tab 1,
15 Exhibit 17.  Is that right?  Yeah, which
16 is 339-17.
17         This is a document that has been
18 filed on the court docket as 393-17.  We
19 are going to mark it as Exhibit 10,
20 please.
21         (Exhibit 10, Docket 393-17
22 Continuation of Baker Museum Exhibit
23 Inventory Checklist, marked for
24 identification.)
25     Q.   Mr. McKenzie, can you tell me if

MAGNA
LEGAL SERVICES

Page 142

1
2  this is a continuation of the checklist we
3  just looked at of the Indiana works that were
4  sent to the Baker Museum?
5      A.  I can't even read it it's so small.
6  Can you blow it up?
7          It looks like it.  Again, that's in
8  the -- that's in the catalogue of the show,
9  Robert Indiana A to Z.  It traveled to three
10 or four museums.  And all those pictures,
11 including the size, the color, is all in the
12 catalogue, which you have, and which is
13 available on Amazon and a hundred other
14 places.
15         MS. SHAH:  All right.  You can pull
16     that down.  And if you could put up
17     tab 1, 393-18, please.
18         This is a document that has been
19     filed on the court docket under 393-18.
20     We are going to mark it as Exhibit 11
21     for the record, please.
22         (Exhibit 11, Docket 393-18
23     Continuation of Baker Museum Exhibit
24     Inventory Checklist, marked for
25     identification.)

Page 143

1
2      Q.  Mr. McKenzie, can you tell me if
3  this is also a continuation of that checklist
4  that shows Indiana works that were sent to
5  the Baker Museum for exhibition?
6      A.  I would say yeah.  Yeah.  These are
7  boxes they were shipped out in and they sent.
8      Q.  And does it list some of the
9  Indiana works that you fabricated with
10 Bob Dylan lyrics on them?
11     A.  Yes.  1 through 12 under case 60 by
12 40, or whatever it is.  Number -- Number 19
13 is all Bob Dylan works.
14     Q.  Okay.  And can you look at it and
15 tell me if this list also includes works with
16 the images of USA FUN, EAT and ART?
17     A.  I see EAT and ART at the bottom --
18     Q.  You see USA --
19     A.  -- under 20, yes.
20     Q.  Thank you.
21         And are you aware that we found
22 these records in your studio?
23     A.  I am unaware.
24     Q.  And if I told you that these
25 records had not been produced to us in the

Page 144

1
2  litigation, you wouldn't have any basis to
3  disagree with me, would you?
4      A.  And if I told you that I answered
5  this question 27 times, would you have any
6  reason to disagree with me?
7      Q.  Yes.  Well, I tried to ask it to
8  you in the -- in the aggregate and your
9  attorney objected.  So now I'm asking it with
10 respect to every document we are looking at.
11         MS. ZERNER:  Mr. McKenzie, before
12     you answer, she is asking the question
13     separately for each document, which she
14     has a right to do.
15         THE WITNESS:  Okay.
16         MS. ZERNER:  If a question can be
17     asked in a different way without
18     referencing potential exhibits that we
19     don't know what they are, but if you
20     could just have some patience and answer
21     the direct question, thank you.
22     A.  I don't know if I have any basis
23 for knowing if you got -- you've gotten this
24 information or not or how you got it or why.
25 Because, like I said, I don't really have

Page 145

1
2  access to all this material.
3          I'm going to assume if you tell me
4  you got it at my studio, that's where you got
5  it from.  I don't know.  I'm not going to sit
6  here and debate it with you because I don't
7  really care.  It's not important.  You know,
8  if you got this before, I don't know.  I
9  would think that --
10         MS. ZERNER:  Mr. McKenzie, I think
11     the question this time was whether or
12     not you have a basis to know whether
13     this was produced by your attorneys in
14     this litigation.  Do you know whether --
15     A.  Is that the question?  Are you
16 asking me if my attorneys produced this in
17 this litigation?  Is that your question?
18     Q.  I'm asking if I told you that this
19 has not been produced in this litigation
20 would you have any basis to disagree with
21 that?
22     A.  I really wouldn't know.  Like I
23 said, I don't know what was produced to you.
24 It's impossible for me to know.
25     Q.  Okay?

MAGNA
LEGAL SERVICES

Page 146

1
2      MS. SHAH:  Broderick, you can pull
3   that down.  If can you put up tab 1,
4   Exhibit 13, which is 393-13.
5      This is a document that has been
6   filed on the court's docket under
7   393-13.  We are going to mark it as
8   Exhibit 12 for the record, please.
9      (Exhibit 12, Docket 393-13 Images
10   for HOPE calendar, marked for
11   identification.)
12   Q.  Do you see this, Mr. McKenzie?
13   A.  Yes.
14   Q.  Can you tell me what this is?
15   A.  I'm not sure.  We were working --
16   Indiana wanted to do a calendar, so we went
17   through different kinds of proposals for a
18   calendar.  Whether or not we ever got this
19   done, I don't think so, we had a lot of
20   different -- you know, he wanted to do a
21   calendar.  We thought it was a cool idea.
22      And we came up -- first we were
23   going to do a different color of HOPE for
24   every month and then it was going to be
25   something else.  I think we ended up with

Page 147

1
2   doing a different color of HOPE for every
3   month.
4      I don't think this calendar
5   happened.  It looks like another one of those
6   projects we spent months on but nothing came
7   of it.
8   Q.  Is this your handwriting?
9   A.  Yes.
10   Q.  Do you recognize this document?
11   A.  Not really.  Because, you know,
12   if -- if we work on something and it just
13   falls apart.  You know, if he doesn't green
14   light it, it's gone.  It's just gone.
15      So I have a feeling that this was
16   one of the projects that we spent all kinds
17   of times pitching and, at the end of it, it
18   just never happened.  I don't think we ever
19   finished this.  It doesn't ring a bell.
20      (Simultaneous crosstalk.)
21      We worked on this for -- we were
22   working on the calendar for quite a long
23   time.  We thought it was a good idea,
24   but we didn't know how to really execute
25   it.  I think in the end we did 12

Page 148

1
2   variations of hope in different color
3   ways and that was the calendar.  This --
4   I'm 99.9 percent sure this just didn't
5   happen.  It's a dead project.
6   Q.  Are you aware that the document
7   appears to contain images of Indiana works to
8   which Morgan alleges it has the rights?
9   A.  The word "alleges" is what you
10   allege, and what I allege is that Morgan
11   doesn't have any right.  So there you go.
12   And the U.S. copyright seems to agree with
13   me.
14   Q.  Would it surprise you to learn that
15   we found this in your studio?
16   A.  No.  I don't know.  It looks like
17   my handwriting.  I guess it was here.
18   Q.  And if I told you that this hadn't
19   been produced to us in the litigation, you
20   wouldn't have any basis to disagree with me,
21   would you?
22   A.  I wouldn't have any basis to agree
23   or disagree because, like I said, I don't
24   know what Mr. Dowd took pictures of and I
25   don't know what he gave you and I don't know

Page 149

1
2   what you've hidden.
3      MS. SHAH:  Okay.  You can pull this
4   down, Broderick.  And if you can put up
5   the document that's marked tab 001A.
6      This is a photograph of a book
7   called Susan Sheehan Gallery, New York.
8   We are going to mark this as exhibit --
9   are we on 13?  14?
10      THE EXHIBIT TECH:  On 13.
11      MS. SHAH:  13.  Let's mark this as
12   Exhibit 13 for the record, please.
13      (Exhibit 13, Photograph of Susan
14   Sheehan Gallery book, marked for
15   identification.)
16   Q.  Do you recognize this,
17   Mr. McKenzie?
18   A.  Yes.  I know Susan Sheehan very
19   well.  And when she did this book, she asked
20   me to comment on it.
21   Q.  This is a book that we found in
22   your studio.  Would that surprise you?
23   A.  No.  Because I've had it since
24   1991.  It's a book of Robert Indiana's
25   prints.  And as somebody who is very

MAGNA
LEGAL SERVICES

Page 150

1
2  interested in Robert Indiana and collected
3  his prints and was on the edge of doing a
4  huge project with Robert Indiana in 1993, I
5  would have to have this book because it's
6  important.
7      Q.  Did you tab the book?  Did you put
8  the yellow Post-its in it?
9      A.  Probably.  You know, that was a
10 book that you look at because Indiana, like
11 every other artist, revisits his images.
12 That's what artists do.
13         Andy Warhol does Marilyn five
14 different ways.  Indiana does LOVE 50
15 different ways.  And Indiana revisits all of
16 his other art all the time.
17         So when you are thinking about
18 doing a project with Robert Indiana, it's
19 important to know what else he did.  That's
20 intellectually and as a publisher something
21 you are going to do.
22         Now, if you are just not a
23 publisher and just somebody off -- ripping
24 off one image of Robert Indiana, different
25 conversation.  But now you are not really a

Page 151

1
2  publisher.
3         I'm a publisher.  I work with the
4  artist.  And like Indiana said, he and I
5  collaborated.  That's how I work as a
6  publisher.  He has an idea; I have an idea.
7  I like his idea, I go with his idea.  He
8  likes my idea, we go with my idea.  That's
9  just how it works.
10     Q.  And this book contains images of
11 Indiana works that you later used as part of
12 the Bob Dylan series that you fabricated,
13 right?
14     A.  Maybe.  I don't know.  I mean, the
15 Bob Dylan stuff was mainly done back and
16 forth, right, with Bob right.  In many ways
17 it was really a collaboration between Jamie
18 Thomas, myself and Bob, and everybody had
19 ideas.  It was really Bob's idea to work with
20 Bob Dylan.  He was -- I didn't realize how
21 big a Bob Dylan fan he is.  And just by a
22 fluke I happened to know Bob Dylan's
23 management.  So I was able to run stuff down.
24 And, you know, I was excited because I happen
25 to like Dylan as well.

Page 152

1
2         So Jamie, on the other hand, was
3  pushing for Taylor Swift, which Bob and I
4  were not interested in.  So Bob was really
5  was very, very excited about the Bob Dylan
6  project.  In fact, when we finished it, he
7  put it in the windows of -- of his studios so
8  everybody could see what he was up to.
9      Q.  And you didn't produce to us any
10 photographs or photocopies from this book in
11 the litigation, did you?
12     A.  I didn't -- I don't know what.
13 Again, I don't know what Mr. Dowd did.  But I
14 wouldn't see that he or I would have thought
15 this had any relevance.  It's just a
16 commercial book of Robert Indiana's that's
17 available all over the place.  In museums, on
18 Amazon.  It's nothing special.  It's just a
19 book.
20     MS. SHAH:  And you can pull this
21 down, please.  If you could put up
22 tab 1-23 -- sorry.  It's tab 1 -- it's
23 going to be 393-23.
24     Q.  This a photograph that has been
25 filed on the court docket as 393-23.  We are

Page 153

1
2  going to mark it as Exhibit 14 for the
3  record, please.
4         (Exhibit 14, Docket 393-23
5  Photograph of study for Indiana/Dylan
6  project, marked for identification.)
7      Q.  Do you see this photograph,
8  Mr. McKenzie?
9      A.  Yes.  I know it very well.
10     Q.  How do you know it very well?
11     A.  Because I worked on this project
12 with Bob and Jamie Thomas for almost four
13 years.  We went through -- Bob's idea was
14 that -- most of his paintings, if not all of
15 his paintings, done from the '60s were done
16 with Bob Dylan blasting in the background,
17 which is how we ended up with Bob Dylan and
18 Bob Indiana working together.
19         And he felt that this was the right
20 thing, the Dylan like a rolling stone,
21 because initially we were going to do --
22 wanted to illustrate all of Dylan's work.
23 And I got the book from one of Dylan's
24 people, and it was 1623 pages.  So it was
25 like, I don't think we can do this.  We will

MAGNA
LEGAL SERVICES

1
2   all be dead by the time we finish it.
3         And I was with Billy Name, who was
4   Warhol's assistant, who said that "like a
5   rolling stone" was all about Andy Warhol and
6   Eddy Sedgwick and that was the pivotal thing
7   and it was all about the '60s.
8         So Indiana got excited, as did I,
9   and we narrowed it down to trying to do
10  something with "like a rolling stone."  And
11  then, from there it became Bob said we should
12  only use '60s pictures.  We should get '60s
13  pieces and put them in because that's when I
14  listened to Dylan, that's what Dylan is
15  about, that's what I'm about.  Putting his
16  '60s stuff with my '60s stuff, that's the way
17  to go.
18        So that took everything off the
19  page and limit it to where we were headed
20  with it.  And then it was a matter of from
21  there, trying to figure out, now that we know
22  that, how do we -- what are we doing.
23        It was a very long process.  It
24  went through a lot of stages.  Bob had ideas.
25  Bob had a lot of ideas.  Jamie had a lot of

1
2   ideas.
3         To tell you the truth, I had less
4   ideas than they did.  I loved the project.
5   They were the ones powering the ideas, and we
6   came up with different ways of putting
7   Dylan's stuff, without putting it over
8   Indiana's stuff, somehow incorporating with
9   Indiana's stuff.
10        And he saw these types of things as
11  typical of what he did.  Diamonds and
12  squares; so we stuck with that idea.  It was
13  a very long and interesting project.
14        So we were very happy with how it
15  came out.  So was Bob.
16        And when we first exhibited it, it
17  was interesting to see that people would walk
18  around singing the song as they watched the
19  work, which we thought was very cool.
20   Q.  Do you recognize this photograph as
21  a page of a folio that you keep in your
22  studio?
23   A.  As a who of a what?
24   Q.  As a -- as a page in what looks to
25  be a portfolio that you keep in your studio?

1
2    A.  I don't know.  I'm not -- I mean,
3   we did a whole design book of it.  It looks
4   like the study for the book.  And it also was
5   a print and also a painting.  So we did the
6   whole -- this is one of the only projects
7   that we ever did that we did all -- all those
8   things out of the same because we were all
9   very excited about this project.
10        It was a very -- you know, it took
11  a long, long time to realize.  And when we
12  finally got to the end of it, we all felt
13  like, Hey, this was a master piece.  This is
14  really important.
15        And, you know, so I said to Bob,
16  anything you want to do it, let's do it.  You
17  want to do it on metal?  We'll do it on
18  metal.  You want to do it on wood?  We'll do
19  it on wood.
20        So we did canvas, paper and a giant
21  book, and then we did it on metal as well.
22  It was probably the most time-consuming
23  project we did of all the things we did with
24  Bob.  And the one that he -- he certainly had
25  the most passionate feeling for.

1
2    Q.  So it wouldn't surprise you if I
3   told you we found this in your studio, right?
4    A.  Not at all.  This is one of the my
5   most favorite projects I've ever did in my
6   life.
7    Q.  And you don't have any idea of
8   whether this or images of this was produced
9   to us in the litigation, is that correct?
10   A.  Wouldn't have any idea.  But it's
11  in the book that you guys have.  We are very
12  proud of that book and everybody who has it
13  likes it.
14        Robert Indiana A to Z, the book
15  that you guys have -- the estate has the
16  book, Bob has the book, Morgan has the book.
17  You know, it is what it is.  It's a pretty --
18  pretty well-known group of pieces that were
19  done around Bob Dylan.
20        MS. SHAH:  Okay.  If you could put
21  up tab 1, Exhibit 24.  It's going to be
22  393-24.
23        This is a photograph that was filed
24  on the court's docket 393-24.  We are
25  going to mark it as Exhibit 15 for the

Page 158

```
 1
 2      record, please.
 3          (Exhibit 15, Docket 393-24
 4      Photograph of limited edition
 5      Dylan/Indiana small and big books,
 6      marked for identification.)
 7   Q.  Do you see this, Mr. McKenzie?
 8   A.  Yeah.  Those are the Bob Dylan
 9   books stacked up there.  It was a limited
10   edition of Bob Dylan books that we did.  The
11   ones on the left, those little ones, were the
12   studies for it.
13          Usually when we do a huge project
14   like this, which is very expensive to
15   produce, we produce a smaller version of it
16   first to see if this there is any corrections
17   we want to make because you really don't want
18   to make a whole stack of things that are,
19   when you look over your shoulder, you know,
20   because we were pretty sure we had a landmark
21   product.  You know, a piece of art.  And we
22   wanted to get it right.
23          We didn't want to produce it and
24   find out that we wished we had changed this
25   to that or that to this.  So we made a
```

Page 159

```
 1
 2   smaller one.  And I think we did make several
 3   changes from the smaller one to the bigger
 4   one.
 5          I've always done that, actually.
 6   You know, whenever I've done -- like, with
 7   Alex Katz, all the paintings I did that were
 8   8 feet by 12 feet, we did them 3 feet by
 9   4 feet.  And before that, we actually did
10   them a foot and a half by 2 feet.  But a foot
11   and a half by 2 feet, if it doesn't work out,
12   it doesn't work out.  But when you start
13   doing it 9 feet by 12 feet, it's a little
14   embarrassing to have something that big that
15   sucks.
16   Q.  So are these editions of books that
17   contain the images of the Bob Dylan works you
18   did with Indiana?  Is that right?
19   A.  Yes.
20   Q.  Okay.  And the smaller ones up in
21   the left-hand corner are studies of the
22   books, is that right?
23   A.  Yes.  It's similar to the bigger
24   books.  But I do believe we made some color
25   changes because we gave Bob a bunch and said
```

Page 160

```
 1
 2   is there anything you want to change.  I
 3   don't remember how much we changed or why,
 4   but I'm pretty sure we made changes from the
 5   small book to the big book.
 6   Q.  Did you sell these books?
 7   A.  Unfortunately not that well.
 8   Probably a million dollar loss, but that's --
 9   that's really was my intent was to believe
10   that somewhere down the road Robert Indiana
11   would be as -- would be much bigger and that
12   I would take the risk of doing all these
13   productions with him.  Whether they worked or
14   they didn't, I wouldn't put them out on the
15   market and just sell them for nothing.  That
16   I would rather sit on them until everything
17   cleared, until he became as big as I felt he
18   should be.
19          So I took the risk on a lot of
20   things, like the Dylan book was a huge risk.
21   You know, it didn't -- to date it hasn't
22   really panned out to even close to paying for
23   what it cost to make, let alone what I gave
24   Indiana to do it.
25   Q.  Do you recognize this as a photo of
```

Page 161

```
 1
 2   these books stacked up in your studio?
 3   A.  Yes.
 4   Q.  Do you know whether photographs of
 5   these books or images of these books or these
 6   books themselves were provided to us as part
 7   of the discovery in this litigation?
 8   A.  Well, they're certainly in the
 9   Robert Indiana A to Z.  It's very
10   well-documented.  It talks about what it is,
11   how it is, why it's out there and everything
12   else.
13          So, you know, I don't know how many
14   times you need information about the same
15   thing or if Dowd gave you more information.
16   Like I said, I didn't monitor what he gave
17   you and so, therefore, I don't know what he
18   gave you.  I don't know, frankly, if what you
19   are telling me is true either; so I can't
20   comment either way.
21          MS. SHAH:  Okay.  You can pull that
22   down and if you could put up tab 1,
23   Exhibit 30, which is 393-30.
24   Q.  Can you tell me what this is --
25   sorry.  Let me mark this.  This is a
```

Page 162

```
1
2   photograph that has been filed on the court's
3   docket under 393-30.  We are going to mark
4   this as Exhibit 16, please.
5        (Exhibit 16, Docket 393-30
6   Photograph of McKenzie studio, marked for
7   identification.)
8        Q.  Do you see this, Mr. McKenzie?
9        A.  Yes.
10       Q.  Do you recognize this as a
11  photograph of your studio?
12       A.  Yes.  Do you see why now it's a
13  good idea to move these things to a storage
14  space?  You know, this is an 1840s barn.
15  Everything is stacked on top of each other.
16  It's highly vulnerable.  And getting
17  everything in a storage space where I can see
18  what's what and why is more than intelligent.
19  It's like I don't know why it took me so long
20  to wake up to it.  But when I see this, I
21  want to throw up.
22       Q.  All of those stacked boxes and
23  canvases we are looking at, are those all
24  Indiana works?
25       A.  Yes.
```

Page 163

```
1
2        Q.  Okay.
3        A.  And there's -- you can a few things
4   in there that are not.  But, you know, I
5   would say 90 percent of this are Indiana
6   works.  Most of the other things I have,
7   Larry Rivers and Alex Katz and Frank Stella
8   and Claes Oldenburg, most of that stuff is in
9   a different storage and none of the Indiana
10  is there.  Indiana was all kept on canvas --
11  on canvas in my spaces.
12       I mean, I see a Joey Ramone
13  portrait standing up there.  That is not an
14  Indiana.  But everything else I see there
15  looks like it's an Indiana.
16       Q.  Okay?
17       MS. SHAH:  You can pull that down,
18  please.  If you could put up tab 1,
19  Exhibit 39, please.  That's going to be
20  393-39.  Thank you.
21       This a document that has been filed
22  on the court's docket under 393-39.  I
23  am going to mark it as Exhibit 17 for
24  the record, please.
25       (Exhibit 17, Docket 393-39
```

Page 164

```
1
2   Photograph of trial piece for
3   Dylan/Indiana book, marked for
4   identification.)
5        Q.  Can you see this, Mr. McKenzie?
6        A.  Yes.  This looks like as we were
7   doing or trying to do the Bob Dylan book, the
8   changes were coming in every -- almost every
9   week.  Every time I went up to Vinalhaven, we
10  would have a discussion of how this book is
11  going to be made or what's going to happen to
12  it.
13       And coming up with the size and
14  shape and, you know, like some were just
15  diamonds.  And then you look at the one on
16  the bottom.  It's a diamond within a
17  rectangle.
18       So it really was a lot of, you
19  know, Bob green lighting it by saying, Well,
20  I did this before with -- did a series on
21  confederacy that had these types of shapes.
22       So with Bob there was always like a
23  sense of continuity.  You know, he -- and
24  it's funny.  Like, at one point he came up
25  with rainbow rolls, which he had never done
```

Page 165

```
1
2   before.  And it's a -- which is a technique
3   in silk screening of rolling one color into
4   another so you get an effect which he had --
5   most of the time he is all about I did this
6   in 1961, so we will do it again.
7        And finally, in that one particular
8   instance, and one other instance, like in the
9   rainbow roll, I said to him that this is
10  going to be weird because everybody
11  associates Warhol with it, and it's not
12  really Indiana colors.
13       He said, You're not going to sit
14  there and tell me what colors an artist is
15  allowed to use, are you?
16       And I was like, Wow.  I felt like
17  such a jerk.
18       So he is an interesting character.
19  In this case he was intent on getting it
20  right.  I think it took us four years to make
21  this thing.  So the number of times I went
22  back and forth.  And one week it was round;
23  the next week it was square; the next week it
24  was a triangle; the next week it was a
25  rectangle.
```

MAGNA
LEGAL SERVICES

1
2        So it went through a lot, a lot of
3    changes. I don't know where this is in the
4    relationship, but we had a stack of stuff you
5    just had to throw in the garbage. You know,
6    where it's like, if he doesn't approve it,
7    what are you going to do with it? Just paper
8    with ink on it.
9        Q.   So am I correct this is a mockup or
10   a study of a page in the Bob Dylan book that
11   you ultimately produced?
12       A.   Yes. This would have been one of
13   who knows how many hundreds of trial pieces
14   that were done. Some were drawn on a napkin.
15   Some were down on a piece of paper. Some
16   were drawn to scale. Some were just -- like
17   this is just obviously no giant attempt to
18   make it look like anything other than get a
19   rough idea of what it could be.
20       So there were lots and lots and
21   lots of these things. Some ended up with
22   him, some ended up in the garbage, some ended
23   up in a portfolio. Who knows? You know,
24   there is a lot of trial and error goes on.
25       Q.   And it wouldn't surprise you that

1
2    we found this in your studio, would it?
3        A.   No. I mean, we had thousands of
4    these things we did. I don't know how much
5    of it we kept and how much we threw away.
6        But if you are going to ask me if
7    Mr. Dowd sent you this or not, again, my
8    answer is I don't know what he sent you. I
9    have no idea. You have to tell me. And then
10   you have to ask him and he will either deny
11   it or not. I don't know. I can't speak to
12   him. I don't know what he did.
13       Q.   Okay. Thank you.
14       MS. SHAH: You can take that down.
15   If you could put up tab 1, Exhibit 29,
16   please, which is 393-29.
17       It's a document that has been filed
18   on the court's docket 393-29. We are
19   going to mark it as Exhibit 18 for the
20   record.
21       (Exhibit 18, Docket 393-29
22   Photograph of LOVE on metal, marked for
23   identification.)
24       Q.   Mr. McKenzie, do you see this
25   photograph?

