UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED,<br><br>Plaintiff,<br><br>-against-<br><br>MICHAEL MCKENZIE, et al.<br><br>Defendants. | Case No. 18-cv-04438-AT-BCM |

## MICHAEL MCKENZIE'S OPPOSITION TO
## PLAINTIFF MORGAN ART FOUNDATION LIMITED'S MOTION (ECF 465)
## FOR TERMINATING SANCTIONS

Date: January 17, 2022

MARKHAM READ ZERNER LLC

John J.E. Markham, II (JM4744)
Bridget A. Zerner (BZ2582)
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
jmarkham@markhamreadzerner.com
bzerner@markhamreadzerner.com
*Attorneys for the Defendant Michael*
*McKenzie dba American Image Art*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................... ii

**MAF's MISCHARACTERIZATION OF FACTS** ........................................... 1
*No Forgeries* ................................................................................................... 1
*No Hiding of McKenzie-Owned Indiana Artwork* ........................................ 3
*Prior Discovery Disputes and Prior Counsel* .............................................. 6
*The Art Archive* ............................................................................................ 7
*Settlement Negotiations and Visit to AIA by Invitation of McKenzie* .......... 8
*The Later, Court-Ordered Inspection and Movement of Artwork* ............... 10
*Gonzalez and His Goal to Sink McKenzie in Litigation* .............................. 13

**ARGUMENT** .................................................................................................. 17
**I.       LEGAL STANDARD FOR "TERMINATING SANCTIONS"** .................. 17
**A.       The Movement of the Artwork Was Not Discovery Misconduct** ............... 18
**B.       Document Production** ................................................................................ 19
*McKenzie Has Not Acted with Intentional Bad Faith and There is Not a Pattern
     of Sanctionable Misconduct* ..................................................................... 19
*Deficiencies Have Been Corrected and Still Can Be Well Before Trial and There
     is No Likeliness of Future Misconduct* ..................................................... 20
*MAF Has not Shown Prejudice Warranting Dismissal* ................................ 20
*Lesser Sanctions or Remedies Than Dismissal* ........................................... 21

**CONCLUSION**................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
  2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ......................................................... 23

*DeCastro v. Kavadia*,
  309 F.R.D. 167 (S.D.N.Y. 2015) ........................................................................... 22

*Ford v. Am. Broad. Co., Inc.*, 101 F.R.D. 664, 667 (S.D.N.Y. 1983),
  *aff'd sub nom. Ford v. ABC Inc.*, 742 F.2d 1434 (2d Cir. 1984)............................. 19

*Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*,
  2019 WL 4727537 (S.D.N.Y. Sept. 26, 2019)........................................................ 19

*JSC Foreign Econ. Assoc. Tech. v. Internl. Dev.and Trade Serv., Inc.*,
  2005 WL 1958361 (S.D.N.Y. Aug. 16, 2005)......................................................... 22

*Lawrence v. City of New York*,
  2018 WL 3611963 (S.D.N.Y. Jul. 27, 2018) .......................................................... 22

*McMunn v. Memorial Sloan-Kettering Cancer Center*,
  191 F. Supp. 2d 440 (S.D.N.Y. 2002)..................................................................... 23

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Employees and Rest. Employees Intern. Union*,
  212 F.R.D. 178, 181 (S.D.N.Y. 2003) .............................................................. 18, 24

*S. New England Tele. Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010).................................................................................... 22

*Sanchez v. Litzenberger*, 09 CIV. 7207 THK,
  2011 WL 672413, at *4-5 (S.D.N.Y. Feb. 24, 2011)............................................... 17

*Skywark v. Isaacson*,
  1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999) ......................................................... 24

*Weinstein v. Ehrenhaus*,
  119 F.R.D. 355 (S.D.N.Y. 1988) ............................................................................ 24

Michael McKenzie d/b/a American Image Art ("McKenzie") respectfully submits this Opposition to Plaintiff Morgan Art Foundation Limited's ("MAF") Motion for Terminating Sanctions (ECF 465) and MAF's Memorandum in Support (ECF 466) ("MAF Memo").

## MAF'S MISCHARACTERIZATION OF FACTS

***No Forgeries*** Prior to his passing, artist Robert Indiana collaborated with McKenzie, an established art publisher doing business as American Image Art (herein "AIA"), on various projects well beyond simply those involving the HOPE image. They produced many other artworks. MAF now claims that these were unauthorized forgeries. For example, MAF claims that Indiana's The Alphabet, the Dylan works, EAT, USA FUN, Shout for Peace as produced by AIA (ECF 47, MAF Amended Complaint, ¶¶76, 93, 94) were forgeries, and yet photographs and video recordings have been produced showing Indiana willingly *personally* signing prints produced by McKenzie of these very images. Declaration of Bridget Zerner, ¶ 2 and Exhibit A. Eye-witness testimony agrees. *See* Exhibit B, Deposition of Jamie Thomas at p. 73 (longtime caretaker and assistant to Indiana testifying that Indiana signed AIA's aluminum LOVE works), *and* p. 82 (re Indiana's authorization of AIA's Dylan works "[Indiana] signed them. I watched him sign them. His lawyer knew about it. He knew about it, my lawyer knew about it."), *and* pp. 167, 184 (Indiana and McKenzie worked together on the WINE project), *and* p. 172 ("He [Indiana] signed -- he signed the [Dylan] prints that Mr. McKenzie brought, and he accepted these [Dylan] books as gifts."), *and* pp.197–200 (testified that Indiana worked with McKenzie on ART, EAT, BRAT, the Dylan works, HOPE, WORD, WALL and displayed these works at Star of Hope); *and* ECF 467-4, Tim Ginexi Dep., pp. 42, 44–46, 68–74, 133 (describing visiting Vinalhaven, meeting Indiana, and watching him sign various AIA published artworks and Indiana accepted pieces with stenciled seal), pp. 158–68 (witnessed Indiana signing AIA

produced images of LOVE, American Dream, EAT, ART, HE, SHE, Shout for Peace, USA FUN, HOPE, BODY, SOUL); *and* Exhibit C, Affidavit of Clara Rodriguez (filed in New York Supreme Court), ¶4 ("I have personally witnessed Robert Indiana at his home studio in Vinalhaven, Maine sign his name with a pencil to our silkscreen prints of "HE" and of "SHE" and of a "HOPE" calendar. I have also personally witnessed Mr. Indiana signing "The Retrospective" giclee, and limited edition prints American Image made with the theme Bob Dylan, Like a Rolling Stone suite.") *and* ECF 467-2, Annette Vessecchia Dep., p. 85 ("I mean, we have pictures of Indiana with the Four Seasons of Hope.")

