Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 1 of 81    January 7, 2022

Vol. II - Osvaldo Gonzalez

EXHIBIT G - 1

**Page 1**

1

Volume II
Pages 1 - 236

UNITED STATES DISTRICT COURT
Southern District of New York

MORGAN ART FOUNDATION LIMITED,    )
     Plaintiff,    )
       )
   -against-    )
       )
MICHAEL MCKENZIE, et. al,    )
     Defendants.    )

**ZOOM CONFERENCE DEPOSITION OF OSVALDO GONZALEZ, VOLUME II,** a witness called on behalf of the Plaintiff, taken pursuant to the provisions of the Federal of Civil Procedure, before Julie B. Starr, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, on January 7, 2022 commencing at 9:09 a.m.

*COPLEY COURT REPORTING, INC.*
*The Mercantile Building*
*71 Commercial St., Suite 700*
*Boston, Massachusetts 02109*
*Tel: 617.423.5841*

**Page 2**

1   APPEARANCES:

2   FOR THE DEFENDANT:
    MARKHAM READ ZERNER, LLC
3    BY: Bridget Zerner, Esq.
    One Commercial Wharf West
4   Boston, Massachusetts 02110

5

6   FOR THE PLAINTIFF:
   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    BY: Luke Nikas, Esq.
7      Haley Banks, Esq.
   51 Madison Avenue, 22nd Floor
8   New York, New York 10010

9

10   FOR THE ESTATE:
   EATON PEABODY
    BY: Alfred Falzone, Esq.
11   100 Middle Street
   P.O. Box 15235
12   Portland, Maine 04112-5235

**Page 3**

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| OSVALDO GONZELEZ | | | | |
| (By Ms. Zerner) | 4 | | 222 | |
| (By Luke Nikas) | 172 | | | |
| (By Alfred Falzone) | 218 | | | |

E X H I B I T S

| No. | Page | Description |
|---|---|---|
| 4 | 29 | Text Messages |
| 5 | 38 | Text Messages |
| 6 | 44 | Redacted E-mail |
| 7 | 53 | E-mail dated August 23, 2021 |
| 8 | 60 | E-mail dated August 26, 2021 |
| 9 | 76 | E-mail dated August 26, 2021 |
| 10 | 88 | E-mail dated September 17, 2021 |
| 11 | 91 | E-mail dated September 3, 2021 |
| 12 | 138 | E-mail dated August 25, 2021 |
| 13 | 141 | Confidential and Binding Term Sheet |
| 14 | 153 | E-mail dated October 20, 2021 |
| 15 | 162 | Supreme Court Appellate Division Decision dated October 2021 |
| 16 | 165 | Supreme Court Appellate Division Decision dated October 2018 |
| 17 | 185 | MAF 60248 |
| 18 | 185 | MAF 60229 |
| 19 | 186 | MAF 60230 |

**Page 4**

CONTINUED EXHIBITS

| No. | Page | Description |
|---|---|---|
| 20 | 187 | MAF 60231 |
| 21 | 188 | MAF 60232 |
| 22 | 188 | MAF 60233 |
| 23 | 189 | MAF 60234 |
| 24 | 189 | MAF 60235 |
| 25 | 189 | MAF 60236 |
| 26 | 190 | MAF 60237 |
| 27 | 190 | MAF 60238 |
| 28 | 191 | MAF 60239 |
| 29 | 191 | MAF 60240 |
| 30 | 192 | MAF 60241 |
| 31 | 193 | MAF 60228 |
| 32 | 195 | MAF 60249 |
| 33 | 196 | E-mail dated July 4, 2021 |
| 34 | 197 | E-mail dated July 5, 2021 |
| 35 | 200 | E-mail dated July 21, 2021 |
| 36 | 204 | 11-page document |
| 37 | 209 | QE 29 |
| 38 | 209 | Declaration of M. McKenzie |
| 39 | 226 | Text Messages |

**EXHIBIT G - 2**

5

1        P R O C E E D I N G S

2     Mr. Osvaldo Gonzalez, of lawful age, being

3 first properly and satisfactorily identified by

4 the production of driver's license, and duly

5 sworn by a Notary Public to tell the truth, the

6 whole truth, and nothing but the truth, deposes

7 and says as follows in answer to direct

8 interrogatories by Attorney Zerner:

9          ********

10     Q.   Good morning, Mr. Gonzalez.

11     A.   Good morning.

12     Q.   Can you state your full name on the

13 record, please?

14     A.   Osvaldo Gonzalez.

15     Q.   And you understand you're under oath

16 today?

17     A.   Yes.

18     Q.   And have you taken any medication or

19 any other substance that would impact your

20 memory or your ability to answer questions

21 truthfully today?

22     A.   No.

23     Q.   Now, you previously appeared on

24 October 1st 2021, for a deposition in this

**COPLEY COURT REPORTING, INC.**

6

1 case. Do you recall that?

2     A.   Yes.

3     Q.   And you're appearing today again

4 pursuant to the Court's Order compelling you to

5 testify and answer questions that you

6 previously did not answer correct?

7     A.   Sure.

8     Q.   Sorry?

9     A.   I said correct.

10     Q.   Thank you. What is your current

11 address?

12     A.   37 Luquillo Beach Boulevard, Luquillo,

13 Puerto Rico.

14     Q.   What is your phone number?

15     A.   917-288-1414.

16     Q.   And that's your cell phone, right?

17     A.   That's it.

18     Q.   Sorry?

19     A.   Yes.

20     Q.   That's the same cell phone number you

21 had when you worked with Mr. McKenzie?

22     A.   Yes.

23     Q.   And that's the cell phone number you've

24 used to communicate with him as well as with

**COPLEY COURT REPORTING, INC.**

7

1 our office, correct?

2     A.   Yes.

3     Q.   Does anybody else reside with you at

4 your home in Puerto Rico?

5     A.   Yes.

6     Q.   Who lives with you?

7     A.   Why is that important? Is that --

8 you're getting into my personal life here.

9     Q.   Well, let me ask you --

10     A.   I don't think it's a relevant question.

11     Q.   I'm -- do you live with family members?

12     A.   I don't want to discuss this line of

13 conversation. I don't understand how this is

14 relevant then.

15     Q.   We'll come back to this. I want to

16 know is anyone else there in the room with you?

17     A.   No, there's no one in the room.

18     Q.   And are you currently employed?

19     A.   I'm not.

20     Q.   How do you support yourself?

21     A.   I have Medicare, social security.

22     Q.   Are you selling your art work right

23 now?

24     A.   Well, I'm working on it.

**COPLEY COURT REPORTING, INC.**

8

1     Q.   Are you selling anyone else's art work?

2     A.   No. Well, I'm working on -- with

3 somebody on some photography. I'm working with

4 an artist here in Puerto Rico.

5     Q.   On photography that you just mentioned?

6     A.   Yes, he's an artist.

7     Q.   Have you been represented by an

8 attorney since August 19, 2021?

9     A.   For one day, yes.

10     Q.   And what's the name of that attorney?

11     A.   Joel Carbonaro.

12     Q.   Carbonaro?

13     A.   Yeah.

14     Q.   Is that C-A-R-B-O-N-A-R -- how do you

15 spell it?

16     A.   Yeah.

17     Q.   Is he in New York?

18     A.   Yes. He's admitted to New York.

19     Q.   When did he represent Mr. McKenzie?

20     A.   At the beginning of the case he wanted

21 to sue the Estate. He wanted to sue -- he

22 wanted to sue the art dealer in --

23       THE COURT REPORTER: It's getting

24 broken up.

**COPLEY COURT REPORTING, INC.**

**EXHIBIT G - 3**

Page 9

1    Q.  Mr. Gonzalez, first off, we're having
2    trouble hearing you.  But I also want to put on
3    the record that if you were part of privileged
4    communications where Mr. McKenzie was speaking
5    with his attorney and you were involved in the
6    privileged communication, Mr. McKenzie has
7    asserted his privilege to those communications
8    and you should not disclose them.  Okay?
9    A.  Okay.
10   Q.  So let me just ask the timing.  You
11   said that Mr. Carbonaro, to your understanding,
12   represented Mr. McKenzie at the beginning of
13   the case.  Do you mean back in 2018?
14   A.  No.  No.  No.  Um, I think after -- I
15   don't know.  Maybe at the end of 2019 or
16   beginning of '20.  Maybe it was after -- after
17   the -- I'm not exactly sure.  Sorry.  They went
18   back and forth for a while, you know.
19   Q.  Okay.
20   A.  Because --
21   Q.  Again, Mr. Gonzalez, I'm not asking you
22   about further communications with his attorney
23   or any attorney.
24   A.  Okay.  Fine.  Fine.

COPLEY COURT REPORTING, INC.

Page 10

1    Q.  So what day did Mr. Carbonaro represent
2    you between August 21st -- excuse me --
3    August 19th 2021 and the present day?
4    A.  I asked Joe to call the U.S. attorney
5    who is handling the American Image
6    investigation to see if I was a target of that
7    investigation, and the answer to that was no.
8    And at the present time -- and that was it.
9    Q.  Okay.  And what's the name of the U.S.
10   attorney, the Assistant U.S. Attorney that you
11   just mentioned?
12   A.  I don't know.
13   Q.  Did you speak to that U.S. --
14   A.  No, I never spoke to him, never.
15   Q.  If we can slow down, both of us.  We
16   need to make sure Ms. Starr can hear my
17   complete question and your complete answer.
18   Okay?  I'll do my best when you're thinking
19   through your answer not to interrupt you.
20   Just to make sure it's clear, are you
21   saying that you never personally spoke to the
22   Assistant U.S. Attorney investigating, as you
23   say, Mr. McKenzie or American Image Art?
24   A.  Sure.  I said yes.

COPLEY COURT REPORTING, INC.

Page 11

1    Q.  Okay.  Yes, did you did not speak to
2    the A.U.S.A.?
3    A.  I did not speak to the A.U.S.A.
4    Q.  Have you spoken to any state or federal
5    prosecutor regarding Mr. McKenzie or American
6    Image Art?
7    A.  No.
8    Q.  How did you put Mr. Carbonaro in
9    contact with the A.U.S.A.?
10   A.  Because he called the FBI agent.
11   Q.  Who was the FBI agent?
12   A.  Um, McKeogh.
13   Q.  Can you spell that?
14   A.  I think it's spelled A-E-O-G-H, Mc --
15   Q.  Did you get the spelling, Ms. Starr?
16       THE COURT REPORTER:  I got M C A E
17   O G H.
18   A.  No.  No.  That's his last name.
19   Q.  Can you -- sorry.  I'm confused.  Can
20   you spell the complete last name as you know
21   it.  Is it M E C --
22   A.  Hold on.  Let me --
23       MR. NIKAS:  I can short circuit
24   this.  The name is Christopher, and the last

COPLEY COURT REPORTING, INC.

Page 12

1    name M-C-K-E-O-G-H.
2        MS. ZERNER:  Thank you.
3    Q.  So Mr. Gonzalez, we lost your video.
4    A.  Okay.
5    Q.  I'm sorry.
6        MS. ZERNER:  Mr. Nikas, you said
7    it's pronounced McKeogh?
8        MR. NIKAS:  That's correct.
9        MS. ZERNER:  Thank you.
10   Q.  Mr. Gonzalez, so did you speak with
11   Agent McKeogh on prior occasions?
12   A.  Yes.
13   Q.  When did you first speak to him?
14   A.  Um, I don't remember the exact date,
15   but July or August or -- I don't remember.
16   Q.  Well, did you speak with him before or
17   after you left American Image Art?
18   A.  Um, after.
19   Q.  Were you still living on the Katonah
20   property when you spoke to Agent McKeogh?
21   A.  Yes.
22   Q.  How many times did you speak to Agent
23   McKeogh?
24   A.  Um, I think three times.

COPLEY COURT REPORTING, INC.

# EXHIBIT G - 4

**13**

1    Q.   Okay.  And on the first occasion did
2    you meet in person or was it a telephone call
3    or how did you correspond?
4        A.   I think I met him in person on the
5    first time.
6        Q.   Where?
7        A.   I don't remember.
8        Q.   How were you put in contact with Mr.
9    McKeogh?
10       A.   Um, Mr. Nikas gave me his number.
11       Q.   When you met in person with him you
12   don't have any memory of where you were?
13       A.   No.
14       Q.   Did you meet at an FBI office?
15       A.   No.
16       Q.   Did you meet at Mr. Nikas' office?
17       A.   No.  No.
18       Q.   Was it at the Katonah property?
19       A.   It could have been at the Katonah
20   property.  I'm really telling you I can't
21   remember.
22       Q.   What did you discuss on that first
23   occasion that you spoke with Agent McKeogh?
24       A.   I think one of the discussions that I

COPLEY COURT REPORTING, INC.

**14**

1    was having was about the HOPE sculpture that I
2    had in my house and I wanted to know what they
3    wanted to do about that HOPE sculpture.  Um,
4    and that's what we discussed, you know.
5        Q.   Okay.
6        A.   Then we also were discussing the
7    movement in the studio with regard to the art.
8        Q.   Okay.  We'll come back to that.  Have
9    you ever been represented by Quinn Emanuel?
10       A.   No.
11       Q.   Have you ever been represented by Luke
12   Nikas?
13       A.   No.
14       Q.   Have you ever received any legal advice
15   from him?
16       A.   No.
17       Q.   Have you received any -- have you ever
18   been represented by Venable?
19       A.   No.
20       Q.   Have you received any legal advice from
21   any attorney at Venable?
22       A.   No.
23       Q.   Did you do anything to prepare for your
24   deposition today?

COPLEY COURT REPORTING, INC.

**15**

1        A.   No, not really.
2        Q.   Did you talk about your deposition with
3    anyone in advance?
4        A.   No, I didn't talk to anybody about
5    anything.
6        Q.   Did you review any documents?
7        A.   I did nothing.  I did absolutely
8    nothing to prepare.
9        Q.   Has anyone provided you documents
10   related to Mr. McKenzie since the last time we
11   were here on a deposition on October 1st 2021?
12       A.   Legal documents?
13       Q.   Yes, start with that; any legal
14   documents other than the ones I provided you?
15       A.   No.
16       Q.   You received documents from me related
17   to the filings in this case, right?
18       A.   Yeah.
19       Q.   You understand -- when I say "this
20   case" we're talking about the federal case
21   before the Southern District of New York
22   involving Morgan Art Foundation and Michael
23   McKenzie.  Do you understand that?
24       A.   Well, the papers that you sent --

COPLEY COURT REPORTING, INC.

**16**

1        Q.   Let me clarify.  Mr. Gonzalez, you're
2    aware that there are multiple lawsuits
3    involving Mr. McKenzie?
4        A.   Yes.
5        Q.   Okay.  I was just clarifying for the
6    record.  Do you understand that right now this
7    deposition is being taken in the case captioned
8    in the Southern District of New York with
9    Morgan Art Foundation as the Plaintiff against
10   Mr. McKenzie and the Estate as Defendants.  Do
11   you understand that?
12       A.   Yes.
13       Q.   And since your last deposition, you did
14   receive filings in this case from me?
15       A.   Yes.
16       Q.   Okay.  Have you been provided any
17   transcripts of any testimony of any parties
18   related to Mr. McKenzie since you appeared for
19   a deposition on October 1st?
20       A.   No.
21       Q.   When did you start working for Mr.
22   McKenzie?
23       A.   I believe -- I don't know, between
24   2019 --

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 5**

17

1    Q.    And were you doing anything for work
2    right before you came to work for Mr. McKenzie?
3    A.    No, just -- I just moved back from
4    Puerto Rico.  Now I'm living in Puerto Rico
5    Q.    Were you working anywhere in Puerto
6    Rico?
7    A.    No.
8    Q.    And do you recall what month you were
9    hired by Mr. McKenzie in 2019?
10    A.    I don't remember.
11    Q.    And for what were you hired by Mr.
12    McKenzie?
13    A.    He originally hired me to work in the
14    sales department of American Image Art.  He
15    said that he wanted to start selling art
16    because he knew that I had been doing art.  And
17    I know him.  I've known him for years.
18         So I took the position titled President
19    of the Sales Division, marketing of the art and
20    I had cards printed up and that's what I did.
21         Later on I discovered that I was really
22    a caretaker for him because he, you know, was
23    psychologically ill.  And people who would work
24    in the studio said he had Asperger's disorder

COPLEY COURT REPORTING, INC.

18

1    so I was kind of -- my job was to take care of
2    him.  I thought that was my job; to be a
3    caretaker, to sit there and listen to the old
4    guy, you know.  And that's what I did.
5         And we tried to do sales.  We did
6    auctions.  We -- we did things but he was
7    obsessed with the case, you know.  So basically
8    that's what I did.  I feel like I was his
9    caretaker, you know.
10    Q.    You've called yourself -- sorry.
11    You've called yourself Mr. McKenzie personal
12    assistant?
13    A.    Yeah.
14    Q.    And what salary did you receive during
15    the time that you worked for American Image
16    Art?
17    A.    I received $2,500 a month.
18    Q.    And were you provided free housing?
19    A.    Well, I stayed in the house but the
20    house was also a studio.  The house was --
21    Q.    The house -- I'm sorry.  I'm having
22    trouble hearing you, Mr. Gonzalez.  We'll keep
23    going.
24         MS. ZERNER:  Ms. Starr, are you

COPLEY COURT REPORTING, INC.

19

1    hearing him?
2         THE COURT REPORTER:  I can hear
3    him, but I'm straining to.
4         (A brief discussion was held off
5    the record.)
6    CONTINUED DIRECT EXAMINATION
7    BY MS. ZERNER:
8    Q.    Mr. Gonzalez, I didn't quite catch
9    that.  Did you say that the house you were
10    living in was also a studio?  Did I hear that?
11    A.    Yes, it was supposed to be a studio and
12    an office, but don't forget; there are more
13    offices there.
14    Q.    So the house that you lived in was used
15    as a studio and an office at the same time you
16    lived there?
17    A.    Yes.  Yeah, that's the only office
18    that's there.
19    Q.    Who used it as an office?
20    A.    Pardon me?
21    Q.    Who was using the office space in the
22    house that you were living in on the Katonah
23    property?
24    A.    Me, I was.  I was.

COPLEY COURT REPORTING, INC.

20

1    Q.    Okay.  And how many bedrooms did the
2    house have?
3    A.    I'm going to object to this as being
4    irrelevant.
5    Q.    Well, you have to answer the question.
6    A.    Well, I'm not going to answer that
7    question.  I'm finished with the house.  You
8    want to talk about --
9    Q.    I'm understanding --
10    A.    -- something related to the case I'll
11    be happy to discuss it with you.
12    Q.    Mr. Gonzalez, you lived in the house
13    and your son and daughter also lived in the
14    house with you, correct?
15    A.    I don't want to discuss my family.
16    That's it.  It's over.
17    Q.    I am just trying to understand; you
18    were provided a home on Mr. McKenzie's property
19    while you worked there and your son and --
20    A.    What does that have to do with the
21    case?
22    Q.    We have several things to talk about
23    today.  This is a relevant question.  You have
24    to answer the question.  You can make your

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 6**

## 21

1  objections, but it's -- as I understand it, are
2  you making an objection on behalf of yourself
3  as an attorney?
4      **A.** I want to --
5      **Q.** Mr. Gonzalez, all I want to understand
6  is that when you were working at American Image
7  Art you were provided a home where you were
8  able to live with your family and that your
9  utilities were paid and it also had a pool,
10 correct?
11     **A.** Correct.
12     **Q.** Okay. And you said you acted as an
13 assistant to Mr. McKenzie, so you -- did you
14 assist him with gathering documents together
15 related to his lawsuit or lawsuits at times?
16     **A.** I dealt with everything that was there,
17 you know. Most of that stuff he -- he had all
18 that stuff himself. No one got near that
19 stuff. No one knew anything. Nobody did
20 anything. He did everything.
21     **Q.** Right, but at times, for instance, if
22 our office needed a document that we were
23 talking about, you would help, if necessary, to
24 e-mail it to us or send it through Drop Box,

COPLEY COURT REPORTING, INC.

## 23

1  violent streak and you know, it was tough. It
2  was very hard. It was very hard, you know.
3      He's not an easy person. He's obese,
4  fantastically obese. He's an anti-Semite, big
5  time. And you know, is that enough? Would you
6  like to hear the picture?
7      **Q.** Did Mr. McKenzie ever interact with
8  your family members while they were on the
9  Katonah property?
10     **A.** Yes.
11     **Q.** How was he towards them?
12     **A.** He was fine with them.
13     **Q.** And his behavior that you've just
14 described, was he like that the entire time
15 that you worked there?
16     **A.** Yeah.
17     **Q.** Do you recall this past summer in
18 July 2021, did Mr. McKenzie announce that he
19 was planning to close his studio and was going
20 to transition to other work?
21     **A.** Um, I know I heard that, but I don't
22 know if I heard it from him or if he sent me an
23 e-mail.
24     **Q.** You recall that -- hearing that before

COPLEY COURT REPORTING, INC.

## 22

1  correct?
2      **A.** Well, yep.
3      **Q.** And you participated in our privileged
4  communications regarding cases at times, as an
5  employee of -- excuse me -- as an employee of
6  American Image Art?
7      **A.** Yes.
8      **Q.** Well, how was Mike to work with?
9      **A.** How was Mike to work with? It was a
10 nightmare. When I say that he is mentally ill,
11 I'm serious. He obsessed on things. I mean,
12 he repeats them back and forth, a lot of times
13 in a row -- um, and -- and he doesn't stop.
14 It's just like you give him some pill that he
15 takes and all he could do is attack, attack
16 everybody, you know.
17     And I tried my best with him, but he --
18 he's not -- he's not there, you know. He likes
19 to urinate in front of women. He pees out in
20 the front of the studio when, you know, like
21 when Annette would be there. And you know,
22 it's just -- what's up with that? He does
23 stuff like that.
24     And -- and like he has this whole

COPLEY COURT REPORTING, INC.

## 24

1  you actually left American Image Art, right?
2      **A.** You know, I don't exactly know the
3  timing but it was very close.
4      **Q.** You don't recall him saying he's
5  planning to close his studio and that being
6  upsetting that you were going to lose your job?
7      **A.** That isn't why it was upsetting. It
8  was upsetting --
9      **Q.** Go ahead.
10     **A.** It was upsetting because he decided to
11 shut down the business because he wanted to
12 hide all the art. So he decided to like go
13 criminal and -- and he didn't want to do
14 business anymore, you know.
15     And I found that, you know, and
16 everything else would be upsetting, you know.
17 You know, I wasted two years waiting to do this
18 sales thing and it was wasted, you know.
19     **Q.** Did you make any art sales while you
20 worked at American Image Art?
21     **A.** Nope.
22     **Q.** Did you have any experience with
23 selling art before you worked at American Image
24 Art?

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 7**

25

1    A.   No, just my own, you know, experiences,
2    you know.
3    Q.   When Mr. McKenzie talked about closing
4    the business last summer for whatever the
5    reason was, you were not going to be able to
6    work at American Image Art anymore, correct?
7    A.   Yeah, obviously.
8    Q.   And were you going to have to move out
9    of the house on the Katonah property?
10   A.   No, he offered me -- he offered to rent
11   it to me.
12   Q.   That was later though, right?
13   A.   Pretty much at the same time.
14   Q.   So you're going to have to start paying
15   rent when you hadn't had to pay rent before?
16   A.   Yes.
17   Q.   And if you couldn't afford the rent
18   then you were going to have to leave, correct?
19   A.   Obviously.
20   Q.   And then you wouldn't have that home
21   and you wouldn't have a home for your son and
22   daughter, correct?
23   A.   Correct.  Well, my son is fine.  My
24   daughter --

**COPLEY COURT REPORTING, INC.**

26

1    Q.   Right.  You helped take care of her,
2    correct?
3    A.   Yes.
4    Q.   And she had been dependant on you
5    during those years and you had been provided
6    that home by Mr. McKenzie?
7    A.   Yeah.
8    Q.   Now, you and Mr. McKenzie had a blow-up
9    around August 17th; do you recall that?
10   A.   Yep.
11   Q.   There was a problem with gas or diesel;
12   is that accurate?
13   A.   That -- the whole hard thing is it was
14   just a minor, you know, nothing in terms of why
15   I ended my relationship with him.  That was the
16   least of it.  I mean, this guy -- don't forget,
17   I know what he's doing.  I know he's shutting
18   down his business.  It wasn't until July when
19   he told me, when he said that.  He was just
20   doing the pro forma thing there.
21        Once again, don't forget; I know like
22   he's talking to the lawyers about, you know,
23   the Trust.  Um, he's -- he's moving all the art
24   from perfectly fine storage space because he

**COPLEY COURT REPORTING, INC.**

27

1    doesn't want, you know, it confiscated, you
2    know.
3        And he just lost faith in the whole
4    thing and decided to -- I guess, he was going
5    to do something like break out.  They started
6    moving out a lot of pieces, you know.
7    Q.   And as you mentioned, you weren't going
8    to be able to work on the sales as you had
9    planned.
10   A.   What --
11   Q.   You know, Mr. Gonzalez, let me just
12   move on.  I wanted to talk about what happened
13   on that day on August 17th 2021.  Can you tell
14   me what happened?  Where were you going that
15   you had to drive the vehicle?
16   A.   I was taking sculptures from -- from
17   Bridge Metal to a place in Connecticut and I
18   had -- and I had to go into the Bronx and where
19   I had to go to pick up the sculptures, it was a
20   complicated parking thing and I cut my arm.  I
21   really severed -- I really put a gash in my
22   arm.  It was pleading.
23        And Bridge Metal put me together and
24   put a Band-Aid on it.  Then I'm going up to

**COPLEY COURT REPORTING, INC.**

28

1    Connecticut and I realize that he gave me the
2    bus without any gas in it.  So I had to stop
3    and get gas.
4        And what happened is there, I go --
5    it's a diesel, but it wasn't like -- I was
6    trying to put diesel in it but at this
7    particular station, those -- they are only for
8    the trucks, so I couldn't get the diesel in
9    there.  So I started to think maybe I wasn't
10   thinking and I put gas in it, you know.  And
11   then the car -- the truck got stuck, you know,
12   on the highway.
13        Then we got towed and this, that and
14   the other thing, you know, and he told me I had
15   to pay for it and that was it.
16   Q.   What sculptures were you moving?
17   A.   I was moving two -- I think two,
18   24-inch HOPE sculptures.
19   Q.   And when you told Mr. McKenzie what
20   happened and he told you that you have to pay
21   for it, how did he treat you?
22   A.   How did he treat me?
23   Q.   Yes.
24   A.   He treated me poorly.

**COPLEY COURT REPORTING, INC.**

Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 8**

**29**

1  Q.  Can you describe to me the interaction.
2  A.  Matter of fact, I can't.  Sorry.  I
3  can't recall it.
4  Q.  Let me show you -- I'm going to mark --
5  MS. ZERNER:  I'm going to continue,
6  and I apologize; you all let me know if you're
7  hearing the background.  I have snow plows
8  going behind me.  I don't know if it's picking
9  up on the Zoom.
10  I'm going to just continue marking
11  exhibits starting with Exhibit 4 since I'll
12  going back to the Exhibits 1, 2 and 3 that we
13  had marked the last time we were together with
14  Mr. Gonzalez.  This next document will be
15  Exhibit 4.
16  (Text Chain was marked for
17  identification as Exhibit No. 4.)
18  MS. ZERNER:  All the attorneys
19  should have them from production.  If you need
20  something e-mailed to you, let me know,
21  including Mr. Falzone.  I'll shoot it over to
22  everyone right now.
23  I'm going to mark this as
24  Exhibit 4.

**COPLEY COURT REPORTING, INC.**

**30**

1  Q.  Mr. Gonzalez, are you able to see the
2  document through your phone when you're on the
3  app?
4  A.  Yeah.
5  Q.  Okay.  Great.  Let me know if you need
6  to see anything further on the document, but
7  what I've marked as Exhibit 4 is what I
8  understand to be text messages between you and
9  Mr. McKenzie.
10  Do you -- and it has a date of
11  August 17th, which I understand to be 2021.  Do
12  you see these?
13  A.  Okay.  Yeah, I see it.
14  Q.  The first text is marked with ogcool,
15  and you use that name, correct?
16  A.  Correct.
17  Q.  And it says "the bus is ready.  Call
18  them to arrange payment.  It's $419."
19  Do you see that?
20  A.  Yeah.
21  Q.  And was that the cost for this incident
22  with the truck that day?
23  A.  Yes.
24  Q.  And McKenzie responds "you should pay

**COPLEY COURT REPORTING, INC.**

**31**

1  it.  You did it".  Right?
2  A.  Yes.
3  Q.  Did you have a telephone call with him
4  separate from this text message?
5  A.  I don't know.  Probably.  I mean, we're
6  talking a while ago.
7  Q.  I mean, do you recall did he yell at
8  you that day about this?
9  A.  No, not really.
10  Q.  All right.  Well, you respond to him
11  here "on-the-job accident.  Mike, you're
12  playing a dangerous game with me.  My daughter
13  is moving with her mother.  My son is moving
14  back down.  My hands are no longer tied behind
15  my back."
16  Is that what you texted to him?
17  A.  Yes.
18  Q.  And are you saying were you -- before
19  this your hands were tied because you were
20  dependant on McKenzie for your job and the
21  house where you -- which you used to support
22  your family, right?
23  A.  Well, more than -- I needed it for my
24  daughter, you know, my mentally ill daughter.

**COPLEY COURT REPORTING, INC.**

**32**

1  Q.  Right.  She was depending on you and
2  she stayed at the house with you on Katonah?
3  A.  Yes.  Yes.
4  Q.  And you go on and say "I have suffered
5  your marginalization, insults and I have
6  nothing here".  Correct?
7  A.  Uh-huh.
8  Q.  And then you say, "let's part ways
9  amicably.  Don't try me".
10  And is this where Mr. McKenzie is
11  talking about closing the business.  And this
12  -- is this what you're referring to when you
13  said he offered you a lease to stay at the
14  house on the Katonah property?
15  A.  Yeah.
16  Q.  And you asked him "what will the lease
17  say".
18  A.  It says it right there.
19  Q.  So you were still considering staying
20  there if the terms were agreeable?
21  A.  Well, it had to be -- if my son wanted
22  to stay there --
23  Q.  I see.
24  A.  -- and pay the rent, you know, and he

**COPLEY COURT REPORTING, INC.**

**EXHIBIT G - 9** 35

33

1    didn't.

2    Q.    And prior to this, none of you were

3    paying rent to live at the house in -- on the

4    Katonah property.

5    A.    Who me?

6    Q.    What?

7    A.    Yeah, I actually -- I actually rented

8    the house there.

9    Q.    You didn't pay rent every month to

10    McKenzie.

11    A.    Not at this time but the time before

12    that I did.

13    Q.    We're talking about 2019 to 2021, you

14    did not pay rent, right?

15    A.    Right.

16    Q.    And scrolling down to the full text

17    message here on the last page of this exhibit,

18    you say "I'm planning to move back to Puerto

19    Rico.  Oh, it wasn't a free ride.  The personal

20    insults, the stabs in the back, the disrespect,

21    your marginalizatizing me and then forcing me

22    to witness the destruction of my business

23    must be considered payment.  I absorbed the

24    slaps in the face and all your insane talk to

COPLEY COURT REPORTING, INC.

34

1    try to help my daughter, but I'm free now".

2    Right?

3    A.    Correct.

4    Q.    As you mentioned you were there and had

5    that home so you could help, in part, because

6    your daughter was dependant on you, right?

7    A.    Right.

8    Q.    And you had to continue to depend on

9    McKenzie, right?

10    A.    Well, it was part of the deal, you

11    know, and something else is supposed to be

12    going on, you know.

13    Q.    And then it was all falling apart,

14    right?

15    A.    No, what's going on is don't forget

16    long before this; I'm making reference -- I

17    understand what he's doing.  I understand the

18    phone conversations he's having with regard to

19    the Trust, wanting to sell the business to Greg

20    Allen.  He was going to do that.  I mean, I

21    think they almost had a contract drawn up.  I

22    mean, he was going to do that and everything

23    that he's doing is to shut down and hide

24    everything and try to walk away, you know.

COPLEY COURT REPORTING, INC.

1    That was a little upsetting to me that,

2    you know, with the Foundation and the Estate,

3    you know -- you know, I was a little offended

4    by that.

5    Q.    And as you said, he was destroying the

6    business so it was going to destroy American

7    Image and your ability to make sales for

8    American Image that you were planning, right;

9    wasn't that all falling apart?

10    A.    Yes, exactly.

11    Q.    And you were upset with Michael for

12    that, right, with what he was doing?

13    A.    Yes, I was.  Yes, I was.

14    Q.    And after this, you know, discussion

15    with Mike about what happened that day and you

16    were injured and this problem happened with the

17    diesel, you called Markham on that day, right?

18    A.    Was that the day or the next day?

19    Pretty close.

20    Q.    You told Markham how angry you were

21    with McKenzie.

22    A.    Yes.

23    Q.    You told Markham that McKenzie was

24    insulting and mean and belittling and you had

COPLEY COURT REPORTING, INC.

36

1    it with him, right?

2    A.    I think so.

3    Q.    And didn't you ask Markham --

4    A.    It sounds right.

5    Q.    Okay.  And when you were speaking to

6    Markham about all this, didn't you ask him if

7    there was any money available to support you?

8    A.    I don't recall that.

9    Q.    You don't recall telling Markham that

10    you hoped you could get financial support from

11    the Estate or from Morgan?

12    A.    What -- what happened was when I went

13    down to speak with -- to meet Luke Nikas, he

14    asked me what I wanted and I said that I was

15    concerned for my daughter and that if they

16    could help me to find her an apartment for her

17    because I wanted to get out of -- out of

18    Katonah as fast as possible because I'm -- I'm

19    concerned about how crazy this guy is.  And I

20    don't get scared fast, you know.

21    Q.    Right.

22    A.    But he's loose and he has guns.

23    Q.    I'm talking about what you said to

24    Markham; you don't recall talking to Markham

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 10**

---

37

1  when you were very upset about Mike yelling at
2  you and saying you had to pay for the diesel
3  and the destruction to the truck and that you
4  were talking about how you needed financial
5  support because of this dispute with Mike.  You
6  don't recall saying that to Markham?
7     **A.**  I don't recall.
8     **Q.**  And you don't recall saying you hope
9  you could get support from the Estate or
10  Morgan?
11     **A.**  I don't recall saying that.
12     **Q.**  But at that point when you had this
13  blow-up with Mike, and as these text messages
14  show, it was clear that you were going to have
15  to leave the Katonah property where you had
16  been living?
17     **A.**  Yeah, but I was okay with that.
18       MS. ZERNER:  I'm going to mark.
19     **A.**  Listen, I'm the one that quit.
20     **Q.**  Before that, you were upset that you
21  were -- as you mentioned, you had spent
22  two years working with Mike and --
23     **A.**  I --
24     **Q.**  Let me finish.  You had planned -- you

COPLEY COURT REPORTING, INC.

---

38

1  had been working on -- you wanted to pursue
2  sales for American Image Art.  You lived in a
3  house there that you were able to have your
4  daughter with you and provide her support,
5  correct?
6     **A.**  And?
7     **Q.**  And that was all being lost during this
8  last summer.
9     **A.**  I know, but when I quit the job I
10  understand that's all going to change.  I
11  mean -- I mean, I didn't quit thinking that,
12  you know, I was going to stay there.  You know,
13  I knew -- I had other plans.  I'm not -- I'm
14  not a slave there.  I could move, and I planned
15  to move and I did.  That's it.  You know.
16     **Q.**  But you were still upset with McKenzie
17  at that time, right?
18     **A.**  Yes, I was upset with him.
19     **Q.**  And do you recall --
20       MS. ZERNER:  I have another
21  document we'll mark as Exhibit 19.  Excuse me.
22  Not 19.  5, I think.  Exhibit 5.
23       (Text Message Chain was marked for
24  identification as Exhibit No. 5.)

COPLEY COURT REPORTING, INC.

---

39

1       (Pause.)
2     **Q.**  I'm sharing another document, Mr.
3  Gonzalez, that is now marked as Exhibit 5 for
4  the deposition.  Do you see this?
5     **A.**  Uh-huh.
6     **Q.**  Let me just -- trying to -- trying to
7  zoom in for you.
8       (Pause.)
9     **Q.**  Sorry.  I'm on a different computer
10  than I'm normally on today.  I'm sorry.  I do
11  not see the zoom on this -- this Adobe format.
12       Can you see the --
13     **A.**  I could before, but not now.
14     **Q.**  All right.  You see up here on this
15  text message chain it has ogcool, right?
16  Bridget, Peggy, Tim and 617-699-4720, right?
17       And do you see here -- can you see that
18  the date is August 19th 2021?
19     **A.**  Well, I can't see the document at this
20  point.
21     **Q.**  Oh, I went off shared screen.  I
22  apologize.  Hold on a second.  Can you see it
23  now?
24     **A.**  Yeah.

COPLEY COURT REPORTING, INC.

---

40

1     **Q.**  Can you see that date?
2     **A.**  Yes.
3     **Q.**  Okay.  If you can take the time to read
4  through it; do you recall sending this text
5  message?
6     **A.**  Yes.
7     **Q.**  The Bridget on there is me and the
8  other 617 number is Markham.  And who is Peggy?
9     **A.**  That's his fiance.
10     **Q.**  McKenzie's fiance?
11     **A.**  Yes.
12     **Q.**  And Tim is Tim who?
13     **A.**  Ginexi, the printer.
14     **Q.**  Who worked at American Image Art?
15     **A.**  Yes.
16     **Q.**  And you state here "hi, just to let you
17  know, I'm no longer working with Mike.  I have
18  exhausted my patience.  I had to endure the
19  torture imposed upon me for the sake of my
20  emotionally ill daughter who lives with me.
21  She is now going to stay with her mother."
22       That's what we were talking about
23  earlier, right?
24     **A.**  Uh-huh.

COPLEY COURT REPORTING, INC.

---

**EXHIBIT G - 11**

41

1    Q.   And you resented that about McKenzie,
2  right; that you had to endure his torture?
3    A.   Yeah.
4    Q.   And you say "Mike has the idiosyncrasy
5  of telling me to go 'F' myself on top of a
6  tsunami of insults and slights, etc... Please
7  let him know that I have enough information
8  about the inner workings of his operation to
9  'bury' him."
10         What are you talking about there?
11   A.   Well, all that stuff that he was doing
12 with -- with the Trust and hiding the art. You
13 know, he was -- I mean, he contacted at least
14 four different law firms and had extensive
15 conversations about creating trusts. And then
16 he was also doing contracts to sell the whole
17 business to -- to Greg Allen and then Greg
18 Allen was going to move it to a trust in Nevada
19 and somehow get it back to his son or something
20 insane like that. And it was just -- that's
21 what he's doing. You know, it's obvious what
22 he's doing.
23   Q.   And just to make sure I heard you
24 correctly; in your description did you say he

COPLEY COURT REPORTING, INC.

42

1  contacted four different law firms? Is that
2  what you said?
3    A.   Yes.
4    Q.   Okay. All right. And --
5    A.   And -- and Las Vegas, and a law firm in
6  Las Vegas.
7    Q.   And other than what you've just
8  described, were you referring to anything else?
9    A.   Other than what I've just described?
10   Q.   Yes. I'm just -- I want to make sure I
11 know everything you were talking about when you
12 said you have enough information --
13   A.   Yeah. Yeah. Like I know -- I've been
14 following this. I know that this is what he's
15 doing. You know what I mean? I mean, I didn't
16 discover it in August. I know he had been
17 doing it. That's the conversation you're
18 having and like he -- John gave him the bad
19 news that --
20   Q.   Mr. Gonzalez, if you're talking about
21 privileged conversations between our law firm
22 and McKenzie, please do not disclose those.
23   A.   Well --
24   Q.   Okay?

COPLEY COURT REPORTING, INC.

43

1    A.   He despaired having any favorable
2  decision legally when he couldn't file his
3  motions.
4    Q.   So you go on to say "if there is a
5  swindler and a liar, it's him. One more attack
6  from him and I will contact Lipson and Nikas
7  and make his life and business ugly. I have
8  the goods. I could actually save the Estate.
9  I'm sure the Star of Hope and the Estate would
10 love to talk with me". Right?
11   A.   Uh-huh.
12   Q.   Now, what's this -- when you say one
13 more attack from him, was there another attack
14 from him after this text?
15   A.   Yes. He called me and he just started
16 to like speak very negatively of me, you know,
17 one of despair, you know. So, you know he just
18 gets very abusive. I can't tell you how
19 abusive he is. He became abusive with me.
20   Q.   Was he yelling at you?
21   A.   He's not yelling. But it was things
22 that he said.
23   Q.   He was insulting?
24   A.   Yeah, he's insulting. You should hear

COPLEY COURT REPORTING, INC.

44

1  what he says about you.
2    Q.   And after -- so he called you after
3  this text message and then you followed through
4  on this threat to make his life and business
5  ugly, right?
6    A.   Yes.
7    Q.   Mr. Gonzalez, why did you plead The
8  Fifth before on October 1st as to your dealings
9  with McKenzie that you just described this
10 morning?
11   A.   Because I have been talking to the FBI.
12 I know there's some -- there's an investigation
13 and the U.S. Attorney involved and I don't
14 know, you know, what's going on, you know.
15         So I wanted to be sure that I knew what
16 I was talking about, you know, and at the time
17 I felt that I may have had exposure. But I
18 told you that I spoke to them and I'm more
19 settled about that, so that's that.
20   Q.   Okay. We're to look at another
21 document.
22         (Pause.)
23   Q.   This is Exhibit 6.
24         (Redacted E-mail was marked for

COPLEY COURT REPORTING, INC.

Vol. III - Osvaldo Gonzalez

**EXHIBIT G - 12** 47

### 45

1   identification as Exhibit No. 6.)

2    Q.   And this is an e-mail -- this one --

3   this copy here you'll see at the bottom has a

4   Venable bates number. It was produced by

5   Venable in response to a subpoena.

6      Mr. Gonzalez, you forwarded me this

7   week all your e-mails with Quinn Emanuel and

8   with Venable, correct?

9    A.   Yeah.

10    Q.   And do you believe you sent me

11   everything that shows all your e-mails with you

12   and those two law firms since August of 2021?

13    A.   Well, you know, now that I'm looking at

14   it, I realize that I only sent you -- well, and

15   Luke. I just -- I didn't think this issue was

16   related to -- yeah.

17    Q.   Okay. We have this so that's not a

18   problem. Do you think -- did you have any

19   other e-mails with any other attorneys now that

20   you're thinking about it that you did not

21   forward to me?

22    A.   No.

23    Q.   Okay. Now, this one dated August 20th

24   2021 at 4:55 p.m., From what I see in the

COPLEY COURT REPORTING, INC.

### 46

1   e-mails, this looks like the first e-mail sent

2   to either Quinn Emanuel or Venable around this

3   time.

4      Did you -- can you tell me did you call

5   anyone before you sent this e-mail as in anyone

6   at Venable or Quinn Emanuel?

7    A.   The only person I think I called was

8   Luke.

9    Q.   But did you call anyone at Venable or

10   Quinn Emanuel before sending this e-mail?

11    A.   No.

12    Q.   Why did you e-mail Kevin Lipson?

13    A.   Because I met Kevin. I dealt with

14   Kevin. I know Kevin.

15    Q.   Sorry. Just to be careful, Oz; you

16   kind of turn the phone and sometimes your voice

17   trails off when you add on a thought at the end

18   of your answer. We just want to make sure that

19   we hear everything that you have to say. Okay.

20    A.   Okay.

21    Q.   So if you can just be careful. How do

22   you know Kevin Lipson?

23    A.   From Portland.

24    Q.   Okay. Was the first time you met Kevin

COPLEY COURT REPORTING, INC.

### (continued)

1   Lipson at the mediation between litigants in

2   Portland, Maine in November of 2019?

3    A.   Yes. Yes.

4    Q.   All right. So you decide to reach out

5   to Mr. Lipson who you understood was still

6   representing the Estate of Robert Indiana at

7   this time in August of 2021?

8    A.   Yes.

9    Q.   Okay. And you say here "I can help the

10   Estate".

11    A.   Yep.

12    Q.   What did you mean by that?

13    A.   Well, they recover a lot of art and

14   then that would have helped them with their

15   case if they have in the Portland court.

16      THE COURT REPORTER: I'm sorry I

17   didn't hear that last part.

18      THE WITNESS: In the Portland

19   courts.

20    Q.   Well, you were aware that the Estate

21   was in active litigation against Mr. McKenzie

22   that was at this point in arbitration before

23   New York Arbitrators, correct?

24    A.   What was this?

COPLEY COURT REPORTING, INC.

### 48

1    Q.   Do you need me to repeat the question?

2    A.   Please.

3    Q.   At this time in August of 2021, you

4   were aware that the Estate was in active

5   litigation against McKenzie in an arbitration

6   pending in New York, right?

7    A.   Yes.

8    Q.   And you were offering to help them

9   against McKenzie.

10    A.   Well, to recover art.

11    Q.   You were going to help them with their

12   case against McKenzie, right?

13    A.   It would have -- it would help -- it

14   would help their case, you know, because like

15   the case is related to what you recover and if

16   you recover a lot of art, then that goes to how

17   much your attorneys fees are.

18    Q.   So you were helping them defend against

19   the Attorney General's claims that they had

20   claimed excessive fees from the Estate for

21   their work?

22    A.   Um, it could -- it could lead to that,

23   you know, but that's a long way off, you know.

24    Q.   Well, you said you could help them with

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 13** 51

---

49

1  their case.
2      A.  That was -- the thought was it would
3  help with the recovery.  I hadn't thought about
4  -- I hadn't thought about you know, how to
5  execute it or I didn't take it that seriously.
6      Q.  Well, you took it seriously enough to
7  call Mr. Lipson, right?
8      A.  Yeah.
9      Q.  And you were offering to help the
10  Estate recover art work from McKenzie, right?
11      A.  Yes.
12      Q.  Which would help them in their case
13  against McKenzie?
14      A.  Yeah.
15      Q.  Did you have any phone calls with Mr.
16  Lipson?
17      A.  Um, no, I don't think so.
18      Q.  And you say here "I do have concerns
19  about my safety as I've already received a call
20  to be careful and not get hurt."
21          What are you talking about there?
22      A.  Well, I was talking about is that Mr.
23  McKenzie articulates a lot of violence in his
24  language, you know.  He talks very, very crazy;

**COPLEY COURT REPORTING, INC.**

---

1      Q.  But the second time when you're working
2  for American Image Art from 2017 to 2021, you
3  said you heard him talking like this the whole
4  time you worked with him, right?
5      A.  Constantly.
6      Q.  Did you say constantly?
7      A.  Constantly.  Never ending.
8      Q.  Now, this e-mail to Mr. Lipson dated
9  August 20th 2021, when you say "I've already
10  received a call to be careful and not get
11  hurt", what are you referring to there?
12      A.  That -- I think it was Tim, the guy,
13  the printer there, you know, a pretty heavy,
14  muscular guy -- you know, he said you know you
15  should be careful and not get hurt and I didn't
16  take to that claim, you know.
17          So you know, I had that concern, you
18  know.
19      Q.  Did you say he called you and said
20  this?
21      A.  No, I was with him personally and he
22  said it.
23      Q.  Mr. Ginexi said that to you when you
24  were with him personally at the Katonah

**COPLEY COURT REPORTING, INC.**

---

50

1  homicides and murders and shootings that he's
2  been involved with.  Just a lot of crazy talk
3  and he has guns.  And you know, he was always
4  saying I'm going to shoot this guy and I'm
5  going to blow this guy up.  He talks like that,
6  you know.  And um, you know, I was concerned
7  for myself, you know.
8      Q.  Did --
9      A.  I didn't want -- you know.
10      Q.  Did Mr. McKenzie talk like that about
11  violence and guns since you started working
12  with him in 2019?
13      A.  Yes.  Don't forget I knew him for
14  10 years before that, so --
15      Q.  So he talked like that -- excuse me.
16  Sorry.  I just want to understand.  Did he talk
17  like that the entire 10 years you knew him?
18      A.  Yes.
19      Q.  So are you talking --
20      A.  When I was only a tenant.
21      Q.  You're talking about when you were a
22  tenant prior to -- on the first occasion prior
23  to when you came back in 2019?
24      A.  Right.

**COPLEY COURT REPORTING, INC.**

---

52

1  property?
2      A.  Yes.
3      Q.  What was the context of the
4  conversation?
5      A.  I don't know.  I guess -- I think I was
6  walking out the door and he was behind and he
7  was just like you know --
8      Q.  Can you place in time when he --
9      A.  Towards the end of the day, I think.  I
10  was leaving the studio.
11      Q.  Did he say that to you on this date,
12  August 20th?
13      A.  I don't remember the date that he said
14  it.
15      Q.  Did he say that to you after you texted
16  everyone that you weren't working with Mike
17  anymore?
18      A.  I think so, yep.
19      Q.  Okay.  So if that was in person, then
20  what are you referring to in this e-mail when
21  you say "I already received a call".
22      A.  I think I'm just making reference to
23  the conversation that I had, you know, without
24  going into -- it was some form of

**COPLEY COURT REPORTING, INC.**

---

## 53

1 communication. The form, I'm not exact, but --
2    Q. Okay. But this e-mail is referring to
3 Tim Ginexi?
4    A. Yes.
5       MS. ZERNER: If everyone is okay,
6 we'll take a break soon. Maybe in 10 minutes.
7 I'll mark the next one.
8       (E-mail was marked for
9 identification as Exhibit No. 7.)
10    Q. Do you recall, Mr. Gonzalez, after you
11 sent that e-mail on August 20th did you get any
12 response that day?
13    A. No.
14    Q. I'll show you this next one. This is
15 an e-mail that was produced, and I know, Mr.
16 Gonzalez, you forwarded it to me as well, and
17 this is the copy produced by Quinn Emanuel.
18 Can you see it on your screen?
19    A. Yes.
20    Q. So this one is an e-mail dated
21 August 23rd 2021, three days after the last
22 e-mail we looked at where you're contacting
23 Luke Nikas and it says "Luke, I'm no longer
24 working with American Image Art. I would like

**COPLEY COURT REPORTING, INC.**

## 54

1 to talk with you. Please call me". Right?
2 You sent this?
3    A. Right. Yes. And that's because Lipson
4 didn't respond for a few days. He didn't
5 respond at all. This is dated a few days later
6 because I waited a few days to hear from Lipson
7 and I don't think he got back to me so I
8 contacted Luke.
9    Q. And why did you contact Luke?
10    A. To talk about the American Image Art.
11    Q. And to provide him information that
12 would be helpful for his client against Mr.
13 McKenzie?
14    A. Um, if that's what it ended up being.
15 I wasn't -- I'm not a lawyer. I'm not like
16 presenting the case. I'm just letting him
17 know.
18    Q. Right. You were letting him know
19 though because he was an adversary of Mr.
20 McKenzie?
21    A. Yes.
22       MS. ZERNER: I think now -- I know
23 we've been going almost an hour and a half. We
24 can take a break for everyone, particularly our

**COPLEY COURT REPORTING, INC.**

## EXHIBIT G - 14   55

1 court reporter.
2       THE COURT REPORTER: Thank you.
3       (A recess was taken at 10:21 a.m.)
4       (Resumed at 10:33 a.m.)
5 CONTINUED DIRECT EXAMINATION
6 BY MS. ZERNER:
7    Q. Mr. Gonzalez, we were talking earlier
8 about Mr. McKenzie's treatment of you while you
9 worked at American Image Art from 2019 to 2021.
10 And you described how abusive -- that he was
11 abusive and he would insult you and humiliate
12 you. Is that correct?
13    A. Yes.
14    Q. Can you give me some specific examples
15 of his insults or how he humiliated you?
16       MS. ZERNER: Hold on, Mr. Gonzalez.
17 We can't hear you.
18       (Pause.)
19       THE COURT REPORTER: I'm not
20 hearing your testimony, Mr. Gonzalez.
21       MS. ZERNER: It's muffled to me
22 too.
23       (A discussion was held off the
24 record to attend to technical issues.)

**COPLEY COURT REPORTING, INC.**

## 56

1 CONTINUED DIRECT EXAMINATION
2 BY MS. ZERNER:
3    Q. I had asked if you can give me some
4 specific examples of his insults or how he
5 humiliated you.
6    A. We were sitting at the kitchen table,
7 myself and Mike, and I said to him you're
8 burning down this business. You're destroying
9 everything the way you're acting.
10       And he lost his mind and jumped over
11 the table screaming --
12    Q. I am sorry. I didn't hear what you
13 said after -- I think what you first said was
14 this happened a few months ago. Was that the
15 first thing you said?
16    A. Yes.
17    Q. And that you were sitting with McKenzie
18 and what I heard you say was that you said to
19 him you're burning down this business. You're
20 destroying everything. And I couldn't hear
21 after that.
22    A. He started screaming at me to go fuck
23 myself and over and over, non-stop. It was
24 like crazy, right. And you know, it kind of

**COPLEY COURT REPORTING, INC.**

**EXHIBIT G - 15**

**57**

1 broke up a little bit. I'm trying to tell him
2 that everything that he was doing was just
3 nuts; just nuts, you know.
4     Q.  Go ahead.
5     A.  So the law firm for the Star of Hope
6 hired --
7     Q.  Are you referring to the law firm that
8 represented the Star of Hope?
9     A.  Correct.
10     Q.  Are you talking about Don Zuretski?
11     A.  Don Zuretski. It's really -- I'll try
12 to speak louder.
13     Q.  What happened with Don Zuretski?
14     A.  So that day he called Don Zuretski to
15 figure out a production plan that they could
16 work on. And what happens is that Mike got on
17 the phone with Mr. Zuretski for 40 minutes and
18 did nothing but rant at Mr. Zuretski about the
19 lawsuits. He's nuts. He's nuts. And he said
20 that that's not going to work out. I said what
21 did you discuss with him and he said we didn't
22 discuss anything.
23          THE COURT REPORTER: I'm really
24 struggling to hear you.
**COPLEY COURT REPORTING, INC.**

**58**

1          THE WITNESS: I'm fading. Let me
2 try -- so what was the question?
3          THE COURT REPORTER: What happened
4 with Don Zuretski.
5     A.  So he went off on Don Zuretski and Don
6 Zuretski told the Star of Hope not to do
7 business with him.
8     Q.  I'm trying to -- if you could hold on
9 for one moment. I was trying to get at
10 examples where Mr. McKenzie insulted you or
11 humiliated you or abused you, and you mentioned
12 the call with Mr. Zuretski.
13          Did you then discuss that with Mr.
14 McKenzie where he mistreated you thereafter or
15 was that leading to something between --
16     A.  No. No. The fact that he did that
17 with Zuretski was the insult to me.
18     Q.  Okay.
19     A.  Because I'm trying to create a business
20 to sell art and when you do that, you kill the
21 business.
22     Q.  You had been working for American Image
23 Art for two years and you say you were trying
24 to develop a sales business, right?
**COPLEY COURT REPORTING, INC.**

**59**

1     A.  We tried -- we tried things and they
2 didn't work and he didn't want to do it.
3     Q.  And --
4     A.  The price was so low. The price was so
5 low that you could -- whatever was going on, he
6 preferred to hold onto the art rather than sell
7 it. The market was low on the Robert Indiana,
8 so you hold it if you don't need the money,
9 right?
10     Q.  And can you -- do any other examples
11 stand out to you from when you first started
12 working with McKenzie in 2019 until you left
13 where he really insulted you or humiliated you?
14     A.  Look, the guy is just insulting. It
15 isn't me. It's everybody. Everybody gets it.
16 And that's just the way it is. You know?
17     Q.  Let me ask, would you -- would McKenzie
18 say offensive things about you in front of the
19 other employees?
20     A.  I -- he says bad things about everybody
21 to everybody about everybody.
22     Q.  So why did you work for him for
23 two years in that kind of environment?
24     A.  For my daughter.
**COPLEY COURT REPORTING, INC.**

**60**

1     Q.  Yeah. Did you resent McKenzie for
2 that? You resented him that for, right; that
3 you had to endure this kind of treatment so you
4 could support yourself and your daughter?
5     A.  Did I resent it, yeah. I resented it.
6     Q.  Okay. So let me show you -- I know we
7 were talking about when you contacted Mr. Nikas
8 via e-mail on August 23rd. I'll mark another
9 e-mail chain.
10          (E-mail chain was marked for
11 identification as Exhibit No. 8.)
12          MS. ZERNER: This will be
13 Exhibit 8.
14          THE COURT REPORTER: Yes,
15 Exhibit 8.
16          MS. ZERNER: Thank you.
17     Q.  Have we lost Oz? Oz, are you still
18 with us?
19     A.  Yes.
20     Q.  Okay. Thanks. Can you see this
21 document on the screen?
22     A.  Yep.
23     Q.  Okay. This is an e-mail chain and I'll
24 scroll through it to the earliest message and
**COPLEY COURT REPORTING, INC.**

**EXHIBIT G - 16**

---

**61**

1 then we'll -- so on this chain we have that
2 first message that we looked at before. It's
3 the August 23rd 2021 e-mail that you sent to
4 Mr. Nikas.
5     A.  Right.
6     Q.  And then it looks like he responds that
7 same morning on August 23rd and says "I will
8 call you shortly", right?
9     A.  Uh-huh.
10     Q.  Did he call you then?
11     A.  Yeah.
12     Q.  And what did you discuss on that first
13 call?
14     A.  About the art that was being hidden.
15     Q.  You were telling him that Mr. McKenzie
16 was hiding art?
17     A.  Yes.
18     Q.  And what do you recall that you said
19 during that conversation?
20     A.  He's hiding art.
21     Q.  Okay. Did you discuss anything else?
22     A.  There were other things -- I'm
23 thinking.
24     Q.  Okay.

COPLEY COURT REPORTING, INC.

---

**62**

1     A.  Oh, we discussed that the Trust.
2     Q.  Did you discuss Greg Allen?
3     A.  Yes.
4     Q.  Do you recall anything else you told
5 Mr. Nikas on that first call?
6     A.  About the Trust, trying to create the
7 Trust in Nevada.
8     Q.  Anything else?
9     A.  That's about it.
10     Q.  And what did Mr. Nikas say to you?
11     A.  Nothing. I said it to him. He took it
12 under advisement, you know.
13     Q.  Did he tell you to do anything at that
14 point?
15     A.  I think he suggested I might contact
16 Mr. McKeogh, the FBI agent.
17     Q.  He suggested that on the first call?
18     A.  Either on the first call or the second
19 call, but pretty much right away.
20     Q.  He suggested talking to the FBI about
21 the movement of art work and hiding art work?
22     A.  Yeah. Yeah. He said, you know, there
23 were agents assigned.
24     Q.  Say that again.

COPLEY COURT REPORTING, INC.

---

**63**

1     A.  I said there were agents assigned. You
2 know, somebody was assigned. It was not
3 someone from out of blue. They already had
4 someone assigned.
5     Q.  You're saying to your understanding
6 there was --
7     A.  It was an ongoing investigation.
8     Q.  You're saying to your understanding
9 there was already FBI agents assigned to
10 investigate McKenzie and American Image Art
11 before you called Mr. Nikas?
12     A.  Absolutely.
13     Q.  And how -- how did you come to that
14 understanding?
15     A.  In conversations I had with the FBI
16 agent.
17     Q.  Well, in that first call or second call
18 did Mr. Nikas tell you that FBI agents were
19 already assigned to investigate McKenzie?
20     A.  Yeah, because he knew -- he knew the
21 FBI agent, so he had to know what was going on,
22 you know.
23     Q.  And Mr. Nikas referred you specifically
24 to Christopher McKeogh?

COPLEY COURT REPORTING, INC.

---

**64**

1     A.  Yes.
2     Q.  And in speaking with the agent
3 thereafter, you understood -- I just want to
4 make sure I'm clear -- were you assuming or
5 were you told that they were already
6 investigating Mr. McKenzie before you reported
7 that there was hiding of art work?
8     A.  Well, the thing that caught my
9 attention about that was that I mentioned to
10 the agent Greg Allen and he told me that he
11 already knew who Greg Allen was.
12     Q.  Okay. Okay.
13     A.  So he kind of gave it away there, you
14 know. But I don't think that's a secret, you
15 know.
16     Q.  And -- all right. So on this e-mail
17 chain after you reached out to Mr. Nikas on the
18 23rd and he responded and called you two days
19 later on August 25th it shows, you e-mailed Mr.
20 Nikas again saying "I received an e-mail this
21 morning from Mr. McKenzie requesting the
22 18-inch solid aluminum HOPE sculpture. What
23 should I do". Right?
24     A.  Right.

COPLEY COURT REPORTING, INC.

65

1    Q.   Why are you telling Mr. Nikas about
2 this HOPE sculpture?
3    A.   Because the people who represent -- um,
4 I was just concerned about the safety of it,
5 you know. That thing was ready to be gone, you
6 know.
7    Q.   What do you mean?
8    A.   I think they were going to move it out,
9 you know.
10    Q.   Who was going to move it out?
11    A.   Oh, McKenzie moved it from the studio
12 to my house.
13    Q.   When did he do that?
14    A.   July or somewhere in there, before the
15 inspection.
16    Q.   And did he say anything to you about
17 that sculpture being placed in your house?
18    A.   Yeah, that he wanted to put it there,
19 You know, because he didn't want -- it could
20 come up in the inspection.
21    Q.   He explicitly said to you he was
22 putting it in your house to hide it from the
23 inspection?
24    A.   Yes.

COPLEY COURT REPORTING, INC.

66

1    Q.   And so you took it into the house?
2    A.   He took it into the house.
3    Q.   But it was put in your house where you
4 were living, right?
5    A.   Yes.
6    Q.   And you didn't object to that?
7    A.   No.
8    Q.   And so you had told Mr. Nikas about
9 that sculpture in your private conversation
10 before this August 25th e-mail?
11    A.   I think so.
12    Q.   And then you say "by the way, they are
13 silk screening hundreds of Four Seasons HOPE
14 prints on canvass, plus stamping smaller HOPE
15 silk screens with Vinalhaven stencils". Right?
16    A.   Yes.
17    Q.   Why did you tell him about that?
18    A.   Because there's a whole thing going on
19 there, you know, outside of the contract, you
20 know; the whole criminal enterprise there, you
21 know.
22    Q.   Outside of what contract?
23    A.   Of what contract is he working under
24 for these HOPE silk screens today. Who's going

COPLEY COURT REPORTING, INC.

EXHIBIT G - 17

67

1 to sign them?
2    Q.   What did you say?
3    A.   Who owns them? Who is going to sign
4 them? Who owns them? They don't -- the Star
5 of Hope; they don't want a piece of it.
6    Q.   The Star of Hope owns a piece of what?
7    A.   Of the sculptures.
8    Q.   What sculptures?
9    A.   The sculptures that was in my house.
10    Q.   Okay. And what about the Four Seasons
11 HOPE prints; you said just now that they were
12 outside of a contract?
13    A.   I don't know. Show me what contract he
14 has that -- but they ended his contract.
15    Q.   Who is "they"?
16    A.   The Estate.
17    Q.   But Mr. Nikas, you knew, works for and
18 worked for at this point, Morgan. He doesn't
19 represent the Estate.
20    A.   Right. Well, I don't know about that,
21 you know. I mean, you want to talk to -- it's
22 going to be hard enough to talk to Luke. I
23 mean, they ironed all that out.
24    Q.   So I'm just trying to understand why

COPLEY COURT REPORTING, INC.

68

1 you thought it was significant to tell Mr.
2 Nikas that they are silk screening hundreds of
3 Four Seasons HOPE prints on canvass at American
4 Image Art. Why did you report that and say
5 "please advise"?
6    A.   Because I knew that that would be
7 helpful to his case.
8    Q.   And why did you think it would be
9 helpful?
10    A.   Well, I guess what the thing is that if
11 the Court finds that he willfully um, disobeyed
12 her Order, then they would make a motion to
13 have the case dismissed as a sanction. And
14 that's. That's it.
15    Q.   And you're talking about the -- a Court
16 Order in the Southern District of New York
17 case, right?
18    A.   Yes.
19    Q.   So it looks like you sent this e-mail
20 on August 25th in the morning, 8:55 a.m. And
21 then there's an e-mail back from Mr. Nikas on
22 the next day, August 26th, that says "Oz, I
23 will be getting back to you very soon with the
24 next steps I believe are appropriate to ensure

COPLEY COURT REPORTING, INC.

Morgan Art vs. McKenzie — Vol. III, Osvaldo Gonzalez

Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 18 of 81

January 7, 2022

## 69

1   this is handled appropriately, consistent with
2   the ethical rules and with everyone's interests
3   protected. Thanks very much for your
4   patience."
5       Do you recall did you speak to Mr.
6   Nikas in between your e-mail and his e-mail?
7       A.   I don't remember that.
8       Q.   And then scrolling up through this
9   chain, again on August 26th later on that day,
10  you sent this image. What is this a picture of
11  here on this -- this has the bates QE 12.
12      A.   What this is is, as you scroll up, this
13  is a background for a HOPE Four Seasons. What
14  I want you to do is scroll up a little more.
15  Up. Up. The way you were going, this way.
16      I want -- I want to see the bottom.
17  What I'm showing here is how many there are;
18  how many of those silk screens are there.
19      Q.   Yes.
20      A.   There's hundreds, you know. Tim would
21  sign them.
22      Q.   Had you seen Four Seasons HOPE prints
23  produced at American Image prior to
24  August 2021?

**COPLEY COURT REPORTING, INC.**

## EXHIBIT G - 18   71

1       A.   I guess there would be, yeah. It
2   depends when you sign them. How are you going
3   to sign them? He's dead so you're going to use
4   stencils, right. That's what I'm saying; they
5   would be stencils.
6       The stencil has to correspond to the
7   date of the contract, you know. You can't just
8   be changing the stencils from year to year
9   depending on what you're calling it that day,
10  you know.
11      Q.   So in your opinion, the problem wasn't
12  that HOPE prints were being made; the problem
13  was the stencil and date being used?
14      A.   Yeah, because then Tim, who is the
15  printer, refused to stencil them because he
16  didn't want to create the concern that they
17  were forgeries.
18      Q.   Did Mr. Ginexi say that to you?
19      A.   Yes. Yes.
20      Q.   When?
21      A.   A number of times. He was always
22  working on them. He told me like as soon as he
23  possibly could, different colors and this and
24  that. And you know, he said at some point we

**COPLEY COURT REPORTING, INC.**

## 70

1       A.   Yeah. Yeah, that's all they were
2   doing. They did that for a very long time.
3   They're still doing it.
4       Q.   And you didn't bring this up as a
5   problem before this date, right?
6       A.   Well, there is no problem with it, you
7   know, technically, you know. It's not signed.
8   It's nothing, but --
9       Q.   So there wasn't a problem with printing
10  these HOPE prints?
11      A.   No. No.
12      Q.   But you were letting Mr. Nikas know so
13  he could use that information to his advantage?
14      A.   Well, I was just trying to alleviate
15  the problem. My motivation wasn't to -- it was
16  -- I wanted to help Mr. Nikas with his case,
17  you know. I wanted to, you know, let the
18  parties know what was going on. I tried to
19  contact both of them.
20      Q.   I'm just confused. Now you're saying
21  there was a problem when I thought you just
22  said there wasn't a problem. So what is the --
23  was there a problem with these Four Seasons
24  HOPEs being printed to your view?

**COPLEY COURT REPORTING, INC.**

## 72

1   were -- they were going to stencil them, you
2   know, and then he got Annette to do the
3   stenciling of the small ones, but they were
4   cutting the stencils from the big ones too.
5       Q.   And you said that Mr. Tim Ginexi
6   expressed to you a number of times that he had
7   concerns that forgeries were being made at
8   American Image Art, right?
9       A.   Who?
10      Q.   I'm just trying to confirm that you're
11  testifying that Mr. Ginexi said on a number of
12  occasions that he had concerns that forgeries
13  of Indiana art work were being made at American
14  Image Art?
15      A.   Who is Mr. Ginexi?
16      Q.   Tim. Tim Ginexi.
17      A.   Oh, Ginexi. Yes. Yes.
18      Q.   Okay. Did he express those concerns to
19  you in 2019?
20      A.   Yes, he did. He was very -- very
21  careful about that. He was very careful. He
22  was concerned.
23      Q.   And he expressed those concerns to you
24  repeatedly in 2020?

**COPLEY COURT REPORTING, INC.**

Morgan Art vs. McKenzie      Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 19 of 81     January 7, 2022

Vol. III Osvaldo Gonzalez

## 73

1    A.   Yeah.  I mean, it wasn't like an every

2  day thing, but you know, a couple times.

3  Because Mike was trying to get Annette to stamp

4  the small one and she didn't do it for a year,

5  you know.

6         Finally, he corralled her there and he

7  got her to start doing it, you know.  Because

8  he said he was going to start doing it.  He saw

9  he could do it and he could shoot them all out,

10  you know.

11    Q.   So it's your testimony that Mr. Ginexi

12  on multiple occasions expressed to you that he

13  thought forgeries of Indiana art work were

14  being made at American Image Art since you

15  started working here in 2019?

16    A.   No.  No.  That isn't what I'm saying.

17  That's not what I'm saying.  I'll tell you what

18  I'm saying.

19    Q.   Please do.

20    A.   I'm saying that Mr. Ginexi expressed to

21  me concern about putting the stencil stamps on

22  the works of Robert Indiana he was working on.

23         He expressed to me on several

24  occasions or time periods.

**COPLEY COURT REPORTING, INC.**

## 74

1         Every time -- somehow that happened to

2  happen.  He would tell Mike, you know, I'm not

3  going to do it.  You know, so try to figure

4  that out.

5    Q.   This happened on occasions since you

6  started working there in 2019 until you

7  stopped; is what you're saying?

8    A.   Yeah.

9    Q.   I'm just trying to confirm that you're

10  saying this occurred prior to these events in

11  the summer of 2021.

12    A.   Oh, yeah.  Yeah.  You could see --

13  that's the whole thing.  You see, the whole

14  thing with the art the signing, you know.

15    Q.   Okay.  Then you brought it to Mr. Nikas

16  as we saw here in the e-mails in August, right?

17    A.   Right.

18    Q.   Did you ever send text messages to

19  either Attorney Nikas or any attorney at Quinn

20  Emanuel or Venable?

21    A.   Text messages?

22    Q.   Yes.

23    A.   I don't know.  I know that Ed Boyle

24  gave me his phone number and told me to text

**COPLEY COURT REPORTING, INC.**

## EXHIBIT G - 19   75

1  him before we met.

2    Q.   Would you be able to check your cell

3  phone when we go on a break?

4    A.   I'm sure I didn't text anybody at those

5  firms.

6    Q.   Okay.  You say you're sure that you --

7    A.   I don't -- I didn't even speak to him,

8  never mind text him.

9    Q.   Are you talking about Ed Boyle right

10  now?

11    A.   And everybody else.  I didn't text any

12  of them.

13    Q.   And Mr. -- Oz, you have the phone

14  turned upward towards the -- you're still there

15  with us, right?

16    A.   Okay.  There.

17    Q.   I'm going to show you another document.

18  All right?

19    A.   Okay.

20    Q.   Do you see this e-mail?

21    A.   Yeah.

22         MS. ZERNER:  We're marking this as

23  Exhibit 9.

24         (E-mail was marked for

**COPLEY COURT REPORTING, INC.**

## 76

1  identification as Exhibit No. 9.)

2         THE COURT REPORTER:  No. 9.

3         MS. ZERNER:  Thank you.

4    Q.   Here's an e-mail on August 26, 2021 to

5  you from Mr. Nikas, right?  Do you recall --

6  you can read through it.  Do you recall

7  receiving this?

8    A.   Yes.

9    Q.   Now, it appears that this is later in

10  the day after you were -- after you sent the

11  images of the Four Seasons HOPE that we were

12  just talking about.

13         And Mr. Nikas says "I am evaluating the

14  appropriate way to move forward as I indicated

15  earlier, but understand based on what you told

16  me, that this is time-sensitive given your

17  concerns about safety.  Can I please have you

18  speak with the FBI in NYC about McKenzie to see

19  if they can provide the protection you and your

20  family may need right away.  I can put you in

21  touch with an agent that I have dealt with many

22  times before and, I believe, would be willing

23  to speak with you promptly."

24         Do you see that?

**COPLEY COURT REPORTING, INC.**

77

1   A.   Yes.

2   Q.   Does -- was it after this e-mail that

3   you spoke with the agent that you've talked

4   about already?

5   A.   Yes.

6   Q.   And when you spoke to the agent, you

7   said you spoke to the agent about the sculpture

8   in the house you were living in and the

9   movement of art work, right?

10   A.   Right.

11   Q.   And you talked about Greg Allen and the

12   Trust that you have been referring to right?

13   A.   Right.  He seemed to know it well.

14   Q.   And did the FBI offer to protect you as

15   a witness?

16   A.   Well, the FBI told me that if he should

17   try to shoot me or I got wounded, that I should

18   call 911.  I said thank you.  That was the

19   extent of the help that they offered me, so --

20   Q.   Okay.  And you were going to talk to

21   the FBI about this concern about McKenzie

22   hiding art work or forging art work, right?

23   You weren't talking to the FBI solely for

24   personal protection, right?

**COPLEY COURT REPORTING, INC.**

78

1   A.   No.  No.  No.

2   Q.   No, you weren't talking to them -- just

3   trying to clarify.  I guess it was a compound

4   question.

5        You didn't go to the FBI to talk

6   specifically about safety and protection,

7   right?

8   A.   No.

9   Q.   You went to them to talk about McKenzie

10   allegedly hiding art work or wrongfully selling

11   art work or forging art work, right?

12   A.   Whatever, yes.

13   Q.   As was -- and Mr. Nikas set you up with

14   the FBI agent to discuss that?

15   A.   Yes.

16   Q.   And again, I am just wondering if in

17   the time since I first asked you, if you recall

18   where you met with the FBI agent on the first

19   occasion.

20   A.   I can't remember.  Unless we had a long

21   telephone conversation, you know, I don't

22   remember.

23   Q.   Okay.  And you said -- did you meet

24   with the agent a second time in person?

**COPLEY COURT REPORTING, INC.**

79

1   A.   I know I spoke to him but I don't think

2   so, no.

3   Q.   Okay.  So you might have only met in

4   person once?

5   A.   Yeah.

6   Q.   I didn't hear you.

7   A.   Yes.

8   Q.   And then you had phone conversations

9   with the agent as well?

10   A.   I had conversations with the agent,

11   yeah.

12   Q.   And can you tell me how many

13   conversations -- how many times you spoke with

14   the agent?

15   A.   Well, I spoke to him -- the last time I

16   spoke to him was that McKenzie called the

17   police on me and said that I was taking, you

18   know, photographs in violating the tenants, you

19   know, privacy and etc...etc...etc...

20        You know, what I was doing really was

21   taking pictures.  I was taking pictures, but I

22   was taking those pictures to send them to Mr.

23   McKeogh down at the FBI who asked me for them.

24   Q.   Okay.  So while you were still living

**COPLEY COURT REPORTING, INC.**

80

1   at the Katonah property, you started going

2   around and taking photographs of -- what were

3   you taking photographs of for the FBI agent?

4   A.   Well, at first I thought they were

5   moving more art, you know.  And then -- then

6   the next thing they did was that they sealed up

7   all the windows in the studio so you couldn't

8   see in.

9   Q.   Who sealed up the windows?

10   A.   McKenzie.

11   Q.   Did you see him doing that?

12   A.   I saw them sealed up.

13   Q.   And was that before or after you were

14   going around taking pictures and they called

15   the police?

16   A.   That was after.

17   Q.   Okay.  So what did the FBI agent ask

18   you to take photographs of at the Katonah

19   property?

20   A.   Well, he wanted -- first he wanted the

21   photographs that I had already sent them, you

22   know.  I had a whole group of photographs that

23   I had.  You know, I sent those and maybe a

24   couple other things and the sculpture.  That's

**COPLEY COURT REPORTING, INC.**

**81**

1  what I sent.

2    Q.  So we saw you were taking pictures of

3  the Four Seasons HOPE prints, right?

4    A.  Right.

5    Q.  And you took pictures of art work that

6  was put in the back of Annette Vassecchio's

7  car?

8    A.  Yes.

9    Q.  And you took pictures of -- is it a bus

10  -- where art work was put in the back of a bus

11  to move to the other storage facility?

12    A.  Yes.

13    Q.  And you took pictures of other Indiana

14  art work at American Image Art?

15    A.  Yes.

16    Q.  And you produced all those to the FBI?

17    A.  Yes.

18    Q.  Did you e-mail them to the FBI?

19    A.  Let me see what I did.  They had some

20  crazy thing with them that you can't send -- I

21  think I e-mailed them.  They don't use Drop

22  Box, you know.

23    Q.  Right.  They had a secure portal that

24  you had to use?

COPLEY COURT REPORTING, INC.

**82**

1    A.  Yeah.  Yeah.

2    Q.  Okay.  Did you produce to the FBI all

3  the same photos that you gave to Quinn Emanuel?

4    A.  I'm sure, yeah.

5    Q.  All right.  And then so you provided

6  the photos that you had already taken on your

7  own.  Then we were talking about that you were

8  walking around the property to take more

9  photos, right?

10    A.  Right.

11    Q.  Did the FBI agent ask you to take more

12  photos or what were you doing?

13    A.  He didn't specifically say go take more

14  photographs, but from his reaction to the

15  original photographs that I offered to him, he

16  seemed enthusiastic about getting photographs,

17  you know, so I went after that.

18    Q.  Okay.  And so when you were walking

19  around taking photographs -- when you were

20  walking around the property on the day -- I'm

21  talking about the day that the police were

22  called -- what were you doing?

23    A.  Tim and Michael were at his house where

24  the storage stuff is and they were -- they were

COPLEY COURT REPORTING, INC.

**83**

1  putting stuff into the bus, art into the bus.

2  And I was trying to take a picture of that.

3    Q.  Okay.  And were you standing next to

4  another tenants's house?

5    A.  It's a common driveway.  It's a common

6  driveway and I was in the driveway.

7    Q.  You were in the driveway near another

8  tenant's house?

9    A.  Yeah, it's also my driveway.  All that

10  is, you know, it's a common driveway.

11    Q.  Okay.  But you could see the neighbor's

12  house, right?

13    A.  Well, of course.

14    Q.  And did you get any pictures that day?

15    A.  No, I didn't.  They didn't come out.

16    Q.  You said McKenzie called the police and

17  claimed that you were taking photos and

18  invading privacy, etc...etc..., right?

19    A.  And I had the sculpture and he was

20  missing his EZ Pass and some other stuff from

21  the office; crazy stuff, you know, crazy.

22    Q.  Did you have his EZ Pass?

23      (Laughter.)

24    A.  No.  No.  That's ridiculous.

COPLEY COURT REPORTING, INC.

**84**

1    Q.  Okay.  And when you say that he said

2  that you had a sculpture, did you understand he

3  was talking about the 18 inch HOPE sculpture

4  that you had in the house where you were

5  residing?

6    A.  Yes -- yes, I did.

7    Q.  Were you refusing to let him have that

8  back?

9    A.  I said I was going to wait and see what

10  they told me to do, you know.

11    Q.  You were going to wait and see who told

12  you what to do?

13    A.  The FBI.

14    Q.  Did you tell McKenzie you were waiting

15  for instructions specifically from the FBI?

16    A.  Yes.  Yes.

17    Q.  So you told him you were refusing to

18  give him the sculpture because you were waiting

19  the FBI instructions?

20    A.  Yes.

21    Q.  We lost your video.

22      MS. ZERNER:  I'm going to continue

23  this way since we seem to be hearing him.  Let

24  me know if you cannot --

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 22**

---

**85**

1    **A.** Okay.

2    **Q.** I just want to be clear. Mr. Gonzalez,

3    can you hear me?

4    **A.** Yep.

5    **Q.** Mr. McKenzie had asked and wanted to

6    retrieve the HOPE sculpture that you had in the

7    house where you were staying on the Katonah

8    property and you would not return it to him at

9    that time, right?

10   **A.** I don't remember having -- engaging in

11   any conversation with him requesting it.

12   **Q.** Well, earlier we looked at an e-mail

13   where you said "I received an e-mail earlier

14   this morning from Mr. McKenzie requesting the

15   18 inch aluminum HOPE sculpture. What should I

16   do."

17       Remember that?

18   **A.** Oh, yes. Yes. I remember that.

19   **Q.** So he had requested it and you wouldn't

20   let him come get it, right?

21   **A.** Well, I didn't answer him. I don't

22   think -- I didn't answer -- I didn't say yes or

23   no, you know.

24   **Q.** Okay. Then after that, you told him

COPLEY COURT REPORTING, INC.

---

**86**

1    that you were going to wait for instructions

2    from the FBI before providing that sculpture to

3    him, right?

4    **A.** Yeah, I was left with the impression

5    that they were going to do some kind of

6    movement.

7    **Q.** What gave you that impression?

8    **A.** But nothing materialized. Just the

9    impression from our conversation.

10   **Q.** You thought the FBI was going to take

11   action against McKenzie?

12   **A.** Yeah.

13   **Q.** And what's the basis for that

14   impression? Why did you have that impression?

15   **A.** Um, just got that impression.

16   Intuitive, gut reaction.

17   **Q.** Well, what did the FBI agent say to

18   you?

19   **A.** About?

20   **Q.** About McKenzie.

21   **A.** About what?

22   **Q.** In response to what you told him about

23   McKenzie and the art work.

24   **A.** He said he would get back to me. He

COPLEY COURT REPORTING, INC.

---

**87**

1    would get back to me, you know.

2    **Q.** And you can't say -- what about what he

3    said or how he acted indicated to you that they

4    were going to move on McKenzie?

5    **A.** I don't know. Just an impression that

6    I got. I don't know. Maybe I'm wrong. I

7    don't know. Maybe didn't have any intention at

8    all.

9        They obviously didn't want to see that

10   they were doing something like radical or with

11   the art -- with that art, you know, prior to,

12   you know, the end of their investigations. I

13   don't know.

14   **Q.** Is it your understanding --

15   **A.** Could be investigating right now.

16   **Q.** Is it your understanding the

17   investigation is still open?

18   **A.** Yep, I think so. Yep.

19       THE COURT REPORTER: Bridget, at

20   some point can we just take two seconds. I do

21   need to run to the ladies room.

22       MS. ZERNER: Sure. Let's do it

23   know.

24       (A brief recess was taken at 11:27

COPLEY COURT REPORTING, INC.

---

**88**

1    a.m.)

2        (Resumed at 12:04 p.m.)

3    CONTINUED DIRECT EXAMINATION

4    BY MS. ZERNER:

5    **Q.** Mr. Gonzalez, I'm sharing the screen so

6    you can see the next document. This is bates

7    stamp QE 1, and we're marking it as Exhibit 10.

8        (E-mail was marked for

9    identification as Exhibit No. 10.)

10   **Q.** This appears to be an e-mail from you

11   to Luke Nikas on September 17, 2021. Do you

12   see that?

13   **A.** Yes.

14   **Q.** And it says "Luke, McKenzie had the

15   police here today". Do you see that?

16   **A.** Yes.

17   **Q.** Thank you. You recall sending this to

18   Mr. Nikas?

19   **A.** Yes.

20   **Q.** And it says that "McKenzie had the

21   police here today wanting to come in and

22   videotape the sculpture. I didn't permit it".

23   Is that true?

24   **A.** Yeah.

COPLEY COURT REPORTING, INC.

Vol. III Osvaldo Gonzalez

**89**

1 Q. Okay. It says "cops are threatening me
2 with police action". Is that true?
3 A. Uh-huh, yes.
4 Q. What did they say to you?
5 A. Oh, the cops came -- the cops came in
6 and --
7 Q. I can't hear what you're saying -- I
8 have to stop you.
9     (A recess was taken to tend to
10 technical issues.)
11 Q. Ready Oz? If you want to tell us what
12 the cops said that day; please tell us what you
13 were talking about when you said the cops were
14 threatening you with police action.
15 A. Are you speaking to me?
16 Q. Can you hear me?
17 A. I can't hear you.
18     MS. ZERNER: Everyone else can hear
19 me, right?
20     THE COURT REPORTER: Yes.
21 Q. Once again, if you can just tell us
22 what the cops said to you that day on
23 September 17th 2021.
24 A. They said to me that -- that McKenzie

COPLEY COURT REPORTING, INC.

**90**

1 had lodged all these complaints: this, that and
2 the other thing, and I explained to him that,
3 you know, I was a witness against him. He was
4 making this stuff up. And he said don't
5 communicate with them at all and I didn't.
6 That was it.
7 Q. This says you were saying to Mr. Nikas
8 "I could use some help". Did you get any help?
9 A. No.
10 Q. And did Nikas tell you to call the FBI
11 about this?
12 A. No, but I would -- I think I -- I think
13 I mentioned it to him. I think I mentioned it
14 to McKeogh.
15 Q. So you did actually call the FBI about
16 this incident, right?
17 A. Yeah.
18 Q. And did they advise you to do anything?
19 A. No.
20 Q. And did you say that was the last time
21 that you spoke with the FBI agent about
22 McKenzie?
23 A. I think so.
24 Q. That would have been around

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 23** 91

1 September 17th?
2 A. Yeah. Yep.
3 Q. Okay. You don't recall any
4 conversations with the FBI about Mike McKenzie
5 or AIA since that time?
6 A. No.
7 Q. Other than the photographs you already
8 mentioned that you produced to the FBI, did you
9 produce to the FBI any other documents related
10 at all to Michael McKenzie or American Image
11 Art?
12 A. No.
13 Q. When you did speak with the FBI, did
14 you discuss the Salama-Caros at all?
15 A. No.
16 Q. Did you discuss Morgan Art Foundation?
17 A. No.
18     MS. ZERNER: And this next document
19 will be Exhibit 11.
20     (E-mail was marked for
21 identification as Exhibit No. 11.)
22 Q. This is another e-mail. Just to
23 confirm, do you recognize this e-mail as one
24 that you sent to Luke Nikas and Ed Boyle?

COPLEY COURT REPORTING, INC.

**92**

1 A. Uh-huh.
2 Q. Just for the record, that's a yes?
3 A. Yes.
4 Q. Why do you say here, "I don't think he
5 had a clue that he was about to nuke the
6 brand".
7 A. Well, when the -- when the artist is
8 outed as a pedophile, you know, that's not
9 good. And that's what they -- Michael talked
10 about that all the time.
11 Q. All right.
12 A. And that's it.
13 Q. Now -- so we looked at the e-mails that
14 you first contacted attorneys for the Estate
15 and attorneys for Morgan around August 23rd of
16 2021. You ultimately arranged and met with
17 them on August 30th, right?
18 A. Yeah.
19 Q. Let me show you -- I want to go back.
20 You recall the last time we were here today for
21 your deposition, we marked this document as
22 Exhibit 3.
23     Do you recall looking at this e-mail
24 chain that involved John Markham and the

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 24**

**93**

1 various attorneys involved in the litigation?
2    A.   Yeah. Yeah.
3    Q.   So at the top of the e-mail on August
4 27th it says Ed Boyle is saying "Oz, are you
5 available to speak this weekend". Do you see
6 that.
7    A.   Yes.
8    Q.   Did you have any conversations with Ed
9 Boyle or anyone at Venable prior to this?
10    A.   No.
11    Q.   And just to clarify, I know it's been
12 several years of litigation, so I mean between
13 August 17th 2021 and August 27th, did you have
14 any conversations with Ed Boyle or anyone at
15 Venable?
16    A.   No.
17    Q.   Now, when he says "are you available to
18 speak this weekend", I understand that you then
19 met in person with Luke Nikas and Ed Boyle the
20 following Monday, August 30th, correct?
21    A.   Correct.
22    Q.   Did you speak with any of them between
23 Friday August 27th and Monday when you got
24 together other than as to discussing the

COPLEY COURT REPORTING, INC.

**94**

1 logistics of how you were going to meet?
2    A.   No.
3    Q.   Okay. And you met at the Sonesta in
4 White Plains, right?
5    A.   Right.
6    Q.   Was anyone else there besides Ed Boyle
7 and Luke Nikas?
8    A.   Yes.
9    Q.   Who else was there?
10    A.   John.
11    Q.   Oh, John Vasquez?
12    A.   Yes.
13    Q.   Anyone else?
14    A.   The stenographers, assistants, other
15 people.
16    Q.   How many other people other than the
17 three attorneys?
18    A.   Three.
19    Q.   Do you know which firm they were from?
20    A.   I thought they were from um, Quinn
21 Emanuel.
22    Q.   How long did you meet with all of them?
23    A.   An hour and a half.
24    Q.   And during that time did one of them

COPLEY COURT REPORTING, INC.

**95**

1 draft a declaration for you on a computer?
2    A.   He drafted a -- the document, yes.
3    Q.   A declaration that you ultimately
4 signed that day?
5    A.   Yes.
6    Q.   Okay. So they were drafting it while
7 you all discussed the content of it at that
8 meeting?
9    A.   We worked on it together. It went
10 along.
11    Q.   What was the last thing you said?
12    A.   I said it went along.
13    Q.   Did you make a draft of any declaration
14 prior to meeting on August 30th?
15    A.   No.
16    Q.   And do you recall who specifically was
17 typing up your declaration?
18    A.   I think Mr. Nikas.
19    Q.   And can you just describe to me how you
20 all collaborated that day?
21    A.   Well, we talked about the different
22 issues that they were interested in. We
23 discussed the art, the Trust, you know, all
24 that stuff with the Trust and the sale. We

COPLEY COURT REPORTING, INC.

**96**

1 discussed some of the art that was being
2 stenciled, the HOPE sculptures that were being
3 stenciled, I think, with a 2015 stamp.
4      MS. ZERNER: Can you hold for me
5 one moment. My car has to be removed for snow.
6 I'm just going to give someone else my keys.
7 Hold on.
8      (Pause.)
9      MS. ZERNER: Back on. Sorry about
10 the interruption.
11    Q.   I think the last thing I had -- you
12 said something about a 2015 stamp.
13    A.   The stencil being used -- stenciling
14 the 10 and a half inch HOPE screen instead of
15 2015.
16    Q.   Okay.
17    A.   I don't know if that's legit or not,
18 you know. Tim didn't think so. He's a master
19 printer.
20    Q.   It was a 10 and a half inch silk screen
21 of what?
22    A.   HOPE.
23    Q.   So the declaration was drafted that day
24 and you signed it that day while you were all

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 25**

97

1  together?
2  A.  Right there, yep.
3  Q.  So there were no e-mails back and forth
4  about drafting the declaration?
5  A.  No.
6  Q.  And did you request anything in
7  exchange for assisting with that declaration?
8  A.  I asked them to see if they could help
9  my daughter.  My daughter was in very bad
10 shape.  I was concerned about the safety issue,
11 and that's the only thing I asked for; to help
12 my daughter.
13     As you know, you know, things didn't
14 work.  She didn't -- you know, we didn't get
15 any help.  She disintegrated and tried to
16 commit suicide.  She had a very serious
17 attempt.  That was the help that I got.
18 Q.  So there was -- neither Quinn Emanuel
19 or Venable offered any -- proposed to help in
20 any way with what you requested?
21 A.  Nothing, nothing.  No.
22 Q.  Have you received any kind of payment
23 from anyone on behalf of the Morgan parties?
24 A.  No.  No.

COPLEY COURT REPORTING, INC.

98

1  Q.  From anyone on behalf of the Estate?
2  A.  No.
3  Q.  From anyone on behalf of the Star of
4  Hope?
5  A.  No, nobody.
6  Q.  Was there any proposal made to work for
7  any of them or to sell art work?
8  A.  No.  No.
9  Q.  Did you offer to sell any art work to
10 them?
11 A.  I don't think so.
12 Q.  At this point you were still living at
13 the house on the Katonah property of Michael
14 McKenzie, right?
15 A.  Who me?
16 Q.  Right, on August 30th.
17 A.  Right.  Yeah, on August 30th.  I moved
18 out on October the 1st.
19 Q.  And why did you assert the Fifth
20 Amendment when I previously asked you about the
21 same subject matter; your communications with
22 Quinn Emanuel and Venable?
23 A.  Because I didn't have any idea what the
24 investigation was going on was about.

COPLEY COURT REPORTING, INC.

99

1  Q.  The FBI investigation?
2  A.  Yeah.
3  Q.  The one that --
4  A.  I was serious about that.
5  Q.  Well --
6  A.  You know, you knew too much about Greg
7  Allen.  I figured I didn't know if Greg Allen
8  was the target or the confidential informant,
9  you know.  Didn't know too much about him.
10 Q.  Well, why is that a concern for
11 yourself and you providing testimony?
12 A.  Why -- sorry?  Can you ask me the
13 question again?
14 Q.  Yeah, my question had been why were you
15 asserting the Fifth Amendment when I tried to
16 ask you questions about your communications
17 with Venable and Quinn Emanuel, and you said
18 that it was because of this FBI investigation
19 and they knew so much about Greg Allen.
20     And I asked why was that a concern for
21 you and you providing testimony about your
22 communications with these law firms at the last
23 deposition.
24 A.  Because they were moving a lot of stuff

COPLEY COURT REPORTING, INC.

100

1  in September -- August and September.  A lot of
2  stuff was going out the door to a billionaire
3  buyer that they had, you know.  And they had
4  this guy, we're talking -- he took out like
5  160 pieces of HOPE, you know.
6     And -- and -- and it was just this
7  whole -- you know, I wasn't even allowed to be
8  near them when they talked.
9  Q.  And when you say they were moving a lot
10 of stuff to him, who are you talking about?
11 A.  Michael McKenzie handing stuff over to
12 Greg Allen.
13 Q.  And you had already openly talked about
14 to the FBI about what you knew about all that,
15 right?
16 A.  I -- actually, they told me.
17 Q.  Who told you?
18 A.  Well, I think by letting me know that
19 they knew who Greg Allen was, there was nothing
20 I had to say to him like --
21 Q.  As of October 1st when we were all
22 together for your deposition last time, you had
23 already openly discussed everything you knew
24 about the movement of art work with the FBI,

COPLEY COURT REPORTING, INC.

101

1  right?

2     A.  Yeah.

3     Q.  You told them about what you knew about

4  Greg Allen, right?

5     A.  I mentioned it, yep, and they told me

6  they knew about him already.

7     Q.  I'm still trying to understand why you

8  thought you should remain silent when I asked

9  you questions about conversations.

10     A.  Because I didn't know what the whole

11  scope of the whole investigation was. I didn't

12  know what it was. I'm sitting here working. I

13  talk to these people. I'm around. You know, I

14  didn't know what they were looking for. I

15  didn't know what was going on, you know.

16     Q.  Why were you concerned that you could

17  be a target?

18     A.  Because I didn't know what the

19  investigation was. It could be -- maybe I was

20  just being overly caution. I don't know. I

21  was a criminal layer for 40 years. You know.

22     Q.  And you thought you were at risk?

23     A.  I didn't know if I was at risk. I

24  didn't know. I wanted to find out and I found

**COPLEY COURT REPORTING, INC.**

102

1  out what I wanted to find out. Then I wrote

2  you a letter and said that I was willing to

3  proceed, but you didn't get back to me about

4  it.

5     Q.  So you thought you could be at risk of

6  being a target of the FBI investigation?

7     A.  I told you I didn't know. I didn't

8  know. I mean, I could sit there and take ten

9  guesses each way.

10     Q.  So when we were last together on

11  October 1st, I believe you said you did not

12  reach out to any auction houses or galleries

13  about McKenzie since August 2021, right?

14     A.  To say negative things about him?

15     Q.  To say anything about him.

16     A.  I -- no. No, I didn't.

17     Q.  Have you contacted any auction houses

18  or galleries since that time, since

19  October 1st?

20     A.  No. No.

21     Q.  Have you spoken to any reporters about

22  McKenzie or American Image Art since

23  August 17th?

24     A.  No. One guy wrote me that he wanted to

**COPLEY COURT REPORTING, INC.**

103

1  talk to me. He's writing a book. And I didn't

2  even answer him.

3     Q.  Who was that?

4     A.  I don't remember the guy's name. He

5  was a reporter.

6     Q.  Okay. And other than the FBI, have you

7  talked to any other law enforcement agent about

8  Michael McKenzie or American Image Art?

9     A.  No.

10     Q.  Have you spoken to any other

11  governmental agent about Michael McKenzie or

12  American Image Art?

13     A.  No.

14     Q.  And you may have answered this already.

15  Have you spoken to any state or federal

16  prosecutor about American Image Art or Michael

17  McKenzie?

18     A.  No.

19     Q.  Now, I'm going to show you the

20  declaration that we were talking about that you

21  signed in White Plains on August 30th. We had

22  previously marked this as Exhibit 1 for your

23  deposition. Do you recognize this?

24     A.  Yes, I do.

**COPLEY COURT REPORTING, INC.**

104

1     Q.  We'll just confirm; is this your

2  initial here on the bottom right?

3     A.  Yes.

4     Q.  We'll go through each page. You see an

5  initial and that's your signature?

6     A.  Yes.

7     Q.  Now, this indicates a date of 4 --

8  well, 4:00 p.m., right, August 31, 4:00 p.m.,

9  right?

10     A.  Uh-huh.

11     Q.  I believe earlier you said you were

12  only there for an hour and a half.

13     A.  Yep.

14     Q.  Okay. So this was printed out at the

15  hotel for you to sign that day?

16     A.  Yes.

17     Q.  Okay. And you signed this under

18  penalty of perjury?

19     A.  I don't remember that.

20     Q.  Well, do you see this first line that

21  says "I, Osvaldo Gonzales, do hereby declare

22  under penalty of perjury that the following is

23  true and correct"?

24     A.  Yes. Yes.

**COPLEY COURT REPORTING, INC.**

**105**

1    Q.   If we go down to the end, it says "I
2    declare under penalty of perjury" and you
3    signed?

4    A.   Yes.  Yes.

5    Q.   Now, you're talking here about "in and
6    around November of 2019 McKenzie asked me to
7    join him at a mediation that was being held on
8    November 25th and 26th in Portland, Maine with
9    the parties to the Southern District of New
10   York action as well as the Star of Hope and the
11   Maine Attorney's General's Office.  I travelled
12   to and from the mediation with McKenzie by
13   car."

14        Right?

15   A.   Yes.

16   Q.   What is your understanding of how that
17   mediation came about?

18   A.   That mediation came about because I
19   believe that Morgan had persuaded the Estate to
20   mediate.  And in that, was going to be engaged,
21   they asked Michael if he wanted to -- if he
22   wanted to join in the mediation that he could.
23   And he decided to do it.

24   Q.   And he asked you to go along with him?

COPLEY COURT REPORTING, INC.

**106**

1    A.   Yes, I didn't want to go.  But I had
2    told him no, I didn't want to go.  I didn't
3    want to be in the car with him for three and a
4    half hours with him.  Are you kidding?  Oh my
5    God.

6    Q.   Why did you decide to go?

7    A.   Because he insisted.  He insisted and
8    he told me that he talked to Mr. McLaughlin,
9    the Chief Mediator, and he said that anybody
10   could accompany you to that; they don't have to
11   be -- it was just anyone, a friend or anybody
12   you want if you think they could help you with
13   it is welcome at the arbitration.  So I ended
14   up going.

15   Q.   And at this time Mr. McKenzie was
16   represented by John Simone in the --

17   A.   Yes, John Simone.

18   Q.   And why didn't McKenzie take an
19   attorney?

20   A.   Because he didn't want to pay.

21   Q.   And when you got there, who did you see
22   there in attendance?

23   A.   Everybody.  Lot of people were there,
24   You know.

COPLEY COURT REPORTING, INC.

**107**

1    Q.   Well, you saw attorneys from the Maine
2    Attorney General's Office?

3    A.   Yes.

4    Q.   Did you recognize Linda Conte?  Did you
5    meet her?

6    A.   You know, I didn't personally meet her
7    at all, no.  I know that they were in the room,
8    one of the rooms, her and Boyle, you know.

9    Q.   Okay.

10   A.   But I never engaged them in any type of
11   conversation.

12   Q.   And you were -- was it your
13   understanding that Star of Hope representatives
14   were there?

15   A.   Oh, they were definitely there.  They
16   were definitely there.  They had two lawyers.
17   They had two lawyers there.

18   Q.   Did you speak to those lawyers?

19   A.   I think I did speak -- no.  No.  I
20   didn't speak to those lawyers.  I didn't speak
21   to them.

22   Q.   Do you know if Larry Storrs was there?

23   A.   Larry Storrs was there.

24   Q.   He was there?

COPLEY COURT REPORTING, INC.

**108**

1    A.   I'm pretty sure Larry Storrs was there.

2    Q.   Did you speak with him at all?

3    A.   No.

4    Q.   And obviously, attorneys for the Estate
5    and Mr. Brannan were there?

6    A.   Yes.

7    Q.   And attorneys for Morgan?

8    A.   Yes.  And all those other people were
9    there.  There were a lot of people there for
10   Morgan; the brothers, the father, you know.

11   Q.   Are you referring to the Salama-Caro
12   family?

13   A.   Yeah.

14   Q.   All right.  Going back to be Exhibit 1,
15   if you look at paragraph 10 and read through
16   it, this is your -- can you confirm this is
17   your position of what you considered to be
18   forging of Robert Indiana's art works?

19   A.   Well, like I said before, the question
20   is if you're putting those stencils on those
21   canvasses and you have two different dates and
22   you don't even know which one is which, and
23   it's from 2015, which is now six or seven years
24   ago, you know, I don't know.

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 28**

109

1    We need an expert to figure that out.

2    Q.   Well, you don't ask a question; you say

3    "I have observed McKenzie forging Robert

4    Indiana art works," right?

12:42:12PM 5    A.   He keeps putting the stencils on those

6    silk screens from 2015.

7    Q.   And you personally contend that that's

8    a forgery?

9    A.   If it's not an authorized signature,

12:42:26PM 10    it's a forgery, yeah.  Yeah.

11    Q.   And this is what you're talking about,

12    that you already described to us about Tim

13    Ginexi saying to you that he refused to stencil

14    Indiana's signature?

12:42:46PM 15    A.   Yeah.  It's a stamp.

16    Q.   By the way, did you ever meet Robert

17    Indiana?

18    A.   No.

19    Q.   Now, in this paragraph you say

12:43:14PM 20    referring to Annette Vessecchia, and I'm

21    looking at paragraph 11; "Vessecchia told me

22    she was reluctant to stencil Indiana's

23    signature on the art works because they were

24    not authorized, but she told me that McKenzie

**COPLEY COURT REPORTING, INC.**

---

110

1    intimidated her into doing so.  Specifically,

2    McKenzie frequently intimidated Vessecchia and

3    his other employees by using implicit threats

4    of violence."

12:43:34PM 5    When did Vessecchia tell you, as you

6    say here, that she was reluctant to stencil a

7    signature on the art works?

8    A.   Well, this is very interesting because

9    Michael asked her to prepare to stencil in July

12:44:04PM 10    of '20, so for a year she didn't do it.

11    Every once in a while I'd ask her about

12    it.  She didn't want to do it.  So a year went

13    by, and I remember exactly because I said to

14    myself, I'm going to write on this box the

12:44:22PM 15    date -- it was July the 13th -- to see how long

16    it's going to be before she does it.

17    And she didn't do it until the very end

18    when he started getting -- basically telling

19    her if they didn't want to do it, they were not

12:44:41PM 20    going to have any work.  He's a bully.  He's a

21    bully.

22    Q.   And --

23    A.   Robert Indiana didn't authorize it.

24    Q.   You say here that -- are you saying

**COPLEY COURT REPORTING, INC.**

---

111

1    that Annette Vessecchia explicitly said to you

2    that she didn't want to do it because she

3    believed it was not authorized by Indiana?

4    A.   Yeah.

12:45:11PM 5    Q.   And then you talk about here threats of

6    violence.  Have you ever seen any guns at Mr.

7    -- in Mr. McKenzie's possession?

8    A.   No.

9    Q.   Did you ever see any guns -- go ahead.

12:45:31PM 10    A.   But he talks about it constantly, about

11    his guns and that he's going to go get them and

12    do such and such and such.  And then he goes

13    into these wild exaggerated things that he's

14    going to do or did or -- and it's all violent.

12:45:48PM 15    They are all violent.

16    Q.   You said -- have you ever seen any guns

17    on the Katonah property?

18    A.   No, I haven't.

19    Q.   You've understood -- Mr. McKenzie told

12:46:05PM 20    you he had a gun?

21    A.   Yes, and he had it in the house.

22    Q.   Was it one gun or more than one gun?

23    A.   I never discussed that with him.  No, I

24    think he had more than one gun.  I think he had

**COPLEY COURT REPORTING, INC.**

---

112

1    more than one gun.

2    Q.   When was the first time -- since you

3    started working at American Image Art in 2019,

4    when was the first time you heard him mention a

12:46:30PM 5    gun?

6    A.   Oh, it had to be right away.  Right

7    away.  He just talks.  They are bullshit

8    stories.  They are like these sarcastic

9    bullshit stories that he intertwines with these

12:46:47PM 10    violent themes, you know.

11    Q.   Do you consider it bullshit?

12    A.   Yeah, I consider -- I think it's

13    bullshit.  When you -- you never know though if

14    any of it's true.  I don't want to find out the

12:47:12PM 15    hard way.

16    Q.   So moving on to paragraph 12, you say

17    in the second sentence "among the art works

18    that Mike McKenzie has forged recently are

19    hundreds of silk screens of Four Seasons of

12:47:33PM 20    HOPE.  Are those the same Four Seasons that we

21    saw depicted in that earlier e-mail that you

22    took a picture of?

23    A.   Yeah, that's part of it, yeah.

24    Q.   Okay.

**COPLEY COURT REPORTING, INC.**

113

1    A.   How many -- how many does the contract
2    say and what colors?  Does it say 300?
3    Q.   And then you say "as well as two HOPE
4    sculptures that are in the process of being
5    created".
6    A.   Yeah.
7    Q.   Are those the ones that you were
8    transporting when the diesel incident happened?
9    A.   Yeah.
10   Q.   All right.  Moving on to this part
11   where you say that McKenzie was moving art
12   work.
13   A.   Yep.
14   Q.   Now, before this -- before we get to
15   the movement of the art work, there was, back
16   in May -- on May -- excuse me -- 25th 2021,
17   attorneys and Salama-Caro came to McKenzie's
18   Katonah property, right?
19   A.   Right.
20   Q.   And you were there?
21   A.   Yes.
22   Q.   And did you understand at the time that
23   there were discussions about the Star of Hope
24   taking possession of all the Indiana art work

COPLEY COURT REPORTING, INC.

114

1    in order to sell it and give McKenzie back part
2    of the proceeds?
3    A.   I don't remember.
4    Q.   Are you saying you don't remember that?
5    A.   No.
6    Q.   I can't hear your answer.
7    A.   I said I don't remember that.
8    Q.   You don't remember in early 2021
9    ongoing settlement discussions to see if we
10   could arrange a deal where the other parties
11   would purchase the Robert Indiana art work from
12   Michael and pay him a percentage?
13   A.   I remember there was a deal.  I don't
14   know if that's exactly what the deal was
15   though.  There was a deal.
16   Q.   And you mentioned before that Mike had
17   had some communications with Don Zuretski,
18   right?
19   A.   Don Zuretski?  He had no communication
20   with Don other than Don Zuretski was forced to
21   listen to a 40-minute harangue that was about
22   nonsense.
23   Q.   But Mr. Zuretski and that Zuretski
24   phone call occurred because there had been

COPLEY COURT REPORTING, INC.

115

1    discussions of whether or not a settlement
2    could be reached between American Image Art and
3    Star of Hope and other parties, right?
4    A.   Yeah, but that wasn't going to happen.
5    Wasn't even remotely close.
6    Q.   Okay.  If we stick with my questions,
7    we can get to that.  You understand that that
8    was discussed, right?
9    A.   It was discussed.
10   Q.   And you understood back in May, 2021
11   that we all arranged for representatives for
12   the Star of Hope and of Morgan to come to the
13   Katonah property to view the art work;
14   specifically to see all the art work and value
15   it as part of settlement discussions, right?
16   A.   Yes, but that wasn't true.
17   Q.   What wasn't true?
18   A.   That there were going to be settlement
19   proposals.
20   Q.   At the time, leading up to May 25th
21   2021, you were aware from discussions with
22   McKenzie that it was on the table -- whether or
23   not it was going to happen -- it was being
24   proposed for the parties to consider whether

COPLEY COURT REPORTING, INC.

116

1    they could reach a settlement where they would
2    purchase all the Indiana art work from Michael.
3    And as part of that, they wanted to see his
4    inventory, right?
5    A.   Right.
6    Q.   And you were there when the parties
7    came to the Katonah property to see the art
8    work.
9    A.   Yes.
10   Q.   Do you remember Tom McCarty from our
11   office was there?
12   A.   Yes.
13   Q.   And Michael McKenzie was not there,
14   right?
15   A.   No, I don't think so.  No.  Right, he
16   wasn't there.
17   Q.   Because the other parties didn't want
18   him there.
19   A.   Right.
20   Q.   And so you were there on behalf of
21   American Image Art?
22   A.   Yes.
23   Q.   And you were in charge of showing them
24   all the art work?

COPLEY COURT REPORTING, INC.

Vol. III Osvaldo Gonzalez

**EXHIBIT G - 30**

## 117

1   **A.**   No. Actually, I wasn't the person in
2   charge. Annette was the person in charge.
3   **Q.**   Annette was in charge?
4   **A.**   Yes.
5   **Q.**   Are you saying Annette was there the
6   whole time and showing people the art work?
7   **A.**   Yes. Yes.
8   **Q.**   The whole time?
9   **A.**   Yeah, a lot.
10   **Q.**   And you were there too?
11   **A.**   I was there.
12   **Q.**   You were there the whole time. You
13   were talking to Don Zuretski for a while?
14   **A.**   I was -- I was there -- you know, I was
15   there. It was in my front yard.
16   **Q.**   Well, you were there talking to the
17   people involved with the value --
18   **A.**   I didn't have any really conversations
19   with anybody about anything, no.
20   **Q.**   You don't recall us pointing out the
21   art work and getting your opinions on the value
22   of the art work at that time back in May?
23   **A.**   I -- I may have very well done that. I
24   may have well done that.

**COPLEY COURT REPORTING, INC.**

## 118

1   **Q.**   Did you -- you were in the studio with
2   them when they were looking at all the art
3   work, right?
4   **A.**   Yes.
5   **Q.**   And did you show them -- was there art
6   work in the basement of McKenzie's house at
7   that point in May, 2021?
8   **A.**   Yes.
9   **Q.**   Was it Indiana art work?
10   **A.**   Yes.
11   **Q.**   Did you show those parties that art
12   work?
13   **A.**   I wasn't showing it. Annette was
14   showing it.
15   **Q.**   Did you show them the art work in the
16   basement?
17   **A.**   No, I wasn't the person doing the
18   showing.
19   **Q.**   Okay. So you weren't in charge is what
20   you're saying?
21   **A.**   I wasn't in charge. Annette was in
22   charge.
23   **Q.**   Did you show them --
24   **A.**   She actually has all the records, all

**COPLEY COURT REPORTING, INC.**

## 119

1   the books. She has the archived, you know.
2   She's the one who knows where the old art is.
3   **Q.**   And you don't recall anyone talking to
4   you about the art work on the property that
5   day?
6   **A.**   No.
7   **Q.**   And the HOPE from the Democratic
8   National Convention was there that day too,
9   right?
10   **A.**   The HOPE?
11   **Q.**   What was that?
12   **A.**   The HOPE?
13   **Q.**   The HOPE from the DNC was there that
14   day.
15   **A.**   It was there, yeah.
16   **Q.**   Did it have a tarp on it?
17   **A.**   Yes, it did.
18   **Q.**   This is in May; May 25th 2021.
19   **A.**   Yep.
20   **Q.**   You're saying there was a tarp on it
21   then for the first time?
22   **A.**   I think so. I think so.
23   **Q.**   Was it your understanding on that visit
24   in May, the first one that was part of

**COPLEY COURT REPORTING, INC.**

## 120

1   settlement discussions about whether all the
2   art work could be purchased and what the value
3   of that art work was, from your observation do
4   you think art work was being hidden on that
5   first visit?
6   **A.**   They didn't see the collection. In
7   fact, not only did they not see the collection,
8   they only looked through half of what they had
9   and declared it over and left. They never came
10   back to look at the collection themselves.
11         This idea of someone offering him the
12   money to buy the art and having them come with
13   inventory, it's -- it wasn't ever going to
14   happen. You know, he says he has 30 million
15   dollars in art. You know, these people are
16   talking about 5 million. I don't know what
17   it's worth, but the guy thinks it's worth a lot
18   of money.
19   **Q.**   Who declared it was over, that you just
20   referenced?
21   **A.**   Who declared? Oh, the Salama-Caros,
22   they -- they just left in the middle of the
23   inspection and it never got finished. They
24   said no, we don't have to look anymore.

**COPLEY COURT REPORTING, INC.**

## Page 121

1  There's too many unauthorized pieces.

2  **Q.**  Who did you hear say that?

3  **A.**  Simon Salama-Caro.

4  **Q.**  You were upset after that visit, right?

5  **A.**  I wasn't upset.  I didn't -- I didn't

6  get upset about that.

7  **Q.**  You didn't express that you were upset

8  about that meeting and that you didn't think

9  they were really engaging in good faith

10 settlement?

11  **A.**  Well, that -- yeah, that's for sure.

12  But you know, I mean, what's the magnitude of

13  my upset?  You know.

14  **Q.**  So you said Simon Salama-Caro declared

15  they didn't have to look at anything else

16  because there were too many unauthorized

17  pieces?

18  **A.**  That was the end of the deal right

19  there, after the inspection.

20  **Q.**  And did you have a suspicion that they

21  were trying to take this art work so they could

22  give it to the Rosenbaum Gallery to sell and

23  cut Mike out of there?

24                MR. NIKAS:  Objection.

COPLEY COURT REPORTING, INC.

## EXHIBIT G - 31    123

1  taken aback that neither side was like talking

2  in good faith.  There was nothing they were

3  going to say to him that he was going to, know

4  you, and they weren't going to offer him

5  anything that he was going to accept.  It was a

6  waste of time.

7          He's not going to reveal how much art

8  he had because once you do that, you open

9  yourself up to really minimizing what you could

10 sell.  You can only sell what you say you got.

11  And he didn't -- he owns all this stuff and he

12  doesn't want anybody to go through the real

13  inventory of what he had.  He refuses to do it.

14  **Q.**  So you're saying at that first visit in

15  May when we were discussing settlement and

16  there was no Court Order in place -- we were

17  just discussing settlement -- and we invited

18  these parties to the Katonah property, that

19  McKenzie was hiding art work from them?  Is

20  that what you're saying?

21                MR. NIKAS:  Objection.

22  **A.**  I'm just saying that they didn't see

23  all the art and they left it all.  They left in

24  a hub, you know.

COPLEY COURT REPORTING, INC.

## Page 122

1  **Q.**  Mr. Gonzalez, can you answer the

2  question?

3  **A.**  Can you give me the question one more

4  time?

5                MS. ZERNER:  Do you have it, Ms.

6  Starr?

7                THE COURT REPORTER:  I do.  The

8  question is *"and did you have a suspicion that*

9  *they were trying to take this art work so they*

10 *could give it to the Rosenbaum Gallery to sell*

11 *and cut Mike out of it".*

12  **A.**  Okay.  Now, there are like numerous

13  conspiracy theories evolving with the Rosenbaum

14  Gallery.

15  **Q.**  I just want to know what you thought,

16  Mr. Gonzalez, what you thought, what your

17  impression was after that first visit to the

18  Katonah property by the Morgan parties after

19  they cut off their review of the art work and

20  didn't want to see anything else.

21  **A.**  Look, I -- I didn't make that --

22                MR. NIKAS:  Hold on.  Objection.

23  **A.**  I didn't make the connection that

24  you're discussion.  I was a little, you know,

COPLEY COURT REPORTING, INC.

## Page 124

1  **Q.**  So as in to hiding the art work, is it

2  your contention that art work was being hidden

3  from them on that first day, May of 2021?

4  **A.**  I don't want to, you know, make that

5  judgement.

6  **Q.**  Well, I don't understand your answer.

7  To your knowledge, was art work being hidden

8  from them on that date in May when they were

9  invited to review art work during settlement

10 discussions?

11  **A.**  I think so, yeah.

12  **Q.**  Why do you say that?

13  **A.**  Because I think I have -- some of those

14  pictures I have are dated and I think they --

15  they under that May date.  That may be them,

16  the piles of canvasses that went into Annette

17  Vessecchia's car.

18  **Q.**  You're skipping over to August.  I'm

19  still talking about May 25th 2021 when the

20  parties gathered by agreement and they were

21  invited to the Katonah property to review the

22  art.

23          As of that time, May 25th 2021, did you

24  personally believe on that date that art was

COPLEY COURT REPORTING, INC.

1  being hidden from anyone?

2      A.   The problem I'm having is that who

3  knows what's going to happen if they had

4  stayed.  They didn't stay.  Obviously they

5  didn't see three quarters of everything because

6  they left.

7      Q.   That wasn't -- you're not answering my

8  question.  I'm talking about whether you

9  believed on that date on May 25th, whether you

10  believed or are aware of anyone taking an

11  action to hide art work from the rest of the

12  parties that came to view the art work on that

13  date.

14      A.   Yes.

15      Q.   What is the basis for you saying that?

16      A.   Well, I saw them taking the canvasses

17  and moving them over to the other building.

18      Q.   On May 25th?

19      A.   Whatever, whatever date -- whatever

20  date the pictures, I took the pictures.

21      Q.   You took pictures in August.  I'm

22  talking about May 25th.

23      A.   I may have taken pictures in May.

24      Q.   What pictures?

1  settlement discussions.

2          MR. NIKAS:  I want to object and

3  make it clear for the record that the art work

4  that was concealed from us in May, we also

5  contend that was a violation of discovery and

6  directly contrary to testimony Mr. McKenzie had

7  given under oath that he had no such art work.

8          And we are also seeking sanctions --

9  because it was concealed to us before then --

10  we are also seeking sanctions and contempt and

11  other remedies with respect to the second

12  inspection where Mr. McKenzie again concealed

13  art work from us.

14          So just trying to make it clear that

15  the objection is not only to the incoherence of

16  the question but also the premise of the Relief

17  we have pending.

18          MS. ZERNER:  You get that, Mr.

19  Gonzalez?

20      Q.   So I'm asking you again about -- what I

21  was just trying to understand is whether you

22  contend or believe or observed that art work

23  was moved to be hidden from the other parties

24  before the visit on May 25th 2021 that occurred

1      A.   Some of the pictures -- the one that

2  shows Annette Vessecchia's car, I think, is

3  around the time of that first discussion.

4      Q.   You produced those in response to -- in

5  August.

6      A.   I think I produced them in August with

7  the ones that were taken in May.

8      Q.   And the Court Ordered inspection

9  occurred in August.

10      A.   Yeah, the first one?

11      Q.   There was one Court Ordered inspection

12  of the Katonah property and that occurred in

13  August, okay?

14      A.   What happened -- it happened before

15  that.  It was before that.

16      Q.   I understand you're saying the art work

17  was moved before the August 5th inspection,

18  right?

19      A.   Didn't they come once, the Salama-Caros

20  and Mr. Nikas, and they all came down for the

21  inspection.  And I think that was way before

22  August.

23      Q.   Yes.  That's what we've been talking

24  about is the May 25th visit pursuant to

1  pursuant to settlement discussions?

2      A.   Yes.

3      Q.   What is the basis for you saying that

4  art work was hidden?

5      A.   I witnessed them take it out of the

6  studio, put it into -- in cars, stacks of them.

7  You know, each one of those is 200 pieces of

8  art, you know.  It took a few trips.  They

9  didn't want them to see that.

10      Q.   They put it in cars and moved it where?

11      A.   To the house.

12      Q.   McKenzie's house?

13      A.   Yep.

14      Q.   And who did that specifically?

15      A.   Annette.

16      Q.   And did you speak up then on May 25th

17  2021 and tell anyone that there was more art

18  work to observe?

19      A.   No.  That wasn't my job, no.

20      Q.   Oh.

21      A.   Annette does that.  She has all the

22  inventory.  She knows where everything is.

23  She's the only one who does.

24      Q.   And then there was a second visit on

vs. HJ Osvaldo Gonzalez

## EXHIBIT G - 33

### 129

1 August 5th 2021 that occurred after a Court
2 Order issued, right? Was that a yes?
3     **A.** What date was that?
4     **Q.** August 5th.
5     **A.** August 5th, okay.
6     **Q.** Prior to the August 5th visit when the
7 attorneys from Quinn Emanuel came to inspect
8 and look at documents -- do you recall that?
9     **A.** Yes.
10     **Q.** Did you understand at that time that a
11 Court Order had issued?
12     **A.** They never discussed that with me, no.
13     **Q.** So at the time you weren't aware of a
14 Court Order?
15     **A.** No, I was just told that they were
16 coming. That's all.
17     **Q.** Okay. What was your understanding of
18 why they were coming?
19     **A.** They were coming to inspect, inspect
20 the inventory.
21     **Q.** Did you have an understanding that they
22 were coming to inspect documents of American
23 Image Art?
24     **A.** I think they had -- let's see, they had

COPLEY COURT REPORTING, INC.

### 130

1 authority to look at anything that was related
2 to the case; e-mails -- this is where Annette
3 has the archives and all the electronic, you
4 know -- she knows where everything is.
5     **Q.** And you were there for the inspection
6 on that date?
7     **A.** I was around, yes.
8     **Q.** And Mr. McKenzie was not there, right?
9     **A.** No, he wasn't.
10     **Q.** And you recall it was requested by the
11 other parties that he not be there, right?
12     MR. NIKAS: Objection. That's
13 false.
14     **A.** Well, he got there right? He got there
15 late.
16     **Q.** I'm -- I wasn't there. So did he get
17 there?
18     **A.** Yeah, I think he got there late.
19     **Q.** Before he got there, were you letting
20 the parties into the studio to look at what was
21 there?
22     **A.** Yes.
23     MR. NIKAS: Bridget, just so you're
24 aware, and you obviously aren't, John Markham

COPLEY COURT REPORTING, INC.

### 131

1 requested that McKenzie be allowed to attend
2 that and he was there from the very beginning,
3 that second inspection.
4     MS. ZERNER: Okay. I wasn't trying
5 to make it -- I obviously didn't intend to make
6 any false statement. My understanding was
7 there were discussions about requesting him not
8 to be there. But if that happened then thank
9 you.
10     MR. NIKAS: I just don't want you
11 to ask a line of questions where you're not
12 aware of that fact and we're wasting time. So
13 John has asked him to be there. He was there.
14 I saw him there at the very beginning. He
15 wasn't involved in the inspection directly, but
16 John did go occasionally to go speak with him
17 throughout the course of it. That's the August
18 date.
19     MS. ZERNER: Thank you.
20     **Q.** Mr. Gonzalez, did anyone ask you to
21 view any art work on that date, on August 5th?
22     **A.** No.
23     **Q.** Did you tell anyone on that date that
24 art work had been moved?

COPLEY COURT REPORTING, INC.

### 132

1     **A.** No. I wasn't talking to anybody.
2     **Q.** I'm going to go back to your
3 August 30th declaration. Within your
4 declaration you said "in addition to hiding the
5 art works by shipping them off the property,
6 McKenzie also planned to conceal the art works
7 through a sequence of transfers that would hide
8 their true ownership"?
9     **A.** That's right.
10     **Q.** How do you know about this?
11     **A.** How do I know about it?
12     **Q.** Yes.
13     **A.** He told me. You know, first he asked
14 me -- he said I'm going to transfer all of the
15 property into Greg Allen's name, you know,
16 which I thought was odd right there. But
17 that's what he said, you know. You know, you
18 can't talk about it. In other words, it isn't
19 like you're going to have an exchange of ideas
20 about this or that or the other thing. He
21 already has his mind set he was going to do it.
22     **Q.** Did you have any discussions with Greg
23 Allen personally?
24     **A.** No. Nope. He come up, load the stuff

COPLEY COURT REPORTING, INC.

133

1  on -- into his van, take it away.
2      Q.   And when McKenzie discussed this with
3  you, was anyone else present?
4      A.   Discussed what?  Oh, yeah.  I mean, he
5  -- when he talks, he talks.  I'm sure that --
6  that Tim and Annette heard about it, you know.
7  I'm sure.  For sure.  It's broadcasted.  You
8  know, and the first lawyers were through
9  Panama.
10     Q.   If you were present -- when you were
11 working for American Image Art, if you were a
12 part of privileged communications between
13 McKenzie and attorneys, I do not want you to
14 disclose them because Mr. McKenzie has asserted
15 his privilege.  Okay?
16     A.   Okay.
17     Q.   So other than if you were involved in
18 privileged communications, you're saying that
19 you believe Annette Vessecchia and Tim Ginexi
20 heard about this plan to conceal art work with
21 Greg Allen?
22     A.   Yeah, yeah.  Sure.
23     Q.   Anyone else a witness to these
24 conversations?

134

1      A.   I'm sure Peggy must have heard it,
2  yeah.
3      Q.   When you say here -- let me see -- so
4  again, when you say here that "McKenzie had
5  negotiations with Greg Allen" in paragraph 16
6  of your declaration -- "he had extensive
7  negotiations with Allen about implementing this
8  plan" -- you weren't a party to those
9  discussions, were you?
10     A.   No.  No.  Not at all.  But I was
11 informed that they were doing it, you know.
12     Q.   You're saying Mike told you this?
13     A.   Yeah, I told him to get a lawyer right
14 away.
15     Q.   Did you have any further discussions --
16     A.   You don't know how ridiculous it is for
17 him to suggest that he was going to put
18 everything in Greg Allen's name.  And I'll tell
19 you why:  when I was practicing law he asked me
20 to contact the FBI because Greg Allen had
21 robbed him of $250,000 worth of art.
22     Q.   So wait.  Are you disclosing when you
23 were actually practicing as an attorney, are
24 you now disclosing your privileged

135

1  communications with McKenzie.
2          (Laughter.)
3      Q.   Was he consulting you as an attorney to
4  assist with that matter?
5      A.   No, not at all.  Not at all.
6      Q.   Are you certain that Mr. McKenzie
7  didn't have the understanding that he was
8  seeking advice from you as an attorney at that
9  time when you were actually practicing law?
10     A.   When I was -- when I was -- when I was
11 admitted?
12     Q.   Yeah, that's what you were talking
13 about, right?  You just started to talk about
14 how Mr. McKenzie came to you for assistance
15 when you were practicing law related to Greg
16 Allen?
17     A.   Yes.  He wanted --
18     Q.   Mr. Gonzalez, on behalf of Mr.
19 McKenzie, I'm not clear that this isn't a
20 privileged communication when you were an
21 attorney acting as his attorney, so we'll stop
22 there for now.
23          MR. NIKAS:  And I want to put on
24 the record that I have a problem with that

136

1  privileged assertion.  Mr. McKenzie had made
2  accusations of wrong-doing against Mr. Gonzalez
3  in connection with events that transpired
4  related to Greg Allen.
5          When an attorney is accused of
6  wrong-doing in connection with the same exact
7  subject matter that the individual later
8  attempts to use as a sword in litigation, the
9  attorney -- here it would be Mr. Gonzalez -- is
10 within his right to defend himself against that
11 wrong-doing by revealing the privileged
12 communications.
13         MS. ZERNER:  You're saying that the
14 allegations being made now by Mr. McKenzie open
15 up the door to the prior privileged
16 communications over ten years ago that had
17 nothing to do with --
18         MR. NIKAS:  Black Letter New York
19 Law.
20         MS. ZERNER:  Are you representing
21 Mr. Gonzalez in any way, Mr. Nikas?
22         MR. NIKAS:  No, I'm not.
23         MS. ZERNER:  Okay.
24         MR. NIKAS:  I'm representing Morgan

137

1  with an entitlement of gaining relevant
2  information related to your client's
3  wrong-doing in this case.  And your assertion
4  of privilege is directly relevant to and under
5  New York Law --
6          THE COURT REPORTER:  I'm sorry,
7  attorney Nikas --
8          MR. NIKAS:  -- under New York Law,
9  settled New York Law, when an individual makes
10  accusations of wrong-doing against his lawyer,
11  that individual, that lawyer, is entitled to
12  testify in a way to defend themselves against
13  that wrong-doing and it does open the door.
14          MS. ZERNER:  I understand that and
15  I'm aware of that, but I think it's still
16  regards to the wrong-doing itself.  I'm not
17  certain it opens the door to every possible
18  privileged communication between that client
19  and the attorney if it's completely irrelevant
20  to the wrong-doing at issue and the allegations
21  at issue.  So we'll have to deal with that.
22          MR. NIKAS:  We'll deal with it
23  question by question.  If we need to file a
24  Motion to Compel as to the improper assertion

COPLEY COURT REPORTING, INC.

139

1  you say there -- you're talking about here that
2  art work was moved because, you say, "to avoid
3  the inspection before the second look by Luke",
4  right?
5      A.  Uh-huh.
6      Q.  So art work was moved between the May
7  25th visit to the Katonah property and the
8  second visit, the inspection that occurred in
9  August, right?
10     A.  Yep.
11     Q.  And you say "plus three sculptures" --
12  never mind.
13         You say, "he", I think referring to
14  McKenzie, right, "went to a lot of trouble to
15  hide the HOPE DNC".  Do you see that?
16     A.  Yep.  Uh-huh.
17     Q.  Did Mr. McKenzie go through a lot of
18  trouble to hide the HOPE DNC?
19     A.  I don't know.  He didn't want anybody
20  to see it.  I don't know.
21     Q.  Why did Mr. --
22     A.  I don't know why.  That thing is old.
23  Statute of limitations passed on that.
24     Q.  I'm sorry.  What are you talking about?

COPLEY COURT REPORTING, INC.

138

1  of privilege you just made, then we will.
2          MS. ZERNER:  If you're following up
3  on this later, we may resolve it today.
4  CONTINUED DIRECT EXAMINATION
5  BY MS. ZERNER:
6      Q.  Mr. Gonzalez, moving on to paragraph 18
7  of your declaration where you say "the day
8  after I informed McKenzie that I was leaving,
9  one of his employees called me and warned me to
10  be careful for your health."
11         Is this Tim Ginexi that you described
12  earlier today or is this somebody else?
13     A.  No, Tim Ginexi.
14         (Pause.)
15     Q.  Okay.
16         MS. ZERNER:  We're to mark another
17  document.  I think the next one we're on is 12.
18         (E-mail was marked for
19  identification as Exhibit No. 12.)
20     Q.  Oz, can you see the document on the
21  screen?
22     A.  Yes.
23     Q.  Do you recall -- this is an e-mail back
24  on August 25th 2021 that you sent to me, and

COPLEY COURT REPORTING, INC.

140

1      A.  Nothing.  The HOPE DNC.
2      Q.  And you say the McKenzie went to a lot
3  of trouble to hide it.  How did he do that?
4      A.  He put the tarp on it.
5      Q.  How big is this particular sculpture?
6      A.  What?
7      Q.  How big is this HOPE sculpture?
8      A.  I think it's 8 feet.
9      Q.  And so Mr. McKenzie put a tarp on it to
10  hide it?
11     A.  Yep.
12     Q.  And that's what you're talking about
13  when you say he went through a lot of trouble?
14     A.  Yes.
15     Q.  And these photographs that you had sent
16  to me of various prints, right --
17     A.  Yes.
18     Q.  -- do you recognize these?
19     A.  That's to show you -- what I'm showing
20  you was quantity.
21     Q.  These are photos that you took when
22  these prints were packed up and moved to the
23  Middletown storage facility, right?
24     A.  Right.  There may have been -- that may

COPLEY COURT REPORTING, INC.

141

1  have been to the house.  Those may have been to
2  the house.
3      Q.  Are you saying they put all these
4  prints in a car at the studio and then drove
5  over to McKenzie's house and put them in there?
6      A.  Yes.
7      Q.  And then weren't they then moved to the
8  Middletown storage facility?
9      A.  Yes.
10     Q.  And you assisted with that move to
11  Middletown, right?
12     A.  Yes.
13     Q.  I want to double check.  Do you need a
14  break?  I think we've gone an hour and a half.
15          THE COURT REPORTER:  I'm okay.
16     Q.  Mr. Gonzalez, we're to mark the binding
17  term sheet as Exhibit 13.  You're familiar with
18  this document?
19          (Binding Term Sheet was marked for
20  identification as Exhibit No. 13.)
21     A.  Yes.
22     Q.  And going back to what we discussed;
23  that mediation in Portland in November of 2019,
24  you were there when this document was signed by

**COPLEY COURT REPORTING, INC.**

142

1  both McKenzie and Mr. Brannan on behalf of the
2  Estate, correct?
3      A.  Correct.
4      Q.  Scrolling down, this is back on
5  November 26, 2019?
6      A.  Yep.
7      Q.  And you assisted with those
8  negotiations?
9      A.  I -- I assisted -- I was intermediary
10  between Mr. Lipson and Mr. McKenzie because he
11  had to be moved from the room.  His behavior
12  had become bizarre.
13     Q.  So you would take messages between
14  McKenzie and Mr. Lipson on behalf of the
15  Estate?
16     A.  Yeah, on behalf of -- on behalf of --
17  on behalf of McKenzie.
18     Q.  I'm sorry.  I meant Mr. Lipson was
19  representing the Estate.
20     A.  Yeah.  Yeah.
21     Q.  And you were --
22     A.  We put McKenzie in a room next to the
23  conference room.  I would go out and I would
24  tell him what his point was, point by point.

**COPLEY COURT REPORTING, INC.**

143

1      Q.  Okay.
2      A.  And they would call Mr. Simone and then
3  we sent it to Mr. Simone and Simone marked it
4  up and you know, we signed it.
5      Q.  And you recall that before it was
6  signed Mr. McLaughlin reminded everyone that it
7  was binding?
8      A.  Yes.
9          MR. FALZONE:  Objection.
10          MS. ZERNER:  Sorry.  I heard -- I
11  think I heard -- did someone else speak there?
12          MR. FALZONE:  I objected.
13     Q.  Your answer was yes, Mr. Gonzalez?
14     A.  Yes.
15     Q.  And as part of the agreement entered
16  between American Image and the Estate, you
17  understood that the parties agreed to terminate
18  the 2008 HOPE Agreement and the arbitration
19  under that Agreement?
20          MR. FALZONE:  Objection.
21     A.  Yes.
22     Q.  Do you need the question repeated?
23     A.  No.
24     Q.  Okay.  Your answer is yes?

**COPLEY COURT REPORTING, INC.**

144

1      A.  Yes.
2      Q.  Thank you.  At that point once this
3  agreement was reached, the parties wanted to
4  end and dismiss the arbitration, right?
5          MR. FALZONE:  Objection.
6      Q.  Sorry.  Mr. Gonzalez?
7      A.  I think that was part of the Agreement.
8      Q.  Right.  Are you referring to the terms
9  on this Binding Sheet?
10     A.  Yes.
11     Q.  Well, here's the line in here; "AIA
12  agrees that the original HOPE Agreement is
13  terminated", right?
14     A.  Right.
15     Q.  Is that a yes?
16     A.  Yes.
17     Q.  And then "the arbitration" -- down here
18  on this next third bullet point down on the
19  third page, "the arbitration between the Estate
20  and AIA pending in the AAA will be dismissed
21  with prejudice," right?
22     A.  Yes.
23          MR. FALZONE:  Objection.
24     Q.  And from your participation in this,

**COPLEY COURT REPORTING, INC.**

**EXHIBIT G - 37**

145

1  there were no discussions between the parties
2  that any disputes arising under this term sheet
3  would have to then be arbitrated, right?
4  　　　　MR. FALZONE:  Objection.
5  **A.**  No mention of that at all.
6  **Q.**  After the term sheet was signed did you
7  speak with anyone from the Star of Hope or from
8  the Attorney General's Office?
9  **A.**  No.
10  **Q.**  During these negotiations, did you
11  observe the Estate's Counsel or Mr. Brannan
12  speaking to anyone that you understood to be
13  from the Star of Hope?
14  　　　　MR. FALZONE:  Objection.
15  **A.**  That's a difficult question because Mr.
16  Brannan got around, you know, to all the
17  different rooms, and I'm sure that he, at some
18  point, went by them, you know.
19  **Q.**  Okay.  And after this day when this
20  document was -- this term sheet was executed
21  and agreed upon, you at that point remained
22  involved with Mr. McKenzie in the discussions
23  between American Image Art and the Estate in
24  attempting to put the Term Sheet Agreement into

COPLEY COURT REPORTING, INC.

147

1  Robert Indiana articulated in the contract, on
2  his last contract.
3  　　　　And once he dies, you can't change
4  that.  That's it.
5  **Q.**  And you've previously said that it
6  appeared to you that the Estate was the one
7  trying to back out of the agreement or change
8  the terms reached in the Binding Term Sheet,
9  right?
10  　　　　MR. FALZONE:  Objection.
11  **A.**  I'm sorry.  I didn't catch the end of
12  that question.
13  **Q.**  Sure.  You said before that it appeared
14  to you that the Estate was the one trying to
15  back out of the Agreement or change the terms
16  reached in the Binding Term Sheet.
17  　　　　MR. FALZONE:  And I objected.
18  **A.**  Yeah.
19  **Q.**  What was the answer, Mr. Gonzalez?
20  **A.**  I said yes.
21  **Q.**  And you said in the past that it was
22  the Estate that was the one trying -- excuse me
23  -- you said in the past that it was the Estate
24  that actually breached the Binding Term Sheet

COPLEY COURT REPORTING, INC.

146

1  a more formal document, right?
2  　　　　MR. FALZONE:  Objection.
3  **A.**  That he did with Mr. Simone.
4  **Q.**  Okay.  And near the end though after
5  Mr. Simone left did you attend to assist with
6  that?
7  **A.**  No.  No.  They -- they don't get it.
8  I'm not allowed to say anything.  He has to do
9  it.  He does everything himself.
10  **Q.**  You're talking about Mr. McKenzie?
11  **A.**  Yeah.
12  **Q.**  I just meant that you were aware of
13  ongoing discussions between American Image Art
14  and the Estate about the term sheet after that
15  day in November of 2019?
16  **A.**  Yeah.
17  　　　　MR. FALZONE:  Objection.
18  **Q.**  Mr. Gonzalez, you have said in the past
19  that the Estate and American Image Art could
20  not draft a new production agreement for the
21  HOPE art work, correct?
22  **A.**  Correct.
23  **Q.**  And why is that?
24  **A.**  Because the production list was what

COPLEY COURT REPORTING, INC.

148

1  by attempting to change the material terms,
2  right?
3  　　　　MR. FALZONE:  Objection.
4  **A.**  That's what Mr. Simone said.
5  **Q.**  And then you said it yourself, right?
6  **A.**  I -- I didn't get involved with the
7  writing or doing anything with regard to that.
8  　　　　MR. FALZONE:  Objection.
9  **A.**  It was just impossible.  You don't get
10  it.  It wasn't rationale.  He created this
11  mess, you know.
12  **Q.**  You had previously testified that
13  American Image Art made an effort to enforce
14  the 2019 Binding Term Sheet but the Estate
15  refused.
16  　　　　MR. FALZONE:  Objection.
17  **A.**  Yes.
18  **Q.**  And do you recall previously stating
19  that the accusations of forgery and
20  unauthorized art work made against McKenzie
21  harmed his reputation and interfered with his
22  sales?
23  **A.**  Yes.
24  **Q.**  And I'll show you what was previously

COPLEY COURT REPORTING, INC.

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 38 of 81    January 7, 2022

vol. II Osvaldo Gonzalez

**EXHIBIT G - 38**

## 149

1   marked as Exhibit 2. Do you see this document
2   that was previously marked as Exhibit 2 and it
3   has the caption from the American Arbitration
4   Association, James Brannan versus Michael
5   McKenzie, and it's titled Witness Statement,
6   Declaration of Osvaldo Gonzalez.
7     A.   Yes.
8     Q.   And do you recall making this Witness
9   Statement?
10     A.   Yes.
11     Q.   And this is another statement that you
12   made under penalty of perjury?
13     A.   Yes.
14     Q.   And you authorized your signature on
15   it?
16     A.   Yes.
17     Q.   And you understood it was going to be
18   submitted to the AAA panel as part of the
19   evidence in that case?
20     A.   Yes.
21     Q.   And do you recall -- as you sit
22   here today -- well, actually, when you signed
23   this back in -- this is dated May 21st 2021;
24   you see that?

**COPLEY COURT REPORTING, INC.**

## 150

1     A.   Yep.
2     Q.   You reviewed this before it was
3   submitted and signed off on, right?
4     A.   Yes.
5     Q.   And you believed each of these
6   statements to be true to the best of your
7   belief?
8     A.   Yes.
9     Q.   And does it remain true to the best of
10   your belief at this time?
11     A.   Yes.
12         MR. FALZONE: Objection.
13     Q.   And you also sat for a deposition
14   during the arbitration as well, Mr. Gonzalez?
15     A.   Yes.
16     Q.   Do you recall that was back last
17   January we had a day on January 21st where you
18   answered some questions and then we had
19   technical problems so we continued the
20   deposition on January 28th 2021. Do you recall
21   that?
22     A.   Yes.
23     Q.   And the Estate's attorneys asked you
24   questions?

**COPLEY COURT REPORTING, INC.**

## 151

1     A.   Yes.
2     Q.   And you understood you were under oath
3   at that time?
4     A.   Yes.
5     Q.   And did you answer questions on those
6   dates truthfully during your deposition?
7     A.   Yes.
8     Q.   All right.
9         MS. ZERNER: Maybe we'll take a
10   quick 10-minute break.
11         (A recess was taken at 1:40 p.m.)
12         (Resumed at 1:52 p.m.)
13   CONTINUED DIRECT EXAMINATION
14   BY MS. ZERNER:
15         MS. ZERNER: We'll see how this
16   goes. We're getting feedback. When I speak I
17   can hear my voice talking over.
18         (Pause.)
19     Q.   Mr. Gonzalez, did you register a
20   copyright to an image of *LOVE* with the L O
21   stacked on top of the V E?
22     A.   I can't hear you.
23         MS. ZERNER: Okay. We're back to
24   this. I don't know how this works.

**COPLEY COURT REPORTING, INC.**

## 152

1         (Pause.)
2     Q.   Did you register a copyright to an
3   image of *LOVE* with L O stacked on top of V E?
4     A.   I have a copyright. Me personally, for
5   *LOVE* 3D, I have that.
6     Q.   And is it your personal opinion that
7   the *LOVE* image is in the public domain?
8     A.   Oh, for sure. No doubt about it.
9     Q.   And so is it your opinion that Morgan
10   does not have a copyright or a trademark to
11   *LOVE*?
12     A.   They don't have a copyright. A
13   trademark is being challenged as we speak, so.
14   But it's in the public domain.
15     Q.   And did you express that opinion to Mr.
16   McKenzie?
17     A.   He expressed it to me.
18     Q.   And you agreed with him?
19     A.   He got it from Mr. Simone.
20     Q.   And you agree with that opinion, that
21   *LOVE* is in the public domain, right?
22     A.   Yes, because I know something about
23   copyrights because I have copyrights.
24     Q.   And --

**COPLEY COURT REPORTING, INC.**

# EXHIBIT G - 39

**153**

1    **A.**   The only thing is that this problem is
2   so simple that it defies -- it could be easy.
3   This is it; you can't copyright a word.  That's
4   it.  They don't permit it.
5    **Q.**   And you've discussed that with McKenzie
6   on multiple occasions before you left American
7   Image Art, right?
8    **A.**   He discussed that with his lawyers.
9    **Q.**   Are you saying that you never said
10  expressly to Mr. McKenzie that you agreed that
11  *LOVE* is in the public domain?
12    **A.**   We -- we did discuss *LOVE* was in the
13  public domain.
14    **Q.**   That's something you could agree on,
15  right?
16    **A.**   Yes, so was he.
17        MS. ZERNER:  I'm going to mark
18  another Document.  This will be Exhibit 14.
19        (Chain of e-mails was marked for
20  identification as Exhibit No. 14.)
21    **Q.**   Mr. Gonzalez, just a few questions.
22  This is a batch of e-mails.  One, I just want
23  to confirm here, og@ogcool.com is your e-mail
24  address, right?

**155**

1   little.  I mean, I was there, but he sits there
2   and he writes that crazy stuff that I'm sure
3   that you got, every day.  And he just rants and
4   raves about suing everybody for fraud.
5    **Q.**   All right.  On this occasion back on
6   February 25th 2020, he e-mailed you saying "can
7   we subpoena Thomas and Brannan to come to New
8   York or do we have to go to them", right.  Do
9   you see this e-mail?
10    **A.**   I see that.
11    **Q.**   You responded here "the rule is
12  generally place of business or residence.
13  Brannan may be in New York case as New York
14  case is here".  Right?
15    **A.**   Right.
16    **Q.**   You sent that e-mail?
17    **A.**   Yes, I did.
18    **Q.**   And I'm scrolling through to ask some
19  specific questions, but if you want to look at
20  anything, just let me know.
21        Here's some e-mails between you and Mr.
22  McKenzie about "copyright doesn't include
23  Indiana".  Do you see that subject line?
24    **A.**   Yep.

**154**

1    **A.**   Yes.
2    **Q.**   And you've used that regularly to
3   correspond?
4    **A.**   People send me e-mails.
5    **Q.**   I'm just talking about your e-mail
6   address in general.  You use og@ogcool.com to
7   correspond with other people?
8    **A.**   Yes.
9    **Q.**   Does anyone else use that e-mail
10  address of yours?
11    **A.**   No.
12    **Q.**   Okay.  And you recognize here this
13  e-mail address of authrfun@aol.com as one of --
14    **A.**   One of McKenzie's e-mails, yeah.
15    **Q.**   Okay.  And this is an example -- you
16  were talking before that you acted as a
17  personal assistant and you would talk to him
18  about his litigation, right?
19    **A.**   Sorry.  Can you give me that question
20  again?
21    **Q.**   I was just saying that you -- when you
22  said you acted as his personal assistant, you
23  would discuss with him his ongoing litigation?
24    **A.**   Um, not as much as you think.  Very

**156**

1    **Q.**   And by the way, this is og.cool.com;
2   that's your website, right?
3    **A.**   Yes.
4    **Q.**   And here this e-mail is May 1st 2020
5   and you're saying to McKenzie -- actually, down
6   further from McKenzie on May 1st, it says "can
7   we write to trademarks and report a fraud."
8        And then you say, "you can challenge
9   the trademark.  Don't forget Hamilton has done
10  so already".  Right?
11    **A.**   Yes.
12    **Q.**   Is that what you were referring to
13  earlier when you said there was a challenge to
14  the trademark?
15    **A.**   What is going on here is that the
16  Hamilton Corporation sued Morgan for filing a
17  fraudulent trademark application and various
18  other things.  They are a very big law firm.  I
19  think they work out of Indiana, and their
20  specialty is copyright.
21        And so they had a cause of action in
22  Morgan.  And so --
23    **Q.**   Are you finished with your answer?
24    **A.**   So I'm saying that the idea that you're

**EXHIBIT G - 40**

157

1  going to go -- I'm just saying to him what
2  happened here was that I got him to hire the
3  law firm that was --
4      Q.  Okay.  Mr. Gonzalez, I appreciate it.
5  I just had that question that you already
6  answered, so I'm going to keep on going also so
7  that you can get your bike.
8      A.  I'll try to catch up.
9      Q.  Let's see here; and do you see here on
10  these e-mail chains there's e-mails from Ed
11  Boyle on behalf of the Estate and Kevin Lipson.
12  And this is og@americanimageart.com.  Was that
13  an e-mail that you used at American Image Art?
14      A.  Yes.
15      Q.  This is in June of 2020.
16      A.  Right.
17      Q.  After the Binding Term Sheet had been
18  executed, right?
19      A.  Right.
20      Q.  And you were involved in some
21  discussions with the Estate related to that,
22  correct?
23      A.  Yes.
24      Q.  And in this e-mail back on June 12,

COPLEY COURT REPORTING, INC.

159

1  e-mails.
2      And then this e-mail came in -- you see
3  here it's dated -- we're on page 20 of the
4  document, and it's an e-mail from og@og.cool,
5  right?
6      A.  Right.
7      Q.  That's another e-mail address of yours?
8      A.  Yes.
9      Q.  The subject is Term Sheet Clause?
10      A.  Right.
11      Q.  And you say "this clause was proposed
12  by the Estate in their proposed Term Sheet,
13  12/17/2019, violated the Binding Term Contract
14  signed in mediation", right?
15      A.  I don't know which clause he's talking
16  about.
17      Q.  You're talking about it.  But you don't
18  remember what clause you're talking about?
19      A.  I don't remember what clause, what that
20  was.
21      Q.  Okay.  But you believe you sent this
22  e-mail?
23      A.  Looks like it.
24      Q.  Do you have any reason to think that it

COPLEY COURT REPORTING, INC.

158

1  2020, you're saying to Mr. Lipson, who was an
2  attorney for the Estate, you're discussing with
3  them claims about the HOPE copyright, right?
4      A.  Right.
5      Q.  And you say "I mean all the HOPE
6  sculptures are copyright claimed by American
7  Image by its being emblazoned on the signature
8  plate", right?  Did you say yes?
9      A.  Yes.  Yeah, if you take it over, you
10  need to do that.
11      Q.  Going further down these e-mails,
12  here's another e-mail from og@americanimageart
13  to Ed Boyle and Kevin Lipson, copying McKenzie,
14  regarding the HOPE copyright on June 12th 2020.
15  Do you see this?
16      A.  Uh-huh.
17      Q.  And do you recall sending this e-mail?
18      A.  Yes.
19      (Pause.)
20      Q.  And you mention in here what we were
21  talking about earlier about *LOVE* being in the
22  public domain, right?
23      A.  Right.
24      Q.  I'm just moving down through some more

COPLEY COURT REPORTING, INC.

160

1  wasn't you that sent the e-mail?
2      A.  No.
3      Q.  Did you have discussions with Michael
4  McKenzie about off shore lawyers?
5      A.  Did I have a conversation with him
6  about him?
7      Q.  Yes.
8      A.  Yes.
9      Q.  Did you provide him information about
10  it?
11      A.  No.
12      Q.  Did you talk --
13      A.  Went on Google and looked it up and the
14  first guy that came up -- he called a few
15  people.  And they were looking in Panama, but
16  -- so I actually remember telling him he was
17  crazy and shouldn't do it.  They said to him
18  that --
19      Q.  Mr. Gonzalez, are you talking about
20  attorneys?
21      A.  Yeah, I'm talking about the attorneys
22  telling Michael that --
23      Q.  I just want to move on.  I'm not asking
24  you -- sorry.  I'm not asking you about Mr.

COPLEY COURT REPORTING, INC.

**161**

1 McKenzie's conversations with his attorneys
2 about the subject matter. Okay?
3    **A.** Okay.
4    **Q.** Did you discuss with him before you
5 left American Image Art how to set up a new
6 corporation or LLC?
7    **A.** I didn't do any of that. He did that.
8 He hired lawyers that did it.
9    **Q.** If you look here we have an e-mail back
10 on June 25th 2021, from og@ogcool.com and
11 there's a link sent and the subject is "off
12 shore lawyers". Did you send this e-mail?
13    **A.** Yes.
14    **Q.** And then there's one here that's
15 June 30th 2021 from og@ogcool to McKenzie about
16 how to start an LLC in New York. Do you see
17 that?
18    **A.** All right.
19    **Q.** Did you send that to him?
20    **A.** Yes.
21    **Q.** And Mr. Gonzalez, you're no longer a
22 member of the New York Bar, right?
23    **A.** No.
24    **Q.** And why not?

**COPLEY COURT REPORTING, INC.**

**162**

1    **A.** Well, I was suspended and then I
2 resigned. I resigned during my resig -- I
3 resigned during my suspension.
4    **Q.** And I'll just confirm with you --
5      MS. ZERNER: I'll mark this as
6 Exhibit 15.
7      (Supreme Court Opinion was marked
8 for identification as Exhibit No. 15.)
9    **Q.** This is a Court Opinion from the
10 Appellate Division in the Second Department of
11 New York in the matter of Osvaldo J. Gonzalez,
12 entered on October 10, 2018.
13      Is this a suspension? Do you recognize
14 this as the suspension you just referred to?
15    **A.** Yes, it does. Yes.
16    **Q.** And this says -- the Order says "the
17 Petitioner and Respondent moved for discipline
18 by consent requesting the Respondent be
19 suspended from the practice of law for the
20 period of three years". Is that correct?
21    **A.** Yes.
22    **Q.** And as part of this, you stipulated to
23 these facts as you can see this on the next
24 part of this?

**COPLEY COURT REPORTING, INC.**

## EXHIBIT G - 41

**163**

1    **A.** Yes.
2    **Q.** And then it has a paragraph here under
3 Findings that says "the Respondent", referring
4 to you, Mr. Gonzalez, "submitted an affidavit
5 dated March 27th 2018, wherein he conditionally
6 admits the facts as set forth in the
7 Stipulation; two, consents to the imposition of
8 a three-year suspension; states that his
9 consent is being given freely and voluntarily
10 without coercion and duress; and is fully aware
11 of the consequences of consenting to such
12 discipline". Is that accurate?
13    **A.** Yes.
14    **Q.** It also says in the next paragraph that
15 you recently into a monitoring agreement with
16 the Lawyer's Assistance Program of the New York
17 City Bar back in 2018?
18    **A.** I did, yes.
19    **Q.** How long did that program last?
20    **A.** Six months.
21    **Q.** Did you complete the program?
22    **A.** Oh, no.
23    **Q.** And it says next, "Respondent",
24 referring to you "was issued an Admonition in

**COPLEY COURT REPORTING, INC.**

**164**

1 1994 for failing to return an unearned fee
2 after being discharged by his client". Is that
3 accurate?
4    **A.** Yes.
5    **Q.** And as part of this Order back in
6 October of 2018, it Orders that "Gonzalez shall
7 desist and refrain from 1, practicing law in
8 any form, either as a principal or agent, clerk
9 or employee of another; 2, appearing as an
10 attorney or counselor at law before any Court,
11 Judge, Justice, Board, Commission or other
12 public authority; 3, giving to another an
13 opinion as to the law or its application or any
14 advice in relation thereto; and 4, holding
15 himself out as in any way as an attorney and
16 counselor at law".
17      You understood that back then when this
18 was issued?
19    **A.** Yes.
20      MS. ZERNER: I'll just quickly mark
21 as Exhibit 16 the next Opinion in the Matter of
22 Osvaldo Gonzalez. This is before the Supreme
23 Court Appellate Division, Second Department
24 like the other one. This entered on March 10,

**COPLEY COURT REPORTING, INC.**

Morgan Art vs. McKenzie                                   Vol. III - Osvaldo Gonzalez                                      January 7, 2022

**EXHIBIT G - 42**

165

1   2021.  Is this referring to you, Mr. Gonzalez?

2   A.   Yes.

3        (Supreme Court Opinion was marked

4   for identification as Exhibit No. 16.)

5   Q.   And over here we have -- it states that

6   you "admitted and submitted an affidavit sworn

7   to on December 3, 2019 in support of your

8   application to resign as an attorney and

9   counselor at law; that you acknowledge that you

10  were then currently the subject of an

11  investigation in connection with the

12  representation of clients involving allegations

13  of professional misconduct".  Correct?

14  A.   Correct.

15  Q.   And it's this Opinion then that you

16  were disbarred and stricken from the role of

17  attorney?

18  A.   Yes.

19  Q.   And you understood this paragraph here

20  that orders like the previous Opinion that you

21  should "thereafter desist and refrain from

22  practicing law, appearing as an attorney,

23  giving to another an opinion as to law or its

24  application or any advice in relation thereto

COPLEY COURT REPORTING, INC.

166

1   and holding yourself out in any way as an

2   attorney and counselor at law, correct?

3   A.   Correct.

4   Q.   And you understood that at that time

5   when this Opinion issued?

6   A.   Yes.

7   Q.   And did you talk to McKenzie about the

8   end of your legal career?

9   A.   Yes.

10  Q.   What did you tell him?

11  A.   What happened was that he -- he Googled

12  me.  He was looking for me and he found my name

13  and he saw that I had been suspended and he

14  called me, you know.

15       And he asked me what I was doing.  I

16  told him I was doing art and he said come up

17  and we'll talk.  And when I got up there and

18  talked to him -- I let it go a couple months.

19  And then he, you know -- he said um, I'm

20  finishing up this case.  This case is going to

21  end, you know.  I got it all worked out.  And

22  you could do sales.  And I would do the sales,

23  I have a lot of art.  It was a great

24  opportunity.

COPLEY COURT REPORTING, INC.

167

1        But it has been destroyed, you know.

2   Q.   And did you discuss your legal career

3   or how it ended with Annette Vessecchia?

4   A.   Can you -- sorry.

5   Q.   I was moving on.  I asked you if

6   discussed the end of your legal career with

7   Annette Vessecchia?

8   A.   I don't think so.  I think she knew

9   though.  She knew.  I'm sure Michael told her,

10  but I never discussed it with her.

11  Q.   Did you discuss it with Tim Ginexi?

12  A.   I'm sure they both new.  He couldn't

13  possibly keep that a secret.

14  Q.   I'm just talking about what you said to

15  them.

16  A.   I didn't say nothing to them.

17  Q.   You didn't for Annette.  Did you talk

18  to Tim Ginexi about how your legal career

19  ended?

20  A.   No.

21  Q.   And I mean, there were problems with

22  your behavior at American Image Art as well,

23  right?

24  A.   Huh?

COPLEY COURT REPORTING, INC.

168

1   Q.   There were problems with your behavior

2   at American Image Art?

3   A.   No.

4   Q.   You didn't ever harass Annette

5   Vessecchia?

6   A.   No.

7   Q.   You didn't try to become intimate with

8   Annette?

9   A.   Annette and I went back and forth.

10  Used to go for walks.  We did a lot of things

11  together.  Whenever Annette had a problem, she

12  always came to me to console her.  It was like

13  -- you know, but you know -- you know.

14  Q.   Did you ever tell her she was hiding

15  behind her marriage?

16  A.   Did I ever tell her what?

17  Q.   That she was hiding behind her

18  marriage?

19  A.   Well, she told me she hadn't had sex

20  with her husband for 10 years.

21  Q.   I'm asking if you ever told her that

22  she was hiding behind her marriage?

23  A.   Yes.

24  Q.   Did you tell her she was a eunuch

COPLEY COURT REPORTING, INC.

Vol. III Osvaldo Gonzalez

**EXHIBIT G - 43**

---

169

1   incapable of love?

2     A.   I may have but -- I said some nasty

3   things, yeah. Intoxicated text messages, you

4   know. We always got back, you know.

5     Q.   Did you say that she seems to like

6   women more than men and she should get a

7   girlfriend?

8     A.   All she ever did was talk with her

9   girlfriends, you know.

10     Q.   Did you say that to her?

11     A.   Yes.

12     Q.   Did you say that if she was nicer to

13   you she would gain everlasting life and her

14   sins would be forgiven and she would fit in her

15   high school prom dress?

16     A.   What?

17     Q.   I said did you ever --

18     A.   What was the last part, the very last

19   part?

20     Q.   That she would fit in her high school

21   prom dress?

22     A.   Sit in her high school prom dress.

23     Q.   Fit. Fit.

24     A.   Sit?

COPLEY COURT REPORTING, INC.

---

170

1     Q.   Fit with an F.

2     A.   Listen, for Annette, her high school

3   prom dress would be more than she wears

4   regularly.

5     Q.   You said you've said some nasty things

6   to her via text or said to her when you were

7   intoxicated?

8     A.   I have. I have.

9     Q.   And did you get angry with her? Did

10   you feel like she was leading you on and you

11   were getting frustrated?

12     A.   I got angry with her, yeah.

13     Q.   I mean, do you consider communications

14   like that to a co-worker to be harassment?

15     A.   No, I don't. I don't because -- if she

16   asked me to stop, I would have stopped.

17     Q.   You are saying that she never asked you

18   to stop?

19     A.   No.

20     Q.   Did you --

21     A.   We had ups and downs like, you know.

22     Q.   Did you break any cell phones before

23   you left the Katonah property?

24     A.   Break cell phones, no.

COPLEY COURT REPORTING, INC.

---

171

1     Q.   Did you leave any -- was there any

2   Indiana art work in the house where you lived

3   on the Katonah property when you left?

4     A.   Not that I know of, no. Whatever was

5   there.

6     Q.   Did you take any Indiana art work?

7     A.   Nothing of any significance, you know.

8   There were some silk screens or some framed art

9   or --

10     Q.   Did you move any art work before you

11   left between the time you were terminated and

12   the time you left in October?

13     A.   What, American Image Art?

14     Q.   Yes.

15     A.   No, never.

16     Q.   Or any -- okay. Do you recall being

17   contacted -- did Annette reach out to you

18   because they couldn't find some art work after

19   you left? She was looking for your input on

20   where it was?

21     A.   Yes.

22     Q.   Did you respond to her?

23     A.   I think so. I think I told her where

24   it was.

COPLEY COURT REPORTING, INC.

---

172

1     Q.   Where was it?

2     A.   It was in the house, in the barn.

3     Q.   Do you recall what art work we're

4   talking about?

5     A.   I think we're talking about the 10 and

6   a half inch silk screens that were, you know,

7   the subject of the stenciling.

8     Q.   One more thing; during any of the

9   breaks we took today, did you speak with anyone

10   about your testimony?

11     A.   No.

12     Q.   Okay.

13       MS. ZERNER: That's all my

14   questions. Mr. Nikas, are you asking

15   questions?

16       MR. NIKAS: I do.

17   CROSS EXAMINATION

18   BY MR. NIKAS:

19     Q.   Good afternoon, Oz. I'll try to be as

20   brief as I can. I know you need to get your

21   bike.

22     A.   My bike, you know.

23     Q.   So toward the end of your testimony,

24   Ms. Zerner asked you about conversations

COPLEY COURT REPORTING, INC.

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 44 of 81    January 7, 2022

Vol. II - Osvaldo Gonzalez

**173**

1   between Michael McKenzie and various lawyers
2   that you overheard. Do you recall being asked
3   those questions?
4    **A.**   Yeah.
5    **Q.**   Now, without telling us yet what you
6   overheard, was it your understanding based on
7   the content of those phone calls that Mr.
8   McKenzie was communicating with those lawyers
9   for the purpose of committing a fraud or a
10   crime by concealing art work from the Court or
11   from the other parties in this case?
12    MS. ZERNER: Objection.
13    **A.**   Absolutely.
14    MR. NIKAS: Bridget, do you intend
15   to assert privilege over the contents of all of
16   those conversations McKenzie had with those
17   lawyers?
18    MS. ZERNER: We -- this is -- all
19   these attorneys that he's claiming he called
20   about handling the art work, give me a quick --
21   if you all stay on, I'll resolve this in one
22   moment. Thanks.
23    (A brief recess was taken.)
24    MS. ZERNER: I have conferred with

COPLEY COURT REPORTING, INC.

**174**

1   me client and he does assert a privilege to
2   calls he made to attorneys at that time.
3    Did we lose Luke?
4    MS. BANKS: He will be back on in a
5   moment. Sorry about that.
6    (Pause.)
7    (Attorney Nikas rejoins Zoom.)
8    MS. ZERNER: I spoke with my client
9   and he does assert his privilege to
10   communications with attorneys this past summer
11   related to his business and personal matters.
12   He's not waived it, and so we object to any
13   disclosure of those communications.
14    MR. NIKAS: Okay. We'll confer
15   after this deposition about the Motion to
16   Compel we intend to file as well as re-opening
17   this deposition, but for now I won't ask those
18   questions.
19    MS. ZERNER: Thank you.
20    **Q.**   Mr. Gonzalez, at the beginning of your
21   deposition, Ms. Zerner asked you a lot of
22   questions about the horrible way in which
23   McKenzie treated you. Do you recall generally
24   those questions?

COPLEY COURT REPORTING, INC.

1    **A.**   Yes.
2    **Q.**   And she also asked you quite a few
3   questions about the way in which McKenzie
4   conducted his business where you testified,
5   generally speaking, that McKenzie had hidden
6   art, engaged in forgery and generally was a
7   nightmare to work with, among other things. Do
8   you recall that testimony?
9    **A.**   Yes.
10    **Q.**   She then asked you whether you resented
11   McKenzie and you said yes. Do you remember
12   that?
13    **A.**   Yeah.
14    **Q.**   Do you think there's anything wrong
15   with resenting someone for -- who you believe
16   may have engaged in criminal behavior?
17    **A.**   No, I think he -- he is entitled to a
18   proportion of resentment that comes with what
19   you do when you do what he did.
20    Don't tell me that you got 30 million
21   dollars in art and you're taking this 30
22   million dollars in art and you're going to hide
23   it, right, so nobody can get at it. And then
24   you're going to shut down your studio and all

COPLEY COURT REPORTING, INC.

**176**

1   the time that I spent trying to get into, you
2   know, into the position of selling art, it's
3   just blown up because he got greedy and wanted
4   to rob the Estate and the Star of Hope. It's
5   outrageous. The greed is just outrageous.
6   It's one of those American Greed episodes, you
7   know.
8    **Q.**   And do you think it's reasonable to
9   resent someone who has conducted themselves
10   that way?
11    **A.**   Pardon me? Sorry?
12    **Q.**   Sure. Do you think it's reasonable to
13   resent somebody who has conducted themselves in
14   that way?
15    **A.**   No, I don't think so. I mean, there's
16   all levels of resentment. You know, the French
17   have "Presumptive Lon" {phonetic}, a general
18   malaise that the French people occasionally
19   fall into. So -- I don't think it's -- it
20   wasn't a big -- that big a deal to me. It was
21   a big deal. I mean, he's awful. He's really
22   horrible the way he treats people.
23    But like I'm a big boy. I've been
24   around. I was taking the shots. I don't hear

COPLEY COURT REPORTING, INC.

177

1  well, so that helps a lot.  I'm deaf in my
2  right ear so I only heard some of it.
3      Q.   Have you told the truth today in your
4  deposition about your view that McKenzie has
5  engaged in criminal behavior?  Did you tell the
6  truth about that?
7      A.   I think so.  I mean, absolutely.
8      Q.   Have you told the truth --
9      A.   The stuff the trust funds and then all
10  that stuff, he was way out there with that.
11  And don't forget that at that point, you know,
12  it's -- he's not waiting to negotiate.  He's
13  not waiting for a decision from AAA.
14         He's doesn't care what's happening in
15  the District Court in Maine or in the Appellate
16  Court there.  He doesn't care about any of
17  that.  It's over.  He just grabbing the art and
18  he's running.  That's it.  That's what
19  happened.
20      Q.   When you testified about your view that
21  Mr. McKenzie forged art work and had hidden
22  art, were you telling the truth in your
23  testimony?
24      A.   Yeah.  Like I said, putting stencils of

178

1  2015 on art works in 2021 -- all right.  If
2  that's not -- if that's not a problem, then
3  it's not a problem.
4      Q.   Did Michael McKenzie --
5      A.   And then -- you have all the stuff that
6  he's created there; hundreds and hundreds of
7  stuff.  But I'm sure that the production
8  listing didn't provide for all that.  It
9  provided for something entirely different.  It
10  didn't provide for 500 Four Seasons of HOPE.
11  You know what I mean?
12         And then he was going to claim that
13  American Image Art was a true beneficiary of
14  the Robert Indiana art world, and he was going
15  to claim that the Morgan Foundation were
16  swindlers and fraudsters.
17      Q.   Mr. Gonzalez, if you could take a look
18  at the declaration that you signed.  It's been
19  marked as Exhibit 1 in this deposition.
20      A.   I'm familiar with it, yeah.
21      Q.   I'm going to have Haley put it up on
22  the screen.  Take a quick look.
23         (Pause.)
24      Q.   Mr. Gonzalez, can you see that on the

179

1  screen, your declaration?
2      A.   Yes.
3      Q.   At the bottom of the declaration toward
4  the end please, Haley, it says in paragraph 19
5  "I have read this document more than once very
6  carefully.  Every statement in this document is
7  completely truthful and accurate".
8         Do you see that?
9      A.   Yes.
10      Q.   Sorry.  You --
11      A.   I said yes.
12      Q.   Okay.  Now, if you could take a look at
13  your document for me, just start to finish, and
14  if you could confirm for us that everything in
15  this declaration is true to the best of your
16  knowledge and belief, other than the fact that
17  we know you've moved to Puerto Rico and so your
18  address would not be the same.
19         But if you could look at the
20  declaration for us and --
21      A.   I did that already before.  And -- and
22  it's -- it's what I said and is what I meant.
23  I reviewed the whole thing.
24      Q.   Everything in this document is correct?

180

1      A.   Yes.  Yes.
2      Q.   Thank you.
3      A.   Yes.
4      Q.   Now, Mr. McKenzie has, you say in your
5  declaration, moved art work both on his
6  property and then to a storage facility in
7  Middletown.  Do you recall giving information
8  about that?
9      A.   Yes.
10      Q.   Now, the first visit that I made to
11  Michael McKenzie's property with some other
12  individuals was on May 25th 2022 [sic],
13  correct?
14      A.   Yeah.
15      Q.   Okay.  Now, when we arrived on
16  McKenzie's property, do you recall that we were
17  instructed to look at the art work in Mr.
18  McKenzie's two floor studio?
19      A.   Sorry?
20      Q.   Did you hear the question?
21      A.   Yeah.
22      Q.   And I didn't hear -- you froze.
23      A.   Can you give me the question again?
24      Q.   Sure.  Sure.  So when we arrived at

**EXHIBIT G - 46**

181

1  McKenzie's property in May of 2021, do you
2  recall that we were shown to the two floor
3  studio and told that's where the art work was
4  located?
5      A.   Yes.
6      Q.   And do you recall that we looked on the
7  first floor of the studio and the second floor
8  of the studio?
9      A.   Yes.
10     Q.   And do you recall that there were art
11 handlers there opening boxes and cataloguing
12 art?
13     A.   Yes.
14     Q.   At the time of that inspection was
15 there art work located in Mr. McKenzie's house
16 that was by Robert Indiana?
17     A.   Yes.
18     Q.   Was it located in his basement?
19     A.   Yes.  It had been finished to house the
20 collection.
21     Q.   Now, was there also art work by Robert
22 Indiana or purported to be by Robert Indiana
23 that Michael McKenzie had moved to wooden racks
24 outside behind one of the buildings on his

COPLEY COURT REPORTING, INC.

182

1  property?
2      A.   What?  That doesn't sound right.  Give
3  me that one more time.  That sounded a little
4  strange.
5      Q.   Sure.  Let's do it this way.
6          MR. NIKAS:  Haley, if you could put
7  up Tab 7, please.  It's a picture of wooden
8  racks or shelves.
9      Q.   Mr. Gonzalez, do you see these wooden
10 shelves?
11     A.   I see, yeah.  I know what that is.  I
12 know what that is.  Ask me what you want about
13 that.
14     Q.   Sure.  Did Mr. McKenzie before the
15 May 25, 2021 inspection, move art work out of
16 his studio onto those wooden shelves so the art
17 work would not be seen by Morgan Art
18 Foundation?
19     A.   Um, it was slightly different.
20     Q.   Sure.  Tell me what you remember.
21     A.   That art work was moved and because
22 there was a lot of stuff, but it was all flat
23 like I showed you, it was stacked.  So we were
24 able to stack it on top of the flat files so

COPLEY COURT REPORTING, INC.

183

1  for that inspection, it was all over there.
2      Q.   So McKenzie had the large stack of art
3  work moved to these racks out of the studio
4  before the May inspection; is that right?
5      A.   No.  No.  Those wooden racks, right,
6  are a different story.  This is the story on
7  the wooden racks.
8      Q.   Okay.
9      A.   Those racks were created by Michael
10 McKenzie to house his art collection, but in
11 order to fit them up in Middletown, they had to
12 be taken apart and put back together again.
13         And the carpenter's came in and they
14 did that, you know, but it had nothing to do
15 with the -- the second inspection now, he was
16 trying to get everything out, you know what I'm
17 saying.
18         And those shelves were then moved out
19 of the house and moved up to the Middletown
20 storage facility.
21     Q.   So before the first inspection when you
22 said that McKenzie had Robert Indiana art work
23 stored in his house in the basement, was that
24 -- was that art work stored on these wooden

COPLEY COURT REPORTING, INC.

184

1  racks?
2      A.   Yes.
3      Q.   Okay.  And other than McKenzie's house
4  in the basement where all of the art work you
5  just described was stored on these racks, were
6  there other -- was there other art work on the
7  property that was not shown to Morgan Art
8  Foundation?
9      A.   Most of it was there in the basement.
10 There was 500 books of Alphabet and the metal
11 jackets.  Did you see those?
12     Q.   We did not see those art works in the
13 studio.  Were those hidden in Mr. McKenzie's
14 basement?
15     A.   Yeah, there were special racks made for
16 them all of the way down one side and up the
17 other; two, upper and lower stacked side by
18 side so you know, to house the Alphabet
19 collection.
20     Q.   And during the inspection in May of
21 2021, you never heard anyone say to me or to
22 Morgan Art Foundation that McKenzie had a whole
23 collection of art work in his house, did you?
24     A.   No they must have forgotten to mention

COPLEY COURT REPORTING, INC.

185

1   that to you.
2          MR. NIKAS:  Now, Haley, if you
3   could put up at that tab 8, please.
4     Q.   Mr. Gonzalez, do you see this
5   photograph on the page?
6     A.   Okay.  Yeah.
7          MR. NIKAS:  What exhibit are we at
8   now?  17?
9          MS. ZERNER:  17.
10         MR. NIKAS:  I'm going to mark the
11  wooden rack as 17 and this photograph which is
12  MAF 60229, I'm marking it as Exhibit 18.
13         (MAF 60248 document was marked for
14  identification as Exhibit No. 17.)
15         (MAF 60229 document was marked for
16  identification as Exhibit No. 18.)
17         MR. NIKAS:  Haley, can you give us
18  the bates for 17.
19         MS. BANKS:  Sorry.  You want the
20  bates number for 7?
21         MR. NIKAS:  Yes.
22         MS. BANKS:  MAF 60248.
23    Q.   Mr. Gonzalez, did you take this
24  photograph?

COPLEY COURT REPORTING, INC.

---

187

1   it was one of the back shelves in the back.
2   You know, there were rooms and I can tell
3   that's in the back.  There's a lot of stuff.
4   Those are all --
5     Q.   This is McKenzie's basement or
6   somewhere else?
7     A.   That's in the basement.
8     Q.   And that's the area that was not shown
9   or disclosed to Morgan before that May
10  inspection, correct?
11    A.   Yes.  Correct.
12    Q.   Okay.
13         MR. NIKAS:  Haley, if you could put
14  up Tab 10, please, MAF 60231.
15         (MAF 60231 document was marked for
16  identification as Exhibit No. 20.)
17    Q.   Mr. Gonzalez, is this another
18  photograph similar to the photograph we showed
19  you a few minutes ago?
20    A.   Yes.
21    Q.   And you took this photo?
22    A.   Yes.
23         MR. NIKAS:  Haley, if you could
24  show Tab 11, please.

COPLEY COURT REPORTING, INC.

---

186

1     A.   Yes.
2     Q.   If you could scroll up -- where are
3   these works located in the picture?  Are they
4   in McKenzie's basement or someplace else?
5     A.   Right there, you can see the studio.
6     Q.   And were those art works moved out of
7   the studio before the inspection?
8     A.   Yeah.  Yeah.
9          MR. NIKAS:  Haley, if you could put
10  up Tab 9, please.
11         (Pause.)
12         MR. NIKAS:  I'll mark this as
13  Exhibit 19.
14         (MAF 60230 document was marked for
15  identification as Exhibit No. 19.)
16    A.   I see it.  I know what it is.
17    Q.   Mr. Gonzalez, what is this a picture
18  of?
19    A.   Those, I believe, are HOPE works.
20  Well, I think they are HOPE works.  Some kind
21  of Robert Indiana work.
22    Q.   Where were they?  Where were they
23  located in this picture?
24    A.   That's -- what you're looking at there,

COPLEY COURT REPORTING, INC.

---

188

1          (MAF 60232 document was marked for
2   identification as Exhibit No. 21.)
3     Q.   Mr. Gonzalez, is this another
4   photograph of Robert Indiana art work that
5   Michael McKenzie kept in his basement?
6     A.   Yes.
7     Q.   And this was in his basement during the
8   May inspection; is that right?
9     A.   Yes.  Yes.
10         MR. NIKAS:  If you could put up tab
11  12, Haley.  I'm going to mark this document as
12  Exhibit 22.
13         (MAF 60233 document was marked for
14  identification as Exhibit No. 22.)
15    Q.   Mr. Gonzalez, is this a photograph of
16  art work purported to be by Robert Indiana that
17  Michael McKenzie kept in his basement?
18    A.   Yes.
19    Q.   And this art work was located in Mr.
20  McKenzie's basement during the May inspection,
21  correct?
22    A.   Yes.
23         MR. NIKAS:  Haley, if you could
24  please put up tab 13.  I'm marking this

COPLEY COURT REPORTING, INC.

Vol. II/ Osvaldo Gonzalez

189

1  document as Exhibit 23, MAF 60234.
2      (MAF 60234 document was marked for
3  identification as Exhibit No. 23.)
4      Q.  Mr. Gonzalez, is this another
5  photograph you took of art work purportedly by
6  Robert Indiana that Michael McKenzie kept in
7  his basement at the time of the May inspection?
8      A.  Yes.
9      Q.  Thank you.
10         MR. NIKAS:  Haley, if you could put
11  up tab 14, please.  I'm marking as Exhibit 24,
12  a document bates stamped MAF 60235.
13         (MAF 60235 document was marked for
14  identification as Exhibit No. 24.)
15      Q.  Mr. Gonzalez, is this another
16  photograph you took of art work purportedly by
17  Robert Indiana that Michael McKenzie kept in
18  his basement at the time of the May inspection?
19      A.  Yes.
20         MR. NIKAS:  If you could put up tab
21  15, please, Haley.  Marking as Exhibit 25, a
22  document bates stamp MAF 60236.
23         (MAF 60236 document was marked for
24  identification as Exhibit No. 25.)

COPLEY COURT REPORTING, INC.

191

1  inspection?
2      A.  Yes.
3      Q.  Do you see the wooden shelf that the
4  art work is stored on top of?
5      A.  Yes.
6      Q.  Is that the same wooden shelf that you
7  just described earlier that Michael McKenzie
8  had deconstructed and then reconstructed behind
9  a building on his property?
10      A.  The same wood.
11         MR. NIKAS:  Haley, if you could
12  please put up at tab 18.  Marking this as
13  Exhibit 28.
14         (MAF 60239 document was marked for
15  identification as Exhibit No. 28.)
16      Q.  Mr. Gonzalez, is this another
17  photograph you took of art work purportedly by
18  Robert Indiana that Michael McKenzie kept in
19  his basement during the May 2021 inspection?
20      A.  Yes.
21         MR. NIKAS:  You can put up tab 19,
22  Haley.  Marking as Exhibit 29, MAF 60240.
23         (MAF 60240 document was marked for
24  identification as Exhibit No. 29.)

COPLEY COURT REPORTING, INC.

190

1      Q.  Mr. Gonzalez, is this another
2  photograph you took of art work purportedly by
3  Robert Indiana that Michael McKenzie kept in
4  his basement around the time of the May 2021
5  inspection?
6      A.  Yes.
7         MR. NIKAS:  If you could put up tab
8  16, Haley.  Marking as Exhibit 26, MAF 60237.
9         (MAF 60237 document was marked for
10  identification as Exhibit No. 26.)
11      Q.  Mr. Gonzalez, is this another
12  photograph you took of art work purportedly by
13  Robert Indiana that Michael McKenzie kept in
14  his basement when the May 2021 inspection
15  occurred?
16      A.  Yes.
17         MR. NIKAS:  You can put up tab 17,
18  Haley.  Marking as Exhibit 27, MAF 60238.
19         (MAF 60238 document was marked for
20  identification as Exhibit No. 27.)
21      Q.  Mr. Gonzalez, is this another
22  photograph you took of art work purportedly by
23  Robert Indiana that Michael McKenzie kept in
24  his basement at the time of the May 2021

COPLEY COURT REPORTING, INC.

192

1      Q.  Mr. Gonzalez, is this another
2  photograph you took of art work purportedly by
3  Robert Indiana that Robert McKenzie kept in his
4  basement during the May 2021 inspection?
5      A.  Yes.
6         MR. NIKAS:  If you could put up
7  tab 20, Haley.  Marking as Exhibit 29 -- did I
8  get that right?  MAF 60241.
9         THE COURT REPORTER:  I think this
10  is 30.
11         MR. NIKAS:  30, you're right.
12         (MAF 60241 document was marked for
13  identification as Exhibit No. 30.)
14      Q.  Mr. Gonzalez, this is a photograph of
15  the first floor of the studio at Michael
16  McKenzie's property, correct?  Can you hear me,
17  Oz?
18      A.  Yes.  Yes, it is.
19      Q.  You said yes, it is a photograph of the
20  first floor studio?
21      A.  Yes.
22      Q.  Do you recall that when I arrived with
23  Morgan Art Foundation --
24      A.  That last picture may be in the

COPLEY COURT REPORTING, INC.

193

1  basement.
2  **Q.** May be in the basement?
3  **A.** Yeah. Yeah, it's in the basement. I
4  can see out the window. You see out the
5  window?
6  **Q.** Okay. And this art work was not shown
7  to Morgan Art Foundation during its May 2021
8  inspection, correct?
9  **A.** Right.
10  **Q.** Thank you.
11       MR. NIKAS: Haley, if you could put
12  up tab 21, please. Marking as Exhibit 31, MAF
13  60228.
14       (MAF 60228 document was marked for
15  identification as Exhibit No. 31.)
16  **Q.** Mr. Gonzalez, this is another
17  photograph of art work you took purportedly by
18  Robert Indiana that McKenzie kept in his
19  basement during the May 2021 inspection,
20  correct?
21  **A.** Yes.
22  **Q.** Mr. Gonzalez, after the May 21st
23  inspection, you have come to learn that the
24  Court issued an Order requiring McKenzie to let

COPLEY COURT REPORTING, INC.

194

1  Morgan Art Foundation inspect the property in
2  early August. Do you recall that?
3  **A.** Yes.
4  **Q.** And the Order was issued on June 29,
5  2021. Does that date ring a bell?
6  **A.** Yes.
7  **Q.** Now, after the June 29, 2021 Order, Mr.
8  -- did Mr. McKenzie take steps to move art work
9  off the property that Morgan Art Foundation had
10  not seen?
11  **A.** Yes.
12  **Q.** Okay.
13  **A.** All of it.
14       MR. NIKAS: Haley, if you could put
15  up tab 23, please.
16  **A.** How many pieces are there?
17  **Q.** Mr. Gonzalez, do you see that truck in
18  front of --
19  **A.** Yes.
20  **Q.** Is that a moving truck?
21  **A.** It's a bus. It's called the art bus.
22  **Q.** Did Michael McKenzie use the art bus
23  pictured here to take art work off the property
24  that Morgan had not seen?

COPLEY COURT REPORTING, INC.

195

1  **A.** Yes.
2       MR. NIKAS: I'm marking as
3  Exhibit 32 document bates stamped MAF 60249.
4       (MAF 60249 document was marked for
5  identification as Exhibit No. 32.)
6  **Q.** And did he use this art truck, as
7  McKenzie calls it, to --
8  **A.** We also rented some big 16-foot trucks.
9  **Q.** I'll get to that in just a moment.
10  When you said that McKenzie used this art truck
11  to move art work off the property that Morgan
12  had not seen at the first inspection, you --
13  did he use this truck after the Court Order in
14  order to move art work off the property?
15  **A.** Yes.
16       MR. NIKAS: Haley, if you could
17  please show us tab 26. I'm marking as
18  Exhibit 33 a document that does not have a
19  bates stamp, but it's an e-mail dated Sunday,
20  July 4, 2021, at 8:14 p.m. It's from Michael
21  McKenzie to vessecchia@mac.com,
22  tginexi@aol.com, og@americanimageart.com and
23  then another Michael McKenzie e-mail, the same
24  as the "from" line.

COPLEY COURT REPORTING, INC.

196

1       In this e-mail, Mr. Gonzalez, Michael
2  McKenzie writes on July 4th, just a week after
3  the Court Order, "we will meet at 8 a.m. I
4  will have a bus in front of the house. We will
5  go up 22, fill up diesel fuel, then stop at
6  Home Depot to pick up ten sets of metal
7  shelves. See ya then". Do you see that?
8       (E-mail without Bates Stamp was
9  marked for identification as Exhibit No. 33.)
10  **A.** Yes, I see it.
11  **Q.** Did Michael McKenzie need metal shelves
12  in order to store art work he intended to move
13  off the property?
14  **A.** Yes. I don't know if he used them but
15  he bought them.
16       MR. NIKAS: Haley, if you could
17  scroll down, please, in that e-mail. There's a
18  July 5th e-mail as well. It's probably a
19  different document. Go to tab 27.
20       MS. ZERNER: Do you want to mark
21  this e-mail as Exhibit 33.
22       MR. NIKAS: So I'm going to mark
23  Exhibit 33 as the document that did not have a
24  bates stamp. If you could put up tab 27.

COPLEY COURT REPORTING, INC.

Morgan Art vs. McKenzie | vol. III Osvaldo Gonzalez

Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 50 of 81

January 7, 2022

EXHIBIT G - 50

197

1    MS. BANKS:  This is tab 27 now.
2    MR. NIKAS:  I'll mark this as
3  Exhibit 34, another e-mail that did not have a
4  bates stamp.  It's from pjrlicense@aol.com to
5  tginexi@aol.com, vessecchia@mac.com and
6  og@americanimageart.com July 5th 2021 at 10:13
7  p.m.
8         (E-mail with no Bates Stamp was
9  marked for identification as Exhibit No. 34.)
10    Q.   Again, Mr. Gonzalez, this is an e-mail
11  sent that you received on July 5th.  It states
12  "given how long it took, I think starting at 8
13  a.m.  Again, hopefully finish packing by 10:30.
14  Get there at 12.  Assemble the shelves and be
15  done by 2".  Do you see that?
16    A.   Yeah, I see it.
17    Q.   Who wrote this e-mail?
18    A.   He did, Mr. McKenzie.
19    Q.   Did Michael --
20    A.   That's his e-mail address.
21    Q.   Michael McKenzie uses the pjrlicense
22  e-mail address?
23    A.   Yep.
24    Q.   Now, do you know how --

COPLEY COURT REPORTING, INC.

198

1    A.   When he worked for Johnson.
2    Q.   Do you know how he accesses that e-mail
3  address, Mr. Gonzalez?
4    A.   I think it's on his laptop, on his AOL
5  account.
6    Q.   Are you aware that Mr. McKenzie did not
7  search for e-mails that were sent or received
8  from and to that e-mail address during the
9  course of this litigation?
10    MS. ZERNER:  Objection.
11    A.   I don't -- I don't know that to be a
12  fact, no.
13    Q.   When Mr. McKenzie writes "given how
14  long it took, I think starting at 8 a.m." --
15  what was he referring to when he says "given
16  how long it took"?
17    A.   It may have been there was an earlier
18  -- another trip the day before.
19    Q.   When he refers to the "it", how long
20  "it" took, is he talking about moving art work
21  off the property after the Court Order?
22    A.   Yeah.  Yep.  Yeah, yeah.
23    Q.   And when he says that again, "hopefully
24  finish packing"; what are you all packing?  Art

COPLEY COURT REPORTING, INC.

199

1  work that he wants moved off the property?
2    A.   Yes.
3    Q.   He says "assemble the shelves and be
4  done by 2".  Why was he instructing you to
5  assemble shelves?
6    MS. ZERNER:  Objection.
7    A.   To reassemble the shelves so they could
8  be used in -- we sized them so we could use
9  them in Middletown.
10    Q.   Were those the shelves from the
11  basement?
12    A.   Yes.
13    Q.   And did that also include the metal
14  shelves that he had purchased at Home Depot
15  that were --
16    A.   You know, we went there and he bought
17  those metal shelves, but I think they are still
18  all stacked up in one of those containers.  I
19  don't think we really used them, you know.
20    Q.   But you used the wooden shelves?
21    A.   Yeah, we pretty much got the whole
22  thing up there.  I think we got four,
23  five pieces of shelving up and down
24    Q.   Now, you talk in your declaration about

COPLEY COURT REPORTING, INC.

200

1  moving the art so we don't need to go into
2  detail there, but I do want to move forward a
3  few weeks?
4    MR. NIKAS:  Haley, if you could put
5  up tab 28, please.  This is an e-mail without a
6  bates stamp.  I'll mark this as Exhibit 35.
7  It's an e-mail from pjrlicense@aol.com.
8    Q.   You've identified that as Michael
9  McKenzie's e-mail address to tginexi@aol.com,
10  og@americanimageart, and vessecchia@mac.com
11  sent July 21st 2021 at 10:15 p.m.  You see this
12  e-mail?
13         (E-mail dated July 21, 2021 was
14  marked for identification as Exhibit No. 35.)
15    A.   Yep.
16    Q.   And you received this e-mail?
17    A.   Yeah.  In this e-mail he's telling Tim
18  -- he's the first one -- he's telling Tim to
19  bring down 20 portfolios that I guess he's
20  going to give to Greg Allen.  They are big.
21  The portfolios are very big, 36 x 48.  There
22  are like four different silk screens in it, so
23  20 of those portfolios is like a big deal, you
24  know.

COPLEY COURT REPORTING, INC.

**EXHIBIT G - 51**

**201**

1    Q.   This says "truck is at studio.  I need
2    to bring down another 20 portfolios before we
3    leave for storage".
4         And just so I understand you, you're
03:23:33PM 5    saying that Mr. McKenzie was instructing Tim to
6    bring down 20 portfolios of art work?
7    A.   On the second floor to the first floor,
8    so I guess Greg Allen could come pick it up
9    from the first floor.
03:23:48PM 10        MS. ZERNER:  Objection to the
11   question.  I didn't think Mr. Nikas finished
12   his question so I was waiting for that.  But
13   for the record, objection.
14   Q.   Is this art work that was hidden from
03:24:02PM 15   Morgan Art Foundation in the first inspection?
16        MS. ZERNER:  Objection.
17   A.   Um, I think those were there on the
18   second floor when you came the first time.  I
19   think you saw -- those were there in the second
03:24:28PM 20   floor on the first trip.  I think they were
21   still there.
22   Q.   This is from the studio?
23   A.   Yes, the second floor of the studio.
24   They were there.  Those portfolios were there.

**202**

1    I think he recorded that too, you know.
2    Q.   And Mr. McKenzie was none the less
3    moving 20 portfolios off the property to --
4    A.   I think if I had to guess, I would say
03:24:58PM 5    he would give them to Greg Allen.
6    Q.   Let me just finish the question.  What
7    I'm asking is Mr. McKenzie was moving this art
8    work off the property after the Court Ordered
9    inspection and before Morgan showed up for that
03:25:18PM 10   August 5th second inspection date, correct?
11   A.   I'm just trying to say that I think
12   those 20 pieces were already in the studio.
13   They didn't go anywhere.  He didn't do anything
14   nefarious with them other than give them to
03:25:38PM 15   Greg Allen and they were going to disappear.
16   Q.   And you never heard Mr. McKenzie say
17   that he was moving art work out of the studio
18   -- withdraw that.
19        You never heard Mr. McKenzie tell
03:25:56PM 20   Morgan that he was moving art work off the
21   property before that August 2021 inspection,
22   did you?
23        MS. ZERNER:  Objection.
24   A.   No.  No.  He never said that.

**203**

1    Q.   Did Mr. McKenzie feel like he was being
2    invaded by Morgan's second inspection?
3        MS. ZERNER:  Objection.
4    A.   Um, I think he felt invaded by
03:26:39PM 5    anything.  No matter what you said, it was --
6    everything was an invasion.  Just the fact that
7    you wanted inventory at all was a problem, you
8    know.
9    Q.   Did McKenzie ever tell you that he was
03:26:52PM 10   angry or pissed off about this Court Order
11   requiring him to allow Morgan on the property?
12        (Laughter.)
13   A.   Absolutely.  He went off on that.
14   Q.   What did he say?
03:27:04PM 15   A.   Nothing.  Just said what he says, you
16   know, they're thieves, scumbags and blah, blah,
17   blah.  He would go on and on like that; a
18   string of profanities.  You know, he was really
19   obsessed with the -- with the idea of the
03:27:31PM 20   inventory.
21        Don't forget that this guy can't let
22   anybody see the inventory because then you're
23   going to know what he has.  You're going to say
24   how the hell did you get all this.

**204**

1        Then in the future when he tries to
2    sell it, he could only sell the pieces that
3    have been verified by you.  And then you're
4    going to not let him verify everything that he
03:28:01PM 5    wants to do, so he decided that he wasn't going
6    to do it at all.
7    Q.   Did he tell you --
8    A.   You were never going to inventory, get
9    a straight answer on the inventory.  Never
03:28:16PM 10   gonna happen.  All these negotiations and all
11   that stuff about 5 million, 3 million, it's all
12   nonsense.  Wasn't even like remotely possible
13   or close.
14   Q.   Did Michael McKenzie ever tell you
03:28:31PM 15   that; that we were never going to get --
16   A.   Absolutely.  Absolutely.
17   Q.   He told you that we were not going to
18   get a straight inventory?
19   A.   In everything he did, he said it.
03:28:55PM 20        MR. NIKAS:  If you could, Haley,
21   please put up tab 30.  We'll mark that as 36.
22   It's an 11 page document.
23        (11 page document was marked for
24   identification a Exhibit No. 36.)

**EXHIBIT G - 52**

### 205

1    Q.   This is an e-mail from you, Mr.
2    Gonzalez, to John Markham, Bridget Zerner,
3    Kevin Lipson and Maaren Shah; do you see that?
4    A.   Right.
5    Q.   It's dated December 16, 2021.
6    A.   Correct.
7    Q.   And then you describe in the e-mail an
8    exchange or a number of exchanges Mr. McKenzie
9    had with Ms. Cyphers, Peggy Cyphers.  Do you
10   see that?
11   A.   Yes.
12   Q.   Is everything that you wrote in this
13   e-mail truthful?
14   A.   Yes, only that I minimized it.
15   Q.   How did you minimize it?
16   A.   Because like what he said was a lot
17   like, you know, more grotesque than what is
18   expressed in this e-mail.
19   Q.   What Mr. McKenzie expressed was even
20   more grotesque than what you described in this
21   e-mail?  Is that what you just said?
22   A.   Yeah, the way he talks.  The way he
23   talks.  He's like fantastically abusive.
24   Q.   Now --

COPLEY COURT REPORTING, INC.

### 206

1    A.   I've heard him say -- we'll get dinner
2    in the back and he'd jump off the table and
3    start pointing at Peggy and telling her to shut
4    her fucking mouth.  Just shut the fuck up.
5    Shut it, you fuck.  You know, 6 inches from her
6    face in front of all our guests.  All right?
7    That's the kind of guy he is, you know.  It's
8    crazy, crazy stuff.
9    Q.   Mr. Gonzalez, you described how after
10   you had revealed Mr. McKenzie's misconduct, he
11   had both reported you to the police and then
12   reported you to the Lawyers Fund.  Do I recall
13   that correctly?
14   A.   Yes.
15   Q.   Before you had provided information
16   about Mr. McKenzie's conduct, did he ever
17   accuse you of committing crimes?
18   A.   No.
19   Q.   Did he ever accuse you of the unlawful
20   practice of law before you had come out and
21   told what Mr. McKenzie was doing?
22   A.   No.
23   Q.   Did he ever say to you that he thought
24   you were his lawyer?

COPLEY COURT REPORTING, INC.

### 207

1    A.   No.
2    Q.   So --
3    A.   He hired seven, eight different law
4    firms.
5    Q.   So is it accurate to say that the very
6    first time Michael McKenzie ever made an
7    accusation that you had committed a crime was
8    after you reported the series of events to me
9    and the Estate of Robert Indiana?
10   A.   Yes.
11        MS. ZERNER:  Objection.
12   A.   But further, he told the Lawyers Fund
13   that the first time he had heard about my being
14   suspended was on August 17th or something,
15   2021.
16        But like I said, you know, the fact
17   that I was suspended came out in one of the
18   depositions where I was questioned about it.
19   All right?
20        He knew about it, you know.  So the lie
21   that he told about not knowing that I had been
22   suspended was done just so he could collect the
23   money from the Lawyers Fund.  It's just a fraud
24   on the Lawyers Fund.

COPLEY COURT REPORTING, INC.

### 208

1    Q.   Did you believe that Michael McKenzie
2    was submitting police reports about you and
3    reporting you to the Lawyers Fund in
4    retaliation for your declaration given in this
5    case?
6        MS. ZERNER:  Objection.
7    A.   Absolutely.
8    Q.   Did you feel intimidated by Mr.
9    McKenzie's police report and reports to the
10   Lawyers Fund?
11   A.   Well, it concerns me, you know.
12   Q.   And was Mr. McKenzie's police report
13   and his report to the Lawyers Fund the reason
14   you felt uncomfortable testifying in your first
15   deposition in this case?
16        MS. ZERNER:  Objection.
17   A.   Yes.
18   Q.   Did you ever talk to Michael McKenzie
19   directly about a police report or the Lawyers
20   Fund report?
21   A.   No.
22   Q.   Mr. Gonzalez, if you could please look
23   at tab 31 which Haley will put up on the screen
24   for you.

COPLEY COURT REPORTING, INC.

209

1      MR. NIKAS:  I'll mark this as
2   Exhibit 37, document bates stamp QE 29.  It's a
3   two-page document.
4      (QE 29 two-page document was marked
5   for identification as Exhibit No. 37.)
6   Q.  Mr. Gonzalez, did you write this e-mail
7   to Mr. Markham on November 17, 2021?
8   A.  Yes.
9   Q.  If you scroll down to the bottom, did
10  you write that e-mail as well?
11  A.  Yes.
12     MR. NIKAS:  You can take that down,
13  Haley.  If you could also put up, Haley,
14  tab 42.  I'll mark this tab Exhibit 38.
15     (Declaration of Michael McKenzie
16  was marked for identification as Exhibit No.
17  38.)
18  Q.  It's a declaration of Michael McKenzie
19  in this case that was signed November 6th 2018.
20     MR. NIKAS:  If you could scroll
21  down to paragraph 11, Haley -- sorry -- go to
22  paragraph 10.  There it is.
23  Q.  Mr. Gonzalez, are you aware that in the
24  August 2021 inspection of the studio my team

COPLEY COURT REPORTING, INC.

210

1   and I collected approximately 6,000 pages of
2   documents that had not been produced in the
3   case.  Are you aware of that?
4   A.  No.
5   Q.  You testified earlier that Annette had
6   access to the archives of the works, invoices,
7   sales records, a whole host of information
8   about McKenzie's sales and production of art
9   work.  Did I get that right?
10  A.  She's got it.  She knows where
11  everything is.  She's got it.
12  Q.  Now, under oath in this declaration,
13  McKenzie wrote "throughout the first several
14  years, AIA paid Indiana a million dollars
15  although his royalty earnings fell short of
16  that.  AIA's records were kept mainly in the
17  old fashioned way of typed and sometimes
18  hand-written hard copies".  Do you see that?
19  A.  What about that?
20  Q.  Do you see that?
21  A.  I see it.
22  Q.  Isn't it correct that Michael McKenzie
23  has an extensive electronic database of his art
24  archive?

COPLEY COURT REPORTING, INC.

211

1      MS. ZERNER:  Objection.
2   A.  Yes.
3   Q.  Is -- is it a false statement under
4   oath for McKenzie to say AIA's records were
5   kept mainly in the old fashioned way of typed
6   and sometimes hand-written hard copies?
7      MS. ZERNER:  Objection.
8   A.  Well, he has an accountant, you know.
9   The bookkeeper comes in regularly.  I think the
10  books are kept with her and Annette takes --
11  you know, I think she has her method of doing
12  it, but I'm sure it's not an archaic method.
13  I'm sure she's pretty much up on what she's
14  doing.
15  Q.  And the records that were kept, were
16  those records kept electronically?
17     MS. ZERNER:  Objection.
18  A.  Well, the collection, the archives, you
19  know, where is it?  You know, how much does it
20  cost?  You know, how many are there?  She has
21  all that.
22  Q.  And that's in McKenzie's possession?
23     MS. ZERNER:  Objection.
24  A.  I'm sorry.  I didn't hear the question.

COPLEY COURT REPORTING, INC.

212

1   Q.  McKenzie or his employees possess those
2   documents; is that right?
3   A.  Well, actually, she has it.  He
4   wouldn't know how to do that, no.
5   Q.  Okay.
6   A.  He wouldn't know how to access the
7   archives, no.  He's pretty backwards.
8   Q.  He knows about the archives, right?
9   A.  Oh yeah, he knows about the archives.
10  Q.  Now, Mr. McKenzie in this declaration
11  says that "with respect to those typed,
12  hand-written hard copies" of his records, he
13  says, "we never kept these records for two
14  reasons; No. 1, as a business practice AIA does
15  not store hard copies of business records for
16  more than three years which is the current IRS
17  requirement".  Did you hear me read that, Mr.
18  Gonzalez?
19  A.  Yes, I heard that.
20  Q.  Is it a false statement to say that
21  McKenzie or AIA does not store hard copies of
22  business records for more than three years?
23     MS. ZERNER:  Objection.
24  A.  I don't know.  Sorry.  I just don't

COPLEY COURT REPORTING, INC.

**Vol. II / Osvaldo Gonzalez**     **EXHIBIT G - 54**

213

1  know the answer to that. All that stuff about
2  keeping hard copies and stuff, I mean, they --
3  they generated a bill of sale. It was an
4  invoice. You know, I'm sure they got all that.
5  You know.
6      Q. Did you see around --
7      A. You got to do a Certificate of
8  Authenticity too. You got to have all that
9  stuff together.
10     Q. Now, did you see the 6,000 pages or so
11 of records around Michael McKenzie's studio
12 when you worked there?
13         MS. ZERNER: Objection.
14     A. No. Fortunately no.
15     Q. Did you see stacks of documents around
16 the studio?
17     A. He had stacks of documents around the
18 studio.
19     Q. And did you understand those stacks of
20 documents to be business records?
21     A. No, I -- I thought they were just stuff
22 from the case. The business records -- the
23 bookkeeper took care of all that.
24     Q. You didn't know one way or the other

**COPLEY COURT REPORTING, INC.**

214

1  how McKenzie kept his business records; is that
2  right?
3      A. I'm sure he kept business records. He
4  got to get them from the bookkeeper, you know.
5  He's pretty sloppy, but that's just him.
6      Q. Sure. So I'm just trying to understand
7  what you know from personal knowledge. Let me
8  read this paragraph to you and we'll see if you
9  know anything. If you don't, that's okay.
10     Mr. McKenzie says "AIA's records were
11 kept mainly in the old fashioned way of typed
12 and sometimes hand-written hard copies. We
13 never kept these records for two reasons; 1, as
14 a business practice, AIA does not store hard
15 copies of business records for more than
16 three years, which is the current IRS
17 requirement". Then there's a citation to a
18 website.
19     "And No. 2, AIA watched Indiana store
20 the copies of everything we handed him in a
21 file on the second floor of Star of Hope,
22 marked MM which he often showed to me.
23 Generally, I handed him both the check and
24 accounting, as he was afraid, rightly so, that

**COPLEY COURT REPORTING, INC.**

215

1  someone would steal it. Therefore, the only
2  copies of AIA's records are in the possession
3  of the Estate, as Indiana kept everything,
4  including, upon information and belief, every
5  copy of the New York Times for the last
6  40 years."
7      Did you hear me read all that?
8      A. Yeah.
9      Q. Now, do you understand that in this
10 case, Morgan Art Foundation has accused
11 McKenzie of withholding significant numbers of
12 business records including the 6,000 pages we
13 found in his studio and the electronic archive
14 and the art work that he hid in the basement
15 and numerous other documents. Do you
16 understand that's an accusation in the case?
17     A. Yes.
18     Q. Do you understand that given what
19 Morgan had collected from McKenzie's studio in
20 August, that we have asserted that virtually
21 every word of this paragraph was a false
22 statement under oath, under penalties of
23 perjury, that Michael McKenzie made. Do you
24 understand that's an accusation in the case?

**COPLEY COURT REPORTING, INC.**

216

1      A. Yes.
2      Q. Do you have any personal knowledge
3  about whether Michael McKenzie kept business
4  records, whether he was being truthful or lying
5  in this paragraph of his declaration -- do you
6  have any personal knowledge about that?
7          MS. ZERNER: Objection.
8      A. I think he had -- he has business
9  records. I know he has business records.
10     Q. How do you know he has business
11 records?
12     A. I've seen them. I've seen them.
13 Because -- because one of the lawyers kept
14 asking him for all the business records. You
15 know, it might have been John, John Markham.
16     Q. Now, Michael McKenzie said in this
17 declaration "AIA has spent six months searching
18 for documents relating to the proceedings
19 surrounding Indiana's Estate in Maine and New
20 York. This search has diverted AIA from its
21 publishing business. For many weeks the entire
22 staff was searching through boxes and checking
23 every file on a computer to see what
24 information we could find and provide."

**COPLEY COURT REPORTING, INC.**

217

1    Did you hear that?
2    A.   Yes.
3    Q.   Now, this was in 2018.  That would have
4    been before you joined McKenzie and AIA; is
5    that right?
6    A.   Yes.
7    Q.   You joined in 2019; is that right?
8    A.   Right.
9    Q.   From your time forward, did you ever
10   participate or see anyone at AIA participate in
11   the collection of documents?
12       MS. ZERNER:  Objection.
13   A.   No.
14   Q.   Did McKenzie ever ask you to collect
15   documents?
16   A.   No.  No.  He got all the documents from
17   Simone.
18   Q.   Did you ever speak with the other AIA
19   employees about their collection of documents?
20   A.   Well, I remember it was a subject of
21   conversation, you know, because everyone was
22   like wow, what are we going to do, because I
23   think that Annette has everything on her
24   computer, you know.

COPLEY COURT REPORTING, INC.

218

1    Q.   You think that what has everything on
2    whose computer?
3    A.   Annette has a lot of the stuff on her
4    computer.
5    Q.   Is that computer in the studio?
6    A.   No, it's in her home.
7    Q.   And that's -- by "everything", you mean
8    the records, the business records --
9    A.   A lot of stuff because a lot of times
10   I'd ask her for something and she would say,
11   let's do it tomorrow.  I'll bring my laptop or
12   whatever so I can access it, you know.
13   Q.   Mr. Gonzalez, I have no more questions
14   for you.  I appreciate your time.
15       THE WITNESS:  Thank you.
16       MS. ZERNER:  Mr. Falzone is up next
17   if he has questions.
18       MR. FALZONE:  I have questions.
19   Maybe 10, 15 questions tops.
20       MS. ZERNER:  Why don't we take a
21   few minutes for the court reporter.
22       (A brief recess was taken at 3:47
23   p.m.)
24       (Resumed at 4:01 p.m.)

COPLEY COURT REPORTING, INC.

219

1    CROSS EXAMINATION
2    BY MR. FALZONE:
3    Q.   I will be as briefly as I can, Mr.
4    Gonzalez.  I just want to quickly draw your
5    attention back to, I believe, Exhibit 1.  I'm
6    going to try to share my screen here.  See how
7    that goes for me.
8        Now, in this declaration, you recognize
9    this?  We talked about it a couple of times
10   today.
11   A.   Yes, I recognize it.
12   Q.   In this declaration you talk about the
13   mediation that took place in Portland, Maine,
14   and I just want to ask you a couple of
15   questions about that.
16       Now, regarding the Term Sheet that came
17   out of that mediation, do you recall when Mr.
18   McKenzie first mentioned his feelings about the
19   terms in that sheet to you?
20   A.   On the way home.
21   Q.   On the way home from?
22   A.   From Portland.
23   Q.   Okay.  Do you remember what he
24   specifically thought about those specific

COPLEY COURT REPORTING, INC.

220

1    terms?
2    A.   He was very unhappy with the BRAT
3    clause, and he didn't like the inventory clause
4    because he said that it was going to make him a
5    fortune.
6    Q.   Did he go into --
7    A.   Plus 725,000.
8    Q.   Did he go into any more specifics about
9    what it was that he disliked about that
10   language?
11   A.   Yeah, he didn't like the fact that it
12   was being challenged at all, that it was
13   perfectly a valid contract and he didn't
14   understand why the -- the Estate would not
15   authenticate it.
16   Q.   So when did he first say to you that he
17   would refuse to abide by the terms of the
18   contract?
19       MS. ZERNER:  Objection.  That was
20   not the testimony.
21   Q.   Paragraph -- let's see, paragraph 6;
22   "in the months that followed the mediation,
23   McKenzie told me numerous times that he did not
24   like the terms of the Term Sheet and did not

COPLEY COURT REPORTING, INC.

221

1  intend to abide by them.
2       Do you recall writing that in the
3  declaration, Mr. Gonzalez?
4    **A.**  Yes.  Yes.
5    **Q.**  Okay.  So if you recall, when was the
6  first time that Mr. McKenzie told you that he
7  would refuse to abide by those terms?
8    **A.**  When?  Right away.  Pretty much, you
9  know, he was just unhappy.  I thought we had
10  done -- got a pretty good deal, and he was like
11  complaining.  That's what he does.  He
12  complains.  That's all.  He complained on the
13  way home.
14       He didn't like the stuff about the
15  authentication, you know.
16    **Q.**  And if you had to guess, how many times
17  would you say that he voiced his displeasure
18  with the terms of the contract to you?
19    **A.**  Countless times, countless.  About
20  every day.
21    **Q.**  Okay.  Now, were you made aware after
22  the conclusion of the mediation of
23  communications that Mr. McKenzie received from
24  the other parties regarding the mediation?

**COPLEY COURT REPORTING, INC.**

223

1    **A.**  I guess in August or September
2  somewhere.
3    **Q.**  So you don't have any firsthand
4  knowledge of what he's doing now for the
5  business of American Image Art now?
6    **A.**  No.
7    **Q.**  You don't have any knowledge, firsthand
8  knowledge, of American Image Art's operations
9  since your employment ended on August 17th
10  2021?
11    **A.**  The only thing I have is the stuff that
12  Peggy told me.
13    **Q.**  I'm talking about your firsthand
14  knowledge of what has been going on at American
15  Image Art; you don't have any firsthand
16  knowledge since August 17th 2021, correct?
17    **A.**  Correct.
18    **Q.**  And you don't have any knowledge, any
19  firsthand knowledge, of what activities are
20  occurring at Katonah since you left the
21  property on October 2nd 2021, right?
22    **A.**  Correct.
23    **Q.**  And these photographs that we went
24  through that you provided to Mr. Nikas of the

**COPLEY COURT REPORTING, INC.**

222

1    **A.**  I think that all went to Mr. Simone.
2    **Q.**  So you weren't aware of any of the
3  discussions that took place after the
4  conclusion of the mediation?
5    **A.**  Mr. Simone was fighting back and forth
6  about every clause there, back and forth.
7    **Q.**  And do you have any sense of what Mr.
8  McKenzie's reaction to those communications
9  were, these discussions with Mr. Simone?
10    **A.**  Yes, he was dead-set against it.  He
11  still is.  Go ahead; give him a contract.  See
12  what he does.  He won't accept it.
13       All I did was get involved with the
14  Binding Term Sheet, you know, because I got
15  stuck with that.  But the whole case is a
16  Binding Term Sheet.
17       MR. FALZONE:  I have no further
18  questions.
19       MS. ZERNER:  I just have a brief
20  follow-up.
21  REDIRECT EXAMINATION
22  BY MS. ZERNER:
23    **Q.**  Mr. Gonzalez, when's the last time you
24  spoke with Mr. McKenzie?

**COPLEY COURT REPORTING, INC.**

224

1  art work at Mr. McKenzie's property, did you --
2  do you still have your original native
3  photographs of those that were taken on your
4  phone?
5    **A.**  I have them in Drop Box, yeah.
6    **Q.**  Okay.  And --
7    **A.**  It has the metadata.
8    **Q.**  What did you say?
9    **A.**  The ones in Drop Box have the metadata.
10    **Q.**  Great.  And you can provide that to us?
11    **A.**  Sure.
12    **Q.**  And all of those photographs that you
13  were shown today and you were asked about that
14  art work being in the basement prior to May
15  25th 2021, I just want to confirm; you didn't
16  actually take those photographs until July or
17  August 2021, right?
18    **A.**  I'm not sure of that.  I think I took
19  some of them sooner.
20    **Q.**  And we'll be able to see from the
21  metadata you mentioned, right?
22    **A.**  Yes.
23    **Q.**  And --
24    **A.**  My dogs are getting upset.

**COPLEY COURT REPORTING, INC.**

225

1    Q.   Noted.  So you also said when you were
2  at the property on May 21st 2021 for the first
3  -- this is the first visit by the Morgan
4  parties, okay?
5         I heard you say you were asked
6  questions by Mr. Nikas about how Morgan parties
7  were not shown the art work in the basement and
8  so the others must have forgotten to mention
9  that, right?
10   A.   Right.
11   Q.   Well, you were there too, and you
12 didn't mention it, right?
13   A.   It wasn't for me to mention.
14   Q.   Didn't you tell us that you would be
15 hosting that day when all those parties were
16 coming to Katonah?
17   A.   Did I say what?
18   Q.   Didn't you tell us that you would host
19 the parties that came to Katonah that day in
20 May?
21   A.   Host the party?
22   Q.   Yeah, that you would be the host at
23 Katonah for Morgan and Don Zuretski and anyone
24 else from Star of Hope?

226

1    A.   Oh, because he wasn't there in the
2  morning, you know.
3    Q.   Right, so you were handling it?
4    A.   Yeah, but then he came.  Then Annette
5  came and they took it over, you know.
6    Q.   You said you were going to be the one
7  hosting, right?
8    A.   To greet them.  Greet them; not host
9  them.  Greet them.
10   Q.   For example -- here, let me show you --
11        MS. ZERNER:  I'm going to mark this
12 quickly.  I don't know what number we're on.
13 We're up in the 30s.
14        MR. NIKAS:  39.
15        MS. ZERNER:  That's next?  39?
16        MR. NIKAS:  Yes.
17        (Text Messages were marked for
18 identification as Exhibit No. 39.)
19   Q.   So Mr. Gonzalez, you see here these are
20 documents.  See this bates number MRZ 00133.
21 Do you see that?  Oh, sorry.  Do you have a
22 smaller screen?  Do you see the number?
23   A.   Yeah.
24   Q.   Okay.  So I'm just telling you our firm

227

1  produced these in response to a subpoena in
2  this case.  These are some text messages
3  between you and I.
4         And here on Monday, May 17th 2021 --
5  you recall back in May you kept having to try
6  and schedule a date for this visit for the
7  settlement review of the art work.  Do you
8  recall that?  Do you recall that?
9    A.   Yes.
10   Q.   You recall the date got changed a few
11 times?
12   A.   What?
13   Q.   You recall that the date got changed a
14 few times?
15   A.   Right.
16   Q.   Back on May 17th 2021 you were checking
17 with me about when everyone was going to come
18 and you say "are we having guests here
19 tomorrow", right?
20   A.   Right.
21   Q.   And you recall you're talking about are
22 we having, for instance, Don Zuretski, Morgan,
23 anyone from the Estate or Star of Hope to
24 visit, right?

228

1    A.   Right.
2    Q.   And I say "will you be hosting",
3  correct?
4    A.   I wouldn't call it hosting.
5    Q.   I'm just asking -- you see that I said
6  that, right; "will you be hosting".
7    A.   Yes.  Yes.
8    Q.   Then you said "yes, I'm so excited".
9    A.   Still am.
10   Q.   You're still excited?
11   A.   Still excited.
12   Q.   Yeah.  But that was your response to me
13 was "yes", right?
14   A.   Okay.
15   Q.   Your response was "yes", correct?
16   A.   Yes, I was being facetious, yes.
17   Q.   Well, you were being facetious about
18 being excited, right?
19   A.   Yes.
20   Q.   But you were answering yes sincerely to
21 my question of "will you be hosting", right?
22   A.   I don't know.
23   Q.   Oh, you don't know now?
24   A.   I just don't know.  I just don't know

229

1    where you're going with all this.

2    Q.    I'm just asking if you were hosting.

3    A.    I said no.

4    Q.    Okay.  And then further down, as we

5    said, the visit occurred on May 25th 2021, and

6    as part of this exhibit I'll include MRZ 136.

7          On May 26, 2021 you texted me at 8 or 9

8    in the morning, and this is after the day after

9    the visit by Morgan and Don Zuretski and Star

10   of Hope, right?

11   A.    Yes.

12   Q.    And you say "there was never an

13   intention by Simon in an effort to settle.

14   Apparently Simon is in complete control".

15   A.    Right.

16   Q.    And you were upset after that visit,

17   right?

18   A.    I mean, I wasn't upset.  You know, I

19   mean -- you know.

20   Q.    Oh, I apologize.  Here, I meant to show

21   you one other part.  Let me ask you this; going

22   back on page MRZ 135, on the actual day when

23   everyone was there and you were hosting on May

24   25th 2021, you texted me "sorry, but today was

COPLEY COURT REPORTING, INC.

231

1    A.    He said it on more than one occasion.

2    Q.    What did he say?

3    A.    He was just adamant about, you know,

4    about the inventory and the authentication, you

5    know.  They were kind of like going together.

6    Q.    Are you talking about the Term Sheet

7    now?

8    A.    Talking about everything in general,

9    you know.

10   Q.    When it comes to the accounting

11   records, you said that Mr. McKenzie has had an

12   accountant to handle that, right?

13   A.    Yeah, his bookkeeper.  She handles all

14   the books.  She got everything.

15   Q.    You do not have firsthand knowledge of

16   how the accountant kept the recordkeeping,

17   right?

18   A.    No, I have no knowledge whatsoever.

19   Q.    You don't have firsthand knowledge of

20   what exactly is on Annette Vessecchia's

21   computer?

22   A.    Well, I do -- I know what's on that

23   computer; the archive and you know, I know.  I

24   kind of know.

COPLEY COURT REPORTING, INC.

230

1    a travesty."

2          Do you recall that?

3    A.    Yes.

4    Q.    Why did you say that?

5    A.    Because nobody was planning to make --

6    to settle, neither side.  There was nothing

7    going on.  They just wanted to come in and look

8    at the inventory and that was it.

9    Q.    And Mr. Nikas asked you questions about

10   your comments that Morgan was not going to get

11   a straight inventory from McKenzie.  And I

12   believe you said something like in everything

13   he did, meaning McKenzie, that indicated to you

14   that they would not get a straight inventory,

15   right?

16   A.    Right.  Right.

17   Q.    So Mr. McKenzie didn't explicitly say

18   to you anything about not providing a straight

19   or accurate inventory to the other side, did

20   he?

21   A.    Yeah, he did.

22   Q.    He explicitly said that to you?

23   A.    Yeah.

24   Q.    Okay.  And when did he say that?

COPLEY COURT REPORTING, INC.

232

1    Q.    You know everything that's on Annette

2    Vessecchia's computer related to American Image

3    Art?

4    A.    No, I don't.  No, I don't.

5    Q.    And you were at American Image Art when

6    the Estate went and filed in the Supreme Court

7    in New York trying to obtain an injunction

8    against American Image Art, right?

9    A.    Yes.

10   Q.    And you were aware -- did you attend

11   the hearing?

12   A.    Me?

13   Q.    Did you attend the hearing on that

14   motion for --

15   A.    No.  No.

16   Q.    Okay.  Were you aware after the fact

17   that at that time in 2019, in the summer of

18   2019, that the Supreme Court in New York denied

19   the Estate's Petition for an injunction?

20   A.    Yes, I was ware of that.

21   Q.    You were aware that the Court ruled

22   that American Image could continue to fabricate

23   Indiana art work, right?

24   A.    Right.

COPLEY COURT REPORTING, INC.

233

1          MR. NIKAS: Objection.

2     A.   According to the contracts.

3     Q.   You were aware of that Ruling?

4     A.   Yes.

5          MR. NIKAS: Objection.

6     A.   But it has to do with which contract

7 you're talking about.

8          MS. ZERNER: I have no further

9 questions.

10          MR. NIKAS: Nor do I. Thank you,

11 Mr. Gonzalez.

12          MS. ZERNER: Mr. Falzone, do you

13 have any more?

14          MR. FALZONE: Nothing further.

15 Thank you everyone.

16          MS. ZERNER: Thank you so much,

17 Julie and Mr. Gonzalez.

18          (Whereupon the deposition concluded

19 at 4:18 p.m.)

20

21

22

23

24

**COPLEY COURT REPORTING, INC.**

---

## EXHIBIT G - 59

235

1 COMMONWEALTH OF MASSACHUSETTS )

2 SUFFOLK COUNTY, ss.          )

3      I wish to make the following changes, for

4 the following reasons:

5 PAGE LINE

6 ____ ____     CHANGE: _____

7          REASON: _____

8 ____ ____     CHANGE: _____

9          REASON: _____

10 ____ ____     CHANGE: _____

11          REASON: _____

12 ____ ____     CHANGE: _____

13          REASON: _____

14 ____ ____     CHANGE: _____

15          REASON: _____

16 ____ ____     CHANGE: _____

17          REASON: _____

18 ____ ____     CHANGE: _____

19          REASON: _____

20 ____ ____     CHANGE: _____

21          REASON: _____

22 ____ ____     CHANGE: _____

23          REASON: _____

24

**COPLEY COURT REPORTING, INC.**

---

234

1 COMMONWEALTH OF MASSACHUSETTS.)

2 SUFFOLK COUNTY, ss.          )

3

4      I, Osvaldo Gonzalez, the witness

5 herein, having read the foregoing testimony of

6 the pages of this deposition, do hereby certify

7 it to be a true and correct transcript, subject

8 to the corrections, if any, shown on the

9 attached page.

10          oOo

11

12

13      _____

14      Osvaldo Gonzalez

15

16

17

18 Subscribed and sworn to before me

19 this_____day of_____, 2022.

20 _____.

21

22

23

24

**COPLEY COURT REPORTING, INC.**

---

236

1

2          CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS   )

3 SUFFOLK COUNTY, ss.          )

4          I, JULIE B. STARR, a Professional
Reporter and Notary Public within the
5 Commonwealth of Massachusetts, do hereby
certify:

6
          That Osvaldo Gonzalez, the witness
7 whose testimony is hereinbefore set forth, was
properly identified and duly sworn by me.

8
          That the foregoing proceedings were
9 taken down by me stenographically via Zoom and
thereafter transcribed under my direction and
10 supervision, and that the within transcript is
a true record of such proceedings.

11
          I further certify that I am not related
12 to any of the parties to this action by blood
or marriage, and that I am in no way
13 interested in the cause or outcome of this
action.

14
          IN WITNESS WHEREOF, I have hereunto set
15 my hand this 12th day of January, 2022.

16

17      _____
          JULIE B. STARR
18          Professional Reporter
          CSR
19
My Commission Expires: March 29, 2024
20

21

22

23 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
24 BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
AND/OR DIRECTION OF THE CERTIFYING REPORTER.
**COPLEY COURT REPORTING, INC.**

# EXHIBIT G - 60
1

## $

**$2,500** [1] - 18:17
**$250,000** [1] - 134:21
**$419** [1] - 30:18

## '

**'20** [2] - 9:16, 110:10
**'bury'** [1] - 41:9
**'F'** [1] - 41:5

## 0

**00133** [1] - 226:20
**02109** [1] - 1:24
**02110** [1] - 2:4
**04112-5235** [1] - 2:12

## 1

**1** [10] - 1:1, 29:12,
88:7, 103:22,
108:14, 164:7,
178:19, 212:14,
214:13, 219:5
**10** [16] - 3:14, 50:14,
50:17, 53:6, 88:7,
88:9, 96:14, 96:20,
108:15, 162:12,
164:24, 168:20,
172:5, 187:14,
209:22, 218:19
**10-minute** [1] - 151:10
**100** [1] - 2:11
**10010** [1] - 2:8
**10:13** [1] - 197:6
**10:15** [1] - 200:11
**10:21** [1] - 55:3
**10:30** [1] - 197:13
**10:33** [1] - 55:4
**11** [8] - 3:15, 91:19,
91:21, 109:21,
187:24, 204:22,
204:23, 209:21
**11-page** [1] - 4:20
**11:27** [1] - 87:24
**12** [8] - 3:16, 69:11,
112:16, 138:17,
138:19, 157:24,
188:11, 197:14
**12/17/2019** [1] -
159:13
**12:04** [1] - 88:2
**12th** [2] - 158:14,
236:15
**13** [4] - 3:17, 141:17,
141:20, 188:24
**135** [1] - 229:22
**136** [1] - 229:6

**138** [1] - 3:16
**13th** [1] - 110:15
**14** [4] - 3:18, 153:18,
153:20, 189:11
**141** [1] - 3:17
**15** [5] - 3:19, 162:6,
162:8, 189:21,
218:19
**15235** [1] - 2:11
**153** [1] - 3:18
**16** [6] - 3:21, 134:5,
164:21, 165:4,
190:8, 205:5
**16-foot** [1] - 195:8
**160** [1] - 100:5
**162** [1] - 3:19
**165** [1] - 3:21
**17** [10] - 3:14, 3:22,
88:11, 185:8, 185:9,
185:11, 185:14,
185:18, 190:17,
209:7
**172** [1] - 3:3
**17th** [12] - 26:9, 27:13,
30:11, 89:23, 91:1,
93:13, 102:23,
207:14, 223:9,
223:16, 227:4,
227:16
**18** [7] - 3:23, 84:3,
85:15, 138:6,
185:12, 185:16,
191:12
**18-inch** [1] - 64:22
**185** [2] - 3:22, 3:23
**186** [1] - 3:24
**187** [1] - 4:4
**188** [2] - 4:5, 4:6
**189** [3] - 4:7, 4:8, 4:9
**19** [8] - 3:24, 8:8,
38:21, 38:22, 179:4,
186:13, 186:15,
191:21
**190** [2] - 4:10, 4:11
**191** [2] - 4:12, 4:13
**192** [1] - 4:14
**193** [1] - 4:15
**195** [1] - 4:16
**196** [1] - 4:17
**197** [1] - 4:18
**1994** [1] - 164:1
**19th** [2] - 10:3, 39:18
**1:40** [1] - 151:11
**1:52** [1] - 151:12
**1st** [10] - 5:24, 15:11,
16:19, 44:8, 98:18,
100:21, 102:11,
102:19, 156:4, 156:6

## 2

**2** [5] - 29:12, 149:1,
149:2, 164:9, 214:19
**2"** [2] - 197:15, 199:4
**20** [11] - 3:18, 4:4,
159:3, 187:16,
192:7, 200:19,
200:23, 201:2,
201:6, 202:3, 202:12
**200** [2] - 4:19, 128:7
**2008** [1] - 143:18
**2015** [6] - 96:3, 96:12,
96:15, 108:23,
109:6, 178:1
**2017** [1] - 51:2
**2018** [8] - 3:21, 9:13,
162:12, 163:5,
163:17, 164:6,
209:19, 217:3
**2019** [22] - 9:15, 16:24,
17:9, 33:13, 47:2,
50:12, 50:23, 55:9,
59:12, 72:19, 73:15,
74:6, 105:6, 112:3,
141:23, 142:5,
146:15, 148:14,
165:7, 217:7,
232:17, 232:18
**2020** [6] - 72:24,
155:6, 156:4,
157:15, 158:1,
158:14
**2021** [88] - 3:11, 3:12,
3:13, 3:14, 3:15,
3:16, 3:18, 3:20,
4:17, 4:18, 4:19,
5:24, 8:8, 10:3,
15:11, 23:18, 27:13,
30:11, 33:13, 39:18,
45:12, 45:24, 47:7,
48:3, 51:2, 51:9,
53:21, 55:9, 61:3,
69:24, 74:11, 76:4,
88:11, 89:23, 92:16,
93:13, 102:13,
113:16, 114:8,
115:10, 115:21,
118:7, 119:18,
124:3, 124:19,
124:23, 127:24,
128:17, 129:1,
138:24, 149:23,
150:20, 161:10,
161:15, 165:1,
178:1, 181:1,
182:15, 184:21,
190:4, 190:14,
190:24, 191:19,
192:4, 193:7,

193:19, 194:5,
194:7, 195:20,
197:6, 200:11,
200:13, 202:21,
205:5, 207:15,
209:7, 209:24,
223:10, 223:16,
223:21, 224:15,
224:17, 225:2,
227:4, 227:16,
229:5, 229:7, 229:24
**2022** [4] - 1:18,
180:12, 234:19,
236:15
**2024** [1] - 236:19
**204** [1] - 4:20
**209** [2] - 4:21, 4:22
**20th** [4] - 45:23, 51:9,
52:12, 53:11
**21** [5] - 4:5, 4:19,
188:2, 193:12,
200:13
**218** [1] - 3:4
**21st** [6] - 10:2, 149:23,
150:17, 193:22,
200:11, 225:2
**22** [4] - 4:6, 188:12,
188:14, 196:5
**222** [1] - 3:3
**226** [1] - 4:23
**22nd** [1] - 2:7
**23** [5] - 3:11, 4:7,
189:1, 189:3, 194:15
**236** [1] - 1:1
**23rd** [6] - 53:21, 60:8,
61:3, 61:7, 64:18,
92:15
**24** [3] - 4:8, 189:11,
189:14
**24-inch** [1] - 28:18
**25** [5] - 3:16, 4:9,
182:15, 189:21,
189:24
**25th** [23] - 64:19,
66:10, 68:20, 105:8,
113:16, 115:20,
119:18, 124:19,
124:23, 125:9,
125:18, 125:22,
126:24, 127:24,
128:16, 138:24,
139:7, 155:6,
161:10, 180:12,
224:15, 229:5,
229:24
**26** [9] - 3:12, 3:13,
4:10, 76:4, 142:5,
190:8, 190:10,
195:17, 229:7
**26th** [3] - 68:22, 69:9,

105:8
**27** [6] - 4:11, 190:18,
190:20, 196:19,
196:24, 197:1
**27th** [4] - 93:4, 93:13,
93:23, 163:5
**28** [4] - 4:12, 191:13,
191:15, 200:5
**28th** [1] - 150:20
**29** [11] - 3:8, 4:13,
4:21, 191:22,
191:24, 192:7,
194:4, 194:7, 209:2,
209:4, 236:19
**2nd** [1] - 223:21

## 3

**3** [6] - 3:15, 29:12,
92:22, 164:12,
165:7, 204:11
**30** [8] - 4:14, 120:14,
175:20, 175:21,
192:10, 192:11,
192:13, 204:21
**300** [1] - 113:2
**30s** [1] - 226:13
**30th** [8] - 92:17, 93:20,
95:14, 98:16, 98:17,
103:21, 132:3,
161:15
**31** [5] - 4:15, 104:8,
193:12, 193:15,
208:23
**32** [3] - 4:16, 195:3,
195:5
**33** [5] - 4:17, 195:18,
196:9, 196:21,
196:23
**34** [3] - 4:18, 197:3,
197:9
**35** [3] - 4:19, 200:6,
200:14
**36** [4] - 4:20, 200:21,
204:21, 204:24
**37** [4] - 4:21, 6:12,
209:2, 209:5
**38** [4] - 3:9, 4:22,
209:14, 209:17
**39** [4] - 4:23, 226:14,
226:15, 226:18
**3:47** [1] - 218:22
**3D** [1] - 152:5

## 4

**4** [11] - 3:3, 3:8, 4:17,
29:11, 29:15, 29:17,
29:24, 30:7, 104:7,
164:14, 195:20

Morgan Art vs. McKenzie | Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 61 of 81 | January 7, 2022
Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 61**[2]

**40** [3] - 57:17, 101:21, 215:6
**40-minute** [1] - 114:21
**42** [1] - 209:14
**44** [1] - 3:10
**48** [1] - 200:21
**4:00** [2] - 104:8
**4:01** [1] - 218:24
**4:18** [1] - 233:19
**4:55** [1] - 45:24
**4th** [1] - 196:2

## 5

**5** [8] - 3:9, 4:18, 38:22, 38:24, 39:3, 120:16, 204:11
**500** [2] - 178:10, 184:10
**51** [1] - 2:7
**53** [1] - 3:11
**5th** [10] - 126:17, 129:1, 129:4, 129:5, 129:6, 131:21, 196:18, 197:6, 197:11, 202:10

## 6

**6** [5] - 3:10, 44:23, 45:1, 206:5, 220:21
**6,000** [2] - 210:1, 213:10, 215:12
**60** [1] - 3:12
**60228** [3] - 4:15, 193:13, 193:14
**60229** [3] - 3:23, 185:12, 185:15
**60230** [2] - 3:24, 186:14
**60231** [3] - 4:4, 187:14, 187:15
**60232** [2] - 4:5, 188:1
**60233** [2] - 4:6, 188:13
**60234** [3] - 4:7, 189:1, 189:2
**60235** [3] - 4:8, 189:12, 189:13
**60236** [3] - 4:9, 189:22, 189:23
**60237** [3] - 4:10, 190:8, 190:9
**60238** [3] - 4:11, 190:18, 190:19
**60239** [2] - 4:12, 191:14
**60240** [3] - 4:13, 191:22, 191:23
**60241** [3] - 4:14, 192:8, 192:12

**60248** [3] - 3:22, 185:13, 185:22
**60249** [3] - 4:16, 195:3, 195:4
**617** [1] - 40:8
**617-699-4720** [1] - 39:16
**617.423.5841** [1] - 1:24
**6th** [1] - 209:19

## 7

**7** [5] - 1:18, 3:11, 53:9, 182:7, 185:20
**700** [1] - 1:23
**71** [1] - 1:23
**725,000** [1] - 220:7
**76** [1] - 3:13

## 8

**8** [10] - 3:12, 60:11, 60:13, 60:15, 140:8, 185:3, 196:3, 197:12, 198:14, 229:7
**88** [1] - 3:14
**8:14** [1] - 195:20
**8:55** [1] - 68:20

## 9

**9** [6] - 3:13, 75:23, 76:1, 76:2, 186:10, 229:7
**91** [1] - 3:15
**911** [1] - 77:18
**917-288-1414** [1] - 6:15
**9:09** [1] - 1:18

## A

**a.m** [8] - 1:18, 55:3, 55:4, 68:20, 88:1, 196:3, 197:13, 198:14
**A.U.S.A** [3] - 11:2, 11:3, 11:9
**AAA** [3] - 144:20, 149:18, 177:13
**aback** [1] - 123:1
**abide** [3] - 220:17, 221:1, 221:7
**ability** [2] - 5:20, 35:7
**able** [8] - 21:8, 25:5, 27:8, 30:1, 38:3, 75:2, 182:24, 224:20
**absolutely** [8] - 15:7,

63:12, 173:13, 177:7, 203:13, 204:16, 208:7
**absorbed** [1] - 33:23
**abused** [1] - 58:11
**abusive** [6] - 43:18, 43:19, 55:10, 55:11, 205:23
**accept** [2] - 123:5, 222:12
**access** [3] - 210:6, 212:6, 218:12
**accesses** [1] - 198:2
**accident** [1] - 31:11
**accompany** [1] - 106:10
**according** [1] - 233:2
**account** [1] - 198:5
**accountant** [3] - 211:8, 231:12, 231:16
**accounting** [2] - 214:24, 231:10
**accurate** [5] - 26:12, 163:12, 164:3, 207:5, 230:19
**accurate"** [1] - 179:7
**accusation** [3] - 207:7, 215:16, 215:24
**accusations** [3] - 136:2, 137:10, 148:19
**accuse** [2] - 206:17, 206:19
**accused** [2] - 136:5, 215:10
**acknowledge** [1] - 165:9
**acted** [4] - 21:12, 87:3, 154:16, 154:22
**acting** [2] - 56:9, 135:21
**action** [7] - 86:11, 89:14, 105:10, 125:11, 156:21, 236:12, 236:13
**action"** [1] - 89:2
**active** [2] - 47:21, 48:4
**activities** [1] - 223:19
**actual** [1] - 229:22
**adamant** [1] - 231:3
**add** [1] - 46:17
**addition** [1] - 132:4
**address** [6] - 6:11, 153:24, 154:6, 154:10, 154:13, 159:7, 179:18, 197:20, 197:22, 198:3, 198:8, 200:9

**admits** [1] - 163:6
**admitted** [3] - 8:18, 135:11, 165:6
**Admonition** [1] - 163:24
**Adobe** [1] - 39:11
**advance** [1] - 15:3
**advantage** [1] - 70:13
**adversary** [1] - 54:19
**advice** [5] - 14:14, 14:20, 135:8, 164:14, 165:24
**advise** [2] - 68:5, 90:18
**advisement** [1] - 62:12
**AEOGH** [1] - 11:14
**affidavit** [2] - 163:4, 165:6
**afford** [1] - 25:17
**afraid** [1] - 214:24
**afternoon** [1] - 172:19
**age** [1] - 5:2
**agent** [25] - 11:10, 11:11, 62:16, 63:16, 63:21, 64:2, 64:10, 76:21, 77:3, 77:6, 77:7, 78:14, 78:18, 78:24, 79:9, 79:10, 79:14, 80:3, 80:17, 82:11, 86:17, 90:21, 103:7, 103:11, 164:8
**Agent** [4] - 12:11, 12:20, 12:22, 13:23
**agents** [4] - 62:23, 63:1, 63:9, 63:18
**ago** [5] - 31:6, 56:14, 108:24, 136:16, 187:19
**agree** [2] - 152:20, 153:14
**agreeable** [1] - 32:20
**agreed** [4] - 143:17, 145:21, 152:18, 153:10
**agreement** [6] - 124:20, 143:15, 144:3, 146:20, 147:7, 163:15
**Agreement** [6] - 143:18, 143:19, 144:7, 144:12, 145:24, 147:15
**agrees** [1] - 144:12
**ahead** [4] - 24:9, 57:4, 111:9, 222:11
**AIA** [13] - 91:5, 144:11, 144:20, 210:14, 212:14, 212:21, 214:14, 214:19,

216:17, 216:20, 217:4, 217:10, 217:18
**AIA's** [4] - 210:16, 211:4, 214:10, 215:2
**Aid** [1] - 27:24
**al** [1] - 1:9
**Alfred** [2] - 2:10, 3:4
**allegations** [3] - 136:14, 137:20, 165:12
**allegedly** [1] - 78:10
**Allen** [24] - 34:20, 41:17, 41:18, 62:2, 64:10, 64:11, 77:11, 99:7, 99:19, 100:12, 100:19, 101:4, 132:23, 133:21, 134:5, 134:7, 134:20, 135:16, 136:4, 200:20, 201:8, 202:5, 202:15
**Allen's** [2] - 132:15, 134:18
**alleviate** [1] - 70:14
**allow** [1] - 203:11
**allowed** [3] - 100:7, 131:1, 146:8
**almost** [2] - 34:21, 54:23
**Alphabet** [2] - 184:10, 184:18
**already"** [1] - 156:10
**aluminum** [2] - 64:22, 85:15
**Amendment** [2] - 98:20, 99:15
**American** [60] - 10:5, 10:23, 11:5, 12:17, 17:14, 18:15, 21:6, 22:6, 24:1, 24:20, 24:23, 25:6, 35:6, 35:8, 38:2, 40:14, 51:2, 53:24, 54:10, 55:9, 58:22, 63:10, 68:3, 69:23, 72:8, 72:13, 73:14, 81:14, 91:10, 102:22, 103:8, 103:12, 103:16, 112:3, 115:2, 116:21, 129:22, 133:11, 143:16, 145:23, 146:13, 146:19, 148:13, 149:3, 153:6, 157:13, 158:6, 161:5, 167:22, 168:2, 171:13, 176:6, 178:13, 223:5,

**COPLEY COURT REPORTING, INC.**

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 62 of 81    January 7, 2022

Vol. III - Osvaldo Gonzalez

**EXHIBIT G - 62**

3

223:8, 223:14, 232:2, 232:5, 232:8, 232:22

**amicably** [1] - 32:9

**AND/OR** [1] - 236:24

**angry** [4] - 35:20, 170:9, 170:12, 203:10

**Annette** [33] - 22:21, 72:2, 73:3, 81:6, 109:20, 111:1, 117:3, 117:5, 118:13, 118:21, 124:16, 126:2, 128:15, 128:21, 130:2, 133:6, 133:19, 167:3, 167:7, 167:17, 168:4, 168:8, 168:9, 168:11, 170:2, 171:17, 210:5, 211:10, 217:23, 218:3, 226:4, 231:20, 232:1

**annette** [1] - 117:2

**announce** [1] - 23:18

**answer** [24] - 5:7, 5:20, 6:5, 6:6, 10:7, 10:17, 10:19, 20:5, 20:6, 20:24, 46:18, 85:21, 85:22, 103:2, 114:6, 122:1, 124:6, 143:13, 143:24, 147:19, 151:5, 156:23, 204:9, 213:1

**answered** [3] - 103:14, 150:18, 157:6

**answering** [2] - 125:7, 228:20

**anti** [1] - 23:4

**anti-Semite** [1] - 23:4

**ANY** [2] - 236:23, 236:24

**AOL** [1] - 198:4

**apart** [3] - 34:13, 35:9, 183:12

**apartment** [1] - 36:16

**apologize** [3] - 29:6, 39:22, 229:20

**app** [1] - 30:3

**APPEARANCES** [1] - 2:1

**appeared** [4] - 5:23, 16:18, 147:6, 147:13

**appearing** [3] - 6:3, 164:9, 165:22

**Appellate** [5] - 3:19, 3:21, 162:10, 164:23, 177:15

**application** [4] - 156:17, 164:13, 165:8, 165:24

**APPLY** [1] - 236:23

**appreciate** [2] - 157:4, 218:14

**appropriate** [2] - 68:24, 76:14

**appropriately** [1] - 69:1

**arbitrated** [1] - 145:3

**arbitration** [8] - 47:22, 48:5, 106:13, 143:18, 144:4, 144:17, 144:19, 150:14

**Arbitration** [1] - 149:3

**Arbitrators** [1] - 47:23

**archaic** [1] - 211:12

**archive** [3] - 210:24, 215:13, 231:23

**archived** [1] - 119:1

**archives** [6] - 130:3, 210:6, 211:18, 212:7, 212:8, 212:9

**area** [1] - 187:8

**arising** [1] - 145:2

**arm** [2] - 27:20, 27:22

**arrange** [2] - 30:18, 114:10

**arranged** [2] - 92:16, 115:11

**arrived** [3] - 180:15, 180:24, 192:22

**Art** [62] - 10:23, 11:6, 12:17, 15:22, 16:9, 17:14, 18:16, 21:7, 22:6, 24:1, 24:20, 24:24, 25:6, 38:2, 40:14, 51:2, 53:24, 54:10, 55:9, 58:23, 63:10, 68:4, 72:8, 72:14, 73:14, 81:14, 91:11, 91:16, 102:22, 103:8, 103:12, 103:16, 112:3, 115:2, 116:21, 129:23, 133:11, 145:23, 146:13, 146:19, 148:13, 153:7, 157:13, 161:5, 167:22, 168:2, 171:13, 178:13, 182:17, 184:7, 184:22, 192:23, 193:7, 194:1, 194:9, 201:15, 215:10, 223:5, 223:15, 232:3, 232:5, 232:8

**art** [183] - 7:22, 8:1, 8:22, 14:7, 17:15, 17:16, 17:19, 24:12, 24:19, 24:23, 26:23, 41:12, 47:13, 48:10, 48:16, 49:10, 58:20, 59:6, 61:14, 61:16, 61:20, 62:21, 64:7, 72:13, 73:13, 74:14, 77:9, 77:22, 78:10, 78:11, 80:5, 81:5, 81:10, 81:14, 83:1, 86:23, 87:11, 95:23, 96:1, 98:7, 98:9, 100:24, 108:18, 109:4, 109:23, 110:7, 112:17, 113:11, 113:15, 113:24, 114:11, 115:13, 115:14, 116:2, 116:7, 116:24, 117:6, 117:21, 117:22, 118:2, 118:5, 118:9, 118:11, 118:15, 119:2, 119:4, 120:2, 120:3, 120:4, 120:12, 120:15, 121:21, 122:9, 122:19, 123:7, 123:19, 123:23, 124:1, 124:2, 124:7, 124:9, 124:22, 124:24, 125:11, 125:12, 126:16, 127:3, 127:7, 127:13, 127:22, 128:4, 128:8, 128:17, 131:21, 131:24, 132:5, 132:6, 133:20, 134:21, 139:2, 139:6, 146:21, 148:20, 166:16, 166:23, 171:2, 171:6, 171:8, 171:10, 171:18, 172:3, 173:10, 173:20, 175:6, 175:21, 175:22, 176:2, 177:17, 177:21, 177:22, 178:1, 178:14, 180:5, 180:17, 181:3, 181:10, 181:12, 181:15, 181:21, 182:15, 182:16, 182:21, 183:2, 183:10, 183:22, 183:24, 184:4, 184:6,

184:12, 184:23, 186:6, 188:4, 188:16, 188:19, 189:5, 189:16, 190:2, 190:12, 190:22, 191:4, 191:17, 192:2, 193:6, 193:17, 194:8, 194:21, 194:22, 194:23, 195:6, 195:10, 195:11, 195:14, 196:12, 198:20, 198:24, 200:1, 201:6, 201:14, 202:7, 202:17, 202:20, 210:8, 210:23, 215:14, 224:1, 224:14, 225:7, 227:7, 232:23

**ART** [1] - 1:6

**Art's** [1] - 223:8

**articulated** [1] - 147:1

**articulates** [1] - 49:23

**artist** [3] - 8:4, 8:6, 92:7

**Asperger's** [1] - 17:24

**assemble** [3] - 197:14, 199:3, 199:5

**assert** [4] - 98:19, 173:15, 174:1, 174:9

**asserted** [3] - 9:7, 133:14, 215:20

**asserting** [1] - 99:15

**assertion** [3] - 136:1, 137:3, 137:24

**assigned** [6] - 62:23, 63:1, 63:2, 63:4, 63:9, 63:19

**assist** [3] - 21:14, 135:4, 146:5

**assistance** [1] - 135:14

**Assistance** [1] - 163:16

**Assistant** [2] - 10:10, 10:22

**assistant** [4] - 18:12, 21:13, 154:17, 154:22

**assistants** [1] - 94:14

**assisted** [3] - 141:10, 142:7, 142:9

**assisting** [1] - 97:7

**Association** [1] - 149:4

**assuming** [1] - 64:4

**attached** [1] - 234:9

**attack** [5] - 22:15, 43:5, 43:13

**attempt** [1] - 97:17

**attempting** [2] - 145:24, 148:1

**attempts** [1] - 136:8

**attend** [5] - 55:24, 131:1, 146:5, 232:10, 232:13

**attendance** [1] - 106:22

**attention** [2] - 64:9, 219:5

**attorney** [27] - 8:8, 8:10, 9:5, 9:22, 9:23, 10:4, 10:10, 14:21, 21:3, 74:19, 106:19, 134:23, 135:3, 135:8, 135:21, 136:5, 136:9, 137:7, 137:19, 158:2, 164:10, 164:15, 165:8, 165:17, 165:22, 166:2

**Attorney** [9] - 5:8, 10:10, 10:22, 44:13, 48:19, 74:19, 107:2, 145:8, 174:7

**Attorney's** [1] - 105:11

**attorneys** [20] - 29:18, 45:19, 48:17, 92:14, 92:15, 93:1, 94:17, 107:1, 108:4, 108:7, 113:17, 129:7, 133:13, 150:23, 160:20, 160:21, 161:1, 173:19, 174:2, 174:10

**auction** [2] - 102:12, 102:17

**auctions** [1] - 18:6

**August** [74] - 3:11, 3:12, 3:13, 3:16, 8:8, 10:2, 10:3, 12:15, 26:9, 27:13, 30:11, 39:18, 42:16, 45:12, 45:23, 47:7, 48:3, 51:9, 52:12, 53:11, 53:21, 60:8, 61:3, 61:7, 64:19, 66:10, 68:20, 68:22, 69:9, 69:24, 74:16, 76:4, 92:15, 92:17, 93:3, 93:13, 93:20, 93:23, 95:14, 98:16, 98:17, 100:1, 102:13, 102:23, 103:21, 104:8, 124:18, 125:21, 126:5, 126:6, 126:9, 126:13, 126:17, 126:22, 129:1,

**EXHIBIT G - 63**

129:4, 129:5, 129:6, 131:17, 131:21, 132:3, 138:24, 139:9, 194:2, 202:10, 202:21, 207:14, 209:24, 215:20, 223:1, 223:9, 223:16, 224:17

**authenticate** [1] - 220:15

**authentication** [2] - 221:15, 231:4

**Authenticity** [1] - 213:8

**authority** [2] - 130:1, 164:12

**authorize** [1] - 110:23

**authorized** [4] - 109:9, 109:24, 111:3, 149:14

**authrfun@aol.com** [1] - 154:13

**available** [3] - 36:7, 93:5, 93:17

**Avenue** [1] - 2:7

**avoid** [1] - 139:2

**aware** [20] - 16:2, 47:20, 48:4, 115:21, 125:10, 129:13, 130:24, 131:12, 137:15, 146:12, 163:10, 198:6, 209:23, 210:3, 221:21, 222:2, 232:10, 232:16, 232:21, 233:3

**awful** [1] - 176:21

---

### B

**background** [2] - 29:7, 69:13

**backwards** [1] - 212:7

**bad** [3] - 42:18, 59:20, 97:9

**Band** [1] - 27:24

**Band-Aid** [1] - 27:24

**Banks** [1] - 2:7

**BANKS** [4] - 174:4, 185:19, 185:22, 197:1

**Bar** [2] - 161:22, 163:17

**barn** [1] - 172:2

**based** [2] - 76:15, 173:6

**basement** [29] - 118:6, 118:16, 181:18, 183:23, 184:4,

---

184:9, 184:14, 186:4, 187:5, 187:7, 188:5, 188:7, 188:17, 188:20, 189:7, 189:18, 190:4, 190:14, 190:24, 191:19, 192:4, 193:1, 193:2, 193:3, 193:19, 199:11, 215:14, 224:14, 225:7

**basis** [3] - 86:13, 125:15, 128:3

**batch** [1] - 153:22

**bates** [14] - 45:4, 69:11, 88:6, 185:18, 185:20, 189:12, 189:22, 195:3, 195:19, 196:24, 197:4, 200:6, 209:2, 226:20

**Bates** [2] - 196:8, 197:8

**Beach** [1] - 6:12

**became** [1] - 43:19

**become** [2] - 142:12, 168:7

**bedrooms** [1] - 20:1

**beginning** [6] - 8:20, 9:12, 9:16, 131:2, 131:14, 174:20

**behalf** [1] - 1:15, 21:2, 97:23, 98:1, 98:3, 116:20, 135:18, 142:1, 142:14, 142:16, 142:17, 157:11

**behavior** [6] - 23:13, 142:11, 167:22, 168:1, 175:16, 177:5

**behind** [8] - 29:8, 31:14, 52:6, 168:15, 168:17, 168:22, 181:24, 191:8

**belief** [4] - 150:7, 150:10, 179:16, 215:4

**belittling** [1] - 35:24

**bell** [1] - 194:5

**beneficiary** [1] - 178:13

**best** [5] - 10:18, 22:17, 150:6, 150:9, 179:15

**between** [24] - 10:2, 16:23, 30:8, 42:21, 47:1, 58:15, 69:6, 93:12, 93:22, 115:2, 133:12, 137:18, 139:6, 142:10, 142:13, 143:16,

---

144:19, 145:1, 145:23, 146:13, 155:21, 171:11, 173:1, 227:3

**big** [13] - 23:4, 72:4, 140:5, 140:7, 156:18, 176:20, 176:21, 176:23, 195:8, 200:20, 200:21, 200:23

**bike** [3] - 157:7, 172:21, 172:22

**bill** [1] - 213:3

**billionaire** [1] - 100:2

**binding** [2] - 141:16, 143:7

**Binding** [11] - 3:17, 141:19, 144:9, 147:8, 147:16, 147:24, 148:14, 157:17, 159:13, 222:14, 222:16

**bit** [1] - 57:1

**bizarre** [1] - 142:12

**black** [1] - 136:18

**blah** [3] - 203:16, 203:17

**blood** [1] - 236:12

**blow** [3] - 26:8, 37:13, 50:5

**blow-up** [1] - 26:8, 37:13

**blown** [1] - 176:3

**blue** [1] - 63:3

**Board** [1] - 164:11

**book** [1] - 103:1

**bookkeeper** [4] - 211:9, 213:23, 214:4, 231:13

**books** [4] - 119:1, 184:10, 211:10, 231:14

**Boston** [2] - 1:24, 2:4

**bottom** [5] - 45:3, 69:16, 104:2, 179:3, 209:9

**bought** [2] - 196:15, 199:16

**Boulevard** [1] - 6:12

**box** [1] - 110:14

**Box** [5] - 2:11, 21:24, 81:22, 224:5, 224:9

**boxes** [2] - 181:11, 216:22

**boy** [1] - 176:23

**Boyle** [11] - 74:23, 75:9, 91:24, 93:4, 93:9, 93:14, 93:19, 94:6, 107:8, 157:11, 158:13

---

**brand"** [1] - 92:6

**brannan** [1] - 145:16

**Brannan** [6] - 108:5, 142:1, 145:11, 149:4, 155:7, 155:13

**BRAT** [1] - 220:2

**breached** [1] - 147:24

**break** [8] - 27:5, 53:6, 54:24, 75:3, 141:14, 151:10, 170:22, 170:24

**breaks** [1] - 172:9

**Bridge** [2] - 27:17, 27:23

**bridget** [2] - 39:16, 173:14

**Bridget** [5] - 2:3, 40:7, 87:19, 130:23, 205:2

**brief** [6] - 19:4, 87:24, 172:20, 173:23, 218:22, 222:19

**briefly** [1] - 219:3

**bring** [5] - 70:4, 200:19, 201:2, 201:6, 218:11

**broadcasted** [1] - 133:7

**broke** [1] - 57:1

**broken** [1] - 8:24

**Bronx** [1] - 27:18

**brothers** [1] - 108:10

**brought** [1] - 74:15

**Building** [1] - 1:23

**building** [2] - 125:17, 191:9

**buildings** [1] - 181:24

**bullet** [1] - 144:18

**bullshit** [4] - 112:7, 112:9, 112:11, 112:13

**bully** [2] - 110:20, 110:21

**burning** [1] - 56:8, 56:19

**bus** [10] - 28:2, 30:17, 81:9, 81:10, 83:1, 194:21, 194:22, 196:4

**business** [38] - 24:11, 24:14, 25:4, 26:18, 32:11, 33:22, 34:19, 35:6, 41:17, 43:7, 44:4, 56:8, 56:19, 58:7, 58:19, 58:21, 58:24, 155:12, 174:11, 175:4, 212:14, 212:15, 212:22, 213:20, 213:22, 214:1, 214:3, 214:14,

---

214:15, 215:12, 216:3, 216:8, 216:9, 216:10, 216:14, 216:21, 218:8, 223:5

**buy** [1] - 120:12

**buyer** [1] - 100:3

**BY** [13] - 2:3, 2:6, 2:10, 19:7, 55:6, 56:2, 88:4, 138:5, 151:14, 172:18, 219:2, 222:22, 236:24

---

### C

**call"** [1] - 52:21

**cannot** [1] - 84:24

**canvass** [2] - 66:14, 68:3

**canvasses** [3] - 108:21, 124:16, 125:16

**caption** [1] - 149:3

**captioned** [1] - 16:7

**car** [8] - 28:11, 81:7, 96:5, 105:13, 106:3, 124:17, 126:2, 141:4

**CARBONAR** [1] - 8:14

**Carbonaro** [2] - 8:11, 8:12

**carbonaro** [3] - 9:11, 10:1, 11:8

**cards** [1] - 17:20

**care** [5] - 18:1, 26:1, 177:14, 177:16, 213:23

**career** [4] - 166:8, 167:2, 167:6, 167:18

**careful** [8] - 46:15, 46:21, 49:20, 51:10, 51:15, 72:21, 138:10

**carefully** [1] - 179:6

**caretaker** [3] - 17:22, 18:3, 18:9

**Caro** [4] - 108:11, 113:17, 121:3, 121:14

**Caros** [3] - 91:14, 120:21, 126:19

**carpenter's** [1] - 183:13

**cars** [2] - 128:6, 128:10

**case** [40] - 6:1, 8:20, 9:13, 15:17, 15:20, 16:7, 16:14, 18:7, 20:10, 20:21, 47:15, 48:12, 48:14, 48:15, 49:1, 49:12, 54:16, 68:7, 68:13, 68:17, 70:16, 130:2, 137:3,

---

**COPLEY COURT REPORTING, INC.**

149:19, 155:13, 155:14, 166:20, 173:11, 208:5, 208:15, 209:19, 210:3, 213:22, 215:10, 215:16, 215:24, 222:15, 227:2
**cases** [1] - 22:4
**cataloguing** [1] - 181:11
**catch** [3] - 19:8, 147:11, 157:8
**caught** [1] - 64:8
**caution** [1] - 101:20
**cell** [6] - 6:16, 6:20, 6:23, 75:2, 170:22, 170:24
**certain** [2] - 135:6, 137:17
**Certificate** [1] - 213:7
**CERTIFICATE** [1] - 236:1
**CERTIFICATION** [1] - 236:23
**certify** [3] - 234:6, 236:5, 236:11
**CERTIFYING** [1] - 236:24
**chain** [8] - 39:15, 60:9, 60:10, 60:23, 61:1, 64:17, 69:9, 92:24
**Chain** [3] - 29:16, 38:23, 153:19
**chains** [1] - 157:10
**challenge** [2] - 156:8, 156:13
**challenged** [2] - 152:13, 220:12
**change** [5] - 38:10, 147:3, 147:7, 147:15, 148:1
**CHANGE** [9] - 235:6, 235:8, 235:10, 235:12, 235:14, 235:16, 235:18, 235:20, 235:22
**changed** [2] - 227:10, 227:13
**changes** [1] - 235:3
**changing** [1] - 71:8
**charge** [7] - 116:23, 117:2, 117:3, 118:19, 118:21, 118:22
**check** [3] - 75:2, 141:13, 214:23
**checking** [2] - 216:22, 227:16
**Chief** [1] - 106:9

**Christopher** [2] - 11:24, 63:24
**circuit** [1] - 11:23
**citation** [1] - 214:17
**City** [1] - 163:17
**Civil** [1] - 1:16
**claim** [3] - 51:16, 178:12, 178:15
**claimed** [3] - 48:20, 83:17, 158:6
**claiming** [1] - 173:19
**claims** [2] - 48:19, 158:3
**clarify** [3] - 16:1, 78:3, 93:11
**clarifying** [1] - 16:5
**Clause** [1] - 159:9
**clause** [7] - 159:11, 159:15, 159:18, 159:19, 220:3, 222:6
**clear** [7] - 10:20, 37:14, 64:4, 85:2, 127:3, 127:14, 135:19
**clerk** [1] - 164:8
**client** [4] - 54:12, 137:18, 174:1, 174:8
**client"** [1] - 164:2
**client's** [1] - 137:2
**clients** [1] - 165:12
**close** [6] - 23:19, 24:3, 24:5, 35:19, 115:5, 204:13
**closing** [2] - 25:3, 32:11
**clue** [1] - 92:5
**co** [1] - 170:14
**co-worker** [1] - 170:14
**coercion** [1] - 163:10
**collaborated** [1] - 95:20
**collect** [2] - 207:22, 217:14
**collected** [2] - 210:1, 215:19
**collection** [10] - 120:6, 120:7, 120:10, 181:20, 183:10, 184:19, 184:23, 211:18, 217:11, 217:19
**colors** [2] - 71:23, 113:2
**coming** [5] - 129:16, 129:18, 129:19, 129:22, 225:16
**commencing** [1] - 1:18
**comments** [1] - 230:10

**Commercial** [2] - 1:23, 2:3
**Commission** [2] - 164:11, 236:19
**commit** [1] - 97:16
**committed** [1] - 207:7
**committing** [2] - 173:9, 206:17
**common** [3] - 83:5, 83:10
**Commonwealth** [2] - 1:17, 236:5
**COMMONWEALTH** [3] - 234:1, 235:1, 236:2
**communicate** [2] - 6:24, 90:5
**communicating** [1] - 173:8
**communication** [5] - 9:6, 53:1, 114:19, 135:20, 137:18
**communications** [18] - 9:4, 9:7, 9:22, 22:4, 98:21, 99:16, 99:22, 114:17, 133:12, 133:18, 135:1, 136:12, 136:16, 170:13, 174:10, 174:13, 221:23, 222:8
**Compel** [2] - 137:24, 174:16
**compelling** [1] - 6:4
**complained** [1] - 221:12
**complaining** [1] - 221:11
**complains** [1] - 221:12
**complaints** [1] - 90:1
**complete** [5] - 10:17, 11:20, 163:21, 229:14
**completely** [2] - 137:19, 179:7
**complicated** [1] - 27:20
**compound** [1] - 78:3
**computer** [10] - 39:9, 95:1, 216:23, 217:24, 218:2, 218:4, 218:5, 231:21, 231:23, 232:2
**conceal** [2] - 132:6, 133:20
**concealed** [3] - 127:4, 127:9, 127:12
**concealing** [1] -

173:10
**concern** [6] - 51:17, 71:16, 73:21, 77:21, 99:10, 99:20
**concerned** [7] - 36:15, 36:19, 50:6, 65:4, 72:22, 97:10, 101:16
**concerns** [7] - 49:18, 72:7, 72:12, 72:18, 72:23, 76:17, 208:11
**concluded** [1] - 233:18
**conclusion** [2] - 221:22, 222:4
**conditionally** [1] - 163:5
**conduct** [1] - 206:16
**conducted** [3] - 175:4, 176:9, 176:13
**confer** [1] - 174:14
**CONFERENCE** [1] - 1:14
**conference** [1] - 142:23
**conferred** [1] - 173:24
**confidential** [1] - 99:8
**Confidential** [1] - 3:17
**confirm** [9] - 72:10, 74:9, 91:23, 104:1, 108:16, 153:23, 162:4, 179:14, 224:15
**confiscated** [1] - 27:1
**confused** [2] - 11:19, 70:20
**Connecticut** [2] - 27:17, 28:1
**connection** [4] - 122:23, 136:3, 136:6, 165:11
**consent** [2] - 162:18, 163:9
**consenting** [1] - 163:11
**consents** [1] - 163:7
**consequences** [1] - 163:11
**consider** [4] - 112:11, 112:12, 115:24, 170:13
**considered** [2] - 33:23, 108:17
**considering** [1] - 32:19
**consistent** [1] - 69:1
**console** [1] - 168:12
**conspiracy** [1] - 122:13
**constantly** [4] - 51:5, 51:6, 51:7, 111:10

**consulting** [1] - 135:3
**contact** [7] - 11:9, 13:8, 43:6, 54:9, 62:15, 70:19, 134:20
**contacted** [7] - 41:13, 42:1, 54:8, 60:7, 92:14, 102:17, 171:17
**contacting** [1] - 53:22
**containers** [1] - 199:18
**Conte** [1] - 107:4
**contempt** [1] - 127:10
**contend** [3] - 109:7, 127:5, 127:22
**content** [2] - 95:7, 173:7
**contention** [1] - 124:2
**contents** [1] - 173:15
**context** [1] - 52:3
**continue** [5] - 29:5, 29:10, 34:8, 84:22, 232:22
**CONTINUED** [7] - 4:1, 19:6, 55:5, 56:1, 88:3, 138:4, 151:13
**continued** [1] - 150:19
**contract** [16] - 34:21, 66:19, 66:22, 66:23, 67:12, 67:13, 67:14, 71:7, 113:1, 147:1, 147:2, 220:13, 220:18, 221:18, 222:11, 233:6
**Contract** [1] - 159:13
**contracts** [2] - 41:16, 233:2
**contrary** [1] - 127:6
**CONTROL** [1] - 236:24
**control"** [1] - 229:14
**Convention** [1] - 119:8
**conversation** [12] - 7:13, 42:17, 52:4, 52:23, 61:19, 66:9, 78:21, 85:11, 86:9, 107:11, 160:5, 217:21
**conversations** [16] - 34:18, 41:15, 42:21, 63:15, 79:8, 79:10, 79:13, 91:4, 93:8, 93:14, 101:9, 117:18, 133:24, 161:1, 172:24, 173:16
**copies** [9] - 211:6, 212:12, 212:15, 212:21, 213:2,

Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 65 of 81

Morgan Art vs. McKenzie                    Vol. III - Osvaldo Gonzalez                    January 7, 2022

EXHIBIT G - 65

214:12, 214:15, 214:20, 215:2
copies" [1] - 210:18
COPLEY [1] - 1:22
cops [6] - 89:1, 89:5, 89:12, 89:13, 89:22
copy [3] - 45:3, 53:17, 215:5
copying [1] - 158:13
copyright [11] - 151:20, 152:2, 152:4, 152:10, 152:12, 153:3, 155:22, 156:20, 158:3, 158:6, 158:14
copyrights [2] - 152:23
corporation [1] - 161:6
Corporation [1] - 156:16
corralled [1] - 73:6
correct [52] - 6:6, 6:9, 7:1, 12:8, 20:14, 21:10, 21:11, 22:1, 25:6, 25:18, 25:22, 25:23, 26:2, 30:15, 30:16, 32:6, 34:3, 38:5, 45:8, 47:23, 55:12, 57:9, 93:20, 93:21, 104:23, 142:2, 142:3, 146:21, 146:22, 157:22, 162:20, 165:13, 165:14, 166:2, 166:3, 179:24, 180:13, 187:10, 187:11, 188:21, 192:16, 193:8, 193:20, 202:10, 205:6, 210:22, 223:16, 223:17, 223:22, 228:3, 228:15, 234:7
corrections [1] - 234:8
correctly [2] - 41:24, 206:13
correspond [4] - 13:3, 71:6, 154:3, 154:7
cost [2] - 30:21, 211:20
Counsel [1] - 145:11
counselor [4] - 164:10, 164:16, 165:9, 166:2
countless [2] - 221:19
COUNTY [3] - 234:2, 235:2, 236:3
couple [5] - 73:2, 80:24, 166:18,

219:9, 219:14
course [3] - 83:13, 131:17, 198:9
COURT [18] - 1:2, 1:22, 8:23, 11:16, 19:2, 47:16, 55:2, 55:19, 57:23, 58:3, 60:14, 76:2, 87:19, 89:20, 122:7, 137:6, 141:15, 192:9
court [3] - 47:15, 55:1, 218:21
Court [27] - 3:19, 3:21, 68:11, 68:15, 123:16, 126:8, 126:11, 129:1, 129:11, 129:14, 162:7, 162:9, 164:10, 164:23, 165:3, 173:10, 177:15, 177:16, 193:24, 195:13, 196:3, 198:21, 202:8, 203:10, 232:6, 232:18, 232:21
Court's [1] - 6:4
courts [1] - 47:19
crazy [11] - 36:19, 49:24, 50:2, 56:24, 81:20, 83:21, 155:2, 160:17, 206:8
create [3] - 58:19, 62:6, 71:16
created [3] - 148:10, 178:6, 183:9
created" [1] - 113:5
creating [1] - 41:15
crime [2] - 173:10, 207:7
crimes [1] - 206:17
criminal [5] - 24:13, 66:20, 101:21, 175:16, 177:5
Cross [1] - 3:2
CROSS [2] - 172:17, 219:1
CSR [1] - 236:18
current [3] - 6:10, 212:16, 214:16
cut [4] - 27:20, 121:23, 122:11, 122:19
cutting [1] - 72:4
Cyphers [2] - 205:9

D

dangerous [1] - 31:12
database [1] - 210:23
date [28] - 12:14,

30:10, 39:18, 40:1, 52:11, 52:13, 70:5, 71:7, 71:13, 104:7, 110:15, 124:8, 124:15, 124:24, 125:9, 125:13, 125:19, 125:20, 129:3, 130:6, 131:18, 131:21, 131:23, 194:5, 202:10, 227:6, 227:10, 227:21
dated [23] - 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:18, 3:20, 3:21, 4:17, 4:18, 4:19, 45:23, 51:8, 53:20, 54:5, 124:14, 149:23, 159:3, 163:5, 195:19, 200:13, 205:5
dates [2] - 108:21, 151:6
daughter [16] - 20:13, 25:22, 25:24, 31:12, 31:24, 34:1, 34:6, 36:15, 38:4, 40:20, 59:24, 60:4, 97:9, 97:12
days [5] - 53:21, 54:4, 54:5, 54:6, 64:18
dead [2] - 71:3, 222:10
dead-set [1] - 222:10
deaf [1] - 177:1
deal [12] - 34:10, 114:10, 114:13, 114:14, 114:15, 121:18, 137:21, 137:22, 176:20, 176:21, 200:23, 221:10
dealer [1] - 8:22
dealings [1] - 44:8
dealt [3] - 21:16, 46:13, 76:21
December [2] - 165:7, 205:5
decide [2] - 47:4, 106:6
decided [5] - 24:10, 24:12, 27:4, 105:23, 204:5
decision [2] - 43:2, 177:13
Decision [3] - 3:20, 3:21
Declaration [3] - 4:22, 149:6, 209:15
declaration [28] - 95:1, 95:3, 95:13,

95:17, 96:23, 97:4, 97:7, 103:20, 132:3, 132:4, 134:6, 138:7, 178:18, 179:1, 179:3, 179:15, 179:20, 180:5, 199:24, 208:4, 209:18, 210:12, 212:10, 216:5, 216:17, 219:8, 219:12, 221:3
declare [2] - 104:21, 105:2
declared [4] - 120:9, 120:19, 120:21, 121:14
deconstructed [1] - 191:8
defend [3] - 48:18, 136:10, 137:12
DEFENDANT [1] - 2:2
Defendants [2] - 1:9, 16:10
defies [1] - 153:2
definitely [2] - 107:15, 107:16
Democratic [1] - 119:7
denied [1] - 232:18
department [1] - 17:14
Department [2] - 162:10, 164:23
dependant [2] - 26:4, 31:20, 34:6
depicted [1] - 112:21
deposes [1] - 5:6
deposition [23] - 5:24, 14:24, 15:2, 15:11, 16:7, 16:13, 16:19, 39:4, 92:21, 99:23, 100:22, 103:23, 150:13, 150:20, 151:6, 174:15, 174:17, 174:21, 177:4, 178:19, 208:15, 233:18, 234:6
DEPOSITION [1] - 1:14
depositions [1] - 207:18
Depot [2] - 196:6, 199:14
describe [3] - 29:1, 95:19, 205:7
described [11] - 23:14, 42:8, 42:9, 44:9, 55:10, 109:12, 138:11, 184:5, 191:7, 205:20, 206:9
Description [2] - 3:7,

4:2
description [1] - 41:24
desist [2] - 164:7, 165:21
despair [1] - 43:17
despaired [1] - 43:1
destroy [1] - 35:6
destroyed [1] - 167:1
destroying [3] - 35:5, 56:8, 56:20
destruction [2] - 33:22, 37:3
detail [1] - 200:2
develop [1] - 58:24
dies [1] - 147:3
diesel [8] - 26:11, 28:5, 28:6, 28:8, 35:17, 37:2, 113:8, 196:5
different [13] - 39:9, 41:14, 42:1, 71:23, 95:21, 108:21, 145:17, 178:9, 182:19, 183:6, 196:19, 200:22, 207:3
difficult [1] - 145:15
dinner [1] - 206:1
DIRECT [7] - 19:6, 55:5, 56:1, 88:3, 138:4, 151:13, 236:24
direct [1] - 5:7
Direct [1] - 3:2
direction [1] - 236:9
DIRECTION [1] - 236:24
directly [4] - 127:6, 131:15, 137:4, 208:19
disappear [1] - 202:15
disbarred [1] - 165:16
discharged [1] - 164:2
discipline [1] - 162:17
discipline" [1] - 163:12
disclose [3] - 9:8, 42:22, 133:14
disclosed [1] - 187:9
disclosing [2] - 134:22, 134:24
disclosure [1] - 174:13
discover [1] - 42:16
discovered [1] - 17:21
discovery [1] - 127:5
discuss [18] - 7:12, 13:22, 20:11, 20:15, 57:21, 57:22, 58:13, 61:12, 61:21, 62:2,

Morgan Art vs. McKenzie                    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 66 of 81                    January 7, 2022

Vol. II - Osvaldo Gonzalez

EXHIBIT G - 66

78:14, 91:14, 91:16, 153:12, 154:23, 161:4, 167:2, 167:11

**discussed** [17] - 14:4, 62:1, 95:7, 95:23, 96:1, 100:23, 111:23, 115:8, 115:9, 129:12, 133:2, 133:4, 141:22, 153:5, 153:8, 167:6, 167:10

**discussing** - 14:6, 93:24, 123:15, 123:17, 158:2

**discussion** [5] - 19:4, 35:14, 55:23, 122:24, 126:3

**discussions** [21] - 13:24, 113:23, 114:9, 115:1, 115:15, 115:21, 120:1, 124:10, 127:1, 128:1, 131:7, 132:22, 134:9, 134:15, 145:1, 145:22, 146:13, 157:21, 160:3, 222:3, 222:9

**disintegrated** [1] - 97:15

**disliked** [1] - 220:9

**dismiss** [1] - 144:4

**dismissed** [2] - 68:13, 144:20

**disobeyed** [1] - 68:11

**disorder** [1] - 17:24

**displeasure** [1] - 221:17

**dispute** [1] - 37:5

**disputes** [1] - 145:2

**disrespect** [1] - 33:20

**DISTRICT** [1] - 1:2

**District** [6] - 1:3, 15:21, 16:8, 68:16, 105:9, 177:15

**diverted** [1] - 216:20

**Division** [5] - 3:19, 3:21, 17:19, 162:10, 164:23

**DNC** [3] - 119:13, 139:18, 140:1

**DNC"** [1] - 139:15

**do"** [1] - 64:23

**document** [56] - 4:20, 21:22, 29:14, 30:2, 30:6, 38:21, 39:2, 39:19, 44:21, 60:21, 75:17, 88:6, 91:18, 92:21, 95:2, 138:17, 138:20, 141:18,

141:24, 145:20, 146:1, 149:1, 159:4, 179:5, 179:6, 179:13, 179:24, 185:13, 185:15, 186:14, 187:15, 188:1, 188:11, 188:13, 189:1, 189:2, 189:12, 189:13, 189:22, 189:23, 190:9, 190:19, 191:14, 191:23, 192:12, 193:14, 195:3, 195:4, 195:18, 196:19, 196:23, 204:22, 204:23, 209:2, 209:3, 209:4

**Document** [1] - 153:18

**documents** [21] - 15:6, 15:9, 15:12, 15:14, 15:16, 21:14, 91:9, 129:8, 129:22, 210:2, 212:2, 213:15, 213:17, 213:20, 215:15, 216:18, 217:11, 217:15, 217:16, 217:19, 226:20

**DOES** [1] - 236:23

**dogs** [1] - 224:24

**dollars** [4] - 120:15, 175:21, 175:22, 210:14

**domain** [6] - 152:7, 152:14, 152:21, 153:11, 153:13, 158:22

**Don** [15] - 57:10, 57:11, 57:13, 57:14, 58:4, 58:5, 114:17, 114:19, 114:20, 117:13, 225:23, 227:22, 229:9

**done** [7] - 117:23, 117:24, 156:9, 197:15, 199:4, 207:22, 221:10

**door** [5] - 52:6, 100:2, 136:15, 137:13, 137:17

**double** [1] - 141:13

**doubt** [1] - 152:8

**down** [30] - 10:15, 24:11, 26:18, 31:14, 33:16, 34:23, 36:13, 56:8, 56:19, 79:23, 105:1, 126:20, 142:4, 144:17,

144:18, 156:5, 158:11, 158:24, 175:24, 184:16, 196:17, 199:23, 200:19, 201:2, 201:6, 209:9, 209:12, 209:21, 229:4, 236:9

**downs** [1] - 170:21

**draft** [3] - 95:1, 95:13, 146:20

**drafted** [2] - 95:2, 96:23

**drafting** [2] - 95:6, 97:4

**draw** [1] - 219:4

**drawn** [1] - 34:21

**dress** [4] - 169:15, 169:21, 169:22, 170:3

**drive** [1] - 27:15

**driver's** [1] - 5:4

**driveway** [4] - 83:5, 83:6, 83:7, 83:9, 83:10

**Drop** [4] - 21:24, 81:21, 224:5, 224:9

**drove** [1] - 141:4

**duly** [2] - 5:4, 236:7

**duress** [1] - 163:10

**during** [20] - 18:14, 26:5, 38:7, 61:19, 94:24, 124:9, 145:10, 150:14, 151:6, 162:2, 162:3, 172:8, 184:20, 188:7, 188:20, 191:19, 192:4, 193:7, 193:19, 198:8

---

**E**

---

**E-mail** [21] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:18, 4:17, 4:18, 4:19, 44:24, 53:8, 60:10, 75:24, 88:8, 91:20, 138:18, 196:8, 197:8, 200:13

**e-mail** [83] - 21:24, 23:23, 45:2, 46:1, 46:5, 46:10, 46:12, 51:8, 52:20, 53:2, 53:11, 53:15, 53:20, 53:22, 60:8, 60:9, 60:23, 61:3, 64:16, 64:20, 66:10, 68:19, 68:21, 69:6, 75:20, 76:4, 77:2, 81:18,

85:12, 85:13, 88:10, 91:22, 91:23, 92:23, 93:3, 112:21, 138:23, 153:23, 154:5, 154:9, 154:13, 155:9, 155:16, 156:4, 157:10, 157:13, 157:24, 158:12, 158:17, 159:2, 159:4, 159:7, 159:22, 160:1, 161:9, 161:12, 195:19, 195:23, 196:1, 196:17, 196:18, 196:21, 197:3, 197:10, 197:17, 197:20, 197:22, 198:2, 198:8, 200:5, 200:7, 200:9, 200:12, 200:16, 200:17, 205:1, 205:7, 205:13, 205:18, 205:21, 209:6, 209:10

**e-mailed** [4] - 29:20, 64:19, 81:21, 155:6

**e-mails** [17] - 45:7, 45:11, 45:19, 46:1, 74:16, 92:13, 97:3, 130:2, 153:19, 153:22, 154:4, 154:14, 155:21, 157:10, 158:11, 159:1, 198:7

**ear** [1] - 177:2

**earliest** [1] - 60:24

**early** [2] - 114:8, 194:2

**earnings** [1] - 210:15

**easy** [2] - 23:3, 153:2

**EATON** [1] - 2:10

**Ed** [10] - 74:23, 75:9, 91:24, 93:4, 93:8, 93:14, 93:19, 94:6, 157:10, 158:13

**effort** [2] - 148:13, 229:13

**eight** [1] - 207:3

**either** [4] - 46:2, 62:18, 74:19, 164:8

**electronic** [3] - 130:3, 210:23, 215:13

**electronically** [1] - 211:16

**Emanuel** [13] - 14:9, 45:7, 46:2, 46:6, 46:10, 53:17, 74:20, 82:3, 94:21, 97:18, 98:22, 99:17, 129:7

**EMANUEL** [1] - 2:6

**emblazoned** [1] - 158:7

**emotionally** [1] - 40:20

**employed** [1] - 7:18

**employee** [3] - 22:5, 164:9

**employees** [5] - 59:19, 110:3, 138:9, 212:1, 217:19

**employment** [1] - 223:9

**end** [15] - 9:15, 46:17, 52:9, 87:12, 105:1, 110:17, 121:18, 144:4, 146:4, 147:11, 166:8, 166:21, 167:6, 172:23, 179:4

**ended** [7] - 26:15, 54:14, 67:14, 106:13, 167:3, 167:19, 223:9

**ending** [1] - 51:7

**endure** [3] - 40:18, 41:2, 60:3

**enforce** [1] - 148:13

**enforcement** [1] - 103:7

**engaged** [5] - 105:20, 107:10, 175:6, 175:16, 177:5

**engaging** [2] - 85:10, 121:9

**ensure** [1] - 68:24

**entered** [3] - 143:15, 162:12, 164:24

**enterprise** [1] - 66:20

**enthusiastic** [1] - 82:16

**entire** [3] - 23:14, 50:17, 216:21

**entirely** [1] - 178:9

**entitled** [2] - 137:11, 175:17

**entitlement** [1] - 137:1

**environment** [1] - 59:23

**episodes** [1] - 176:6

**Esq** [4] - 2:3, 2:6, 2:7, 2:10

**Estate** [42] - 8:21, 16:10, 35:2, 36:11, 37:9, 43:8, 43:9, 47:6, 47:20, 48:4, 48:20, 49:10, 67:16, 67:19, 92:14, 98:1, 105:19, 108:4, 142:2, 142:15,

Morgan Art vs. McKenzie | Case 1:18-cv-04438-AT-BCM  Document 479-7  Filed 01/17/22  Page 67 of 81 | January 7, 2022
Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 67**

142:19, 143:16,
144:19, 145:23,
146:14, 146:19,
147:6, 147:14,
147:22, 147:23,
148:14, 157:11,
157:21, 158:2,
159:12, 176:4,
207:9, 215:3,
216:19, 220:14,
227:23, 232:6
**ESTATE** [1] - 2:9
**Estate"** [1] - 47:10
**Estate's** [3] - 145:11,
150:23, 232:19
**et** [1] - 1:9
**etc..** [1] - 41:6
**etc...etc..** [1] - 83:18
**etc...etc...etc..** [1] -
79:19
**ethical** [1] - 69:2
**eunuch** [1] - 168:24
**evaluating** [1] - 76:13
**events** [3] - 74:10,
136:3, 207:8
**everlasting** [1] -
169:13
**evidence** [1] - 149:19
**evolving** [1] - 122:13
**exact** [3] - 12:14, 53:1,
136:6
**exactly** [6] - 9:17,
24:2, 35:10, 110:13,
114:14, 231:20
**exaggerated** [1] -
111:13
**EXAMINATION** [9] -
19:6, 55:5, 56:1,
88:3, 138:4, 151:13,
172:17, 219:1,
222:21
**example** [2] - 154:15,
226:10
**examples** [4] - 55:14,
56:4, 58:10, 59:10
**excessive** [1] - 48:20
**exchange** [3] - 97:7,
132:19, 205:8
**exchanges** [1] - 205:8
**excited** [3] - 228:10,
228:11, 228:18
**excited"** [1] - 228:8
**excuse** [6] - 10:2,
22:5, 38:21, 50:15,
113:16, 147:22
**execute** [1] - 49:5
**executed** [2] - 145:20,
157:18
**exhausted** [1] - 40:18
**Exhibit** [80] - 29:11,

29:15, 29:17, 29:24,
30:7, 38:21, 38:22,
38:24, 39:3, 44:23,
45:1, 53:9, 60:11,
60:13, 60:15, 75:23,
76:1, 88:7, 88:9,
91:19, 91:21, 92:22,
103:22, 108:14,
138:19, 141:17,
141:20, 149:1,
149:2, 153:18,
153:20, 162:6,
162:8, 164:21,
165:4, 178:19,
185:12, 185:14,
185:16, 186:13,
186:15, 187:16,
188:2, 188:12,
188:14, 189:1,
189:3, 189:11,
189:14, 189:21,
189:24, 190:8,
190:10, 190:18,
190:20, 191:13,
191:15, 191:22,
191:24, 192:7,
192:13, 193:12,
193:15, 195:3,
195:5, 195:18,
196:9, 196:21,
196:23, 197:3,
197:9, 200:6,
200:14, 204:24,
209:2, 209:5,
209:14, 209:16,
219:5, 226:18
**exhibit** [3] - 33:17,
185:7, 229:6
**EXHIBITS** [1] - 4:1
**Exhibits** [1] - 29:12
**exhibits** [1] - 29:11
**experience** [1] - 24:22
**experiences** [1] - 25:1
**expert** [1] - 109:1
**Expires** [1] - 236:19
**explained** [1] - 90:2
**explicitly** [4] - 65:21,
111:1, 230:17,
230:22
**exposure** [1] - 44:17
**express** [3] - 72:18,
121:7, 152:15
**expressed** [8] - 72:6,
72:23, 73:12, 73:20,
73:23, 152:17,
205:18, 205:19
**expressly** [1] - 153:10
**extensive** [3] - 41:14,
134:6, 210:23
**extent** [1] - 77:19

**EZ** [2] - 83:20, 83:22

# F

**fabricate** [1] - 232:22
**face** [2] - 33:24, 206:6
**facetious** [2] - 228:16,
228:17
**facility** [5] - 81:11,
140:23, 141:8,
180:6, 183:20
**fact** [10] - 29:2, 58:16,
120:7, 131:12,
179:16, 198:12,
203:6, 207:16,
220:11, 232:16
**facts** [2] - 162:23,
163:6
**fading** [1] - 58:1
**failing** [1] - 164:1
**faith** [3] - 27:3, 121:9,
123:2
**fall** [1] - 176:19
**falling** [2] - 34:13,
35:9
**false** [5] - 130:13,
131:6, 211:3,
212:20, 215:21
**Falzone** [4] - 2:10, 3:4,
218:16, 233:12
**falzone** [1] - 29:21
**FALZONE** [19] - 143:9,
143:12, 143:20,
144:5, 144:23,
145:4, 145:14,
146:2, 146:17,
147:10, 147:17,
148:3, 148:8,
148:16, 150:12,
218:18, 219:2,
222:17, 233:14
**familiar** [2] - 141:17,
178:20
**family** [7] - 7:11,
20:15, 21:8, 23:8,
31:22, 76:20, 108:12
**fantastically** [2] -
23:4, 205:23
**fashioned** [3] -
210:17, 211:5,
214:11
**fast** [2] - 36:18, 36:20
**father** [1] - 108:10
**favorable** [1] - 43:1
**FBI** [45] - 11:10, 11:11,
13:14, 44:11, 62:16,
62:20, 63:9, 63:15,
63:18, 63:21, 76:18,
77:14, 77:16, 77:21,
77:23, 78:5, 78:14,

78:18, 79:23, 80:3,
80:17, 81:16, 81:18,
82:2, 82:11, 84:13,
84:15, 84:19, 86:2,
86:10, 86:17, 90:10,
90:15, 90:21, 91:4,
91:8, 91:9, 91:13,
99:1, 99:18, 100:14,
100:24, 102:6,
103:6, 134:20
**February** [1] - 155:6
**Federal** [1] - 1:16
**federal** [3] - 11:4,
15:20, 103:15
**fee** [1] - 164:1
**feedback** [1] - 151:16
**feelings** [1] - 219:18
**fees** [2] - 48:17, 48:20
**feet** [1] - 140:8
**fell** [1] - 210:15
**felt** [3] - 44:17, 203:4,
208:14
**few** [13] - 54:4, 54:5,
54:6, 56:14, 128:8,
153:21, 160:14,
175:2, 187:19,
200:3, 218:21,
227:10, 227:14
**fiance** [2] - 40:9, 40:10
**Fifth** [3] - 44:8, 98:19,
99:15
**fighting** [1] - 222:5
**figure** [3] - 57:15,
74:3, 109:1
**figured** [1] - 99:7
**file** [5] - 43:2, 137:23,
174:16, 214:21,
216:23
**filed** [1] - 232:6
**files** [1] - 182:24
**filing** [1] - 156:16
**filings** [2] - 15:17,
16:14
**fill** [1] - 196:5
**finally** [1] - 73:6
**financial** [2] - 36:10,
37:4
**Findings** [1] - 163:3
**fine** [5] - 9:24, 23:12,
25:23, 26:24
**finish** [5] - 37:24,
179:13, 197:13,
198:24, 202:6
**finished** [2] - 20:7,
120:23, 156:23,
181:19, 201:11
**finishing** [1] - 166:20
**firm** [8] - 42:5, 42:21,
57:5, 57:7, 94:19,
156:18, 157:3,

226:24
**firms** [6] - 41:14, 42:1,
45:12, 75:5, 99:22,
207:4
**first** [59] - 5:3, 9:1,
12:13, 13:1, 13:5,
13:22, 30:14, 46:1,
46:24, 50:22, 56:13,
56:15, 59:11, 61:2,
61:12, 62:5, 62:17,
62:18, 63:17, 78:17,
78:18, 80:4, 80:20,
92:14, 104:20,
112:2, 112:4,
119:21, 119:24,
120:5, 122:17,
123:14, 124:3,
126:3, 126:10,
132:13, 133:8,
160:14, 180:10,
181:7, 183:21,
192:15, 192:20,
195:12, 200:18,
201:7, 201:9,
201:15, 201:18,
201:20, 207:6,
207:13, 208:14,
210:13, 219:18,
220:16, 221:6,
225:2, 225:3
**firsthand** [7] - 223:3,
223:7, 223:13,
223:15, 223:19,
231:15, 231:19
**fit** [6] - 169:14, 169:20,
169:23, 170:1,
183:11
**five** [1] - 199:23
**flat** [2] - 182:22,
182:24
**Floor** [1] - 2:7
**floor** [13] - 180:18,
181:2, 181:7,
192:15, 192:20,
201:7, 201:9,
201:18, 201:20,
201:23, 214:21
**follow** [1] - 222:20
**follow-up** [1] - 222:20
**followed** [2] - 44:3,
220:22
**following** [6] - 42:14,
93:20, 104:22,
138:2, 235:3, 235:4
**follows** [1] - 5:7
**FOR** [3] - 2:2, 2:5, 2:9
**forced** [1] - 114:20
**forcing** [1] - 33:21
**FOREGOING** [1] -
236:23

**EXHIBIT G - 68**

foregoing [2] - 234:5, 236:8
forged [2] - 112:18, 177:21
forgeries [4] - 71:17, 72:7, 72:12, 73:13
forgery [4] - 109:8, 109:10, 148:19, 175:6
forget [8] - 19:12, 26:16, 26:21, 34:15, 50:13, 156:9, 177:11, 203:21
forging [4] - 77:22, 78:11, 108:18, 109:3
forgiven [1] - 169:14
forgotten [2] - 184:24, 225:8
form [3] - 52:24, 53:1, 164:8
forma [1] - 26:20
formal [1] - 146:1
format [1] - 39:11
forth [8] - 9:18, 22:12, 97:3, 163:6, 168:9, 222:5, 222:6, 236:7
fortunately [1] - 213:14
fortune [1] - 220:5
forward [4] - 45:21, 76:14, 200:2, 217:9
forwarded [2] - 45:6, 53:16
Foundation [14] - 15:22, 16:9, 35:2, 91:16, 178:15, 182:18, 184:8, 184:22, 192:23, 193:7, 194:1, 194:9, 201:15, 215:10
FOUNDATION [1] - 1:6
Four [11] - 66:13, 67:10, 68:3, 69:13, 69:22, 70:23, 76:11, 81:3, 112:19, 112:20, 178:10
four [4] - 41:14, 42:1, 199:22, 200:22
framed [1] - 171:8
fraud [4] - 155:4, 156:7, 173:9, 207:23
fraudsters [1] - 178:16
fraudulent [1] - 156:17
free [3] - 18:18, 33:19, 34:1
freely [1] - 163:9
French [2] - 176:16, 176:18

frequently [1] - 110:2
Friday [1] - 93:23
friend [1] - 106:11
front [7] - 22:19, 22:20, 59:18, 117:15, 194:18, 196:4, 206:6
froze [1] - 180:22
frustrated [1] - 170:11
fuck [5] - 56:22, 206:4, 206:5
fucking [1] - 206:4
fuel [1] - 196:5
full [2] - 5:12, 33:16
fully [1] - 163:10
Fund [6] - 206:12, 207:12, 207:23, 207:24, 208:3, 208:10, 208:13, 208:20
funds [1] - 177:9
future [1] - 204:1

## G

gain [1] - 169:13
gaining [1] - 137:1
galleries [2] - 102:12, 102:18
Gallery [3] - 121:22, 122:10, 122:14
game [1] - 31:12
gas [4] - 26:11, 28:2, 28:3, 28:10
gash [1] - 27:21
gathered [1] - 124:20
gathering [1] - 21:14
general [3] - 154:6, 176:17, 231:8
General's [4] - 48:19, 105:11, 107:2, 145:8
generally [5] - 155:12, 174:23, 175:5, 175:6, 214:23
generated [1] - 213:3
Ginexi [17] - 40:13, 51:23, 53:3, 71:18, 72:5, 72:11, 72:15, 72:16, 72:17, 73:11, 73:20, 109:13, 133:19, 138:11, 138:13, 167:11, 167:18
girlfriend [1] - 169:7
girlfriends [1] - 169:9
given [8] - 76:16, 127:7, 163:9, 197:12, 198:13, 198:15, 208:4, 215:18

God [1] - 106:5
gonna [1] - 204:10
Gonzales [1] - 104:21
gonzalez [3] - 9:1, 55:7, 218:13
GONZALEZ [1] - 1:15
Gonzalez [89] - 5:2, 5:10, 5:14, 9:21, 12:3, 12:10, 16:1, 18:22, 19:8, 20:12, 21:5, 27:11, 29:14, 30:1, 39:3, 42:20, 44:7, 45:6, 53:10, 53:16, 55:16, 55:20, 85:2, 88:5, 122:1, 122:16, 127:19, 131:20, 135:18, 136:2, 136:9, 136:21, 138:6, 141:16, 143:13, 144:6, 146:18, 147:19, 149:6, 150:14, 151:19, 153:21, 157:4, 160:19, 161:21, 162:11, 163:4, 164:6, 164:22, 165:1, 174:20, 178:17, 178:24, 182:9, 185:4, 185:23, 186:17, 187:17, 188:3, 188:15, 189:4, 189:15, 190:1, 190:11, 190:21, 191:16, 192:1, 192:14, 193:16, 193:22, 194:17, 196:1, 197:10, 198:3, 205:2, 206:9, 208:22, 209:6, 209:23, 212:18, 219:4, 221:3, 222:23, 226:19, 233:11, 233:17, 234:4, 234:14, 236:6
GONZALEZ [1] - 3:2
goods [1] - 43:8
Google [1] - 160:13
Googled [1] - 166:11
governmental [1] - 103:11
grabbing [1] - 177:17
great [3] - 30:5, 166:23, 224:10
greed [1] - 176:5
Greed [1] - 176:6
greedy [1] - 176:3
greet [3] - 226:8, 226:9

Greg [25] - 34:19, 41:17, 62:2, 64:10, 64:11, 77:11, 99:6, 99:7, 99:19, 100:12, 100:19, 101:4, 132:15, 132:22, 133:21, 134:5, 134:18, 134:20, 135:15, 136:4, 200:20, 201:8, 202:5, 202:15
grotesque [2] - 205:17, 205:20
group [1] - 80:22
guess [10] - 27:4, 52:5, 68:10, 71:1, 78:3, 200:19, 201:8, 202:4, 221:16, 223:1
guesses [1] - 102:9
guests [2] - 206:6, 227:18
gun [6] - 111:20, 111:22, 111:24, 112:1, 112:5
guns [7] - 36:22, 50:3, 50:11, 111:6, 111:9, 111:11, 111:16
gut [1] - 86:16
guy [14] - 18:4, 26:16, 36:19, 50:4, 50:5, 51:12, 51:14, 59:14, 100:4, 102:24, 120:17, 160:14, 203:21, 206:7

## H

Haley [17] - 178:21, 179:4, 185:2, 185:17, 186:9, 188:11, 188:23, 189:21, 190:8, 190:18, 191:22, 192:7, 204:20, 208:23, 209:13, 209:21
haley [11] - 2:7, 182:6, 187:13, 187:23, 189:10, 191:11, 193:11, 194:14, 195:16, 196:16, 200:4
half [9] - 54:23, 94:23, 96:14, 96:20, 104:12, 106:4, 120:8, 141:14, 172:6
Hamilton [2] - 156:9, 156:16
hand [5] - 210:18, 211:6, 212:12,

214:12, 236:15
hand-written [4] - 210:18, 211:6, 212:12, 214:12
handed [2] - 214:20, 214:23
handing [1] - 100:11
handle [1] - 231:12
handled [1] - 69:1
handlers [1] - 181:11
handles [1] - 231:13
handling [3] - 10:5, 173:20, 226:3
hands [2] - 31:14, 31:19
happy [1] - 20:11
harangue [1] - 114:21
harass [1] - 168:4
harassment [1] - 170:14
hard [13] - 23:2, 26:13, 67:22, 112:15, 210:18, 211:6, 212:12, 212:15, 212:21, 213:2, 214:12, 214:14
harmed [1] - 148:21
health [1] - 138:10
hear [30] - 10:16, 19:2, 19:10, 23:6, 43:24, 46:19, 47:17, 54:6, 55:17, 56:12, 56:20, 57:24, 79:6, 85:3, 89:7, 89:16, 89:17, 89:18, 114:6, 121:2, 151:17, 151:22, 176:24, 180:20, 180:22, 192:16, 211:24, 212:17, 215:7, 217:1
heard [19] - 23:21, 23:22, 41:23, 51:3, 56:18, 112:4, 133:6, 133:20, 134:1, 143:10, 143:11, 177:2, 184:21, 202:16, 202:19, 206:1, 207:13, 212:19, 225:5
hearing [9] - 9:2, 18:22, 19:1, 23:24, 29:7, 55:20, 84:23, 232:11, 232:13
heavy [1] - 51:13
held [3] - 19:4, 55:23, 105:7
hell [1] - 203:24
help [22] - 21:23, 34:1, 34:5, 36:16, 47:9, 48:8, 48:11, 48:13,

48:14, 48:24, 49:3, 49:9, 49:12, 70:16, 77:19, 90:8, 97:8, 97:11, 97:15, 97:17, 97:19, 106:12
**help"** [1] - 90:8
**helped** [2] - 26:1, 47:14
**helpful** [3] - 54:12, 68:7, 68:9
**helping** [1] - 48:18
**helps** [1] - 177:1
**here"** [2] - 32:6, 155:14
**hereby** [3] - 104:21, 234:6, 236:5
**herein** [1] - 234:5
**hereinbefore** [1] - 236:7
**hereunto** [1] - 236:14
**hi** [1] - 40:16
**hid** [1] - 215:14
**hidden** [11] - 61:14, 120:4, 124:2, 124:7, 125:1, 127:23, 128:4, 175:5, 177:21, 184:13, 201:14
**hide** [10] - 24:12, 34:23, 65:22, 125:11, 132:7, 139:15, 139:18, 140:3, 140:10, 175:22
**hiding** [13] - 41:12, 61:16, 61:20, 62:21, 64:7, 77:22, 78:10, 123:19, 124:1, 132:4, 168:14, 168:17, 168:22
**high** [4] - 169:15, 169:20, 169:22, 170:2
**highway** [1] - 28:12
**himself** [4] - 21:18, 136:10, 146:9, 164:15
**hire** [1] - 157:2
**hired** [6] - 17:9, 17:11, 17:13, 57:6, 161:8, 207:3
**hold** [8] - 11:22, 39:22, 58:8, 59:6, 59:8, 96:4, 96:7, 122:22
**Hold** [1] - 55:16
**holding** [2] - 164:14, 166:1
**Home** [2] - 196:6, 199:14

**home** [11] - 7:4, 20:18, 21:7, 25:20, 25:21, 26:6, 34:5, 218:6, 219:20, 219:21, 221:13
**homicides** [1] - 50:1
**Hope** [19] - 43:9, 57:5, 57:8, 58:6, 67:5, 67:6, 98:4, 105:10, 107:13, 113:23, 115:3, 115:12, 145:7, 145:13, 176:4, 214:21, 225:24, 227:23, 229:10
**HOPE** [42] - 14:1, 14:3, 28:18, 64:22, 65:2, 66:13, 66:14, 66:24, 67:11, 68:3, 69:13, 69:22, 70:10, 71:12, 76:11, 81:3, 84:3, 85:6, 85:15, 96:2, 96:14, 96:22, 100:5, 112:20, 113:3, 119:7, 119:10, 119:12, 119:13, 139:15, 139:18, 140:1, 140:7, 143:18, 144:12, 146:21, 158:3, 158:5, 158:14, 178:10, 186:19, 186:20
**hope** [1] - 37:8
**hoped** [1] - 36:10
**hopefully** [2] - 197:13, 198:23
**HOPEs** [1] - 70:24
**horrible** [2] - 174:22, 176:22
**host** [5] - 210:7, 225:18, 225:21, 225:22, 226:8
**hosting** [7] - 225:15, 226:7, 228:2, 228:4, 228:21, 229:2, 229:23
**hosting"** [1] - 228:6
**hotel** [1] - 104:15
**hour** [4] - 54:23, 94:23, 104:12, 141:14
**hours** [1] - 106:4
**house** [52] - 14:2, 18:19, 18:20, 18:21, 19:9, 19:14, 19:22, 20:2, 20:7, 20:12, 20:14, 25:9, 31:21, 32:2, 32:14, 33:3, 33:8, 38:3, 65:12,

65:17, 65:22, 66:1, 66:2, 66:3, 67:9, 77:8, 82:23, 83:4, 83:8, 83:12, 84:4, 85:7, 98:13, 111:21, 118:6, 128:11, 128:12, 141:1, 141:2, 141:5, 171:2, 172:2, 181:15, 181:19, 183:10, 183:19, 183:23, 184:3, 184:18, 184:23, 196:4
**houses** [2] - 102:12, 102:17
**housing** [1] - 18:18
**hub** [1] - 123:24
**humiliate** [1] - 55:11
**humiliated** [4] - 55:15, 56:5, 58:11, 59:13
**hundreds** [6] - 66:13, 68:2, 69:20, 112:19, 178:6
**hurt** [3] - 49:20, 51:11, 51:15
**husband** [1] - 168:20

---

**I**

**idea** [4] - 98:23, 120:11, 156:24, 203:19
**ideas** [1] - 132:19
**identification** [36] - 29:17, 38:24, 45:1, 53:9, 60:11, 76:1, 88:9, 91:21, 138:19, 141:20, 153:20, 162:8, 165:4, 185:14, 185:16, 186:15, 187:16, 188:2, 188:14, 189:3, 189:14, 189:24, 190:10, 190:20, 191:15, 191:24, 192:13, 193:15, 195:5, 196:9, 197:9, 200:14, 204:24, 209:5, 209:16, 226:18
**identified** [3] - 5:3, 200:8, 236:7
**idiosyncrasy** [1] - 41:4
**II** [2] - 1:1, 1:15
**ill** [4] - 17:23, 22:10, 31:24, 40:20
**Image** [58] - 10:5, 10:23, 11:6, 12:17,

17:14, 18:15, 21:6, 22:6, 24:1, 24:20, 24:23, 25:6, 35:7, 35:8, 38:2, 40:14, 51:2, 53:24, 54:10, 55:9, 58:22, 63:10, 68:4, 69:23, 72:8, 72:14, 73:14, 81:14, 91:10, 102:22, 103:8, 103:12, 103:16, 112:3, 115:2, 116:21, 129:23, 133:11, 143:16, 145:23, 146:13, 146:19, 148:13, 153:7, 157:13, 158:7, 161:5, 167:22, 168:2, 171:13, 178:13, 223:5, 223:8, 223:15, 232:2, 232:5, 232:8, 232:22
**image** [4] - 69:10, 151:20, 152:3, 152:7
**images** [1] - 76:11
**impact** [1] - 5:19
**implementing** [1] - 134:7
**implicit** [1] - 110:3
**important** [1] - 7:7
**imposed** [1] - 40:19
**imposition** [1] - 163:7
**impossible** [1] - 148:9
**impression** [8] - 86:4, 86:7, 86:9, 86:14, 86:15, 87:5, 122:17
**improper** [1] - 137:24
**IN** [1] - 236:14
**INC** [1] - 1:22
**incapable** [1] - 169:1
**inch** [5] - 84:3, 85:15, 96:14, 96:20, 172:6
**inches** [1] - 206:5
**incident** [3] - 30:21, 90:16, 113:8
**include** [3] - 155:22, 199:13, 229:6
**including** [3] - 29:21, 215:4, 215:12
**incoherence** [1] - 127:15
**Indiana** [39] - 47:6, 59:7, 72:13, 73:13, 73:22, 81:13, 109:4, 109:17, 110:23, 111:3, 113:24, 114:11, 116:2, 118:9, 147:1, 156:19, 171:2,

171:6, 178:14, 181:16, 181:22, 183:22, 186:21, 188:4, 188:16, 189:6, 189:17, 190:3, 190:13, 190:23, 191:18, 192:3, 193:18, 207:9, 210:14, 214:19, 215:3, 232:23
**Indiana"** [1] - 155:23
**Indiana's** [4] - 108:18, 109:14, 109:22, 216:19
**indicated** [3] - 76:14, 87:3, 230:13
**indicates** [1] - 104:7
**individual** [3] - 136:7, 137:9, 137:11
**individuals** [1] - 180:12
**informant** [1] - 99:8
**information** [11] - 41:7, 42:12, 54:11, 70:13, 137:2, 160:9, 180:7, 206:15, 210:7, 215:4, 216:24
**informed** [2] - 134:11, 138:8
**initial** [2] - 104:2, 104:5
**injunction** [2] - 232:7, 232:19
**injured** [1] - 35:16
**inner** [1] - 41:8
**input** [1] - 171:19
**insane** [2] - 33:24, 41:20
**insisted** [2] - 106:7
**inspect** [5] - 129:7, 129:19, 129:22, 194:1
**inspection** [43] - 65:15, 65:20, 65:23, 120:23, 121:19, 126:8, 126:11, 126:17, 126:21, 127:12, 130:5, 131:3, 131:15, 139:3, 139:8, 181:14, 182:15, 183:1, 183:4, 183:15, 183:21, 184:20, 186:7, 187:10, 188:8, 188:20, 189:7, 189:18, 190:5, 190:14, 191:1, 191:19, 192:4,

193:8, 193:19, 193:23, 195:12, 201:15, 202:9, 202:10, 202:21, 203:2, 209:24
**instance** [2] - 21:21, 227:22
**instead** [1] - 96:14
**instructed** [1] - 180:17
**instructing** [2] - 199:4, 201:5
**instructions** [3] - 84:15, 84:19, 86:1
**insult** [2] - 55:11, 58:17
**insulted** [2] - 58:10, 59:13
**insulting** [4] - 35:24, 43:23, 43:24, 59:14
**insults** [5] - 32:5, 33:20, 41:6, 55:15, 56:4
**intend** [4] - 131:5, 173:14, 174:16, 221:1
**intended** [1] - 196:12
**intention** [2] - 87:7, 229:13
**interact** [1] - 23:7
**interaction** [1] - 29:1
**interested** [2] - 95:22, 236:13
**interesting** [1] - 110:8
**interests** [1] - 69:2
**interfered** [1] - 148:21
**intermediary** [1] - 142:9
**interrogatories** [1] - 5:8
**interrupt** [1] - 10:19
**interruption** [1] - 96:10
**intertwines** [1] - 112:9
**intimate** [1] - 168:7
**intimidated** [3] - 110:1, 110:2, 208:8
**intoxicated** [2] - 169:3, 170:7
**intuitive** [1] - 86:16
**invaded** [2] - 203:2, 203:4
**invading** [1] - 83:18
**invasion** [1] - 203:6
**inventory** [7] - 116:4, 120:13, 123:13, 128:22, 129:20, 203:7, 203:20, 203:22, 204:8, 204:9, 204:18, 220:3, 230:8,

230:11, 230:14, 230:19, 231:4
**investigate** [2] - 63:10, 63:19
**investigating** [3] - 10:22, 64:6, 87:15
**investigation** [12] - 10:6, 10:7, 44:12, 63:7, 87:17, 98:24, 99:1, 99:18, 101:11, 101:19, 102:6, 165:11
**investigations** [1] - 87:12
**invited** [3] - 123:17, 124:9, 124:21
**invoice** [1] - 213:4
**invoices** [1] - 210:6
**involved** [12] - 9:5, 44:13, 50:2, 92:24, 93:1, 117:17, 131:15, 133:17, 145:22, 148:6, 157:20, 222:13
**involving** [3] - 15:22, 16:3, 165:12
**ironed** [1] - 67:23
**irrelevant** [2] - 20:4, 137:19
**IRS** [2] - 212:16, 214:16
**issue** [4] - 45:15, 97:10, 137:20, 137:21
**issued** [7] - 129:2, 129:11, 163:24, 164:18, 166:5, 193:24, 194:4
**issues** [3] - 55:24, 89:10, 95:22
**it"** [3] - 31:1, 88:22, 122:11
**itself** [1] - 137:16

## J

**jackets** [1] - 184:11
**James** [1] - 149:4
**January** [5] - 1:18, 150:17, 150:20, 236:15
**job** [7] - 18:1, 18:2, 24:6, 31:11, 31:20, 38:9, 128:19
**Joe** [1] - 10:4
**Joel** [1] - 8:11
**John** [12] - 42:18, 92:24, 94:10, 94:11, 106:16, 106:17, 130:24, 131:13,

131:16, 205:2, 216:15
**Johnson** [1] - 198:1
**join** [2] - 105:7, 105:22
**joined** [2] - 217:4, 217:7
**Judge** [1] - 164:11
**judgement** [1] - 124:5
**Julie** [2] - 1:16, 233:17
**JULIE** [2] - 236:4, 236:17
**July** [17] - 4:17, 4:18, 4:19, 12:15, 23:18, 26:18, 65:14, 110:9, 110:15, 195:20, 196:2, 196:18, 197:6, 197:11, 200:11, 200:13, 224:16
**jump** [1] - 206:2
**jumped** [1] - 56:10
**June** [7] - 157:15, 157:24, 158:14, 161:10, 161:15, 194:4, 194:7
**Justice** [1] - 164:11

## K

**Katonah** [31] - 12:19, 13:18, 13:19, 19:22, 23:9, 25:9, 32:2, 32:14, 33:4, 36:18, 37:15, 51:24, 80:1, 80:18, 85:7, 98:13, 111:17, 113:18, 115:13, 116:7, 122:18, 123:18, 124:21, 126:12, 139:7, 170:23, 171:3, 223:20, 225:16, 225:19, 225:23
**keep** [3] - 18:22, 157:6, 167:13
**keeping** [1] - 213:2
**keeps** [1] - 109:5
**kept** [25] - 188:5, 188:17, 189:6, 189:17, 190:3, 190:13, 190:23, 191:18, 192:3, 193:18, 210:16, 211:5, 211:10, 211:15, 211:16, 212:13, 214:1, 214:3, 214:11, 214:13, 215:3, 216:3, 216:13, 227:5, 231:16

**Kevin** [9] - 46:12, 46:13, 46:14, 46:22, 46:24, 157:11, 158:13, 205:3
**keys** [1] - 96:6
**kidding** [1] - 106:4
**kill** [1] - 58:20
**kind** [12] - 18:1, 46:16, 56:24, 59:23, 60:3, 64:13, 86:5, 97:22, 186:20, 206:7, 231:5, 231:24
**kitchen** [1] - 56:6
**knowing** [1] - 207:21
**knowledge** [15] - 124:7, 179:16, 214:7, 216:2, 216:6, 223:4, 223:7, 223:8, 223:14, 223:16, 223:18, 223:19, 231:15, 231:18, 231:19
**known** [1] - 17:17
**knows** [7] - 119:2, 125:3, 128:22, 130:4, 210:10, 212:8, 212:9

## L

**ladies** [1] - 87:21
**language** [2] - 49:24, 220:10
**laptop** [2] - 198:4, 218:11
**large** [1] - 183:2
**Larry** [3] - 107:22, 107:23, 108:1
**Las** [2] - 42:5, 42:6
**last** [27] - 11:18, 11:20, 11:24, 15:10, 16:13, 25:4, 29:13, 33:17, 38:8, 47:17, 53:21, 79:15, 90:20, 92:20, 95:11, 96:11, 99:22, 100:22, 102:10, 147:2, 150:16, 163:19, 169:18, 192:24, 215:5, 222:23
**late** [2] - 130:15, 130:18
**laughter** [1] - 135:2
**Laughter** [2] - 83:23, 203:12
**law** [24] - 41:14, 42:1, 42:5, 42:21, 45:12, 57:5, 57:7, 99:22, 103:7, 134:19, 135:9, 135:15,

156:18, 157:3, 162:19, 164:7, 164:10, 164:13, 165:9, 165:22, 165:23, 166:2, 206:20, 207:3
**Law** [4] - 136:19, 137:5, 137:8, 137:9
**law"** [1] - 164:16
**lawful** [1] - 5:2
**lawsuit** [1] - 21:15
**lawsuits** [3] - 16:2, 21:15, 57:19
**lawyer** [5] - 54:15, 134:13, 137:10, 137:11, 206:24
**Lawyer's** [1] - 163:16
**lawyers** [13] - 26:22, 107:16, 107:17, 107:18, 107:20, 133:8, 153:8, 160:4, 161:8, 173:1, 173:8, 173:17, 216:13
**Lawyers** [8] - 206:12, 207:12, 207:23, 207:24, 208:3, 208:10, 208:13, 208:19
**lawyers"** [1] - 161:12
**layer** [1] - 101:21
**lead** [1] - 48:22
**leading** [3] - 58:15, 115:20, 170:10
**learn** [1] - 193:23
**lease** [2] - 32:13, 32:16
**least** [2] - 26:16, 41:13
**leave** [4] - 25:18, 37:15, 171:1, 201:3
**leaving** [2] - 52:10, 138:8
**left** [18] - 12:17, 24:1, 59:12, 86:4, 120:9, 120:22, 123:23, 125:6, 146:5, 153:6, 161:5, 170:23, 171:3, 171:11, 171:12, 171:19, 223:20
**legal** [8] - 14:14, 14:20, 15:12, 15:13, 166:8, 167:2, 167:6, 167:18
**legally** [1] - 43:2
**legit** [1] - 96:17
**less** [1] - 202:2
**Letter** [1] - 136:18
**letter** [1] - 102:2
**letting** [5] - 54:16, 54:18, 70:12,

100:18, 130:19
**levels** [1] - 176:16
**liar** [1] - 43:5
**license** [1] - 5:4
**lie** [1] - 207:20
**life** [4] - 7:8, 43:7, 44:4, 169:13
**limitations** [1] - 139:23
**LIMITED** [1] - 1:6
**Linda** [1] - 107:4
**LINE** [1] - 235:5
**line** [6] - 7:12, 104:20, 131:11, 144:11, 155:23, 195:24
**link** [1] - 161:11
**Lipson** [17] - 43:6, 46:12, 46:22, 47:1, 47:5, 49:7, 49:16, 51:8, 54:3, 54:6, 142:10, 142:14, 142:18, 157:11, 158:1, 158:13, 205:3
**list** [1] - 146:24
**listen** [4] - 18:3, 37:19, 114:21, 170:2
**listing** [1] - 178:8
**litigants** [1] - 47:1
**litigation** [8] - 47:21, 48:5, 93:1, 93:12, 136:8, 154:18, 154:23, 198:9
**live** [3] - 7:11, 21:8, 33:3
**lived** [6] - 19:14, 19:16, 20:12, 20:13, 38:2, 171:2
**lives** [2] - 7:6, 40:20
**living** [9] - 12:19, 17:4, 19:10, 19:22, 37:16, 66:4, 77:8, 79:24, 98:12
**LLC** [3] - 2:2, 161:6, 161:16
**LLP** [1] - 2:6
**load** [1] - 132:24
**located** [6] - 181:4, 181:15, 181:18, 186:3, 186:23, 188:19
**lodged** [1] - 90:1
**logistics** [1] - 94:1
**Lon** [1] - 176:17
**look** [20] - 44:20, 59:14, 108:15, 120:10, 120:24, 121:15, 122:21, 129:8, 130:1, 130:20, 139:3, 155:19, 161:9,

178:17, 178:22, 179:12, 179:19, 180:17, 208:22, 230:7
**looked** [7] - 53:22, 61:2, 85:12, 92:13, 120:8, 160:13, 181:6
**looking** [9] - 45:13, 92:23, 101:14, 109:21, 118:2, 160:15, 166:12, 171:19, 186:24
**looks** [4] - 46:1, 61:6, 68:19, 159:23
**loose** [1] - 36:22
**lose** [2] - 24:6, 174:3
**lost** [6] - 12:3, 27:3, 38:7, 56:10, 60:17, 84:21
**louder** [1] - 57:12
**love** [2] - 43:10, 169:1
**LOVE** [9] - 151:20, 152:3, 152:5, 152:7, 152:11, 152:21, 153:11, 153:12, 158:21
**low** [3] - 59:4, 59:5, 59:7
**lower** [1] - 184:17
**Luke** [18] - 2:6, 3:3, 14:11, 36:13, 45:15, 46:8, 53:23, 54:8, 54:9, 67:22, 88:11, 88:14, 91:24, 93:19, 94:7, 139:3, 174:3
**Luquillo** [2] - 6:12
**lying** [1] - 216:4

---

**M**

**M-C-K-E-O-G-H** [1] - 12:1
**Maaren** [1] - 205:3
**Madison** [1] - 2:7
**MAF** [43] - 3:22, 3:23, 3:24, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 185:12, 185:15, 185:22, 186:14, 187:14, 187:15, 188:1, 188:13, 189:1, 189:2, 189:12, 189:13, 189:22, 189:23, 190:8, 190:9, 190:18, 190:19, 191:14, 191:22, 191:23, 192:8,

192:12, 193:12, 193:14, 193:5, 195:4
**mAF** [1] - 185:13
**magnitude** [1] - 121:12
**mail** [104] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:18, 4:17, 4:18, 4:19, 21:24, 23:23, 44:24, 45:2, 46:1, 46:5, 46:10, 46:12, 51:8, 52:20, 53:2, 53:8, 53:11, 53:15, 53:20, 53:22, 60:8, 60:9, 60:10, 60:23, 61:3, 64:16, 64:20, 66:10, 68:19, 68:21, 69:6, 75:20, 75:24, 76:4, 77:2, 81:18, 85:12, 85:13, 88:8, 88:10, 91:20, 91:22, 91:23, 92:23, 93:3, 112:21, 138:18, 138:23, 153:23, 154:5, 154:9, 154:13, 155:9, 155:16, 156:4, 157:10, 157:13, 157:24, 158:12, 158:17, 159:2, 159:4, 159:7, 159:22, 160:1, 161:9, 161:12, 195:19, 195:23, 196:1, 196:8, 196:17, 196:18, 196:21, 197:3, 197:8, 197:10, 197:17, 197:20, 197:22, 198:2, 198:8, 200:5, 200:7, 200:9, 200:12, 200:13, 200:16, 200:17, 205:1, 205:7, 205:13, 205:18, 205:21, 209:6, 209:10
**mailed** [4] - 29:20, 64:19, 81:21, 155:6
**mails** [17] - 45:7, 45:11, 45:19, 46:1, 74:16, 92:13, 97:3, 130:2, 153:19, 153:22, 154:4, 154:14, 155:21, 157:10, 158:11, 159:1, 198:7
**Maine** [8] - 2:12, 47:2, 105:8, 105:11, 107:1, 177:15,

216:19, 219:13
**malaise** [1] - 176:18
**March** [3] - 163:5, 164:24, 236:19
**marginalization** [1] - 32:5
**marginalizatizing** [1] - 33:21
**mark** [22] - 29:4, 29:23, 37:18, 38:21, 53:7, 60:8, 138:16, 141:16, 153:17, 162:5, 164:20, 185:10, 186:12, 188:11, 196:20, 196:22, 197:2, 200:6, 204:21, 209:1, 209:14, 226:11
**marked** [47] - 29:13, 29:16, 30:7, 30:14, 38:23, 39:3, 44:24, 53:8, 60:10, 75:24, 88:8, 91:20, 92:21, 103:22, 138:18, 141:19, 143:3, 149:1, 149:2, 153:19, 162:7, 165:3, 178:19, 185:13, 185:15, 186:14, 187:15, 188:1, 188:13, 189:2, 189:13, 189:23, 190:9, 190:19, 191:14, 191:23, 192:12, 193:14, 195:4, 196:9, 197:9, 200:14, 204:23, 209:4, 209:16, 214:22, 226:17
**market** [1] - 59:7
**marketing** [1] - 17:19
**MARKHAM** [1] - 2:2
**Markham** [15] - 35:17, 35:20, 35:23, 36:3, 36:6, 36:9, 36:24, 37:6, 40:8, 92:24, 130:24, 205:2, 209:7, 216:15
**marking** [15] - 29:10, 75:22, 88:7, 185:12, 188:24, 189:11, 189:21, 190:8, 190:18, 191:12, 191:22, 192:7, 193:12, 195:2, 195:17
**marriage** [4] - 168:15, 168:18, 168:22,

236:12
**MASSACHUSETTS** [3] - 234:1, 235:1, 236:2
**Massachusetts** [4] - 1:17, 1:24, 2:4, 236:5
**master** [1] - 96:18
**material** [1] - 148:1
**materialized** [1] - 86:8
**matter** [7] - 29:2, 98:21, 135:4, 136:7, 161:2, 162:11, 203:5
**Matter** [1] - 164:21
**matters** [1] - 174:11
**Mc** [1] - 11:14
**McCarty** [1] - 116:10
**MCKENZIE** [1] - 1:9
**McKenzie** [218] - 4:22, 6:21, 8:19, 9:4, 9:6, 9:12, 10:23, 11:5, 15:10, 15:23, 16:3, 16:10, 16:18, 16:22, 17:2, 17:9, 17:12, 18:11, 21:13, 23:7, 23:18, 25:3, 26:6, 26:8, 28:19, 30:9, 30:24, 31:20, 32:10, 33:10, 34:9, 35:21, 35:23, 38:16, 41:1, 42:22, 44:9, 47:21, 48:5, 48:9, 48:12, 49:10, 49:13, 49:23, 50:10, 54:13, 54:20, 56:17, 58:10, 58:14, 59:12, 59:17, 60:1, 61:15, 63:10, 63:19, 64:6, 64:21, 65:11, 76:18, 77:21, 78:9, 79:16, 80:10, 83:16, 84:14, 85:5, 85:14, 86:11, 86:20, 86:23, 87:4, 88:14, 88:20, 89:24, 90:22, 91:4, 91:10, 98:14, 100:11, 102:13, 102:22, 103:8, 103:11, 103:17, 105:6, 105:12, 106:15, 106:18, 109:3, 109:24, 110:2, 111:19, 112:18, 113:11, 114:1, 115:22, 116:13, 123:19, 127:6, 127:12, 130:8, 131:1, 132:6, 133:2, 133:13, 133:14, 134:4, 135:1, 135:6,

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 72 of 81    January 7, 2022

Vol. III - Osvaldo Gonzalez

EXHIBIT G - 72
13

135:14, 135:19, 136:1, 136:14, 138:8, 139:14, 139:17, 140:2, 140:9, 142:1, 142:10, 142:14, 142:17, 142:22, 145:22, 146:10, 148:20, 149:5, 152:16, 153:5, 153:10, 155:22, 156:5, 156:6, 158:13, 160:4, 161:15, 166:7, 173:1, 173:8, 173:16, 174:23, 175:3, 175:5, 175:11, 177:4, 177:21, 178:4, 180:4, 181:23, 182:14, 183:2, 183:10, 183:22, 184:22, 188:5, 188:17, 189:6, 189:17, 190:3, 190:13, 190:23, 191:7, 191:18, 192:3, 193:18, 193:24, 194:8, 194:22, 195:7, 195:10, 195:21, 195:23, 196:2, 196:11, 197:18, 197:21, 198:6, 198:13, 201:5, 202:2, 202:7, 202:16, 202:19, 203:1, 203:9, 204:14, 205:8, 205:19, 206:21, 207:6, 208:1, 208:18, 209:15, 209:18, 210:13, 210:22, 211:4, 212:1, 212:10, 212:21, 214:1, 214:10, 215:11, 215:23, 216:3, 216:16, 217:4, 217:14, 219:18, 220:23, 221:6, 221:23, 222:24, 230:11, 230:13, 230:17, 231:11
**McKenzie's** [32] - 20:18, 40:10, 55:8, 111:7, 113:17, 118:6, 128:12, 141:5, 154:14, 161:1, 180:11, 180:16, 180:18,

**181**:1, 181:15, 184:3, 184:13, 186:4, 187:5, 188:20, 192:16, 200:9, 206:10, 206:16, 208:9, 208:12, 210:8, 211:22, 213:11, 215:19, 222:8, 224:1
**McKeogh** [11] - 11:12, 12:7, 12:11, 12:20, 12:23, 13:9, 13:23, 62:16, 63:24, 79:23, 90:14
**McLaughlin** [2] - 106:8, 143:6
**me"** [3] - 32:9, 43:10, 54:1
**mean** [34] - 9:13, 22:11, 26:16, 31:5, 31:7, 34:20, 34:22, 35:24, 38:11, 41:13, 42:15, 47:12, 65:7, 67:21, 67:23, 73:1, 93:12, 102:8, 121:12, 133:4, 155:1, 158:5, 167:21, 170:13, 176:15, 176:21, 177:7, 178:11, 213:2, 218:7, 229:18, 229:19
**meaning** [1] - 230:13
**MEANS** [1] - 236:24
**meant** [4] - 142:18, 146:12, 179:22, 229:20
**mediate** [1] - 105:20
**mediation** [14] - 47:1, 105:7, 105:12, 105:17, 105:18, 105:22, 141:23, 159:14, 219:13, 219:17, 220:22, 221:22, 221:24, 222:4
**Mediator** [1] - 106:9
**Medicare** [1] - 7:21
**medication** [1] - 5:18
**meet** [11] - 13:2, 13:14, 13:16, 36:13, 78:23, 94:1, 94:22, 107:5, 107:6, 109:16, 196:3
**meeting** [3] - 95:8, 95:14, 121:8
**member** [1] - 161:22
**members** [2] - 7:11, 23:8
**memory** [2] - 5:20,

13:12
**men** [1] - 169:6
**mentally** [2] - 22:10, 31:24
**mention** [7] - 112:4, 145:5, 158:20, 184:24, 225:8, 225:12, 225:13
**mentioned** [14] - 8:5, 10:11, 27:7, 34:4, 37:21, 58:11, 64:9, 90:13, 91:8, 101:5, 114:16, 219:18, 224:21
**Mercantile** [1] - 1:23
**mess** [1] - 148:11
**message** [7] - 31:4, 33:17, 39:15, 40:5, 44:3, 60:24, 61:2
**Message** [1] - 38:23
**Messages** [4] - 3:8, 3:9, 4:23, 226:17
**messages** [7] - 30:8, 37:13, 74:18, 74:21, 142:13, 169:3, 227:2
**met** [10] - 13:4, 13:11, 46:13, 46:24, 75:1, 78:18, 79:3, 92:16, 93:19, 94:3
**metadata** [3] - 224:7, 224:9, 224:21
**metal** [5] - 184:10, 196:6, 196:11, 199:13, 199:17
**Metal** [2] - 27:17, 27:23
**method** [2] - 211:11, 211:12
**Michael** [53] - 15:22, 35:11, 82:23, 91:10, 92:9, 98:13, 100:11, 103:8, 103:11, 103:16, 105:21, 110:9, 114:12, 116:2, 116:13, 149:4, 160:3, 160:22, 167:9, 173:1, 178:4, 180:11, 181:23, 183:9, 188:5, 188:17, 189:6, 189:17, 190:3, 190:13, 190:23, 191:7, 191:18, 192:15, 194:22, 195:20, 195:23, 196:1, 196:11, 197:19, 197:21, 200:8, 204:14, 207:6, 208:1,

208:18, 209:15, 209:18, 210:22, 213:11, 215:23, 216:3, 216:16
**MICHAEL** [1] - 1:9
**middle** [1] - 120:22
**Middle** [1] - 2:11
**Middletown** [7] - 140:23, 141:8, 141:11, 180:7, 183:11, 183:19, 199:9
**might** [3] - 62:15, 79:3, 216:15
**Mike** [21] - 22:8, 22:9, 31:11, 35:15, 37:1, 37:5, 37:13, 37:22, 40:17, 41:4, 52:16, 56:7, 57:16, 73:3, 74:2, 91:4, 112:18, 114:16, 121:23, 122:11, 134:12
**million** [7] - 120:14, 120:16, 175:20, 175:22, 204:11, 210:14
**mind** [4] - 56:10, 75:8, 132:21, 139:12
**minimize** [1] - 205:15
**minimized** [1] - 205:14
**minimizing** [1] - 123:9
**minor** [1] - 26:14
**minutes** [4] - 53:6, 57:17, 187:19, 218:21
**misconduct** [1] - 206:10
**misconduct"** [1] - 165:13
**missing** [1] - 83:20
**mistreated** [1] - 58:14
**MM** [1] - 214:22
**moment** [5] - 58:9, 96:5, 173:22, 174:5, 195:9
**Monday** [3] - 93:20, 93:23, 227:4
**money** [5] - 36:7, 59:8, 120:12, 120:18, 207:23
**monitoring** [1] - 163:15
**month** [3] - 17:8, 18:17, 33:9
**months** [5] - 56:14, 163:20, 166:18, 216:17, 220:22
**MORGAN** [1] - 1:6
**Morgan** [40] - 15:22,

16:9, 36:11, 37:10, 67:18, 91:16, 92:15, 97:23, 105:19, 108:7, 108:10, 115:12, 122:18, 136:24, 152:9, 156:16, 156:22, 178:15, 182:17, 184:7, 184:22, 187:9, 192:23, 193:7, 194:1, 194:9, 194:24, 195:11, 201:15, 202:9, 202:20, 203:11, 215:10, 215:19, 225:3, 225:6, 225:23, 227:22, 229:9, 230:10
**Morgan's** [1] - 203:2
**morning** [9] - 5:10, 5:11, 44:10, 61:7, 64:21, 68:20, 85:14, 226:2, 229:8
**most** [2] - 21:17, 184:9
**mother** [2] - 31:13, 40:21
**Motion** [2] - 137:24, 174:15
**motion** [2] - 68:12, 232:14
**motions** [1] - 43:3
**motivation** [1] - 70:15
**mouth** [1] - 26:16
**move** [20] - 25:8, 27:12, 33:18, 38:14, 38:15, 41:18, 65:8, 65:10, 76:14, 81:11, 87:4, 141:10, 160:23, 171:10, 182:15, 194:8, 195:11, 195:14, 196:12, 200:2
**moved** [22] - 17:3, 65:11, 98:17, 126:17, 127:23, 128:10, 131:24, 139:2, 139:6, 140:22, 141:7, 142:11, 162:17, 179:17, 180:5, 181:23, 182:21, 183:3, 183:18, 183:19, 186:6, 199:1
**movement** [6] - 14:7, 62:21, 77:9, 86:6, 100:24, 113:15
**moving** [23] - 26:23, 27:6, 28:16, 28:17, 31:13, 80:5, 99:24,

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 73 of 81    January 7, 2022
Vol. III - Osvaldo Gonzalez

EXHIBIT G - 73
14

100:9, 112:16,
113:10, 113:11,
125:17, 138:6,
158:24, 167:5,
194:20, 198:20,
200:1, 202:3, 202:7,
202:17, 202:20
**MR** [74] - 11:23, 12:8,
121:24, 122:22,
123:21, 127:2,
130:12, 130:23,
131:10, 135:23,
136:22, 136:24,
137:8, 137:22,
143:9, 143:12,
143:20, 144:5,
144:23, 145:4,
145:14, 146:2,
146:17, 147:10,
147:17, 148:3,
148:8, 148:16,
150:12, 172:16,
172:18, 173:14,
174:14, 182:6,
185:2, 185:7,
185:10, 185:17,
185:21, 186:9,
186:12, 187:13,
187:23, 188:10,
188:23, 189:10,
189:20, 190:7,
190:17, 191:11,
191:21, 192:6,
192:11, 193:11,
194:14, 195:2,
195:16, 196:16,
196:22, 197:2,
200:4, 204:20,
209:1, 209:12,
209:20, 218:18,
219:2, 222:17,
226:14, 226:16,
233:1, 233:5,
233:10, 233:14
**MRZ** [3] - 226:20,
229:6, 229:22
**MS** [81] - 12:2, 12:6,
12:9, 19:7, 29:5,
29:18, 37:18, 38:20,
53:5, 54:22, 55:6,
55:16, 55:21, 56:2,
60:12, 60:16, 75:22,
76:3, 84:22, 87:22,
88:4, 89:18, 91:18,
96:4, 96:9, 122:5,
127:18, 131:4,
131:19, 136:13,
136:23, 137:14,
138:2, 138:5,
138:16, 143:10,
151:9, 151:14,

151:15, 151:23,
153:17, 162:5,
164:20, 172:13,
173:12, 173:18,
173:24, 174:4,
174:8, 174:19,
185:9, 185:19,
185:22, 196:20,
197:1, 198:10,
199:6, 201:10,
201:16, 202:23,
203:3, 207:11,
208:6, 208:16,
211:1, 211:7,
211:17, 211:23,
212:23, 213:13,
216:7, 217:12,
218:20, 220:19,
222:19, 222:22,
226:11, 226:15,
233:8, 233:12,
233:16
**muffled** [1] - 55:21
**multiple** [3] - 16:2,
73:12, 153:6
**murders** [1] - 50:1
**muscular** [1] - 51:14
**must** [4] - 33:23,
134:1, 184:24, 225:8

## N

**name** [12] - 5:12, 8:10,
10:9, 11:18, 11:20,
11:24, 12:1, 30:15,
103:4, 132:15,
134:18, 166:12
**nasty** [2] - 169:2,
170:5
**National** [1] - 119:8
**native** [1] - 224:2
**near** [4] - 21:18, 83:7,
100:8, 146:4
**necessary** [1] - 21:23
**need** [16] - 10:16,
29:19, 30:5, 48:1,
59:8, 76:20, 87:21,
109:1, 137:23,
141:13, 143:22,
158:10, 172:20,
196:11, 200:1, 201:1
**needed** [3] - 21:22,
31:23, 37:4
**nefarious** [1] - 202:14
**negative** [1] - 102:14
**negatively** [1] - 43:16
**negotiate** [1] - 177:12
**negotiations** [5] -
134:5, 134:7, 142:8,
145:10, 204:10

**neighbor's** [1] - 83:11
**Nevada** [2] - 41:18,
62:7
**never** [25] - 10:14,
10:21, 51:7, 75:8,
107:10, 111:23,
112:13, 120:9,
120:23, 129:12,
139:12, 153:9,
167:10, 170:17,
171:15, 184:21,
202:16, 202:19,
202:24, 204:8,
204:15, 212:13,
214:13, 229:12
**Never** [1] - 204:9
**new** [3] - 146:20,
161:5, 167:12
**New** [26] - 1:3, 2:8,
8:17, 8:18, 15:21,
16:8, 47:23, 48:6,
68:16, 105:9,
136:18, 137:5,
137:8, 137:9, 155:7,
155:13, 161:16,
161:22, 162:11,
163:16, 215:5,
216:19, 232:7,
232:18
**news** [1] - 42:19
**next** [19] - 29:14,
35:18, 53:7, 53:14,
68:22, 68:24, 80:6,
83:3, 88:6, 91:18,
138:17, 142:22,
144:18, 162:23,
163:14, 163:23,
164:21, 218:16,
226:15
**nicer** [1] - 169:12
**nightmare** [2] - 22:10,
175:7
**Nikas** [47] - 2:6, 3:3,
12:6, 13:10, 14:12,
36:13, 43:6, 53:23,
60:7, 61:4, 62:5,
62:10, 63:11, 63:18,
63:23, 64:17, 64:20,
65:1, 66:8, 67:17,
68:2, 68:21, 69:6,
70:12, 70:16, 74:15,
74:19, 76:5, 76:13,
78:13, 88:11, 88:18,
90:7, 90:10, 91:24,
93:19, 94:7, 95:18,
126:20, 136:21,
137:7, 172:14,
174:7, 201:11,
223:24, 225:6, 230:9
**NIKAS** [56] - 11:23,

12:8, 121:24,
122:22, 123:21,
127:2, 130:12,
130:23, 131:10,
135:23, 136:18,
136:22, 136:24,
137:8, 137:22,
172:16, 172:18,
173:14, 174:14,
182:6, 185:2, 185:7,
185:10, 185:17,
185:21, 186:9,
186:12, 187:13,
187:23, 188:10,
188:23, 189:10,
189:20, 190:7,
190:17, 191:11,
191:21, 192:6,
192:11, 193:11,
194:14, 195:2,
195:16, 196:16,
196:22, 197:2,
200:4, 204:20,
209:1, 209:12,
209:20, 226:14,
226:16, 233:1,
233:5, 233:10
**Nikas'** [1] - 13:16
**nobody** [4] - 21:19,
98:5, 175:23, 230:5
**non** [1] - 56:23
**non-stop** [1] - 56:23
**none** [2] - 33:2, 202:2
**nonsense** [2] -
114:22, 204:12
**normally** [1] - 39:10
**NOT** [1] - 236:23
**Notary** [3] - 1:17, 5:5,
236:4
**noted** [1] - 225:1
**nothing** [21] - 5:6,
15:7, 15:8, 26:14,
32:6, 57:18, 62:11,
70:8, 86:8, 97:21,
100:19, 123:2,
136:17, 140:1,
167:16, 171:7,
183:14, 203:15,
230:6, 233:14
**November** [8] - 47:2,
105:6, 105:8,
141:23, 142:5,
146:15, 209:7,
209:19
**now"** [1] - 34:1
**nuke** [1] - 92:5
**number** [15] - 6:14,
6:20, 6:23, 13:10,
40:8, 45:4, 71:21,
72:6, 72:11, 74:24,

185:20, 205:8,
226:12, 226:20,
226:22
**numbers** [1] - 215:11
**numerous** [3] -
122:12, 215:15,
220:23
**nuts** [4] - 57:3, 57:19
**NYC** [1] - 76:18

## O

**oath** [6] - 5:15, 127:7,
151:2, 210:12,
211:4, 215:22
**obese** [2] - 23:3, 23:4
**object** [4] - 20:3, 66:6,
127:2, 174:12
**objected** [2] - 143:12,
147:17
**objection** [40] - 21:2,
121:24, 122:22,
123:21, 127:15,
130:12, 143:20,
144:5, 144:23,
145:4, 145:14,
146:2, 146:17,
147:10, 148:3,
148:8, 148:16,
150:12, 173:12,
198:10, 199:6,
201:10, 201:13,
201:16, 202:23,
203:3, 207:11,
208:6, 208:16,
211:1, 211:7,
211:17, 211:23,
212:23, 213:13,
216:7, 217:12,
220:19, 233:1, 233:5
**Objection** [1] - 143:9
**objections** [1] - 21:1
**observation** [1] -
120:3
**observe** [2] - 128:18,
145:11
**observed** [1] - 109:3,
127:22
**obsessed** [3] - 18:7,
22:11, 203:19
**obtain** [1] - 232:7
**obvious** [1] - 41:21
**obviously** [7] - 25:7,
25:19, 87:9, 108:4,
125:4, 130:24, 131:5
**occasion** [6] - 13:1,
13:23, 50:22, 78:19,
155:5, 231:1
**occasionally** [2] -
131:16, 176:18

**COPLEY COURT REPORTING, INC.**

Morgan Art vs. McKenzie Case 1:18-cv-04438-AT-BCM Document 479-7 Filed 01/17/22 Page 74 of 81 January 7, 2022

Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 74**

15

**occasions** [6] - 12:11, 72:12, 73:12, 73:24, 74:5, 153:6
**occurred** [9] - 74:10, 114:24, 126:9, 126:12, 127:24, 129:1, 139:8, 190:15, 229:5
**occurring** [1] - 223:20
**October** [15] - 3:18, 3:20, 3:21, 5:24, 15:11, 16:19, 44:8, 98:18, 100:21, 102:11, 102:19, 162:12, 164:6, 171:12, 223:21
**odd** [1] - 132:16
**OF** [7] - 1:14, 234:1, 235:1, 236:2, 236:23, 236:23, 236:24
**offended** [1] - 35:3
**offensive** [1] - 59:18
**offer** [3] - 77:14, 98:9, 123:4
**offered** [6] - 25:10, 32:13, 77:19, 82:15, 97:19
**offering** [3] - 48:8, 49:9, 120:11
**office** [11] - 7:1, 13:14, 13:16, 19:12, 19:15, 19:17, 19:19, 19:21, 21:22, 83:21, 116:11
**Office** [3] - 105:11, 107:2, 145:8
**offices** [1] - 19:13
**often** [1] - 214:22
**og.cool.com** [1] - 156:1
**og@ americanimageart** [2] - 158:12, 200:10
**og@ americanimageart. com** [3] - 157:12, 195:22, 197:6
**og@og.cool** [1] - 159:4
**og@ogcool** [1] - 161:15
**og@ogcool.com** [3] - 153:23, 154:6, 161:10
**ogcool** [2] - 30:14, 39:15
**old** [6] - 18:3, 119:2, 139:22, 210:17, 211:5, 214:11
**on-the-job** [1] - 31:11

**once** [9] - 26:21, 79:4, 89:21, 110:11, 123:8, 126:19, 144:2, 147:3, 179:5
**One** [1] - 2:3
**one** [60] - 7:17, 8:9, 13:24, 21:18, 21:19, 37:19, 43:5, 43:12, 43:17, 45:2, 45:23, 53:7, 53:14, 53:20, 58:9, 73:4, 91:23, 94:24, 96:5, 99:3, 102:24, 107:8, 108:22, 111:22, 111:24, 112:1, 119:2, 119:24, 122:3, 126:1, 126:10, 126:11, 128:7, 128:23, 138:9, 138:17, 147:6, 147:14, 147:22, 153:22, 154:13, 154:14, 161:14, 164:24, 172:8, 173:21, 176:6, 181:24, 182:3, 184:16, 187:1, 199:18, 200:18, 207:17, 213:24, 216:13, 226:6, 229:21, 231:1
**ones** [6] - 15:14, 72:3, 72:4, 113:7, 126:7, 224:9
**ongoing** [4] - 63:7, 114:9, 146:13, 154:23
**oOo** [1] - 234:10
**open** [4] - 87:17, 123:8, 136:14, 137:13
**opening** [2] - 174:16, 181:11
**openly** [2] - 100:13, 100:23
**opens** [1] - 137:17
**operation** [1] - 41:8
**operations** [1] - 223:8
**opinion** [7] - 71:11, 152:6, 152:9, 152:15, 152:20, 164:13, 165:23
**Opinion** [7] - 162:7, 162:9, 164:21, 165:3, 165:15, 165:20, 166:5
**opinions** [1] - 117:21
**opportunity** [1] - 166:24
**order** [4] - 114:1,

183:11, 195:14, 196:12
**Order** [16] - 6:4, 68:12, 68:16, 123:16, 129:2, 129:11, 129:14, 162:16, 164:5, 193:24, 194:4, 194:7, 195:13, 196:3, 198:21, 203:10
**Ordered** [3] - 126:8, 126:11, 202:8
**Orders** [1] - 164:6
**orders** [1] - 165:20
**original** [3] - 82:15, 144:12, 224:2
**originally** [1] - 17:13
**Osvaldo** [9] - 5:2, 5:14, 104:21, 149:6, 162:11, 164:22, 234:4, 234:14, 236:6
**OSVALDO** [2] - 1:14, 3:2
**outcome** [1] - 236:13
**outed** [1] - 92:8
**outrageous** [2] - 176:5
**outside** [4] - 66:19, 66:22, 67:12, 181:24
**overheard** [2] - 173:2, 173:6
**overly** [1] - 101:20
**own** [2] - 25:1, 82:7
**ownership** [1] - 132:8
**owns** [4] - 67:3, 67:4, 67:6, 123:11
**Oz** [10] - 46:15, 60:17, 68:22, 75:13, 89:11, 93:4, 138:20, 172:19, 192:17

## P

**p.m** [12] - 45:24, 88:2, 104:8, 151:11, 151:12, 195:20, 197:7, 200:11, 218:23, 218:24, 233:19
**P.O** [1] - 2:11
**packed** [1] - 140:22
**packing** [3] - 197:13, 198:24
**PAGE** [1] - 235:5
**page** [13] - 3:7, 4:2, 33:17, 104:4, 144:19, 159:3, 185:5, 204:22, 204:23, 209:3, 209:4, 229:22, 234:9
**Pass** [2] - 83:20, 83:22
**passed** [1] - 139:23
**past** [5] - 23:17, 146:18, 147:21,

**pages** [4] - 210:1, 213:10, 215:12, 234:6
**Pages** [1] - 1:1
**paid** [2] - 21:9, 210:14
**Panama** [2] - 133:9, 160:15
**panel** [1] - 149:18
**papers** [1] - 15:24
**paragraph** [17] - 108:15, 109:19, 109:21, 112:16, 134:5, 138:6, 163:2, 163:14, 165:19, 179:4, 209:21, 209:22, 214:8, 215:21, 216:5, 220:21
**pardon** [2] - 19:20, 176:11
**parking** [1] - 27:20
**part** [22] - 9:3, 32:8, 34:5, 34:10, 47:17, 112:23, 113:10, 114:1, 115:15, 116:3, 119:24, 133:12, 143:15, 144:7, 149:18, 162:22, 162:24, 164:5, 169:18, 169:19, 229:6, 229:21
**participate** [2] - 217:10
**participated** [1] - 22:3
**participation** [1] - 144:24
**particular** [2] - 28:7, 140:5
**particularly** [1] - 54:24
**parties** [27] - 16:17, 70:18, 97:23, 105:9, 114:10, 115:3, 115:24, 116:6, 116:17, 118:11, 122:18, 123:18, 124:20, 125:12, 127:23, 130:11, 130:20, 143:17, 144:3, 145:1, 173:11, 221:24, 225:4, 225:6, 225:15, 225:19, 236:12
**party** [2] - 134:8, 225:21
**Pass** [2] - 83:20, 83:22
**passed** [1] - 139:23
**past** [5] - 23:17, 146:18, 147:21,

147:23, 174:10
**patience** [2] - 40:18, 69:4
**Pause** [10] - 39:1, 44:22, 55:18, 96:8, 138:14, 152:1, 158:19, 174:6, 178:23, 186:11
**pause** [2] - 39:8, 151:18
**pay** [10] - 25:15, 28:15, 28:20, 30:24, 32:24, 33:9, 33:14, 37:2, 106:20, 114:12
**paying** [2] - 25:14, 33:3
**payment** [3] - 30:18, 33:23, 97:22
**PEABODY** [1] - 2:10
**pedophile** [1] - 92:8
**pees** [1] - 22:19
**Peggy** [6] - 39:16, 40:8, 134:1, 205:9, 206:3, 223:12
**penalties** [1] - 215:22
**penalty** [4] - 104:18, 104:22, 105:2, 149:12
**pending** [3] - 48:6, 127:17, 144:20
**people** [16] - 17:23, 65:3, 94:15, 94:16, 101:13, 106:23, 108:8, 108:9, 117:6, 117:17, 120:15, 154:4, 154:7, 160:15, 176:18, 176:22
**percentage** [1] - 114:12
**perfectly** [2] - 26:24, 220:13
**period** [1] - 162:20
**periods** [1] - 73:24
**perjury** [5] - 104:18, 104:22, 105:2, 149:12, 215:23
**permit** [2] - 88:22, 153:4
**person** [12] - 13:2, 13:4, 13:11, 23:3, 46:7, 52:19, 78:24, 79:4, 93:19, 117:1, 117:2, 118:17
**personal** [11] - 7:8, 18:11, 33:19, 77:24, 152:6, 154:17, 154:22, 174:11, 214:7, 216:2, 216:6
**personally** [8] - 10:21,

51:21, 51:24, 107:6,
109:7, 124:24,
132:23, 152:4
**persuaded** [1] -
105:19
**Petition** [1] - 232:19
**Petitioner** [1] - 162:17
**phone** [16] - 6:14,
6:16, 6:20, 6:23,
30:2, 34:18, 46:16,
49:15, 57:17, 74:24,
75:3, 75:13, 79:8,
114:24, 173:7, 224:4
**phones** [2] - 170:22,
170:24
**phonetic** [1] - 176:17
**photo** [1] - 187:21
**photograph** [17] -
185:5, 185:11,
185:24, 187:18,
188:4, 188:15,
189:5, 189:16,
190:2, 190:12,
190:22, 191:17,
192:2, 192:14,
192:19, 193:17
**photographs** [16] -
79:18, 80:2, 80:3,
80:18, 80:21, 80:22,
82:14, 82:15, 82:16,
82:19, 91:7, 140:15,
223:23, 224:3,
224:12, 224:16
**photography** [2] - 8:3,
8:5
**photos** [6] - 82:3,
82:6, 82:9, 82:12,
83:17, 140:21
**pick** [3] - 27:19, 196:6,
201:8
**picking** [1] - 29:8
**picture** [9] - 23:6,
69:10, 83:2, 112:22,
182:7, 186:3,
186:17, 186:23,
192:24
**pictured** [1] - 194:23
**pictures** [16] - 79:21,
79:22, 80:14, 81:2,
81:5, 81:9, 81:13,
83:14, 124:14,
125:20, 125:21,
125:23, 125:24,
126:1
**piece** [2] - 67:5, 67:6
**pieces** [9] - 27:6,
100:5, 121:1,
121:17, 128:7,
194:16, 199:23,
202:12, 204:2

**piles** [1] - 124:16
**pill** [1] - 22:14
**pissed** [1] - 203:10
**pjrlicense** [1] - 197:21
**pjrlicense@aol.com**
[2] - 197:4, 200:7
**place** [6] - 27:17, 52:8,
123:16, 155:12,
219:13, 222:3
**placed** [1] - 65:17
**Plains** [2] - 94:4,
103:21
**Plaintiff** [3] - 1:7, 1:15,
16:9
**PLAINTIFF** [1] - 2:5
**plan** [3] - 57:15,
133:20, 134:8
**planned** [4] - 27:9,
37:24, 38:14, 132:6
**planning** [5] - 23:19,
24:5, 33:18, 35:8,
230:5
**plans** [1] - 38:13
**plate** [1] - 158:8
**playing** [1] - 31:12
**plead** [1] - 44:7
**pleading** [1] - 27:22
**plows** [1] - 29:7
**plus** [3] - 66:14,
139:11, 220:7
**point** [17] - 37:12,
39:20, 47:22, 62:14,
67:18, 71:24, 87:20,
98:12, 118:7,
142:24, 144:2,
144:18, 145:18,
145:21, 177:11
**pointing** [2] - 117:20,
206:3
**police** [13] - 79:17,
80:15, 82:21, 83:16,
88:15, 88:21, 89:2,
89:14, 206:11,
208:2, 208:9,
208:12, 208:19
**pool** [1] - 21:9
**poorly** [1] - 28:24
**portal** [1] - 81:23
**portfolios** [7] -
200:19, 200:21,
200:23, 201:2,
201:6, 201:24, 202:3
**Portland** [9] - 2:12,
46:23, 47:2, 47:15,
47:18, 105:8,
141:23, 219:13,
219:22
**position** [3] - 17:18,
108:17, 176:2
**possess** [1] - 212:1

**possession** [4] -
111:7, 113:24,
211:22, 215:2
**possible** [3] - 36:18,
137:17, 204:12
**possibly** [2] - 71:23,
167:13
**practice** [4] - 162:19,
206:20, 212:14,
214:14
**practicing** [6] -
134:19, 134:23,
135:9, 135:15,
164:7, 165:22
**preferred** [1] - 59:6
**prejudice** [1] - 144:21
**premise** [1] - 127:16
**prepare** [3] - 14:23,
15:8, 110:9
**present** [4] - 10:3,
10:8, 133:3, 133:10
**presenting** [1] - 54:16
**President** [1] - 17:18
**Presumptive** [1] -
176:17
**pretty** [11] - 25:13,
35:19, 51:13, 62:19,
108:1, 199:21,
211:13, 212:7,
214:5, 221:8, 221:10
**previous** [1] - 165:20
**previously** [9] - 5:23,
6:6, 98:20, 103:22,
147:5, 148:12,
148:18, 148:24,
149:2
**price** [2] - 59:4
**principal** [1] - 164:8
**printed** [3] - 17:20,
70:24, 104:14
**printer** [4] - 40:13,
51:13, 71:15, 96:19
**printing** [1] - 70:9
**prints** [10] - 66:14,
67:11, 68:3, 69:22,
70:10, 71:12, 81:3,
140:16, 140:22,
141:4
**privacy** [2] - 79:19,
83:18
**private** [1] - 66:9
**privilege** [7] - 9:7,
133:15, 137:4,
138:1, 173:15,
174:1, 174:9
**privileged** [12] - 9:3,
9:6, 22:3, 42:21,
133:12, 133:18,
134:24, 135:20,
136:1, 136:11,

136:15, 137:18
**pro** [1] - 26:20
**problem** [19] - 26:11,
35:16, 45:18, 70:5,
70:6, 70:9, 70:15,
70:21, 70:22, 70:23,
71:11, 71:12, 125:2,
135:24, 153:1,
168:11, 178:2,
178:3, 203:7
**problems** [3] - 150:19,
167:21, 168:1
**Procedure** [1] - 1:16
**proceed** [1] - 102:3
**proceedings** [3] -
216:18, 236:8,
236:10
**proceeds** [1] - 114:2
**process** [1] - 113:4
**produce** [2] - 82:2,
91:9
**produced** [10] - 45:4,
53:15, 53:17, 69:23,
81:16, 91:8, 126:4,
126:6, 210:2, 227:1
**production** [7] - 5:4,
29:19, 57:15,
146:20, 146:24,
178:7, 210:8
**profanities** [1] -
203:18
**professional** [1] -
165:13
**Professional** [3] -
1:17, 236:4, 236:18
**Program** [1] - 163:16
**program** [2] - 163:19,
163:21
**prom** [4] - 169:15,
169:21, 169:22,
170:3
**promptly** [1] - 76:23
**pronounced** [1] - 12:7
**properly** [2] - 5:3,
236:7
**property** [54] - 12:20,
13:18, 13:20, 19:23,
20:18, 23:9, 25:9,
32:14, 33:4, 37:15,
52:1, 80:1, 80:19,
82:8, 82:20, 85:8,
98:13, 111:17,
113:18, 115:13,
116:7, 119:4,
122:18, 123:18,
124:21, 126:12,
132:5, 132:15,
139:7, 170:23,
171:3, 180:6,
180:11, 180:16,

181:1, 182:1, 184:7,
191:9, 192:16,
194:1, 194:9,
194:23, 195:11,
195:14, 196:13,
198:21, 199:1,
202:3, 202:8,
202:21, 203:11,
223:21, 224:1, 225:2
**proportion** [1] -
175:18
**proposal** [1] - 98:6
**proposals** [1] - 115:19
**proposed** [4] - 97:19,
115:24, 159:11,
159:12
**prosecutor** [2] - 11:5,
103:16
**protect** [1] - 77:14
**protected** [1] - 69:3
**protection** [3] - 76:19,
77:24, 78:6
**provide** [8] - 38:4,
54:11, 76:19, 160:9,
178:8, 178:10,
216:24, 224:10
**provided** [11] - 15:9,
15:14, 16:16, 18:18,
20:18, 21:7, 26:5,
82:5, 178:9, 206:15,
223:24
**providing** [4] - 86:2,
99:11, 99:21, 230:18
**provisions** [1] - 1:16
**psychologically** [1] -
17:23
**public** [7] - 152:7,
152:14, 152:21,
153:11, 153:13,
158:22, 164:12
**Public** [3] - 1:17, 5:5,
236:4
**publishing** [1] -
216:21
**Puerto** [8] - 6:13, 7:4,
8:4, 17:4, 17:5,
33:18, 179:17
**purchase** [2] - 114:11,
116:2
**purchased** [2] - 120:2,
199:14
**purported** [2] -
181:22, 188:16
**purportedly** [8] -
189:5, 189:16,
190:2, 190:12,
190:22, 191:17,
192:2, 193:17
**purpose** [1] - 173:9
**pursuant** [4] - 1:15,

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 76 of 81    January 7, 2022

Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 76**

17

6:4, 126:24, 128:1
**pursue** [1] - 38:1
**put** [45] - 9:2, 11:8, 13:8, 27:21, 27:23, 27:24, 28:6, 28:10, 65:18, 66:3, 76:20, 81:6, 81:10, 128:6, 128:10, 134:17, 135:23, 140:4, 140:9, 141:3, 141:5, 142:22, 145:24, 178:21, 182:6, 183:12, 185:3, 186:9, 187:13, 188:10, 188:24, 189:10, 189:20, 190:7, 190:17, 191:12, 191:21, 192:6, 193:11, 194:14, 196:24, 200:4, 204:21, 208:23, 209:13
**putting** [6] - 65:22, 73:21, 83:1, 108:20, 109:5, 177:24

## Q

**QE** [5] - 4:21, 69:11, 88:7, 209:2, 209:4
**quantity** [1] - 140:20
**quarters** [1] - 125:5
**questioned** [1] - 207:18
**questions** [27] - 5:20, 6:5, 99:16, 101:9, 115:6, 131:11, 150:18, 150:24, 151:5, 153:21, 155:19, 172:14, 172:15, 173:3, 174:18, 174:22, 174:24, 175:3, 218:13, 218:17, 218:18, 218:19, 219:15, 222:18, 225:6, 230:9, 233:9
**quick** [3] - 151:10, 173:20, 178:22
**quickly** [3] - 164:20, 219:4, 226:12
**QUINN** [1] - 2:6
**Quinn** [13] - 14:9, 45:7, 46:2, 46:6, 46:10, 53:17, 74:19, 82:3, 94:20, 97:18, 98:22, 99:17, 129:7
**quit** [3] - 37:19, 38:9, 38:11
**quite** [2] - 19:8, 175:2

## R

**rack** [1] - 185:11
**racks** [9] - 181:23, 182:8, 183:3, 183:5, 183:7, 183:9, 184:1, 184:5, 184:15
**radical** [1] - 87:10
**rant** [1] - 57:18
**rants** [1] - 155:3
**rather** [1] - 59:6
**rationale** [1] - 148:10
**raves** [1] - 155:4
**re** [1] - 174:16
**re-opening** [1] - 174:16
**reach** [4] - 47:4, 102:12, 116:1, 171:17
**reached** [5] - 64:17, 115:2, 144:3, 147:8, 147:16
**reaction** [3] - 82:14, 86:16, 222:8
**read** [8] - 40:3, 76:6, 108:15, 179:5, 212:17, 214:8, 215:7, 234:5
**READ** [1] - 2:2
**Ready** [1] - 89:11
**ready** [2] - 30:17, 65:5
**real** [1] - 123:12
**realize** [2] - 28:1, 45:14
**really** [16] - 13:20, 15:1, 17:21, 27:21, 31:9, 57:11, 57:23, 59:13, 79:20, 117:18, 121:9, 123:9, 176:21, 199:19, 203:18
**reason** [3] - 25:5, 159:24, 208:13
**REASON** [9] - 235:7, 235:9, 235:11, 235:13, 235:15, 235:17, 235:19, 235:21, 235:23
**reasonable** [2] - 176:8, 176:12
**reasons** [3] - 212:14, 214:13, 235:4
**reassemble** [1] - 199:7
**receive** [2] - 16:14, 18:14
**received** [15] - 14:14, 14:17, 14:20, 15:16, 18:17, 49:19, 51:10, 52:21, 64:20, 85:13,

97:22, 197:11, 198:7, 200:16, 221:23
**receiving** [1] - 76:7
**recently** [2] - 112:18, 163:15
**recess** [6] - 55:3, 87:24, 89:9, 151:11, 173:23, 218:22
**recognize** [8] - 91:23, 103:23, 107:4, 140:18, 154:12, 162:13, 219:8, 219:11
**reconstructed** [1] - 191:8
**record** [10] - 5:13, 9:3, 16:6, 19:5, 55:24, 92:2, 127:3, 135:24, 201:13, 236:10
**recorded** [1] - 202:1
**recordkeeping** [1] - 231:16
**records** [28] - 118:24, 210:7, 210:16, 211:4, 211:15, 211:16, 212:12, 212:13, 212:15, 212:22, 213:11, 213:20, 213:22, 214:1, 214:3, 214:10, 214:13, 214:15, 215:2, 215:12, 216:4, 216:9, 216:11, 216:14, 218:8, 231:11
**recover** [5] - 47:13, 48:10, 48:15, 48:16, 49:10
**recovery** [1] - 49:3
**Recross** [1] - 3:2
**Redacted** [2] - 3:10, 44:24
**REDIRECT** [1] - 222:21
**Redirect** [1] - 3:2
**reference** [2] - 34:16, 52:22
**referenced** [1] - 120:20
**referred** [2] - 63:23, 162:14
**referring** [16] - 32:12, 42:8, 51:11, 52:20, 53:2, 57:7, 77:12, 108:11, 109:20, 139:13, 144:8, 156:12, 163:3, 163:24, 165:1,

198:15
**refers** [1] - 198:19
**refrain** [2] - 164:7, 165:21
**refuse** [2] - 220:17, 221:7
**refused** [3] - 71:15, 109:13, 148:15
**refuses** [1] - 123:13
**refusing** [2] - 84:7, 84:17
**regard** [3] - 14:7, 34:18, 148:7
**regarding** [5] - 11:5, 22:4, 158:14, 219:16, 221:24
**regards** [1] - 137:16
**register** [2] - 151:19, 152:2
**Registered** [1] - 1:16
**regularly** [3] - 154:2, 170:4, 211:9
**rejoins** [1] - 174:7
**related** [16] - 15:10, 15:16, 16:18, 20:10, 21:15, 45:16, 48:15, 91:9, 130:1, 135:15, 136:4, 137:2, 157:21, 174:11, 232:2, 236:11
**relating** [1] - 216:18
**relation** [2] - 164:14, 165:24
**relationship** [1] - 26:15
**relevant** [5] - 7:10, 7:14, 20:23, 137:1, 137:4
**Relief** [1] - 127:16
**reluctant** [2] - 109:22, 110:6
**remain** [2] - 101:8, 150:9
**remained** [1] - 145:21
**remedies** [1] - 127:11
**remember** [28] - 12:14, 12:15, 13:7, 13:21, 17:10, 52:13, 69:7, 78:20, 78:22, 85:10, 85:17, 85:18, 103:4, 104:19, 110:13, 114:3, 114:4, 114:7, 114:8, 114:13, 116:10, 159:18, 159:19, 160:16, 175:11, 182:20, 217:20, 219:23
**reminded** [1] - 143:6
**remotely** [2] - 115:5,

204:12
**removed** [1] - 96:5
**rent** [8] - 25:10, 25:15, 25:17, 32:24, 33:3, 33:9, 33:14
**rented** [2] - 33:7, 195:8
**repeat** [1] - 48:1
**repeated** [1] - 143:22
**repeatedly** [1] - 72:24
**repeats** [1] - 22:12
**report** [7] - 68:4, 156:7, 208:9, 208:12, 208:13, 208:19, 208:20
**reported** [4] - 64:6, 206:11, 206:12, 207:8
**reporter** [3] - 55:1, 103:5, 218:21
**REPORTER** [17] - 8:23, 11:16, 19:2, 47:16, 55:2, 55:19, 57:23, 58:3, 60:14, 76:2, 87:19, 89:20, 122:7, 137:6, 141:15, 192:9, 236:24
**Reporter** [3] - 1:17, 236:4, 236:18
**reporters** [1] - 102:21
**reporting** [1] - 208:3
**REPORTING** [1] - 1:22
**reports** [2] - 208:2, 208:9
**represent** [4] - 8:19, 10:1, 65:3, 67:19
**representation** [1] - 165:12
**representatives** [2] - 107:13, 115:11
**represented** [7] - 8:7, 9:12, 14:9, 14:11, 14:18, 57:8, 106:16
**representing** [4] - 47:6, 136:20, 136:24, 142:19
**REPRODUCTION** [1] - 236:23
**reputation** [1] - 148:21
**request** [1] - 97:6
**requested** [4] - 85:19, 97:20, 130:10, 131:1
**requesting** [5] - 64:21, 85:11, 85:14, 131:7, 162:18
**requirement"** [2] - 212:17, 214:17
**requiring** [2] - 193:24,

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 77 of 81    January 7, 2022

Vol. H - Osvaldo Gonzalez

EXHIBIT G - 77

18

203:11
**resent** [4] - 60:1, 60:5, 176:9, 176:13
**resented** [4] - 41:1, 60:2, 60:5, 175:10
**resenting** [1] - 175:15
**resentment** [2] - 175:18, 176:16
**reside** [1] - 7:3
**residence** [1] - 155:12
**residing** [1] - 84:5
**resig** [1] - 162:2
**resign** [1] - 165:8
**resigned** [3] - 162:2, 162:3
**resolve** [2] - 138:3, 173:21
**respect** [2] - 127:11, 212:11
**respond** [4] - 31:10, 54:4, 54:5, 171:22
**responded** [2] - 64:18, 155:11
**Respondent** [4] - 162:17, 162:18, 163:3, 163:23
**responds** [2] - 30:24, 61:6
**response** [7] - 45:5, 53:12, 86:22, 126:4, 227:1, 228:12, 228:15
**rest** [1] - 125:11
**Resumed** [4] - 55:4, 88:2, 151:12, 218:24
**retaliation** [1] - 208:4
**retrieve** [1] - 85:6
**return** [2] - 85:8, 164:1
**reveal** [1] - 123:7
**revealed** [1] - 206:10
**revealing** [1] - 136:11
**review** [5] - 15:6, 122:19, 124:9, 124:21, 227:7
**reviewed** [2] - 150:2, 179:23
**Rico** [8] - 6:13, 7:4, 8:4, 17:4, 17:6, 33:19, 179:17
**ride** [1] - 33:19
**ridiculous** [2] - 83:24, 134:16
**rightly** [1] - 214:24
**ring** [1] - 194:5
**risk** [3] - 101:22, 101:23, 102:5
**rob** [1] - 176:4
**robbed** [1] - 134:21
**Robert** [27] - 47:6, 59:7, 73:22, 108:18,

109:3, 109:16, 110:23, 114:11, 147:1, 178:14, 181:16, 181:21, 181:22, 183:22, 186:21, 188:4, 188:16, 189:6, 189:17, 190:3, 190:13, 190:23, 191:18, 192:3, 193:18, 207:9
**role** [1] - 165:16
**room** [7] - 7:16, 7:17, 87:21, 107:7, 142:11, 142:22, 142:23
**rooms** [3] - 107:8, 145:17, 187:2
**Rosenbaum** [3] - 121:22, 122:10, 122:13
**row** [1] - 22:13
**royalty** [1] - 210:15
**rule** [1] - 155:11
**ruled** [1] - 232:21
**rules** [1] - 69:2
**Ruling** [1] - 233:3
**run** [1] - 87:21
**running** [1] - 177:18

---

## S

**safety** [5] - 49:19, 65:4, 76:17, 78:6, 97:10
**sake** [1] - 40:19
**Salama** [7] - 91:14, 108:11, 113:17, 120:21, 121:3, 121:14, 126:19
**Salama-Caro** [4] - 108:11, 113:17, 121:3, 121:14
**Salama-Caros** [3] - 91:14, 120:21, 126:19
**salary** [1] - 18:14
**sale** [2] - 95:24, 213:3
**sales** [13] - 17:14, 18:5, 24:18, 24:19, 27:8, 35:7, 38:2, 58:24, 148:22, 166:22, 210:7, 210:8
**Sales** [1] - 17:19
**SAME** [1] - 236:23
**sanction** [1] - 68:13
**sanctions** [2] - 127:8, 127:10
**sarcastic** [1] - 112:8
**sat** [1] - 150:13

**satisfactorily** [1] - 5:3
**save** [1] - 43:8
**saw** [10] - 73:8, 74:16, 80:12, 81:2, 107:1, 112:21, 125:16, 131:14, 166:13, 201:19
**say"** [1] - 32:17
**scared** [1] - 36:20
**schedule** [1] - 227:6
**school** [4] - 169:15, 169:20, 169:22, 170:2
**scope** [1] - 101:11
**screaming** [2] - 56:11, 56:22
**screen** [12] - 39:21, 53:18, 60:21, 88:5, 96:14, 96:20, 138:21, 178:22, 179:1, 208:23, 219:6, 226:22
**screening** [2] - 66:13, 68:2
**screens** [8] - 66:15, 66:24, 69:18, 109:6, 112:19, 171:8, 172:6, 200:22
**scroll** [7] - 60:24, 69:12, 69:14, 186:2, 196:17, 209:9, 209:20
**scrolling** [4] - 33:16, 69:8, 142:4, 155:18
**sculpture** [18] - 14:1, 14:3, 64:22, 65:2, 65:17, 66:9, 77:7, 80:24, 83:19, 84:2, 84:3, 84:18, 85:6, 85:15, 86:2, 88:22, 140:5, 140:7
**sculptures** [11] - 27:16, 27:19, 28:16, 28:18, 67:7, 67:8, 67:9, 96:2, 113:4, 139:11, 158:6
**scumbags** [1] - 203:16
**sealed** [3] - 80:6, 80:9, 80:12
**search** [2] - 198:7, 216:20
**searching** [2] - 216:17, 216:22
**Seasons** [11] - 66:13, 67:10, 68:3, 69:13, 69:22, 70:23, 76:11, 81:3, 112:19, 112:20, 178:10
**second** [20] - 39:22,

51:1, 62:18, 63:17, 78:24, 112:17, 127:11, 128:24, 131:3, 139:3, 139:8, 181:7, 183:15, 201:7, 201:18, 201:19, 201:23, 202:10, 203:2, 214:21
**Second** [2] - 162:10, 164:23
**seconds** [1] - 87:20
**secret** [2] - 64:14, 167:13
**secure** [1] - 81:23
**security** [1] - 7:21
**see** [110] - 10:6, 30:1, 30:6, 30:12, 30:13, 30:19, 32:23, 39:4, 39:11, 39:12, 39:14, 39:17, 39:19, 39:22, 40:1, 45:3, 45:24, 53:18, 60:20, 69:16, 74:12, 74:13, 75:20, 76:18, 76:24, 80:8, 80:11, 81:19, 83:11, 84:9, 84:11, 87:9, 88:6, 88:12, 88:15, 93:5, 97:8, 104:4, 104:20, 106:21, 110:15, 111:9, 114:9, 115:14, 116:3, 116:7, 120:6, 120:7, 122:20, 123:22, 125:5, 128:9, 129:24, 134:3, 138:20, 139:15, 139:20, 149:1, 149:24, 151:15, 155:9, 155:10, 155:23, 157:9, 158:15, 159:2, 161:16, 162:23, 178:24, 179:8, 182:9, 182:11, 184:11, 184:12, 185:4, 186:5, 186:16, 191:3, 193:4, 194:17, 196:7, 196:10, 197:15, 197:16, 200:11, 203:22, 205:3, 205:10, 210:18, 210:20, 210:21, 213:6, 213:10, 213:15, 214:8, 216:23, 217:10, 219:6, 220:21, 222:11, 224:20,

226:19, 226:20, 226:21, 226:22, 228:5
**seeking** [3] - 127:8, 127:10, 135:8
**seem** [1] - 84:23
**sell** [13] - 34:19, 41:16, 58:20, 59:6, 98:7, 98:9, 114:1, 121:22, 122:10, 123:10, 204:2
**selling** [6] - 7:22, 8:1, 17:15, 24:23, 78:10, 176:2
**Semite** [1] - 23:4
**send** [7] - 21:24, 74:18, 79:22, 81:20, 154:4, 161:12, 161:19
**sending** [4] - 40:4, 46:10, 88:17, 158:17
**sense** [1] - 222:7
**sensitive** [1] - 76:16
**sent** [26] - 15:24, 23:22, 45:10, 45:14, 46:1, 46:5, 53:11, 54:2, 61:3, 68:19, 69:10, 76:10, 80:21, 80:23, 81:1, 91:24, 138:24, 140:15, 143:3, 155:16, 159:21, 160:1, 161:11, 197:11, 198:7, 200:11
**sentence** [1] - 112:17
**separate** [1] - 31:4
**September** [8] - 3:14, 3:15, 88:11, 89:23, 91:1, 100:1, 223:1
**sequence** [1] - 132:7
**series** [1] - 207:8
**serious** [3] - 22:11, 97:16, 99:4
**seriously** [2] - 49:5, 49:6
**set** [7] - 78:13, 132:21, 161:5, 163:6, 222:10, 236:7, 236:14
**sets** [1] - 196:6
**settle** [2] - 229:13, 230:6
**settled** [2] - 44:19, 137:9
**settlement** [13] - 114:9, 115:1, 115:15, 115:18, 116:1, 120:1, 121:10, 123:15, 123:17, 124:9,

127:1, 128:1, 227:7
**seven** [2] - 108:23, 207:3
**several** [4] - 20:22, 73:23, 93:12, 210:13
**severed** [1] - 27:21
**sex** [1] - 168:19
**Shah** [1] - 205:3
**shall** [1] - 164:6
**shape** [1] - 97:10
**share** [1] - 219:6
**shared** [1] - 39:21
**sharing** [2] - 39:2, 88:5
**sheet** [6] - 141:17, 145:2, 145:6, 145:20, 146:14, 219:19
**Sheet** [16] - 3:17, 141:19, 144:9, 145:24, 147:8, 147:16, 147:24, 148:14, 157:17, 159:9, 159:12, 219:16, 220:24, 222:14, 222:16, 231:6
**shelf** [2] - 191:3, 191:6
**shelves** [15] - 182:8, 182:10, 182:16, 183:18, 187:1, 196:7, 196:11, 197:14, 199:3, 199:5, 199:7, 199:10, 199:14, 199:17, 199:20
**shelving** [1] - 199:23
**shipping** [1] - 132:5
**shoot** [4] - 29:21, 50:4, 73:9, 77:17
**shootings** [1] - 50:1
**shore** [2] - 160:4, 161:12
**short** [2] - 11:23, 210:15
**shortly** [1] - 61:8
**shots** [1] - 176:24
**show** [18] - 29:4, 37:14, 53:14, 60:6, 67:13, 75:17, 92:19, 103:19, 118:5, 118:11, 118:15, 118:23, 140:19, 148:24, 187:24, 195:17, 226:10, 229:20
**showed** [4] - 182:23, 187:18, 202:9, 214:22
**showing** [7] - 69:17,

116:23, 117:6, 118:13, 118:14, 118:18, 140:19
**shown** [7] - 181:2, 184:7, 187:8, 193:6, 224:13, 225:7, 234:8
**shows** [3] - 45:11, 64:19, 126:2
**Shut** [1] - 206:5
**shut** [5] - 24:11, 34:23, 175:24, 206:3, 206:4
**shutting** [1] - 26:17
**sic** [1] - 180:12
**side** [6] - 123:1, 184:16, 184:17, 184:18, 230:6, 230:19
**sign** [6] - 67:1, 67:3, 69:21, 71:2, 71:3, 104:15
**signature** [7] - 104:5, 109:9, 109:14, 109:23, 110:7, 149:14, 158:7
**signed** [15] - 70:7, 95:4, 96:24, 103:21, 104:17, 105:3, 141:24, 143:4, 143:6, 145:6, 149:22, 150:3, 159:14, 178:18, 209:19
**significance** [1] - 171:7
**significant** [2] - 68:1, 215:11
**signing** [1] - 74:14
**silent** [1] - 101:8
**silk** [11] - 66:13, 66:15, 66:24, 68:2, 69:18, 96:20, 109:6, 112:19, 171:8, 172:6, 200:22
**similar** [1] - 187:18
**Simon** [4] - 121:3, 121:14, 229:13, 229:14
**Simone** [12] - 106:16, 106:17, 143:2, 143:3, 146:3, 146:5, 152:19, 217:17, 222:1, 222:5, 222:9
**simone** [1] - 148:4
**simple** [1] - 153:2
**sincerely** [1] - 228:20
**sins** [1] - 169:14
**sit** [5] - 18:3, 102:8, 149:21, 169:22, 169:24

**sits** [1] - 155:1
**sitting** [3] - 56:6, 56:17, 101:12
**six** [3] - 108:23, 163:20, 216:17
**sized** [1] - 199:8
**skipping** [1] - 124:18
**slaps** [1] - 33:24
**slave** [1] - 38:14
**slightly** [1] - 182:19
**slights** [1] - 41:6
**sloppy** [1] - 214:5
**slow** [1] - 10:15
**small** [2] - 72:3, 73:4
**smaller** [2] - 66:14, 226:22
**snow** [2] - 29:7, 96:5
**social** [1] - 7:21
**solely** [1] - 77:23
**solid** [1] - 64:22
**someone** [8] - 63:3, 63:4, 96:6, 120:11, 143:11, 175:15, 176:9, 215:1
**someplace** [1] - 186:4
**sometimes** [4] - 46:16, 210:17, 211:6, 214:12
**somewhere** [3] - 65:14, 187:6, 223:2
**son** [7] - 20:13, 20:19, 25:21, 25:23, 31:13, 32:21, 41:19
**Sonesta** [1] - 94:3
**soon** [3] - 53:6, 68:23, 71:22
**sooner** [1] - 224:19
**sorry** [34] - 6:8, 6:18, 9:17, 11:19, 12:5, 18:10, 18:21, 29:2, 39:9, 39:10, 46:15, 47:16, 50:16, 56:12, 96:9, 99:12, 137:6, 139:24, 142:18, 143:10, 144:6, 147:11, 154:19, 160:24, 167:4, 176:11, 179:10, 180:19, 185:19, 209:21, 211:24, 212:24, 226:21, 229:24
**Sorry** [1] - 174:5
**sound** [1] - 182:2
**sounded** [1] - 182:3
**sounds** [1] - 36:4
**Southern** [3] - 1:3, 15:21, 16:8, 68:16, 105:9
**space** [2] - 19:21,

26:24
**speaking** [6] - 9:4, 36:5, 64:2, 89:15, 145:12, 175:5
**special** [1] - 184:15
**specialty** [1] - 156:20
**specific** [4] - 55:14, 56:4, 155:19, 219:24
**specifically** [9] - 63:23, 78:6, 82:13, 84:15, 95:16, 110:1, 115:14, 128:14, 219:24
**specifics** [1] - 220:8
**spell** [3] - 8:15, 11:13, 11:20
**spelled** [1] - 11:14
**spelling** [1] - 11:15
**spent** [3] - 37:21, 176:1, 216:17
**spoken** [4] - 11:4, 102:21, 103:10, 103:15
**ss** [3] - 234:2, 235:2, 236:3
**St** [1] - 1:23
**stabs** [1] - 33:20
**stack** [2] - 182:24, 183:2
**stacked** [5] - 151:21, 152:3, 182:23, 184:17, 199:18
**stacks** [4] - 128:6, 213:15, 213:17, 213:19
**staff** [1] - 216:22
**Stamp** [2] - 196:8, 197:8
**stamp** [11] - 73:3, 88:7, 96:3, 96:12, 109:15, 189:22, 195:19, 196:24, 197:4, 200:6, 209:2
**stamped** [2] - 189:12, 195:3
**stamping** [1] - 66:14
**stamps** [1] - 73:21
**stand** [1] - 59:11
**standing** [1] - 83:3
**Star** [19] - 43:9, 57:5, 57:8, 58:6, 67:4, 67:6, 98:3, 105:10, 107:13, 113:23, 115:3, 115:12, 145:7, 145:13, 176:4, 214:21, 225:24, 227:23, 229:9
**STARR** [2] - 236:4, 236:17

**Starr** [5] - 1:16, 10:16, 11:15, 18:24, 122:6
**start** [9] - 15:13, 16:21, 17:15, 25:14, 73:7, 73:8, 161:16, 179:13, 206:3
**started** [12] - 27:5, 28:9, 43:15, 50:11, 56:22, 59:11, 73:15, 74:6, 80:1, 110:18, 112:3, 135:13
**starting** [3] - 29:11, 197:12, 198:14
**state** [4] - 5:12, 11:4, 40:16, 103:15
**statement** [6] - 131:6, 149:11, 179:6, 211:3, 212:20, 215:22
**Statement** [2] - 149:5, 149:9
**statements** [1] - 150:6
**STATES** [1] - 1:2
**states** [3] - 163:8, 165:5, 197:11
**stating** [1] - 148:18
**station** [1] - 28:7
**statute** [1] - 139:23
**stay** [6] - 32:13, 32:22, 38:12, 40:21, 125:4, 173:21
**stayed** [3] - 18:19, 32:2, 125:4
**staying** [2] - 32:19, 85:7
**steal** [1] - 215:1
**stencil** [11] - 71:6, 71:13, 71:15, 72:1, 73:21, 96:13, 109:13, 109:22, 110:6, 110:9
**stenciled** [2] - 96:2, 96:3
**stenciling** [3] - 72:3, 96:13, 172:7
**stencils** [7] - 71:4, 71:5, 71:8, 72:4, 108:20, 109:5, 177:24
**stencils"** [1] - 66:15
**stenographers** [1] - 94:14
**stenographically** [1] - 236:9
**steps** [2] - 68:24, 194:8
**stick** [1] - 115:6
**still** [20] - 12:19, 32:19, 38:16, 47:5, 60:17, 70:3, 75:14,

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM   Document 479-7   Filed 01/17/22   Page 79 of 81   January 7, 2022

Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 79**

20

79:24, 87:17, 98:12, 101:7, 124:19, 137:15, 199:17, 201:21, 222:11, 224:2, 228:9, 228:10, 228:11

**stipulated** [1] - 162:22

**Stipulation** [1] - 163:7

**stop** [8] - 22:13, 28:2, 56:23, 89:8, 135:21, 170:16, 170:18, 196:5

**stopped** [2] - 74:7, 170:16

**storage** [7] - 26:24, 81:11, 82:24, 140:23, 141:8, 180:6, 183:20

**storage"** [1] - 201:3

**store** [5] - 196:12, 212:15, 212:21, 214:14, 214:19

**stored** [4] - 183:23, 183:24, 184:5, 191:4

**stories** [2] - 112:8, 112:9

**Storrs** [3] - 107:22, 107:23, 108:1

**story** [2] - 183:6

**straight** [5] - 204:9, 204:18, 230:11, 230:14, 230:18

**straining** [1] - 19:3

**strange** [1] - 182:4

**streak** [1] - 23:1

**Street** [1] - 2:11

**stricken** [1] - 165:16

**string** [1] - 203:18

**struggling** [1] - 57:24

**stuck** [2] - 28:11, 222:15

**studio** [40] - 14:7, 17:24, 18:20, 19:10, 19:11, 19:15, 22:20, 23:19, 24:5, 52:10, 65:11, 80:7, 118:1, 128:6, 130:20, 141:4, 175:24, 180:18, 181:3, 181:7, 181:8, 182:16, 183:3, 184:13, 186:5, 186:7, 192:15, 192:20, 201:1, 201:22, 201:23, 202:12, 202:17, 209:24, 213:11, 213:16, 213:18, 215:13, 215:19, 218:5

**stuff** [34] - 21:17, 21:18, 21:19, 22:23, 41:11, 82:24, 83:1, 83:20, 83:21, 90:4, 95:24, 99:24, 100:2, 100:10, 100:11, 123:11, 132:24, 155:2, 177:9, 177:10, 178:5, 178:7, 182:22, 187:3, 204:11, 206:8, 213:1, 213:2, 213:9, 213:21, 218:3, 218:9, 221:14, 223:11

**subject** [10] - 98:21, 136:7, 155:23, 159:9, 161:2, 161:11, 165:10, 172:7, 217:20, 234:7

**submitted** [4] - 149:18, 150:3, 163:4, 165:6

**submitting** [1] - 208:2

**subpoena** [3] - 45:5, 155:7, 227:1

**Subscribed** [1] - 234:18

**substance** [1] - 5:19

**sue** [3] - 8:21, 8:22

**sued** [1] - 156:16

**suffered** [1] - 32:4

**SUFFOLK** [3] - 234:2, 235:2, 236:3

**suggest** [1] - 134:17

**suggested** [3] - 62:15, 62:17, 62:20

**suicide** [1] - 97:16

**suing** [1] - 155:4

**Suite** [1] - 1:23

**SULLIVAN** [1] - 2:6

**summer** [6] - 23:17, 25:4, 38:8, 74:11, 174:10, 232:17

**Sunday** [1] - 195:19

**supervision** [1] - 236:10

**support** [9] - 7:20, 31:21, 36:7, 36:10, 37:5, 37:9, 38:4, 60:4, 165:7

**supposed** [2] - 19:11, 34:11

**Supreme** [7] - 3:19, 3:21, 162:7, 164:22, 165:3, 232:6, 232:18

**surrounding** [1] - 216:19

**suspended** [6] - 162:1, 162:19,

166:13, 207:14, 207:17, 207:22

**suspension** [4] - 162:3, 162:13, 162:14, 163:8

**suspicion** [2] - 121:20, 122:8

**swindler** [1] - 43:5

**swindlers** [1] - 178:16

**sword** [1] - 107:1

**sworn** [4] - 5:5, 165:6, 234:18, 236:7

---

**T**

**Tab** [4] - 182:7, 186:10, 187:14, 187:24

**tab** [21] - 185:3, 188:10, 188:24, 189:11, 189:20, 190:7, 190:17, 191:12, 191:21, 192:7, 193:12, 194:15, 195:17, 196:19, 196:24, 197:1, 200:5, 204:21, 208:23, 209:14

**table** [4] - 56:6, 56:11, 115:22, 206:2

**talks** [8] - 49:24, 50:5, 111:10, 112:7, 133:5, 205:22, 205:23

**target** [4] - 10:6, 99:8, 101:17, 102:6

**tarp** [4] - 119:16, 119:20, 140:4, 140:9

**team** [1] - 209:24

**technical** [3] - 55:24, 89:10, 150:19

**technically** [1] - 70:7

**Tel** [1] - 1:24

**telephone** [3] - 13:2, 31:3, 78:21

**ten** [3] - 102:8, 136:16, 196:6

**tenant** [2] - 50:20, 50:22

**tenant's** [1] - 83:8

**tenants** [1] - 79:18

**tenants's** [1] - 83:4

**tend** [1] - 89:9

**term** [5] - 141:17, 145:2, 145:6, 145:20, 146:14

**Term** [16] - 3:17, 141:19, 145:24, 147:8, 147:16,

147:24, 148:14, 157:17, 159:9, 159:12, 159:13, 219:16, 220:24, 222:14, 222:16, 231:6

**terminate** [1] - 143:17

**terminated** [2] - 144:13, 171:11

**terms** [12] - 26:14, 32:20, 144:8, 147:8, 147:15, 148:1, 219:19, 220:1, 220:17, 220:24, 221:7, 221:18

**testified** [4] - 148:12, 175:4, 177:20, 210:5

**testify** [2] - 6:5, 137:12

**testifying** [2] - 72:11, 208:14

**testimony** [13] - 16:17, 55:20, 73:11, 99:11, 99:21, 127:6, 172:10, 172:23, 175:8, 177:23, 220:20, 234:5, 236:7

**text** [18] - 30:8, 30:14, 31:4, 33:16, 37:13, 39:15, 40:4, 43:14, 44:3, 74:18, 74:21, 74:24, 75:4, 75:8, 75:11, 169:3, 170:6, 227:2

**Text** [6] - 3:8, 3:9, 4:23, 29:16, 38:23, 226:17

**texted** [4] - 31:16, 52:15, 229:7, 229:24

**tginexi@aol.com** [3] - 195:22, 197:5, 200:9

**THE** [26] - 2:2, 2:5, 2:9, 8:23, 11:16, 19:2, 47:16, 47:18, 55:2, 55:19, 57:23, 58:1, 58:3, 60:14, 76:2, 87:19, 89:20, 122:7, 137:6, 141:15, 192:9, 218:15, 236:23, 236:23, 236:24, 236:24

**themes** [1] - 112:10

**themselves** [4] - 120:10, 137:12, 176:9, 176:13

**then"** [1] - 196:7

**theories** [1] - 122:13

**thereafter** [4] - 58:14, 64:3, 165:21, 236:9

**therefore** [1] - 215:1

**thereto** [2] - 164:14, 165:24

**thieves** [1] - 203:16

**thinking** [5] - 10:18, 28:10, 38:11, 45:20, 61:23

**thinks** [1] - 120:17

**third** [2] - 144:18, 144:19

**THIS** [1] - 236:23

**this_____day** [1] - 234:19

**Thomas** [1] - 155:7

**threat** [1] - 44:4

**threatening** [2] - 89:1, 89:14

**threats** [2] - 110:3, 111:5

**three** [12] - 12:24, 53:21, 94:17, 94:18, 106:3, 125:5, 139:11, 162:20, 163:8, 212:16, 212:22, 214:16

**three-year** [1] - 163:8

**throughout** [2] - 131:17, 210:13

**tied** [2] - 31:14, 31:19

**Tim** [22] - 39:16, 40:12, 51:12, 53:3, 69:20, 71:14, 72:5, 72:16, 82:23, 96:18, 109:12, 133:6, 133:19, 138:11, 138:13, 167:11, 167:18, 200:17, 200:18, 201:5

**time-sensitive** [1] - 76:16

**timing** [2] - 9:10, 24:3

**titled** [2] - 17:18, 149:5

**TO** [1] - 236:23

**today** [17] - 5:16, 5:21, 6:3, 14:24, 20:23, 39:10, 66:24, 88:21, 92:20, 138:3, 138:12, 149:22, 172:9, 177:3, 219:10, 224:13, 229:24

**today"** [1] - 88:15

**together** [12] - 21:14, 27:23, 29:13, 93:24, 95:9, 97:1, 100:22, 102:10, 168:11, 183:12, 213:9, 231:5

**Tom** [1] - 116:10

**tomorrow** [2] - 218:11, 227:19

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 80 of 81    January 7, 2022
Vol. II - Osvaldo Gonzalez

**EXHIBIT G - 80**
21

**took** [33] - 17:18, 49:6, 62:11, 66:1, 66:2, 81:5, 81:9, 81:13, 100:4, 112:22, 125:20, 125:21, 128:8, 140:21, 172:9, 187:21, 189:5, 189:16, 190:2, 190:12, 190:22, 191:17, 192:2, 193:17, 197:12, 198:14, 198:16, 198:20, 213:23, 219:13, 222:3, 224:18, 226:5
**top** [6] - 41:5, 93:3, 151:21, 152:3, 182:24, 191:4
**tops** [1] - 218:19
**torture** [2] - 40:19, 41:2
**touch** [1] - 76:21
**tough** [2] - 23:1
**toward** [2] - 172:23, 179:3
**towards** [3] - 23:11, 52:9, 75:14
**towed** [1] - 28:13
**trademark** [5] - 152:10, 152:13, 156:9, 156:14, 156:17
**trademarks** [1] - 156:7
**trails** [1] - 46:17
**transcribed** [1] - 236:9
**transcript** [2] - 234:7, 236:10
**TRANSCRIPT** [1] - 236:23
**transcripts** [1] - 16:17
**transfer** [1] - 132:14
**transfers** [1] - 132:7
**transition** [1] - 23:20
**transpired** [1] - 136:3
**transporting** [1] - 113:8
**travelled** [1] - 105:11
**travesty** [1] - 230:1
**treat** [2] - 28:21, 28:22
**treated** [2] - 28:24, 174:23
**treatment** [2] - 55:8, 60:3
**treats** [1] - 176:22
**tried** [7] - 18:5, 22:17, 59:1, 70:18, 97:15, 99:15
**tries** [1] - 204:1
**trip** [2] - 198:18, 201:20

**trips** [1] - 128:8
**trouble** [6] - 9:2, 18:22, 139:14, 139:18, 140:3, 140:13
**truck** [9] - 28:11, 30:22, 37:3, 194:17, 194:20, 195:6, 195:10, 195:13, 201:1
**trucks** [2] - 28:8, 195:8
**true** [13] - 88:23, 89:2, 104:23, 112:14, 115:16, 115:17, 132:8, 150:6, 150:9, 178:13, 179:15, 234:7, 236:10
**trust** [2] - 41:18, 177:9
**Trust** [9] - 26:23, 34:19, 41:12, 62:1, 62:6, 62:7, 77:12, 95:23, 95:24
**trusts** [1] - 41:15
**truth** [7] - 5:5, 5:6, 177:3, 177:6, 177:8, 177:22
**truthful** [3] - 179:7, 205:13, 216:4
**truthfully** [2] - 5:21, 151:6
**try** [12] - 32:9, 34:1, 34:24, 57:11, 58:2, 74:3, 77:17, 157:8, 168:7, 172:19, 219:6, 227:5
**trying** [31] - 20:17, 28:6, 39:6, 57:1, 58:8, 58:9, 58:19, 58:23, 62:6, 67:24, 70:14, 72:10, 73:3, 74:9, 78:3, 83:2, 101:7, 121:21, 122:9, 127:14, 127:21, 131:4, 147:7, 147:14, 147:22, 176:1, 183:16, 202:11, 214:6, 232:7
**tsunami** [1] - 41:6
**turn** [1] - 46:16
**turned** [1] - 75:14
**two** [21] - 24:17, 28:17, 37:22, 45:12, 58:23, 59:23, 64:18, 87:20, 107:16, 107:17, 108:21, 113:3, 163:7, 180:18, 181:2, 184:17, 209:3,

209:4, 212:13, 214:13
**two-page** [2] - 209:3, 209:4
**type** [1] - 107:10
**typed** [4] - 210:17, 211:5, 212:11, 214:11
**typing** [1] - 95:17

**U**

**U.S** [6] - 10:4, 10:9, 10:10, 10:13, 10:22, 44:13
**ugly** [1] - 43:7, 44:5
**ultimately** [2] - 92:16, 95:3
**unauthorized** [3] - 121:1, 121:16, 148:20
**uncomfortable** [1] - 208:14
**UNDER** [1] - 236:24
**under** [20] - 5:15, 62:12, 66:23, 104:17, 104:22, 105:2, 124:15, 127:7, 137:4, 137:8, 143:19, 145:2, 149:12, 151:2, 163:2, 210:12, 211:3, 215:22, 236:9
**understood** [11] - 47:5, 64:3, 111:19, 115:10, 143:17, 145:12, 149:17, 151:2, 164:17, 165:19, 166:4
**unearned** [1] - 164:1
**unhappy** [2] - 220:2, 221:9
**UNITED** [1] - 1:2
**unlawful** [1] - 206:19
**UNLESS** [1] - 236:24
**unless** [1] - 78:20
**up** [81] - 8:24, 17:20, 22:22, 26:8, 27:19, 27:24, 29:9, 34:21, 37:13, 39:14, 50:5, 54:14, 57:1, 65:20, 69:8, 69:12, 69:14, 69:15, 70:4, 78:13, 80:6, 80:9, 80:12, 90:4, 95:17, 106:14, 115:20, 123:9, 128:16, 132:24, 136:15, 138:2, 140:22, 143:4, 157:8, 160:13,

160:14, 161:5, 166:16, 166:17, 166:20, 176:3, 178:21, 182:7, 183:11, 183:19, 184:16, 185:3, 186:2, 186:10, 187:14, 188:10, 188:24, 189:11, 189:20, 190:7, 190:17, 191:12, 191:21, 192:6, 193:12, 194:15, 196:5, 196:6, 196:24, 199:18, 199:22, 199:23, 200:5, 201:8, 202:9, 204:21, 206:4, 208:23, 209:13, 211:13, 218:16, 222:20, 226:13
**upper** [1] - 184:17
**ups** [1] - 170:21
**upset** [13] - 35:11, 37:1, 37:20, 38:16, 38:18, 121:4, 121:5, 121:6, 121:7, 121:13, 224:24, 229:16, 229:18
**upsetting** [6] - 24:6, 24:7, 24:8, 24:10, 24:16, 35:1
**upward** [1] - 75:14
**urinate** [1] - 22:19
**URQUHART** [1] - 2:6
**uses** [1] - 197:21
**utilities** [1] - 21:9

**V**

**valid** [1] - 220:13
**value** [4] - 115:14, 117:17, 117:21, 120:2
**van** [1] - 133:1
**various** [4] - 93:1, 140:16, 156:17, 173:1
**Vasquez** [1] - 94:11
**Vassecchio's** [1] - 81:6
**Vegas** [2] - 42:5, 42:6
**vehicle** [1] - 27:15
**Venable** [14] - 14:18, 14:21, 45:4, 45:5, 45:8, 46:2, 46:6, 46:9, 74:20, 93:9, 93:15, 97:19, 98:22, 99:17
**verified** [1] - 204:3

**verify** [1] - 204:4
**versus** [1] - 149:4
**Vessecchia** [9] - 109:20, 109:21, 110:2, 110:5, 111:1, 133:19, 167:3, 167:7, 168:5
**Vessecchia's** [4] - 124:17, 126:2, 231:20, 232:2
**vessecchia@mac. com** [3] - 195:21, 197:5, 200:10
**via** [3] - 60:8, 170:6, 236:9
**video** [2] - 12:3, 84:21
**videotape** [1] - 88:22
**view** [6] - 70:24, 115:13, 125:12, 131:21, 177:4, 177:20
**Vinalhaven** [1] - 66:15
**violated** [1] - 159:13
**violating** [1] - 79:18
**violation** [1] - 127:5
**violence** [4] - 49:23, 50:11, 110:4, 111:6
**violent** [4] - 23:1, 111:14, 111:15, 112:10
**virtually** [1] - 215:20
**visit** [18] - 119:23, 120:5, 121:4, 122:17, 123:14, 126:24, 127:24, 128:24, 129:6, 139:7, 139:8, 180:10, 225:3, 227:6, 227:24, 229:5, 229:9, 229:16
**voice** [2] - 46:16, 151:17
**voiced** [1] - 221:17
**Volume** [1] - 1:1
**VOLUME** [1] - 1:15
**voluntarily** [1] - 163:9

**W**

**wait** [4] - 84:9, 84:11, 86:1, 134:22
**waited** [1] - 54:6
**waiting** [6] - 24:17, 84:14, 84:18, 177:12, 177:13, 201:12
**waived** [1] - 174:12
**walk** [1] - 34:24
**walking** [4] - 52:6, 82:8, 82:18, 82:20

Morgan Art vs. McKenzie    Case 1:18-cv-04438-AT-BCM    Document 479-7    Filed 01/17/22    Page 81 of 81    January 7, 2022
Vol. II - Osvaldo Gonzalez

EXHIBIT G - 81
22

**walks** [1] - 168:10
**wants** [2] - 199:1, 204:5
**ware** [1] - 232:20
**warned** [1] - 138:9
**waste** [1] - 123:6
**wasted** [2] - 24:17, 24:18
**wasting** [1] - 131:12
**watched** [1] - 214:19
**ways** [1] - 32:8
**wears** [1] - 170:3
**website** [2] - 156:2, 214:18
**week** [2] - 45:7, 196:2
**weekend** [1] - 93:18
**weekend"** [1] - 93:5
**weeks** [2] - 200:3, 216:21
**welcome** [1] - 106:13
**West** [1] - 2:3
**Wharf** [1] - 2:3
**whatsoever** [1] - 231:18
**wherein** [1] - 163:5
**WHEREOF** [1] - 236:14
**White** [2] - 94:4, 103:21
**whole** [22] - 5:6, 22:24, 26:13, 27:3, 41:16, 51:3, 66:18, 66:20, 74:13, 80:22, 100:7, 101:10, 101:11, 117:6, 117:8, 117:12, 179:23, 184:22, 199:21, 210:7, 222:15
**wild** [1] - 111:13
**willfully** [1] - 68:11
**willing** [2] - 76:22, 102:2
**window** [2] - 193:4, 193:5
**windows** [2] - 80:7, 80:9
**wish** [1] - 235:3
**withdraw** [1] - 202:18
**withholding** [1] - 215:11
**Witness** [3] - 3:2, 149:5, 149:8
**witness** [7] - 1:15, 33:22, 77:15, 90:3, 133:23, 234:4, 236:6
**WITNESS** [4] - 47:18, 58:1, 218:15, 236:14
**witnessed** [1] - 128:5
**women** [2] - 22:19,

169:6
**wondering** [1] - 78:16
**wood** [1] - 191:10
**wooden** [11] - 181:23, 182:7, 182:9, 182:16, 183:5, 183:7, 183:24, 185:11, 191:3, 191:6, 199:20
**word** [2] - 153:3, 215:21
**words** [1] - 132:18
**worker** [1] - 170:14
**workings** [1] - 41:8
**works** [17] - 67:17, 73:22, 108:18, 109:4, 109:23, 110:7, 112:17, 132:5, 132:6, 151:24, 178:1, 184:12, 186:3, 186:6, 186:19, 186:20, 210:6
**world** [1] - 178:14
**worth** [3] - 120:17, 134:21
**wounded** [1] - 77:17
**wow** [1] - 217:22
**write** [4] - 110:14, 156:7, 209:6, 209:10
**writes** [3] - 155:2, 196:2, 198:13
**writing** [3] - 103:1, 148:7, 221:2
**written** [4] - 210:18, 211:6, 212:12, 214:12
**wrong-doing** [8] - 136:2, 136:6, 136:11, 137:3, 137:10, 137:13, 137:16, 137:20
**wrongfully** [1] - 78:10
**wrote** [5] - 102:1, 102:24, 197:17, 205:12, 210:13

**Y**

**yard** [1] - 117:15
**year** [6] - 71:8, 73:4, 110:10, 110:12, 163:8
**years** [18] - 17:17, 24:17, 26:5, 37:22, 50:14, 50:17, 58:23, 59:23, 93:12, 101:21, 108:23, 136:16, 168:20, 210:14, 212:16,

212:22, 214:16, 215:6
**years"** [1] - 162:20
**yell** [1] - 31:7
**yelling** [3] - 37:1, 43:20, 43:21
**York** [26] - 1:3, 2:8, 8:17, 8:18, 15:21, 16:8, 47:23, 48:6, 68:16, 105:10, 136:18, 137:5, 137:8, 137:9, 155:8, 155:13, 161:16, 161:22, 162:11, 163:16, 215:5, 216:20, 232:7, 232:18
**yourself** [9] - 7:20, 18:10, 18:11, 21:2, 60:4, 99:11, 123:9, 148:5, 166:1

**Z**

**ZERNER** [81] - 2:2, 12:2, 12:6, 12:9, 18:24, 19:7, 29:5, 29:18, 37:18, 38:20, 53:5, 54:22, 55:6, 55:16, 55:21, 56:2, 60:12, 60:16, 75:22, 76:3, 84:22, 87:22, 88:4, 89:18, 91:18, 96:4, 96:9, 122:5, 127:18, 131:4, 131:19, 136:13, 136:20, 136:23, 137:14, 138:2, 138:5, 138:16, 143:10, 151:9, 151:14, 151:15, 151:23, 153:17, 162:5, 164:20, 172:13, 173:12, 173:18, 173:24, 174:8, 174:19, 185:9, 196:20, 198:10, 199:6, 201:10, 201:16, 202:23, 203:3, 207:11, 208:6, 208:16, 211:1, 211:7, 211:17, 211:23, 212:23, 213:13, 216:7, 217:12, 218:16, 218:20, 220:19, 222:19, 222:22, 226:11, 226:15, 233:8, 233:12, 233:16

**Zerner** [6] - 2:3, 3:3, 5:8, 172:24, 174:21, 205:2
**Zoom** [3] - 29:9, 174:7, 236:9
**ZOOM** [1] - 1:14
**zoom** [2] - 39:7, 39:11
**Zuretski** [20] - 57:10, 57:11, 57:13, 57:14, 57:17, 57:18, 58:4, 58:5, 58:6, 58:12, 58:17, 114:17, 114:19, 114:20, 114:23, 117:13, 225:23, 227:22, 229:9

**COPLEY COURT REPORTING, INC.**