UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1/17/2025_

MORGAN ART FOUNDATION LIMITED,

Plaintiff,

-against-

MICHAEL MCKENZIE d/b/a AMERICAN
IMAGE ART,

Defendant.

18-CV-4438 (JLR) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. JENNIFER L. ROCHON**

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated December 10, 2021 (Dkt. 465), brought pursuant to Fed. R. Civ. P. 37(b), plaintiff and counterclaim-defendant Morgan Art Foundation Limited (MAF) seeks terminating sanctions against defendant and counterclaim-plaintiff Michael McKenzie d/b/a American Image Art (McKenzie),[1] arguing that such sanctions are the only effective remedy for McKenzie's "extreme disregard for the legal system," which he demonstrated throughout the pendency of this action by, among other things: (i) repeatedly representing to MAF and to the Court that he searched for and produced documents responsive to MAF's discovery requests when he did not; (ii) persistently failing to produce – or disclose the existence of – his detailed electronic inventory (the Art Archive) of the Robert Indiana artworks that he fabricated (Indiana Artworks), while falsely attesting that his records were kept "mainly" in hard copy, and for only three years; (iii) failing to identify or produce any communications with Gregory Allen, an art dealer through whom McKenzie sold various Indiana Artworks; (iv) surreptitiously removing thousands of Indiana

---

[1] In its pleadings, MAF named McKenzie and American Image Art (AIA) as two separate defendants, identifying AIA as a Delaware corporation and McKenzie as its principal. *See* First Amended Complaint (FAC) (Dkt. 47) ¶¶ 20-21. In fact, AIA is McKenzie's sole proprietorship, *see* McKenzie Declaration dated Nov. 6, 2018 (McKenzie Decl.) (Dkt. 103) ¶ 2, and thus has no independent legal existence under New York law. On August 27, 2020, with the consent of all parties, the Court terminated AIA as separate party and amended the caption to add the alias "d/b/a American Image Art" to McKenzie's name. (Dkt. 343.)

Artworks from his property shortly before a Court-ordered inspection on August 5, 2021; and (v) lying about the reasons for the move at his post-inspection deposition, while flatly refusing to produce other evidence well within the scope of MAF's discovery requests and Fed. R. Civ. P. 26(b)(1). *See* Pl. Mem. (Dkt. 466) at 4-15.

In opposition to the motion, McKenzie asserts that he did not intentionally conceal documents or information, but rather relied on his various attorneys[2] to review his records and produce responsive documents, and that he removed the Indiana Artworks from his property in the summer of 2021 for innocent reasons. Def. Mem. (Dkt. 478) at 3-13. McKenzie further argues that terminating sanctions would be inappropriate because any discovery deficiencies could still be corrected, and there is "no likeli[hood] of future misconduct," *Id.* at 20. However, even when faced with plaintiff's sanctions motion, McKenzie made no effort to produce the Art Archive, his communications with Allen, or any of the other documents or information he wrongly withheld during the discovery period.

For the reasons that follow, I recommend that MAF's motion be granted in part. McKenzie committed significant discovery misconduct, over a long period of time, and repeatedly demonstrated – both by word and by deed – that he could not be relied upon either to comply with this Court's discovery orders or to be truthful about whether he had done so. Most egregiously, by concealing approximately 2,500 Indiana Artworks ahead of MAF's inspection, and by failing to produce the Art Archive or his correspondence with Allen, McKenzie frustrated discovery into the authenticity of the Indiana Artworks he fabricated and the volume and economics of his Indiana-

---

[2] McKenzie has been represented by three different law firms over the life of this action but is currently unrepresented. *See* Part I(D) of this Report and Recommendation, *infra*.

related business. Because these issues are central to McKenzie's remaining counterclaims against MAF, I recommend that they be dismissed.

Additionally, because McKenzie's misconduct blocked MAF from discovering evidence relevant to its claim that he tortuously interfered with MAF's rights under its contracts with Indiana, I recommend that a default judgment be granted to MAF on that claim. With respect to MAF's remaining claims, I recommend non-dispositive sanctions short of termination, including an order precluding McKenzie from making any affirmative use of the evidence withheld, permitting MAF to present evidence of his discovery misconduct to the jury, and requiring McKenzie to compensate MAF for the fees and costs it incurred due to his discovery misconduct. However, I recommend against the extreme remedy of ending the entire case by sanction.

## I.    BACKGROUND

This action is one of several concerning the late American artist Robert Indiana, the legal rights to his intellectual property and artistic legacy, and related disputes. Plaintiff MAF, an art dealer, acquired the exclusive right to reproduce, fabricate, and market a wide variety of Robert Indiana artworks, including his well-known *LOVE* stacked-word image and sculpture, by virtue of a series of written agreements it entered into with the artist during his lifetime, including one dated April 9, 1999 (the April 1999 Agreement) and another dated December 22, 1999 (the December 1999 Agreement). *See* FAC ¶ 8. In the April 1999 Agreement (as amended in 2004), Indiana conveyed to MAF "all copyright, trademark, and other rights" in all the paintings and sculptures that he conceived from 1960 to April 2004, and in both agreements, he granted MAF "the right to sue for any infringement of the rights Indiana conveyed." *Id*. MAF agreed to pay royalties to Indiana in specified amounts. *Id*. After inking these agreements, MAF alleges, it spent years restoring and burnishing Indiana's reputation as an artist, culminating in a highly regarded retrospective exhibition at the Whitney Museum in New York in 2013. *Id*. ¶¶ 7-10, 14.

Defendant McKenzie, an art publisher, also claims an exclusive right to create and market certain Robert Indiana artworks, including the *HOPE* stacked-word image and sculpture used in Barack Obama's 2008 presidential campaign. McKenzie acquired these rights by virtue of a contract signed by the artist on August 11, 2008 (the HOPE Contract) and several addenda thereto. *See* Third Amended Answer, Counterclaims and Cross-Claims (TAA) (Dkt. 91) ¶¶ 233-34, 237. McKenzie agreed to pay royalties to Indiana in the amount of 25% for sculptures and 33% for canvas images. HOPE Contract at 3. However, the artist reserved "all copyright rights in and to the images and the works created hereunder." *Id.*

In this action – initially filed on May 19, 2018, one day before Indiana died at age 89 – MAF charges that McKenzie, acting in concert with Indiana's caretaker, Jamie Thomas, took advantage of the artist in his twilight years to make quick profits. FAC ¶¶ 12-17. As Indiana's health declined, Thomas allegedly kept him isolated from his long-time friends and supporters, such as MAF, while McKenzie published "derivative artworks, supposedly by Robert Indiana," based on earlier Indiana works to which MAF had exclusive rights. *Id.* ¶ 12. For example, in 2016, McKenzie published a series of images called *Like a Rolling Stone* (referred to by MAF as the *Dylan Works*), consisting of images taken from well-known early Indiana paintings – the rights to which were held by MAF – embellished with "lyrics from Bob Dylan songs." *Id.* ¶ 93. Additionally, McKenzie published "unauthorized reproductions of the LOVE image that were exhibited at major art fairs." *Id.* ¶¶ 13, 93. According to MAF, these "forged and inauthentic works" not only violated the April 1999 Agreement and the December 1999 Agreement; they harmed Indiana's market and undermined his carefully restored reputation. *Id.* ¶ 12. MAF asserts claims against McKenzie for copyright infringement, trademark infringement, tortious interference with

contract, violation of the Visual Artists Rights Act (VARA), 17 U.S.C. §§ 101 *et seq*., unfair competition, and defamation. FAC ¶¶ 114, 120-21, 127-28, 140, 147-48, 151-54, 158.[3]

McKenzie, for his part, claims to be Indiana's long-time "friend and art publisher," who helped "reintroduce [his] artwork to an indifferent art world and an uninterested public" in the 1990s – and who paid the artist nearly "10 million dollars pursuant to the HOPE Contract and addenda." *See* TAA at 1-4, ¶¶ 195-97. McKenzie asserts that all the works he produced under Indiana's name were "authorized," either by the artist himself or by Thomas on his behalf. *Id.* ¶¶ 265-73. In addition to denying any unlawful conduct, McKenzie asserts counterclaims against MAF.[4] As relevant here, McKenzie seeks a declaratory judgment that he had "full authority from Indiana to produce, market, and sell" the Indiana Artworks that he fabricated, and that these works – including *HOPE*, the *Dylan Works*, and works entitled *EAT*, *WINE* and *BRAT* – are "not forgeries." TAA ¶¶ 326, 332. Additionally, he seeks damages for defamation and slander of title. *Id.* ¶¶ 339-45, 379-88.

---

[3] The original Complaint named Indiana himself as a defendant and asserted claims against him for copyright infringement and breach of contract. Compl. (Dkt. 1) ¶¶ 106-112, 127-31. On July 23, 2018, James W. Brannan, as personal representative of the Estate of Robert Indiana (the Estate) was substituted as a defendant in place of Indiana. (Dkt. 35.) In the FAC, MAF sued the Estate and Thomas for copyright infringement and breach of contract, and sued Thomas, along with McKenzie, for trademark infringement, tortious inference with contract, violation of VARA, unfair competition, and defamation. FAC ¶¶ 109-16, 131-163.

[4] McKenzie also asserted cross-claims against the Estate and Thomas. The Estate, for its part, asserted counterclaims against MAF and certain MAF affiliates. On October 9, 2018, the Hon. Analisa Torres, United States District Judge, granted the Estate's motion to compel arbitration of McKenzie's claims against it, relying on the arbitration clause in the HOPE Contract. *See Morgan Art Found. Ltd. v. McKenzie*, 2018 WL 11293753 (S.D.N.Y. Oct. 9, 2018). Thereafter, McKenzie and the Estate engaged in arbitration before the American Arbitration Association (AAA). On July 1, 2019, Judge Torres: (1) dismissed some (but not all) of the Estate's counterclaims against MAF and its affiliates; (2) dismissed some (but not all) of McKenzie's counterclaims against MAF; and (3) dismissed all of McKenzie's cross-claims against Thomas. *Morgan Art Found. Ltd. v. McKenzie*, 2019 WL 2725625 (S.D.N.Y. July 1, 2019).

Since McKenzie's fabrication and sale of Indiana Artworks is at the center of both the claims and the counterclaims in this action – and since he has affirmatively asserted that he had Indiana's blessing for all of his activities – McKenzie should have been highly motivated to comply with his discovery obligations regarding those activities. Instead, as detailed below, he erected a series of roadblocks that repeatedly hampered discovery and required numerous court interventions over the course of the three-year discovery period. Even those interventions – as it later became clear – proved insufficient.

The extent of McKenzie's discovery misconduct was revealed in May 2021 (long after document discovery was to have been completed), when McKenzie invited MAF to his studio, in Katonah, New York, in connection with a potential settlement under which he would sell all of his Indiana Artworks to other parties. During that visit, MAF discovered that McKenzie was in possession of numerous documents – including the Art Archive – that should have been produced years prior. In July 2021, this Court ordered McKenzie to submit to a second inspection of his property under heavily negotiated terms. But in the weeks leading up to that inspection, McKenzie and his studio staff worked frantically to move some 2,500 Indiana Artworks from his property to a storage facility in Middleton, New York, thereby concealing them from MAF. When his subterfuge was discovered, his combative performance at deposition (during which he admitted that he concealed discoverable information from his own counsel and refused outright to divulge other relevant information to MAF because it was "[n]one of your business") made it abundantly clear that McKenzie still did not intend to cooperate in discovery in good faith.

### A.    MAF's Claims

The April 1999 Agreement between MAF and Indiana (as amended in 2004) extended to "all paintings, sculptures, constructions and other art work" that was "conceived by Indiana from 1960 to 2004." ¶¶ 8, 43; *see also* Declaration of Luke Nikas dated Nov. 6, 2018 (Nikas 2018 Decl.)

