UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORGAN ART FOUNDATION LIMITED,

PLAINTIFF,

-AGAINST-

MICHAEL MCKENZIE D/B/A AMERICAN IMAGE ART,

DEFENDANT.

Case No. 1:18-cv-04438-JLR-BCM

HONORABLE JENNIFER L. ROCHON

## PLAINTIFF'S PRE TRIAL BRIEF

Dated: February 25, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Luke Nikas
Paul B. Maslo
Alex Lefkowitz
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
lukenikas@quinnemanuel.com
paulmaslo@quinnemanuel.com
alexlefkowitz@quinnemanuel.com

*Attorneys for Plaintiff Morgan Art Foundation Limited*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION ..............................................................................................................

FACTUAL BACKGROUND................................................................................................2

    A.    Robert Indiana's Career ...................................................... 2

    B.    Enter MAF ......................................................................... 3

    C.    Inauthentic *HOPE* Prints.................................................... 4

    D.    The Whitney Museum Presents Robert Indiana: Beyond Love................. 4

    E.    McKenzie Exploits Indiana's Decline .................................. 5

    F.    McKenzie's Litigation Misconduct ..................................... 5

REMAINING CLAIMS AND ISSUES ...................................................................................7

I.     PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM WARRANTS A MINIMUM OF $80 MILLION IN DAMAGES .........................................................7

II.    PLAINTIFF'S COPYRIGHT CLAIM SATISFIES THE LEGAL STANDARD ...................................9

III.   PLAINTIFF'S TRADEMARK CLAIM SATISFIES THE LEGAL STANDARD................................10

IV.   PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF ON ALL CLAIMS .........................................12

<u>T</u><span>ABLE OF</span> <u>A</u><span>UTHORITIES</span>

*Cases*                                                                                                   *Page*

*AOL Inc. v. Digital Delivery Networks, Inc.*,
  2016 WL 2909117 (S.D.N.Y. Apr. 29, 2016), *report and recommendation
  adopted*, 2016 WL 2889063 (S.D.N.Y. May 17, 2016)...........................................13

*Arista Recs., LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010).................................................................................10

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
  814 F.3d 91 (2d Cir. 2016)...................................................................................14

*David v. Glemby Co.*,
  717 F. Supp. 162 (S.D.N.Y. 1989) ........................................................................10

*Design Partners, Inc. v. Five Star Elec. Corp.*,
  2017 WL 818364 (E.D.N.Y. Mar. 1, 2017)...............................................................9

*Int'l Mins. & Res., S.A. v. Am. Gen. Res., Inc.*,
  2000 WL 97613 (S.D.N.Y. Jan. 27, 2000) ...............................................................10

*Int'l Mins. & Res., S.A. v. Pappas*,
  96 F.3d 586 (2d Cir. 1996)....................................................................................9

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
  551 F. Supp. 3d 408 (S.D.N.Y. 2021)......................................................................12

*Off-White LLC v. 5HK5584*,
  2020 WL 1646692, (S.D.N.Y. Apr. 3, 2020), *report and recommendation
  adopted*, 2020 WL 3050552 (S.D.N.Y. June 8, 2020)................................................13

*Pearson Educ., Inc. v. Vergara*,
  2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010)............................................................14

*Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*,
  511 F. Supp. 2d 324 (E.D.N.Y. 2007) .....................................................................10

*Reproducta Co. v. Kellmark Corp.*,
  1994 WL 719705 (S.D.N.Y. Dec. 27, 1994) ............................................................13

*Rogers v. Koons*,
  960 F.2d 301 (2d Cir. 1992)...................................................................................11

*Scholz Design, Inc. v. Sard Custom Homes, LLC*,
  691 F.3d 182 (2d Cir. 2012)...................................................................................11

*Sirius XM Radio Inc. v. Aura Multimedia Corp.*,
  2024 WL 1756854 (S.D.N.Y. Apr. 6, 2024), *report and recommendation
  adopted*, 2024 WL 1739905 (S.D.N.Y. Apr. 23, 2024)............................................................14

*Telebrands Corp. v. HM Imp. USA Corp.*,
  2012 WL 3930405 (E.D.N.Y. July 26, 2012), *report and recommendation
  adopted*, 2012 WL 3957188 (E.D.N.Y. Sept. 10, 2012)............................................................12

*Universal City Studios, Inc. v. Nintendo Co.*,
  797 F.2d 70 (2d Cir. 1986)............................................................10

## INTRODUCTION

Morgan Art Foundation Limited ("MAF") filed this case to hold Michael McKenzie accountable for forging Robert Indiana's artwork, infringing on MAF's registered trademarks and copyrights, and intentionally interfering with MAF's exclusive contractual rights to make Indiana's most iconic works.

