UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORGAN ART FOUNDATION LIMITED,

                PLAINTIFF,

-AGAINST-

MICHAEL MCKENZIE D/B/A AMERICAN IMAGE ART,

                DEFENDANT.

Case No. 1:18-cv-04438-AT-BCM

**HONORABLE JENNIFER ROCHON**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO PREVENT DEFENDANT FROM TESTIFYING OUTSIDE THE SCOPE OF THE LITIGATION, MAKING PEJORATIVE COMMENTS, OR DRAWING LEGAL CONCLUSIONS

Dated: February 25, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Luke Nikas
Paul B. Maslo
Alex Lefkowitz
295 Fifth Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
lukenikas@quinnemanuel.com
paulmaslo@quinnemanuel.com
alexlefkowitz@quinnemanuel.com

*Counsel for Morgan Art Foundation*

### TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

I.    The Scope of the Litigation ................................................................................ 2

    A.    The Parties' Claims .................................................................................. 2

    B.    McKenzie's Discovery Misconduct and Resulting Sanctions ................... 4

II.    McKenzie's Unsupported Inflammatory Testimony ........................................... 4

    A.    Indiana's Assistant Cannot Be Trusted Because He Was a Drug Addict ... 4

    B.    MAF and Its Advisors Are Liars and Criminals ....................................... 5

    C.    MAF Is a Sham Operation ........................................................................ 7

    D.    MAF and Its Advisors Cheated and Stole From Indiana .......................... 7

    E.    MAF's Lead Trial Counsel Is a Liar ........................................................ 8

    F.    Anyone Who Disagrees With McKenzie Is a Liar and/or Drug Addict ..... 8

III.    McKenzie's Improper Legal Conclusions .......................................................... 9

LEGAL STANDARD ..................................................................................................... 10

ARGUMENT ............................................................................................................... 11

I.    The Court Should Exclude Evidence and Testimony Related to Issues Outside the Scope of the Litigation ............................................................................................ 11

II.    The Court Should Prohibit McKenzie From Using Pejorative Terms or Phrases ........... 12

III.    The Court Should Prohibit McKenzie From Making Legal Conclusions .................... 14

CONCLUSION ............................................................................................................. 15

<u>TABLE OF AUTHORITIES</u>

*Cases*                                                                                    *Page(s)*

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
   2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009)................................................................11, 13

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
   262 F.R.D. 293 (S.D.N.Y. 2009) ..........................................................................................11

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010)................................................................................................14, 15

*Culley v. Edwards Mfg. Co. of Alberta Lea*,
   2024 WL 5145565 (S.D.N.Y. Dec. 17, 2024) ..........................................................10, 11, 12

*Davis v. City of New York*,
   959 F. Supp. 2d 427 (S.D.N.Y. 2013).....................................................................................14

*Dollman v. Mast Indus., Inc.*,
   2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011) ..........................................................................13

*Dotson v. City of Syracuse*,
   2019 WL 6337326 (N.D.N.Y. Nov. 27, 2019) ........................................................................12

*Gorbea v. Verizon New York, Inc.*,
   2014 WL 2916964 (E.D.N.Y. June 25, 2014) ........................................................................12

*Hamza v. Saks Fifth Ave., Inc.*,
   2011 WL 6187078 (S.D.N.Y. Dec. 5, 2011) ..........................................................................12

*MatconUSA LP v. Houston Cas. Co.*,
   2022 WL 4242402 (W.D. Wash. Aug. 16, 2022)....................................................................15

*Moribe v. Am. Water Heater Co.*,
   2024 WL 708562 (D. Haw. Feb. 21, 2024) ............................................................................15

*Pescatore v. Pan Am. World Airways, Inc.*,
   97 F.3d 1 (2d Cir. 1996)..........................................................................................................11

*Plew v. Ltd. Brands, Inc.*,
   2012 WL 379933 (S.D.N.Y. Feb. 6, 2012)............................................................................13

*Rubinstein v. Music Sales Corp.*,
   2021 WL 3374539 (S.D.N.Y. Aug. 3, 2021)..........................................................................14

*Sanga Music, Inc. v. EMI Blackwood Music, Inc.*,
   1994 WL 406103 (S.D.N.Y. July 29, 1994), *aff'd*, 55 F.3d 756 (2d Cir. 1995).....................14