1
2        A.   Yes.
3        Q.   This is a photograph of what looks
4    to me like a large canvas that we found in
5    your studio.
6        A.   It's metal.
7        Q.   It's metal. So you recognize this?
8        A.   See, that's why we got into this.
9    Is because in 2012 or so, or 2013, you know,
10   the ability to bend metal because it was now
11   programmed through computers was a whole new
12   game.
13       So it was slick enough that it
14   looked like a -- it looked like a painting.
15   And we were -- both Bob and I were really
16   excited about that. That's why we finished
17   the LOVE project, and then we did the HOPE
18   project too. Because both of us loved the --
19   loved the look of these things.
20       Q.   So this is a LOVE image on metal
21   that you produced that is now sitting in your
22   studio, is that correct?
23       A.   Yes. And again, the continuity of
24   this goes back to 1994. That's when we --
25   believe it or not, it's when we started the

1
2    metal project was 1994. It went through all
3    kinds of edifications and finally we got to
4    the point where we both liked it.
5        We had thrown a number of them in
6    the garbage. We tried it in stainless steel.
7    We tried it on aluminum. We tried it on
8    iron. And it just never -- never clicked.
9    And then this thing was much later and we
10   finished the project.
11       MS. SHAH: If you can take that
12   down and pull up tab 1, Exhibit 25,
13   which is 393-25.
14       This a document that has been filed
15   on the court's docket under 393-25. We
16   will mark this as Exhibit 19 for the
17   record, please.
18       (Exhibit 19, Docket 393-25 back of
19   metal LOVE on metal, marked for
20   identification.)
21       Q.   Mr. McKenzie, do you recognize
22   this?
23       A.   Yes. That's the back of the thing
24   you are looking at. So in order to identify
25   what it was, we wrote, as we always do on a

MAGNA
LEGAL SERVICES

1
2  canvas or a print, the name of the piece.
3  And in his case, the way he names his LOVE
4  pieces is Red Purple, Red Blue, Red Green.
5  And they were numbered consecutively of what
6  they were.  So that's how that's -- was the
7  way you could tell one from another.
8      Q.  You don't know whether photographs
9  or images of this work were produced to us in
10  this litigation, correct?
11     A.  No idea.
12     Q.  And certainly you haven't turned
13  over this work to the estate or Morgan as
14  part of this litigation, right?
15     A.  What do you mean "turned over this
16  work"?
17     Q.  Given the work to the estate or
18  given the work to Morgan.
19     A.  Given the work?  Are you talking
20  about the physical piece?
21     Q.  Yes, the physical piece.
22     A.  Why would I do that?
23         MS. ZERNER:  Just yes or no,
24     Mr. McKenzie, about whether you have or
25     not.

1
2      A.  I gave the estate all the artist's
3  proofs because Indiana left them at my studio
4  because they took up too much space in his
5  studio and it took up a huge amount of space
6  in my studio.
7         So when finally Brannan said, Do
8  you have anything of Robert Indiana's, he had
9  left in my studio in Vinalhaven quite a lot
10  of his artist's proofs.  And at my own
11  expense, I put together all the stuff that
12  Bob left in my studio for two years and got
13  them to James Brannan.
14         So whatever was Robert Indiana's --
15  and there was quite a lot of it.  I don't
16  remember how many pieces but my guess, if I
17  would recollect, it was I think 95 pieces he
18  had left in my studio.  It was a huge
19  insurance liability for me.
20         -- I brought to Brannan.  I
21  personally filled up two bus loads and also
22  sent another whole -- I don't know how many
23  pallets of UPS to him.
24         So everything that was Robert
25  Indiana's of (inaudible) and several other

1
2  things were indeed given to Brannan.  But he
3  gets the artist's proofs, but he doesn't get
4  my pieces, no.
5      Q.  Mr. McKenzie, do you still possess
6  this piece?
7      A.  Do I who what?
8      Q.  Do you still possess the piece that
9  we are looking at in the exhibit?
10     A.  I think so.  I don't know what's up
11  there to tell you the truth.  But probably.
12  I mean, I still have several of the Book of
13  Love pieces, and Indiana's got his -- his
14  artist proofs, which are, I guess, with
15  Brannan if he hasn't sold them to pay for his
16  litigation, I don't know, or pay himself I
17  guess more accurately.
18         MS. SHAH:  All right.  You can pull
19     this down.
20         If you could you put up tab 1,
21     Exhibit 33.  It should be marked 393-33.
22     This was a photograph that was filed on
23     the court docket under Docket 393-33.  I
24     am going to mark this as Exhibit 20 for
25     the record, please.

1
2         (Exhibit 20, Docket 393-33
3     Photograph of file cabinet with Indiana
4     prints, marked for identification.)
5      Q.  Can you see this photograph,
6  Mr. McKenzie?
7      A.  Yes.
8      Q.  Do you recognize this?
9      A.  Yes.  This is one of many file
10  cabinets that are upstairs, and I think
11  downstairs as well, in my studio.  And each
12  one of these drawers has a stack of Robert
13  Indiana prints in it; so when you try to
14  count from one to 1,000, some of these
15  drawers can contain 300 pieces.
16         So if you look in the drawer it is
17  going to say number 1 at the top and 300
18  at the bottom.  So if you go through that
19  drawer, you might have a thousand pieces
20  right there.  You might have 1200.  And
21  that's -- that's how it's set up.
22     Q.  Okay.  And this includes prints of
23  the Indiana work that has the image ART on it
24  right, A-R-T?
25     A.  I don't know.  There are ART pieces

MAGNA
LEGAL SERVICES

Page 174

1
2   in there and LOVE pieces in there and HOPE
3   pieces in there.  This is almost all Robert
4   Indiana work, and every one of those drawers
5   has got a wad of Indiana prints.  So right in
6   that one file cabinet I will bet you there
7   are 700 pieces.  Maybe more.
8       Q.  Okay.  Are there also Tikva pieces
9   in there?
10      A.  Yes.  Not US -- you asked me Tikva
11  and Ahava.  There are some Tikva proofs in
12  there.  The edition is with Rosenbaum I
13  believe.
14         MS. SHAH:  Okay.  And for the court
15  reporter, that's Tikva, T-I-K-V-A.
16      Q.  Are there EAT prints in there,
17  E-A-T?
18      A.  Probably.
19      Q.  Are there Ahava --
20      A.  -- no.  Ahava, that's from a long,
21  long time ago and I didn't -- you know, I had
22  a minor role in that.  I was not the
23  publisher.  You know, I bought a couple of
24  pieces at the beginning.  That was it.  And I
25  don't think I have any left.  I might have

Page 175

1
2   one left somewhere.  I don't even know.
3       Q.  And you have no basis to say one
4   way or another whether photographs or images
5   of all of these prints were produced to us in
6   the litigation, correct?
7       A.  All of that would be in the same
8   Robert Indiana A to Z book, and in it, it
9   would indicate what the edition size is, how
10  big they are.  It's very well documented.
11         And certainly you have that book,
12  as does Mr. Brannan, as does Mr. Lipson
13  (phonetic).  So I don't know what you need
14  beyond that.  I mean, I can't send you
15  every -- every single piece of it.  If I did
16  150 of something, you would have one and say
17  there is 150.  What do you -- going to send
18  you pictures of all 150 pieces?
19         That would seem to me to be
20  obnoxious.  I don't think that would be
21  anything to do with discovery.  That would be
22  attempting to load things, to overburden
23  something.  And I would certainly never
24  approve of that.  I don't know if Mr. Dowd
25  did or not.  But to me, that kind of

Page 176

1
2   mentality is creepy.
3       Q.  Are you aware of why Mr. Markham
4   thought he needed to file a letter with the
5   court indicating that you had moved art works
6   off the premises before the second
7   inspection?
8          MS. ZERNER:  Objection to the
9      extent -- Mr. McKenzie, I just want to
10     object to the extent it calls for
11     attorney/client privileged
12     communications.
13         Now, if you can otherwise answer,
14     go ahead.
15      A.  I have no idea.
16      Q.  Are you aware or do you have an
17  understanding of how Mr. Markham learned that
18  you had moved art works off the property
19  before the second inspection?
20      A.  No.  Like I said, I thought we
21  would -- I was expecting to see from you a
22  detailed list of all 4,000 pieces and either
23  complaining I had more than 4,000 or less
24  than 4,000 with a line-by-line breakdown of
25  every piece that you saw with a photograph

Page 177

1
2   with it, its size, dimensions, it's medium,
3   its year, whether or not it was signed or
4   initialed or not signed.
5          And then, frankly, I was going to
6   compare that to my own notes knowing that I
7   have defective information on that art
8   archive and update the art archive.  That's
9   what I thought was going to happen.
10         I haven't seen anything from you
11  indicating how many pieces you found, what
12  they looked like, where or why.  I saw
13  nothing.  I have no list.
14         And to me it's like saying here is
15  $4 million in cash and you didn't count it.
16  I don't get it.
17         All you did was take pictures of
18  the briefcase.  I don't understand how you
19  think you are making a deal or what's going
20  on or what the story is, but it seems at best
21  very sketchy.
22      Q.  And so am I correct that you don't
23  know how Mr. Markham learned that you had
24  moved art works off the property before the
25  second inspection?

MAGNA
LEGAL SERVICES

Page 178

1
2     A.  I don't know.  And frankly, I don't
3  care because, I mean, I moved it when I
4  thought we were done with this inspection
5  stuff.  I thought all we were doing was
6  looking at documents.
7        So I had no reason to even consider
8  telling him.  Why would I tell him?  For
9  what?  Should I ask him if I can drink water?
10 I mean, why would I do that?
11       MS. SHAH:  I think this is probably
12 a good time for a break.
13       MS. ZERNER:  Yes.  I think we've
14 been going two hours almost.
15       MS. SHAH:  Yes.  Let's go off the
16 record, please.
17       THE VIDEOGRAPHER:  Off the record
18 at 3:50 p.m.
19       (Recess.)
20       THE VIDEOGRAPHER:  On the record.
21 The time is 4:08 p.m.
22       THE WITNESS:  Nothing is coming up
23 on my screen here, so I don't know what
24 to do.
25       MS. SHAH:  Sorry.  Let's go off the

Page 179

1
2  record so we can fix this.
3        THE VIDEOGRAPHER:  Off the at
4  4:08 p.m.
5        (Recess.)
6        THE VIDEOGRAPHER:  On the record at
7  4:13 p.m.
8     Q.  Hi, Mr. McKenzie.
9     A.  Hi.
10    Q.  So we've discussed this afternoon
11 one or two visits from Mr. Dowd's colleagues
12 where they searched through your studio and
13 your computer, et cetera for information to
14 produce in that litigation.  Do you recall?
15    A.  Yes.
16    Q.  Other than Mr. Dowd or his
17 associates, how much time would you say your
18 own studio assistants or employees spent
19 searching through the studio for hardcopy
20 documents or information?
21    A.  I think most of that was done by
22 Dowd.  My studio assistants really spent most
23 of their time going through their own
24 computers and phones to see if there was
25 anything on their pictures or emails or texts

Page 180

1
2  that had any relevance.  And the same for all
3  of my contractors and subcontractors.  I
4  don't remember a contractors or
5  subcontractors coming to look for files.
6        Most of what my studio assistants
7  did to look for files would have been done in
8  conjunct with when Dowd's staff was here.
9     Q.  So those one or two visits?
10    A.  Yes.
11    Q.  Did your studio assistants or
12 employees spend a lot of time looking through
13 other of your or American Image's files,
14 computer files, electronic files -- any of
15 your or American Image's files, including
16 computer files, electronic files, emails, et
17 cetera?
18    A.  All of that was done by Dowd.  We
19 left the computer and the computer and
20 phone with him.  And he did -- I can't
21 remember.  He had some name for what it was
22 that somehow analyzed the computer and got
23 whatever was important.  I can't remember
24 what he called it.  But my computer and phone
25 were there for probably six hours while they

Page 181

1
2  did whatever they had to do.
3        My studio staff, then they went
4  through their own personal computers and I
5  actually paid them to do so.  You know, I
6  paid them as if they were working to go
7  through their own computers and phones as did
8  my subcontractors.
9     Q.  About how much time did they spend
10 going through their own computers and phones?
11    A.  Quite a lot.  And, you know,
12 several of them complained that it was a pain
13 in the ass, as I recall.  Especially my
14 subcontractors were particularly upset that
15 they spent so much time doing it.  I didn't
16 ask them exactly how much.  I don't recall.
17 But it went on for a couple of days.
18    Q.  Did you personally search through
19 your own email for responsive documents?
20    A.  No.  Because Mr. Dowd had some kind
21 of a program -- I can't remember what he
22 called it -- Searchlight or something, that
23 he could type in -- or I guess, put in any
24 kind of search he wanted and it would pull
25 those things out on to a thumb drive.

MAGNA
LEGAL SERVICES

Page 182

```
1
2        So I would say that his ability to
3   search, from what he described, he seemed to
4   think my ability to search was nothing like
5   his ability to search.  And again, I've never
6   tried to search a computer and I'm not a
7   lawyer, so I'm accepting what he says is
8   true.
9        Q.  Did you come to understand at any
10  point during this litigation that there was a
11  problem with the discovery that you had
12  provided?
13       A.  Not until recently, no.  I don't
14  remember anyone telling me, not -- not
15  whoever was involved along the various ways,
16  you know, Lipson or Brannan or Nikas or
17  anybody saying to me, oh, you know, we only
18  have 16,000.
19       I remember they were asking for
20  other people's stuff and the other people
21  provided it.  I don't know what more I can
22  really do beyond that.
23       I mean, I know they asked for one
24  or two people that worked for me either a
25  long time ago or -- and I wasn't able to get
```

Page 183

```
1
2   them to -- to do anything.  But I can't -- if
3   someone doesn't want to participate, I can't
4   really do anything.  But otherwise, all the
5   people that were currently working for me at
6   any point in this litigation, they provided
7   anything they possibly could.
8        And I asked them several times.
9   Are you sure?  You know, anything.  Even if
10  you think it's obscure and really doesn't
11  have anything to do with anything, just put
12  it in.  You know, don't -- I mean don't send
13  in your grocery list and stupid stuff.  But
14  if it's a comment that you made to me about
15  Robert Indiana, just put it in.
16       So I thought that everybody did,
17  you know, a fairly comprehensive job of going
18  through all their -- their electronic
19  instruments to get whatever was necessary.
20  And my understanding was it was quite a lot
21  of stuff.
22       Q.  How much time did you personally
23  spend going through emails or electronic
24  files or hardcopy files to look for documents
25  relevant to this case?
```

Page 184

```
1
2        A.  I told you that Mr. Dowd seemed to
3   think he had a much better source of doing
4   that than mine and encouraged me to leave my
5   computer with him, which I wasn't so happy
6   with, but that's what I did.
7        Q.  Okay.  So you spent basically no
8   time searching for documents personally, is
9   that right?
10       A.  Well, I drove into New York City,
11  left the computer with him for six hours and
12  drove.  Back so a ten-hour day was shot to
13  the wind.  And he printed it out or put it on
14  a thumb drive, whatever it was, and he seemed
15  to think that that would be much more
16  efficient and much more accurate than me
17  trying to do it by hand, which is what I
18  would have done.
19       MS. SHAH:  I don't think I have
20       anything else at this point.  Thank you,
21       Mr. McKenzie.
22       THE WITNESS:  Thank you.
23  EXAMINATION BY
24  MS. ZERNER:
25       Q.  All right.  Mr. McKenzie, I have a
```

Page 185

```
1
2   few questions before we go.
3        A.  Okay.
4        MS. ZERNER:  I believe we are on
5   the next exhibit.  Should be Exhibit 21,
6   is that correct?
7        MS. SHAH:  I think that's right.
8        THE EXHIBIT TECH:  Yes, ma'am,
9   that's correct, 21; 21 is correct.
10       MS. ZERNER:  I appreciate that.
11  Thank you.
12       All right.  Then I am going to mark
13  this next document, which is the order
14  from the Supreme Court of New York.
15  This will be marked Exhibit 21.
16       (Exhibit 21, Supreme Court of New
17  York Order, marked for identification.)
18       Q.  And Mr. McKenzie, do you recognize
19  this order?
20       A.  Yes, I do.
21       Q.  Is this the one that you had in
22  your hand and referenced earlier when you
23  were talking about an order from
24  Judge Schecter?
25       A.  Yes.
```

Page 186

1
2      Q.  Okay.
3      A.  And I was present for that order as
4  well, so I witnessed the entire thing.
5      Q.  You were in court at the time that
6  the argument was held on the estate's
7  petition seeking an injunction against you,
8  is that accurate?
9      A.  Yeah.  It was a 15-minute bench
10  decision.  The judge wasn't buying into any
11  of his story.
12      Q.  Okay.  And Mr. McKenzie, do you
13  take court orders seriously?
14      A.  Yeah.  I'm a -- you know, my family
15  is in politics.  My great-great-grandparents
16  were policemen.  And, you know, I'm guy who
17  has driven 350,000 miles with no ticket.  I'm
18  very pro-cop, very pro-law.
19      Q.  Okay.  I just wanted to clarify.
20      I believe I heard you say earlier
21  today in response to questioning about
22  whether you knew there was a court order in
23  place regarding the second visit to your
24  property, the inspection, I believe I heard
25  you say something like, well, it wouldn't

Page 187

1
2  matter one way or the other if there was a
3  court order.
4      Can you clarify what you meant
5  about that when you were speaking to
6  Mr. Markham?
7      A.  Yeah.  What I -- see I'm very -- I
8  obey authority.  I believe in authority.
9      So if John Markham is my attorney
10  and he tells me that people are going to come
11  over on Friday, he doesn't need a court
12  order.  I am going to obey him because he is
13  an authority.  The court order is obviously a
14  big authority, but, you know I don't speed,
15  and I don't make left-hand turns.  I'm just
16  not that kind of person.  I'm very pro-obey
17  the law.  That's who I am.  You know, I'm a
18  straight guy.
19      Q.  Okay.  Just -- just clarifying that
20  you weren't saying that court orders don't
21  matter, correct?
22      A.  No.  I would never disobey --
23      Q.  Okay.
24      A.  -- any kind of authority order.
25  Never would.

Page 188

1
2      Q.  All right.
3      MS. ZERNER:  I'm going to move on
4  to another document, so this will be
5  marked Exhibit 22.
6      (Exhibit 22, Markham Inventory
7  email to Zaretsky, marked for
8  identification.)
9      Q.  And this is an email.  One moment.
10      All right.  Mr. McKenzie, I am
11  showing you an email between counsel.  And
12  this is from John Markham to the attorney Don
13  Zaretsky, and I'm copied on it, Bridget
14  Zerner, and it's entitled "Inventory."
15      Now, I know you are not on this
16  email, but the content here is a message from
17  John Markham saying, "This is the current
18  inventory AIA has including Rosenbaum."
19      Do you see that?
20      A.  Yes.
21      Q.  Do you recognize the list here,
22  this inventory?
23      A.  Yes.  That's what we were hoping
24  they would check because we are not sure how
25  accurate this is, right?  Like I said, it's a

Page 189

1
2  guess.  We made the best guess we could.
3      We were kind of hoping that Nikas
4  and his staff was going to go over it piece
5  by piece by piece and say, Well, you told us
6  there would be 19 things that do this, but we
7  found this and we are missing that or we have
8  more of these or less of these or something
9  else.
10      And we were very surprised --
11      Q.  Okay.
12      A.  Yeah.
13      Q.  Mr. McKenzie, I understand.  You
14  explained that before, so I don't -- I just
15  am trying --
16      A.  Sorry.
17      Q.  -- to get through some -- some
18  other points here.
19      So did you provide this list to
20  your counsel?
21      A.  Yes.
22      Q.  And did you authorize disclosure to
23  Mr. Zaretsky?
24      A.  Yes.  And I spoke to Mr. Zaretsky
25  about it as well.