MAF repeatedly claims that McKenzie forged Indiana artwork with a Ghostwriter that signed Indiana's name. Yet, Thomas testified that Indiana told him that Indiana knew and approved of McKenzie using that machine. *See* Ex. B, Thomas Dep., pp. 25, 26–27 ("I just recall one time that he [Indiana] had said a machine of some sort signed his name for him and how much easier that was than having to do it on his own, especially if he didn't feel like signing that day."; "He didn't come right out and say "authorize." He just said that it happened and how that made it easier. But I didn't question the authorization just because he said it had happened and he didn't complain, so -- in fact, he seemed like it was something he was happy about, so.") Annette Vessecchia also heard Indiana ask McKenzie to use such a machine. *See,* ECF 467-2, Vessecchia Dep., pp. 49–58 ("I also overheard conversations, multiple conversations of Indiana complaining about having to sign …[the Four Seasons of HOPE] And he was freaking out that he was going to have to sign that many and that Mike needed to find another way to make that happen . . . [Indiana] said in some way, "You know, I don't think I'm going to be able to do it unless we can get, you know, a machine to help" and "[McKenzie] was not crazy about it.")

***No Hiding of Mckenzie-Owned Indiana Artwork***    MAF now wants this Court to believe that it had no idea McKenzie possessed Indiana artwork until Spring 2021 (*see* ECF 467, Declaration of Nikas, ¶2 *and* MAF Memo, p. 6) as if that artwork was purposely hidden from them. Mr. Nikas' timing is simply not close to true. To begin with, McKenzie's very first pleading filed in this case, on July 13, 2018, made it clear that McKenzie still had Indiana artwork because McKenzie asserted a "slander of title" claim that MAF's conduct was interfering with his ability to sell his Indiana artworks. *See* ECF 29, AIA Counterclaim, ¶285 ("As a direct result of [MAF]'s false statements, *American Image is virtually unable to sell the Indiana artworks for anything approaching their true value*, given the legal uncertainty that now wrongfully clouds title to the Indiana artworks." [emphasis added]); *see also* ECF 61, AIA Amended Counterclaim, 9/7/2018, ¶327 (repeating allegation and adding request for finding that "Plaintiff has slandered the title of artworks owned by American Image" at p. 50); ECF 91, AIA Third Amended Counterclaim, ¶387 and p. 58 in Prayer for Relief (repeating claim in operative pleading). Back on September 7, 2018, the Estate filed a declaration with exhibits in support of their motion to compel arbitration of its disputes with McKenzie that included a letter from McKenzie's counsel, dated September 6, 2018, directed to the Estate and discusses the various pending litigation, including MAF's claims, that states:

> American Image objected to making *its unsold property* part of the Maine Probate proceeding because the Maine Court lacks jurisdiction and the Estate has not filed ancillary probate in New York. *Any Disputes relating to unsold Indiana artworks are subject to arbitration in New York. The so-called "improprieties" you allude to have nothing to do with Indiana property, which has already been turned over*. (*Id*.) Rather, MART appears to claim that American Image exceeded the scope of the HOPE Contract and thus breached MART's alleged agreements with Indiana. If the Estate asserts American Image exceeded the scope of the HOPE Contract, then arbitration is the appropriate forum to determine those issues.

ECF 70-8, pp. 3–4 (emphasis added).[1]

       McKenzie also filed a declaration on November 6, 2018 that states:

> As detailed in the Third Amended Answer, MART's false claims of forgery have lowered the prices of artworks that Indiana authorized and caused collectors, museums and galleries to question the authenticity of the work. . . . These horrible and completely unfounded accusations damage sales and subsequent royalties to the Estate to fund the Star of Hope Foundation. . . . AIA and I have expended time and resources to defend against MART's false claims to the detriment of promoting Indiana's legacy and increasing the value of the Estate.

ECF 103, ¶¶14–16. It was no secret that McKenzie had Indiana artworks that he contended were

not the Estate's property (unlike the artist's proofs that he returned). Rather, if he sold any of his

Indiana pieces, a percentage would go to the Estate (and thus to the Star of Hope) as he had paid

Indiana before. Unfortunately, those sales almost completely stopped thanks to MAF's bad-

mouthing in this case. MAF had the opportunity to ask McKenzie about his inventory well before

---

[1]    MAF completely ignores the context of McKenzie's testimony before the Knox County Probate Court. The limited purpose of that proceeding was to "identify any tangible and intangible assets of the estate" and thus the Estate was to examine the witnesses "in an effort to identify the assets of decedent's estate and to receive such assets." ECF 393-2, Probate Transcript, pp. 4–5. It was not to learn what assets McKenzie had that were not part of the Estate. The examination right before the responses on which MAF relies to claim McKenzie "lied" show the context that McKenzie understood he was being asked about whether he possessed Robert Indiana-owned work, not to identify the Indiana works that McKenzie owned and thus which did not need to be returned to the Estate as of that time. *Id.* at pp. 63–64 (Q; "Do you have anymore in your possession? A: [McKenzie] Of Bob's? Are you asking that? Q: Of Mr. Indiana's? A: No."); and p. 78 (Q: Other than those 66 works, do you have in your possession any Robert Indiana works *belonging to the estate*? A: No. . . .") [emphasis added] *See also*, ECF 467-1, McKenzie Dep., pp. 171–172 (explaining that McKenzie returned artist's proofs and property of Indiana to the Estate but "he doesn't get my pieces.") The artwork that McKenzie did not turn over and that MAF has known about for some time now, belongs to McKenzie, not to the Estate.

    Additionally, as part of the briefing on whether the disputes between McKenzie and the Estate should be arbitrated, back on September 21, 2018, McKenzie's prior counsel filed documentation of discovery requests and responses from the Knox County Probate case involving the Estate stating that "By August 31, [2018,] American Image delivered the other Indiana owned artist proofs located in the Vinalhaven and Katonah studios to Petitioner. All Indiana property is now in possession of the Estate." ECF 79-5, p. 5. The same filing includes a letter from prior counsel, attorney Dowd, stating that "On August 9, [2018,] my associate Hardin Rowley and American Image's Maine counsel, Sean Joyce, offered the Personal Representative [of the Indiana Estate] the opportunity to examine American Image's inventory at its Katonah, New York studio to aid the Personal Representative's accounting of the Estate." ECF 79-5, p. 18. McKenzie did not hide the fact that he had Indiana artworks and the dispute was over who owned the artwork. All of this was served on and known by MAF.

May 2021 and chose not to do so—McKenzie never lied about this. *See, e.g.*, Ex. D, Deposition of McKenzie, 9/9/2020 (MAF's counsel asked no questions about AIA's current inventory or sales). MAF now incredibly claims they had no idea McKenzie had Indiana artworks until Spring 2021 to construct a record of misconduct when none occurred.