(Dkt. 107) Ex. A (Dkt. 107-1) (Apr. 1999 Ag.) The December 1999 Agreement conveyed to MAF the exclusive right to produce, fabricate, own, and sell sculptures identified as *LOVE*, *AHAVA*, *AMOR*, *NUMBERS* sculptures *One* though *Zero*, *ART*, and *2000*. FAC ¶¶ 8, 49, 52; Nikas 2018 Decl. Ex. B (Dkt. 107-2) (Dec. 1999 Ag.) Both agreements granted MAF the right to sue for any infringement of the rights Indiana conveyed. *See* April 1999 Ag. at ECF p. 2; Dec. 1999 Ag. at ECF p. 4.

### 1.    Copyright Infringement

In Count I of the FAC, MAF alleges it is the owner of valid copyrights in the Robert Indiana works *USA FUN* (1965) and *The Ninth American Dream* (2001), and that McKenzie violated the Copyright Act by producing and distributing "original elements" of those works without authorization from MAF. FAC ¶¶ 110-116. The FAC includes images of both of these original Indiana works (with notes as to their provenance), juxtaposed against the purportedly unauthorized infringing works fabricated by McKenzie:

ORIGINAL

INFRINGEMENT






11. *USA FUN*, 1964–65, oil on canvas, 51 x 51 inches. Private collection.


*Rights transferred in April 2004 amendment*

FAC at p. 40.

McKenzie's version of *The Ninth American Dream* included lyrics from a Bob Dylan song around the outside of the image:

ORIGINAL                          INFRINGEMENT



10. *The Ninth American Dream*, 2001, oil on canvas, nine panels, overall: 153 x 153 inches. Private collection.

*Rights transferred in April 2004 amendment*

FAC at p. 39.

McKenzie counters that MAF's copyrights are "invalid," that it "did not timely file its copyright registrations," and that its copyright claims are barred "by the doctrine of fair use." TAA ¶¶ 179, 181-82.[5]

---

[5] McKenzie further asserts that all the Indiana Artworks that he produced, including those derived from *USA FUN* and *The Ninth American Dream*, were "authorized," either by Indiana himself or by Thomas on Indiana's behalf. TAA at 3; *id.* ¶¶ 180, 265, 273, 326. If Indiana effectively conveyed his copyrights to MAF, however, this would not be a defense to MAF's copyright claims.

### 2. Trademark Infringement

In Counts II and III, MAF alleges that it "established and received a trademark in *LOVE*," and that McKenzie violated federal and state trademark law by reproducing, counterfeiting, copying, and distributing unauthorized versions of *LOVE* for financial gain. FAC ¶¶ 117-130. The FAC includes an image of the original Indiana work, juxtaposed against one of the purportedly unauthorized infringing works produced by McKenzie:

ORIGINAL                                    INFRINGEMENT





1. *LOVE*, 1966, oil on canvas, 72 x 72 inches. Indianapolis Museum of Art, Indiana

*Rights transferred in April 1999 contract*

FAC at p. 31.

McKenzie denies any trademark infringement. He avers that MAF's two trademark registrations for *LOVE* (and one application) cover umbrellas, gym bags, infant carriers, and other

articles, but not fine art, and that he "has not published *LOVE* artworks in any of the mediums covered by" MAF's registrations and application. TAA ¶¶ 228-31.[6]

### 3.    Tortious Interference with Contract

In Count V, MAF alleges that McKenzie (together with Thomas) tortiously interfered with MAF's exclusive rights under the April 1999 and December 1999 Agreements. FAC ¶¶ 136-42. Specifically, MAF alleges that McKenzie "intentionally caused Indiana to breach [both agreements] by authorizing the production, promotion, and sale of works of art that, under the [April 1999] Agreement and the [December 1999] Agreement, can only be produced, promoted, and sold by Morgan Art Foundation." *Id.* ¶ 140. Again, the FAC includes images of the original Indiana works (the rights to which he conveyed to MAF) juxtaposed against the McKenzie-fabricated works that – even if authorized by Indiana – allegedly violated MAF's contractual rights:

---

[6] McKenzie admits that, beginning in 2012, he produced a "silkscreen of LOVE onto aluminum panels," McKenzie Decl. ¶ 6, but claims that this did not infringe MAF's rights because the silkscreened panels were intended to "serve as the fulfillment" of a project called BOOK OF *LOVE*, which McKenzie produced for Indiana in the 1990s, before MAF acquired those rights. *Id.* ¶¶ 4-6. During his initial deposition in this action, taken on September 9, 2020, McKenzie further testified that in the future he would "probably" fabricate new *LOVE* works, "because LOVE is public domain, and I'll start doing LOVE things pretty much immediately." *See* Declaration of Bridget A. Zerner, Esq. (Zerner Decl.) (Dkt. 479) Ex. D (McKenzie 2020 Tr.) (Dkt. 479-4) at 76:23-77:3.

ORIGINAL

INFRINGEMENT





6. *The Sixth American Dream (USA 666)*, 1964–66, oil on canvas, fine panels, each 36 x 36 inches. Private collection.

*Located in Nice Catalogue at p. 201; print image located in Sheehan Catalogue at p. 45*

ORIGINAL

INFRINGEMENT





7. *The New Glory Penny*, 1963, oil on canvas, each panel: 24 x 24 inches. Private collection.

*Rights transferred in April 2004 amendment; print image located in Sheehan Catalogue at p. 22*

FAC at p. 36.

### 4.    VARA Violations

In Count VI, MAF alleges that McKenzie violated VARA by "producing, distributing, and publicly displaying works of art attributed to Robert Indiana that were not created or authorized

by Indiana or by Morgan Art Foundation" under its 1999 Agreements. FAC ¶ 147. Specifically, MAF alleges that the McKenzie-produced Indiana Artworks "have injured the reputation and integrity of Robert Indiana and his artistic works, *id*. ¶ 148, and betray themselves as "forgeries," because "the quality, known features, and signatures are not consistent with Indiana's authentic works." *Id*. ¶ 12.

### 5. Unfair Competition

In Count VII, MAF claims that McKenzie committed consumer fraud (presumably under N.Y. Gen. Bus. Law (GBL) §§ 349 and 350) by "producing, distributing, and publicly displaying unauthorized and counterfeit works of art," thereby "caus[ing] injury to consumers in New York." FAC ¶¶ 151, 153.

### 6. Defamation

Finally, in Count VII, MAF accuses McKenzie of defaming it by making false statements to the effect that "Morgan Art Foundation failed to pay Robert Indiana money that was contractually owed to him, that Morgan Art Foundation did not pay Indiana for seven years, and that Morgan Art Foundation has exploited and misused its relationship with Robert Indiana for its own financial benefit." FAC ¶ 159.

### B. McKenzie's Counterclaims

The HOPE Contract and its first two written addenda cover specified editions of the *HOPE* image and sculpture. *See* TAA Exs. B-D (Dkts. 91-2 through 91-4). A 2011 addendum entitled Indiana to a 30% royalty on "all monies received by [McKenzie] annually for the exclusive rights to HOPE Wine, water & Spirits." *Id*. Ex. E (Dkt. 91-5). In another addendum, dated March 31, 2012, Indiana granted McKenzie "the right and license to use the Artwork [*HOPE*], the "ROBERT INDIANA" name and the "ROBERT INDIANA" signature . . . exclusively and worldwide in connection with the manufacture, marketing, distribution, promotion advertising and sale of

Beverages." *Id.* Ex. F (Dkt. 91-6) ¶ 1. McKenzie alleges that these rights were expanded even further by "verbal" addenda, *id.* ¶ 265, which authorized him to publish "more original artworks," *id.*, including the *Dylan Works*, *see id.* ¶ 267, and *BRAT* (short for bratwurst), which was a monumental stacked-word sculpture commissioned by Johnsonville Sausage and installed in September 2018 outside the sausage company's plant in Wisconsin. *Id.* at 3, ¶¶ 265-73. After Thomas acquired the artist's power of attorney in 2016, it was he who "often" communicated Indiana's "final approval" of McKenzie's projects. *Id.* ¶¶ 272-73.

Four of McKenzie's counterclaims survived Judge Torres's July 1, 2019 decision, either in whole or in part.

### 1. Declaratory Judgment

In his Second Counterclaim, McKenzie seeks a declaration that he had "full authority from Indiana to produce, market, and sell all of the artworks at issue," TAA ¶ 326, and "has not engaged in any act of copyright infringement." *Id.* ¶ 327. In his Third Counterclaim, he seeks a declaration that the April 1999 Agreement and the December 1999 Agreement "do not govern the artworks Indiana created and [McKenzie] published, and that such artworks are not forgeries." *Id.* ¶ 332.

### 2. Defamation

McKenzie's Fourth Counterclaim alleges that MAF defamed him by, among other things, falsely telling art galleries, patrons, and journalists that the Indiana Artworks he published "were not authentic," thereby hurting McKenzie's "standing and sales in the art world" and causing potential buyers to lose interest. TAA ¶¶ 278-86. He further alleges that MAF "planted a false story" in the New York Times that "the BRAT sculpture was not authorized by Indiana." *Id.* ¶ 286.

### 3. Slander of Title

Lastly, McKenzie's Eighth Counterclaim, for slander of title, alleges that MAF "falsely told the Contini Art Gallery" that McKenzie "was forging HOPE Contract artworks that Indiana

authorized." TAA ¶¶ 380-81. (Other aspects of McKenzie's eighth counterclaims were dismissed by Judge Torres. *See Morgan Art Found. Ltd. v. McKenzie*, 2019 WL 2725625, at *11-12.)

### C. Documents and Information in McKenzie's Possession

#### 1. Indiana Artworks

McKenzie operates his art publishing business out of a studio in Katonah, New York. *See* McKenzie 2020 Tr. at 9:6-9. The studio is located on the same 25-acre property as Mr. McKenzie's residence. *Id.* at 9:8-9; *see also* Declaration of Luke Nikas dated December 12, 2021 (Nikas 2021 Decl.) (Dkt. 467) Ex. 2 (Dkt. 467-2) (Vessecchia Tr.) at 10:25-11:3. Until July 2021, McKenzie stored Indiana artworks on the first and second floors of the two-story studio, and in the basement of his residence. Vessecchia Tr. at 120:6-17, 122:11-123:13, 126:13-19; Nikas 2021 Decl. Ex. 4 (Dkt. 467-4) (Ginexi Tr.) at 38:18-39:5, 89:7-14. Although the "scale and volume" of Indiana artworks kept on McKenzie's property made estimates difficult, Timothy Ginexi (McKenzie's silkscreen printer) estimated that about half of the Indiana artworks were kept in the studio and half were kept in McKenzie's basement. Ginexi Tr. at 8:9-21, 89:15-25. During his second deposition in this action, taken on September 10, 2021, McKenzie estimated that, as of May 2021, the studio and basement contained at least 2,500 artworks. Nikas 2021 Decl. Ex. 1 (Dkt. 467-1) (McKenzie 2021 Tr.) at 45:13-16.