McKenzie maliciously exploited Indiana in his late age, isolated Indiana from his friends and supporters, forged some of Indiana's most recognizable works, exhibited the fraudulent works in museums, and sold the fraudulent works to collectors for millions of dollars—all in violation of MAF's rights. McKenzie fabricated and released into the market low-quality, unauthorized, knock-off works, which damaged Indiana's market and standing in the art world. To cover his tracks, he used a mechanical "ghostwriter" to falsely inscribe Indiana's signature. Indiana attested in writing that McKenzie was a forger, Indiana confirmed on video that McKenzie was emotionally abusive, and McKenzie's own studio assistant recorded a video of McKenzie forging Indiana's artworks in which she described them as forgeries. McKenzie's extraordinary misconduct has known no bounds, and he continued to produce forgeries since this suit was filed.

Throughout this case, McKenzie made a mockery of the discovery process and repeatedly thumbed his nose at the Court. Though he had thousands of documents and artworks in his possession that demonstrated the extent of his scheme, he lied under oath about the evidence in his possession, refused to voluntarily sit for his deposition or produce documents, misrepresented his discovery efforts to the Court and MAF's counsel, concealed those documents and artworks, and intentionally hid evidence after the Court ordered further discovery.

On September 3, 2025, as punishment for years of McKenzie's discovery abuses, the Court awarded MAF a default judgment on its claim for tortious interference with contract and dismissed McKenzie's counterclaims. (Dkt. 578.) Now, all that remains to be determined are the damages

on the tortious interference claim, the scope of the injunctive relief to prevent McKenzie's continued interference, and the extent to which McKenzie infringed on MAF's copyrights and trademark.[1]

**FACTUAL BACKGROUND**

**A.      Robert Indiana's Career**

Indiana's career as an artist skyrocketed in the early 1960s when the Museum of Modern Art acquired two of his works—a painting titled *The American Dream I* and a sculpture titled *Moon*.  The year 1964 marked an even higher level of fame for Indiana:  he created a work depicting four colored letters, L-O-V-E, with the "LO" stacked on the "VE" and the "O" notably tilted outward to the right.  The image, called *LOVE*, went viral.  It originated as a work on paper and was then used by Indiana in paintings and sculpture.  It was published on posters and plastered on commercial products.  It was selected for a Christmas card published by MoMA.  It was translated by Indiana into new original artworks depicting the *LOVE* image in multiple other languages.  It became one of the most recognizable sculptures in the world and was placed in various public spaces, including the well-known "Love Park" in Philadelphia.  In 1973, the U.S. Postal Service printed 330 million postage stamps bearing the *LOVE* image.

Indiana's initial success was short-lived.  He became so deeply associated with *LOVE* that the general public and the art world largely ignored his other works.  By 1978, Indiana was suffering financially, and he retreated from New York to Vinalhaven, Maine.  His home was reachable only by ferry and small-engine plane.  Two decades passed.  His fame subsided.  His

---

[1]    Because MAF is voluntarily dismissing its claims for common-law trademark infringement, breach of contract, violations of the Visual Artists Rights Act, unfair competition, and defamation, the trial in this case involves only (1) liability and damages/relief on MAF's claim for copyright infringement, (2) liability and damages/relief on its claim for trademark infringement under the Lanham Act, and (3) damages/relief on its claim for tortious interference.

2

works were not in high demand.

**B.**     **Enter MAF**

In the mid-1990s, MAF and its advisor, Simon Salama-Caro, sought to reverse the course of history for Indiana.  Salama-Caro had a strategy to revive Indiana's career:  years of hard work and investment, strict enforcement of Indiana's rights, and a focus on quality.  Indiana accepted Salama-Caro's recommendations.  MAF and Indiana memorialized their agreement in two written contracts.  In the "IP/License Agreement," dated April 9, 1999, and effective June 28, 1998, Indiana conveyed to MAF all "copyright, trademark, and other rights" in certain images and granted MAF the *exclusive* right to reproduce, promote, and sell these images worldwide.   In exchange, MAF agreed to pay Indiana 50% of the net income it received.  This contract was later amended to extend to all paintings and sculptures conceived by Indiana from 1960 to April 2004.