*United States v. Dupree*,
   620 F. App'x 49 (2d Cir. 2015) ..........................................................................................12

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988)...............................................................................................14

## *Rules*

Fed. R. Evid. 401 ...............................................................................2, 10, 11, 12,  13, 15

Fed. R. Evid. 402 ................................................................................2, 10, 11, 12, 13, 15

Fed. R. Evid. 403 ........................................................................................2, 10, 13, 15

Plaintiff Morgan Art Foundation Limited submits this memorandum of law in support of its motion *in limine* to prevent Defendant Michael McKenzie d/b/a American Image Art from testifying outside the scope of the litigation, making pejorative comments, or drawing legal conclusions.

## INTRODUCTION

This is a straightforward case, involving only liability and damages on MAF's claim for copyright infringement, liability and damages on its claim for trademark infringement, and damages on its claim for tortious interference. But McKenzie's deposition makes clear that he has no intention of trying those claims on the evidence. Instead, he seeks to turn this case into a sideshow of insults, conspiracy theories, and legal argument masquerading as testimony. Much as McKenzie may wish otherwise, this is not a forum for him to attack witnesses as "junkies," accuse MAF and its advisors of being "criminals," smear counsel with baseless allegations, or offer unsupported legal conclusions.

The Court has broad authority to ensure that the jury hears admissible evidence—not argument, invective, and distraction. Without clear limits, McKenzie will inject all three into the trial. MAF files this motion *in limine* to ensure that the Court has an opportunity to impose those limits now, before the trial begins and McKenzie irreparably prejudices MAF's case with his improper testimony. The Court should grant MAF's motion and impose these routine guardrails that are essential to ensure a fair trial on the merits.

*First*, the Court should preclude McKenzie from veering into collateral disputes and theories tied to dismissed claims or matters that are no longer in the case. That evidence is irrelevant as a matter of law. It also serves only to confuse the issues, waste time, and invite the jury to decide the case on improper grounds. Courts routinely exclude such "red herrings" before trial for precisely those reasons.

*Second*, the Court should prohibit McKenzie from using pejorative terms or phrases when he testifies at trial. McKenzie's deposition transcript is full of vitriolic personal attacks—he testified that Robert Indiana's assistant is a dead junkie, MAF and its advisors are criminals, MAF is a sham operation, MAF and its advisors cheated and stole from Indiana, MAF's lead trial counsel is a liar, and several people who spoke out against him were drug addicts. None of this makes any fact of consequence more or less probable, which is why it is excludable under Rules 401 and 402. And all of it risks inflaming the jury and distracting from the merits, which is exactly the type of prejudice Rule 403 is designed to prevent.

*Finally*, McKenzie repeatedly offers legal conclusions that he has no right or expertise to give. He insists that MAF's copyright and trademark rights do not exist because the works are in the "public domain" and that MAF is committing "fraud" by enforcing them. Those are not facts; they are legal determinations. Allowing McKenzie to present those conclusions would invite the jury to substitute his rhetoric for the law.

## FACTUAL BACKGROUND

### I. THE SCOPE OF THE LITIGATION

#### A.    The parties' claims

MAF acquired the exclusive right to reproduce, fabricate, and market a wide variety of Indiana artworks, including his well-known *LOVE* stacked-word image and sculpture, by virtue of a series of written agreements it entered with the artist during his lifetime. The agreements were dated April 9, 1999, and December 22, 1999.[1] In the April 1999 Agreement (as amended in 2004), Indiana conveyed to MAF all copyright, trademark, and other rights in all the paintings and

---

[1]  This section draws from the January 17, 2025 Report and Recommendation (Dkt. No. 560) and September 3, 2025 Opinion and Order (Dkt. No. 578) on MAF's motion for sanctions. For clarity and conciseness, quotation marks, internal citations, and page cites have been omitted.

sculptures that he conceived from 1960 to April 2004, and in both agreements, he granted MAF the right to sue for any infringement of the rights Indiana conveyed. MAF agreed to pay royalties to Indiana in specified amounts. After inking these agreements, it spent years restoring and burnishing Indiana's reputation as an artist, culminating in a highly regarded retrospective exhibition at the Whitney Museum in New York in 2013.