**MAGNA**
LEGAL SERVICES

Page 190

```
1
2      Q.  Okay.  And he, at that time to your
3  understanding, represented the Star of Hope?
4      A.  Yes.  That was my understanding.
5      Q.  And did you understand this could
6  also be disclosed to Morgan?
7      A.  Yes.  As well as to the estate.
8      Q.  And did -- okay.  And did you
9  purposely leave off any Indiana artwork from
10 this list?
11     A.  No.
12     MS. ZERNER:  Moving on to another
13     exhibit for some questions.  This next
14     one, I'm showing you another email chain
15     that we are marking as Exhibit 23.
16     Q.  And this, the top email has a date
17 of May 24, 2021.
18     And Mr. McKenzie, I know you are
19 not copied on this email, but I just want to
20 ask you a few questions about the content
21 because this is, again --
22     A.  Okay.
23     Q.  -- some messages between counsel.
24     And this was, you can read from the
25 content that this was regarding arrangements
```

Page 191

```
1
2  for the first visit to your property where
3  counsel agreed to have these parties come in
4  and see the artwork, okay?
5      (Exhibit 23, Email chain re first
6  visit to American Image Art, marked for
7  identification.)
8      A.  Okay.
9      Q.  And if you see here, scrolling down
10 to the beginning of the email chain, which
11 starts with Mr. Zaretsky back on May 24,
12 2021, and Mr. Zaretsky is listing names of
13 people who may be or will be coming to your
14 property to look at the art.  And he names
15 various people, including some of the
16 Salama-Caro.
17     Mr. McKenzie, did you have an
18 understanding that some of the Morgan parties
19 or their representatives may come to your
20 property to see the artwork in May 2021?
21     A.  Yes, I did.
22     Q.  There is also a reference here to a
23 Luke potentially coming.  It says, Let's put
24 Luke's name on the list.
25     Did you understand that Luke Nikas
```

Page 192

```
1
2  on behalf of the Morgan parties may come as
3  well?
4      A.  Yes, I did.
5      Q.  And the email from Markham to
6  Mr. Zaretsky about this viewing of the
7  artwork at your studio explains that another
8  attorney from our firm, Tom McCarty, would be
9  there and that you, Mr. McKenzie, were not,
10 but that Oz Gonzalez would be there.
11     Do you recall that?
12     A.  Yeah.
13     Q.  And did you leave Mr. Gonzalez in
14 charge that day to present the artwork?
15     A.  Yes.  And also Annette Vessecchia as
16 well.  I felt one should be upstairs and one
17 should be down.  I don't really know what
18 they did because I wasn't there.  Wasn't
19 there, I should say.
20     Q.  Was -- were they authorized to show
21 all of the Indiana artwork relevant to this
22 case to the parties?
23     A.  Yes.  Anything they wanted to show
24 they could show.
25     Q.  Did you instruct --
```

Page 193

```
1
2      A.  My desire was to sell all the art
3  and be done with this.  That's what I thought
4  we were trying to do.
5      Q.  And you opened up your studio and
6  any other parts where there was artwork for
7  them to see?
8      A.  Yes.
9      Q.  Did you instruct Oz or anyone else
10 that they should hide any artwork from these
11 parties?
12     A.  No.  It was to my advantage to have
13 as many pieces as I could to get the highest
14 amount of money back that -- that I could
15 get.
16     MS. ZERNER:  I'm marking another
17     email chain as the next exhibit,
18     Exhibit 24.  Again, you will see,
19     Mr. McKenzie.  You are not on the emails, but
20     I want to ask you about some of the
21     content.
22     A.  Okay.
23     (Exhibit 24, July 2021 Email chain
24 re second inspection, marked for
```

Page 194

```
1
2      identification.)
3         Q.  These are emails in July 2021 and I
4   will scroll down to the earliest at the
5   bottom.
6         So to explain, this is when counsel
7   was discussing the terms of an inspection of
8   your property, which would be a second visit
9   to your property to see documents there,
10  okay?
11        A.  Okay.
12        Q.  Now, Mr. Markham on July 20, 2021,
13  says to Mr. Nikas, in part here -- if you're
14  with me -- there is one part where he says,
15  regarding the draft stipulation that counsel
16  were working on, he says right here, This
17  still says, quote-unquote, artwork and it was
18  my impression from our discussion the other
19  day that you were not planning to copy
20  artwork.
21        Do you see that?
22        A.  Yes.
23        Q.  Now, Mr. Nikas responds up here in
24  the next email on this chain, up here on
25  July 20, responding to Mr. Markham in this
```

Page 195

```
1
2   email, second paragraph, "As for the
3   reference to artwork, correct.  I don't
4   intend to inventory all the artwork because
5   that was basically done before."
6         Do you see that?
7         A.  Yes.  That's what I was told, that
8   we were done with that.
9         Q.  That was my question.
10        Was that relayed to you by
11  Mr. Markham?
12        A.  Yeah.  I asked him why are they
13  coming back again.  He said they want to see
14  more documents.  I said all right, whatever.
15  I mean...
16        Q.  Now, Mr. Nikas does also say here,
17  "I also don't want to be completely precluded
18  from photographing any artwork at our
19  inspection."
20        Do you see that?
21        A.  Yes.  I was not told that though.
22        Q.  Well, let me -- just wait for a
23  question.
24        You were not there, right?
25        A.  No, I wasn't there.  But I was told
```

Page 196

```
1
2   it was an inspection of documents.
3         Q.  Okay.  And I also want to know, so
4   was Mr. Gonzalez at the second visit as well?
5         A.  I believe so.  And I believe both
6   he and Annette were there for both visits.
7         Q.  Okay.  Well, did anyone who was at
8   your studio that day for the second visit
9   with Mr. Nikas and the other people coming
10  that day, did anyone report to you that
11  Morgan wanted to or tried to photograph any
12  artwork that day and they could not do so?
13        A.  No.  I think they stuck to the
14  original plan of just looking at documents.
15  That's -- that's what I was told.  Again, I
16  wasn't there; that's just what I was being
17  told.
18        Q.  And Mr. McKenzie, as you sit here
19  today, do you know the exact dates that you
20  moved artwork to your new storage facility?
21        A.  Honestly, I don't.  You know, it's
22  a couple of months ago, so I don't remember
23  the exact timing of it.  I would really have
24  to research it to figure it out.
25        Q.  And I understand you agreed to
```

Page 197

```
1
2   check for those records.
3         So, and you made multiple trips to
4   the storage facility, right?
5         A.  Yes.
6         Q.  Is it possible you made some trips
7   to the storage facility when we were
8   discussing a further inspection of documents?
9         MS. SHAH:  Objection.
10        A.  It's possible.
11        Q.  You are not sure?
12        A.  I'm not sure, no.
13        Q.  Well, let me ask you.
14        Before the second visit, the
15  court-ordered inspection, once you knew that
16  there was going to be a second visit, did you
17  instruct any of your staff to hide the fact
18  that you had moved artwork to a new storage
19  facility?
20        A.  No.  I thought that was a positive
21  for everyone.  Because, as you saw those
22  limited pictures of my studio, things are
23  stacked up on top of each other; whereas, in
24  the storage facility, they are on shelves and
25  they are lined up where you actually have a
```



Page 198

1
2  much better idea of what you are looking at.
3      I mean, it's very difficult to
4  really see what goes on in the studio because
5  there is so much on top of itself.  In the
6  storage facility at least it's somewhat more
7  palatable.  Here it's almost impossible.
8      MS. ZERNER:  Thank you,
9  Mr. McKenzie.  I don't have any further
10 questions.
11     THE WITNESS:  Okay.  Thank you.
12     MS. ZERNER:  Michelle might have
13 follow-up.
14     MS. SHAH:  I don't have anything
15 further.  Thank you.
16     MS. ZERNER:  Great.
17     THE VIDEOGRAPHER:  Off the record
18 at 4:35 p.m.  This concludes today's
19 deposition.
20     (Time noted:  4:35 p.m.)
21
22
23
24
25

Page 199

1
2                    - - -
3              I N D E X
4                    - - -
5  WITNESS          EXAMINATION      PAGE
6  MICHAEL McKENZIE   MS. SHAH        4
7            MS. ZERNER     184
8
9
10                   - - -
11 -------------- EXHIBITS ---------------
12 EXHIBIT      DESCRIPTION         PAGE
13   1     Court Order         9
14   2     Docket 393-4 Art archive   101
         printout of Book of Love
         covers
15
16   3     Docket 393-5 Art archive   110
         printout listing Book of
17       Love books
18   4     Docket 393-6 art archive   114
         printout for HOPE works
19
20   5     Docket 393-12 Art       117
         archive printout for
         Aluminum Art
21
22
23
24
25

Page 200

1
2  6     Docket 393-15 Photograph   124
       of proofs of fabricated
3      ART images
4  7     Docket 393-16 Variations   133
       on metal of LOVE and
5      HOPE
6  8     393-19 Star of Hope     136
       pictures
7
8  9     Docket 393-14 Baker     140
       Museum Exhibit Inventory
9      Checklist
10 10    Docket 393-17         141
       Continuation of Baker
       Museum Exhibit Inventory
11     Checklist
12 11    Docket 393-18         142
       Continuation of Baker
13     Museum Exhibit Inventory
       Checklist
14
15 12    Docket 393-13 Images for   146
       HOPE calendar
16 13    Photograph of Susan     149
       Sheehan Gallery book
17
18 14    Docket 393-23 Photograph   153
       of study for
19     Indiana/Dylan project
20 15    Docket 393-24 Photograph   158
       of limited edition
       Dylan/Indiana small and
21     big books
22
23
24
25       Index (cont'd)

Page 201

1
2  16    Docket 393-30 Photograph   162
       of McKenzie studio
3
4  17    Docket 393-39 Photograph   163
       of trial piece for
       Dylan/Indiana book
5
6  18    Docket 393-29 Photograph   167
       of LOVE on metal
7  19    Docket 393-25 back of     169
       metal LOVE on metal
8
9  20    Docket 393-33 Photograph   173
       of file cabinet with
       Indiana prints
10
11 21    Supreme Court of New     185
       York Order
12 22    Markham Inventory email   188
       to Zaretsky
13
14 23    Email chain re first     191
       visit to American Image
       Art
15
16 24    July 2021 Email chain re   193
       second inspection
17
18
19
20        INDEX
21 Request for Production of Documents
22    PAGE   LINE
23    21    3
      27    17
      50    18
24    50    25
      51    11
25    74    19



Page 202

```
1
2
        - - -
3   Stipulations
    Page  Line
4         Page  Line  Page  Line
    None
5
6       - - -
7   Questions Marked
    Page  Line
8         Page  Line  Page  Line
    None
9       - - -
10
    To Be Filled In
11  Page  Line
          Page  Line  Page  Line
12  None
        - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 203

```
1
2                   CERTIFICATE
3
        I HEREBY CERTIFY that the foregoing
4   proceedings were duly sworn by me and is a
    true record of the testimony given by the
5   witnesses.
6
    _____
    Leslie Fagin,
7   Registered Professional Reporter
    Dated:  September 12, 2021
8
9
10
        (The foregoing certification of
11  this transcript does not apply to any
    reproduction of the same by any means, unless
12  under the direct control and/or supervision
    of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 204

```
1
2   ACKNOWLEDGMENT OF DEPONENT
3       I, MICHAEL McKENZIE, do hereby
    certify that I have read the foregoing pages,
4   and that the same is a correct transcription
    of the answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or substance,
6   if any, noted in the attached Errata Sheet.
7
8
    MICHAEL McKENZIE
9           DATE
10
11  Subscribed and sworn
    to before me this   day of   , 2021.
12
    My commission expires:
13
14
    Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 205

```
1
2       - - - - - -
3       E R R A T A
4       - - - - - -
    PAGE     LINE       CHANGE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**A**

abide 133:5
ability 107:11
  116:4 129:10,25
  168:10 182:2,4,5
able 30:17 36:13
  81:21 103:8
  104:23 117:5
  123:20 151:23
  182:25
Absolutely 74:19
  93:9,10,12
abundantly 39:10
  72:5
accepting 182:7
access 120:14 123:5
  123:7,21 131:17
  136:4 138:16
  145:2
accessing 120:11
accuracy 103:17
accurate 5:5 46:15
  102:9 103:4 104:3
  104:5 184:16
  186:8 188:25
accurately 172:17
accused 80:11
ACKNOWLED...
  204:2
activities 71:16
add 102:22
added 102:25
additions 118:7
address 21:6,9
adjacent 20:22
advantage 193:12
advised 88:25
affiliated 127:22
affordable 41:12
  41:14
afternoon 4:9,16
  179:10
Agency 141:4
aggregate 144:8
ago 35:9 54:6 55:18

82:4,6 87:21
  112:2 174:21
  182:25 196:22
agree 82:10 110:20
  148:12,22
agreed 9:4 29:14
  40:12 115:21,23
  191:3 196:25
agreement 29:11
Ah 27:4
Ahava 54:4,5
  174:11,19,20
ahead 5:17 9:24
  107:9 176:14
AIA 188:18
Air 113:25 114:18
Alex 56:12,13
  58:17 112:24
  159:7 163:7
allege 128:9 148:10
  148:10
alleges 128:6 148:8
  148:9
Allen 72:25 74:22
  75:2 77:24 78:5,7
  79:6,24 80:4,19
  80:24 81:19 82:15
  83:7,22 84:5,18
  84:22 86:5,6,19
  86:22 89:3 108:12
  108:14,17,21,21
  108:22 109:7,8,10
  109:10
Allentown 113:13
  113:21,22
allowed 42:18
  69:24 165:15
allowing 8:25
alphabet 54:8
aluminum 117:16
  118:5,12,13 169:7
  199:20
amazing 114:5
Amazon 142:13
  152:18
American 1:6 2:8

3:25 180:13,15
  191:6 201:14
amount 42:3 43:9
  49:21 53:3 61:12
  72:11 79:13 171:5
  193:14
analyzed 180:22
Andy 65:21,23
  150:13 154:5
and/or 52:12 75:14
  203:12
animals 39:19
Annette 17:11 18:7
  19:12 20:4 23:19
  32:8 33:11 38:7
  47:20,25 59:15
  60:15,18,25 62:5
  62:7 105:12 106:2
  106:17 123:6
  192:15 196:6
Annette's 20:19
answer 5:9,18 34:8
  41:13 51:7 72:16
  72:19 80:20,21,25
  81:8,13,14 82:13
  83:17,19 84:2
  85:9,12 89:17
  90:5,6 98:2 108:8
  112:2 121:4,14
  130:17,24 144:12
  144:20 167:8
  176:13
answered 72:19
  144:4
answers 5:9 96:4
  204:4
anxious 76:14
anybody 31:24
  47:23 59:4 82:19
  93:3 105:21
  119:23 122:20
  123:16 182:17
anybody's 60:8
anymore 17:13
  91:7 92:15,17,22
  100:18

anyplace 50:11
anyway 128:14
  130:8
apart 55:25 104:4
  147:13
apartment 41:7
  74:5
apologies 101:15
apologize 13:10
apparently 49:17
  49:20 62:12 79:12
  105 126:6
appear 83:10
appearance 94:13
appearances 2:2
  3:16
appears 110:16
  118:4 148:7
Apple 6:22
apply 203:11
applying 23:21
appreciate 138:3
  185:10
apprise 80:2 82:19
  83:4
apprised 60:3
  80:18 82:13 83:19
  84:2
approach 83:2
approve 166:6
  175:24
approved 23:16
arbitration 96:11
archive 101:18
  102:7,15,19 103:3
  103:9,13,23,25
  104:2,16 105:3
  106:3,8,9,17,21
  106:24 110:6,17
  111:7,10 114:24
  115:10 117:16
  118:2,24 119:3,15
  120:6,20,23 121:4
  121:6,9 122:11
  123:6,15,17,21
  127:8 134:9,14,17

177:8,8 199:14,16
  199:18,20
archives 111:4
area 45:21 49:23,24
  50:13
areas 72:8
argument 186:6
arrangement 73:17
arrangements
  190:25
art 1:3,6,10,11 2:9
  3:5,20 4:2,14,17
  4:20 8:19 9:2
  10:14,16,22 11:8
  13:21 25:14 35:12
  35:16 36:12 40:2
  43:20 45:9,14
  46:3,19 47:5,12
  47:12 53:15 59:7
  59:25 60:5 61:9
  61:13 62:17 63:8
  65:14,14,15 71:25
  72:2,9,14 73:2,9
  73:12 74:23 78:8
  78:14 83:4,20
  84:3 87:23 94:6
  95:15 96:10 98:25
  99:5 101:17 102:7
  102:15,19 103:3,8
  103:13,23,24
  104:2,16 105:3
  106:3,7,9,17,21
  106:24 110:5,17
  111:3,7,10 114:23
  115:10 117:15,16
  118:2,6,23,23
  119:2,15 120:6,20
  120:23 121:4,6,9
  122:11 123:6,14
  123:17,21 124:5
  125:2,10,23 127:7
  128:4 130:12
  134:9,13,17,25
  135:7 143:16,17
  150:16 158:21
  173:23,25 176:5



176:18 177:7,8,24
191:6,14 193:2
199:14,16,18,19
199:20 200:3
201:14
**article** 100:2
**artist** 23:10 65:11
95:16 150:11
151:4 165:14
172:14
**artists** 25:17 65:17
112:25 150:12
**artist's** 171:2,10
172:3
**artwork** 32:20 33:4
34:10 36:18 37:4
37:8,14 38:2
67:20 73:15 95:16
190:9 191:4,20
192:7,14,21 193:6
193:10 194:17,20
195:3,4,18 196:12
196:20 197:18
**artworks** 67:14,15
**aside** 59:11
**asked** 5:19 14:14
14:17 16:8,10,12
18:21 30:18 37:18
82:22 93:20,25
94:7 96:20 121:2
130:18 135:25
139:4 144:17
149:19 174:10
182:23 183:8
195:12
**asking** 4:15 6:3
11:10,12,15 37:18
66:20 71:8,9
81:13 85:10 90:14
128:23 131:5,16
135:15,17 137:15
137:17 139:20
144:9,12 145:16
145:18 182:19
**asks** 30:11
**ass** 181:13

**assets** 90:12,17
**assistant** 154:4
**assistants** 71:11
179:18,22 180:6
180:11
**associate** 132:15
**associated** 70:20
**associates** 98:23
120:19 131:9
132:6 165:11
179:17
**association** 68:18
70:14 95:15
**assume** 5:18 6:12
12:15 33:14 82:12
83:18,25 96:21
128:3 129:6
132:25 145:3
**assumed** 10:12,14
62:18,19 132:21
**assuming** 20:3
127:4
**assumption** 81:20
84:8
**attached** 101:21
204:6
**attachment** 65:10
**attempt** 103:11
166:17
**attempting** 175:22
**attorney** 8:4,8 68:6
68:8,13 69:7,12
90:21 129:8 133:4
144:9 187:9
188:12 192:8
**attorneys** 2:4,8
8:18 14:2,9 15:5
15:23 20:6 21:2
32:6 37:2 60:4
62:8 68:25 69:20
74:17 89:13 91:5
92:12 93:5 120:20
145:13,16
**attorney/client**
89:14 91:2 176:11
**audio** 62:6 78:22

**August** 8:18 31:14
32:19 98:18
**author** 128:14
**authority** 187:8,8
187:13,14,24
**authorize** 189:22
**authorized** 192:20
**automatically**
118:24
**available** 49:12
74:16 106:18,22
111:20 142:13
152:17
**aveer** 139:16,17
**Avenue** 2:5
**averred** 114:10
**Avis** 49:14
**aware** 8:18,24
11:22 13:18 15:13
28:17 32:17 58:20
62:5,6 68:12
98:22 99:4 111:12
111:15 119:17,19
123:20 128:5,18
128:25 143:21
148:6 176:3,16
**awful** 13:23
**A-R-T** 53:16 87:23
125:24 173:24

---

**B**

**back** 23:2,9 26:4
31:4 61:7,14,22
61:25 63:18 66:22
73:21 77:8 86:5
88:10 93:19 94:21
94:25 98:20
104:11 105:16
108:25 115:22
121:22 151:15
165:22 168:24
169:18,23 184:12
191:11 193:14
195:13 201:7
**backed** 42:6
**background** 22:20

153:16
**bagels** 31:18
**Baker** 140:18 141:2
141:7,22 142:4,23
143:5 200:7,10,12
**balls** 43:21
**bankruptcy** 80:15
**bar** 68:17 70:14
**Barack** 73:23
**Barbara** 97:9
**BARBARY** 2:14
**Barbery** 3:12
**barn** 59:23 162:14
**barrel** 79:24
**basically** 92:18
141:3 184:7 195:5
**basis** 69:21,22
129:21 130:22
137:9 139:2 144:2
144:22 145:12,20
148:20,22 175:3
**Bates** 113:11
**Bedford** 20:22
38:13 41:6
**began** 26:9 95:4
**beginning** 18:4
25:19 30:19 42:18
66:4,11,21 73:24
87:6,8 109:5
112:21 174:24
191:10
**begins** 3:3
**begun** 26:14
**behalf** 192:2
**believe** 16:16 18:20
32:19 55:7 73:19
74:5 87:12,20
111:17 128:13
131:10,11 140:25
159:24 160:9
168:25 174:13
185:4 186:20,24
187:8 196:5,5
**believed** 100:10
**bell** 147:19
**bench** 186:9

**bend** 168:10
**bending** 116:18
**benefit** 74:25
**bent** 116:19
**best** 46:8 47:9
51:17 85:15
125:18 177:20
189:2
**bet** 174:6
**better** 17:19 34:21
35:17,19 36:14
38:20 39:6 41:20
41:21 42:7 88:16
184:3 198:2
**beyond** 107:11
175:14 182:22
**bid** 75:10
**big** 43:17 76:7,9
109:22 151:21
158:5 159:14
160:5,17 175:10
187:14 200:21
**bigger** 159:3,23
160:11
**biggest** 49:7
**bills** 63:5
**Billy** 154:3
**bit** 13:15 112:23
**black** 22:19
**blank** 63:21,23,25
64:4,4
**blast** 64:5,7,8
**blasting** 153:16
**block** 112:4
**Blond** 105:17
**blow** 142:6
**Blue** 170:4
**board** 132:20
**Bob** 24:9 52:23
53:2 87:14 115:20
116:8,11 124:25
143:10,13 151:12
151:15,16,18,20
151:21,22 152:3,4
152:5 153:12,16
153:17,18 154:11

154:24,25 155:15
156:15,24 157:16
157:19 158:8,10
159:17,25 164:7
164:19,22 166:10
168:15 171:12
**Bob's** 151:19
153:13
**book** 52:17 64:21
87:20 99:9,19
101:18 102:10,11
102:13 110:6,17
130:9 141:4 149:6
149:14,19,21,24
150:5,7,10 151:10
152:10,16,19
153:23 156:3,4,21
157:11,12,14,16
157:16,16 160:5,5
160:20 164:3,7,10
166:10 172:12
175:8,11 199:14
199:16 200:16
201:4
**bookkeeper** 50:20
**books** 53:2 67:5
72:6 73:20 110:7
110:18 158:5,9,10
159:16,22,24
160:6 161:2,5,5,6
199:17 200:21
**boroughs** 49:23
**Boston** 2:10
**bothering** 78:22
**bottom** 101:22
110:10,23 117:2
117:21 134:12
143:17 164:16
173:18 194:5
**bought** 31:18 73:20
76:6,8 87:9,11,20
108:12,25 112:21
112:23,24 174:23
**bowling** 43:21
**Box** 81:24
**boxes** 18:16 119:22

119:22 120:12
143:7 162:22
**brand** 35:14 39:5
**brand-new** 41:18
42:2
**Brannan** 1:7,14
80:13 171:7,13,20
172:2,15 175:12
182:16
**break** 7:25 8:2 15:5
39:24 47:8 85:18
94:4 178:12
**breakdown** 176:24
**breaks** 8:6
**Bridget** 2:10 3:23
188:13
**briefcase** 177:18
**bring** 97:14
**broadcast** 59:6
**Broderick** 2:15
9:15 32:16 101:7
101:15 110:2
114:20 117:13
123:25 133:7
136:8 140:9
141:13 146:2
149:4
**broke** 25:13
**Bronxville** 72:8
**brought** 15:24,24
171:20
**building** 35:5,6,16
40:12
**built** 39:6
**bunch** 72:7 97:6
159:25
**bus** 171:21
**business** 3:25 60:9
60:14 80:5,21
81:2,16 82:17
85:7,11
**businesses** 79:17
**buy** 34:15 36:3
73:14 75:6,23
76:14 81:23 82:3
83:2 84:23 87:14