It is inconceivable that MAF has not long known that McKenzie was publishing Indiana artworks for another reason as obvious as a strike from a ball-peen hammer: over two years ago, in July 2019, the Estate attempted to stop McKenzie from fabricating art during this litigation and the arbitration when it filed a petition with the New York Supreme Court seeking an injunction to stop all sales, which was denied on August 22, 2019. The presiding Justice ruled:

> Respondents [McKenzie/AIA] have every incentive to maximize the value of the artwork and petitioner [Estate] did not adduce sufficient proof that this court should alter the status quo by preventing respondents from continuing to fabricate art pending the arbitration (petitioner did not show a likelihood that respondents have sold forged and infringing art on this record).

Ex. E, Decision and Order on Motion, by New York County Supreme Court, Schecter, J.

Moreover, when MAF took McKenzie's first deposition in this case, on September 9, 2020, McKenzie told them he was still trying to sell works he possessed (which they claimed were forgeries). *See* Ex. D, McKenzie Dep., p. 89 (Q. [MAF Counsel] "How long did the selling, displaying, promoting of Dylan works go on for, approximately? A. *It's still going on*.")[2] [emphasis added]). The Dylan works is one of the major projects about which MAF complains. MAF had the opportunity to fully question McKenzie about his ongoing publishing of Indiana works, his inventory, and his sales, and documentation of the same at his deposition in 2020. Yet, they chose not to. MAF points to no interrogatory answer or request for admission response where McKenzie misrepresented whether Indiana artwork was in his possession. Nor does Mr.

---

[2]     During the deposition in September 2020, McKenzie himself also directed MAF counsel directly to the docket number of the New York Supreme Court case.  *See,* Ex. D, McKenzie Dep., p. 146.

Nikas's declaration point to where McKenzie's prior counsel represented that McKenzie did not possess Indiana artwork. Simply, McKenzie did not conceal his ownership of Indiana artwork.[3]

**_Prior Discovery Disputes and Prior Counsel_** Discovery motions have been sustained all around. It has not been one-sided, and motions to compel were also filed and granted against MAF. *See, e.g.*, ECF 307, Order granting in part McKenzie and the Estate's motions. Delay occurred in part because of an expert forensic analysis required for a dispute between MAF, the Estate, and Thomas over spoliation. *See* ECF 153, Order re Forensic Examination; ECF 173, Letter Motion to Extend Discovery Deadlines due to Forensic Examination; ECF 174, Order Granting Extension. McKenzie has participated in discovery, responding to multiple sets of document requests, interrogatories, as well as an over-the-top 258 requests for admissions with the Court sustaining some of McKenzie's objections. *See, e.g.*, ECF 275, Order.

As for document production, McKenzie had two prior law firms (first Raymond Dowd of Dunnington, Bartholow & Miller, LLP, then John Simoni of Goetz Fitzpatrick LLC) represent him before the undersigned firm. McKenzie has explained how he made his records available and relied on prior counsel to review and produce responsive documents in the early stage of discovery. *See* ECF 467-1, McKenzie Dep., pp. 14–21, 99–100, 119–23, 132–33, 135–36, 179–84 (describing how McKenzie made available his computer, emails, documents, and records at his studio for prior counsel to search, gather and produce; he relied on prior counsel to produce documents as required, leaving his computer and cell phone with prior counsel to search; nothing

---

[3]     As to MAF's lament that McKenzie's LOVE pieces "infringe" on MAF's "exclusive" rights (MAF Memo, pp. 15, 18), that allegation is part of the case to be decided at trial. It certainly remains in dispute in this litigation. *See* ECF 91, McKenzie's Third Amended Answer, pp. 20–21 (asserting defenses that MAF's claimed copyrights and trademarks and its License Agreement with Indiana are invalid); *see also*, Ex. F, The Hamilton Collection, Inc.'s Opposition to MAF's asserted trademark stating LOVE is in the public domain and third-parties are free to use the LOVE image and variations thereof commercially or otherwise. As of this time, the Hamilton proceedings before the US Patent and Trademark Office have been temporarily suspended to allow the parties to attempt settlement.

was hidden or withheld from attorneys' review). Some of this effort was described in the letter submitted by attorney Simoni which states that Dowd's firm searched email accounts and that AIA searched and provided documents to counsel as directed. *See* ECF 393-3. AIA employees Vessecchia and Ginexi have confirmed AIA's cooperation with the prior law firms, testifying that that the Dunnington firm came to the Katonah property and was provided full access to the AIA computer and documents; they likewise produced documents to attorney Simoni. ECF 467-2, Vessecchia Dep., pp. 248–49; ECF 467-4, Ginexi Dep., pp. 81–87.

In trying to establish a pattern of misconduct, MAF repeatedly states that McKenzie "refused to sit for his deposition." MAF Memo, pp. 1–2, 4. This is not true. McKenzie's prior counsel objected to his appearance, absent a Court order, until a decision was reached on McKenzie's pending motion to stay MAF's claims at that time. They withdrew that position during a discovery conference with the Court on January 29, 2019, resolving that matter three years ago. Order at ECF 137, pp. 1–2. MAF was able to take McKenzie's deposition during discovery and has had a full opportunity to question him on all subjects. That deposition, taken on September 9, 2020, lasted 337 pages, after which counsel for MAF stated "no further questions." (Ex. D, McKenzie Dep., p. 337). Not once since then has MAF come to this Court about McKenzie failing to answer even one question asked of him. There is no prejudice here.

***The Art Archive*** McKenzie and AIA employee Vessecchia made the AIA computers, with their database, available to their first attorney when they relied on his assistance to search for and produce documents. *See above and* ECF 467-1, McKenzie Dep., pp. 119–23. MAF has now obtained hardcopy printouts from the database. McKenzie and Vessecchia answered questions about the database (which contains information on other AIA artists, not just Indiana) at their depositions. On September 10, 2021, McKenzie answered all questions about the Art

Archive, archive printouts, and sales by Greg Allen, and he confirmed AIA still has access to it. MAF counsel made no request to be provided further access or copies. ECF 467-1, McKenzie Dep., pp. 101–20. On November 3, 2021, Vessecchia explained that the database is hosted by a third-party, that she and AIA still have access, but that she does not have a hardcopy of all that data, and MAF made no request for access or copies. ECF 467-2, Vessecchia Dep., pp. 138–44, 252–53. Since September 2021, MAF has known about but not asked for further electronic access, nor additional copies, nor to subpoena the host of the Archive and they have not otherwise sought to confer with counsel on further production from this system. Zerner Dec. ¶15.