#### 2. The Art Archive and Other Inventory Records

McKenzie and his staff used a computer program that they referred to as the Art Archive to catalog and keep track of artworks that McKenzie produced and sold. McKenzie 2021 Tr. at 102:5-104:23; Vessecchia Tr. at 138:22-140:18; *see also* Nikas 2021 Decl. Exs. 8-16 (printouts showing detailed information concerning various *LOVE* and *HOPE* works, all dated 3/23/17).[7]

---

[7] Nikas attests that these records were found and photographed in McKenzie's studio on May 25, 2021. Nikas 2021 Decl. ¶ 12. McKenzie testified that they were printouts "from the . . . what we

The Art Archive is an online database accessible via a website with a login. Vessecchia Tr. at 252:5-12. McKenzie's staff began using it in 2015. McKenzie 2021 Tr. 121:5-9. According to Annette Vessecchia (McKenzie's graphic designer), the Art Archive is "an inventory kind of program where you keep everything, you know, organized in a way that you kind of knows what you have." Vessecchia Tr. at 138:18-21; *see also* McKenzie 2021 Tr. at 104:4-11 (the purpose of the Art Archive is "to catalog the Indiana works that [he] produced over time," including "where it was in the studio"). At deposition in 2021, McKenzie expressed doubt about the accuracy of the Art Archive. *See* 2021 McKenzie 2021 Tr. at 103:3-4 ("none of us is really quite sure [that it] is accurate, unfortunately"). But Vessecchia, who did "maintenance" on the Art Archive, testified that "it should be a pretty close representation of what's been manufactured, produced, however you want to say it, in addition to a photograph that goes along with that." Vessecchia Tr. at 139:6-10. Both McKenzie and his staff had access to the Art Archive. McKenzie 2021 Tr. at 105:5-8, 106:17-20; Vessecchia Tr. at 140:14-21. At oral argument on the instant sanctions motion, McKenzie's counsel confirmed that he did not produce the Art Archive in discovery, and still had not produced it. 3/1/22 Arg. Tr. (Dkt. 490) at 47:21-48:25.

In addition to the Art Archive, McKenzie's staff maintained paper records of his Indiana Artworks. *See*, *e.g.*, Nikas 2021 Decl. Ex. 7 (invoice for 2009 sale of *HOPE* work for $150,000); *id*. Exs. 17, 20-21 (shipping records listing Indiana Artworks sent to the Baker Museum in Florida in 2016, and returned in 2017, including many *LOVE*, *HOPE*, and *USA FUN* pieces, twelve *Dylan Works* pieces, and other allegedly infringing Indiana Artwork). These records, like the Art Archive, were not produced to MAF during the discovery period. Nikas 2021 Decl. ¶ 5.

---

call the art archive." McKenzie 2021 Tr. at 102:5-7; *see also id*. at 115:2-15 (identifying another record dated 3/23/17 as "a printout from the art archive," listing *HOPE* works).

### 3.    Sales by Art Dealer Gregory Allen

McKenzie did business with an art dealer named Gregory Allen. McKenzie 2021 Tr. at 72:25-73:24; *see also* Nikas 2021 Decl. Ex. 3 (Allen Tr.) at 8:8-9:20. Allen has sold art for McKenzie, including Indiana Artwork, since at least 2007. McKenzie 2021 Tr. at 73:2-24; Allen Tr. at 15:23-17:18. McKenzie spoke to Allen about buying Indiana Artworks during the pendency of this action, including in 2021. McKenzie Tr. at 75:2-76:23, 77:10-23, 87:4-21; Allen Tr. at 35:13-17. McKenzie and Allen corresponded frequently by email and text and maintained records of sales. McKenzie 2021 Tr. at 85:5-20; Allen Tr. at 55:5-15. The Art Archive reflects sales and consignments of Indiana Artworks to Allen going back to 2013. *See* Nikas 2021 Decl. Exs. 8, 16. However, McKenzie did not disclose Allen's name pursuant to Fed. R. Civ. P. 26(a)(1), nor in his responses to MAF's interrogatories. Pl. Mem. at 14. At Allen's deposition, on November 5, 2021 (during which he was represented by McKenzie's counsel), he testified that he regularly engaged in email and text communications with McKenzie concerning the sale of Indiana Artworks. Allen Tr. at 55:5-15; 62:7-17. He also testified that he first looked at his deposition subpoena that morning and did nothing to gather responsive documents. *Id.* at 57:18-59:4; 72:8-73:14.

Months later, when MAF filed the instant sanctions motion, McKenzie still had not produced any documents reflecting his communications with Allen. Pl. Mem. at 14. Nor did he do so in response to that motion. *See* 3/1/22 Arg. Tr. at 48:20-25 (defendant's counsel, conceding that "possibly Mr. McKenzie has some" emails with Allen, but "he would have to look").

### D.    McKenzie's Discovery Delays, Dishonesty, and Disobedience Across Three Sets of Counsel

MAF served McKenzie with its First Requests for the Production of Documents on September 10, 2018. *See* Nikas Ltr. dated Jan. 17, 2019 (Dkt. 131) Ex. 1 (Dkt. 131-1) (First RFP). In these requests, MAF called for the production of "[a]ll documents and communications relating

to or concerning [McKenzie's] business dealings or projects with Robert Indiana or relating to any Robert Indiana Works." First RFP No. 1. MAF also requested documents and communications concerning the Indiana Artworks, including the artworks depicted in MAF's First Amended Complaint and the alleged infringing artworks fabricated by McKenzie. For example, First RFP No. 3 called for documents concerning McKenzie's "creation, production, distribution, promotion, or sale of Robert Indiana Works"; First FRP No. 6 requested documents concerning exhibitions of Indiana Artworks facilitated or curated by McKenzie (including at the Baker Museum)[8]; and First RFP No. 30 sought "Documents sufficient to identify all Robert Indiana Works You have created, produced, promoted, or sold, to whom, and their current disposition, status, and/or whereabouts." *Id.* The Art Archive was directly responsive to all three of these RPFs, as were many of McKenzie's paper invoices and shipping records.

In his written responses to the First RFPs, McKenzie promised to produce documents on November 9, 2018. *See* Nikas Ltr. dated Jan. 17, 2019 Ex. B (Dkt. 131-2), at 7. On that date, McKenzie produced 1,240 pages, but the "vast majority" of the production "appeared to come from the internet or other publicly available sources." Nikas Ltr. dated Jan. 17, 2019, at 1. The production did not include the Art Archive. Nor did it include a single email from McKenzie's publishing operation. Nikas Ltr. dated Jan. 24, 2019 (Dkt. 136), at 3.

On November 6, 2018, McKenzie moved to stay the claims against him (and thereby stay discovery), or in the alternative, to require MAF to post a bond. (Dkt. 101.) In his accompanying

---

[8] Public sources confirm that, in 2016-17, the Baker Museum hosted an exhibition entitled, "Robert Indiana: Now and Then," organized by McKenzie. *See Robert Indiana: Now and Then*, Artis—Naples, artisnaples.org (last visited Jan. 7, 2025 [https://perma.cc/AL6S-97B2]. The exhibition included many of Indiana's "icons," the rights to which belonged to MAF, such as *LOVE,* and marked "the debut of his most recent series, *LIKE A ROLLING STONE*, which merges the work of Indiana and Bob Dylan, two of the most iconic American pop-culture artists." *Id*.

declaration, he complained that AIA had already "spent six months searching for documents," thus diverting it from its business, and that "[f]or many weeks the entire staff was searching through boxes and checking every file on a computer to see what information we could find and provide." McKenzie Decl. ¶ 11. McKenzie also attested, falsely, that the studio's "records were kept mainly in the old fashioned way of typed and sometimes hand written hard copies," and that AIA did not "store hard copies of business records for more than 3 years." *Id*. ¶ 10. In fact, McKenzie and his staff had maintained the electronic Art Archive for at least three years at that point, and retained numerous paper records dating back well beyond three years. *See*, *e.g.*, Nikas 2021 Decl. Ex. 10 (invoice for sale of HOPE silkscreen for $150,000 on September 1, 2009). Moreover, he and Allen (who had sold Indiana Artworks for McKenzie since 2007) corresponded frequently by email and text. McKenzie 2021 Tr. at 85:5-20; Allen Tr. at 55:5-15.[9]

On December 28, 2018, MAF served its Second Request for the Production of Documents. *See* Nikas Ltr. dated Jan. 17, 2019, Ex. 3 (Dkt. 131-3) (Second RFP). In these requests, MAF asked for evidence supporting McKenzie's counterclaims, such as "documents and communications concerning any actual or prospective business relationships or opportunities that [McKenzie] contends that MAF interfered with and [McKenzie] lost as a result." Second RFP No. 2.

On January 7, 2019, McKenzie flatly refused to produce any further documents or sit for a deposition, relying on his pending stay request. *See* Nikas Ltr. dated Jan. 17, 2019, Ex. 6 (Dkt. 131-6) (Jan. 7, 2019 letter from McKenzie's counsel announcing that "until the Court decides the

---

[9] McKenzie also attested that he "has no employees but uses two to six independent contractors depending on workload." McKenzie Decl. ¶ 2. In fact, Vessecchia was "officially employed" by McKenzie, as a graphic designer, from 2012 until at least 2021, when her deposition was taken. Vessecchia Tr. at 9:9-13, 13:8-12. Similarly, Ginexi was "officially employed" by McKenzie, as a silkscreen printer, from 2015 until at least 2021, when his deposition was taken. Ginexi Tr. at 8:4-14.

pending motion for a stay or a security bond, American Image Art and Mr. McKenzie will not produce any more documents or appear for a deposition absent a Court order.").

### 1.    Disobedience of the January 29, 2019 Discovery Order

MAF made its first application for an order compelling McKenzie to provide discovery on January 17, 2019. *See* Nikas Ltr. dated Jan. 17, 2019. McKenzie was represented, at that time, by Raymond Dowd, Esq., of Dunnington, Bartholow & Miller, LLP (Dunnington). During a January 29, 2019 discovery conference, Dunnington withdrew McKenzie's blanket refusal to proceed with discovery. *See* 1/29/19 Conf. Tr. (Dkt. 142) at 48:10-16. The Court then cautioned counsel: "saying we're not doing any discovery and then requiring plaintiff to make a letter application before you wisely walk that back could be grounds for shifting the fees." *Id*. at 48:10-16. The Court did not impose sanctions that day, but warned McKenzie that this was his "one free bite," and that he would "not get another one." *Id.* at 48:15-17.

Following the conference, the Court granted MAF's motion, in part; directed McKenzie to "honor [his] discovery obligations in accordance with the Federal Rules of Civil Procedure and this Court's scheduling orders"; and ordered him to produce, among other things, "communications relating to or concerning . . . the artworks referenced in the parties' pleadings." 1/29/19 Order (Dkt. 137) ¶¶ 1-3. Because McKenzie had not yet produced any responsive emails, the Court specifically ordered him to "search for and produce documents and electronically stored information (ESI) from [his] personal files, including any email accounts he used for relevant communications." *Id.* ¶ 2. Additionally, McKenzie was ordered to "make a reasonable search for documents and ESI in the physical custody of the studio assistants, contractors, and/or other workers who created, sent or received relevant documents," and to produce documents (after this "reasonably diligent search") no later than February 28, 2019. *Id*. The parties were further directed to meet and confer "in good faith" regarding potential ESI discovery issues by February 28, 2019. *Id.* ¶ 6.

On February 28, 2019, Dunnington advised MAF's counsel that it was in the process of collecting responsive documents (*see* Dkt. 180-1 at ECF p. 2), but made no production until April 18, 2019, when it turned over 516 pages – not including the Art Archive (which MAF did not yet know about) or any communications with Allen (whose name had not yet been divulged to MAF). In his April 18, 2019 cover letter (Dkt. 185-2), attorney Dowd represented that twelve AIA "contractors" had been asked to search for responsive documents, and that some of them, including Vessecchia and Ginexi, had produced documents. He added that McKenzie was "responding to the Requests on a rolling basis and will continue to make additional productions as additional responsive documents are identified." (*Id.*)

On July 1, 2019, Judge Torres denied McKenzie's motion for a stay and/or an order requiring MAF to post a bond. *Morgan Art Found. Ltd. v. McKenzie*, 2019 WL 2725625 at *3-4. The next day, Dunnington moved to withdraw as counsel for McKenzie (Dkt. 176), because of "[i]rreconcilable differences as to case strategy." Dowd Decl. (Dkt. 177) ¶ 7.