In the "Sculpture Agreement," dated December 22, 1999, and effective July 27, 1995, Indiana conveyed to MAF the *exclusive* right to "produce and fabricate," own, and sell sculptures of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS* (*ONE* through *ZERO*), *ART*, and *2000*.  In exchange, MAF agreed to pay Indiana 20% of the receipts from the sale of these sculptures.   Under both agreements, MAF had the right to sue for any infringement of the rights Indiana conveyed.

MAF appointed Artists Rights Society ("ARS"), a copyright, licensing, and monitoring organization for visual artists, to begin enforcing Indiana's rights against copyright infringers.  MAF successfully removed cheap reproductions and products incorporating Indiana's images from the tchotchke market.  Simultaneously, ARS granted selective licenses in certain protected works.  These licenses enabled, for the first time, royalties to be paid to Indiana stemming from the authorized use of his images.  Thanks to MAF's careful efforts, Indiana made a spectacular comeback and the art market for Indiana's work increased dramatically from 2004 through 2008.

C.     **Inauthentic *HOPE* Prints**

On September 13, 2008, Indiana's 80th birthday, Salama-Caro noticed that Indiana's studio was filled with silkscreen prints on canvas in different sizes and colors depicting the four letters, H-O-P-E, that were arranged in the same way as *LOVE*, with the "HO" stacked on top of the "PE." Despite these *HOPE* prints garnering significant attention during the 2008 Obama presidential campaign, Indiana repeatedly confirmed that he "had no hand in *HOPE*"—in other words, McKenzie was creating the works, not Indiana, and then forcing them on Indiana through emotional abuse and intimidation.

Following the commercial success of the *HOPE* prints, McKenzie flooded the market with poorly made "Indiana" works between 2009 and 2013.  A video taken around 2013 shows a "ghostwriter" machine being used at McKenzie's instruction to mechanically replicate the name "Robert Indiana."  The high volume of low quality works damaged Indiana's market, which started to decline once again.  In November 2012, Indiana specifically pointed out an illustration in a new exhibition catalogue of the *LOVE* image rendered in red and gold and screen printed on a 26 x 26 x 2-inch aluminum panel.  Indiana expressed concern that he had never seen that work before and had not created or authorized it.   A number of important art dealers informed Salama-Caro that these low-quality works were damaging Indiana's market and his standing in the art world.

D.     **The Whitney Museum Presents Robert Indiana: Beyond Love**

In the wake of McKenzie's misconduct, MAF revived the dialogue on Indiana's work with art historians, museums, and art dealers.   Indiana, in turn, concentrated on creating new works... In the end, Indiana made a comeback.  His market revived and works started selling for significant sums of money.  In 2011, Indiana's sculptures generated $13.7 million in royalties, up from $5.6 million the year prior.

In 2013, Indiana finally received the museum attention his works deserved.  The highly

4

regarded Whitney Museum held the first major retrospective exhibition of Indiana's works called "Robert Indiana: Beyond Love."

### E.    McKenzie Exploits Indiana's Decline

In the years leading up to this litigation, Indiana's health was declining rapidly.[2]  McKenzie saw the vulnerability in the aging artist—isolated in his small town in Maine—and began a plan to ramp up production of the forged Indiana works.  McKenzie exhibited unauthorized reproductions of *LOVE* at major art fairs.  In 2016, McKenzie published an edition of derivative artworks, supposedly by Indiana, based on works that are protected under the April 1999 contract. Indiana himself has disavowed authorizing or creating such works.

McKenzie marketed, exhibited, and sold these works as authentic.  The physical works themselves reveal the truth:  the quality, known features, and signatures are not consistent with Indiana's authentic works.  The forged works harmed the market for Indiana's works.  Indiana's royalties declined.  Meanwhile, McKenzie lined his pockets with millions of dollars by peddling the fraudulent Indiana works.

### F.    McKenzie's Litigation Misconduct

From the onset of this lawsuit, McKenzie skirted his responsibilities under the law and ignored direct orders from the Court.  McKenzie initially refused to produce documents until the Court ordered him to do so.  (Dkt. 137 at 2-3.)  The Court warned that this was McKenzie's "one free bite" at the apple and that he "won't get another one." (Dkt. 142 48:10-17.)  Despite the Court's clear warning, McKenzie's misconduct only expanded.