In this action—filed on May 19, 2018, one day before Indiana died at age 89—MAF alleges that McKenzie, acting in concert with Indiana's caretaker, Jamie Thomas, took advantage of the artist in his twilight years to make quick profits. As Indiana's health declined, Thomas kept him isolated from his long-time friends and supporters, such as MAF, while McKenzie published derivative artworks based on earlier works to which MAF had exclusive rights.

McKenzie also published unauthorized reproductions of the *LOVE* image that were exhibited at major art fairs. These forged and inauthentic works not only violated the April 1999 Agreement and the December 1999 Agreement; they harmed Indiana's market and undermined his carefully restored reputation. As a result, MAF filed this lawsuit, asserting claims against McKenzie for copyright infringement, trademark infringement (both under the Lanham Act and common law), tortious interference with contract, violation of the Visual Artists Rights Act (VARA), unfair competition, and defamation. MAF also brought a claim for breach of contract against the Estate.

In addition to denying any unlawful conduct, McKenzie asserted counterclaims against MAF. Four counterclaims remained following the Court's resolution of MAF's motion to dismiss: a declaratory judgment that McKenzie had full authority from Indiana to produce, market, and sell the Indiana artworks that he fabricated and that the AIA-published Indiana artworks are not forgeries; and damages for defamation and slander of title.

3

### B.      McKenzie's discovery misconduct and resulting sanctions

During discovery, McKenzie erected a series of roadblocks that repeatedly hampered the process and required numerous Court interventions over the course of the three-year period. Even those interventions—as it later became clear—proved insufficient. When McKenzie's subterfuge was discovered, his combative performance at deposition made it abundantly clear that he still did not intend to cooperate in discovery in good faith. To punish McKenzie's egregious discovery violations, the Court, among other things, struck his remaining counterclaims and awarded default judgment as to liability on MAF's claim for tortious interference.

Because MAF is voluntarily dismissing its claims for common-law trademark infringement, breach of contract, violations of VARA, unfair competition, and defamation, the trial in this case involves only (1) liability and damages on MAF's claim for copyright infringement, (2) liability and damages on its claim for trademark infringement under the Lanham Act, and (3) damages on its claim for tortious interference.

## II.      MCKENZIE'S UNSUPPORTED INFLAMMATORY TESTIMONY

Throughout his deposition, McKenzie made false derogatory comments that have no bearing on any of the issues in the case.

### A.      Indiana's assistant cannot be trusted because he was a drug addict

McKenzie testified that Sean Hillgrove, one of Indiana's assistants who spoke out against McKenzie under oath, could not be trusted because he was a heroin addict who died of an overdose. (*See, e.g.*, 9/9/20 Tr. 16:22-25 ("Sean is dead so I can't really – he's a little silent right now."); 9/9/20 Tr. 17:7-12 ("Well, Sean – I hate to say it because he's passed on, but Sean Hillgrove was a heroin addict, and as a general matter, as a father with two children, I'm not particularly, you know, fond of heroin addicts."); 9/9/20 Tr. 17:20-24 ("I never particularly disagreed or agreed with him, you know. I told Bob we should really think about getting better assistants, but that's

his call.  I don't hire heroin addicts here."); 9/9/20 Tr. 196:2-5 ("I said, I don't hire addicts, and somebody who's a heroin addict has a propensity to say things that may or may not be accurate."); 9/9/20 Tr. 210:3-5 ("Sean Hillgrove is – you can't dig him up.  Trust me when I tell you, not a viable witness."); 9/9/20 Tr. 216:4-5 ("Well, Mr. Hillgrove is a junkie, liar."); 9/9/20 Tr. 219:14-17 ("Well, but somebody under oath has said that you're a liar, right, Mr. McKenzie, we've already gone over that, right?" "Yes. A dead junkie…"); 9/9/20 Tr. 220:11-14 ("Did the dead junkie mention that we had a deal or a contract or he didn't mention that?  Well, did detox pay him – did detox pay him . . .").)