87:19 112:23
128:15
**buying** 75:3 76:5
77:13,21 186:10

---
**C**
---

**c** 4:3,3
**cabinet** 173:3 174:6
201:9
**cabinets** 173:10
**calendar** 146:10,16
146:18,21 147:4
147:22 148:3
200:15
**California** 129:16
**call** 39:3 49:19
52:16 59:12 97:21
102:7 113:4
127:10
**called** 4:3 22:10
54:14 149:7
180:24 181:22
**calls** 21:18 73:13
89:14 120:9
176:10
**cameras** 42:3
**canvas** 25:15 26:21
116:21 156:20
163:10,11 168:4
170:2
**canvases** 162:23
**car** 75:22,24
**care** 82:23 119:24
145:7 178:3
**careful** 43:20
**Carolina** 50:3
**case** 4:24 13:22
14:7 15:20 16:7
18:5,6 20:13 39:8
70:22,25 88:8,18
88:22 89:8 90:13
90:19 100:25
101:22 143:11
165:19 170:3
183:25 192:22
**Casey** 27:3

**cash** 10:17,19
177:15
**catalogue** 104:5
141:9 142:8,12
**ceiling** 43:7
**center** 127:16
**Cerciello** 27:3,4
**certain** 99:24
103:22
**certainly** 77:20
108:19 156:24
161:8 170:12
175:11,23
**CERTIFICATE**
203:2
**certification** 203:10
**certify** 203:3 204:3
**certifying** 203:12
**cetera** 59:13 179:13
180:17
**chain** 190:14 191:5
191:10 193:17,24
194:24 201:13,15
**chance** 52:11 80:14
80:16 109:14
**change** 24:10
139:21 160:2
205:4
**changed** 124:25
158:24 160:3
**changes** 159:3,25
160:4 164:8 166:3
204:5
**character** 165:18
**charge** 192:14
**chart** 113:7,10
**chat** 9:10 27:23
**cheated** 10:25
**check** 62:2,23,25
77:6 106:18,22,24
122:20 188:24
197:2
**checklist** 140:19,25
141:23 142:2,24
143:3 200:8,11,13
**cheese** 31:19

**children** 41:7 74:25
90:22
**choose** 90:24
**Christ** 98:15
**Christine** 112:15
**circumstances**
92:22
**city** 6:4,4 121:20
184:10
**Claes** 163:8
**claimed** 67:4 72:3,6
**clarification** 11:14
**clarify** 5:14,17
128:24 186:19
187:4
**clarifying** 187:19
**clear** 11:16 37:21
37:23 39:11 72:5
72:10
**cleared** 160:17
**clearly** 69:18 99:18
121:8
**clever** 80:14
**click** 57:23
**clicked** 169:8
**clients** 74:7,10,13
75:4,10,12,13
76:6,8,11 79:10
**close** 136:3 160:22
**cloud** 107:16
**clue** 129:16,24
132:4 138:2 140:6
**code** 41:6
**coffee** 7:7 31:19
131:22
**collaborated** 151:5
**collaboration**
151:17
**colleague** 3:22
**colleagues** 16:5,25
19:7,11 28:18
179:11
**collect** 15:7,14
16:11 17:3 67:10
70:22,23
**collected** 16:6



MAGNA ▶
LEGAL SERVICES

150:2
collecting 15:19
collector 65:14
collectors 73:6
College 95:14
color 11:5 24:5
    125:4,16,19
    142:11 146:23
    147:2 148:2
    159:24 165:3
colors 22:16 45:3
    125:13,14 165:12
    165:14
comb 30:8
combination 86:8
come 9:8 10:24
    11:25 12:9 29:15
    29:16 30:4,15
    42:19 63:15,16
    75:25 83:2,9
    109:11 121:13,19
    132:16,22 182:9
    187:10 191:3,19
    192:2
comes 40:11 89:8
    90:9 93:14 100:5
    108:7
coming 12:15,16,21
    37:5,11 44:24
    86:5 125:13
    132:14 164:8,13
    178:22 180:5
    191:13,23 195:13
    196:9
commencing 1:18
comment 119:5
    149:20 161:20
    183:14
comments 71:3,5
commercial 2:9
    152:16
commission 204:12
commitment 76:2
communicate 7:8
    7:22 8:3,5,7 86:6
communications

89:15 91:3 176:12
companies 49:15
compare 45:4
    103:8 177:6
compared 33:18
    35:21 44:19
competent 133:3
compiled 62:4
complained 181:12
complaining
    176:23
complete 131:18
completely 93:13
    195:17
complicated 69:21
    102:20 106:16
    119:8
complied 16:17
    69:18
comprehensive
    183:17
computer 6:15,16
    14:15 20:3,3,5
    22:16 71:16
    107:13,16 116:18
    117:8 120:3,4
    121:15,25 134:19
    140:3 179:13
    180:14,16,19,19
    180:22,24 182:6
    184:5,11
computers 16:11
    18:23 71:12
    100:17 116:3,11
    136:6 168:11
    179:24 181:4,7,10
conceal 90:12
concealing 90:17
conception 21:21
concern 38:22
concludes 198:18
conduct 9:2
conducted 8:19
confederacy 164:21
confer 70:15
conference 1:17

98:10
conferences 98:11
conferred 68:17
conferring 69:22
    70:17
confirm 7:20 61:3,4
confirmed 68:19
confirms 118:24
confrontation
    31:24
confusing 101:14
conjunct 180:8
consecutively 170:5
consider 178:7
consigned 108:13
constitute 89:3
construction 47:22
    48:10 59:16,21
    78:17
consult 68:7 79:18
consultant 73:2
consulted 89:13
consuming 47:15
contact 20:24 21:5
    27:15 74:15
contacted 16:18
contain 128:6
    148:7 159:17
    173:15
contained 17:5
contains 151:10
content 188:16
    190:20,25 193:22
continuation
    141:22 142:2,23
    143:3 200:10,12
continue 9:14 94:6
    95:15 96:9
continued 106:3
    112:22
continuing 91:9,12
continuity 164:23
    168:23
contract 70:3 80:7
    81:25
contracted 14:20

contractors 180:3,4
contradicts 30:9
control 35:20 39:16
    203:12
controlled 35:17,19
controls 35:18
    39:17 41:17 42:6
cont'd 200:25
conversation 5:6
    75:17 76:15 94:9
    94:12 150:25
conversations 79:5
    82:5
cool 146:21 155:19
cooperation 131:18
copied 111:25
    140:2 188:13
    190:19
copy 9:9,20 27:23
    122:7 194:19
copyright 52:2
    128:11 148:12
corner 118:15
    159:21
corners 116:21,24
correct 4:20 19:8
    24:15 28:21 33:3
    34:9 37:13,16
    48:2 60:6 68:13
    69:12 77:12 81:20
    82:15 84:7 93:4
    103:9 107:19
    126:4 134:5 157:9
    166:9 168:22
    170:10 175:6
    177:22 185:6,9,9
    187:21 195:3
    204:4
corrected 23:5
corrections 158:16
    204:5
correctly 107:14
corroborating
    66:23
cost 160:23
costing 36:7

Cottingham 56:14
    77:15,22 87:12
    112:25
counsel 3:15
    188:11 189:20
    190:23 191:3
    193:20 194:6,15
count 10:15,18 11:3
    11:3 44:7,18,25
    45:17 48:25 61:20
    61:21 63:5,9,11
    173:14 177:15
counted 61:13,13
    63:14
country 74:3
County 96:14
couple 5:23 18:5
    35:8 40:3 47:21
    53:13 55:18 59:15
    61:11 127:11
    139:4 174:23
    181:17 196:22
coupled 22:20
course 27:18 69:19
    103:20 138:19
court 1:2,19 3:13
    5:2 8:25 9:7,12,19
    9:20 10:2,4,7,10
    12:7 28:7 29:15
    29:22 30:16,20,24
    32:18,19 59:12
    93:20,22,23,25
    94:12,16 96:6,13
    115:3 117:19
    124:8 133:13
    136:13 140:16
    141:18 142:19
    152:25 172:23
    174:14 176:5
    185:14,16 186:5
    186:13,22 187:3
    187:11,13,20
    199:13 201:10
court's 28:20 146:6
    157:24 162:2
    163:22 167:18



169:15
**court-ordered**
29:13 197:15
**cover** 28:24 55:9,16
116:5
**covered** 55:19,22
56:3,4,7
**covers** 101:18
102:11,13 199:15
**coyotes** 39:21
**crap** 76:23
**Crash** 56:17
**crawl** 36:11
**cream** 31:19
**create** 22:4,8,9,24
**created** 22:23
24:19,22
**creates** 23:23,24
**creating** 22:13
23:20
**creation** 21:24 24:8
24:13,13 26:5
71:24
**creepy** 176:2
**crooks** 81:5,6,9,9
**crosstalk** 64:3
82:20 83:23 84:6
113:20 147:20
**crushed** 35:7
**current** 188:17
**currently** 183:5
**custom** 26:6
**Cutrone** 56:17

**D**

**D** 199:3
**daily** 69:4,21,22
**damage** 35:15
**Dan** 56:19
**date** 25:8 26:4
42:15,21,22 58:8
94:24,25 95:3
98:18 110:23
119:11 126:16,17
134:12,13,16
160:21 190:16

204:9
**dated** 28:7 101:22
110:10 115:3
117:20 203:7
**dates** 42:25 51:10
98:13 111:9
196:19
**day** 15:25 25:21
43:25 44:3 48:20
49:4 69:9 109:11
121:16 131:12,12
138:20 184:12
192:14 194:19
196:8,10,12
204:11
**days** 100:23 129:14
131:10,11 181:17
**dead** 148:5 154:2
**deal** 70:5 81:5,8
177:19
**dealer** 78:8,14
**dealing** 76:23
**deals** 79:22 87:3
**debate** 67:25 145:6
**deceases** 95:16
**decide** 23:11 75:24
**decided** 125:18
132:2
**decision** 99:13,15
100:9 186:10
**decree** 70:14
**deep** 45:24
**defective** 102:8
177:7
**Defendant** 1:15
**Defendants** 1:9
**definitely** 132:16
**degree** 14:8 21:23
**demand** 49:18
**demanded** 25:25
**deny** 167:10
**depending** 75:11
**DEPONENT** 204:2
**deposition** 1:17 3:4
3:9 4:24 6:13,17
7:13,15,21,23 8:6

8:10 21:2,3 27:17
32:25 59:14 74:18
97:12 198:19
**describe** 22:12
51:16 68:21 73:11
**described** 56:24
182:3
**DESCRIPTION**
199:12
**design** 21:18 156:3
**desire** 193:2
**destroyed** 40:13
**destroys** 40:12
**detailed** 11:3
176:22
**determine** 8:15,16
121:3 127:6
**determining** 96:9
**devalue** 25:22
**developers** 79:19
84:22
**device** 6:13,14
**devices** 6:18 7:5,22
**diamond** 164:16
**diamonds** 155:11
164:15
**died** 125:21
**different** 18:9
30:13 42:24,25
44:12,13 50:12
73:3 75:4,13
76:10 79:10 84:23
86:16 112:25
125:3,6,14,15
144:17 146:17,20
146:23 147:2
148:2 150:14,15
150:24 155:6
163:9
**difficult** 34:17,23
198:3
**difficulties** 13:11
**dimension** 11:4
**dimensions** 177:2
**direct** 27:24 144:21
203:12

**directed** 73:3
**direction** 23:18
**disagree** 124:17
129:22 130:22
134:23 135:13
137:10 138:9,25
144:3,6 145:20
148:20,23
**disbarment** 68:15
69:13,15
**disbarred** 68:13
69:14
**disclosed** 190:6
**disclosure** 189:22
**discovery** 121:11
133:5 135:22,23
161:7 175:21
182:11
**discuss** 91:4
**discussed** 56:9 89:6
179:10
**discussing** 9:18
108:18,22,24
118:3 194:7 197:8
**discussion** 62:16
164:10 194:18
**discussions** 90:7,16
90:20
**dishonest** 83:12
**disks** 107:6
**disobey** 187:22
**disposal** 49:14
**disposed** 66:6
**distortion** 62:6
**distribution** 21:22
71:25
**DISTRICT** 1:2,2
**divulge** 91:3
**Doc** 28:7
**docket** 101:17,21
101:21 110:5,9
114:23 115:3
117:15,19 124:4,8
133:13,16 136:13
136:16 140:16,18
141:18,21 142:19

142:22 146:6,9
152:25 153:4
157:24 158:3
162:3,5 163:22,25
167:18,21 169:15
169:18 172:23,23
173:2 199:14,16
199:18,19 200:2,4
200:7,9,12,14,17
200:19 201:2,3,5
201:7,8
**document** 28:3,10
63:10 71:6 101:20
102:3 110:8
111:13,19,23
115:2,7 117:18
124:7,11,15 129:2
129:20 130:7
131:21 133:12,19
134:22 135:10
136:12 140:15,21
141:17 142:18
144:10,13 146:5
147:10 148:6
149:5 163:21
167:17 169:14
185:13 188:4
**documented** 103:7
175:10
**documents** 12:10
12:15,16,18,22,23
13:3,4,20 14:6,11
15:7,15,19 16:6,9
17:3 19:16 20:11
30:5,7 37:6,11,12
57:3 62:13 66:6
67:16,21 70:22,24
71:3,4,13,14,17
71:18 98:24 99:5
101:3 107:19
130:19 131:3
132:9,23 178:6
179:20 181:19
183:24 184:8
194:9 195:14
196:2,14 197:8



201:20
**doing** 3:25 5:22
  6:12,17 7:24 14:4
  15:23 16:21 36:4
  54:17 62:12 72:5
  94:7 104:25 121:6
  122:9 124:24
  131:16 132:24
  136:25 147:2
  150:3,18 154:22
  159:13 160:12
  164:7 178:5
  181:15 184:3
**dollar** 63:5 160:8
**dollars** 40:3 88:10
**Don** 188:12
**Donald** 56:15
**door** 39:22
**double** 49:25 67:4
**doubt** 118:19 133:4
**Dowd** 14:9 15:6,23
  18:17 100:12
  111:24 120:9,18
  121:8 122:25
  129:5,24 131:8
  132:24 135:15
  137:12,23 138:13
  139:7,10 148:24
  152:13 161:15
  167:7 175:24
  179:16,22 180:18
  181:20 184:2
**Dowd's** 16:4,25
  19:7,11 70:12
  71:11 132:6
  179:11 180:8
**downstairs** 38:8
  104:11 173:11
**draft** 194:15
**drawer** 136:4
  173:16,19
**drawers** 18:22
  173:12,15 174:4
**drawn** 166:14,16
**drink** 178:9
**drive** 16:16 48:24

74:6 181:25
  184:14
**driven** 186:17
**driving** 43:18
**drove** 184:10,12
**duly** 4:4 203:4
**Dylan** 52:21,23
  53:2 87:14 143:10
  143:13 151:12,15
  151:20,21,25
  152:5 153:16,17
  153:20 154:14,14
  157:19 158:8,10
  159:17 160:20
  164:7 166:10
**Dylan's** 151:22
  153:22,23 155:7
**Dylan/Indiana**
  158:5 164:3
  200:20 201:4

**E**
**E** 4:3,3,3 199:3
  205:3
**earlier** 26:24 28:19
  116:6 185:22
  186:20
**earliest** 194:4
**early** 24:3
**easy** 47:14
**EAT** 53:7 87:23
  125:2 143:16,17
  174:16
**Eaton** 56:20,20
**Eddy** 154:6
**edge** 150:3
**edifications** 169:3
**edition** 24:23 25:3
  26:8,10,13,14
  95:4,5,24 158:4
  158:10 174:12
  175:9 200:20
**editioned** 26:18
**editions** 159:16
**effect** 165:4
**efficient** 184:16

**eight** 8:22 33:9,13
  61:19 62:3,23
  63:17
**either** 44:14 58:9
  60:14 67:11 68:2
  74:6 79:2 81:16
  88:2 103:25 117:2
  119:4 128:17
  132:18 134:19
  137:25 161:19,20
  167:10 176:22
  182:24
**electronic** 6:13,18
  7:5,21 107:3,18
  180:14,16 183:18
  183:23
**electronically**
  129:7
**Eleven** 21:15
**else's** 19:22
**email** 21:6,10 86:7
  86:10 119:11
  181:19 188:7,9,11
  188:16 190:14,16
  190:19 191:5,10
  192:5 193:17,24
  194:24 195:2
  201:12,13,15
**emailed** 86:18
**emails** 19:25 71:17
  120:5 179:25
  180:16 183:23
  193:19,20 194:3
**Emanuel** 2:4 3:10
  3:19
**embarrassing**
  159:14
**employ** 47:12
**employed** 47:21
  48:10
**employees** 179:18
  180:12
**employment** 70:3
**encountered** 25:18
**encouraged** 184:4
**ended** 75:7 146:25

153:17 166:21,22
  166:22
**engagement** 70:2,6
  70:9
**English** 56:18
**entered** 10:4
**entire** 79:23 186:4
**entitled** 8:3 41:5
  67:7 77:4 188:14
**entries** 108:10
  112:5
**entry** 113:4
**Errata** 204:6
**error** 166:24
**especially** 23:12
  181:13
**ESQUIRE** 2:6,6,10
**essentially** 69:6
**estate** 1:7,14 36:2
  66:23 67:3,7
  75:15 77:2,3,7
  80:2,9,18 90:21
  92:18,24,25 94:2
  97:6 123:2 157:15
  170:13,17 171:2
  190:7
**estate's** 186:6
**et** 3:6 59:13 179:13
  180:16
**everybody** 18:19
  59:9 122:19
  151:18 152:8
  157:12 165:10
  183:16
**evolution** 116:2
**exact** 196:19,23
**exactly** 29:3,3
  68:10 93:20 94:10
  95:17 130:15
  181:16
**EXAMINATION**
  4:7 184:23 199:5
**examined** 4:5
**example** 22:14
  24:17 66:18
  104:17,20 106:5

**excited** 109:12
  116:12 151:24
  152:5 154:8 156:9
  168:16
**execute** 147:24
**exhibit** 2:15 9:12
  13:9,16 27:21
  28:8 32:15 101:7
  101:16,17,23
  110:3,5,12 113:12
  114:9,21,23 115:5
  117:15,22 124:4
  124:10 126:22
  133:10,11,15,16
  136:11,14,16
  140:13,17,18
  140:19 141:14,15
  141:19,21,22
  142:20,22,23
  146:4,8,9 149:8
  149:10,12,13
  153:2,4 157:21,25
  158:3 161:23
  162:4,5 163:19,23
  163:25 167:15,19
  167:21 169:12,16
  169:18 172:9,21
  172:24 173:2
  185:5,5,8,15,16
  188:5,6 190:13,15
  191:5 193:17,18
  193:24 199:12
  200:8,10,13
**exhibited** 155:16
**exhibition** 104:18
  141:8 143:5
**exhibits** 101:9
  113:17 119:16
  144:18 199:11
**existence** 120:20
**expecting** 176:21
**expense** 171:11
**expensive** 38:20,23
  158:14
**expires** 204:12
**explain** 28:25 118:8



194:6
**explained** 26:7
189:14
**explains** 192:7
**extent** 89:12 176:9
176:10
**E-A-T** 53:7 87:24
174:17

**F**

**fabricate** 91:10,13
94:6 96:10
**fabricated** 116:17
118:11,13 124:5
125:23 126:15
134:5 137:4 143:9
151:12 200:2
**fabricating** 94:23
106:4
**fabrication** 21:21
71:24 115:21,23
116:3 117:8
**fabrications** 92:7
**fabricators** 116:10
**face** 40:17
**faced** 40:16
**facilities** 39:5,7
41:19 57:22 67:15
**facility** 35:11 38:25
41:12,16,20,22
42:2,7,9,10,12,15
42:24 44:6,10
45:10,15 46:9,18
46:20,25 47:18
48:13,24 50:18,23
51:19 52:6 56:10
56:11,25 57:4,7,9
57:15,17 58:10,22
59:5 67:12,20
196:20 197:4,7,19
197:24 198:6
**fact** 10:21 30:24
35:7 40:3 129:14
132:24 152:6
197:17
**Fagin** 1:19 3:13

203:6
**fair** 5:20
**fairly** 19:4 68:16
73:5 133:3 183:17
**fall** 35:3 55:25
**falls** 27:10 147:13
**family** 186:14
**fan** 151:21
**far** 33:25 85:14
86:14 104:12
**farm** 39:20
**far-off** 41:19
**favorite** 157:5
**feel** 27:23 31:23
66:9 83:12
**feeling** 97:15 119:3
147:15 156:25
**feelings** 125:2
**feet** 35:5 43:6,8,14
45:24,24 49:8,10
49:10 159:8,8,8,9
159:10,11,13,13
**fell** 35:6
**felt** 16:22 35:17,19
69:8 71:5 100:24
109:20 130:5,6
153:19 156:12
160:17 165:16
192:16
**figure** 1:11 22:17
47:6 57:20 81:22
119:6 154:21
196:24
**file** 18:22 173:3,9
174:6 176:4 201:9
**filed** 115:3 117:19
124:8 133:13
136:13 140:15
141:18 142:19
146:6 152:25
157:23 162:2
163:21 167:17
169:14 172:22
**files** 94:20 180:5,7
180:13,14,14,15
180:16,16 183:24

183:24
**filled** 171:21
202:10
**finally** 156:12
165:7 169:3 171:7
**find** 30:5,8 65:9
97:7 127:10 135:6
135:8,24 158:24
**finding** 94:14
**fine** 5:7,15 30:8
42:7 85:20
**finish** 5:4 26:10,12
35:2 64:7,8 95:25
154:2
**finished** 25:3
116:13 147:19
152:6 168:16
169:10
**finishing** 96:2
**firm** 70:7,10,12
71:11 105:3 141:5
141:10 192:8
**first** 11:12,18,20,21
18:5 24:18,22
26:8 28:13 29:10
30:2 34:6 38:3
40:21 42:21 53:5
57:19 58:3,4
73:19 75:19,23
76:19 95:23 112:4
146:22 155:16
158:16 191:2,5
201:13
**fit** 51:20 52:14,15
**five** 33:11 36:22
49:22 95:7 99:12
150:13
**fix** 179:2
**floor** 1:23 83:8
**fluke** 151:22
**folio** 155:21
**followed** 83:13
**following** 96:11
97:20
**follows** 4:6
**follow-up** 198:13