**_Settlement Negotiations and Visit to AIA by Invitation of McKenzie_** As part of settlement negotiations in 2021, McKenzie voluntarily provided a summary inventory of the Indiana works in his possession. _See_ Markham Dec. ¶ 6 and Markham Ex. C. MAF claims that McKenzie "actively concealed artworks" before the settlement visit on May 25, 2021. MAF Memo 9–10. McKenzie was not under any court order or discovery obligation to show MAF any of his artwork in May 2021. McKenzie was not under court order to create and produce the summary inventory he provided to MAF, nor had he otherwise concealed that AIA-owned Indiana artwork had long been in his possession. Nonetheless, as part of settlement negotiations, McKenzie permitted MAF and its counsel to come to his property to inspect his studio and artwork, knowing full well there was no guarantee of settlement, and thus he may have to continue to litigate in this proceeding. If he was trying to hide "discovery," as MAF now claims, it does not make sense that he left all his records in full view when MAF came to his property. Nor does it make sense, as MAF claims, that McKenzie was hiding Indiana artwork from them, when the very purpose of this first visit was to determine the value and appropriate payment to him for that artwork. As McKenzie himself explained, at ECF 467-1, pp. 192–93:

Q. And did you leave Mr. Gonzalez in charge that day to present the artwork?
A. [McKenzie] Yes. And also Annette Vessecchia as well. I felt one should be upstairs and one should be down. [the studio has two floors] I don't really know what they did because I wasn't there. Wasn't there, I should say.
Q. Was -- were they authorized to show all of the Indiana artwork relevant to this case to the parties?
A. Yes. Anything they wanted to show they could show.
Did you instruct –
A. My desire was to sell all the art and be done with this. That's what I thought we were trying to do.
Q. And you opened up your studio and any other parts where there was artwork for them to see?
A. Yes.
Q. Did you instruct Oz or anyone else that they should hide any artwork from these parties?
A. No. It was to my advantage to have as many pieces as I could to get the highest amount of money back that -- that I could get.

*See also* ECF 467-1, McKenzie Dep., pp. 188-189; ECF 472-2, Vessecchia Dep., p. 147 ("I thought they were coming to take an inventory…Of whatever Indiana artwork might be there"), pp. 249–50:

Q The visit -- did you -- for the May 25th visit, did you understand that Oz Gonzalez was left in charge by McKenzie to show all the artwork?
A Yes.
Q And to your knowledge, Oz was aware of the big HOPE sculpture outside?
A Yes.
Q At that time?
A Yes.
Q And he was aware about the artwork in the basement?
A Yes.
Q Did you ever hear McKenzie, in advance of that May visit, instruct Oz or anyone to hide certain Indiana artwork from the parties coming that day?
A No.
Q And you weren't there the whole time on the May 25th visit; right?
A No.

MAF did not want McKenzie there and so he left Gonzalez, who knew where all the artwork was located, to present the artwork for inspection by the art handlers. Markham Dec., ¶¶ 8-10.

Despite the above, MAF wants to blame McKenzie for the fact that they claim they did not get to see everything at that first visit (Gonzalez, who has now turned against McKenzie, wants to deny

that he oversaw the art inspections to put the responsibility solely on Vessecchia). More than that, MAF is trying to use this claim for litigation-ending sanctions. McKenzie did not have a discovery obligation to show any artwork on that date; that was a voluntary settlement meeting. Gonzalez, upon whom MAF relies, has testified that MAF cut off the art evaluation themselves and did not finish reviewing the artwork by their own choice. *See* Ex. G, Gonzalez Dep., pp. 120–21 ("Oh, the Salama-Caros, they -- they just left in the middle of the inspection and it never got finished. They said no, we don't have to look anymore. There's too many unauthorized pieces.") This first art inspection shows no discovery violation.

**The Later, Court-Ordered Inspection and Movement of Artwork** When settlement fell through, MAF used the opportunity, without any notice to, or conference with current counsel before the day a joint letter was due, to run to this Court exclaiming that McKenzie was a criminal and his discovery conduct required a referee and other relief.  Zerner Dec. ¶ 9. The Court denied this extreme remedy. ECF 396, Transcript of 6/29/21 Conference, p. 17. At the conference with this Court, McKenzie, through counsel, agreed to an inspection sought based on MAF's claim that it had not received documents to which it was entitled during discovery. *Id.*, pp. 18–21. The issue was about documents, not artwork, as the Court noted during the conference when the Court suggested an inspection:

> THE COURT: Well, so let me just pause you there for a moment, and I understand your issues when you contrast the testimony that Mr. McKenzie gave in the Knox County probate court with the fact that you saw these Robert Indiana works still extant, dozens of them in his studio. But for purposes of this case and McKenzie's discovery obligations, I don't think he had discovery obligations to Morgan Art to produce the artworks. Your discovery demands went more to the documentation of the art business. I'm oversimplifying somewhat. And I understand your argument there as well that there's lots of documentation of the art business lying around in Katonah that should have been photocopied or otherwise made available to you.
>       *          *          *
> So what I'd like to see happen here is this. I would like counsel to meet and confer in good faith with respect to arranging an inspection which could then result hopefully in

> a final production of written evidence satisfying McKenzie's written discovery obligations.

ECF 396, Transcript of 6/29/21 Conference, pp. 19–22. (MAF counsel did not dispute the Court's view that McKenzie did not have an obligation to produce artwork.) Attorney Zerner called McKenzie after this conference and advised him a further inspection of documents was necessary. Zerner Dec. ¶ 10. On July 1, 2021, attorney Zerner sent to McKenzie the Court's Order that ruled "Plaintiff's request that the Court 'appoint a special master at McKenzie's expense to personally oversee McKenzie's document collection…is DENIED" and instead ruled that "parties shall promptly meet and confer to arrange an inspection, pursuant to Fed.R.Civ. P. 34, of McKenzie's studio in Katonah….", and that plaintiff may be able to reopen "McKenzie's deposition after the inspection and any subsequent document production …" Zerner Dec. ¶ 11.

By this time, in early July, 2021, McKenzie had already been making arrangements to move his artwork, not to hide it or defy any court order, but because, after having outsiders (MAF and SOH) come to his property to view the artwork in May 2021, he realized he did not have the artwork well-organized or stored in an easily accessible and viewable place, and, as McKenzie fully explained (ECF 467-1, McKenzie Dep., p. 34–36):

> …So I moved things off the premises because after, theoretically, you guys were going to buy everything, I realized that it was impossible or very difficult to see everything here because it was stacked up on top of each other just for lack of space. So I started moving things so that -- and it's much better in the space that it's in to view. . . .
>
>    *   *   *
>
> …when I saw the [Middletown] facility, I realized I was keeping valuable art in a space that maybe, maybe not was up to the task; whereas, the space that I viewed was brand new, made out of steel, no trees, anything around it that could damage the building and art. It was temperature controlled I felt better than my own temperature controls. It was humidity controlled I felt better than my own humidity control. And also, the value of my property compared to the value of the storage space, the property is much more valuable. So on every level, I was making a mistake to keep it here. I hadn't really thought about it because it was sitting around for so long. But when the estate or whomever is trying to buy the work, it stimulates what am I doing. And when I did that, I realized I was keeping all this stuff in the wrong place. It was costing me more

11

money to keep it here than put it somewhere else. It wasn't being protected as well, and it also opened up all of my space here. Instead of having to crawl around thousands of works of art where I can't even move in my own studio, it opens up the studio to really be able to work here a lot better and my home too. So it was nothing but plus from my standpoint, moving.