Once MAF learned that Dunnington was withdrawing, it requested an update on McKenzie's efforts to collect and produce additional documents from the AIA custodians (particularly emails and other ESI), noting that no additional documents had been produced since February, and pointing out deficiencies in the production thus far. (Dkt. 185-4 at ECF pp. 2-3.) Dunnington responded by stating only, "we have forwarded your inquiry to Mr. McKenzie." (*Id.* at ECF p. 2.) On July 17, 2019, the Court granted Dunnington's motion to withdraw and gave McKenzie until August 16, 2019, to retain new counsel. (Dkt. 188.)

On August 15, 2019, John B. Simoni, Jr., Esq., of Goetz Fitzpatrick LLP (Goetz), appeared on behalf of McKenzie (Dkt. 191.) Five weeks later, on September 27, 2019, Simoni represented that McKenzie had "exhausted all reasonable diligence" to obtain responsive ESI from the AIA

custodians and had "no further information or records to provide." (Dkt. 262-2 at 1.) According to Simoni, McKenzie had "complied with every aspect of discovery." (*Id*.)

### 2.    Disobedience of the May 20, 2020 Discovery Order

On May 15, 2020, plaintiff again sought discovery relief, explaining that Dunnington's promise of rolling productions and Goetz's subsequent about-face gave it "reason to believe that [McKenzie had] not searched for or produced all responsive documents in [his] possession or control." (Dkt. 262 at 1.) At the May 18, 2020 discovery conference, attorney Simoni stated that his office was having difficulty responding to MAF's requests, explaining, "it's partly a problem of inheriting things and partly a problem of my office not having as much involvement as it should by this point in terms of exactly what previously took place" when Dunnington represented McKenzie. 5/18/20 Conf. Tr. (Dkt. 266) at 27:9-13. Simoni added that "some of the information that [he] was getting from [his] client seems to be a little different from the information" relayed by Dunnington in April 2019. *Id*. at 27:22-29:1. At Simoni's request, the Court gave McKenzie an opportunity to provide a more detailed report concerning his compliance with his discovery obligations before hearing MAF's motion. *Id*. at 28:3-31:8. The Court then ordered McKenzie to provide the following information about his document search and production efforts:

a.    Which email accounts of the AIA Defendants were searched;

b.    Which email accounts (in existence during the relevant time period) were not searched;

c.    What other sources of electronically stored information (ESI) belonging to the AIA Defendants (e.g., databases, electronic files, desktop and laptop computers, cellphones, text messages, messaging apps, social media accounts) were searched;

d.    What sources of ESI (in existence during the relevant time period) were not searched;

e.    What search terms and connectors were used;

21

      f.      Who conducted the search(es);

      g.      What hard copy sources were searched, and by whom;

      h.      What efforts were made to obtain documents (including ESI) in the physical possession of AIA's present or former agents, including present or former employees and independent contractors.

5/20/20 Order (Dkt. 264) ¶ 2.

On May 26, 2020, attorney Simoni sent MAF's counsel a letter which revealed, among other things, that four AIA email accounts were never searched by counsel, because "McKenzie did not remember the passwords" to three of them, while the fourth "was not used by AIA in matters concerning Robert Indiana." 5/26/20 Simoni Ltr. (Dkt. 393-3) at 1-2. As to the first three accounts, Vessecchia (who "monitored" them for AIA) reported that they were "cleaned out regularly" and searched them herself, without supervision by counsel. *Id*. at 2. Further, Simoni reported, McKenzie's cellphone and AIA's desk top computers "were searched by [unspecified] AIA personnel." *Id*. at 2. Similarly, Dunnington left it to AIA to search its own hard copy documents. *Id*. at 4. As to the two McKenzie email accounts searched by Dunnington, a list of search terms was provided. *Id*. at 2-3. However, as to the three accounts searched by Vessecchia, the AIA desktop computers, and McKenzie's phone, Simoni reported that whatever search terms were used were "not known and cannot be verified." *Id*. at 3. Notwithstanding the troubling gaps in the account he provided, Simoni concluded that "[t]he net of the above search report is that AIA and McKenzie have met their obligations concerning document discovery and there is no right for Morgan or any other party to demand further inquiry." *Id*. at 5.

Two weeks later, on June 8, 2020, Simoni moved by Order to Show Cause for leave to withdraw as counsel for McKenzie (Dkt. 294), citing "[i]rreconciliable differences as to case strategy." (Dkt. 295 ¶ 9.) On June 18, 2020, the Court granted the withdrawal motion and required new counsel to appear no later than July 20, 2020. (Dkt. 311.) On July 16, 2020, John J.E.

Markham, II, Esq., and Bridget A. Zerner, Esq., of Markham Read Zerner LLP (MRZ) appeared for McKenzie. (Dkts. 326-27.)

### E.    McKenzie's Open Disregard for the June 29, 2021 and July 21, 2021 Orders

#### 1.    Settlement Discussions

MAF did not immediately renew its pursuit of discovery from McKenzie. Instead, the parties to this action (and related legal proceedings) engaged in complex, multi-party settlement negotiations from mid-2020 through mid-2021, during which they requested, and the Court granted, a series of litigation stays. (*See*, *e.g.*, Dkts. 354, 369, 381, 387.) In September 2020, MAF reported that it had reached an agreement with non-party Star of Hope, Inc. (SOH), the sole beneficiary of Indiana's Estate under his will, which would moot the claims and counterclaims between MAF and the Estate. (*See* Dkt. 351.) In November, the Estate itself executed a settlement term sheet with MAF. (Dkt. 367.)[10]

At around the same time, McKenzie began discussing a possible settlement under which SOH would buy out the Indiana Artwork in McKenzie's possession and MAF and McKenzie would dismiss their claims and counterclaims against one another. *See* Markham Decl. (Dkt. 480) ¶¶ 2-4. Because this concept required an "evaluation" of the Indiana Artwork, the parties agreed to a "viewing," at McKenzie's studio, on May 25, 2021. *Id.* ¶ 9. As part of the negotiations leading up to the viewing, McKenzie provided a "summary inventory" of the Indiana Artworks in his possession. *Id.* ¶ 2 & Ex. C-1 (Dkt. 480-3) (May 10, 2021 email from Markham listing "the current inventory AIA has").

---

[10] It took more than six months – and multiple additional rounds of intense negotiations – for MAF and the Estate to finalize their settlement, which ultimately extended to Thomas as well. MAF voluntarily dismissed its claims against the Estate and Thomas on June 16, 2021. (Dkt. 391.)

MAF personnel and counsel attended the viewing on May 25, 2021. Nikas 2021 Decl. ¶ 3. McKenzie did not attend, although one of his lawyers did. Markham Decl. ¶ 9. Additionally, two of McKenzie's staff were present: Annette Vessecchia and Osvaldo Gonzalez. Nikas 2021 Decl. ¶ 3.[11] The MAF personnel were shown the first and second floors of McKenzie's studio and were told that all the Indiana Artworks in McKenzie's possession were located there. *Id*.[12] During the May 21 visit, the MAF team learned that, in addition to "roughly 1,000 artworks purportedly by Robert Indiana, including several forgeries," McKenzie possessed "numerous highly relevant and responsive documents" that "were laying around in plain sight." 6/25/21 Joint Ltr. (Dkt. 393) at 2. These documents (many of which the MAF team photographed) included "inventory lists" of works that "directly infringe on MAF's rights," "invoices for the sale of such works," "emails from studio assistants with previously undisclosed email accounts," "invoices of sales," "inventories of works [McKenzie] created and shipped for exhibition or sale," "accounting documents, including notebooks with sales information," "notebooks detailing [McKenzie's] working process and drawings of forgeries," and the artworks themselves, "many of which contain images to which MAF has exclusive rights[.]" *Id*. at 2, 5.

---

[11] Gonzalez is a disbarred lawyer, *see Matter of Gonzalez*, 194 A.D.3d 35, 36, 139 N.Y.S.3d 909 (2d Dep't 2021), who worked for McKenzie until late August 2021, at which point the two men had a falling out and Gonzalez's employment ended. *See* Nikas 2021 Decl. Ex. 46 (Dkt. 467-46) (Gonzalez Decl.) ¶ 18. During his employment, Gonzalez performed a variety of legal work for McKenzie (notwithstanding that he was prohibited from doing so by, *inter alia*, 22 N.Y. Comp. Codes R. & Regs. § 1240.15), including acting as McKenzie's "principal attorney" at an Indiana-related mediation proceeding, interfacing with McKenzie's attorneys of record in this and other litigations "on a daily basis," and "conferring with [McKenzie] on a daily basis about legal things," which is "what he was paid to do." McKenzie 2021 Tr. at 69:20-25; 72:23-24. Gonzalez also lived on McKenzie's property. *Id*. at 72:21-22; Gonzalez Decl. ¶ 3. During his second deposition, McKenzie testified that he was "unaware of the terms of [Gonzalez's] disbarment until relatively recently." *Id*. at 68:14-15.

[12] This proved to be false. Vessecchia later testified that Indiana Artworks were also stored in the basement of McKenzie's residence. Vessecchia Tr. 120:9-23, 122:13-123:13.

24

MAF asked the Court to order McKenzie to "produce all of these responsive documents and numerous others he has failed to produce," and to appoint a Special Master, at McKenzie's expense, to oversee the process. 6/25/21 Joint Ltr. at 9.

### 2. Order to Allow Inspection

Rather than appoint a Special Master, the Court ordered the parties to meet and confer for the purpose of arranging a further inspection of McKenzie's studio. *See* 6/29/21 Order (Dkt. 395) ¶ 3. In accordance with the 6/29/21 Order, the parties submitted a stipulation and proposed order to govern the inspection (Dkt. 407), which the Court so-ordered on July 21, 2021. Pursuant to the 7/21/21 Order (Dkt. 408), the inspection was to take place no later than August 13, 2021, and MAF was to be permitted to inspect "both floors of the studio and storage space located at [McKenzie's property in] Katonah, NY 10536 (the 'Site')." *Id.* The 7/21/21 Order further stated that MAF's counsel could "copy, photograph, and/or video-record the Site and any documents found at the Site." *Id.* ¶ 4. The term "document" was defined "as broadly as permitted under the document requests issued by MAF and the Federal Rules of Civil Procedure and shall include, but not be limited to, books, emails, binders, *artworks*, journals, handwritten notes, and any other information that MAF believes is responsive to the document requests MAF has served in this action or is otherwise relevant to this action." *Id.* (emphasis added)

### 3. McKenzie's Concealment of Artwork Before the Court-Ordered Inspection

Attorney Zerner notified McKenzie about the upcoming inspection on July 1, 2021. Her email reproduced the exact text of the ECF notification for the 6/29/21 Order, including that the parties were to "arrange an inspection . . . of McKenzie's studio in Katonah, New York." *See* Zerner Decl. Ex. H (7/1/21 email), at 1 (quoting 6/29/21 Order ¶ 1).

Almost immediately after he received Zerner's email, McKenzie and his staff began moving Indiana Artwork off his property. On July 4, 2021, McKenzie spoke to Vessecchia about "cleaning the basement out because . . . he was going to close the studio, and then . . . have the collection all in one spot." Vessecchia Tr. at 159:4-14. McKenzie, Vessecchia, Ginexi, and Gonzalez all participated in moving Indiana Artworks from McKenzie's property to a storage facility in Middletown, New York. Vessecchia Tr. at 158:3-17, 162:3-163:11; Ginexi Tr. at 30:5-16, 104:16-105:22, 109:11-110:14. The transported works included "Hope artworks," "Love Artworks," and *Dylan Works*. Vessecchia Tr. at 153:20-155:4, 156:21-157:14; Ginexi Tr. at 146:2-147:18. Vessecchia later testified, "the idea was to get all the Indiana stuff together." Vessecchia Tr. 167:14-22.