After MAF's unsuccessful attempts to obtain McKenzie's compliance with the Court's first order, the Court ordered McKenzie to provide detailed information about his document collection

---

[2]   Robert Indiana passed away in his Vinalhaven home on May 19, 2018.

efforts.  (Dkt. 264 at 2.)  McKenzie's counsel represented that a full search had been conducted and that all responsive documents had been produced.  (Dkt. 393-3.)  This proved to be false.

During a studio visit, MAF discovered that despite McKenzie's repeated representations to MAF, the Court,[3] and the Maine probate court overseeing Indiana's estate[4] that he had nothing further in his possession, McKenzie possessed roughly 1,000 artworks purportedly by Indiana, including many forgeries.  MAF also found thousands of documents that McKenzie had failed to produce and significant evidence of McKenzie's forgery process.  (*See, e.g.*, Dkt. 467 Exs. 6, 28-29, 37.)  MAF's second inspection of the property revealed 5,913 pages of additional documents and artworks that were relevant to MAF's claims, were responsive to MAF's discovery requests, and had never been produced.  (Dkt. 467 ¶ 5.)

Shortly after the second inspection, McKenzie's former employee informed MAF that McKenzie had removed several truckloads of artworks from his property *after* the Court ordered McKenzie to permit MAF's inspection.  (Dkt. 467 ¶ 6.)  He reported that McKenzie continued to forge Indiana artworks and conceal evidence.  (*Id.*)  Subsequent depositions of McKenzie's staff revealed that McKenzie hid hundreds of artworks in the basement of his residence.  (*Id.* Ex. 2, Vessecchia Dep. 120:12-17, 123:19-24; *see also id.* Ex. 4, Ginexi Dep. 27:5-21, 89:11-25.) McKenzie later admitted that he moved approximately 2,500 artworks to an offsite storage facility before MAF's second inspection and covered a monumental sculpture on his property with a tarp. (*See* McKenzie Dep. 09/10/21 45:13-16; 55:9-12.)  To punish McKenzie's egregious discovery violations, the Court, among other things, struck his remaining counterclaims and awarded default

---

[3]  *See, e.g.*, Dkt. 393-1 (representing that, "[f]ollowing a reasonable search," McKenzie "ha[d] identified documents responsive to" numerous RFPs and would "produce those documents by November 9, 2018, as the parties agreed").

[4]  *See, e.g.*, Dkt. 393-2 at 63:19-25 (McKenzie testifying that he did not have any *LOVE* works in his possession).

judgment as to liability on MAF's claim for tortious interference.  (Dkt. 560, 578.)

McKenzie still showed no signs of stopping.  In his most recent deposition, McKenzie stated that he "100%" continues to fabricate Indiana works.  (*See* McKenzie Dep. 09/10/21 91:9-11,15.) When asked whether he had disclosed this to MAF he responded, "Absolutely not.  That means completely not and no and never."  (*Id.* at 93:4-15.)  McKenzie's studio assistant admitted that, at McKenzie's direction, she helped him stencil Indiana's signature on prints and observed McKenzie's staff using a machine referred to as the "ghostwriter" to sign Indiana's name on artworks, even after his death.  (*See* Dkt. 467 Ex. 2, Vessecchia Dep. 104:7-18, 187:14-20, 189:15-191:17.)  Depositions further confirm that McKenzie continues to forge Indiana artworks, including by backdating posthumously created Indiana prints.

<u>REMAINING CLAIMS AND ISSUES</u>

## I.    PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM WARRANTS A MINIMUM OF $80 MILLION IN DAMAGES

The Court has already determined liability as to MAF's tortious interference claim.  (Dkt. 578).  "It is well-settled that, under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract."  *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996).  "[A] party claiming general damages 'need only provide a 'stable foundation for a reasonable estimate [of damages].''"  *Design Partners, Inc. v. Five Star Elec. Corp.*, 2017 WL 818364, at *15 (E.D.N.Y. Mar. 1, 2017) (citation omitted).   "[A] party claiming consequential damages must prove the amount of damage with 'reasonable certainty.'"  *Id.*

MAF has a clear basis to receive general, consequential, and punitive damages as to the License/IP Agreement and the Sculpture Agreement.  The License/IP Agreement transferred to MAF "the exclusive right throughout the world in perpetuity to reproduce, promote, and sell" all

of Indiana's paintings, sculptures, constructions, and other work.  The Sculpture Agreement granted MAF "the exclusive right, in perpetuity, to produce and fabricate" Indiana's sculptures, including *LOVE*.  McKenzie intentionally caused Indiana to breach these agreements.  MAF has lost the exclusivity it bargained for.  MAF's lost royalties from 2012 to present are the "natural and probable consequence of [this] breach," and MAF can clearly demonstrate a "stable foundation for a reasonable estimate of the amount."  *Design Partners*, 2017 WL 818364, at *15.