### B.    MAF and its advisors are liars and criminals

He testified that MAF, along with its advisors Simon and Marc Salama-Caro, is a criminal enterprise involved in money laundering, among other illegal activities.  (*See, e.g.*, 9/9/20 Tr. 293:12-18 ("I meant that everyone in the world, including me, seemed to think that Simon, Morgan and their whole organization is a thieving, lying, swindling organization that runs offshore in an LLC in a P.O. Box.  The P.O. Box is also shared with 42 other false companies."); 9/9/20 Tr 21:12-17 ("they're supported by money laundering . . . I don't want to be near money laundering"); 9/9/20 Tr. 21:18-23 ("Simon Salama-Caro . . . when I met him, he was the worst person I ever met. And as it turned out he was arrested for forgery, including for Robert Indiana."); 9/9/20 Tr. 22:7-9 ("I'm not really involved with criminals, and obviously Morgan and Simon are."); 9/9/20 Tr. 23:3-4 ("He [Simon] never paid either one of us, and he ducked us for the entire time."); 9/9/20 Tr. 24:2-4 ("It made [Simon] look like a liar, which is basically what he is."); 9/9/20 Tr. 50:23-51:3 ("And that was Robert Gore who apparently was then a CEO and also apparently is the guy who ripped off the Panama Papers guys that do the money laundering."); 9/9/20 Tr. 55:16-22 ("And also Melissa Hamilton who said, Simon is the worst person you could possibly know.  He pretends to be your friend, gets into your house and steals everything you own.  I was like, wow,

that's a lot of lying."); 9/9/20 Tr. 57:18-24 ("You assert that Morgan . . . [is] just a simple group of criminals using Indiana to launder dirty money with art sales. Did you make that statement?" "It seems to be the way it is."); 9/9/20 Tr. 59:17-23 ("We know that their beginning – their beginning, the man who funded Morgan was a fellow named Naggar, Guy Nagar, N-A-G-G-A-R. He apparently was taken down for pyramid scams similar to Bernie Madoff. I mean, there are so many things. And Bob constantly was coming up with how he was ripped off…"); 9/9/20 Tr. 61:23-62:17 ("Morgan are criminals. Anybody that's taking – laundering money, …" "And what evidence did you have that they're laundering money?" "The FBI report of the Panama Papers … you then do background on Mr. Gore . . . he . . . does money laundering as a professional . . . The Panama Papers are not some fiction of somebody on the internet. It's an FBI organization[.]"); 9/9/20 Tr. 69:4-9 ("Do you have any information that MAF is connected to drugs?" "The only information I have from the FBI is them telling me that most of the people that they tagged for the Panama Papers are connected either to drugs or guns."); 9/9/20 Tr. 69:20-24 ("the FBI explained what the Panama Papers were to me, because I had no idea what it was, and they in a nutshell said most of it was connected to trying to stop drugs and guns."); 9/9/20 Tr. 121:24-122:2 ("He said that Bob must have signed some contracts with Morgan, and he asserted they're crooks."); 9/9/20 Tr. 124:22-24 ("I don't know what he was doing with people that are listed as money launderers who don't pay him."); 9/9/20 Tr. 318:10-15 ("You said that Morgan and Simon are liars, thieves and crooks and you said you believed that to be true, correct?" "I believed that to be true from everything that Thomas, Frumer and Indiana told me.").)

He even went so far as to compare MAF's advisors to a snake. (*See, e.g.*, 9/9/20 Tr. 39:16-17 ("…one of the Salama-Caros slithered in…"); 9/9/20 Tr. 320:10-22 ("He also said that Simon got into his life by – after I gave him money in 2000 – or excuse me, 1995 to '07 is the first time

he made money, and he didn't file his taxes and Simon slithered up there with a yellow pad and got him to sign over *LOVE* by taking him to [sic] some accountant in Massachusetts – Mr. Black was his name, who then told him that the only way he could represent Indiana without Indiana going to jail forever was if Indiana gave him all the rights to *LOVE*, and that seemed kind of harsh.").)

### C.    MAF is a sham operation

He testified that MAF isn't even a real business, with its own office.  (*See, e.g.*, 9/9/20 Tr. 50:20-51:3 ("Knocked on the door of what was given as the Morgan Art Foundation's address, 11 Keates Place.  Answered the door.  Never heard of Morgan Art Foundation."); 9/9/20 Tr. 57:18-24 ("You assert that Morgan doesn't have a phone number, address, email, or website . . .?"  "It seems to be the way it is."); 9/9/20 Tr. 59:8-12 ("It was unlimited bad faith things on Morgan. You couldn't find anything about them.  Someone is trying to do a show, you can't contact them[.]"); 9/9/20 Tr. 106:6-108:10 (recounting a story of visiting MAF and how no one at the front desk in the building was familiar with it).)