**foot** 159:10,10
**forbid** 39:21
**Force** 113:25
114:19
**foregoing** 203:3,10
204:3
**forget** 129:15
**forging** 97:19,23
**forgot** 64:25 65:6,7
65:25 66:2
**form** 117:7 204:5
**formerly** 73:3
**formula** 45:25
**forth** 151:16
165:22
**fortieth** 51:3
**forward** 75:9
**found** 34:2 41:18
60:21,22,22 61:5
64:25 65:7 67:2
68:10 96:5 115:25
116:10 134:22
137:8 138:8
143:21 148:15
149:21 157:3
167:2 168:4
177:11 189:7
**Foundation** 1:3,10
3:5,20 4:14,18,20
8:19 9:2 13:21
62:8 71:19 83:5
83:20 84:3
**four** 39:17 57:21
87:11 142:10
153:12 165:20
**Frank** 163:7
**frankly** 35:2 41:2
68:17 80:9 81:2
82:25 95:25 116:7
136:25 161:18
177:5 178:2
**fraudulent** 89:3,7
89:23 90:8
**free** 27:24 83:16
131:17 138:16
**freeze** 72:17,18

**freight** 43:3
**Friday** 3:7 187:11
**friend** 79:20
**front** 28:3 76:6,8
96:22,25 97:5,11
98:9 102:3
**full** 33:15 106:14
122:6 132:24
**fully** 126:6
**fun** 47:15 53:11
143:16
**function** 9:10
**funny** 164:24
**further** 197:8 198:9
198:15
**future** 131:6

**G**

**G** 96:7,13 108:12
108:21
**gallery** 112:14,17
112:19 127:23
149:7,14 200:16
**game** 92:15 168:12
**garbage** 166:5,22
169:6
**gate** 33:17
**gather** 20:11
**generated** 117:9
**generators** 42:6
**getting** 31:24 49:25
98:3 162:16
165:19
**giant** 45:23 117:3
156:20 166:17
**Ginexi** 19:24 27:5
48:4
**give** 5:8 19:21
21:10 46:7 50:11
52:11 71:18 74:16
74:17 77:2 84:25
92:12 98:13 100:6
105:9 111:9
**given** 10:12 34:2
81:15 85:13 92:11
99:9 121:4 170:17



170:18,19 172:2
203:4 204:4
**gives** 56:2
**giving** 41:3 72:12
**glasses** 17:22
**go** 5:17 9:24 13:12
  16:10,20 17:2
  18:18 19:15 20:10
  22:16,21 26:2
  30:10 38:23 44:25
  48:12 57:20 62:22
  62:25 63:17 64:23
  71:16 80:12 88:11
  107:9 108:25
  120:6 122:15
  126:13 127:7
  129:4 132:8
  138:16,20 148:11
  151:7,8 154:17
  173:18 176:14
  178:15,25 181:6
  185:2 189:4
**God** 39:21
**goes** 22:12 114:10
  114:12,16 166:24
  168:24 198:4
**going** 4:15 5:18
  7:12,19 9:14,23
  11:25 12:9,23,24
  13:4 22:15,15
  30:6,7,15 31:9
  33:6 34:15 38:22
  39:2 43:13 49:3
  50:4,21 51:8 56:3
  59:24,24 60:25
  63:9,10 65:4
  72:11 73:17,20
  75:21,22,24 76:3
  80:8 82:12,18
  83:18,25 85:12
  91:7 96:19 98:20
  101:2,8,12,23
  105:24 109:18
  110:3,11 114:11
  117:5 119:11,23
  121:18,19,21,23

124:9,20 126:9,13
126:18 129:11
133:14 135:14
136:14 139:21
140:11,17 141:19
142:20 145:3,5
146:7,23,24 149:8
150:21 152:23
153:2,21 157:21
157:25 162:3
163:19,23 164:11
164:11 165:10,13
166:7 167:6,19
172:24 173:17
175:17 177:5,9,19
178:14 179:23
181:10 183:17,23
185:12 187:10,12
188:3 189:4
197:16
**Gonzalez** 47:20
  48:6,22 55:7
  59:15 67:23 68:22
  69:10,11 70:4,21
  71:15 192:10,13
  196:4
**good** 4:9,11,12
  39:12 40:5 44:25
  56:2 61:17 106:12
  111:8 116:8
  147:23 162:13
  178:12
**gotten** 76:5,8
  144:23
**grape** 35:7
**great** 13:13 58:11
  61:21 74:21 79:3
  86:4 198:16
**great-great-gran...**
  186:15
**green** 147:13
  164:19 170:4
**Greg** 72:25 74:22
  79:6 80:19,24
  81:19 82:15 83:6
  83:21 84:4,18,22

86:5,18,22 89:3
108:17,20,22
109:8
**Gregory** 75:2 79:24
  108:14 109:7,10
  109:10
**grip** 105:3
**grocery** 183:13
**groundwork** 31:8
**group** 109:16
  157:18
**guess** 30:18 34:7
  45:16 46:5,8,14
  104:22 108:6
  111:8 113:3
  127:21 134:7
  148:17 171:16
  172:14,17 181:23
  189:2,2
**guessing** 133:21
  134:15
**guy** 79:21 109:18
  114:2 186:16
  187:18
**guys** 34:15 157:11
  157:15

---

**H**

**H** 4:3
**hair** 105:17
**half** 38:18 75:15
  88:9 159:10,11
**hand** 25:12,20,22
  68:7 96:6 152:2
  184:17 185:22
**handle** 105:22
**handshake** 70:5
  87:3
**handwriting**
  126:21,22,24,25
  147:8 148:17
**hang** 121:20
**happen** 60:25 65:8
  76:15,18 109:16
  121:23 126:9
  127:7 148:5

151:24 164:11
177:9
**happened** 31:13
  61:21 69:14 76:20
  95:6 97:7,14
  104:14 115:19
  147:5,18 151:22
**happening** 33:23
**happens** 40:14
  96:10 118:12
**happy** 23:12
  155:14 184:5
**hard** 32:11 137:7
**hardcopy** 17:3
  71:13,17 107:19
  179:19 183:24
**haul** 54:18
**head** 5:10,10 25:16
  58:8
**headed** 154:19
**hear** 78:19,25 86:2
**heard** 25:24 186:20
  186:24
**hearing** 32:3,5
**heavy** 53:3
**height** 43:7
**held** 1:18 186:6
**hell** 127:9
**Hello** 72:17
**help** 21:20 22:3,6
  22:24 47:22 70:21
  71:23 131:19
  135:24 138:5
**helped** 18:20 19:22
  47:17,23 48:9,13
  59:16 70:23
**helpful** 98:3
**Hey** 156:13
**Hi** 86:2 179:8,9
**hidden** 130:15
  149:2
**hide** 130:11 136:2
  193:10 197:17
**hiding** 137:14,15
  137:17,20,25
  139:9

**high** 45:22 49:18
  73:5 76:11,12,12
  79:18
**highest** 193:13
**highly** 162:16
**high-net-worth**
  79:11,19
**high-worth** 76:13
**hinterlands** 39:3
**hire** 68:9
**hit** 119:10
**hold** 13:14
**holes** 117:3
**home** 6:6 36:14
  50:2 71:18 122:4
**honest** 48:25 75:7
  83:11
**honestly** 41:24
  83:15 129:7
  196:21
**honesty** 83:14
**Honorable** 96:7,12
**hope** 22:15,17
  53:19 55:5,9
  58:16 73:22 87:9
  87:10 91:17 92:16
  92:17 106:4 109:2
  114:24 115:13
  116:15 118:14
  121:22 133:17,23
  133:24 134:4
  136:17,23 146:10
  146:23 147:2
  148:2 168:17
  174:2 190:3
  199:18 200:5,6,15
**HOPEs** 73:24
**hoping** 10:22 47:7
  103:5 188:23
  189:3
**hopped** 137:2
**horrible** 38:24
  115:22,24
**hour** 38:18,18 39:4
  43:23
**hours** 8:23 15:17



33:10,11,14 36:22
43:19 61:20 62:4
62:17,23 63:17
100:23 103:6
122:2 129:9
178:14 180:25
184:11
**house** 41:3 52:12
63:22 64:2,11,19
74:4 83:16
**huge** 40:25 49:20
53:3 72:11 150:4
158:13 160:20
171:5,18
**humanly** 44:3
**humidity** 35:18,19
39:15 41:17 42:5
**hundred** 25:17
139:5 142:13
**hundreds** 99:20
166:13

**I**

**idea** 10:5,8 24:11
33:6 36:20 56:2
58:11 59:21,23
80:14 82:9 89:7
104:8 106:14
112:2 120:7
122:13 123:23
124:18 127:3
129:23 130:4
137:13 139:11,13
139:14 140:5
146:21 147:23
151:6,6,7,7,8,8,19
153:13 155:12
157:7,10 162:13
166:19 167:9
170:11 176:15
198:2
**ideas** 125:4,14
151:19 154:24,25
155:2,4,5
**identification** 9:13
101:19 110:7

114:25 117:17
124:6 133:18
136:18 140:20
141:24 142:25
146:11 149:15
153:6 158:6 162:7
164:4 167:23
169:20 173:4
185:17 188:8
191:7 194:2
**identified** 95:18
**identify** 169:24
**Iko** 56:19
**illegal** 69:8 70:19
85:15
**illustrate** 153:22
**image** 1:6 2:9 4:2
112:5 125:23
127:16 150:24
168:20 173:23
191:6 201:14
**images** 17:4 51:18
51:18 91:16 124:5
128:6 134:4
143:16 146:9
148:7 150:11
151:10 157:8
159:17 161:5
170:9 175:4 200:3
200:14
**Image's** 180:13,15
**imagine** 13:7
**important** 5:3
65:20,21 100:21
100:21 109:4,20
145:7 150:6,19
156:14 180:23
**impossible** 34:16
145:24 198:7
**impression** 23:4
120:3 194:18
**inaudible** 171:25
**inch** 120:13
**inches** 45:22,24
**include** 51:23
**includes** 143:15

173:22
**including** 136:5
142:11 180:15
188:18 191:15
**incorporating**
155:8
**Index** 200:25
201:19
**Indiana** 1:8,14
21:22 22:24 23:3
23:4 24:3 25:13
54:11 65:16 67:20
67:21 71:25 73:9
73:12,14,19 77:11
77:15,21 79:7
80:3 83:6 86:19
86:22 87:4 88:21
89:8 90:9 91:10
91:13,24 93:7,16
93:19 94:5,22,23
99:19 103:14
104:6 110:18
112:18,23 113:18
125:22 126:3
128:13 134:3
135:4 136:24
137:3 141:4,6
142:3,9 143:4,9
146:16 148:7
150:2,4,10,14,15
150:18,24 151:4
151:11 153:18
154:8 157:14
159:18 160:10,24
161:9 162:24
163:5,9,10,14,15
165:12 171:3
173:3,13,23 174:4
174:5 175:8
183:15 190:9
192:21 201:9
**Indiana's** 149:24
152:16 155:8,9
171:8,14,25
172:13
**Indiana/Dylan**

153:5 200:18
**indicate** 7:14 111:2
175:9
**indicates** 141:9
**indicating** 176:5
177:11
**individual** 79:12
**influx** 49:22
**information** 13:20
13:24 14:6,22
15:7,15,20 16:6
19:16 20:25 21:5
27:15 70:24 74:15
85:10 89:19
122:11 141:3
144:24 161:14,15
177:7 179:13,20
**informed** 10:7
30:23 36:25
**informing** 32:19
**inherited** 79:13
**initial** 14:8 126:11
**initialed** 126:7
177:4
**initially** 153:21
**initiated** 100:12
105:12
**injunction** 186:7
**ink** 166:8
**insignia** 22:25
24:14 25:9
**insofar** 10:16
**inspect** 11:8 12:10
12:15,16 13:4
30:15 36:24
**inspected** 39:9
**inspecting** 36:22
124:16
**inspection** 8:20,24
9:3,19,21 10:2,3,7
10:10,15 28:13
29:7,10,13,20
31:7,10,11,17
32:21 33:5,7
36:19,21 37:2
60:6,16 62:10

111:14 176:7,19
177:25 178:4
186:24 193:25
194:7 195:19
196:2 197:8,15
201:16
**instance** 45:20
165:8,8
**instances** 123:19
**instruct** 192:25
193:9 197:17
**instruments** 183:19
**insurance** 171:19
**intellectually**
150:20
**intelligent** 38:16
162:18
**intend** 195:4
**intent** 104:5,22
160:9 165:19
**intention** 7:24
**interest** 88:2
**interested** 59:8
75:4,13 77:13,14
77:17,20 79:9,23
87:17 96:2 136:25
150:2 152:4
**interesting** 155:13
155:17 165:18
**interrupt** 78:16
**inventory** 34:2,3
44:8,12,16,17
46:21 50:24 51:3
115:10 118:2
140:19 141:23
142:24 188:6,14
188:18,22 195:4
200:8,10,13
201:12
**investigation** 92:19
**investments** 79:14
**invoices** 86:21
**involved** 15:22
21:25 23:19 59:13
109:21 182:15
**involvement** 15:19



**in-law** 41:6
**iPhone** 6:25 7:4
**iron** 169:8
**irrelevant** 130:7
**issue** 13:6
**issues** 132:20
**items** 76:7,9

**J**

**jail** 70:19 80:16
**James** 1:7,14 80:12
171:13
**Jamie** 1:7 151:17
152:2 153:12
154:25
**Jennifer** 96:7,12
**jerk** 165:17
**job** 20:15 45:6 47:4
183:17
**Joey** 163:12
**John** 187:9 188:12
188:17
**joined** 3:21
**judge** 94:3,3,7,13
94:17 96:18,20
97:20,21 98:9,17
185:24 186:10
**judgment** 90:13,18
120:9
**July** 193:24 194:3
194:12,25 201:15
**jumping** 54:23
**June** 114:16
**junior** 131:9
**Justine** 2:14 3:12

**K**

**K** 4:3
**Kate** 17:20 19:12
26:23 27:2,3,4
**Katie** 102:18
105:10,22,23
**Katonah** 6:5,7
15:11 16:25 44:5
46:10 67:19
**Katz** 56:12,13

58:17 77:14,22
112:24 159:7
163:7
**keep** 7:13 35:24
36:7 40:6 56:3
67:15,20 86:21
88:4 115:10
121:15,17,19
136:3 139:20
155:21,25
**keeping** 35:11 36:6
59:6,9
**kept** 67:5 77:8
125:7,8,13 163:10
167:5
**killing** 55:23
**kind** 16:23 23:25
30:10 39:14 48:20
55:4 76:23 80:8
84:13 97:18
105:21 109:15
132:21 175:25
181:20,24 187:16
187:24 189:3
**kinds** 65:16 99:10
146:17 147:16
169:3
**knew** 48:22 59:25
65:11 68:5 72:7
102:21 103:24
106:12 126:9,12
186:22 197:15
**know** 4:23 8:3,15
16:15 17:6,11
18:5,14,17,17,19
18:21,23 19:2,4
19:24 21:9,24
22:2,4,22 23:10
25:21 28:22 30:2
30:3,5 31:21 32:3
32:4,8,9 33:2
36:19 38:4,6,7,9
38:12,21 39:3,7,8
39:18,19,20 40:7
41:24 42:5,17
43:4,5,14,19 44:7

44:14 45:5,19
46:4 47:5,6,11,13
48:12,21 49:3,6
49:14,20,21 50:13
52:7,8 53:8,13,18
54:16,17,21 55:23
58:7,25 59:4,5,9
59:13 60:2,12,17
60:18 61:10,18
62:21 63:13 64:5
64:6,22,24 65:2,9
65:18,18 67:6,8
69:7 71:7,10 72:2
73:7 74:7 75:5,23
76:5,10,12,21,22
76:24,25 77:5,8
77:16,16 78:19
79:8,15,17,18
80:12,13 82:7,8
82:10 85:4 86:15
86:25 88:7,12
89:20 90:25 92:13
92:14,17,20,22,25
95:23 96:4 99:8
99:18,20,23,25
100:3,19 101:14
102:22,23,24,24
103:22 104:9,11
104:12,18,23
105:3,10,19,20
106:2,6,7,8,11,23
106:24 107:6,8,8
107:15,17 108:5
108:25 111:6,9,11
111:22,22,24
114:3 116:2,8
119:2,2,9,12,13
119:19 120:12,13
120:16,22 121:6,7
121:10,11,12
122:2,10,13 123:9
123:12,13,14,22
124:24 126:25
129:7,11,12 130:2
130:6,7,9,18,20
131:3,6,13,22

132:16 134:10,10
134:14,20,24
135:5,6,8,14,17
135:18,19,19,20
137:14,16,18,19
137:19,22,22,23
137:24,24 138:10
138:15 139:3,6,7
139:8,9,9,12,18
139:19,20,23
141:5 144:19,22
145:5,7,8,12,14
145:22,23,24
146:20 147:11,13
147:24 148:16,24
148:25,25 149:18
150:9,19 151:14
151:22,24 152:12
152:13 153:9,10
154:21 156:2,10
156:15 157:17
158:19,21 159:6
160:21 161:4,13
161:13,17,18
162:14,19 163:4
164:14,19,23
166:3,5,23 167:4
167:8,11,12 168:9
170:8 171:22
172:10,16 173:25
174:21,23 175:2
175:13,24 177:23
178:2,23 181:5,11
182:16,17,21,23
183:9,12,17
186:14,16 187:14
187:17 188:15
190:18 192:17
196:3,19,21
**knowing** 37:16
131:24 139:3
144:23 177:6
**knowledge** 87:16
102:19
**knows** 58:20 59:18
105:13 106:7

134:25 135:20
166:13,23

**L**

**L** 4:3
**laborers** 48:21
**lack** 17:19 34:19
**landmark** 158:20
**laptop** 7:14
**Lara** 127:16,20,22
**large** 56:13 79:13
168:4
**Larry** 163:7
**Las** 74:9,12
**late** 19:5
**law** 96:12 187:17
**lawsuit** 59:14
**lawyer** 121:11
182:7
**lawyers** 27:16
59:12 132:8
**lay** 31:8
**laying** 24:25
**learn** 148:14
**learned** 10:2
176:17 177:23
**leave** 9:9 39:22
41:2 105:23 184:4
190:9 192:13
**leaving** 41:10
**left** 19:4 20:6
105:22 158:11
171:3,9,12,18
174:25 175:2
180:19,19 184:11
**left-hand** 159:21
187:15
**legal** 1:23 3:12,14
68:7 69:17,21,23
70:15,18
**Leslie** 1:19 3:13
203:6
**letter** 32:18,23 70:2
70:3,6,7,9,10
96:12 98:17 176:4
**letting** 59:8



**let's** 11:16,16 34:7
89:16,16 114:17
116:16 149:11
156:16 178:15,25
191:23
**level** 35:23
**liabilities** 39:25
**liability** 40:16
171:19
**liable** 40:15
**Lichtenstein** 77:17
**lied** 69:9
**lies** 84:14
**life** 65:20,22 157:6
**light** 147:14
**lighting** 164:19
**liked** 116:9 117:9
136:24 169:4
**likes** 151:8 157:13
**limit** 154:19
**limited** 1:3,10 3:21
158:4,9 197:22
200:20
**line** 113:10 201:21
202:3,4,4,7,8,8,11
202:11,11 205:4
**lined** 197:25
**line-by-line** 176:24
**Lipson** 175:12
182:16
**list** 33:15 44:17
60:20 61:2,8,25
62:4,19,21,24,25
63:16,17,18 75:8
103:13 104:17
118:20 141:6
143:8,15 176:22
177:13 183:13
188:21 189:19
190:10 191:24
**listen** 138:4
**listened** 154:14
**listing** 110:6,17
191:12 199:16
**lists** 115:13 118:6
**litigation** 4:15

12:19 13:6,19
66:5,8,12,22
69:12 71:14,19
91:14,25 92:4,8
93:6,8,18 99:2,7
110:9 119:18,21
122:12 128:19,20
129:3,19,21
130:21 135:12
138:24 144:2
145:14,17,19
148:19 152:11
157:9 161:7
170:10,14 172:16
175:6 179:14
182:10 183:6
**little** 13:15 69:8
86:14 112:23
114:6 121:18
126:19 134:11
158:11 159:13
**live** 20:21 27:9
52:12 72:21 73:25
**lives** 20:22
**LLC** 1:11,11,12
3:24
**LLP** 2:4 3:11
**load** 43:19 175:22
**loading** 43:22
**loads** 171:21
**locate** 55:25
**located** 6:2
**locations** 67:18
**lock** 79:23
**locker** 52:15 54:13
59:19
**long** 14:10 15:6
19:3 21:14 36:2
40:20 54:18 57:25
67:23 73:16,16
82:4 88:11 112:2
138:20 147:22
154:23 155:13
156:11,11 162:19
174:20,21 182:25
**longer** 58:2 103:19

**look** 12:21,23 14:5
18:16,21,22,22
24:5 28:2 37:6,11
44:16 58:13,16
61:8 62:18 63:10
71:18 86:24
101:10 112:3
113:3 116:8 118:6
120:25 121:13
122:23 126:23
137:5 139:24,25
140:2 143:14
150:10 158:19
164:15 166:18
168:19 173:16
180:5,7 183:24
191:14
**looked** 17:7,11,17
18:23 19:18,19
39:9,25 97:12
115:21 116:7,12
116:24 142:3
168:14,14 177:12
**looking** 6:14 14:12
38:10,11,17 40:24
62:13 66:2 68:8
71:13 79:14 94:11
104:17 107:23
116:6 119:16
120:4 126:16
132:23 135:25
138:20 144:10
162:23 169:24
172:9 178:6
180:12 196:14
198:2
**looks** 107:25 108:6
115:11 116:4,20
124:23 125:15
134:8 140:25
142:7 147:5
148:16 155:24
156:3 163:15
164:6 168:3
**loosely** 39:15
**loss** 160:8

**lost** 105:21
**lot** 13:23 21:17
36:14 41:4 45:18
49:5,11 50:3
53:20,21,21 65:23
67:13 71:2,3
74:10,12 80:12
87:2 92:23 95:6
97:4 109:13
120:22 125:6
146:19 154:24,25
154:25 160:19
164:18 166:2,2,24
171:9,15 180:12
181:11 183:20
**lots** 166:20,20,21
**love** 24:17 51:23,25
52:2,6,18 73:20
74:19 87:19,20
101:18 102:10,12
102:13 108:11
109:2 110:6,14,18
113:4 116:13,14
133:17,23,24
134:4 150:14
167:22 168:17,20
169:19 170:3
172:13 174:2
199:14,17 200:4
201:6,7
**loved** 155:4 168:18
168:19
**lowest** 17:19
**Luke** 191:23,25
**Luke's** 191:24
**lunch** 60:13
**lyrics** 52:23 143:10

_____

**M**

**M** 4:3,3
**Maaran** 3:18 4:13
**Maaren** 2:6 78:16
**MAC** 6:22,24 7:2,4
**machine** 22:22
**machines** 122:8
**mad** 55:24