*See also, id*., pp. 197–98. (Thus McKenzie did not claim that it was moved solely for his concern about "weather" as MAF falsely asserts in its Memo at p. 2). *See also* ECF 467-4, Ginexi Dep., p. 30 ("the only reason I was given for moving the art was for the safety of the art"); ECF 467-2, Vessecchia Dep., p. 159 (he wanted the "collection all in one spot because it was just disorganized. I mean, it was").

The bulk of the artwork was moved on July 5 and 6, 2021, *before* the jointly proposed Stipulation and Order had been finalized or filed. *See* ECF 467-4, Ginexi Dep., pp. 109-113; ECF 407, Joint Stipulated filed July 20, 2021. On July 18, 2021, AIA attorney Markham emailed McKenzie again that there would be a "records inspection." Markham Dec. ¶ 14. Some artwork was moved on July 22, 2021, the day after the Stipulation and Order was entered (at ECF 408) but McKenzie had not seen it (or its language stating that the artwork should be available). ECF 467-1, McKenzie Dep., p. 12 ("Mr. Markham told me that he [Nikas] was going to come to inspect documents.")

As for McKenzie being "visibly angry" about the Court-ordered inspection (MAF Memo, p. 10), Ginexi's complete answer states McKenzie was angry in part because while he was being ordered to produce documents, he felt that MAF still had not produced documents that he was entitled to in litigation. *See* ECF 467-4, pp. 116–17 and 150–51. At the same time, there was no indication to Ginexi that they were moving artwork to avoid a court-ordered inspection. *Id.* at p. 151. McKenzie has been visibly angry since this litigation began in 2018 as he has been wrongfully accused of forgery and abusing his good friend, Robert Indiana.

12

Moreover, McKenzie simply did not hide from MAF that he had stored artwork in his basement as well as his studio during his deposition on September 10, 2021 (as MAF claims at Memo, p. 11). McKenzie explicitly testified that he moved the artwork to Middletown to free up space *in his house* as well as his studio. ECF 467-1, McKenzie Dep., pp. 40–41 ("I started looking at everything, I realized I was making a huge mistake to leave stuff [artwork] here. And, frankly, space in my house that I was giving up was worth a lot of money…"); p. 52 ("You know, I didn't – I didn't try to -- you know, whatever was taking up space that I needed is what I moved. So I tried to move anything that would give me a chance to work in my own studio and/or live in my own house"). The questioning that MAF points to is asking a different question than MAF now pretends, namely about whether McKenzie specifically moved "blank silkscreens" into his house between the first and second MAF visits and otherwise whether he moved artwork from the studio to the house between the visits. MAF then points to the testimony of Ginexi and Vessecchia stating that artwork was already in the basement as of the first visit in May. If artwork was already in the basement as of the first visit, then McKenzie was not lying when he said he does not recall moving anything into the basement between the two visits – it was already there. And McKenzie has openly stated that he moved all this artwork from the Katonah property to the Middletown storage facility between the visits and he reported this to the Court first and invited questioning. Markham Dec. ¶ 30.

***Gonzalez and His Goal to Sink McKenzie in Litigation*** Osvaldo Gonzalez is not worthy of belief. He had known McKenzie in the past when Gonzalez had been a practicing attorney and then he was hired by McKenzie in April 2019 to work at AIA. After forty years of practice, Gonzalez was suspended from the practice of law on October 10, 2018, and was ordered to refrain from practicing law including giving an opinion as to the law or its application or any

advice in relation thereto. Ex. G, Gonzalez Dep., pp. 162–64. Gonzalez had no prior experience

in art sales. *Id*., at pp. 24–25. Gonzalez actively assisted McKenzie in this litigation as well as

with the arbitration against the Estate, the litigation in Maine, and attended and assisted

McKenzie at the mediation (instead of any lawyer) involving all these parties that occurred in

Portland, Maine in November 2019. *Id*., pp. 21-22, 105-106. Gonzalez, as an employee of AIA,

was part of attorney-client privileged communications and thus well versed in McKenzie's legal

disputes. *Id*. and Markham Dec. ¶ 17.

      MAF will attempt to argue that Gonzalez became upset with McKenzie in the summer of

2021 because McKenzie was allegedly engaging in "criminal" activity. *See,* Ex. G., Gonzalez

Dep., p. 175. Yet he himself was involved in all the activity he now says is "criminal" and uses

that as a basis for turning on McKenzie. His real reason for turning on McKenzie is that he

loathes McKenzie:

> A. Look, the guy is just insulting. It isn't me. It's everybody. Everybody gets it. And that's just the way it is. You know?
> Q. Let me ask, would you -- would McKenzie say offensive things about you in front of the other employees?
> A. I -- he says bad things about everybody to everybody about everybody.
> Q. So why did you work for him for two years in that kind of environment?
> A. For my daughter.
> Q. Yeah. Did you resent McKenzie for that? You resented him that for, right; that you had to endure this kind of treatment so you could support yourself and your daughter?
> A. Did I resent it, yeah. I resented it.

*Id*., pp. 59–60. His anger towards McKenzie was building before he decided to betray McKenzie,

including because McKenzie announced he was considering closing AIA this past summer. *See*

*e.g.*, 467-2, Vessecchia Dep., p. 182 ("Oz was upset that Mike was going to close the business

and he was going to lose his job and everything, and he was just pissed off").

      Gonzalez and McKenzie's personal and professional relationship totally broke down on

August 17, 2021 when Gonzalez was moving HOPE sculptures for McKenzie in a van that

required diesel and Gonzalez filled it with gasoline causing damage. Ex. I, p. 1, Ex. G, Gonzalez

Dep., pp. 26–28, 30–35. Gonzalez and McKenzie got into an argument over the incident,

McKenzie said that Gonzalez would have to pay for the damage, and Gonzalez was upset and

warned McKenzie he was "playing a dangerous game," advising that because his daughter and

son were moving out of the Katonah house, his hands were "no longer tied." Ex. G, Gonzalez

Dep, pp. 31–35. Gonzalez called Markham after this incident and advised he could not take it

anymore and he was done with McKenzie. *See* Markham Dec. ¶¶ 18–19.