The art was moved over the course of "maybe two weeks," during which McKenzie and his staff worked "every day, sometimes even on weekends" to load the art into assorted vehicles and take it to the facility. McKenzie 2021 Tr. 48:24-49:5. Vessecchia made two trips to Middletown, beginning on July 4 or 5. Vessecchia Tr. at 158:13-24. McKenzie made "a lot of trips," McKenzie 2021 Tr. at 4:4-5, which required him to rent trucks "from anyplace that could give it to [him]." *Id.* at 50:9-13. Ginexi assisted with at least three "runs," during which he and McKenzie "used cars," "his van," and "a box truck" to move the Indiana Artwork. Ginexi Tr. at 29:24-30:9, 115:2-14. Gonzalez and Vessecchia also used Vessecchia's car to move canvases, which they stacked unceremoniously in the back of the vehicle (on a blanket but otherwise unprotected). Vessecchia Tr. at 129:2-10; Ginexi Tr. at 107:13-108:8; Nikas 2021 Decl. Ex. 45 (Dkt. 467-45) (photograph of Indiana Artworks stacked in the back of a passenger car). Additionally, many of the artworks were temporarily placed on outdoor racks set up specifically to facilitate the move to the Middletown storage facility. Vessecchia Tr. at 134:13-16, 150:2-

151:13. All told, McKenzie and his staff worked from July 4 through at least July 21, 2021 to move approximately 2,500 Indiana Artworks – most of McKenzie's inventory – to the Middletown storage facility. McKenzie 2021 Tr. at 45:13-16; Vessecchia Tr. 159:15-160:21, 167:3-168:6, 172:2-12; Ginexi Tr. 113:7-114:14.

McKenzie told his staff that he was moving the artwork because he was concerned that conditions in the studio and basement might damage it. Ginexi Tr. 28:5-23. At deposition, he noted that the Middletown storage unit was "temperature controlled" and "humidity controlled." McKenzie 2021 Tr. at 35:10-22. Additionally, he explained, he believed MAF wanted to buy the artworks and "realized that it was impossible or very difficult to see everything" in the studio because of the way the works were organized. *Id*. at 34:13-19. "Viewing things here, much more difficult. Viewing things there, very, very simple." *Id*. at 34:20-24. However, despite his concern about protecting the Indiana Artwork, McKenzie did not hire professional art movers. *Id*. at 47:11-16. Moreover – as described below – no one told MAF that most of the Indiana Artwork had been moved offsite until three weeks after the Court-ordered inspection, when Gonzalez (having severed his relationship with McKenzie) blew the whistle.

### 4.    The August 5, 2021 Inspection and the Revelation by Gonzalez

MAF conducted the Court-ordered inspection on August 5, 2021. Nikas 2021 Decl. ¶ 4. Attorney Markam attended the inspection, and Gonzalez "observed" it. Markham Decl. ¶ 16.

During the August 5 inspection, MAF "located 5,913 pages of relevant documents that McKenzie had previously failed to produce and had falsely represented to the Court and MAF's counsel were not in his possession." Nikas 2021 Decl. ¶ 5. However, MAF was not able to view most of the Indiana Artworks – because they were no longer on McKenzie's property. McKenzie did not inform MAF of this fact. Nor did he tell his own counsel of record what he had done. Instead, three weeks later, Gonzalez reached out to counsel for both parties to apprise them of

these events. Nikas 2021 Decl. ¶ 6; Markham Decl. ¶ 19. Gonzalez also supplied photographs showing the move in progress, *see*, *e.g.*, Nikas 2021 Decl. Ex. 45 (photo of Indiana Artworks in the back of Vessecchia's car), and a declaration in which he stated that McKenzie "attempted to conceal" numerous Indiana Artworks from MAF by moving them off of his property (and, in some cases, by moving them from the studio into his house) ahead of the Court-ordered second inspection. Gonzalez Decl. ¶¶ 13-15. In the same declaration, Gonzalez attested that McKenzie "continues to forge Indiana artworks to this day," by using the artist's stencils to backdate works fabricated after his death. *Id*. ¶¶ 10-12.

### 5.    McKenzie's Reopened Deposition

After Gonzalez's revelations, MAF advised the Court that it would seek sanctions against McKenzie. (Dkt. 417.) Before the motion was filed, the parties conducted four new depositions (of Allen, Ginexi, Gonzalez, and Vessecchia) and the renewed deposition of McKenzie. (*See* Dkt. 422.) Although Gonzalez undoubtedly had mixed motives for divulging the facts set forth in his declaration,[13] Ginexi and Vessecchia both confirmed, at their depositions, that McKenzie did in fact continue to apply Indiana's stencils (bearing dates no later than 2018) to works fabricated after his death.[14] They also confirmed that McKenzie moved truckloads of Indiana Artworks off his

---

[13] *See* Markham Decl. ¶ 18 (recounting an August 17, 2021 call from Gonzalez in which Gonzalez complained that McKenzie had treated him unfairly after he mistakenly put gas into the diesel engine of McKenzie's van and announced that he was "done" with McKenzie); Gonzalez Decl. ¶ 18 (attesting that he "quit working for McKenzie after he berated me about the type of fuel I put in his vehicle at a gas station").

[14] Some of the Indiana Artworks at McKenzie's studio had Indiana's signature applied with a ghostwriter, which is a "machine that is used to duplicate a signature[.]" Vessecchia Tr. at 43:24-44:20, 49:22-50:4, 63:2-18, 84:16-20; *see also* Ginexi Tr. at 40:12-42:5. On other Indiana Artworks, McKenzie or his staff used an "artist's seal," sometimes referred to as Indian's "stencil," "stamp" or "emblem," applied to the back, to "authenticate" the work. Vessecchia Tr. at 46:16-47:6. At McKenzie's direction, Ginexi applied Indiana's emblem to Indiana Artworks fabricated at McKenzie's studio, though according to his deposition testimony he stopped doing so after Indiana's death in 2018. Ginexi Tr. at 43:5-55:21, 127:17-128:17. Vessecchia also applied

premises – hurriedly and surreptitiously – *after* the Court issued the 6/29/21 Order and *before* the inspection took place on August 5, 2021. *See* Part I(E)(3), *supra*.

McKenzie himself testified that he moved the Indiana Artworks to make it easier for viewing and to protect the art from the elements. McKenzie 2021 Tr. at 34:9-36:16. He also claimed that when he moved the artwork he "had no idea there would be a second inspection." *Id.* at 36:17-24. This testimony is thoroughly incredible. First, the Indiana Artworks had been stored in the same conditions for years, without causing any apparent concern, but were hurriedly moved during the short window between the issuance of the 6/29/21 Order and the inspection on August 5, 2021. This was not a coincidence. Second, the methods used by McKenzie's staff to move the artworks – including temporarily leaving them outdoors and piling them in the trunk of Vessecchia's car without protection – are inconsistent with his claim that he was concerned about protecting them. Third, McKenzie was expressly informed of the second inspection by his attorneys, *see id*. at 36:25-37:6; Zerner Decl. Ex. H, and demonstrated his understanding of its scope when he told Ginexi, "around" the time of the inspection, that MAF "had a court order to come in and, you know, go through his art." Ginexi Tr. at 117:15-25. Fourth, McKenzie did not even tell his own lawyers that he had moved Indiana Artworks off-premises, *see* McKenzie 2021 Tr. at 36:25-37:24, and did not offer to permit MAF to inspect the works in the storage facility until after Gonzalez blew the whistle – weeks *after* the inspection was completed.

---

Indiana's emblem to Indiana Artworks, at McKenzie's direction. Vessecchia Tr. at 13:8-10, 187:14-19. At deposition, Vessecchia testified that she and other staff members continued this practice, at McKenzie's direction, after the artist's death. *Id*. at 189:20-191:23. Vennecchia applied stencils to Indiana Artwork in November 2020, *id*. at 199:6-200:17, and was asked to apply new stencils as recently as 2021. *Id*. at 203:11-21. Vessecchia also observed McKenzie himself using a stencil on an Indiana Artwork after the artist's death. *Id*. at 190:5-7.

At the same 2021 deposition, McKenzie admitted that he continued to fabricate and sell new Indiana Artworks throughout this litigation, but never produced any records documenting their production or sale. McKenzie 2021 Tr. 91:9-93:15. When asked whether he had "turned over to [his] attorneys to produce in this litigation records of the Indiana works that [he's] been producing during this litigation," his response was, "Absolutely not. That means completely not and no and never." McKenzie 2021 Tr. 93:4-13. When asked whether there were *potential* sales of Indiana artwork that he was exploring but had not disclosed in discovery, McKenzie flatly refused to answer:

> Q.   So, just for the record, my question was I'm going to assume that from that answer that you have not apprised Mr. Nikas or Morgan Art that you were thinking of selling the works to Greg Allen . . . and can you please correct me now if that assumption is wrong.
>
> A.   No. That's 100 percent right.
>
> Q.   Okay.
>
> A.   And the more you talk, the more I think I will sell it -- I think I'll just sell it tonight. I'm kind of sick of the lies.
>
> Q.   Who would you sell it to tonight?
>
> A.   All the people I just mentioned before.
>
> Q.   You only mentioned Greg Allen. Who else are you thinking about selling it to?
>
> A.   I – I told you that there are several other people that I work with that are developers, and Greg Allen himself has got three different people that want to buy it.
>
> Q.   Can you give me the names of anyone else you are thinking of selling the work to?
>
> A.   Nope.
>
> Q.   Do you know the names?
>
> A.   I might.

| | |
|---|---|
| Q. | Is that a yes or a no? |
| A. | None of your business. |
| Q. | That's not the question. |
| A. | Well, that's the answer. You are asking me my personal information about my business that you have no right to ask. |

McKenzie 2021 Tr. 83:18-85:11.

All fact discovery in this action closed on November 19, 2021. (Dkt. 455.)

### F.    The Motion for Sanctions

In its moving brief in support of its sanctions motion, filed on December 10, 2021, MAF argues that "terminating sanctions are warranted and necessary," Pl. Mem. at 16, because McKenzie "repeatedly and intentionally refused to comply with Court-ordered discovery" and "intentionally concealed highly relevant evidence," *id*. at 17; because his conduct prejudiced MAF, which will never be certain "what has been destroyed," *id*. at 21; because McKenzie's conduct was part of a pattern of obstruction, *id*. at 21-22; because, after being caught out, McKenzie continued to "conceal, mislead, obfuscate, and refuse," rather than correct his misdeeds, *id*. at 23; and because even if this Court ordered him – again – to comply with his discovery obligations, his own deposition testimony demonstrates that he would continue to disobey. *Id*. at 23-24.; *see also* Pl. Reply Mem. (Dkt. 482) at 7 (McKenzie's "repeated abuses . . . prove he will never engage in fair litigation").

In his January 17, 2022 opposition brief, McKenzie claims, in essence, that all of the discovery misconduct conduct to which MAF objects was the fault of his prior counsel, was innocent, or was too trivial to warrant terminating sanctions. Thus, for example, McKenzie asserts that the Art Archive was "made available" to McKenzie's first law firm (Dunnington), which he "relied on" to search for and produce documents, Def. Mem. at 7, and in any event could still be

produced if MAF genuinely wanted to see it. *Id.* at 7-8. However, as noted above, McKenzie's second law firm (Goetz) reported that AIA's computers were searched by "AIA personnel," not by counsel, Simoni Ltr. at 2, and that any search terms used are "not known and cannot be verified." *Id.* at 3. Given that both Dunnington and Goetz withdrew from their representation of McKenzie during the discovery period due to "irreconcilable differences," it is particularly difficult to credit McKenzie's current effort to blame them for his persistent and consistent failure to produce relevant and discoverable documents. In any event, "[a] litigant chooses counsel at his peril." *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F. 2d 1062, 1068 (2d Cir. 1979). Having hired three separate law firms (along with a disbarred lawyer) to act as his agents in this action, McKenzie is responsible for any misconduct on their part. *See, e.g.*, *Scott v. New York Dep't of Corr.*, 2007 WL 4178405, at *4 (S.D.N.Y. Nov. 26, 2007) ("[A] client assumes the risk of his attorney's actions and is bound even by the consequences of his attorney's negligence") (quoting *Chira v. Lockheed Aircraft, Corp.*, 634 F.2d 664, 666-67 (2d Cir. 1980))).