MAF's royalty revenues were at an all-time high in 2011, up until McKenzie began widely circulating artworks that MAF had the exclusive right to make.  Royalties began to drop materially as a direct result of McKenzie's tortious interference, such that over the seven years leading up to the lawsuit, MAF's decrease in royalties resulted in total damages of $40,456,463.57, averaging $5,779,490.94 less per year—which provides a recognized basis for projecting damages every subsequent year after this lawsuit without any conflating impact of the lawsuit itself.  *See e.g.*, *David v. Glemby Co.*, 717 F. Supp. 162, 172 (S.D.N.Y. 1989) (permitting plaintiff to prove damages from "lost royalty income" that would have been provided had defendant not breached); *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 331 (E.D.N.Y. 2007) (lost royalties are not too speculative where "[p]laintiff's claim is technically not for lost 'profits' which generally refers to the excess of revenues over outlays in a given period of time, including depreciation and other non-cash expenses and is often synonymous with 'net profit.' Rather, Plaintiff's claim is for lost royalties, the calculation of which is not dependent on profits.").  Therefore, MAF seeks a minimum of $86,692,364.08, not inclusive of any

8

consequential damages proximately caused by the harm McKenzie brought to Indiana's reputation, and punitive damages.[5]

## II.    PLAINTIFF'S COPYRIGHT CLAIM SATISFIES THE LEGAL STANDARD

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citation omitted). "A certificate of copyright registration is prima facie evidence of ownership of a valid copyright." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012).

MAF holds the copyrights for "The Ninth America Dream" and "USA FUN."



---

[5] Punitive damages are warranted because of the ongoing nature of McKenzie's forgery operation, and his blatant disregard for MAF's rights. McKenzie exploited Indiana, produced countless forgeries, harmed MAF's business, and profited tremendously. *See, e.g.*, *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986) ("New York courts have considered punitive damages to be particularly appropriate for tortious conduct involving deliberate action 'systematically conducted for profit.'"); *Int'l Mins. & Res., S.A. v. Am. Gen. Res., Inc.*, 2000 WL 97613, at *2 (S.D.N.Y. Jan. 27, 2000) ("an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights ... [or] amounts to gross, wanton, or willful fraud or other morally culpable conduct") (quotation marks and citation omitted).

The extent of McKenzie's forgery, including the use of the "ghostwriter," the presence of hundreds of forged works on his property, and the existence of low-quality versions of the works, is clear.  (*See* McKenzie 9.10.20 Dep. 143:8-19 (confirming that USA FUN was sent to the Baker Museum by McKenzie for exhibition).)  This case presents "the rare scenario where there is direct evidence of copying"—McKenzie has admitted and stood by his forgery process.  *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir. 1992) ("even were such direct evidence of copying unavailable . . . defendant Koons' access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue").

## III.    PLAINTIFF'S TRADEMARK CLAIM SATISFIES THE LEGAL STANDARD

To establish trademark infringement, the plaintiff must show "(1) that the plaintiff's mark is entitled to protection, and (2) that the defendant's 'use of its mark is likely to cause consumers confusion.'"  *Nat'l Acad. of Television Arts & Scis.*, *Inc. v. Multimedia Sys. Design, Inc.,* 551 F. Supp. 3d 408, 426 (S.D.N.Y. 2021). "A certificate of registration with the Patent and Trademark Office is *prima facie* evidence that the mark is entitled to protection."  *Id.* "Infringement is willful where '(1) the defendant was actually aware of the infringing activities, or (2) . . . the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness to' 'the rights of the holder of the copyright or mark.'"  *Telebrands Corp. v. HM Imp. USA Corp.*, 2012 WL 3930405, at *4 (E.D.N.Y. July 26, 2012), *report and recommendation adopted*, 2012 WL 3957188 (E.D.N.Y. Sept. 10, 2012).