### D.    MAF and its advisors cheated and stole from Indiana

He testified that MAF cheated Indiana by not paying him.  (*See, e.g.*, 9/9/20 Tr. 20:19-21:8 ("What are the issues that you have with Morgan Art Foundation?" "[A]ccording to Bob, [they] never paid him . . . he was being cheated . . . he wasn't allowed to do any work."); 9/9/20 Tr. 24:17-18 ("he knows [MAF and Simon are] ripping him off"); 9/9/20 Tr. 53:13-21 ("you're supposed to get four accountings a year, and 11 or 12 years into it you have none, and the only one you got has nothing to do with any of the art sales"); 9/9/20 Tr. 63:7-9 ("Jamie Thomas told me he went through all the books, and they hadn't received a dime from Morgan in seven years."); 9/9/20 Tr. 66:24-67:4 ("There's 1000 other things that Indiana said that were detrimental and bad about both Simon and Morgan and his son.  And, like I said, if I went over every one, we'll be

here until Saturday."); 9/9/20 Tr. 286:9-11 ("stop jacking around with some guy who doesn't know what he's doing, who's ripping him off left, right and center"); 9/9/20 Tr. 325:3-5 ("Well, Thomas said they were thieves, and that they hadn't paid for seven or eight years, which I was shocked by.").)

### E.    MAF's lead trial counsel is a liar

He testified that MAF's lead attorney is a liar and the source of various problems. (*See, e.g.*, 9/9/20 Tr. 42:6-11 ("[T]hose allegations were lies. They were fabricated by Mr. Nikas, who also claimed he was trying to save Robert Indiana's life. He never met Robert Indiana. How was he saving his life. So all of these things, to me, are all just lies, L-I-E-S."); 9/9/20 Tr. 42:22-43:5 ("I told you, the statement that Jamie Thomas was a killer was a lie. The statement that I was a forger was a lie. The statement that the two of us worked together to keep—whatever his name is—Simon Salama-Caro, if that's his real name, which we're not sure, to keep him off of the island, that's a lie."); 9/9/20 Tr. 74:19-25 ("Mr. Nikas went on board with some law magazine and said that Indiana was basically murdered and he was trying to save his life, which is the biggest lie you could possibly throw out there. He accused Jamie Thomas of being a murderer."); 9/9/20 Tr. 150:15-16 ("No. It was all parroting Mr. Nikas' lies from what I can tell."); 9/9/20 Tr. 192:10-11 ("Mr. Nikas was the one who created all the problems with BRAT.").)

### F.    Anyone who disagrees with McKenzie is a liar and/or drug addict

McKenzie used vulgar language and personally attacked anyone who disagreed with him. His two favorite insults: calling a person a liar or drug user. (*See, e.g.*, 9/9/20 Tr. 309:8 ("So ask me the fucking question."); 9/9/20 Tr. 239:18-21 ("Yeah. I didn't lie to her. She just wrote something that I don't really believe. She's a publicist, and publicists lie. That's what they do."); 9/9/20 Tr. 200:7-16 ("Again, your concern for the ex-employee that accused you of fraud publicly, notwithstanding, the question remains, did you earlier, just today, testify under oath that part of

the reason why she did it was because she was high . . .?"  "Yeah.  She smokes a lot of pot.  But then that's who she is.").)