**Madison** 2:5
**MAF** 4:18
**magazine** 100:2
**Magna** 1:23 3:12
3:14
**mail** 121:22
**Maine** 69:5 80:11
92:19
**major** 76:8
**maker** 7:7
**making** 21:25 34:3
35:23 40:25 120:8
177:19
**Malibu** 74:8
**man** 131:9
**management**
151:23
**managing** 105:5
**manpower** 62:17
**Marilyn** 150:13
**mark** 101:11,23
110:11 115:4
117:21 124:9
133:14 136:14
140:17 141:19
142:20 146:7
149:8,11 153:2
157:25 161:25
162:3 163:23
167:19 169:16
172:24 185:12
**marked** 9:12 28:8
101:19 110:4,7
114:24 117:17
124:3,5 133:11,18
136:17 140:11,19
141:23 142:24
146:10 149:5,14
153:6 158:6 162:6
164:3 167:22
169:19 172:21
173:4 185:15,17
188:5,7 191:6
193:25 202:7
**market** 160:15
**Markham** 2:8 3:24



9:23 12:4,9 30:3
30:10,14,22 32:10
32:18,24 69:2
132:20 176:3,17
177:23 187:6,9
188:6,12,17 192:5
194:12,25 195:11
201:12
**marking** 190:15
193:16
**Massachusetts** 2:10
**master** 27:8 156:13
**matching** 117:4
**material** 145:2
**materials** 72:12
101:4 132:9
**matrix** 22:2 23:13
23:20,23,24
**matter** 3:5 69:17
70:16 154:20
187:2,21
**mattered** 31:2
**matters** 13:5 68:7
69:21 70:18 91:4
**max** 44:21
**Max's** 73:5
**ma'am** 13:16 185:8
**McCarty** 192:8
**McKENZIE** 1:6,18
2:8 3:4,6,25 4:9
11:9 15:4 27:22
28:9 32:17 57:12
85:16,19 86:2,13
89:11 90:23 97:24
101:10,25 110:13
115:6 117:23
124:12 130:25
133:20 136:20
140:22 141:25
143:2 144:11
145:10 146:12
149:17 153:8
158:7 162:6,8
164:5 167:24
169:21 170:24
172:5 173:6 176:9

179:8 184:21,25
185:18 186:12
188:10 189:13
190:18 191:17
192:9 193:19
196:18 198:9
199:6 201:2 204:3
204:8
**McKenzie's** 28:14
**mean** 12:12,22
15:11,22 17:8
21:5 24:13 28:25
29:4 33:9 43:14
46:2 47:8 53:2
58:4 64:21 76:5
76:21 86:25
100:17 120:10,21
127:13 128:12
131:7 133:3
151:14 156:2
163:12 167:3
170:15 172:12
175:14 178:3,10
182:23 183:12
195:15 198:3
**means** 93:12 118:9
127:20 203:11
**meant** 12:16 71:4
187:4
**mediation** 69:5
**medium** 177:2
**meeting** 29:5,5,5
57:19 58:3
**meetings** 21:19
**memory** 54:18
**mental** 76:2
**mentality** 176:2
**mentioned** 26:23
27:5 54:20,22
70:17 84:16,18
**message** 188:16
**messages** 190:23
**messy** 116:25
126:19
**met** 24:2 132:16
**metal** 108:11

110:15 113:5
115:19,20,21,24
116:2,17,18,19,21
118:12 133:17,23
133:25 156:17,18
156:21 167:22
168:6,7,10,20
169:2,19,19 200:4
201:6,7,7
**Metropolitan** 114:9
114:13
**Michael** 1:6,18 2:8
3:4,24 57:12
199:6 204:3,8
**Michelle** 11:10
198:12
**middle** 114:15
**Middletown** 41:25
67:13
**miles** 186:17
**million** 10:17,19
63:4,8 67:6,10
88:10 94:5 127:14
160:8 177:15
**mind** 54:23 77:9
100:5 117:5
**mine** 184:4
**minor** 174:22
**minute** 31:5 39:22
94:11
**minutes** 27:12
43:23
**missing** 44:14
127:8 189:7
**mistake** 35:24 41:2
**mixed** 97:8
**mockup** 166:9
**models** 116:7
**moment** 188:9
**moments** 65:20,21
**money** 34:3 36:7
41:4 61:12 79:13
96:3 193:14
**monitor** 161:16
**monstrous** 122:17
**month** 107:5,7

146:24 147:3
**months** 18:6 55:18
56:5 82:6 105:18
147:6 196:22
**moot** 132:21
**Morgan** 1:3,10 3:5
3:20 4:14,17,18
4:19 8:19 9:2
13:21 14:4 60:4
62:7 71:19 83:4
83:20 84:3 92:24
92:25 128:6,8
148:8,10 157:16
170:13,18 190:6
191:18 192:2
196:11
**morning** 19:4
**Moses** 97:9 98:9,17
**move** 36:12 37:12
43:2,4 44:4 47:6
47:17 51:14 52:5
52:10 54:24 55:2
56:10,24 57:3,6
58:17,24 63:21,25
64:5,10,15,18
78:20 162:13
188:3
**moved** 32:20 33:4
34:9,13 36:18
37:3,8,14,25
40:21 41:23 42:15
42:17,18,23 45:9
45:14 46:19,24
50:25 51:4,19,20
51:22 52:10,13,17
52:22 53:5,9,14
53:17,20,21 54:9
54:12,15,20 56:9
56:12,21 58:21
59:18 60:4 62:9
66:5,12 176:5,18
177:24 178:3
196:20 197:18
**mover** 47:12
**movers** 47:13
**moving** 34:20

35:10 36:16 40:8
41:11 43:20,21
44:2 49:21,22
50:2 59:22 190:12
**multiple** 8:22 197:3
**museum** 113:12,17
114:9,13 127:12
140:19 141:2,7,22
142:4,23 143:5
200:8,10,13
**museums** 125:11
130:14 142:10
152:17

_____

### N

N 4:3 199:3
**name** 4:13 17:16,21
17:24,25 19:12,22
20:19 26:25 41:22
41:24 42:12 50:18
57:10,13 78:2,4,6
78:12 105:16
154:3 170:2
180:21 191:24
**names** 16:2 17:15
48:19 58:19,23
84:25 85:4 105:9
170:3 191:12,14
**napkin** 166:14
**Naples** 141:2
**narrowed** 154:9
**navigate** 103:22,24
**near** 39:12,13 74:3
**necessarily** 123:16
**necessary** 183:19
**need** 5:8 7:15 21:9
55:12 78:20 100:3
161:14 175:13
187:11
**needed** 18:20 36:23
52:9 64:21 131:20
140:4 176:4
**needs** 106:8
**negative** 41:9,10
**negotiated** 69:5
**neither** 93:3 116:8



119:4
nerve 47:4,16
never 25:17,24
  40:16 45:6 54:5
  60:3 61:6,21
  66:24 75:8 80:17
  93:13 120:10
  126:8,12 127:13
  131:23 132:12
  147:18 164:25
  169:8,8 175:23
  182:5 187:22,25
new 1:2,20,24,24
  2:5,5 6:5,7 27:11
  35:14 39:5 41:25
  67:13 74:4 93:23
  96:14,14 116:10
  117:7 149:7
  168:11 184:10
  185:14,16 196:20
  197:18 201:10
nice 116:6
Nikas 10:13 11:18
  11:22 12:6 28:18
  29:10,20,22 30:15
  30:19 33:5 34:10
  55:20 58:4 60:16
  63:20 64:14,17
  75:5 76:18 83:5,8
  83:20 84:2 98:20
  98:22 182:16
  189:3 191:25
  194:13,23 195:16
  196:9
nine 124:23
ninth 60:7
nod 5:10
nonsense 80:9
nonsensical 90:4
Nope 85:3
North 50:3
Notary 1:20 4:4
  204:14
notation 108:12
  118:8 127:15
note 112:5 113:11

noted 198:20 204:6
notes 44:20 45:5
  177:6
notice 1:18
number 11:5 21:6
  24:10 33:17 35:3
  56:13,13,14,15,16
  56:17 62:8 63:2
  73:5,23 77:5
  89:24 95:7 118:6
  122:17 143:12,12
  165:21 169:5
  173:17
numbered 170:5
numbers 45:3 46:8

O

Obama 73:23
  109:3,14,22
  112:21
obey 96:19 187:8
  187:12
object 89:9,12
  176:10
objected 144:9
Objection 130:23
  176:8 197:9
obnoxious 100:4,6
  175:20
obscure 183:10
obviously 166:17
  187:13
occasions 18:9
occur 94:9
occurred 35:4
offer 81:22 83:11
  83:13
offered 75:12,20
  82:3
offering 77:10
offhand 16:2
office 74:4 121:20
  122:3 128:11
oftentimes 26:11
oh 10:24 11:12
  29:25 80:20 98:15

109:8 112:11
  182:17
okay 5:16,25 6:6,9
  7:2,12 8:9 9:17,25
  11:21 12:2,5,11
  13:13 15:13,18
  18:7 19:21 20:19
  20:24 21:12 23:19
  24:7 26:3,20,23
  27:14 28:12 29:9
  31:3,11,12,14,15
  32:4,14 37:7,19
  37:25 46:7,17
  50:21 51:5,16
  53:10 54:3,8
  56:23 58:7 59:2
  59:11 60:3,10
  71:23 78:9,24
  79:3 82:12,16
  84:10 86:10 89:16
  90:3 91:6 93:4
  94:18 96:15 97:17
  98:5,7,20 101:2
  104:4 108:20
  109:8,24 111:12
  112:3,18 113:3,14
  113:19 123:24
  132:5 133:7 134:3
  134:21 136:7
  137:8 138:3 140:7
  143:14 144:15
  145:25 149:3
  157:20 159:20
  161:21 163:2,16
  167:13 173:22
  174:8,14 184:7
  185:3 186:2,12,19
  187:19,23 189:11
  190:2,8,22 191:4
  191:8 193:23
  194:10,11 196:3,7
  198:11
old 39:20 107:6
Oldenburg 163:8
once 40:17 81:22
  82:3 99:11 116:14

197:15
ones 17:14 66:13
  155:5 158:11,11
  159:20
online 50:14
open 9:10 18:21,23
  39:22 106:25
  118:23 123:9,10
  123:17
opened 36:10 81:23
  82:8 83:8 100:14
  118:25 120:14
  193:5
opening 85:13
opens 36:13
opinion 114:4
order 8:25 9:7,12
  9:19,20 10:2,4,7
  10:10 12:7 28:6
  28:21 29:15 30:20
  30:24 90:12,17
  96:6 97:20 169:24
  185:13,17,19,23
  186:3,22 187:3,12
  187:13,24 199:13
  201:11
ordered 29:22
  30:16 55:4
orders 98:8,10,14
  186:13 187:20
original 109:2
  196:14
Osvaldo 48:22 55:7
outflux 49:24
outlets 66:17
outside 38:22 64:13
  78:18
overburden 175:22
owed 88:9
owes 67:6
owned 120:11
owns 74:11
Oz 47:20 48:6
  59:15 67:23 68:22
  192:10 193:9

P

pack 47:17 59:17
page 28:13 108:21
  112:4 154:19
  155:21,24 166:10
  199:5,12 201:21
  202:3,4,4,7,8,8,11
  202:11,11 205:4
pages 118:11
  119:15,21 133:24
  133:24 153:24
  204:3
paid 69:24 181:5,6
pain 181:12
paint 25:23
painted 116:20
  118:13
painter 122:21
painters 16:15
painting 45:23
  87:13 156:5
  168:14
paintings 23:4,9,17
  24:21 25:20 26:4
  26:11,18 54:24
  56:8,13,14,15,16
  56:18,18,19,19,23
  58:16,17 87:9,12
  91:18 95:21
  115:17 153:14,15
  159:7
palatable 198:7
pallets 171:23
Pandora's 81:24
panned 160:22
paper 25:14 96:21
  125:25 126:2
  137:6 156:20
  166:7,15
papers 96:24 97:4
  97:11 138:20
paperwork 97:6
paragraph 28:12
  195:2
part 13:21 24:7



38:14 70:22 71:10
72:4 77:6,7 88:18
88:22 110:16
131:11 134:9,17
135:11 138:23
151:11 161:6
170:14 194:13,14
participate 183:3
particular 95:4
104:19 165:7
particularly 59:8
128:11 181:14
parties 3:15 29:12
191:3,18 192:2,22
193:11
partner 112:16
parts 77:6 193:6
party 13:18
passed 65:12
passionate 156:25
patience 144:20
pay 172:15,16
paying 160:22
pencil 23:5 25:14
pendency 7:13,20
91:25 92:8 93:17
pending 85:17
96:10
people 8:22 14:18
14:20,21 15:22,24
16:13,17 17:6,8
17:10,12 18:18
19:18 22:3 32:2,7
33:9,12,13 42:4
44:12 47:21 48:8
48:12,17,22 49:21
49:22,24 58:24,25
59:11,13 61:19
62:3,23 63:17
68:17 70:16,23
72:7 73:4,23
76:13 79:15,22
84:16,21,23 85:13
103:19,23 104:25
105:8 109:13,16
109:20 114:15

131:8,19 132:19
153:24 155:17
182:20,24 183:5
187:10 191:13,15
196:9
people's 182:20
percent 46:15 77:4
80:15 84:9 91:15
129:25 130:2,3,3
130:3 136:4 148:4
163:5
perfectly 86:3
116:19,20
permitted 9:21
permitting 9:19
10:3 12:7
person 17:19 75:23
75:25 86:9,11,12
102:18 103:17
104:20 105:7,8
106:14 120:24
187:16
personal 1:7,14
15:18 85:10 181:4
personally 14:5
16:18 20:11
171:21 181:18
183:22 184:8
Peter 73:4
petition 186:7
phone 6:22 16:11
20:8 21:6,11,18
50:15,16 68:24
86:7,10,12,15
121:17,19,22,24
140:3 180:20,24
phones 19:25
100:17 136:6
179:24 181:7,10
phonetic 27:3
175:13
photo 160:25
photocopies 152:10
photograph 122:7
124:4,14 149:6,13
152:24 153:5,7

155:20 157:23
158:4 162:2,6,11
164:2 167:22,25
168:3 172:22
173:3,5 176:25
196:11 200:2,16
200:17,19 201:2,3
201:5,8
photographed
101:4 111:13
photographing
195:18
photographs 17:4
57:6 66:7 98:24
99:5 101:3 130:19
152:10 161:4
170:8 175:4
physical 170:20,21
Picasso 64:25 65:19
Picassos 77:23
picked 125:7 129:5
picture 22:18 99:11
131:21 132:2
136:19
pictures 33:16
111:24 114:14
134:18 136:17,23
141:11 142:10
148:24 154:12
175:18 177:17
179:25 197:22
200:6
piece 21:25 45:23
54:14 62:25,25
82:2,4 103:7
156:13 158:21
164:2 166:15
170:2,20,21 172:6
172:8 175:15
176:25 189:4,5,5
201:4
pieces 10:25 33:20
33:21 44:13,25
45:18,19 46:19,24
60:22 61:10,15,19
61:20,23,23,24

63:3,11,14 109:2
109:2,5 110:15
115:18 116:15
117:10 122:16
124:23,24 127:8
130:10 154:13
157:18 166:13
170:4 171:16,17
172:4,13 173:15
173:19,25 174:2,3
174:7,8,24 175:18
176:22 177:11
193:13
pitching 147:17
pivotal 154:6
place 36:7 38:6
42:4 66:10 74:3,8
74:9,13 152:17
186:23
places 41:19 50:12
74:2 142:14
plaintiff 1:4 2:4
3:20
plan 8:8 90:11
196:14
planning 194:19
plates 22:4,10,13
played 125:17
player 109:21
please 5:14 9:7
27:21 50:22 84:7
110:12 115:5
124:2 133:8
136:15 141:20
142:17,21 146:8
149:12 152:21
153:3 158:2 162:4
163:18,19,24
167:16 169:17
172:25 178:16
plug 100:22 104:13
107:10
plus 36:15
point 17:7 19:14
33:23 37:3 99:24
130:16 132:21

164:24 169:4
182:10 183:6
184:20
points 76:21 189:18
pole 17:20
policemen 186:16
politics 186:15
popped 134:13
pops 65:24
portfolio 116:4
155:25 166:23
portrait 163:13
positive 41:9,10
46:6 197:20
possess 172:5,8
possible 43:10 44:3
52:7 197:6,10
possibly 44:2 68:9
77:19,22 86:24
87:10 183:7
post-dates 95:2
Post-its 150:8
potential 144:18
potentially 79:6
191:23
powering 155:5
practice 25:8
precedes 94:25
precluded 195:17
predict 114:7
premises 34:14
176:6
prepare 31:4,16
present 2:14 3:16
60:15 186:3
192:14
presently 6:2
president 109:14
pretty 25:25 52:25
112:20 116:6
120:24 121:5
157:17,18 158:20
160:4
prevent 14:11
prevented 69:16
70:17 120:10



122:8
**prevents** 81:25
**previous** 69:3
116:23
**previously** 14:19
68:5
**prime** 38:13
**principal** 69:6
**print** 22:23 91:9,12
95:24 107:20
125:10 156:5
170:2
**printed** 22:22
26:20 95:5 108:9
111:23 115:18
125:25,25 134:19
137:5 184:13
**printer** 27:7,8
122:22
**printing** 22:6,10
115:20
**printout** 101:18
107:24,25 108:7
110:6,17 111:3
114:24 115:9
117:16,25 119:15
127:5 199:14,16
199:18,20
**printouts** 108:4
119:22
**prints** 23:16 25:7
25:10,11 45:20,21
54:24 56:8,16,17
56:20,24 87:11
91:20 95:22
112:22 115:17
126:2 128:5
149:25 150:3
173:4,13,22 174:5
174:16 175:5
201:9
**privileged** 89:14,19
176:11
**Pro** 6:22,24 7:2,3
**probably** 9:4 10:23
17:17 19:23 20:4

27:12 28:11 36:22
40:4 45:11 50:12
52:20 53:9,14
67:6 73:7 76:20
82:22 86:20
105:16 110:3
126:17 127:20
150:9 156:22
160:8 172:11
174:18 178:11
180:25
**probe** 74:11
**problem** 4:21 27:18
44:11 182:11
**proceedings** 203:4
**process** 71:10
154:23
**produce** 13:19
70:24 71:14 92:9
93:6 100:9 152:9
158:15,15,23
179:14
**produced** 86:23
92:3,6 99:6
103:14 104:6
116:13 119:17,21
122:12 126:15
128:19,20 130:21
135:11 143:25
145:13,16,19,23
148:19 157:8
166:11 168:21
170:9 175:5
**producing** 93:7,17
**product** 158:21
**production** 21:21
50:22 51:9 201:20
**productions** 160:13
**professional** 39:16
47:11,12 203:7
**profile** 73:6 76:12
76:12 79:18
**program** 102:20
106:12,15 107:3
181:21
**programmed**

168:11
**project** 25:19
102:14 116:13,14
125:20 148:5
150:4,18 152:6
153:6,11 155:4,13
156:9,23 158:13
168:17,18 169:2
169:10 200:18
**projects** 48:10 72:6
147:6,16 156:6
157:5
**proofs** 124:5
125:16,22 171:3
171:10 172:3,14
174:11 200:2
**properly** 102:25
**property** 32:21
33:4 34:10 35:3
35:20,22 36:18
37:4,9,15 38:2
40:22 55:6,11
60:5 62:9 66:5,13
72:21 176:18
177:24 186:24
191:2,14,20 194:8
194:9
**proposals** 146:17
**propounded** 204:5
**protect** 90:12,18
91:2
**protected** 36:9
39:13
**proud** 130:12,13
157:12
**proven** 81:10
**provide** 13:20 21:2
21:4 27:16,16
120:15 189:19
**provided** 13:23
14:6,22 42:8 88:8
88:13,17,22 129:2
129:19,20 138:23
161:6 182:12,21
183:6
**pro-cop** 186:18

**pro-law** 186:18
**pro-obey** 187:16
**prudent** 31:25
**Public** 1:20 4:5
204:14
**publish** 54:6
**publisher** 65:15
150:20,23 151:2,3
151:6 174:23
**publishing** 17:24
**pull** 9:6,15 13:15
27:20,24 32:15
101:8,11 110:2
114:21 117:12
123:25 133:8
136:8 140:8
141:12 142:15
146:2 149:3
152:20 161:21
163:17 169:12
172:18 181:24
**purchase** 77:11
**purchased** 79:16
**purchases** 109:4
**purchasing** 75:14
75:14,15 79:6,23
**Purple** 170:4
**purported** 75:5
**purporting** 92:15
**purpose** 8:10 10:9
10:15 11:2 12:13
**purposely** 190:9
**pursuant** 1:18 8:25
12:6 28:20 29:11
**pushed** 40:9
**pushing** 152:3
**put** 17:18 36:8
39:15 64:12 65:2
80:12 113:18
117:13 124:2
133:9 134:18
136:10 140:10
141:13 142:16
146:3 149:4 150:7
152:7,21 154:13
157:20 160:14

161:22 163:18
167:15 171:11
172:20 181:23
183:11,15 184:13
191:23
**putting** 40:2 59:11
154:15 155:6,7
**p.m** 1:19 3:8 14:24
15:3 85:22,25
178:18,21 179:4,7
198:18,20

_____
**Q**
_____

**quadruple** 40:4
**quality** 78:22
**question** 5:13,17,19
34:7 37:17,18
41:11,15 52:4,5
72:16,20 78:9,10
80:22 81:13 83:25
85:8,17 88:14
89:17,25 90:5,7
96:5 97:25 98:2
124:21 138:5,7
139:4 144:5,12,16
144:21 145:11,15
145:17 195:9,23
**questionable** 114:4
**questioning** 186:21
**questions** 4:16 5:24
9:15 31:7 101:12
185:2 190:13,20
198:10 202:7
204:4
**Quinn** 2:4 3:10,18
**quirky** 114:2
**quite** 14:9,21 15:6
19:2 49:2 76:14
79:13 87:2 103:4
104:24 120:22
147:22 171:9,15
181:11 183:20
**quote-unquote**
194:17

_____
**R**
_____



**R** 205:3,3
**raccoons** 39:21
**rain** 55:23
**rainbow** 164:25
 165:9
**RAISONE** 1:12
**Rakower** 2:6 3:22
**Ramone** 163:12
**ran** 73:4
**range** 122:6
**Ray** 120:9 135:15
 137:11 138:13
**Raymond** 14:9
 15:6
**read** 2:8 3:24
 126:19 142:5
 190:24 204:3
**reading** 68:19
 72:19
**ready** 13:12
**real** 45:25 88:2
 97:6 125:2
**realize** 38:12 39:7
 107:11 151:20
 156:11
**realized** 34:16
 35:11 36:5 39:4
 40:25 42:9 57:24
 58:10
**realizing** 38:5
**really** 10:18 12:8
 18:18,25 20:14
 22:10 25:16 32:12
 34:2 35:24 36:13
 38:4,15 40:7,16
 43:25 44:21 48:21
 50:8 54:15 67:11
 74:11 75:7 81:5
 87:13 92:14,20
 93:2 99:16 100:4
 103:3,11,21,25
 104:3,13 105:16
 106:7,14 107:7,16
 114:7 116:22,24
 119:4,24 120:9
 123:3,14,16