Two days later, on August 19, 2021, Gonzalez sent a text to undersigned counsel,

employees of AIA, and McKenzie's fiancé that included the following:

> hi, just to let you know, I'm no longer working with Mike. I have exhausted my
> patience. I had to endure the torture imposed upon me for the sake of my emotionally
> ill daughter who lives with me. She is now going to stay with her mother.
> 
>         \*        \*        \*
> 
> if there is a swindler and a liar, it's him. One more attack from him and I will contact
> Lipson and Nikas and make his life and business ugly. I have the goods. I could actually
> save the Estate. I'm sure the Star of Hope and the Estate would love to talk with me.

Ex. G, Gonzalez Dep., pp. 39–43; Ex. I, p. 2. Gonzalez testified that after sending the text,

McKenzie called him and further insulted him:

> Q. And after -- so he [McKenzie] called you after this text message and then you followed
> through on this threat to make his life and business ugly, right?
> A. Yes.

*Id*., p. 44. The above simply gives lie to MAF's contention that Gonzalez was angry about

McKenzie's supposed criminal conduct. Prior to this final blow-up between them, Gonzalez

went along with McKenzie, clearly having no concern of "criminal" conduct. *See, e.g.*, Ex G.,

Gonzalez Dep., p. 141 (Gonzalez assisted with moving the artwork to Middletown); pp. 65–66

(Gonzalez took a HOPE sculpture into his residence before the court-ordered inspection without

objection); pp. 27–28; 113 (Gonzalez assisted with transporting HOPE sculptures that he now

wants to claim were forgeries). AIA master printer Ginexi testified that Gonzalez never

expressed concerns that they were making "forgeries" or about the use of the stencils but in fact

Gonzalez repeatedly urged AIA to produce LOVE pieces and all his "concerns" about what they

were publishing only arose after he left. ECF 467-4, Ginexi Dep., pp. 152–53; *see also* ECF 467-

2, Vessecchia Dep., pp. 261–62 (Gonzalez wanted to make LOVE pieces because it is in the

public domain). These AIA employees also heard Gonzalez telling McKenzie to use the

Ghostwriter machine which McKenzie refused. ECF 467-2, Vessecchia Dep., pp. 253–54; ECF

467-4, Ginexi Dep., pp. 38–39, 148–49. Gonzalez even admits that after he left AIA, he was

trying to do what he could to help MAF and the Estate prevail against McKenzie, including with

this very motion:

> Q. So I'm just trying to understand why you thought it was significant to tell Mr.
> Nikas [counsel for MAF] that they are silk screening hundreds of Four Seasons HOPE
> prints on canvass at American Image Art. Why did you report that and say "please
> advise"?
> A. Because I knew that that would be helpful to his case.
> Q. And why did you think it would be helpful?
> A. Well, I guess what the thing is that if the Court finds that he willfully um, disobeyed
> her Order, then they would make a motion to have the case dismissed as a sanction.
> And that's. That's it.
> Q. And you're talking about the -- a Court Order in the Southern District of New York
> case, right?
> A. Yes.

Ex. G, Gonzalez Dep., pp. 67–68.

Further evidence that Gonzalez is not credible are his claims that he was in fear for his

life because McKenzie said threatening things, as Gonzalez also testified that McKenzie said

things like that for the 10 years that he knew him and yet clearly, he was not in real fear of

McKenzie's alleged words; Gonzalez not only decided to work for McKenzie after all those

years of alleged threats of violence, but even to bring his family onto the property to live with

him, this supposedly dangerous man. *See* Ex. I, Gonzalez Dep., pp. 50–51; see also, ECF 467-2,

16

Vessecchia Dep., p. 246; ECF 467-4, Ginexi Dep., p. 153. Vessecchia described ongoing

harassment by Gonzalez when they worked together (ECF 467-2, Vessecchia Dep., pp. 255–57)

which Gonzalez brushed off as the result of intoxication and justified that Vessecchia never told

him to stop (Ex G, Gonzalez Dep., pp. 168–70) Gonzalez's claims about nefarious activity

between McKenzie and Greg Allen are not corroborated. As to the allegation that they were

going to transfer the artwork into secret trusts, McKenzie explained that he never spoke to Allen

about trusts ("it's not what he does; he is an art dealer") but rather consulted an attorney this past

summer "about setting up estate for my children." ECF 467-1, McKenzie Dep. pp. 78, 90. Greg

Allen also testified he never had any conversations with McKenzie about setting up trusts. ECF

467-3, Allen Dep., pp. 68–69.

## ARGUMENT

## I.    LEGAL STANDARD FOR "TERMINATING SANCTIONS"

MAF relies on *Sanchez v. Litzenberger*, 09 CIV. 7207 THK, 2011 WL 672413, at **4–5

(S.D.N.Y. Feb. 24, 2011) for the factors assessed on a motion claiming a party's conduct

constitutes a fraud on the Court and abuse of the discovery process. In addition to the factors

cited by MAF (Memo 16), that case provides that "a fraud upon the court will only be found

where the misconduct at issue 'seriously affects the integrity of the normal process of

adjudication'" and "[p]erjury alone does not constitute fraud upon the court." *Id.,* at 4. Further:

> ...in order to grant sanctions based upon fraud, it must be established by clear and
> convincing evidence that a party has sentiently set in motion some unconscionable
> scheme calculated to interfere with the judicial system's ability impartially to adjudicate
> a matter by ... unfairly hampering the presentation of the opposing party's claim or
> defense." ***

*Id.*, at **4–5 (citations omitted). What actually occurred here does not arise to the level

warranting case-ending sanctions. "The judicial system prefers to resolve controversies on the

merits. … a result driven by discovery abuse is justified only on the rarest of occasions…"

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Employees and Rest. Employees Intern. Union*, 212

F.R.D. 178, 181 (S.D.N.Y. 2003) (citations omitted). This is certainly not one of those rare

occasions.

### A.  The Movement of the Artwork Was Not Discovery Misconduct

As shown above, despite all the hype by Gonzalez and MAF, and running to the FBI,

McKenzie did not lie about the existence of the artwork and his movement of the artwork was

not in violation of any court order or discovery obligation nor was it otherwise wrongful conduct.

McKenzie rightfully owns and possesses this artwork and had the right to move it to another

storage facility.[4] The real facts drastically deflate MAF's motion. No one—neither MAF nor the

Estate—has proven that McKenzie's Indiana artworks are owned by them, nor that they are

forgeries that he does not have the right to sell, and he was under no restriction from transferring

or selling them at the time they were moved. To the contrary, the New York Supreme Court

previously ruled that McKenzie did have the right to sell his Indiana artwork during litigation.