Moreover, while it is true that, after the second inspection in August 2021, MAF opted to pursue sanctions rather than push for additional discovery, it is also true – and considerably more troubling – that McKenzie failed to produce the Art Archive (or the Allen emails, or the invoices and shipping records showing sales, consignments, and exhibitions of Indiana Artworks) *even when facing a motion for terminating sanctions*. As MAF correctly points out in its reply brief, McKenzie was under a continuing obligation to produce documents responsive to its RFPs, without the need for further prompting from MAF. Pl. Reply Mem. at 11; *see also*, *e.g.*, *Rodriguez v. Quality Auto. Servs., Inc.*, 2023 WL 6157320, at *4 (E.D.N.Y. Sept. 21, 2023) (imposing terminating sanctions where, *inter alia*, defendants notified plaintiff that they had located

responsive documents, and invited plaintiff to "inspect" them, but failed to review and produce the documents even after plaintiff moved for discovery sanctions).

As for Greg Allen, McKenzie points out that MAF has now taken his deposition and "had the opportunity to fully question him." Def. Mem. at 21. However, although both McKenzie and Allen were asked to produce their emails, texts, and other communications concerning Indiana Artworks, neither man did so. MAF therefore could neither corroborate nor challenge their testimony that Allen "only sold three or four pieces for McKenzie," Def. Mem. at 21, and that Allen and McKenzie never discussed setting up a secret trust through which they could continue to sell Indiana Artworks while hiding those transactions from MAF and this Court. *Id.* at 17.[15]

As for the Indiana Artworks themselves, McKenzie argues that MAF was well aware that he had a large inventory of works in his possession; that he made no effort to hide any of it from MAF during the *first* inspection in May; that he understood the issue in the *second* inspection to be "documents, not artwork," Def. Mem. at 10; and consequently that he saw no reason not to proceed with arrangements he had "already been making" to move the artwork to a more "easily accessible and viewable place." *Id.* at 11. Although the 7/21/21 Order expressly required McKenzie to make the artwork available during the second inspection, McKenzie claims that he did not see that order, and consequently that he continued moving Indiana Artworks offsite. *Id.* at 12. He further argues that because he "rightfully owns and possesses this artwork," he had "the right to move it to another storage facility." Def. Mem. at 18.

Once again, McKenzie fails to persuade. Ownership of relevant evidence does not give the owner any right to hide that evidence in litigation or to flout court orders requiring that it be made available to an opposing party. Further, if and to the extent there was any ambiguity in the 6/29/21

---

[15] According to Gonzalez, McKenzie told him about this plan. Gonzalez Decl. ¶ 16.

Order – as to whether McKenzie was required to make the Indiana Artworks available during the second inspection – it was dispelled by the 7/21/21 Order, which was heavily negotiated between the parties' attorneys before being presented for a judicial signature, and which expressly covered artwork as well as business records. Under these circumstances, it strikes this Court as highly unlikely that McKenzie's third law firm, MRZ, did not give him a copy of the 7/21/21 Order and/or explain its requirements to him.[16] Moreover, as attorney Zerner confirmed at oral argument, McKenzie communicated frequently with his attorneys about the upcoming second inspection, but kept his art-moving activities secret from them. 3/1/22 Arg. Tr. at 36:25-37:1 ("We did not know the artwork moved."). This is not the conduct of a client who believes his conduct to be innocent.

Finally, McKenzie argues that Gonzalez is not "worthy of belief," Def. Mem. at 14, because he became a whistle-blower out of anger at McKenzie. Def. Mem. at 13-17. To be sure, Gonzalez is no boy scout. Regardless of his motivation, however – and even allowing that he may have embellished some of his collateral claims of misconduct by McKenzie – it is now incontrovertible that he was telling the truth about the use of Indiana's stencil and about the rapid and secret movement of the Indiana Artworks from McKenzie's property to a storage facility in Middleton just before the second inspection took place.

### G.    Later Developments

#### 1.    Supplemental Production

On March 18, 2022 – two and a half weeks *after* the sanctions motion was argued – McKenzie produced "a raft of evidence" to MAF, including "emails between McKenzie and Greg Allen," "reports run from the Art Archive," and "document production and submissions made in

---

[16] In their declarations, neither Markham nor Zerner affirmatively supports McKenzie's claim that he did not know that the second inspection extended to the Indiana Artwork.

the arbitration between McKenzie and the Estate." Def. 6/15/22 Ltr. (Dkt. 496) at 2 n.1. In a supplemental letter-brief submitted in 2024, McKenzie argues that these documents, now "long in MAF's possession," are favorable to him, and that their production shows that terminating sanctions should not be imposed. Def. 8/22/24 Ltr. (Dkt. 548) at 1-3. In response, MAF argues that McKenzie's untimely production of previously withheld materials simply confirms that he "lied about his document productions" earlier in the case. Pl. 8/22/24 Ltr. (Dkt. 549) at 1. MAF adds that "the production doesn't come close to remedying the numerous issues presented by McKenzie's discovery abuses," and "only makes the situation worse, because the production of new documents, which McKenzie turned over after the Court had already allowed Morgan to conduct supplemental discovery based on McKenzie's prior discovery violations, would require yet another round of substantial discovery. Enough is enough." *Id*. at 1-2.

### 2.    Settlement Effort

In the months following the argument on the sanctions motion, MAF and McKenzie made yet another effort to settle their dispute, including by participating in a settlement conference before the undersigned magistrate judge on May 6, 2022. (*See* Dkts. 489, 494.) The conference was unsuccessful.

### 3.    Arbitration Award

On July 14, 2023, the AAA tribunal presiding over the claims and counterclaims between the Estate and McKenzie issued its Final Award, concluding that: (i) the HOPE Contract was properly terminated by the Estate on May 9, 2019; (ii) any oral agreements between McKenzie and Indiana were automatically terminated upon the artist's death; (iii) despite the termination of all of his contracts with Indiana, McKenzie continued to sell Indiana Artworks until September 14, 2021 (when the tribunal enjoined him from doing so), without authorization and without paying any royalties to the Estate; and (iv) Indiana "consented to the production and sale of the BRAT

sculpture," but was not paid all the royalties due to him for that commission. Final Award (Dkt. 508-1) at 34-40, 46.[17] The tribunal further found that Indiana "agreed to and accepted royalty payments for McKenzie's production and sale of a number of non-HOPE works in addition to the BRAT sculpture," including several *Dylan Works*. *Id*. at 41. As to these works, the tribunal concluded that "there is no basis for [the Estate's] contention that [McKenzie] produced or sold such artwork without Indiana's authorization," and that, because royalties were paid, the Estate was not "damaged as a result of such activities." *Id.* at 40.

The tribunal awarded damages to the Estate in the amount of $581,250.00, representing the proceeds of McKenzie's improper sales of certain artist's proofs that were rightfully Indiana's property; $443,892.00, representing estimated unpaid royalties for the 28-month period after Indiana's death during which McKenzie was selling Indiana Artworks without authorization[18]; and $359,465.00, representing unpaid royalties due on *BRAT*, plus interest. Final Award at 38, 40, 41, 44, 46. McKenzie was directed to release the Indiana Artwork in his possession to a designated art storage facility for appraisal and distribution, with the Estate to receive all of the remaining artist's proofs, 30% of the sculptures, and 50% of the artwork in any other medium (subject to a lien by

---

[17] In reaching these conclusions, the tribunal expressly found that "McKenzie was not a credible witness," and consequently gave his testimony "no weight except to the extent that support for such testimony could be found in contemporaneous documents." Final Award at 40. The tribunal ruled against McKenzie on all of his counterclaims against the Estate, concluding that they "have no merit and merely serve to complicate and prolong these proceedings." *Id*. at 44.

[18] McKenzie failed to produce any evidence of the amount of these sales. Final Award at 39. In order to estimate the Estate's damages, the tribunal assumed that total HOPE sales for this period were $1,530.662.00 (50% lower, on a per-month basis, than sales during calendar year 2017, due to "disruption to the market for HOPE-related Indiana artwork caused by litigation following the death of Indiana"). *Id*. at 39-40. The tribunal then applied a blended royalty rate of 29%. *Id*. at 40.

the Estate on McKenzie's share to the extent of any unpaid damages). *Id.* at 46-47.[19] Going forward, McKenzie has "no right in law or in equity to produce, manufacture, or create any Indiana Artwork." *Id.* at 48.

On September 5, 2023, the Hon. Jennifer L. Rochon, United States District Judge, confirmed the Final Award and entered judgment thereon. (Dkt. 521.)

### 4.    Markham Read Zerner LLP Dissolves and Withdraws

On August 6, 2024, Bridget Zerner alerted the Court that her law partner John Markham had passed away and that MRZ would be winding down its practice and withdrawing from all pending cases, including this one. (Dkt. 546.) On September 30, 2024, attorney Zerner moved to withdraw as counsel for McKenzie. (Dkt. 552.) The Court granted the motion on October 21, 2024, giving McKenzie until November 29, 2024, to retain new counsel or enter a notice of pro se appearance. (Dkt. 556.) As of the date of this Report and Recommendation, McKenzie has neither retained new counsel nor filed a notice of pro se appearance.

## II.    LEGAL STANDARDS

### A.    Rule 37

Fed. R. Civ. P. 37(b) governs sanctions for failure to obey a prior discovery order. If a party or a witness "fails to obey an order to provide or permit discovery," Rule 37(b)(2)(A) permits the court to "issue further just orders," including orders:

> (i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

---

[19] The HOPE Contract specified that if any unsold HOPE artworks remained in McKenzie's possession when the contract was terminated, 30% of the sculptures and 50% of the canvases were to be returned to the artist. HOPE Contract at 3.

    (iii)     striking pleadings in whole or in part;

    (iv)     staying further proceedings until the order is obeyed;

    (v)     dismissing the action or proceeding in whole or in part;

    (vi)     rendering a default judgment against the disobedient party; or

    (vii)     treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed R. Civ. P. 37(b)(2)(A).

In addition, Rule 37(b)(2)(C) requires the court to order that the disobedient party pay the "reasonable expenses, including attorney's fees" incurred by the moving party, either "instead of or in addition to" the sanctions permitted by Rule 37(b)(2)(A), unless the "failure was substantially justified or other circumstances make an award of expenses unjust."

## B.    The Appropriate Sanctions

Discovery sanctions serve a "threefold" purpose: (1) to "ensure that a party will not benefit from its own failure to comply"; (2) "to obtain compliance with the Court's orders"; and (3) to serve a "general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault." *Loc. 3621, EMS Officers Union, DD-37, AFSCME, AFL-CIO v. City of New York*, 2021 WL 134566, at *3 (S.D.N.Y. Jan. 14, 2021) (quoting *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010)) (internal citation omitted). In service of crafting a sanction that achieves this tripartite purpose, district courts have at their disposal several types of sanctions of varying degrees of severity.