MAF holds the trademark for "LOVE."  (US Registration Number 4879320.)



McKenzie appropriated the *LOVE* mark—he has repeatedly admitted it himself.  (*See* McKenzie 9.10.20 Dep. 134:3-8 ("So these are Indiana works of the images LOVE and HOPE that you fabricated, correct?"  "Yes.").)  Not only is McKenzie's use *likely* to cause consumer confusion and impair goodwill, it actively has—resulting in a decrease in MAF's revenues.  (*See* Section I, above; *see also Who Owns Love?* Bloomberg, May 22, 2018.)  McKenzie's counterfeit *LOVE* prints, paintings, and sculptures are identical to MAF's registered mark, and they were clearly created to deceive the public.  *See, e.g.*, *Off-White LLC v. 5HK5584*, 2020 WL 1646692, at *5 (S.D.N.Y. Apr. 3, 2020), *report and recommendation adopted*, 2020 WL 3050552 (S.D.N.Y. June 8, 2020) (finding consumer confusion where "products are virtually identical to one of the [plaintiff's] Products, with only minor variations").

## IV.   PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF ON ALL CLAIMS

In addition to monetary damages, MAF seeks injunctive relief to bar McKenzie from creating art that infringes on or interferes with MAF's rights and to prohibit McKenzie from selling, displaying, or offering for sale any of the works already made in violation of MAF's rights.  For permanent injunctive relief,  "plaintiff 'must demonstrate (1) actual success on the merits, and (2) irreparable harm.'"  *AOL Inc. v. Digital Delivery Networks, Inc.*, 2016 WL 2909117, at *3 (S.D.N.Y. Apr. 29, 2016), *report and recommendation adopted*, 2016 WL 2889063 (S.D.N.Y. May 17, 2016).

As to tortious interference with MAF's contracts, MAF has already established actual success on the merits.  *Id.* ("the plaintiff has established success on the merits due to the defendant's default").  Irreparable harm is imminent due to the lingering threats of continued interference with MAF's rights: McKenzie's forged Indiana works are still in his possession, custody, or control, and based on his own testimony there is no reason to believe he will stop producing them.  *See, e.g.*, *Reproducta Co. v. Kellmark Corp.*, 1994 WL 719705, at *1 (S.D.N.Y. Dec. 27, 1994) (granting permanent injunction barring defendant from reproducing paintings because defendant's profits on the infringing works are "an inaccurate measure of the current and future damages plaintiffs may incur as a result of Kellmark's breach of contract, tortious interference with contractual relations, and unfair competition").  Moreover, "[a] court may infer from a defendant's default that it is willing to, or may continue its infringement."  *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010).

As for copyright and trademark infringement, "[i]n intellectual property actions, permanent injunctions are normally granted when there is a threat of continuing violations."  *Sirius XM Radio Inc. v. Aura Multimedia Corp.*, 2024 WL 1756854, at *7 (S.D.N.Y. Apr. 6, 2024), *report and*

*recommendation adopted*, 2024 WL 1739905 (S.D.N.Y. Apr. 23, 2024) (citation omitted). "[A] court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." *Id.* As above, the threat of McKenzie continuing to infringe on MAF's intellectual property is considerable, and based on McKenzie's extensive history of disobeying the Court and his explicit testimony that he will continue to make the works, an appropriate injunction is needed to protect MAF's exclusive rights. *See, e.g.*, *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 103 (2d Cir. 2016) ("The district court's 'civil contempt powers are particularly adapted to curb recidivist offenders' where future noncompliance is a well-founded concern.")

Dated: February 25, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Luke Nikas*
      Luke Nikas
      Paul Maslo
      Alex Lefkowitz
      295 Fifth Avenue
      New York, NY 10016
      (212) 849-7000
      lukenikas@quinnemanuel.com
      paulmaslo@quinnemanuel.com
      alexlefkowitz@quinnemanuel.com

      *Attorneys for Plaintiff Morgan Art*
      *Foundation Limited*

<u>CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION</u>

I hereby certify that the foregoing memorandum complies with the word limitation because it contains 3,499 words, as counted by Microsoft Word.

Dated: February 25, 2026

By:    */s/ Luke Nikas*⎯⎯⎯⎯⎯⎯
       Luke Nikas