### III.    MCKENZIE'S IMPROPER LEGAL CONCLUSIONS

Throughout his deposition, McKenzie testified that there is no copyright or trademark in *LOVE* because it is in the public domain.  And, by claiming otherwise, MAF is committing fraud.  (*See, e.g.*, 9/9/20 Tr. 28:3-11 ("You can take that contract and wipe your butt with it, because it had no validity whatsoever on Love . . . . Everyone in the world knows that, and everyone has seen – there are at least 1000 people making Love before Morgan ever touched it.  Morgan has no rights to Love.  They're liars."); 9/9/20 Tr. 288:13-22 ("Even if you were right and it were in the public domain . . . does that prevent Morgan from exclusively producing and selling it under the contract?"  "A hundred percent.  They're putting a copyright on it that they don't own, that they know they don't own it.  It's a fraudulent act."); 9/9/20 Tr. 328:12-21 ("[W]hat is your basis for saying that Morgan fraudulently procured the rights to *LOVE*, what is your evidence of that?"  "It's not about fraudulently procuring the rights.  There are no rights.  The rights are held by the public.  It's in public domain.  So when they sell the rights to *LOVE*, that is a fraudulent sale of a copyright they don't own."); 9/9/20 Tr. 25:22-26:2 ("Morgan Art owns the rights to Love, correct?"  "I don't know if you can use this word, bull, you know what the back end word is.  Love is in [the] public domain."); 9/9/20 Tr. 26:12-20 ("And they said, Mike, it's in public domain.  There are people making whistles and bells and T shirts for years, and Indiana never filed a copyright.  So Morgan's rights to Love is a joke, and they're going to go to hell and jail for licensing something that they know they couldn't license.  That's what's going to go down, so brace yourself."); 9/9/20 Tr. 27:15-20 ("And that contract only says what he owns, and he didn't own any rights to Love.  And he knew that and so did they because you can go over on Google for 15 seconds and you're going to find out who owns Love.  It's called all the people in the world.  It's free."); 9/9/20 Tr. 76:25-

77:3 ("I probably will because *LOVE* is public domain, and I'll start doing *LOVE* things pretty much immediately."); 9/9/20 Tr. 108:19-111:3 (says he had a financial backer who wanted to take *LOVE* public but decided against it because *LOVE* was in the public domain and could not be protected); 9/9/20 Tr. 156:14-15 ("*LOVE* is in the public domain.  That's what *LOVE* is.").)

### LEGAL STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*."  *Culley v. Edwards Mfg. Co. of Alberta Lea*, 2024 WL 5145565, at *1 (S.D.N.Y. Dec. 17, 2024) (quotation marks omitted).  "An *in limine* motion is intended to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Id.* (quotation marks omitted).  "Because a ruling on a motion *in limine* is subject to change as the case unfolds, this ruling constitutes a preliminary determination in preparation for trial."  *Id.* (quotation marks omitted).

"With certain exceptions, all relevant evidence is admissible, and evidence which is not relevant is not admissible."  *Id.* at *2 (citing Fed. R. Evid. 402).  "Evidence is relevant if 'it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action.'"  *Id.* (quoting Fed. R. Evid. 401).  "Relevant evidence may still be excluded by the Court 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"  *Id.* (quoting Fed. R. Evid. 403).  When making its decision, "the Court has "broad discretion to balance probative value against possible prejudice under Rule 403."  *Id.* (quotation marks and citation omitted).

<u>ARGUMENT</u>

I.  **THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY RELATED TO ISSUES OUTSIDE THE SCOPE OF THE LITIGATION**

The trial in this case will focus on (1) liability and damages on MAF's claim for copyright infringement, (2) liability and damages on its claim for trademark infringement under the Lanham Act, and (3) damages on its claim for tortious interference.  The scope of the trial should be limited to only these issues, and McKenzie should be prohibited from presenting any extraneous testimony or evidence.  *See, e.g.*, *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 296 n.3 (S.D.N.Y. 2009) (granting motion *in limine* to limit scope of trial to sole remaining issue in the case).  "Simply put, irrelevant evidence is unhelpful and inadmissible," and "raising . . . unrelated matter[s] . . .  creates a red herring that will encourage the jury to misread the issue[s] and the evidence."  *Culley v. Edwards Mfg. Co. of Alberta Lea*, 2024 WL 5145565, at *3 (S.D.N.Y. Dec. 17, 2024) (quotation marks and citation omitted).

*First*, with regard to MAF's claim for tortious interference, McKenzie should be limited to presenting only damages-related evidence and testimony.  *See, e.g.*, *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 16 (2d Cir. 1996) ("The only issue before the jury in this case was the issue of compensatory damages.   Only evidence relevant to that issue should have been admitted."); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 2009 WL 3111766, at *8 (S.D.N.Y. Sept. 28, 2009) ("The Court already has held that the scope of triable issues is limited solely to whether the Bondholders unreasonably failed to mitigate their consequential damages. Therefore, because Aristocrat does not proffer Mr. Bush's testimony for mitigation of damages, his testimony, whether live or by deposition, is not relevant under Federal Rule of Evidence 401 and, thus, not admissible under Federal Rule of Evidence 402.") (citations omitted).