124:25 135:14
136:24 137:22
139:15 144:25
145:7,22 147:11
147:24 150:25
151:17,19 152:4
156:14 158:17
160:9,22 164:18
165:12 168:15
179:22 182:22
183:4,10 192:17
196:23 198:4
**reason** 37:24 40:5
 62:14,15 65:10
 81:12 94:14
 113:22 118:19
 124:17 132:22
 133:4 134:23
 135:12 138:9,24
 144:6 178:7
**reasons** 31:23
 32:24 114:5
**recall** 9:25 10:6
 14:4 27:2 30:22
 30:25 37:25 40:20
 48:19 52:17,22
 54:12 55:19 87:25
 179:14 181:13,16
 192:11
**receipts** 50:6 51:9
**Recess** 85:23
 178:19 179:5
**recognize** 147:10
 149:16 155:20
 160:25 162:10
 168:7 169:21
 173:8 185:18
 188:21
**recollect** 14:15
 171:17
**recollection** 51:17
**record** 3:3 14:23,25
 15:2 28:6 46:18
 50:20 83:24 85:21
 85:24 103:2 129:8
 133:14 136:15

140:17 142:21
146:8 149:12
153:3 158:2
163:24 167:20
169:17 172:25
178:16,17,20
179:2,6 198:17
203:4
**records** 42:11,14
 46:23 50:5,17,23
 88:4,8,17,20 92:3
 92:6 93:6 100:15
 106:18,22 123:5
 143:22,25 197:2
**rectangle** 164:17
 165:25
**red** 108:11 113:5
 170:4,4,4
**redundant** 99:11
 99:15 100:10
**refer** 4:17 112:13
 112:15
**reference** 191:22
 195:3
**referenced** 19:8
 102:16,18 185:22
**referencing** 144:18
**referred** 97:12
**referring** 4:19 9:8
 93:24
**refers** 113:15
**regarding** 10:10
 69:17 186:23
 190:25 194:15
**Regardless** 37:19
**Registered** 203:7
**regulate** 119:23
 129:13 131:14
**regulations** 95:14
**reign** 132:24
**relate** 97:5
**related** 12:23 13:3
 13:5 67:21 98:25
**relationship** 71:6
 166:4
**relatively** 68:15

**relayed** 195:10
**relevance** 16:22
 37:10,17,20
 152:15 180:2
**relevant** 12:18
 13:20 14:17 15:7
 15:14 19:16 20:12
 66:7 100:24 130:8
 183:25 192:21
**remain** 51:7
**remaining** 46:10
**remains** 80:25
**remember** 9:22
 15:21 16:2 17:6
 17:12,14,16,21,23
 17:25 18:12 19:13
 26:25 31:20 32:10
 48:16 54:19 57:25
 65:7,13 105:15,24
 113:23 122:15
 125:10 132:11,13
 160:3 171:16
 180:4,21,23
 181:21 182:14,19
 196:22
**reminder** 4:25
**remotely** 1:18 5:23
**rent** 50:9 57:14
 107:4
**rental** 51:10 57:9
 107:7
**rentals** 50:6
**rented** 49:16 50:10
 50:13 51:11 57:16
**repair** 55:13
**report** 104:14
 196:10
**reporter** 1:20 3:13
 5:2 174:15 203:7
 203:12
**represent** 3:17 4:14
**REPRESENTAT...**
 1:7,14
**representatives**
 191:19
**represented** 190:3

**representing** 3:19
**reproduced** 100:2
**reproducing**
 137:21
**reproduction**
 203:11
**request** 3:10
 201:20
**requested** 19:19
**requests** 16:18
**required** 13:19
**research** 196:24
**resembling** 83:14
**reside** 67:14
**residence** 15:11
**respect** 144:10
**responding** 194:25
**responds** 194:23
**response** 186:21
**responsive** 181:19
**rest** 42:19,20 134:2
**resulting** 90:18
**results** 116:18
**resurfaced** 55:14
**retention** 70:3,7,10
**retired** 68:10
**Retrospective**
 54:15
**return** 96:3
**returned** 113:13
 127:13
**reveal** 89:19
**reverses** 96:19
**review** 139:24
**reviewed** 71:2
**revisits** 150:11,15
**RICATALOGUE**
 1:12
**ridiculous** 97:18
**right** 7:7 11:23 15:8
 18:4 23:11 29:18
 49:18 56:6 66:2
 75:19 80:13 81:9
 81:10 82:24 83:7
 83:17,18 84:9
 85:11 86:11 90:6



93:15 95:6 96:22
97:22 101:20
106:19,22 107:14
109:5,10 110:15
111:21 113:11
115:14,15 116:16
118:15 119:14
123:7 125:13,24
126:20 134:12
137:4 138:11,18
141:8,15 142:15
144:14 148:11
151:13,16,16
153:19 157:3
158:22 159:18,22
165:20 170:14
172:18 173:20,24
174:5 184:9,25
185:7,12 188:2,10
188:25 194:16
195:14,24 197:4
**rights** 82:21,24
92:21 128:7,8,14
148:8
**ring** 147:19
**ripping** 150:23
**risk** 160:12,19,20
**Rivers** 77:18 163:7
**Riverside** 74:6
**road** 4:25 160:10
**Robert** 1:8,14
56:14 65:16 67:21
73:14,18 99:19
135:4 141:4 142:9
149:24 150:2,4,18
150:24 152:16
157:14 160:10
161:9 171:8,14,24
173:12 174:3
175:8 183:15
**role** 174:22
**roll** 165:9
**rolling** 153:20
154:5,10 165:3
**rolls** 164:25
**Ron** 56:18

**Ronnie** 56:16
**roof** 59:4
**room** 5:24 6:10,19
7:5 136:3
**Rosenbaum** 44:15
54:2 66:17,21
67:9 104:20
108:23,24 109:9
109:23 127:11,17
127:21,22,23
174:12 188:18
**Rothkos** 76:6
**rough** 166:19
**round** 165:22
**row** 108:11
**royalties** 88:10
**ruled** 94:13
**rules** 4:25 95:13
133:6
**ruling** 94:16
**run** 102:21,22
151:23
**rusting** 55:15,24
**Ryan** 2:6 3:22

**S**
**Salama-Caro** 1:11
191:16
**sale** 21:22 35:2
71:24
**sales** 66:17 86:22
88:5,21 92:4
**salesperson** 128:4
**sat** 94:2
**save** 40:2 50:8
**saw** 35:10 131:23
139:10 155:10
176:25 177:12
197:21
**saying** 15:5 59:4
70:14 97:23
164:19 177:14
182:17 187:20
188:17
**says** 28:13 29:6
30:6,10 73:13

79:10 97:22
108:12,13,20
112:5 113:4,11
114:12 118:5,16
118:25 121:13
127:16 182:7
191:23 194:13,14
194:16,17
**scale** 166:16
**scan** 14:16
**scare** 38:25
**Schecter** 94:3,3,17
96:8,13 185:24
**scheduling** 98:10
**SCOTT** 2:15
**screen** 9:9 25:7,11
27:25 101:8
178:23
**screened** 26:21,22
118:14
**screening** 165:3
**screens** 63:22,23
64:2,4,5,11
**screw** 66:23
**scroll** 194:4
**scrolling** 191:9
**sculpture** 24:20
55:6,10 116:5
**sculptures** 55:2
87:10 91:22 95:20
115:17
**search** 17:20 18:3,8
19:15 20:8,9
181:18,24 182:3,4
182:5,6
**searched** 19:12,13
179:12
**searching** 179:19
184:8
**Searchlight** 181:22
**second** 11:11,13,15
11:23 12:6,13
28:17,23 29:5,7
29:19 31:10,11,13
31:17 32:21 33:5
33:7 34:11,13

36:19,21 37:2
41:15 55:20 60:5
60:16 62:10 63:20
64:14,17 89:10
98:21 108:11
113:10 137:21
176:6,19 177:25
186:23 193:25
194:8 195:2 196:4
196:8 197:14,16
201:16
**secondhand** 32:3,5
**secretarial** 20:15
**security** 42:3
**Sedgwick** 154:6
**see** 9:20 27:25 28:3
28:15 29:6,7
34:17 38:17 55:25
57:22 61:2 62:14
72:19 98:18 99:16
102:2 103:11
108:15 110:13,19
110:23 112:7,8,10
115:6 116:12
117:23 118:17
122:24 124:11
126:3 127:18
133:19 134:6
136:19 140:21
143:17,18 146:12
152:8,14 153:7
155:17 158:7,16
162:8,12,17,20
163:12,14 164:5
167:24 168:8
173:5 176:21
179:24 187:7
188:19 191:4,9,20
193:7,18 194:9,21
195:6,13,20 198:4
**seeing** 65:5 111:17
**seeking** 186:7
**seen** 28:9 177:10
**sell** 40:13,18 58:13
72:3,9,13,14 73:8
73:12 75:20,21,22

75:24 76:3,25
77:7 80:7 81:24
82:9,11,24 83:8
83:15 84:12,13,15
112:18 128:2
160:6,15 193:2
**selling** 76:2 80:3,19
80:24 81:19 82:2
82:14 83:6,21
84:4,19 85:2 89:2
89:22 91:24
**send** 16:9,22 94:15
119:10 131:25
132:2 175:14,17
183:12
**sending** 120:17
**sense** 5:21 22:5
25:5 58:12,13,18
93:14,15 114:6
164:23
**sent** 16:15,16 18:18
104:18,20 114:14
122:16,21,22
127:12 129:5
131:8,23,25
139:23 141:7
142:4 143:4,7
167:7,8 171:22
**sentimental** 65:10
**separate** 41:5,6
**separately** 144:13
**September** 1:19 3:7
203:7
**series** 101:9 151:12
164:20
**seriously** 186:13
**Services** 1:23 3:12
3:14
**set** 34:25 74:24
75:16 78:2,3,7,12
95:14 173:21
**sets** 21:18 67:5
79:21
**setting** 78:6 90:21
**settlement** 69:6
**seven** 82:6 87:9



95:5
**Shah** 2:6 3:18,18
  4:8,13 13:9,13,17
  27:20 32:15 78:21
  79:4 85:20 101:6
  109:25 110:8
  114:20 115:2
  117:12,18 123:25
  124:7 133:7 136:8
  140:8,14 141:12
  142:15 146:2
  149:3,11 152:20
  157:20 161:21
  163:17 167:14
  169:11 172:18
  174:14 178:11,15
  178:25 184:19
  185:7 197:9
  198:14 199:6
**shake** 5:10
**shape** 164:14
**shapes** 164:21
**share** 9:9
**SHEARBROOK**
  1:11
**Sheehan** 149:7,14
  149:18 200:16
**Sheet** 204:6
**shelves** 197:24
**she'll** 22:3
**shipped** 127:16,20
  127:25 128:22
  129:5 143:7
**shocked** 68:16
**short** 40:23
**shortly** 38:3 57:18
  58:9
**shot** 40:10,19 43:4
  184:12
**shoulder** 131:15
  158:19
**show** 9:7 50:18
  51:10 62:20 93:14
  101:2,24 113:22
  113:24 114:18
  128:10 130:14,19

142:8 192:20,23
  192:24
**showed** 23:7 24:3
**showing** 46:23
  50:24 62:20
  188:11 190:14
**shows** 44:8 130:10
  143:4
**shut** 7:17
**sic** 139:16,17
**sick** 76:23 84:13
**side** 92:21
**sides** 117:3
**sign** 25:14,15,22
  126:10
**signature** 126:17
**signed** 11:6,6 23:4
  23:12,17 25:12
  94:16 96:16 126:5
  126:6 177:3,4
**significantly** 10:19
**signing** 25:20
**silk** 25:7,11 26:21
  26:22 63:21,23,25
  64:4,10 165:3
**similar** 159:23
**SIMON** 1:10
**Simone** 69:4
  132:12
**Simone's** 70:10
**simple** 34:24
**Simultaneous** 64:3
  82:20 83:23 84:6
  113:20 147:20
**singing** 155:18
**single** 41:8 120:13
  175:15
**sit** 145:5 160:16
  165:13 196:18
**sitting** 5:24 35:25
  96:22,25 97:4,11
  98:9 114:15
  168:21
**six** 82:6 87:9 95:7
  105:18 122:2
  127:8 180:25

184:11
**size** 11:4 33:17
  134:7 142:11
  164:13 175:9
  177:2
**sketchy** 177:21
**slick** 168:13
**slide** 131:21
**small** 126:19 142:5
  158:5 160:5
  200:20
**smaller** 158:15
  159:2,3,20
**smart** 59:7
**sold** 40:10 44:14
  61:10 66:16,19,21
  67:2,3,4 72:4
  73:23 87:5 104:19
  172:15
**somebody** 30:4
  56:2 60:20 61:2
  73:14 76:3,4
  102:17 121:3,12
  122:25 127:4,11
  149:25 150:23
**somewhat** 198:6
**song** 155:18
**son's** 78:2,4,6,12
**soon** 25:22 40:24
  118:23 119:9
  134:13
**sophisticated** 60:2
**sorry** 13:10 31:4
  78:16 79:3 107:9
  128:24 133:10
  152:22 161:25
  178:25 189:16
**sorts** 14:22 21:19
**sound** 86:14
**sounds** 138:11,12
  138:13,14
**source** 184:3
**SOUTHERN** 1:2
**space** 34:19,21
  35:12,13,21 36:10
  38:13 39:11,18

40:4 41:3 43:10
  45:18 46:3 48:15
  52:9,16,18,24
  53:3 56:22 57:16
  62:24 64:13 83:17
  162:14,17 171:4,5
**spaces** 39:10,17
  43:11 163:11
**speak** 5:4 56:7
  74:22 77:24 78:5
  78:10 85:18
  135:18 167:11
**speaking** 5:4 28:19
  69:16,20 187:5
**special** 65:3 152:18
**specific** 12:20
  46:19,24
**specifically** 31:22
  69:2 71:9 72:7
  105:18 138:4
**speed** 138:5 187:14
**spend** 72:11 94:11
  180:12 181:9
  183:23
**spent** 63:16 65:19
  65:21 120:22
  147:6,16 179:18
  179:22 181:15
  184:7
**spoke** 75:2 189:24
**square** 43:6,13
  165:23
**squares** 155:12
**stack** 47:7 158:18
  166:4 173:12
**stacked** 34:18
  45:20 158:9 161:2
  162:15,22 197:23
**staff** 14:18 16:10
  17:7,8 47:19
  100:16 120:10
  129:9 180:8 181:3
  189:4 197:17
**stages** 42:17 43:18
  154:24
**stainless** 55:5 169:6

**stamp** 94:21
**stamped** 22:25 24:8
  24:14,19 25:9
  26:5 94:24
**stamping** 93:18
**standing** 59:3
  163:13
**standpoint** 36:15
**Star** 92:16,16
  136:16,23 190:3
  200:6
**start** 26:8 38:11
  65:4,5 85:13
  89:16 101:7 102:2
  135:15 159:12
**started** 34:20 38:4
  38:17 40:24 73:18
  73:22 78:18 95:9
  95:11,24 103:17
  106:12 168:25
**starts** 191:11
**state** 1:20 3:16
  80:10 96:13
**STATES** 1:2
**stay** 61:20 64:12
**stayed** 100:23
**stays** 74:7
**steal** 55:8
**steel** 35:14 55:5
  169:6
**Stella** 77:17 163:7
**stencil** 22:8 23:7,14
  23:15,16,20,21,24
  24:4,5,7 25:9,15
  93:19 94:24 95:10
**stenciled** 25:12
**stencilling** 22:7
**stencils** 23:8 26:2,3
**Stenographic** 1:19
**step** 34:4
**steps** 114:15
**stimulates** 36:4
**stipulation** 194:15
**Stipulations** 202:3
**stock** 79:23
**stone** 153:20 154:5



154:10
stop 52:3 97:23
storage 35:21 38:15
  39:5,6,10,11,17
  43:10,11 44:6,10
  45:10,14 46:9,18
  46:20,20,24 47:18
  48:13,24 50:18,23
  51:19 52:6,16,18
  52:23 54:13 56:10
  56:11,25 57:4,7,9
  57:14,16,22 58:21
  59:5,18 67:12,15
  67:19 162:13,17
  163:9 196:20
  197:4,7,18,24
  198:6
store 56:3
stored 44:9
story 52:3 97:19
  128:16 177:20
  186:11
straight 187:18
straighten 81:4
straightened 13:12
strange 34:2 62:3
Street 1:23 79:21
strong 125:2
stuck 24:10 155:12
  196:13
studies 158:12
  159:21
studio 6:8 8:20
  10:11 15:14,16
  17:2,3,5 18:8
  19:14,15,24 20:10
  20:12 28:14,19
  30:16 36:12,13
  43:6 44:5 45:9
  46:11 52:12 58:5
  63:21,22 64:12,15
  64:18 67:19 71:13
  71:17 73:5 74:4
  76:19 98:21
  100:16 101:4
  104:10 108:4,7

109:11 111:14,20
  121:14 124:16
  126:10 127:5
  131:18,19 132:10
  134:22 137:9
  138:8,17,19
  143:22 145:4
  148:15 149:22
  155:22,25 157:3
  161:2 162:6,11
  167:2 168:5,22
  171:3,5,6,9,12,18
  173:11 179:12,18
  179:19,22 180:6
  180:11 181:3
  192:7 193:5 196:8
  197:22 198:4
  201:2
studios 73:3 152:7
study 131:14 153:5
  156:4 166:10
  200:18
studying 30:4
stuff 24:18 36:6
  40:13,19 41:2
  49:11 59:17 64:24
  73:22 100:13
  119:22 122:5
  125:15,19 151:15
  151:23 154:16,16
  155:7,8,9 163:8
  166:4 171:11
  178:5 182:20
  183:13,21
stupid 183:13
subcontractors
  14:3 16:14 180:3
  180:5 181:8,14
subject 91:4
submit 100:20,20
Subscribed 204:11
substance 204:5
substantial 61:12
subtract 102:23,24
subtracted 122:18
subworkers 14:3

sucks 159:15
sudden 40:8 116:5
suitcase 63:4
Sullivan 2:4 3:11
  3:19
Sultan 56:15 77:19
  87:12
super 38:20
supervise 16:20
  135:22
supervised 135:22
  135:23
supervision 203:12
supplemented
  99:22
supporter 109:22
suppose 7:3
supposed 133:2
Supreme 93:20,22
  93:23,25 94:16
  96:5,13 185:14,16
  201:10
sure 6:3 8:2 10:18
  18:10 19:17 42:16
  42:21,22 44:16
  46:4 50:7,19,20
  51:24 52:25 53:4
  53:12,17,25 63:2
  67:25 68:18 71:2
  75:6 78:17 87:13
  89:18 90:14,24
  94:19 96:23 102:9
  102:21 103:4,16
  103:18,23 105:11
  105:12 106:6
  107:4,5 118:22
  120:24 121:2,5
  123:8 134:17
  135:21 141:11
  146:15 148:4
  158:20 160:4
  183:9 188:24
  197:11,12
surface 133:25
surprise 148:14
  149:22 157:2

166:25
surprised 60:19
  189:10
Susan 149:7,13,18
  200:16
suspect 85:15
Swift 152:3
swindler 66:25
sworn 4:4 203:4
  204:11
S-C-H-E-C-T-E-R
  96:8

T

T 205:3
tab 9:6 27:21
  101:16 110:2
  114:21 117:13
  124:3 133:9,10
  136:10 140:10
  141:13,14 142:17
  146:3 149:5 150:7
  152:22,22 157:21
  161:22 163:18
  167:15 169:12
  172:20
take 13:2 14:13,14
  20:17 34:4 43:13
  43:17 45:18 46:12
  48:14,23 49:11
  85:18 89:18
  109:25 114:20
  122:7 129:10,11
  129:12,13,25
  132:3 140:3
  160:12 167:14
  169:11 177:17
  186:13
taken 1:18 3:9 5:2
  134:18
takes 22:22 43:19
  43:22,24 45:24
talk 29:4 31:6
  74:19 79:8 84:11
talked 38:6 66:14
talking 7:6 26:17

31:9 43:5 61:11
  89:21 128:21
  131:2,4 137:16
  170:19 185:23
talks 161:10
tarp 55:10,17,20,23
  56:5
task 35:13 41:16
Taylor 152:3
team 44:24 94:4
  135:23
TECH 13:9,16
  149:10 185:8
technical 13:10
TECHNICIAN
  2:15
technique 165:2
tell 8:12,16 13:25
  16:2 17:15,21
  18:10 20:25 32:12
  33:3 37:3,8,14,24
  44:25 49:19 57:15
  58:19 62:15 71:8
  74:6 80:23 81:7
  82:22 83:10 88:3
  89:21,23 94:10
  97:3,21 98:8
  102:5 103:25
  111:6,10 113:15
  114:11,12 115:16
  120:5,6,18 123:4
  124:22 126:14,18
  127:3 130:8,20
  135:21 137:7
  138:15 140:24
  141:25 143:2,15
  145:3 146:14
  155:3 161:24
  165:14 167:9
  170:7 172:11
  178:8
telling 33:24 60:8
  60:13 139:19
  161:19 178:8
  182:14
tells 30:3 187:10



temperature 35:16
  35:18 39:15 41:17
  42:5
ten 33:10,13 58:16
  61:20 62:3,23
  63:17
Tennessee 50:2
tennis 12:24
tens 134:25
ten-hour 184:12
term 17:19
terms 68:14,16
  69:15 80:6 82:23
  194:7
terrible 80:10
testified 4:5
testimony 11:17
  34:6 36:17 42:23
  203:4
tests 125:16
texts 179:25
thank 4:22 7:18
  11:14 13:17 25:6
  27:19 72:20 79:4
  86:4 96:15,17
  98:6 117:11
  140:14 143:20
  144:21 163:20
  167:13 184:20,22
  185:11 198:8,11
  198:15
Thanks 4:11 136:9
  140:9
theme 127:14
theoretically 34:15
thieves 81:11
thing 12:21 20:4,15
  22:11 28:23 33:24
  38:16 41:8 44:20
  46:2 63:7 97:7
  99:12,14 100:2,6
  115:12 118:10
  119:7,13 126:8
  130:15 139:21
  153:20 154:6
  161:15 165:21