Ex. E. The Order entered by this Court on June 29, 2021, which was provided to McKenzie (Ex.

H), did not order McKenzie to make his artwork available at an inspection. Rather, it ordered the

parties to meet and confer to arrange an inspection and the terms of that inspection. At the court

conference prior to the entry of this Order, MAF's counsel was clear that what it sought was

document production, not artwork, and undersigned counsel so advised McKenzie. McKenzie

moved his artwork on July 5 and 6, 2021, for legitimate reasons, before the parties jointly filed

the proposed stipulation (on July 20) setting the terms which MAF insisted should include

"artwork" even though MAF's counsel explicitly advised he really was not planning to further

---

[4]     Nor was it wrongful conduct to put a tarp over a large outdoor sculpture exposed to the elements. ECF 467-1, McKenzie Dep., pp. 55-56.

inspect artwork and undersigned counsel repeated this to McKenzie. The artwork was moved, not hidden, before this Court entered the Order setting the terms of the inspection. At the inspection, not a single person from MAF requested further viewing of any artwork.  ECF 467-1, McKenzie Dep., p. 196. The artwork is secure and can be made available for any further inspection, though the Estate, who is now collaborating with MAF, has since made a complete inspection of the artwork at Middletown as well as remaining pieces at Katonah (Zerner Dec., ¶ 17) and undoubtedly shared their inventory with MAF, yet MAF's filing makes no showing that any artwork is now missing. Moreover, after the handwringing by the Estate and MAF over the movement of artwork to a new storage facility, McKenzie agreed not to move, transfer, or sell the Indiana artwork as of this time, reserving his rights. ECF 431. Thus, with respect to moving artwork, no sanctions are appropriate at all.

## B. Document Production

Stripped of MAF's embellishment, the document production issues come down to three things: the production of 5,913 pages of documents to MAF through a court-ordered inspection, the Art Archive, and other documentation of sales of artwork.

*McKenzie Has Not Acted with Intentional Bad Faith and There is Not a Pattern of Sanctionable Misconduct* McKenzie has engaged in discovery, relied on prior counsel to make productions,[5] and continued to cure deficiencies with discovery responses as they arise. MAF did

---

[5]      MAF cites to *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2019 WL 4727537 (S.D.N.Y. Sept. 26, 2019) (at Memo 16) a case before this Court that involved improper conduct by attorney Dowd and the Dunnington firm and sanctions including for obstructing access to electronic data allegedly supporting their claims where a later forensic analysis showed the data had been saved and then was deleted before the laptop was produced to the other side for examination. McKenzie relied on Dowd and his firm at the start of discovery in this case unaware of such conduct and should not be punished based on prior counsel. *See, Ford v. Am. Broad. Co., Inc.*, 101 F.R.D. 664, 667 (S.D.N.Y. 1983)("There is no question that a court should exercise prudence, caution, and leniency before punishing violations of rules with sanctions so extreme as to deny a litigant the effective opportunity to have his case heard. … The sins or omissions of lawyers should not mechanically

not discover the documents at McKenzie's studio "fortuitously," but by invitation of McKenzie, who clearly had no problem with MAF seeing his studio and all the documents he left in open view for them when he welcomed them to his property. If McKenzie was the flagrant obstructionist alleged, he would have removed these documents or never invited MAF into his studio.  There is also no evidence of destruction of any documents in contrast to many of the cases that MAF cites in its papers, as further set out below.

*Deficiencies Have Been Corrected and Still Can Be Well Before Trial and There is No Likeliness of Future Misconduct* While there have been disputes and deficiencies, it is neither unusual in this type of complex litigation between competitors with personal grudges and extreme distrust, nor has it arisen to the level to warrant the extreme sanctions called for by MAF. McKenzie has continued to supplement his productions, has appeared for depositions and answered questions, complied with the Court-ordered inspection, and there is still time to address the latest, easily cured, complaint by MAF. The record shows that all the outrage over lies and hidden artwork and overseas trusts comes solely from Gonzalez, who has admitted a vendetta against McKenzie, has reason to lie, and has been proven to have lied. Yet MAF continues to waive around his sworn statement as the truth because it is their only "evidence" for many of their assertions.

*MAF Has Not Shown Prejudice Warranting Dismissal* No trial date has been set in this case, expert discovery has not been completed, dispositive motions are not yet due. MAF now has the 5,000+ documents from the inspection (and these are not "damning" but show what MAF already knew—that McKenzie was publishing various Indiana artworks, public knowledge in the

---

be visited on the client, especially where the result would be to undermine the usefulness and fairness of our legal and judicial system.")

art world before this suit). MAF has taken the deposition of Greg Allen, whom they claim was concealed from them, and had the opportunity to fully question him. As to the Art Archive, even if prior counsel did not produce it after being given access to AIA's computers, now, since September 10, 2021, after MAF confirmed its existence, AIA's online access to it, and a full explanation of the data, MAF has not asked for it even though counsel have been in regular contact on discovery and depositions since that time. Markham Dec. ¶¶ 21–22; Zerner Dec. ¶ 15. If MAF really sought it, they could have had it. Further access can still be provided if MAF really wants it, rather than just using it to claim grounds to warrant case ending sanctions. MAF can also be provided any other additional sales records beyond the archive—which would be limited if there are any—as, for example, Allen testified that he sold only three or four pieces for McKenzie (ECF 467-3, Allen Dep., p. 17) (and MAF already has some records related to Allen), and Gonzalez testified, as the purported President of the Sales Division the last two years, that he sold none. [6] Ex. G, Gonzalez Dep., p. 24. MAF had the opportunity to take McKenzie's deposition pursuant to the Court's last order and chose not to. Zerner Dec. ¶ 16 Another deposition could be arranged for questioning on this last batch of documents, if really necessary. *See Sanchez*, 2011 WL 672413, at *7 ("The necessity of conducting additional depositions, without more, does not constitute prejudice").