"A default judgment is the most severe sanction provided by Fed. R. Civ. P. 37(b), because it terminates the case." *Mason Tenders Dist. Council Welfare Fund v. Precise Brick, Inc.*, 2009 WL 1675399, at *1 (S.D.N.Y. June 15, 2009). A preclusion order preventing a party from offering evidence it has withheld during discovery is another "harsh" remedy, but one which can "ensur[e]

that the parties comply with their discovery obligations and that the discovering party is not prejudiced by virtue of an adversary's failure to meet these obligations." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3476735, at *8 (S.D.N.Y. Nov. 30, 2006). A sanction deeming certain facts established can be tailored to be "more limited" than a preclusion order. *Louis Vuitton Malletier*, 2006 WL 3476735, at *8, *11 (rejecting request for "broad preclusion of any evidence" relating to plaintiff's claim but holding that plaintiff's late and incomplete production merited "more limited" order "deeming as true" defendant's contentions). The court may also order "further discovery" as a remedy for inadequate discovery, *Regul. Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, 2014 WL 3844796, at *15 (S.D.N.Y. Aug. 5, 2014), as this Court effectively did in the 6/29/21 Order and the 7/21/21 Order. On the spectrum of severity, "[t]he mildest is an order to reimburse the opposing party for expenses caused by the failure to cooperate." *Cine Forty-Second Street Theatre Corp.*, 602 F.2d at 1066.

Rule 37 authorizes the district courts to issue whatever combination of sanctions is necessary to achieve a "just" result, "commensurate with the non-compliance." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *21 (Jul. 18, 2017) (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007)); *see also Sieck v. Russo,* 869 F.2d 131, 134 (2d Cir. 1989) ("We . . . prefer to . . . provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from among the available range is appropriate.").

## III.    DISCUSSION

MAF seeks terminating sanctions on all remaining claims in this action; that is, the entry of a default judgment in its favor on its claims and the dismissal of McKenzie's remaining counterclaims. I agree that McKenzie's conduct merits significant sanctions. However, as explained below, I find that a combination of dispositive and non-dispositive measures – short of

complete termination of this action – will be commensurate with the extent of the misconduct, sufficient to cure the prejudice to MAF and prevent McKenzie from benefiting from his misconduct, and adequate to deter future misconduct.

### A.    Dispositive Sanctions

A court "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future." *Grammar v. Sharinn & Lipshie, P.C.*, 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (citing *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014)). However, the Second Circuit has "consistently recognized" that terminating sanctions are appropriate "where 'a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault.'" *Robertson v. Dowbenko*, 443 F. App'x 659, 660 (2d Cir. 2011) (quoting *John B. Hull, Inc. v. Waterbury Petrol. Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)); *see*, *e.g.*, *Antonmarchi v. Consol. Edison Co. of New York*, 514 F. App'x 33, 35-36 (2d Cir. 2013) (affirming dismissal of all of plaintiff's claims as a sanction after plaintiff delayed in producing documents, concealed other discoverable evidence "by shipping boxes of relevant documents to Puerto Rico during the pendency of the litigation," refused to provide the address to which he had shipped them, "fail[ed] to produce another box of documents that was later destroyed when his basement flooded in 2005," and admitted, at his reopened deposition, that he "had determined not to produce material even though he had been ordered to do so"); *Rodriguez*, 2023 WL 6157320, at *3-5 (imposing terminating sanctions where defendants repeatedly failed to produce responsive documents over the course of the discovery period, after which they belatedly notified plaintiff that they had "located" 18 crates of potentially responsive "tow records," and invited plaintiff to inspect them, but failed – even in the face of plaintiff's sanctions motion – to review and produce the documents as required by Rule 34); *Gutman v. Klein*, 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008) (recommending entry of a default judgment where defendant and his computer

technician tampered with defendant's laptop in advance of a Court-ordered forensic inspection and then lied about what they had done and why), *adopted,* 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008), *aff'd,* 515 F. App'x 8 (2d Cir. 2013). Dismissal – of the entire case or a portion – is also appropriate when it serves "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

In determining whether non-compliance with a court's orders merits dismissal, courts consider "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of… non-compliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)). Courts also consider whether imposing lesser sanctions would prejudice the moving party. *See 42West LLC v. Gould*, 2024 WL 4345572, at *7 (S.D.N.Y. Sept. 30, 2024). Noncompliance is considered willful "when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control." *Lewis v. Marlow*, 2021 WL 2269553, at *6 (S.D.N.Y. June 3, 2021) (quoting *Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015)). Courts "routinely" find willfulness "where a party has repeatedly failed to produce documents" in violation of court orders. *Id.* (quoting *Farmer v. Hyde Your Eyes Optical, Inc.*, 2015 WL 2250592, at *7 (S.D.N.Y. May 13, 2015)).

McKenzie's conduct meets this standard. Even if the Court were to believe that McKenzie did not fully understand that his first *and* second sets of lawyers failed to produce the Art Archive, the communications with Allen, the sales records, and other discoverable documents (which would

stretch credulity), his brazen attempt to sabotage the Court-ordered inspection – by moving hundreds of Indiana Artworks off his property just before MAF's lawyers arrived – amply demonstrated willfulness. None of his proffered excuses comes close to showing that McKenzie did not understand his obligations under the 6/29/21 and 7/21/21 Orders. On the contrary, the evidence shows that McKenzie went to great lengths to disobey the Orders: recruiting three employees to assist him in moving the artwork off his property, while keeping that project secret even from his then-current lawyers. At deposition, McKenzie once against displayed his willful noncompliance with his discovery obligations by stating, in no uncertain terms, that he would "absolutely not" produce to MAF the records of Indiana Artworks that he fabricated during the litigation. McKenzie 2021 Tr. at 93:4-13.[20]

McKenzie and his counsel were warned about his obligations and the consequences of disobedience, beginning on January 29, 2019, when the Court concluded that McKenzie's refusal to participate in discovery was sanctionable and advised that he would not get another "free bite." 1/29/19 Conf. Tr. 48:15-17. However, he continued to disregard his obligations, including by falsely representing (through counsel) that he and AIA "met their obligations concerning document discovery and there is no right for Morgan or any other party to demand further inquiry," 5/6/20 Simoni Ltr. at 5, and by failing – for years – to produce the Art Archive, his communications with Allen, and other records concerning the Indiana Artwork in his possession.[21] Moreover, when this

---

[20] These are the same records that he failed to produce before the AAA, requiring the tribunal to estimate the damages due to the Estate. *See* Final Award at 39.

[21] The 1/29/19 Order required McKenzie to produce those records. Thus, by the time the instant sanctions motion was argued, he had been in continuous noncompliance with that Order for more than three years. *See* Part I(D)(1), *supra*. Courts have repeatedly found that noncompliance for a period as short as three or four months "warrants the harshest of sanctions, including dismissal or default." *Icon International, Inc. v. Elevation Health LLC*, 347 F.R.D. 274, 289 (S.D.N.Y. 2024) (citing, *inter alia*, *Embuscado v. DC Comics*, 347 F. App'x 700, 701 (2d Cir. 2009)).

Court ordered McKenzie to provide "further discovery" to remedy his previous misconduct, *Regul. Fundamentals*, 2014 WL 3844796, at *15 (that is, to submit to the second inspection), he responded by spiriting relevant evidence off the premises, lying about his reasons for doing so, and *again* failing to produce the Art Archive, the Allen correspondence, and other discoverable documents – even after MAF filed the instant motion.

Accordingly, I find that McKenzie persistently, repeatedly, and willfully failed to comply with this Court's discovery orders despite having been warned of the consequences of his intransigence. Moreover, since he disregarded the judicial warning he was given in 2019, and responded to the Court's 2021 orders requiring him to provide "further discovery" by doubling down on his misconduct, it is apparent that lesser sanctions – that is, sanctions less than termination of at least some of the parties' claims and counterclaims – would not be effective. In short, all of the *Agiwal* prongs are satisfied.

### 1.    McKenzie's Remaining Counterclaims Should be Stricken

Through his counterclaims, McKenzie seeks the Court's assistance in bolstering his legitimacy as an art publisher. His Second and Third Counterclaims seek purely declaratory relief – that he had "full authority from Indiana to produce, market, and sell all the artworks at issue," that he did not infringe MAF's copyrights, that MAF's contracts with Indiana "do not govern" the Indiana Artworks he published, and that they were not "forgeries." TAA ¶ 326, 327, 332. As a result of McKenzie's intentional and long-running campaign of discovery misconduct, he has lost the privilege of using this Court for that purpose.[22]

---

[22] As noted above, the AAA tribunal found that McKenzie had authority *from Indiana* to produce certain non-HOPE artworks (and paid royalties on those works), and therefore that his conduct did not violate the rights of *the Estate*, which stands in Indiana's shoes. The tribunal was not asked to determine – and did not consider – whether McKenzie violated *MAF's* rights under its contracts

Nor is he entitled to seek declaratory relief or damages on his Fourth Counterclaim, for defamation, TAA ¶¶ 340-45, or on the surviving portion of his Eighth Counterclaim, for slander of title. *Id*. ¶ 387. Indeed, by withholding inventory and sales documents, and refusing to answer questions concerning his fabrication, promotion, and sale of the Indiana Artworks "at issue," *id*. ¶ 326, McKenzie has deprived MAF of the evidence it would need to assess and challenge any damages claim he brought. I therefore recommend that McKenzie's remaining counterclaims (the Second, Third, Fourth, and Eighth Counterclaims) be stricken, so that he cannot continue to benefit from the legal process that he has so thoroughly abused.

### 2. MAF Should be Granted a Default Judgment as to Liability on its Claim for Tortious Interference with Contract

In Count V of the FAC, MAF alleges that McKenzie caused Indiana to breach the April 1999 Agreement (as amended) and the December 1999 Agreement, which granted MAF the exclusive rights to produce and sell a wide range of Indiana Artworks, including not only *LOVE* but all the other paintings and sculptures that Indiana conceived from 1960 to April 2004. TAA ¶¶ 8, 61. McKenzie did this, according to MAF, by producing, promoting, and selling "works of art that, under [those] Agreement[s], can only be produced, promoted, and sold by Morgan Art Foundation." *Id*. ¶ 140. MAF claims that the silkscreened *LOVE* panels produced by McKenzie in or around 2012, as well as the *Dylan Works*, fall within its exclusive contractual rights. *Id*. ¶¶ 84, 93, 94 (showing side-by-side images of original Indiana works, covered by MAF's contracts, and McKenzie's "infringement" of each work).

---

with Indiana or under the copyright and trademark laws. There is thus no risk that a judgment adverse to McKenzie on these points will conflict with the AAA's Final Award or the resulting judgment.

Under New York law, the elements of tortious interference with contract are (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996)). In this case, the "third party" was Robert Indiana, and it was his breach of the April and December 1999 Agreements that McKenzie is alleged to have procured. Consequently, McKenzie's contention that Indiana authorized all the challenged artworks provides no defense to MAF's tortious interference claim.

By moving approximately 2,500 Indiana Artworks to evade inspection, concealing the Art Archive and communications with Allen, and refusing to answer questions about his ongoing fabrication activity, McKenzie made it impossible for MAF to discover which Indiana works (or derivatives therefrom) he produced, promoted, and sold in violation of MAF's exclusive contractual rights. Moreover, some of the documents withheld by McKenzie for years – until MAF noticed them in his studio in 2021 – appear to support its claim that McKenzie was deeply involved in conceiving and designing (not just fabricating) the disputed artworks. *See*, *e.g.*, Nikas 2021 Decl. Exs. 34, 38, 40 (sketches for *Dylan Works*). McKenzie's discovery misconduct thus handicapped MAF's ability to establish his "intentional procurement of the third-party's breach," as well as its damages.

MAF now has all the documents it found in McKenzie's studio, as well as at least portions of the Art Archive, and some Allen communications. Given McKenzie's dishonest conduct throughout this litigation, however, there can be no assurance that all relevant and discoverable

documents were preserved and have now been produced. Moreover, as MAF points out, *see* Pl. Mem. at 4-15, it did *not* have these documents during the fact discovery period, when it could have questioned witnesses about them at deposition or used them to identify relevant non-parties from whom additional information could have been obtained. I therefore conclude that the only way to ensure that McKenzie does not "benefit from [his] own failure to comply" with this Court's orders, *S. New Eng. Tel. Co.*, 624 F.3d at 149, is to enter a default judgment in MAF's favor, as to liability, on its claim for tortious interference with contract (Count V of the FAC).