*Second*, with regard to MAF's claims for copyright and trademark infringement, McKenzie should be prohibited from presenting any evidence or testimony that does not directly relate to liability or damages on those claims. *See, e.g.*, *United States v. Dupree*, 620 F. App'x 49, 54 (2d Cir. 2015) (affirming decision to exclude testimony "regarding conduct unrelated to th[e] case"); *Culley*, 2024 WL 5145565, at *3 ("As the basis of Plaintiff's remaining claims are tied to the issue of a potential rear guard, *not* the front guard, the Court finds that Plaintiff's purported comment regarding the front guard [is] not relevant to the instant action.") (emphasis in original); *Dotson v. City of Syracuse*, 2019 WL 6337326, at *3 (N.D.N.Y. Nov. 27, 2019) ("Defendants' Motion in Limine No. 1 is granted to the extent that Plaintiff is limited to presenting evidence relevant to her sole surviving claim[.]").

*Finally*, testimony and evidence related to McKenzie's counterclaims are off limits because they were dismissed. *See, e.g.*, *Gorbea v. Verizon New York, Inc.*, 2014 WL 2916964, at *2 (E.D.N.Y. June 25, 2014) ("claims that were dismissed or [already] determined . . . may not be tried, and evidence relating thereto may not be introduced at trial" and "will be excluded" because it is irrelevant); *Hamza v. Saks Fifth Ave., Inc.*, 2011 WL 6187078, at *7 (S.D.N.Y. Dec. 5, 2011) ("Any testimony and/or evidence relating to the plaintiff's previously dismissed disability discrimination claim is wholly irrelevant to any issue in contention in her current retaliatory discharge claim, and thus any evidence of Ms. Hamza's injury and/or disability, or of the defendant's animus toward her with regard to any injury or disability is hereby precluded from introduction at trial pursuant to Federal Rules of Evidence 401 and 402.").

## II. THE COURT SHOULD PROHIBIT MCKENZIE FROM USING PEJORATIVE TERMS OR PHRASES

McKenzie's deposition testimony was littered with vitriolic personal attacks. For example, he testified that Indiana's assistant is a dead junkie, MAF and its advisors are liars and criminals,

MAF is a sham operation, MAF and its advisors cheated and stole from Indiana, MAF's lead trial counsel is a liar, and several people who spoke out against him were liars and/or drug addicts. The Court should prevent him from making similar inflammatory remarks during the trial.

Such testimony is irrelevant and inadmissible under Rules 401 and 402 because it has nothing to do with any of the claims at issue or the material facts to be considered by the jury. Because the only reason McKenzie seeks to offer these and similar statements is to unfairly prejudice the jury against MAF and its witnesses by triggering an emotional response based on his hyperbolic insults, they also run headlong into Rule 403's prohibition on allowing evidence with probative value (none here) that is "substantially outweighed by the danger of" "unfair prejudice" and "misleading the jury."

Accordingly, Mckenzie should be prohibited from offering this type of testimony and evidence. *See, e.g.*, *Plew v. Ltd. Brands, Inc.*, 2012 WL 379933, at *2 (S.D.N.Y. Feb. 6, 2012) ("Defendants move to prevent Plew from using pejorative terms or phrases at trial. Courts may prohibit the use of pejorative terms under Federal Rule of Evidence 403 when such categorizations are inflammatory and unnecessary to prove a claim. The Court agrees that characterizing Victoria's Secret actions as 'stealing' risks prejudicing the jury and will not aid in its finding of facts. Accordingly, Defendants' motion is granted."); *Dollman v. Mast Indus., Inc.*, 2011 WL 3911035, at *4 (S.D.N.Y. Sept. 6, 2011) (excluding statement because it has "no relation to any issue in this case" and "can serve only to unfairly prejudice . . ., embarrass . . ., and draw the jury's attention away from the probative facts"); *Aristocrat Leisure Ltd.*, 2009 WL 3111766, at *7 (noting that "[t]his Court has prohibited the use of pejorative terms when such categorizations were inflammatory and unnecessary to prove a claim," granting motion *in limine* to prohibit party from

13

"making inflammatory remarks," and "caution[ing] the parties against using inflammatory terms and making derogatory statements that do not bear on the issues being tried").