169:9,23 186:4
things 7:11 18:15
  19:19 21:19 24:6
  34:14,20,22,23
  42:20 44:24 47:9
  50:8 52:16 53:5
  59:9,22 65:5
  66:19 67:3 68:22
  69:23 77:18 80:11
  97:8,19,23 99:10
  99:20,24,25 100:9
  102:6,10,23
  109:16 114:3,4
  119:21 120:4,16
  122:14,19,22,23
  125:7 135:2,6
  137:20 138:5,21
  155:10 156:8,23
  158:18 160:20
  162:13 163:3,6
  166:21 167:4
  168:19 172:2
  175:22 181:25
  189:6 197:22
think 8:11 9:22
  12:22,24 14:19
  15:25 18:9 19:3
  19:17,17 20:2,7
  26:7 27:22 28:23
  29:14 31:18,25
  32:9 40:18 41:9
  44:2 45:8,13
  46:16 47:20,23,23
  48:9,18 51:24
  54:6,14,22 55:3
  57:2 59:20,23
  60:8 64:16,20
  66:15 72:20 74:9
  74:13 76:20 84:12
  84:12 86:15 87:4
  87:8,17,25 88:23
  88:24 89:24 90:2
  100:4 102:12,17
  102:21 105:2
  106:13,20 107:4
  107:15,20 109:13

110:14 112:21,24
  115:11 120:21,21
  124:10 129:15
  132:11,13,14,18
  132:19,22 133:10
  134:2,6 135:8
  137:6 138:5 145:9
  145:10 146:19,25
  147:4,18,25
  153:25 159:2
  165:20 171:17
  172:10 173:10
  174:25 175:20
  177:19 178:11,13
  179:21 182:4
  183:10 184:3,15
  184:19 185:7
  196:13
thinking 10:22 41:4
  80:3,18,23 81:18
  82:14 83:6,21
  84:4,19 85:2
  134:12 150:17
third 45:12 46:5,12
  67:7
Thomas 1:7 151:18
  153:12
thought 11:2 14:16
  20:12 29:25 33:22
  33:25 35:25 40:8
  44:23,24 49:25
  52:14,15 60:24
  68:8,18 75:21
  100:21 109:18
  117:5 146:21
  147:23 152:14
  155:19 176:4,20
  177:9 178:4,5
  183:16 193:3
  197:20
thousand 40:3 47:9
  63:5 173:19
thousands 36:11
  65:15 99:23,23
  114:14 119:20,20
  119:20 135:2

167:3
three 14:2 26:15
  39:14 48:11 50:12
  52:19 57:21 68:2
  69:19 70:16 72:14
  75:3,12 77:19,20
  79:10 84:23 87:11
  142:9
threw 126:12 167:5
throw 162:21 166:5
thrown 66:6 169:5
thumb 16:16
  181:25 184:14
ticket 76:7,9 186:17
tight 116:22,24
Tikva 53:24 174:8
  174:10,11,15
Tim 19:24,24 27:5
  47:20 48:4 59:15
  60:15
time 3:8 10:3 14:10
  15:6 16:5 19:3,15
  34:5 38:14 40:18
  40:23 43:22,24
  46:3 47:15 49:2
  51:3 60:7 64:6
  65:8,9,24,24
  70:20 72:12 75:19
  95:18 104:7 107:8
  107:10,21,21
  109:19 112:2
  114:17 120:23
  121:8 132:7,19
  137:21 145:11
  147:23 150:16
  154:2 156:11
  164:9 165:5
  174:21 178:12,21
  179:17,23 180:12
  181:9,15 182:25
  183:22 184:8
  186:5 190:2
  198:20
times 19:11,18
  36:23 42:25 44:13
  65:19,20 99:12,14

100:3,7 123:10,13
  125:19 132:8
  139:5 144:5
  147:17 161:14
  165:21 183:8
time-consuming
  44:20 47:3 156:22
timing 98:12
  196:23
toaster 7:7
today 3:7 32:25
  56:5 98:4 186:21
  196:19
today's 8:10 198:18
told 8:21 9:23
  10:13,21 11:24
  12:2,9,14 13:2
  33:7,24 34:12
  37:5 58:23 60:18
  60:21 61:4,8 62:7
  63:3 67:3 68:9
  70:19 81:18 84:20
  129:18 131:7
  134:21 135:10
  137:8,11 138:7,22
  143:24 144:4
  145:18 148:18
  157:3 184:2 189:5
  195:7,21,25
  196:15,17
Tom 192:8
tonight 84:13,15
tooth 30:8
top 22:3,21 34:18
  58:8,15 105:10
  112:4 117:2 118:5
  118:15 162:15
  173:17 190:16
  197:23 198:5
totem 17:20
touch 105:19
town 20:23
track 104:23
trademark 52:2
train 43:3
transcript 5:5



37:21,23 203:11
transcription 204:4
transfer 74:24 89:4
    89:7 90:8
transferring 74:23
    77:25 78:11 89:2
transparent 77:3
transpire 72:13
transpired 32:12
    87:18
traveled 142:9
tree 40:11
trees 35:3,5,15
trial 125:16 164:2
    166:13,24 201:4
triangle 165:24
trickier 95:22
    121:18
tried 47:2 52:10
    115:19 119:6
    125:6,15 144:7
    169:6,7,7 182:6
    196:11
tries 9:15
triple 67:4
trips 48:23 49:5
    197:3,6
Tristan 56:20,20
trouble 80:10
truck 43:13,16 47:7
    49:7,9,13,15 50:5
    51:10,12,14,21
    52:14
truckload 43:25
    47:3
trucks 49:7,12,16
    49:17 50:4,9
    51:11
true 28:22 68:11,19
    95:19,20 161:19
    182:8 203:4
truly 42:7
trust 23:25 66:24
    78:3 80:12
trusts 74:24 77:25
    78:6,7,12

truth 8:17 16:3
    17:22 18:10 88:3
    89:21 120:5 123:4
    130:8 155:3
    172:11
try 5:3 38:19 45:17
    52:8 61:3 107:10
    173:13
trying 8:14,16 11:8
    34:25 36:3 37:20
    44:18 47:6,22
    54:22 55:8 58:11
    58:12 59:6 105:24
    125:12 127:6
    130:11 154:9,21
    164:7 184:17
    189:15 193:4
turn 33:19
turned 6:23,24,25
    93:5,10 120:2
    170:12,15
turns 69:15 187:15
TV 130:14
twice 15:25 69:14
two 7:10 15:24 16:4
    16:24 19:7,10
    22:16 24:25 25:2
    26:15 33:12 35:8
    39:13 48:18 49:3
    52:19 67:5 68:2
    69:19 75:3 77:6
    86:8 87:10 109:4
    117:2,3 124:24
    131:8,10 132:6
    171:12,21 178:14
    179:11 180:9
    182:24
two-thirds 46:6,13
tying 38:14 56:22
type 181:23
types 68:21 71:15
    155:10 164:21
typical 155:11
typically 86:6
T-I-K-V-A 53:24
    174:15

U

Uh-huh 63:24
ultimately 166:11
unaware 68:14
    143:23
unbelievable 42:3
underneath 113:8
understand 4:19
    5:11,14 8:9,12
    10:9 12:5,11,12
    12:17,20 29:9,21
    30:12,14 31:9
    32:23 69:7 107:14
    177:18 182:9
    189:13 190:5
    191:25 196:25
understanding
    176:17 183:20
    190:3,4 191:18
understood 5:19
    13:3
unfortunately
    55:13 102:8 103:4
    103:9 160:7
UNITED 1:2
unloading 43:24
update 106:3
    119:10,11 177:8
updated 118:16,20
    118:25
UPS 171:23
upset 181:14
upsetting 68:20
upstairs 38:8 43:7
    104:10 173:10
    192:16
Urquhart 2:4 3:10
    3:19
USA 53:11 143:16
    143:18
use 7:15,21 23:7
    25:4 51:14 64:9
    95:10 111:10
    154:12 165:15
Usually 158:13

Utica 113:12,25
    114:2,18
U.S 128:10 148:12

V

valuable 35:12,22
    38:13 59:7 135:7
value 35:20,21
variations 125:9
    127:14 133:17,22
    148:2 200:4
various 68:25 74:2
    98:24 103:19
    182:15 191:15
Vegas 74:9,12
verbal 5:8,9
verse 3:6
version 158:15
verso 23:2,21 25:10
Vesseccia 20:20
    47:25 62:7 192:15
video 1:17
videographer 2:14
    3:2,11 14:23 15:2
    85:21,24 178:17
    178:20 179:3,6
    198:17
Videotape 3:3
view 34:22
viewed 35:14
viewing 34:22,23
    192:6
Vinalhaven 164:9
    171:9
virtually 3:9
visit 11:11,13,13,15
    11:18,20,21,23
    12:6,7,13 28:18
    29:19 31:13 34:11
    34:13 38:4 40:21
    55:21 58:4 63:20
    64:14,17 76:19
    98:21 132:5
    186:23 191:2,6
    194:8 196:4,8
    197:14,16 201:14

visited 57:23
visits 16:4,24 19:7
    19:10 132:6
    179:11 180:9
    196:6
vulnerable 39:18
    162:16
V-E-S-S-E-C-C-I...
    20:20

W

W 1:7,14
wad 174:5
wait 5:3 89:10
    97:25 195:22
waited 122:3
waiting 60:20 61:2
    61:16
wake 162:20
walk 38:5 131:14
    155:17
wall 65:3 79:21
    116:5
want 5:23 9:10
    10:17,23 20:7
    28:2 31:6,22
    55:24 59:4 61:19
    62:20 64:8 65:12
    76:25 77:7 81:2,5
    81:12 83:15 84:23
    89:12 90:24,25
    97:21 99:12,14
    100:5 109:17
    111:18 121:21
    128:9 138:17
    156:16,17,18
    158:17,17,23
    160:2 162:21
    176:9 183:3
    190:19 193:21
    195:13,17 196:3
wanted 14:13 20:9
    23:6,7 24:4,24
    25:14 57:20 67:9
    100:16 109:21
    113:22,24 122:7,9



123:5 140:4
146:16,20 153:22
158:22 181:24
186:19 192:23
196:11
**wants** 30:4 73:14
75:23 77:3 128:15
**Wappingers** 27:10
**Warhol** 65:21,23
150:13 154:5
165:11
**Warhols** 76:9
**Warhol's** 154:4
**wasn't** 8:21 20:14
23:12 31:21 32:11
32:12 36:9 47:14
47:14,14 60:17
68:10 94:11
111:16 117:4
120:8,16 129:15
131:12,15,16
182:25 184:5
186:10 192:18,18
195:25 196:16
**waste** 109:19
**watched** 155:18
**water** 178:9
**way** 24:16,16 25:13
30:5,13 31:2
51:13 53:4 54:16
56:21 70:19 75:16
77:9 83:13 88:11
88:16 103:24
105:16 107:11
122:10 128:17
131:24 134:19
139:3 144:17
154:16 161:20
170:3,7 175:4
187:2
**ways** 51:6 89:25
125:4,17 148:3
150:14,15 151:16
155:6 182:15
**weak** 42:9
**week** 111:23 164:9

165:22,23,23,24
**weekends** 49:4
**weeks** 35:8 49:3
72:9
**weird** 165:10
**well-documented**
161:10
**well-known** 157:18
**went** 8:23 14:10
15:4,14 18:2,8
19:24,25 24:2
33:14 38:7,18
39:2 57:21 69:4
71:11,12 103:6,19
115:22 116:3
122:25,25 123:10
126:9,13 134:13
141:2 146:16
153:13 154:24
164:9 165:21
166:2 169:2 181:3
181:17
**weren't** 62:20
187:20
**West** 1:23 2:9 74:4
**Westchester** 38:14
**we'll** 77:5,5 156:17
156:18
**We're** 50:21
**we've** 24:10 28:8
40:16 56:9 66:13
67:2 106:13
108:17,22,24
118:2 119:15
178:13 179:10
**Wharf** 2:9
**whatsoever** 58:14
**white** 22:19
**wide** 49:10
**wind** 184:13
**window** 39:24
78:18
**windows** 152:7
**winning** 94:4
**wished** 158:24
**witness** 4:4 78:25

91:6 98:5,7
144:15 178:22
184:22 198:11
199:5
**witnessed** 186:4
**witnesses** 203:5
**Witz** 56:19
**woman** 105:14
131:9
**woman's** 17:16
**wood** 156:18,19
**Woodward** 112:6
112:13,13,16,16
112:19
**word** 22:17 53:7,15
53:23 54:4 100:5
118:14 148:9
**words** 53:11
**work** 17:13 21:12
21:17,18 24:14
36:3,14 42:24
46:3 47:5,22
48:14 52:11 57:24
58:13 67:9 72:23
73:8,11 75:3,14
75:15,20,22 80:6
84:21 85:2 89:22
96:3 104:18,19
106:10 109:17
112:25 147:12
151:3,5,19 153:22
155:19 159:11,12
170:9,13,16,17,18
170:19 173:23
174:4
**worked** 14:18
16:13 17:12,22
19:23 21:14 25:17
26:24 44:12 58:24
65:17 67:23 68:4
68:23,25 69:3
105:15 106:13
109:15 119:7
127:4 147:21
153:11 160:13
182:24

**workers** 14:2 59:16
59:21
**working** 42:4
146:15 147:22
153:18 181:6
183:5 194:16
**works** 10:14,16,22
11:8 21:22,23
23:2,22 24:17
36:11 40:22 41:23
44:4,9 45:8,13
47:18 48:24 50:24
51:18,19,21,23,25
52:6,18,21,22
53:6,10,15,19,23
54:3,8,11 58:21
59:18 61:9 62:9
65:15 66:12,16
71:25 73:6,9,12
74:23 75:6 77:10
77:11,25 78:11
79:7 80:4,19,24
81:19 82:14 83:6
83:21 84:4 86:19
86:22 87:4,15,19
87:24 88:21 89:2
89:8 90:9 91:10
91:13,16,24 93:7
93:16 94:22,22
98:25 99:6 103:14
103:19 104:6
106:4 107:8
111:11 112:19
114:24 115:13
119:3 121:12
123:15 125:23
126:3 134:3,25
135:3,7 137:3,6
141:6 142:3 143:4
143:9,13,15 148:7
151:9,11 159:17
162:24 163:6
176:5,18 177:24
199:18
**worse** 85:15
**worth** 40:4 41:4

63:8
**wouldn't** 30:25
33:19 59:7 62:11
66:10 72:13 92:9
106:23,24 123:3
130:4 131:13
133:5 137:12,13
138:24 139:2,13
139:14 144:2
145:22 148:20,22
152:14 157:2,10
160:14 166:25
186:25
**Wow** 165:16
**wracking** 47:4,16
**wrap** 25:16
**wrapped** 18:14,25
**wrapping** 47:9
**written** 107:19
**wrong** 36:6 82:16
84:8
**wrote** 32:18 169:25

---
**X**
---
**x** 1:3,10,16 199:3
**Xerox** 122:8
**Xeroxed** 132:3

---
**Y**
---
**yeah** 11:24 14:21
21:4,8 23:3 27:12
29:14 43:2 46:12
49:17 53:20 71:22
78:25 87:7 91:19
92:2 96:23 104:8
107:23,25 110:16
110:19 112:11,11
112:11,12 128:3
131:5 133:21
141:15 143:6,6
158:8 186:9,14
187:7 189:12
192:12 195:12
**year** 11:5 17:23
18:13,13,13 24:8
24:9,12,13,18,22



25:2 26:5,9,13,13
26:14,16,24 76:16
177:3
**years** 21:15 26:15
26:15 54:6 65:18
68:2 69:19 72:14
73:7 74:8 87:2,21
103:15,21 105:2,6
108:9 153:13
165:20 171:12
**yellow** 150:8
**yes-or-no** 34:7
**York** 1:2,20,24,24
2:5,5 6:5,7 27:11
41:25 67:13 74:4
93:23 96:14,14
149:7 184:10
185:14,17 201:11

___ Z ___

**Z** 4:3 99:19 142:9
157:14 161:9
175:8
**Zaretsky** 82:5
188:7,13 189:23
189:24 191:11,12
192:6 201:12
**Zerner** 2:8,10 3:23
3:23,24 11:9 21:7
69:2 78:15,24
79:3 85:16 86:13
89:9 90:23 97:24
98:6 130:23
140:13 144:11,16
145:10 170:23
176:8 178:13
184:24 185:4,10
188:3,14 190:12
193:16 198:8,12
198:16 199:7
**Zerner's** 70:7
**Zoom** 1:17 6:13,17

___ $ ___

**$10** 94:5
**$100,000** 61:11

**$12** 67:6
**$4** 10:17,19 63:4
67:10 177:15
**$50** 63:8

___ 0 ___

**001** 110:2
**001A** 149:5
**02110** 2:10

___ 1 ___

**1** 3:3 9:12 27:21
28:8 101:16
114:21 117:13
133:9,10 136:10
140:10 141:13,14
142:17 143:11
146:3 152:22
157:21 161:22
163:18 167:15
169:12 172:20
173:17 199:13
**1,000** 46:10 136:4
173:14
**1-15** 124:3
**1-23** 152:22
**1:46** 85:22
**10** 1:19 3:7 43:23
46:15 87:10
141:19,21 200:9
**100** 84:9 91:15
129:25
**10010** 2:5
**10018** 1:24
**101** 199:14
**11** 24:23,24 142:20
142:22 200:12
201:24
**110** 199:16
**114** 199:18
**117** 199:19
**12** 49:10 73:7 87:10
105:17 143:11
146:8,9 147:25
159:8,13 200:14
203:7

**12th** 1:23
**12,000** 61:23
**12:00** 1:19
**12:04** 3:8
**12:18** 14:24
**12:28** 15:3
**1200** 61:23 173:20
**124** 200:2
**13** 113:4,4 146:4
149:9,10,11,12,13
200:16
**133** 200:4
**136** 200:6
**14** 140:11 149:9
153:2,4 200:17
**140** 200:7
**141** 200:9
**142** 200:12
**146** 200:14
**149** 200:16
**15** 46:15 58:17
157:25 158:3
200:19
**15-minute** 186:9
**150** 175:16,17,18
**1500** 46:10 122:21
**153** 200:17
**158** 200:19
**16** 43:5 45:6 100:3
100:6 133:10,11
162:4,5 201:2
**16,000** 122:16
182:18
**1600** 43:13
**162** 201:2
**1623** 153:24
**163** 201:3
**167** 201:5
**169** 201:7
**17** 133:10 141:15
163:23,25 201:3
201:23
**173** 201:8
**18** 25:4 141:14
167:19,21 201:5
201:23

**18-hour** 45:6
**180** 10:25
**184** 199:7
**1840s** 162:14
**185** 201:10
**188** 201:12
**19** 136:11 143:12
169:16,18 189:6
201:7,25
**191** 201:13
**1912** 25:3
**193** 201:15
**1958** 23:9
**1961** 165:6
**1991** 149:24
**1993** 115:20 150:4
**1993/1994** 102:14
**1994** 168:24 169:2
**1995** 73:21

___ 2 ___

**2** 101:17,23 119:16
159:10,11 199:14
**2,000** 122:23
**2:01** 85:25
**20** 27:12 35:5 49:8
143:19 172:24
173:2 194:12,25
201:8
**2000** 115:22 121:7
**2008** 122:22
**2011** 105:17
**2012** 25:3,4 95:9,10
168:9
**2013** 108:25 111:23
115:25 168:9
**2014** 105:25 108:25
**2015** 95:11,12
105:25 121:7
128:22,22
**2016** 113:12
**2017** 25:4 95:12,13
111:24
**2018** 94:25 95:2
**2021** 1:19 3:7
190:17 191:12,20

**193:24 194:3,12
201:15 203:7
204:11
**21** 185:5,9,9,15,16
201:10,22
**22** 33:20 188:5,6
201:12
**2200** 63:12
**23** 43:7 190:15
191:5 201:13
**24** 157:21 190:17
191:11 193:18,24
201:15
**25** 80:15 169:12
201:24
**2500** 45:13 46:9
**26,000** 122:17
**27** 144:5 201:23
**29** 167:15

___ 3 ___

**3** 9:6 27:21 28:12
88:9 110:5,12
119:16 130:2
159:8 199:16
201:22
**3,820** 10:24
**3/23/14** 108:13
**3/23/17** 101:22
110:11,24 111:3
115:4 117:20
118:16,21
**3:50** 178:18
**30** 32:19 77:4 99:14
130:3 161:23
**30th** 98:18
**300** 33:20 173:15
173:17
**320** 1:23
**33** 172:21
**339-17** 141:16
**339-5** 110:4
**350,000** 186:17
**3600** 60:23
**37th** 1:23
**39** 163:19



MAGNA
LEGAL SERVICES

**393** 141:14
**393-12** 117:14,15
 117:20 199:19
**393-13** 146:4,7,9
 200:14
**393-14** 140:12,16
 140:18 200:7
**393-15** 124:3,4,9
 200:2
**393-16** 133:11,13
 133:16 200:4
**393-17** 141:18,21
 200:9
**393-18** 142:17,19
 142:22 200:12
**393-19** 136:11,13
 136:16 200:6
**393-23** 152:23,25
 153:4 200:17
**393-24** 157:22,24
 158:3 200:19
**393-25** 169:13,15
 169:18 201:7
**393-29** 167:16,18
 167:21 201:5
**393-30** 161:23
 162:3,5 201:2
**393-33** 172:21,23
 173:2 201:8
**393-39** 163:20,22
 163:25 201:3
**393-4** 101:17,21
 199:14
**393-5** 110:5,10
 199:16
**393-6** 114:22,23
 115:3 199:18
**395** 28:7

---
**4**

**4** 45:22,24 101:7,16
 114:23 115:5
 119:16 159:9
 199:6,18
**4,000** 10:14,22
 44:25 45:8 60:22

 61:9 63:3,11,14
 134:24 176:22,23
 176:24
**4:08** 178:21 179:4
**4:13** 179:7
**4:35** 198:18,20
**40** 65:18 143:12
**40-foot** 49:13
**400** 45:21
**42** 130:3
**4600** 60:22

---
**5**

**5** 1:11 8:18 31:14
 110:3 117:15,22
 119:16 135:3
 199:19
**5:00** 19:5
**50** 150:14 201:23
 201:24
**50/50** 80:14
**500** 51:6
**51** 2:5 201:24

---
**6**

**6** 114:21 124:4,10
 200:2
**6,000** 135:3
**6/29/21** 28:7
**6:00** 19:5
**60** 143:11
**60s** 153:15 154:7,12
 154:12,16,16
**624-6221** 1:24

---
**7**

**7** 49:10 108:10,10
 133:15,16 200:4
**7,000** 43:6 63:14
**700** 174:7
**74** 201:25

---
**8**

**8** 45:24,24 136:14
 136:16 159:8
 200:6

**8-by-20** 43:11
**8/23/13** 108:14
**8/31/2021** 98:15
**80** 36:22 62:17
**866** 1:24
**892** 61:24

---
**9**

**9** 140:13,17,18
 159:13 199:13
 200:7
**9/22/2019** 96:16
**9/9/15** 127:17,21
**9:00** 19:3
**90** 130:3 163:5
**94** 115:20
**95** 171:17
**96** 73:21
**99.9** 148:4