**Lesser Sanctions or Remedies Than Dismissal** Rather than extreme sanctions, all that may be necessary, considering the record and the time until a trial setting, is targeted, supplemental production, which can be promptly accomplished. Neither dismissal nor adverse

---

[6]      We note that certain proprietary information should still be protected in the same manner that MAF has been permitted to keep protected such information. *See, e.g.,* ECF 317, Transcript of Motion Hearing, p. 102, MAF Counsel arguing "It's the fact that, you know, the customer lists to whom Morgan sold art, to whom Shearbrook or Morgan interacts with from a customer basis standpoint is very sensitive commercial information" and at p. 104, Court allowing Attorney's Eyes' Only designation.

inferences are appropriate. Considering the complete record, monetary sanctions are not warranted either. This situation, and the lack of bad faith, clearly contrasts with the cases cited by MAF, even those in which sanctions were granted instead of dismissal. *See, e.g., DeCastro v. Kavadia*, 309 F.R.D. 167 (S.D.N.Y. 2015) (Torres, J., *adopting* Freeman, M.J.) (MAF Memo 25)(defendant destroyed emails with a document deletion program the day after the court granted plaintiffs leave to move to compel, lied about it, and willfully withheld documents and the court granted sanction for an adverse inference instruction and fees, but not dismissal); *JSC Foreign Econ. Assoc. Tech. v. Internl. Dev. and Trade Serv., Inc.*, 2005 WL 1958361 (S.D.N.Y. Aug. 16, 2005) (Peck, M.J.) (MAF Memo 25) *aff'd* 2006 WL 1148110 (S.D.N.Y. Apr. 28, 2006)(court awarded fees alone where defendant and her counsel were found to have acted in bad faith in seeking stays for time to provide affidavits they knew they would not provide, and both had interposed Fifth Amendment claims purely for purposes of delay)

The other cases relied on by MAF for seeking dismissal involve circumstances drastically different from the situation here, including intentional destruction of evidence, coverups, and extended campaigns of boldface lies, none of which happened here. We note a few examples of the distinguishable factual scenarios from MAF's caselaw herein.  In *S. New England Tele. Co. v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) (MAF Memo 22), the Second Circuit affirmed sanctions of default and contempt where forensic analysis concluded that there was significant erasure of data using anti-forensic software, "all defendants had willfully violated the court's discovery orders" by failing to turn over records ordered disclosed, and by destroying and withholding documents that were within the scope of the orders.  In *Lawrence v. City of New York*, 2018 WL 3611963 (S.D.N.Y. Jul. 27, 2018) (Pauley, J.) (MAF Memo 23), a civil rights plaintiff: (1) provided 67 staged photos to her attorney, who produced them as an exhibit on the

record, where photos were taken 2 years after alleged violations by police; (2) plaintiff lied in

deposition testimony that the (staged) photos were from days after the incident; (3) plaintiff lied

to court in a letter, claiming she accidentally produced the staged photos to her attorney as a

result of an eye infection; (4) attorney withdrew from case after defendant inspected the metadata

on the photos and revealed that they were not taken right after the incident as claimed; (5) in

response to sanctions motions, plaintiff then attributed photo problem to her mental illness,

claimed her medications prevented her from testifying truthfully, and then claimed the

photographs were taken by her grandchild for a book report—these shifting explanations gave

the court sufficient cause to doubt plaintiff's credibility and necessitating dismissal.  In *DAG*

*Jewish Directories, Inc. v. Y & R Media, LLC*, 2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010)

(Howell, J.) (MAF Memo 24), in a case alleging defendants were misrepresenting themselves as

plaintiffs' affiliate, plaintiff first substantially altered text to omit a key provision of a document

central to the case and then submitted to the court a forged contract, purporting to be from

defendants, that included plaintiff's trade name in the signature line, but the original contract was

produced establishing "overwhelming" evidence of forgery and the court held that, given the

prior incident of plaintiff manipulating documents, the fact that plaintiff "brazenly" asserted the

veracity of the forged document through the time of the sanctions motion, and the court's belief

that plaintiff lacked remorse, dismissal and an award of fees was proper. In *McMunn v.*

*Memorial Sloan-Kettering Cancer Center*, 191 F. Supp. 2d 440 (S.D.N.Y. 2002) (Buchwald, J.)

(MAF Memo 24), plaintiff's case alleging she was fired after a cancer diagnosis was dismissed

after plaintiff: (1) repeatedly and provably lied about her relationship with a material witness,

lied about his address to prevent his deposition, and continued to lie when confronted with video

footage; (2) concealed how many credit cards she owned in order to conceal purchases showing

her location as the defendant hospital claimed that she was terminated after a series of

unexplained absences, during which it was alleged that she had gone out of state; (3) edited

audio recordings of phone conversations to omit the crucial fact that an employee of defendant

had told her it was unlikely that plaintiff would be rehired which was at issue; (4) plaintiff

claimed she had to sell her apartment to satisfy creditors after her termination when it was really

a sham sales transaction between her and her boyfriend, and she claimed she was homeless after

being "forced" to sell her apartment as a result of her termination by defendants, and testified

that she had to sleep in Grand Central Station, in hotel lobbies, and in various NYC parks, when

in fact she was living with her boyfriend; and (5) when confronted with private investigator

evidence disproving her assertions, claimed to have stayed with another individual, who had in

fact died some months before—all of these lies were "for the purpose of unfairly bolstering her

claim that her termination by defendant left her destitute and with severe emotional damages." In

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178

(S.D.N.Y. 2003) (Preska, J.) (MAF Memo 16), dismissal was granted because defendant and

their counsel failed to preserve records, counsel lied to the court counsel about vacation

schedules to avoid a deposition, and defendant replaced their computers with new ones to avoid

forensic examination among other improper conduct. In *Weinstein v. Ehrenhaus*, 119 F.R.D. 355

(S.D.N.Y. 1988) (Leval, J.) (MAF Memo 21), the court dismissed plaintiff's case after court

considered sanctions on two prior occasions, plaintiff refused to appear for three scheduled

depositions, was "evasive and uncooperative" when he did attend, failed to turn over documents

in defiance of a court order, and fraudulently filed a *lis pendens* on a property that defendants

were trying to sell. In *Skywark v. Isaacson*, 1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999)

(Keenan, J.) (MAF Memo 22), dismissal was granted where plaintiff denied being in any

automobile accidents after the date of the ship-board accident, which was a lie, as he had been involved in a disabling accident for which he had received extensive treatment, about which he also lied; he lied about being able to work since the accident; he fabricated a neurological condition (according to defense expert); he delayed and withheld medical documents; and his deception used the Court as an "unwitting tool" to achieve an overvalued, court-mediated settlement; plaintiff continued to make deceptive arguments in response to the sanctions motion.

If MAF seriously contends that any of the other cases cited involves conduct matching here, we invite them to bring those details to the Court's attention.

## CONCLUSION

With respect to the conduct of McKenzie, sanctions are not warranted, and MAF's motion should be denied.

Date: January 17, 2022                              Respectfully submitted,

*/s/ John J.E. Markham, II*
John J.E. Markham, II (JM4744)
*/s/ Bridget A. Zerner*
Bridget A. Zerner (BZ2582)
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax:(617)742-8604
jmarkham@markhamreadzerner.com
bzerner@markhamreadzerner.com
*Attorneys for the Defendant Michael*
*McKenzie dba American Image Art*

## Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified and paper copies will be sent to any indicated as non-registered participants on January 17, 2022.

*/s/ Bridget A. Zerner*
Bridget A. Zerner

25