### B.    Non-Dispositive Sanctions

McKenzie's misconduct also prejudiced MAF with respect its claims for copyright infringement, trademark infringement, violations of VARA, unfair competition, and defamation. As to these claims, however, I note that McKenzie has asserted various defenses that either raise purely legal questions or – if they raise fact questions – can be answered without relying on evidence within McKenzie's possession, custody, or control.

For example, McKenzie asserts that MAF does not own valid copyrights in the works at issue and/or that it did not timely register its copyrights, *see* TAA ¶¶ 179, 181; that MAF's trademark registrations cover various consumer items, but not fine art, *see id.* ¶¶ 228-32; and that MAF lacks standing to assert Indiana's rights under VARA. *Id.* ¶ 174.[23] I note as well that GBL § 349 was designed to reach conduct affecting "the consuming public at large," in which "the parties occupied disparate bargaining positions." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d

---

[23] Under 17 U.S.C. § 106A(b), "Only the author of a work of visual art has the rights conferred by subsection (a) in that work, whether or not the author is the copyright owner." *See also id.* § 106A(e)(1) ("The rights conferred by subsection (a) may not be transferred[.]"); *Schmid v. City & Cnty. of San Francisco*, 60 Cal. App. 5th 470, 488, 274 Cal. Rptr. 3d 727, 743 (2021) (both VARA and its state-law counterpart, CAPA, "create rights that are personal to artists," such that "[o]nly a person who created a work of art," or that person's heirs, "may enforce them").

308, 321 (1995). It is not clear whether that statute can appropriately be applied to the fine art transactions at issue here. Finally, MAF's defamation claim will require it to show (among other things) that the statements McKenzie allegedly made about it were "false," *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019), proof of which will have to come from MAF, not McKenzie.

As to these claims, I conclude that entry of a default judgment would over-penalize McKenzie for his discovery misconduct and provide an undeserved windfall to MAF, while sanctions short of termination can adequately serve the goals of Rule 37(b). I therefore recommend that, as to Counts I, II, III, VI, VI, and VII of MAF's Amended Complaint, the following non-dispositive sanctions be imposed:

### 1.    Preclusion

This Court has never seen the "raft of evidence" produced after oral argument on the sanctions motion, Def. 6/15/22 Ltr. at 3, and consequently is in no position to determine whether those documents are in fact favorable to McKenzie, as he claims. *Id*. Having failed to produce them until well past the last minute, however, McKenzie should be precluded from making any affirmative use those documents in defense of MAF's remaining claims. *See Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*, 2017 WL 2840279, at *15 (S.D.N.Y. June 27, 2017) ("By refusing to produce its documents to defendants, plaintiff has forfeited its own right to introduce them in this case, to testify as to their contents, or otherwise to rely on them."); *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, 2015 WL 3526661, at *6 (S.D.N.Y. June 3, 2015) ("By not producing [various documents], the non-ZB Bank Defendants have forfeited their right to introduce them in this case; put otherwise, they are precluded from relying on them."). Similarly, McKenzie should be

precluded from introducing, testifying about, or otherwise affirmatively relying on the contents of the documents located in his studio and collected by MAF in the summer of 2021.[24]

For similar reasons, McKenzie should be precluded from calling Gregory Allen as a witness or submitting any affidavit or declaration from him. *See Shanghai Weiyi*, 2017 WL 2840279, at *18 (precluding defendant from relying on any "future testimony" of its principal, "as to any issue of liability or damages," after failing to make him available for deposition as directed by the Court); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at trial, unless the failure was substantially justified or is harmless.").

### 2.    Presentation of Evidence

As an additional sanction, MAF should be permitted to present evidence to the jury concerning (i) McKenzie's failure to timely disclose or produce the Art Archive; (ii) his failure to timely disclose Allen's role or produce communications with Allen; (iii) his failure to timely produce the 5000-plus documents ultimately located in and collected from his studio; and (iv) his removal of the Indiana Artwork, without notice to MAF or his own lawyers, in advance of the

---

[24] Although McKenzie eventually produced these documents, the Court can have no confidence that the production was complete or that it included both favorable and unfavorable evidence. Thus, precluding McKenzie only from "using the documents [he] *declined* to disclose – without more – would be an inadequate sanction. The disobedient party would continue to benefit from its misconduct, which in turn would undercut the deterrent value of the judicially-imposed remedy." *Shanghai Weiyi*, 2017 WL 2840279, at *15 (precluding plaintiff from using documents it ultimately did produce, as well as any still unproduced); *see also Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 2010 WL 3420741, at *6 (W.D.N.Y. July 23, 2010) (recommending a "limited preclusion order" preventing plaintiffs from offering evidence of damages resulting from a specific business arrangement, where defendant had to file three motions, including one for sanctions, before plaintiff produced the relevant documents), *adopted*, 2010 WL 3420730 (W.D.N.Y. Aug. 23, 2010).

second inspection. Further, the jury should be permitted to consider that evidence, along with all the other evidence in the case, in evaluating credibility and finding the facts. *See Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *27-28 (S.D.N.Y. June 20, 2019) (permitting defendants to present evidence concerning plaintiff's takedown of an email server so that jury could consider it in connection with evaluating plaintiff's credibility).

Such a sanction is appropriate here because it recognizes that the prejudice to MAF from McKenzie's discovery misconduct goes beyond the expenses it incurred in pursuing the missing discovery and making its sanctions motion. Although less severe than an adverse inference instruction, this type of sanction will help "rectify the evidentiary imbalance" that McKenzie created by producing relevant information only after depositions had been concluded and fact discovery had otherwise closed. *Linde v. Arab Bank, PLC*, 706 F.3d 92, 102 (2d Cir. 2013). It will be the prerogative of the district judge, at the time of trial, to determine the scope of the misconduct-related evidence to be permitted at trial and to craft any related jury instructions. *See Franklin v. Howard Brown Health Ctr.*, 2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) ("Of course the evidence to be allowed and the extent of the presentation of the litigation hold are matters to be decided at trial."), *adopted,* 2018 WL 5831995 (N.D. Ill. Nov. 7, 2018); *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *7 (N.D. Ill. Mar. 23, 2018) ("The [magistrate judge] leaves it to the district judge to determine the appropriate means for presenting the [spoliation] evidence and arguments at trial on this issue.")

### 3.    Monetary Sanctions

Monetary sanctions are the "norm, not the exception, when a party is required to engage in motion practice in order to obtain the discovery to which it is entitled." *Seena Int'l Inc.*, 2016 WL 2865350, at *11 (quoting *Cine Forty-Second St. Theatre*, 602 F.2d at 1066). Sanctions may be imposed "on an attorney, a party, or both." *Richard Green (Fine Paintings) v. McClendon*, 262

F.R.D. 284, 288 (S.D.N.Y. 2009) (quoting *Metro. Opera Ass'n, Inc.*, 212 F.R.D. at 220.). "The Court has wide discretion to apportion Rule 37 monetary sanctions between a party and its counsel." *Joint Stock*, 2017 WL 3671036, at *16 (citing *Yeboah v. United States*, 2000 WL 1576886, at *3-4 (S.D.N.Y. Oct. 20, 2000)).

In this case, as noted above, McKenzie was warned in 2019 that he had used up his "one free bite" and would "not get another one." 1/29/19 Conf. Tr. 48:15-17. Since that time, McKenzie's abject discovery failures required MAF to expend considerable resources to seek the discovery to which it was entitled in the ordinary course. Consequently, MAF is entitled to its fees and expenses reasonably incurred in obtaining that discovery – beginning immediately after the May 25, 2021 viewing at McKenzie's studio, and including, *inter alia*, its fee and expenses reasonably incurred in negotiating and carrying out the second inspection, conducting McKenzie's second deposition, and briefing and arguing its sanctions motion.[25]

In this case, McKenzie's disobedience of this Court's discovery orders spanned more than three years and three law firms (two of which withdrew over "irreconcilable differences"). Moreover, he concealed his most egregious misconduct from his own attorneys and refused outright, at deposition, to divulge relevant and discoverable information to MAF because it was "[n]one of your business." It is thus appropriate to allocate full responsibility for the monetary sanctions to McKenzie.

---

[25] MAF is not entitled to recover its fees and expenses incurred in conducting the Ginexi, Vessacchia, Allen, and Gonzalez depositions, because it likely would have taken testimony from all four of those witnesses had McKenzie timely made the disclosures and produced the documents required by this Court's Orders and the Federal Rules of Civil Procedure.

## IV.    CONCLUSION

For the foregoing reasons, I recommend, respectfully, that plaintiff's motion for discovery sanctions be GRANTED IN PART, to the extent that:

1.    McKenzie's Second, Third, Fourth, and Eighth Counterclaims should be stricken in their entirety;

2.    MAF should be awarded a default judgment as to liability on its claim for tortious interference of contract against McKenzie (Count V of its First Amended Complaint);

3.    McKenzie should be precluded from making any affirmative use (whether at trial or in motion practice) of the Art Archive, his communications with Gregory Allen, or any of the documents that MAF ultimately located in and collected from McKenzie's studio in 2021.

4.    McKenzie should be precluded from calling Allen as a witness or submitting any affidavit or declaration from him.

5.    MAF should be permitted to introduce evidence to the jury concerning (i) McKenzie's failure to timely disclose or produce the Art Archive; (ii) his failure to timely disclose Allen's role or produce communications with Allen; (iii) his failure to timely produce the 5000-plus documents ultimately located in and collected from his studio; and (iv) his removal of the Indiana Artwork, without notice to MAF or his own lawyers, in advance of the second inspection, and the jury should be permitted to consider that evidence, along with all the other evidence in the case,

6.    McKenzie should be required to reimburse MAF's reasonable expenses, including attorneys' fees and out-of-pocket costs, incurred after May 25, 2021, to obtain the documents and information improperly withheld by McKenzie, including expenses incurred in negotiating and carrying out the second inspection, conducting McKenzie's second deposition, and briefing and arguing its sanctions motion, but not including expenses incurred in connection with the Ginexi, Vessacchia, Allen, and Gonzalez depositions.

   a.    MAF should be directed to file its fee application within 30 days of the Court's decision on the instant sanctions motion, supported by one or more declarations setting forth its reimbursable fees and costs and attaching the relevant attorney time and expense records. All sums requested should be supported by admissible evidence, including properly authenticated copies of counsel's contemporaneous time records, admissible evidence concerning the reasonableness of the rates actually charged to and paid by the client for the relevant time, and invoices supporting the claimed expenses.

b. McKenzie should be directed to file a response – limited to the *amount* of fees and expenses to be awarded – no later than 30 days after MAF's fee application is filed. There should be no reply.

7. The parties are reminded that "[a]ffirmative experts shall be disclosed and affirmative expert reports shall be exchanged no later than 30 days after the Court has issued a decision on the sanctions motion," with rebuttal reports and expert depositions to follow. (Dkt. 500.) Unless the district judge resolves the instant sanctions motion by terminating this action in its entirety, this schedule will remain in effect.

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to pro se defendant Michael McKenzie at 161 Goldens Bridge Road, Katonah, New York 10536.

Dated:    New York, New York
          January 17, 2025

_____
**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Plaintiff shall have 14 days from this date, and defendant shall have 17 days from the date of mailing, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b); *see also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court and delivered to the chambers of the Hon. Jennifer L. Rochon in accordance with Judge Rochon's individual rules of practice. Any request for an extension of time to file objections must be directed to Judge Rochon. **Failure to file timely objections will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).