## III.    THE COURT SHOULD PROHIBIT MCKENZIE FROM MAKING LEGAL CONCLUSIONS

In McKenzie's deposition, he repeatedly offered improper legal conclusions that should be excluded during the trial of this case.

In particular, McKenzie testified multiple times that there is no copyright or trademark in *LOVE* because it is in the public domain, and, by claiming otherwise, MAF is committing fraud. *See, e.g.*, *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 1994 WL 406103, at *5 (S.D.N.Y. July 29, 1994), *aff'd*, 55 F.3d 756 (2d Cir. 1995) ("entry of a work into the public domain is a question of law") (quotation marks omitted); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) (testifying that someone committed "fraud" constitutes a "legal conclusion[]"); *Rubinstein v. Music Sales Corp.*, 2021 WL 3374539, at *3 (S.D.N.Y. Aug. 3, 2021) (disallowing RFA because it "call[ed] for a legal conclusion" by asking whether a work was in the "public domain" and hence "could have been copied without infringement").

"[W]itnesses may not present testimony in the form of legal conclusions" because "[s]uch testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the witness's judgment for the jury's." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (cleaned up).  While "[t]he cases laying out this rule have focused on *expert* witnesses[,] . . . the impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer." *Id.* at 62 n.5 (emphasis in original); *see also Davis v. City of New York*, 959 F. Supp. 2d 427, 435 (S.D.N.Y. 2013) ("neither expert nor lay witnesses may present testimony in the form of legal conclusions") (quotation marks omitted).

In addition, such testimony should be excluded because Mckenzie's opinions on whether *LOVE* is subject to copyright/trademark protection and whether MAF has committed fraud (a claim

that is not even at issue in the case) is irrelevant and inadmissible under Rules 401 and 402. It is also foreclosed by Rule 403 because the non-existent probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury: McKenzie would, in essence, be directing the jury regarding which conclusion to reach. *See, e.g.*, *Cameron*, 598 F.3d at 62 (noting that "such testimony is subject to the general balancing rule of Rule 403").

Thus, the Court should preclude McKenzie from testifying regarding these and similar legal conclusions at trial. *See, e.g.*, *Moribe v. Am. Water Heater Co.*, 2024 WL 708562, at *1 (D. Haw. Feb. 21, 2024) (finding that "a lay witness may not testify as to legal conclusions" and ruling on a motion *in limine* that "[n]either expert witnesses nor lay witnesses may provide testimony to the jury as to the ultimate legal questions"); *MatconUSA LP v. Houston Cas. Co.*, 2022 WL 4242402, at *3 (W.D. Wash. Aug. 16, 2022) (ruling on a motion *in limine* that "[l]ay witnesses . . . may not testify as to legal conclusions such as the correct interpretation of a contract or the meaning of policy provisions").

## CONCLUSION

For the reasons above, the Court should grant MAF's motion *in limine* and (1) confine McKenzie's testimony and evidence to the scope of the claims actually being tried, (2) prohibit his inflammatory and pejorative rhetoric, and (3) preclude him from offering legal conclusions.

Dated: February 23, 2026                    Respectfully submitted,

                                            QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                            By:  /s/ Luke Nikas
                                                 Luke Nikas
                                                 Paul B. Maslo
                                                 Alex Lefkowitz
                                                 295 Fifth Avenue, 9th Floor
                                                 New York, New York 10016
                                                 Tel: (212) 849-7000
                                                 lukenikas@quinnemanuel.com
                                                 paulmaslo@quinnemanuel.com
                                                 alexlefkowitz@quinnemanuel.com

                                                 *Counsel for Morgan Art Foundation*

**C**ERTIFICATION OF **C**OMPLIANCE WITH **W**ORD **L**IMITATION

      I certify that the foregoing memorandum complies with the word limitation because it contains 5,012 words, as counted by Microsoft Word.

Dated: February 25, 2026

By:    <u>*/s/ Luke Nikas*</u>
        Luke Nikas

## CERTIFICATION OF MEET AND CONFER PROCESS

I certify that I met and conferred with opposing counsel on February 23, 2026, and the meet and confer process was unsuccessful.

February 25, 2026

By:    */s/ Luke Nikas*
Luke Nikas